IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

JOSE RODRIGUEZ,

                    Plaintiff,

                                              Civ. Action No.
          v.                                  9:10-CV-0734 (NAM/DEP)

N. SMITH, Nurse Administrator, Upstate
Correctional Facility,

                    Defendant.

_____

APPEARANCES:                    OF COUNSEL:

FOR PLAINTIFF:

JOSE RODRIGUEZ, *pro se*
82-A-4529
Upstate Correctional Facility
P.O. Box 2001
Malone, New York 12953

FOR DEFENDANT:

HON.  ERIC T. SCHNEIDERMAN        JUSTIN C. LEVIN, ESQ.
Attorney General                  Assistant Attorney General
State of New York
The Capitol
Albany, New York 12224

HON. DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

REPORT, RECOMMENDATION AND ORDER

          Plaintiff Jose Rodriguez, a New York State prison inmate who is

proceeding *pro se* and *in forma pauperis*, brings this action pursuant to 42 U.S.C § 1983, alleging that during the course of his confinement he has been deprived of his civil rights.  While difficult to decipher, when construed with the utmost generosity plaintiff's complaint appears to allege that defendant has been deliberately indifferent to and has failed to adequately treat his back pain.  As relief, plaintiff requests only an order authorizing an x-ray to ascertain the source of his back pain.

In response to plaintiff's complaint the defendant has moved for its dismissal for failure to state a claim upon which relief may be granted. Defendant also seeks dismissal based upon her lack of personal involvement in the violations alleged, as well as on the ground of qualified immunity.  After careful review of plaintiff's complaint in light of the arguments advanced by each party, for the reasons that follow, I recommend that defendant's motion be granted and that plaintiff's complaint be dismissed, though with leave to replead.

I.    BACKGROUND[1]

---

[1]    In light of the procedural posture of this case, the following recitation is drawn principally from plaintiff's amended complaint, the contents of which have been accepted as true for purposes of the pending motion.  *See Erickson v. Pardus,* 551 U.S. 89, 127 S. Ct. 2197, 2200 (2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1965 (2007)); *see also Cooper v. Pate*, 378 U.S. 546, 546, 84 S. Ct. 1733, 1734 (1964). While that amended complaint is the operative pleading and the

The plaintiff is a prison inmate entrusted to the care and custody of the New York State Department of Corrections and Community Supervision ("DOCCS") (formerly the New York State Department of Correctional Services, or the "DOCS"). *See generally* Amended Complaint (Dkt. No. 5) § 2. At all times relevant to his complaint, Rodriguez was housed within the Upstate Correctional Facility ("Upstate") located in Malone, New York.[2] *Id.* at § 2.

In or about August 2009, plaintiff was diagnosed by Dr. Patrick as having a "broken disc" in his back, a condition which plaintiff attributes to an assault occurring on April 4, 2004, during the time of his incarceration. Amended Complaint (Dkt. No. 5) at §§ 6-7. While it appears that since the assault occurred  Rodriguez has undergone several back x-rays over

─────────────────

object of defendants' motion, superceding all earlier filed complaints, *see Harris v. City of New York*, 186 F.3d 243,249 (2d Cir. 1999), plaintiff's initial complaint is also properly considered by the court when evaluating the plausibility of his claims, as is his response to defendant's motion, to the extent they support the allegations in his amended complaint. *Hale v. Rao*, No. 9:08-CV-1612, 2009 WL 3698420, at *3 n.8 (N.D.N.Y. Nov. 3, 2009) (Hurd, D.J. and Lowe, M.J.) ("[I]n cases where a *pro se* plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they are consistent with the allegations in the complaint.)

[2]    Upstate is a maximum security prison comprised exclusively of special housing unit ("SHU") cells in which inmates are confined, generally though not always for disciplinary reasons, for twenty-three hours each day. *See Samuels   v. Selsky*, No. 01 CIV. 8235, 2002 WL 31040370, at *4 n.11 (S.D.N.Y. Sept. 12, 2002).

the time, he claims that yet another back x-ray is necessary to ascertain the source of his back pain.  Amended Complaint (Dkt. No. 5) §§ 6-7. Plaintiff does not allege that his request for an additional x-ray was specifically denied by prison personnel; rather, he appears to be claiming that he has been waiting eight months to a year for approval of the requested back x-ray.  *Id.*  Plaintiff's amended complaint is unclear as to whether his doctor requested the administration of the x-ray, and whether the x-ray has been determined to be medically necessary.  *Id.*  In his complaint plaintiff expresses overall frustration at the inability of prison medical officials to diagnose and treat his ongoing back pain. *Id*.

As evidence of the seriousness of his back condition, plaintiff points to a medical examination conducted on January 27, 2011 by Dr. Adams, as a result of which the physician requested that the plaintiff undergo ultrasound testing.[3]  Plaintiff's Memorandum (Dkt. No. 15) pp. 9-10 and Exhibit.  Plaintiff does not allege that he was denied the suggested ultrasound testing, but proffers Dr. Adams' request as further evidence of the seriousness of his back condition.

While not readily apparent from his complaint, in addition to

---

[3]      That examination occurred after both commencement of this action and the filing of plaintiff's amended complaint.

plaintiff's claims with respect to his back pain and the failure of prison officials to order another back x-ray, he also appears to express concerns regarding two-week interruptions in his pain medication which occurred in December 2009, and again in June of 2010.[4],[5]   *See, e.g.,* Plaintiff's Memorandum of Law (Dkt. No. 15) pp. 8-9; *see also* Complaint (Dkt. No. 1) at pp. 3-4, ¶¶ 13-15.   On January 6, 2010, defendant Smith, a nurse administrator at Upstate,  responding to plaintiff's complaint regarding the first of those two delays in providing additional pain medication, admitted that his December 25, 2009 request was not filled due to a shortage in providers and two intervening holidays, but also advised Rodriguez that his December 31, 2009 request was filled.   Complaint (Dkt. No. 1) Attachment at p. 7(unnumbered).   Defendant Smith concluded her

---

[4]      It appears from plaintiff's submissions that his prescription for Ibuprofen 400 mg. may have been discontinued or suspended by prison medical officials, fearing that continued use of that particular prescription drug might result in liver damage to the plaintiff.  Plaintiff's Memorandum (Dkt. No. 15) pp. 9-10.

[5]      In his original complaint plaintiff also appears to allege that he was denied the prescription drugs Lipitor and Metoprotol, placing him at increased risk of suffering a heart attack. *See* Complaint (Dkt. No. 1) pp. 12-13 (unnumbered). Lipitor is the trademarked version of the generic medication atorvastian calcium. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1077 (31st ed. 2007).  Atorvastian calcium is an oral medication which acts to inhibit cholesterol synthesis in individuals with elevated cholesterol levels. *Id*. at 175.  Metoprolol tartrate is the generic formulation of Lopressor and is a cardioselective blocking agent that is used to treat hypertension and other conditions.  *Id*. at 1089, 1172.  Plaintiff does not reiterate this claim in his amended complaint.

response by reminding plaintiff that it takes at least five days in order to process refill requests. *Id.*

Plaintiff maintains that the delay in receiving the additional back x-ray and the denial of his medication is defendant Smith's responsibility in her capacity as a nurse administrator at Upstate.  Complaint (Dkt. No. 1) ¶¶ 4, 16-17, 19; *see also* Amended Complaint (Dkt. No. 5) § 7.  Plaintiff further alleges that defendant Smith is responsible for any treatment denials since all sick-call slips are sent to the nurse administrator's office for review.  Amended Complaint (Dkt. No. 5) § 7.

II.   PROCEDURAL HISTORY

Plaintiff's complaint, which is actually comprised of two nearly identical complaints, though dated earlier, were filed with the court on June 23, 2010.[6]  Complaint (Dkt. No. 1).  The first complaint (Dkt. No. 1 at 1-7) sets forth his claims against Nurse Administrator Smith; in his second complaint, (Dkt. No. 1 at 8-20), plaintiff names Mr. Baker, a nurse at Upstate, as a defendant.[7]  Upon initial review of plaintiff's complaint

---

[6]    Even though the original complaint is dated June 7, 2010, certain exhibits attached to the complaint bear later dates. *See, e.g.,* Dkt No. 1 at pp. 14-16 (grievance response dated 6/18/10).

[7]    These pleadings are referred to herein collectively as the "complaint."

pursuant to 28 U.S.C. § 1915A, on October 9, 2010, Senior District Judge

Thomas J. McAvoy granted plaintiff's request for *in forma pauperis* status,

but directed him to file an amended complaint within thirty days, noting

several deficiencies in the original pleading.  *See generally* Decision and

Order (Dkt. No. 4).  In his decision, *inter alia*, District Judge McAvoy found

that Rodriguez had failed to allege any acts of deliberate indifference on

the part of defendant Baker.[8]  *Id.*

Plaintiff filed an amended complaint on October 20, 2010, in

compliance with Senior District Judge McAvoy's order.  Amended

Complaint (Dkt. No. 5).  In his amended complaint, which names only

Nurse Administrator Smith as a defendant, plaintiff appears to assert a

claim of deliberate medical indifference, centering upon the failure of

prison officials to adequately treat his back condition and provide him with

an x-ray and pain medication.  *See generally, id.*  As relief, plaintiff

requests an order directing the defendant to authorize an additional x-ray

to assist in the diagnosis and treatment of his back condition, and

specifically disavows seeking recovery of monetary damages in the action.

---

[8]     The court notes that although all claims against Nurse Baker were dismissed by
virtue of Senior District Judge McAvoy's October 9, 2010 order, he  is named as a
defendant in a separate action commenced by the plaintiff in this court.  *See*
*Rodriguez v. Baker*, 9:10-CV-1122 (DNH/RFT).

*Id.* at § 8.

In response to plaintiff's complaint, on January 27, 2011, defendant moved for its dismissal pursuant to the Federal Rule of Civil Procedure 12(b)(6), challenging the sufficiency of plaintiff's allegations and arguing that they do not support a plausible Eighth Amendment claim.  Dkt. No. 14.  In support of her motion, defendant asserts that dismissal is warranted on the grounds that 1) the complaint fails to state a cognizable deliberate indifference claim; 2) she was not personally involved in plaintiff's medical care; and 3) she is entitled to qualified immunity.[9]  *Id.* Defendant's motion, which plaintiff has opposed, *see* Dkt. No. 15, is now ripe for determination and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c).  *See* Fed. R. Civ. P. 72(b).

III.    DISCUSSION

A.    Dismissal Motion Standard

_____

[9]    Defendant has also requested a protective order barring discovery pending resolution of the pending dismissal motion.  *Id.*

A motion to dismiss a complaint, brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading, utilizing as a backdrop a pleading standard which, though unexacting in its requirements, "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny.  *Ashcroft v. Iqbal*, ___ U.S. ___, ___, 129 S. Ct. 1937, 1949 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555, 127 S. Ct. 1955, (2007)).  Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  *Id.*  While modest in its requirement, that rule commands that a complaint contain more than mere legal conclusions; "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."  *Iqbal,* 129 S. Ct. at 1950.

To withstand a motion to dismiss, a complaint must plead sufficient facts which, when accepted as true, state a claim which is plausible on its face.  *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008) (citing *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974).  As the Second

Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.'" *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974).

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true and draw all inferences in favor of the non-moving party. *Cooper v. Pate*, 378 U.S. 546, 546, 84 S. Ct. 1723, 1734 (1964); *Miller v. Wolpoff & Abramson, LLP*, 321 F.3d 292, 300 (2d Cir. 2003), *cert. denied*, 540 U.S. 823, 124 S. Ct. 153 (2003); *Burke v. Gregory*, 356 F. Supp. 2d 179, 182 (N.D.N.Y. 2005) (Kahn, J.). However, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. *Iqbal*, 129 S. Ct. at 1949.  In the wake of *Twombly* and *Iqbal*, the burden undertaken by a party requesting dismissal of a complaint under Rule 12(b)(6) remains substantial; the question presented by such a motion is not whether the plaintiff is likely ultimately to prevail, "'but whether the claimant is entitled to offer evidence to support the claims.'" *Log On America, Inc. v.*

*Promethean Asset Mgmt. L.L.C.*, 223 F. Supp.2d 435, 441 (S.D.N.Y. 2001) (quoting *Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 673 (2d Cir. 1995)) (citations and quotations omitted).

When assessing the sufficiency of a complaint against this backdrop, particular deference should be afforded to a *pro se* litigant whose complaint merits a generous construction by the court when determining whether it states a cognizable cause of action. *Erickson*, 127 S. Ct. at 2200  (quoting *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S. Ct. 285, 292 (1976)) ("'[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'") (internal quotations omitted); *Davis v. Goord*, 320 F.3d 346, 350 (2d Cir. 2003) (citation omitted); *Donhauser v. Goord*, 314 F. Supp. 2d 119, 121 (N.D.N.Y. 2004) (Hurd, J.) (citation omitted).

B.    <u>Deliberate Medical Indifference</u>

Plaintiff alleges that defendant Smith was deliberately indifferent to his serious medical needs because others working under her supervision, including Nurse Baker, denied or delayed refills of his prescription medication, and because medical personnel at Upstate have failed to

11

arrange for a requested back x-ray.  In response to these assertions, defendant contends that plaintiff's complaint fails to set forth a plausible deliberate indifference cause of action, in that it does not show that he suffers from a medical condition sufficiently serious to implicate the Eighth Amendment, nor was she indifferent to any such need.

Claims that prison officials have intentionally disregarded an inmate's medical needs fall under the umbrella of protection from the imposition of cruel and unusual punishment afforded by the Eighth Amendment.  *Estelle,* 429 U.S. at 102, 104, 97 S. Ct. at 290, 291.  The Eighth Amendment prohibits punishment that involves the "unnecessary and wanton infliction of pain" and is incompatible with "the evolving standards of decency that mark the progress of a maturing society."  *Id.; see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S. Ct. 1078, 1084 (1986) (citing, *inter alia, Estelle).*  While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement.  *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S. Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S. Ct. 2392, 2400 (1981)).  To satisfy their obligations under the Eighth

Amendment, prison officials must "ensure that inmates receive adequate food, shelter, and medical care, and must take reasonable measures to guarantee the safety of inmates." *Farmer*, 511 U.S. at 832, 114 S. Ct. at 1976 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27, 104 S. Ct. 3194, 3200 (1984)) (internal quotations omitted).

A claim alleging that prison officials have violated the Eighth Amendment by inflicting cruel and unusual punishment must satisfy both objective and subjective requirements. *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009); *Price v. Reilly*, No. 07-CV-2634 (JFB/ARL), 2010 WL 889787, at *7-8 (E.D.N.Y. Mar. 8, 2010).[10]  Addressing the objective element, to prevail a plaintiff must demonstrate a violation sufficiently serious by objective terms, "in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996).  With respect to the subjective element, a plaintiff must also demonstrate that defendant had "the necessary level of culpability, shown by actions characterized by

_____

[10]     Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

'wantonness.'" *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999).

Claims of medical indifference are subject to analysis utilizing this Eighth

Amendment paradigm.  *See Salahuddin v. Goord,* 467 F.3d 263, 279-81

(2d Cir. 2006).

### 1.    Objective Requirement

Analysis of the objective, "sufficiently serious," requirement of an

Eighth Amendment medical indifference claim begins with an inquiry into

"whether the prisoner was actually deprived of adequate medical care . .

.", and centers upon whether prison officials acted reasonably in treating

the plaintiff.  *Salahuddin*, 467 F.3d at 279.  A second prong of the

objective test addresses whether the inadequacy in medical treatment

was sufficiently serious.  *Id*. at 280.  If there is a complete failure to

provide treatment, the court must look to the seriousness of the inmate's

medical condition.  *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir.

2003).  If, on the other hand, the complaint alleges that treatment was

provided but was inadequate, the seriousness inquiry is more narrowly

confined to that alleged inadequacy, rather than focusing upon the

seriousness of the prisoner's medical condition.  *Salahuddin*, 467 F.3d at

14

280.  "For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in treatment. . . [the focus of] the inquiry is on the challenged delay or interruption, rather that the prisoner's underlying medical condition alone."  *Id.* (quoting *Smith*, 316 F.3d at 185) (internal quotations omitted).  In other words, at the heart of the relevant inquiry is the seriousness of the medical need, and whether from an objective viewpoint the temporary deprivation was sufficiently harmful to establish a constitutional violation.  *Smith*, 316 F.3d at 186.  Of course, "when medical treatment is denied for a prolonged period of time, or when a degenerative medical condition is neglected over sufficient time, the alleged deprivation of care can no longer be characterized as 'delayed treatment', but may properly be viewed as a 'refusal' to provide medical treatment."  *Id.* at 186, n.10 (quoting *Harrison v. Barkley*, 219 F.3d 132, 137 (2d Cir. 2000)).

Since medical conditions vary in severity, a decision to leave a condition untreated may or may not raise constitutional concerns, depending on the circumstances.  *Harrison,* 219 F.3d at 136-37 (quoting, *inter alia, Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir. 1998)).

15

Relevant factors informing this determination include whether the plaintiff suffers from an injury or condition that a "'reasonable doctor or patient would find important and worthy of comment or treatment'", a condition that "'significantly affects'" a prisoner's daily activities, or "'the existence of chronic and substantial pain.'" *Chance,* 143 F.3d at 702 (citation omitted); *Lafave v. Clinton County,* No. CIV. 9:00CV774, 2002 WL 31309244, at *3 (N.D.N.Y. Apr. 3, 2002) (Sharpe, M.J.) (citation omitted).

In this instance, plaintiff alleges that he has been diagnosed with a "broken disc" in his back following a prison assault. "Depending upon the facts presented, severe back pain, especially if lasting an extended period of time . . . may qualify as a serious medical need[]'under the Eighth Amendment." *Benjamin v. Kooi*, No. 9:07-CV-0506, 2010 WL 985844, at * 7 (N.D. N.Y. Feb. 25, 2010) (Homer, M.J.) (citing and quoting *Mendoza v. McGinnis*, No. 05-CV-1124, 2008 WL 4239760 at *10 & n.16 (N.D.N.Y. Sept. 11, 2008)); *see also Guarneri v. Hazzard,* No. 06-CV-0985, 2008 WL 552872, at *6 (N.D.N.Y. Feb. 27, 2008) (Mordue, C.J. and Homer, M.J.) (holding that severe back pain, especially if long-lasting, can amount to a serious medical need); *Faraday v. Lantz,* No. 03-CV-1520, 2005 WL

16

3465846, at *5 (D. Conn. Dec. 12, 2005) (holding that persistent complaints of "lower back pain caused by herniated, migrated discs [and] sciatica ..." leading to severe pain constitute a serious medical need); *Nelson v. Rodas*, No. 01-CV-7887 (RCC/AJP), 2002 WL 31075804, at *14 (S.D.N.Y. Sept.17, 2002) (holding that "[s]evere back pain, especially if lasting an extended period of time, can amount to a serious medical need").  Plaintiff's allegations regarding his back condition are therefore sufficient to plausibly satisfy the first portion of the objective requirement under the Eighth Amendment.  *See Rhames v. Federal Bureau of Prisons*, No. 00 CIV. 4338AKH, 2002 WL 1268005, at *7 (S.D.N.Y. June 6, 2002).

Analysis of the objective prong also requires a second inquiry, under which the treatment provided to the plaintiff for his back condition is examined.  In this instance it is clear from his pleadings that Rodriguez has received treatment including x-rays as well as pain medication.  Plaintiff's pain medication claim is focused not upon a failure to treat, but rather upon two delays of modest duration – for two weeks in June 2010 and two weeks over Christmas vacation in December 2009 – in providing prescribed pain medication.  *See* Complaint (Dkt. No. 1) at p. 2, ¶¶ 13-15

17

and p. 7.  Such minor and inconsequential delays are insufficient to satisfy the objective prong of the Eighth Amendment deliberate indifference test, and are not properly characterized as a constitutionally significant "refusal" to provide medical treatment.  *See De Jesus v. Albright*, No. 08 Civ. 5804(DLC), 2011 WL 814838, at * (S.D.N.Y. Mar. 9, 2011) (citing *Smith*, 316 F.3d at 186).

Similarly, the alleged refusal or delay in providing an x-ray, given that by his own admission has undergone previous back x-rays, fails to satisfy the objective prong of the controlling test and represent a refusal to provide treatment; instead, this portion of plaintiff's claims presents nothing more than a classic disagreement over a course of diagnosis and treatment which is not actionable under the Eighth Amendment.  *Lewis v. Johnson*, No. 9:08-CV-482, 2010 WL 3785771, at * 18 (N.D.N.Y. Aug. 5, 2010) (Baxter, M.J.) ("Disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment.") (citing *Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 311 (S.D.N.Y. 2001)), *report and recommendation*

18

*adopted*, 2010 WL 3762016 (Apr. 1, 2010) (McAvoy, S.J.).  I therefore recommend dismissal of plaintiff's deliberate indifference claims for failure to meet the objective prong of the controlling test.

### 2.    Subjective Element

Turning to the second, subjective requirement for establishing an Eighth Amendment medical indifference claim, I conclude that the plaintiff has not alleged facts sufficient to show that defendant Smith acted with a sufficiently culpable state of mind.  The second prong of the test mandates a showing of deliberate indifference on the part of one or more of defendants.  *Salahuddin*, 467 F.3d at 280 (citing *Wilson v. Seiter*, 501 U.S. 294, 300, 111 S. Ct. 2321, 2325 (1991)).  Deliberate indifference, in a constitutional sense, exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S. Ct. at 1979; *Leach v. Dufrain,* 103 F. Supp. 2d 542, 546 (N.D.N.Y. 2000) (Kahn, J.) (citing *Farmer*); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998)

19

(Kahn, J. and Homer, M.J.) (same).  Deliberate indifference is a mental state equivalent to subjective recklessness as the term is used in criminal law.  *Salahuddin*, 467 F.3d at 280 (citing *Farmer,* 511 U.S. at 839-40, 114 S. Ct. 1970).

Mere negligence on the part of a physician or other prison medical official in treating or failing to treat a prisoner's medical condition, on the other hand, does not implicate the Eighth Amendment and is not properly the subject of a section 1983 action.  *Estelle,* 429 U.S. at 105-06, 97 S. Ct. at 292; *Chance,* 143 F.3d at 703.  "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."  *Estelle,* 429 U.S. at 106, 97 S. Ct. at 292.  Thus, for example, a physician who "delay[s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not exhibit the mental state necessary for deliberate indifference.  *Harrison,* 219 F.3d at 139.  If prison officials consciously delay or otherwise fail to treat an inmate's serious medical condition "as punishment or for other invalid reasons," however, such conduct is actionable as deliberate indifference.  *Harrison,* 219 F.3d at 138;  *Kearsey v. Williams,* No. 99 Civ 8646, 2005 WL 2125874, at *5

(S.D.N.Y. Sep. 1, 2005).

Plaintiff's complaint lacks any factual allegations plausibly demonstrating that defendant Smith was deliberately indifferent to his serious medical needs.  Plaintiff has not alleged that defendant Smith refused to provide him with the proper and necessary medical treatment for his back pain.  Instead, Rodriguez contends that he continues to await a decision as to whether to approve a requested back x-ray, without identifying the actual decisionmakers, not that medically necessary back x-rays were denied by defendant Smith.  Additionally, plaintiff has not alleged any facts demonstrating that the delay in approval exposed him to an excessive risk of harm of which defendant Smith was or reasonably should have been aware; there are no allegations in plaintiff's complaint that his condition has deteriorated, or that his pain has substantially increased and interfered with his ability to performed daily activities while awaiting further treatment.

Since defendant Baker was previously dismissed from this action, plaintiff's sole allegation with respect to his pain medication is that he did not receive refills of his pain medication in a timely manner.  While the

21

pertinent chronology is not clearly stated, it appears that two delays, each of a two-week duration, are implicated in this portion of plaintiff's deliberate indifference claim.   Such a claim is substantially deficient in that plaintiff's complaint fails to show subjectively that defendant Smith acted intentionally or was aware that the delays in providing pain medication refills would expose Rodriguez to an excessive risk to his health.  *Baskerville v. Blot,* 224 F. Supp. 2d 723, 735-36 (S.D.N.Y. 2002) (holding that delay in receipt of prescription refills is insufficient to give rise to an Eighth Amendment claim of medical indifference) (citation omitted). It appears that, rather than being intentional, the delay in providing refills is attributable at least in part to untimely requests by the plaintiff, defendant Smith having responded to plaintiff's prison complaint by advising him that he needed to request refills in a timely manner to ensure that there were no lapses in his medication.

In sum, plaintiff's complaint is devoid of any allegations suggesting that Nurse Smith, the sole remaining defendant, knew of and disregarded an excessive risk to plaintiff's health or safety. I therefore recommend that the court find that plaintiff's complaint fails to allege a plausible Eighth

Amendment deliberate medical indifference cause of action since plaintiff

has not alleged sufficient facts to satisfy the subjective prong of the

governing test.  S*ee Young v. Coughlin*, No. 93 Civ. 262 DLC, 1998 WL

32518, at *4-7 (S.D.N.Y. 1998), *aff'd*, 182 F.3d 902 (2d Cir. 1999).

C.    Personal Involvement

Defendant Smith's motion also seeks dismissal of plaintiff's claims

against her on the ground that plaintiff's complaint fails to allege a

sufficient degree of involvement on her part in the constitutional

deprivations alleged to support a finding of liability against her.[11]

Personal involvement of defendants in alleged constitutional

deprivations is a prerequisite to an award of damages under section 1983.

*Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of*

*Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991) and *McKinnon v. Patterson,*

568 F.2d 930, 934 (2d Cir. 1977), *cert. denied*, 434 U.S. 1087, 98 S. Ct.

1282 (1978)).  In order to prevail on a section 1983 cause of action

against an individual, a plaintiff must show some tangible connection

---

[11]    While this is raised as an independent ground for dismissal there clearly is considerable overlap between the arguments supporting this point and defendant's contention that plaintiff has not met the subjective prong of the controlling Eighth Amendment test.

between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

Plaintiff alleges that Nurse Baker denied plaintiff access to pain medication and that defendant Smith had actual knowledge of the denial. He also appears to contend that as a nurse administrator it was defendant's responsibility to authorize and arrange for the requested x-ray.  Plaintiff has not, however, alleged any facts showing that Nurse Administrator Smith was directly involved in his treatment.  Instead, it appears likely that plaintiff has named defendant Smith as a defendant based principally upon her supervisory position as a nurse administrator at Upstate.  Amended Complaint. (Dkt. No. 5) at  ¶ 7 ("she have this responsibility following her code as administrator.").

It is well-established that a supervisor such as the defendant cannot be liable for damages under section 1983 solely by virtue of being a supervisor; there is no *respondeat superior* liability under section 1983. *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003); *Wright*, 21 F.3d at 501.  Instead, culpability on the part of a supervisory official for a civil rights violation must be established in one of several ways, including by

showing that the individual 1) has directly participated in the challenged

conduct; 2) after learning of the violation through a report or appeal, has

failed to remedy the wrong; 3) created or allowed to continue a policy or

custom under which unconstitutional practices occurred; 4) was grossly

negligent in managing the subordinates who caused the unlawful event; or

5) failed to act on information indicating that unconstitutional acts were

occurring.[12]  *Iqbal v. Hasty*, 490 F.3d 143, 152-53 (2d Cir. 2007), *rev'd on

other grounds sub nom.*, *Ashcroft v. Iqbal*, ___ U.S. ___,129 S. Ct. 1937

(2009); *see also Richardson*, 347 F.3d at 435; *Colon v. Coughlin,* 58 F.3d

---

[12]     The issue of supervisory liability for civil rights violation was addressed by the Supreme Court recently in its decision in *Ashcroft*,  129 S. Ct. 1937.  The Second Circuit has yet to address the impact of  *Iqbal* upon the categories of supervisory liability under *Colon*.  Lower courts have struggled with this issue, and specifically whether *Iqbal* effectively calls into question certain prongs of the *Colon* five-part test for supervisory liability.  *See Sash*, 674 F. Supp. 2d at 542-544; *see also Stewart v. Howard*, No. 9:09-CV-0069 (GLS/GHL), 2010 WL 3907227, at *12 n.10 (N.D.N.Y. Apr. 26, 2010) ("The Supreme Court's decision in [*Iqbal*] arguably casts in doubt the continued vitality of some of the categories set forth in *Colon.*") (citations omitted), *report and recommendation adopted*, 2010 WL 3907137 (Sept. 30, 2010) .  While some courts have taken the position that only the first and third of the five *Colon* categories remain viable and can support a finding of supervisory liability, *see, e.g., Bellamy v. Mount Vernon Hosp.*, No. 07 CIV. 1801, 2009 WL1835939, at *6 (S.D.N.Y. June 26, 2009), *aff'd*, 387 Fed. App'x 55 (2d Cir. 2010), others disagree and conclude that whether any of the five categories apply in any particular case depends upon the particular violations alleged and the supervisor's participatory role, *see, e.g., D'Olimpio v. Crisafi*, Nos. 09 Civ. 7283 (JSR), 09 Civ. 9952 (JSR), 2010 WL 2428128, at *5 (S.D.N.Y. Jun. 15, 2010); *Qasem v. Toro*, No. 09 Civ. 8361 (SHS), 2010 WL 3156031, at *4 (S.D.N.Y. Aug. 10, 2010).

865, 873 (2d Cir. 1995); *Wright*, 21 F.3d at 501.

Defendant Smith's review and response to plaintiff's complaints and grievances could arguably bring her squarely within the second of the five potential grounds under *Colon* and *Iqbal* for establishing personal involvement on the part of a supervisory employee.   Some courts have held that personal liability against a supervisor with no direct involvement in the offending conduct may nonetheless lie where a "supervisor's 'involvement went beyond merely the receipt of complaint letters,' to 'responding, explaining the treatment and defending the institution.'" *Woods v. Goord*, No. 01 Civ. 3255 (SAS), 2002 U.S. Dist LEXIS 7157, at *27-31, 2002 WL 731691, at *7-9 (S.D.N.Y. Apr. 23, 2002) (Schendlin, J.) (internal citations omitted); *see also Baez v. Harris,* No. 9:01-CV-807, 2007 WL 446015, at *2 (N.D.N.Y. Feb. 7, 2007) (Mordue, C.J.) (fact that defendant Selsky responds personally to all disciplinary appeals by inmates found sufficient to withstand summary judgment motion based on lack of personal involvement)*; Rashid v. Hussain*, No. 95- Civ. 676, 1997 U.S. Dist. LEXIS 16132, at *9-10, 1997 WL 642549, at *3 (N.D.N.Y. Oct. 15, 1997) (Pooler, J.).  This basis for finding supervisory liability does not

apply in this case, however, since by the time defendant responded to plaintiff's grievance regarding prescription medication on January 6, 2010 it appears the prescription had been written, and plaintiff should have received medication; thus the violation was not ongoing, and the defendant therefore could not have intervened to end the violation. *Reid v. Bezio*, No. 9:10-CV-609,  2011 WL 1577761, at * 7 (N.D.N.Y. Mar. 30, 2011) (Homer, M.J.) (citing *Shomo v. City of New York*, 579 F.3d 176, 184 (2d Cir. 2009) and *Harnett v. Barr*, 538 F. Supp. 2d 511, 524 (N.D.N.Y. 2008)), *report and recommendation adopted*, 2011 WL 1585067 (Apr.  26, 2011) (Mordue, C.J.).

Drawing all inferences and resolving all ambiguities in plaintiff's favor, I conclude that plaintiff has not sufficiently alleged defendant Smith's personal involvement in any constitutional violation relating to the delay in refilling his prescription medication, or delay in providing an x-ray to withstand defendant's dismissal motion. *See Charles v. N.Y. State Dep't of Corr. Servs.*, No. 9:07-CV-1274, 2009 WL 890548, at *5-9 (N.D.N.Y. Mar. 21, 2009) (Hurd, J. and DiBianco, M.J.).  As such, I recommend that plaintiff's deliberate indifference claim also be dismissed

27

on the ground that defendant was not personally involved in the conduct giving rise to his claim.

> D.   <u>Leave to Amend</u>

In light of my recommendation that plaintiff's complaint be dismissed for failure to allege a plausible Eighth Amendment deliberate indifference cause of action, I next consider whether, in light of his *pro se* status, he should be allowed to file an amended complaint in an effort to cure perceived deficiencies by restating the deficient claims and asserting additional facts demonstrating the existence of plausible constitutional claims.

Ordinarily, a court should not dismiss a complaint filed by a *pro se* litigant without granting leave to amend *at least* once if there is any indication that a valid claim might be stated. *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir.1991) (emphasis added); *see also* Fed. R. Civ. P. 15(a) (leave to amend "shall be freely given when justice so requires"); *see also Mathon v. Marine Midland Bank, N.A.,* 875 F.Supp. 986, 1003 (E.D.N.Y.1995) (leave to replead granted where court could not say that under no circumstances would proposed claims provide a basis for relief).

28

The court must next determine whether plaintiff is entitled to the benefit of this general rule, given the procedural history of the case.

Although plaintiff has been given the opportunity to amend his complaint once, based upon the scant and difficult-to-decipher pleading that is now before the court, I am unable to conclude with complete confidence that plaintiff cannot possibly allege the existence of a viable constitutional claim based upon the circumstances that he has set forth in his original complaint and amended complaint.  Accordingly, I recommend that plaintiff be granted one final opportunity to amend his complaint.

Plaintiff is reminded, however, that the law in the Second Circuit clearly provides that "complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning."  *Hunt v. Budd*, 895 F. Supp. 35, 38 (N.D.N.Y. 1995) (McAvoy, C.J.) (citing *Barr v. Abrams*, 810 F.2d 358, 363 (2d Cir. 1987) (other citations omitted)); *Pourzandvakil v. Humphry*, No. 94-CV-1594, 1995 U.S. Dist. LEXIS 7136, at *24-25 (N.D.N.Y. May 22, 1995) (Pooler, D.J.) (citation omitted).  In his amended complaint, plaintiff

therefore should clearly set forth the facts, including the wrongful acts that give rise to the claim, the dates, times and places of the alleged acts, and the identity of each individual who committed each alleged wrongful act. Such an amended complaint must replace the existing second amended complaint, must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the court, *see Harris v. City of N.Y.*, 186 F.3d 243, 249 (2d Cir. 1999) (citing *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)); Fed. R. Civ. P. 10(a), and should specifically allege facts indicating the involvement of  the named defendant in the constitutional deprivations alleged in sufficient detail to establish the they were tangibly connected to those deprivations.  *See Bass,* 790 F.2d at 263.

   F.    Protective Order

   Defendant also moves pursuant to Rule 26(c)(1) of the Federal Rules of Civil Procedure for a protective order staying discovery pending the resolution of defendant's motion to dismiss.  That rule provides, in relevant part, that

> [a] party or any person from whom discovery is sought may
> move for a protective order in the court where the action is
> pending . . . The Court may, for good cause, issue an order to
> protect a party or person from annoyance, embarrassment,
> oppression, or undue burden or expense, including one or
> more of the following: (A) forbidding the disclosure or
> discovery.

Fed. R. Civ. P. 26(c)(1); *see also, Spencer Trask Software and Information Services, LLC v. RPost Intern. Ltd.*, 206 F.R.D. 367, 368 (S.D.N.Y. 2002) (granting stay of discovery pending determination of motion to dismiss where court found defendants presented "substantial arguments" for dismissal of many if not all of the claims in the lawsuit); *United States v. County of Nassau*, 188 F.R.D. 187, 188-89 (E.D.N.Y. 1999) (granting stay of discovery during the pendency of a motion to dismiss where the "interests of fairness, economy and efficiency . . . favor[ed] the issuance of a stay of discovery,"  and where the plaintiff failed to claim prejudice in the event of a stay.).

In light of my recommendation that the court dismiss plaintiff's complaint with leave to amend, I find that good cause exists for issuing an order to protect the defendant from the burden of discovery until the court acts upon this report and, if adopted, until plaintiff files an amended

complaint that is accepted for filing by the court, the defendant responds

to the amended complaint, and the court issues its standard pretrial

scheduling order pursuant to Rule 16 of the Federal Rules of Civil

Procedure.

## IV.   SUMMARY AND RECOMMENDATION

Plaintiff's Eighth Amendment cause of action, which alleges

deliberate medical indifference premised on delays he has experienced in

receiving medical treatment while incarcerated at Upstate, falls short of

alleging sufficient facts showing that prison medical personnel were

deliberately indifferent to his serious medical needs, and that defendant

Smith was personally involved in the constitutional deprivation alleged.[13]

As such, I am recommending that plaintiff's claim of deliberate medical

indifference be dismissed although in deference to his *pro se* status, I also

recommend that he be given one final opportunity to amend his complaint

to eliminate the perceived substantive shortcomings.

Based upon the foregoing discussion, it is hereby respectfully

---

[13]   In view of my recommendations on the merits, I have not addressed defendant's alternative claim that she is entitled to a defense of qualified immunity.

RECOMMENDED that defendant's motion to dismiss plaintiff's amended complaint (Dkt. No. 5) be GRANTED, and that plaintiff's complaint in this action be DISMISSED, with leave to replead; and it is further

RECOMMENDED that plaintiff be afforded thirty days from any decision adopting this report and recommendation to file an amended complaint, and that in the event that plaintiff fails to timely file an amended complaint the action be DISMISSED with no further action by the court.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the Clerk of the Court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; and it is further

ORDERED, that pending a final determination in connection with the instant motion and the submission of an amended complaint which is accepted for filing with the court, defendant's submission of a response to that amended complaint, and the issuance by the court of its standard

Rule 16 pretrial scheduling order, discovery in this action is STAYED; and

it is further

ORDERED that the clerk of the court serve a copy of this report and

recommendation upon the parties in accordance with this court's local

rules.

_____

David E. Peebles
U.S. Magistrate Judge


Dated:      August 19, 2011
            Syracuse, NY



Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
John HALE, Plaintiff,
v.
Jadow RAO; J. Ireland; Mack/s/Revell; R. Furnia; J.
Silver; John Doe # 1; John Doe # 2; Jane Doe # 1; Jane
Doe # 2; Jane Doe # 3; and Jane Doe # 4, Defendants.
**No. 9:08-CV-612.**

Nov. 3, 2009.

John Hale, Alden, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of
New York, Richard Lombardo, Esq., Asst. Attorney
General, of Counsel, Albany, NY, for Defendants.

### *DECISION and ORDER*

DAVID N. HURD, District Judge.

**\*1** Plaintiff, John Hale, brought this civil rights action in
March 2008, pursuant to 42 U.S.C. § 1983. By
Report-Recommendation dated September 29, 2009, the
Honorable George H. Lowe, United States Magistrate
Judge, recommended that defendants' motions to dismiss
(Docket No. 27) be granted in part and denied in part as
follows: (1) the motion to dismiss should be granted to the
extent that plaintiff asserts claims for money damages
against defendants in their official capacities; and (2) the
motion should be denied to the extent that defendants
moved to dismiss plaintiff's Eighth Amendment claim
against defendant Rao, and moved to dismiss the
complaint against defendant Rao on the ground of
qualified immunity. The Magistrate Judge further
recommended that the motion to dismiss for failure to

prosecute, or in the alternative for an order compelling
plaintiff's responses (Docket No. 36), be denied. No
objections to the Report-Recommendation have been filed.

Based upon a careful review of the entire file and the
recommendations of Magistrate Judge Lowe, the
Report-Recommendation is accepted and adopted in all
respects. *See* 28 U.S.C. 636(b) (1).

Accordingly, it is

ORDERED that

1. Defendants' motion to dismiss (Docket No. 27) is
GRANTED IN PART and DENIED IN PART;

    a. The motion to dismiss is GRANTED to the extent
    that plaintiff asserts claims for money damages against
    defendants in their official capacities; and

    b. The motion is DENIED to the extent that
    defendants moved to against defendant Rao on the
    ground of qualified immunity;

2. Defendants' motion to dismiss for failure to prosecute,
or in the alternative, for an order compelling plaintiff's
responses (Docket No. 36) is DENIED;

3. This matter is referred back to the Magistrate Judge for
any further proceedings.

IT IS SO ORDERED.

### *REPORT-RECOMMENDATION AND ORDER*

GEORGE H. LOWE, United States Magistrate Judge.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

This *pro se* prisoner civil rights action, filed pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c) of the Local Rules of Practice for this Court.

Currently pending is a Motion to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(c), seeking dismissal of the complaint in its entirety against Defendant Dr. Jadow Rao and against Defendants J. Ireland, R. Furnia, Mack Reyell, J. Silver, and Rao in their official capacities. Dkt. No. 27. Plaintiff opposes the motion. Dkt. Nos. 39, 41.

Also pending is a Motion to Dismiss for Lack of Prosecution pursuant to Fed.R.Civ.P. 41(b) or, in the alternative, for an Order compelling Plaintiff to respond to paragraphs I(A)(1)(b) and (c) of the Court's Mandatory Pretrial Discovery and Scheduling Order. Dkt. No. 36. Plaintiff opposes the motion. Dkt. Nos. 39, 41.

For the reasons discussed below, I recommend that the Motion to Dismiss pursuant to Fed.R.Civ.P. 12(b)(6) and 12(c) be granted, in part, and denied, in part. I also recommend that the Motion to Dismiss for Lack of Prosecution pursuant to Fed.R.Civ.P. 41(b) or, in the alternative, for an Order compelling Plaintiff's responses be denied.

## I. MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6) AND 12(c)

### A. BACKGROUND

**\*2** Plaintiff John Hale alleges that eleven employees ("Defendants") of the New York State Department of Correctional Services ("DOCS") violated his rights under the Eighth Amendment when (1) in or around May of 2006, Defendants Ireland, Revell, Furnia, and Silver physically assaulted and injured him without provocation at Clinton Correctional Facility ("C.F."), and (2) between May of 2006 and February of 2008, the remaining seven Defendants (Dr. Rao, John Does 1-2, and Jane Does 1-4)

were deliberately indifferent to his resulting serious medical needs at Clinton, Southport, Elmira and Attica C.F.s. Complaint at ¶¶ 16-27.

Plaintiff states that he has exhausted his administrative remedies. Complaint at ¶ 29. Plaintiff has submitted copies of decisions from the Central Office Review Committee of the Inmate Grievance Program. Dkt. No. 5, Exhibits. Plaintiff also included a copy of a decision from the Superintendent of Attica C.F. *Id.*

### B. LEGAL STANDARD GOVERNING MOTIONS TO DISMISS

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). It has long been understood that a defendant may base such a motion on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Federal Rule of Civil Procedure 8(a)(2); [FN1] or (2) a challenge to the legal cognizability of the claim.[FN2]

> FN1. *See* 5C Wright & Miller, *Federal Practice and Procedure* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a)(2).") (citations omitted); *Princeton Indus., Inc. v. Rem,* 39 B.R. 140, 143 (Bankr .S.D.N.Y.1984) ("The motion under F.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint as to whether the plaintiff has conformed to F.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement' that the pleader is entitled to relief."); *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972) ("This motion under Fed.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement that the pleader is entitled to relief.' ").

> FN2. *See Swierkiewicz v. Sorema N.A.,* 534 U.S.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

506, 514 (2002) ( "These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest.... In addition, they state claims upon which relief could be granted under Title VII and the ADEA."); *Wynder v. McMahon,* 360 F.3d 73, 80 (2d Cir.2004) ("There is a critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas,* 308 F.3d 180, 187 (2d Cir.2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation ... fails as a matter of law.") (citation omitted); *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000) (distinguishing between a failure to meet Rule 12(b)(6)'s requirement of stating a cognizable claim and Rule 8(a)'s requirement of disclosing sufficient information to put defendant on fair notice); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 379 F.Supp.2d 348, 370 (S.D.N.Y.2005) ("Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim [under Rule 12(b)(6) ].") (citation omitted); *accord, Straker v. Metro Trans. Auth.,* 331 F.Supp.2d 91, 101-102 (E.D.N.Y.2004).

Rule 8(a)(2) requires that a pleading contain "a short and plain statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) (emphasis added). By requiring this "showing," Rule 8(a)(2) requires that the pleading contain a short and plain statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." [FN3] The main purpose of this rule is to "facilitate a proper decision on the merits." [FN4] A complaint that fails to comply with this rule "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." [FN5]

FN3. *Dura Pharm., Inc. v. Broudo,* 125 S.Ct. 1627, 1634 (2005) (holding that the complaint failed to meet this test) (citation omitted; emphasis added); *see also Swierkiewicz,* 534 U.S. at 512 [citation omitted]; *Leatherman v.*

*Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168 (1993) (citation omitted).

FN4. *Swierkiewicz,* 534 U.S. at 514 (quoting *Conley,* 355 U.S. at 48); *see also Simmons v. Abruzzo,* 49 F.3d 83, 86 (2d Cir.1995) ("Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial.") (citation omitted); *Salahuddin v. Cuomo,* 861 F .2d 40, 42 (2d Cir.1988) ("[T]he principle function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial.") (citations omitted).

FN5. *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Technol., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 (2d Cir.1996)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 556-57, 570 (2007)). Accordingly, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

alleged-but has not *shown*-that the pleader is entitled to relief." *Iqbal,* 129 S.Ct. at 1950 (emphasis added).

**\*3** It should also be emphasized that, "[i]n reviewing a complaint for dismissal under Fed.R.Civ.P. 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." FN6 "This standard is applied with even greater force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se.* "FN7 In other words, while all pleadings are to be construed liberally under Rule 8(e), *pro se* civil rights pleadings are to be construed with an *extra* degree of liberality.

> FN6. *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) (citation omitted); *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

> FN7. *Hernandez,* 18 F.3d at 136 (citation omitted); *Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003) (citations omitted); *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d Cir.1999) (citation omitted).

For example, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint. FN8 Moreover, "courts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest." FN9 Furthermore, when addressing a *pro se* complaint, *generally* a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." FN10 Of course, an opportunity to amend is not required where the plaintiff has already amended his complaint. FN11 In addition, an opportunity to amend is not required where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it." FN12

FN8. "Generally, a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum." *Gadson v. Goord,* 96-CV-7544, 1997 WL 714878, at \*1, n. 2 (S.D.N.Y. Nov. 17, 1997) (citing, *inter alia, Gil v. Mooney,* 824 F.2d 192, 195 (2d Cir.1987) (considering plaintiff's response affidavit on motion to dismiss)). Stated another way, "in cases where a pro se plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they 'are consistent with the allegations in the complaint.' " *Donhauser v. Goord,* 314 F.Supp.2d 119, 212 (N.D.N.Y.2004) (considering factual allegations contained in plaintiff's opposition papers) (citations omitted), *vacated in part on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004). This authority is premised, not only on case law, but on Rule 15 of the Federal Rules of Civil Procedure, which permits a plaintiff, as a matter of right, to amend his complaint once at any time before the service of a responsive pleading-which a motion to dismiss is not. *See Washington v. James,* 782 F.2d 1134, 1138-39 (2d Cir.1986) (considering subsequent affidavit as amending *pro se* complaint, on motion to dismiss) (citations omitted).

FN9. *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (finding that plaintiff's conclusory allegations of a due process violation were insufficient) (internal quotation and citation omitted).

FN10. *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal quotation and citation omitted); *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

FN11. *Yang v. New York City Trans. Auth.,* 01-CV-3933, 2002 WL 31399119, at \*2 (E.D.N.Y. Oct. 24, 2002) (denying leave to amend where plaintiff had already amended

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

complaint once); *Advanced Marine Tech. v. Burnham Sec., Inc.,* 16 F.Supp.2d 375, 384 (S.D.N.Y.1998) (denying leave to amend where plaintiff had already amended complaint once).

FN12. *Cuoco,* 222 F.3d at 112 (finding that repleading would be futile) (citation omitted); *see also Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) (citation omitted).

However, while this special leniency may somewhat loosen the procedural rules governing the form of pleadings (as the Second Circuit has observed),[FN13] it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Rules 8, 10 and 12.[FN14] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Rules 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow.[FN15] Stated more plainly, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." [FN16]

FN13. *Sealed Plaintiff v. Sealed Defendant # 1,* No. 06-1590, 2008 WL 3294864, at *5 (2d Cir. Aug. 12, 2008) ("[The obligation to construe the pleadings of *pro se* litigants liberally] entails, at the very least, a permissive application of the rules governing the form of pleadings.") (internal quotation marks and citation omitted); *see also Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) ("[R]easonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training ... should not be impaired by harsh application of technical rules.") (citation omitted).

FN14. *See Prezzi v. Schelter,* 469 F.2d 691, 692 (2d Cir.1972) (extra liberal pleading standard set forth in *Haines v. Kerner,* 404 U.S. 519 [1972], did not save *pro se* complaint from dismissal for failing to comply with Fed.R.Civ.P. 8 ]); *accord,*

*Shoemaker v. State of Cal.,* 101 F.3d 108 (2d Cir.1996) (citing *Prezzi v. Schelter,* 469 F.2d 691) (unpublished disposition cited only to acknowledge the continued precedential effect of *Prezzi v. Schelter,* 469 F.2d 691, within the Second Circuit); *accord, Praseuth v. Werbe,* 99 F.3d 402 (2d Cir.1995).

FN15. *See McNeil v. U.S.,* 508 U.S. 106, 113 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Faretta v. California,* 422 U.S. 806, 834, n. 46 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *cf. Phillips v. Girdich,* 408 F.3d 124, 128, 130 (2d Cir.2005) (acknowledging that *pro se* plaintiff's complaint could be dismissed for failing to comply with Rules 8 and 10 if his mistakes either "undermine the purpose of notice pleading [ ]or prejudice the adverse party").

FN16. *Stinson v. Sheriff's Dep't of Sullivan Cty.,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980).

Defendants also move pursuant to Fed.R.Civ.P. 12(c). Rule 12(c) of the Federal Rules of Civil Procedure provides, in pertinent part: "After the pleadings are closed ... any party may move for judgment on the pleadings." Fed.R.Civ.P. 12(c). "In deciding a Rule 12(c) motion, [courts] apply the same standard as that applicable to a motion under Rule 12(b)(6)." [FN17]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

FN17. *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.), *cert. denied,* 513 U.S. 816 (1994) (citations omitted); *accord, Patel v. Contemporary Classics of Beverly Hills,* 259 F.3d 123, 126 (2d Cir.2001) (citations omitted) ("The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that of a Rule 12(b)(6) motion for failure to state a claim.").

## C. ANALYSIS

### 1. Eighth Amendment

Reading the complaint generously, Plaintiff alleges that he complained to Defendant Rao, Health Services Director at Attica C.F., about his "medical problems," which included (1) the injuries he sustained during the alleged May 2006 incident, such as persistent vomiting of blood and urinating of blood, (2) surgical staples in his stomach, and (3) swollen ribs.[FN18] Complaint at ¶ ¶ 16-27. Plaintiff alleges that in response, Dr. Rao stated that he did not believe Plaintiff's complaints, consistently "denied" Plaintiff's complaints, and called Plaintiff " 'crazy.' " *Id.* at ¶¶ 26, 27. Plaintiff claims that as a result, he has endured pain, suffering, and injuries. *Id.*

FN18. Specifically, Plaintiff states, "It should be noted that *Plaintiff has been complaining about all of the above medical problems* [which include the injuries sustained during the alleged assault, the surgical staples, and swollen ribs] to medical staff here at Attica C.F. *including Defendant Dr. Rao* ... and ever since he was beaten by the Defendant Officers Ireland, Reyell, Furnia, and Silver *he has been throwing up blood and urinating blood yet the Defendants consisting* [sic] *denied his complaints;* resulting in Plaintiff's pain and suffering, and further injuries." Complaint at ¶ 27 (emphasis added).

**\*4** Defendants argue that Plaintiff has made an insufficient showing of an Eighth Amendment claim against Defendant Rao. Dkt. No. 27-2 at pp. 3-6.

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual" punishments. The word "punishment" refers not only to deprivations imposed as a sanction for criminal wrongdoing, but also to deprivations suffered during imprisonment. *Estelle v. Gamble,* 429 U.S. 97, 102-03 (1976). Punishment is "cruel and unusual" if it involves the unnecessary and wanton infliction of pain or if it is incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle,* 429 U.S. at 102. Thus, the Eighth Amendment imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners. *Farmer v. Brennan,* 511 U.S. 825, 832 (1994). Thus, prison officials must "ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.' " *Farmer,* 511 U.S. at 832 (quoting *Hudson v. Palmer,* 468 U.S. 517, 526-27 (1984)).

A viable Eighth Amendment claim must contain both an objective and a subjective component. *Farmer,* 511 U.S. at 834. To satisfy the objective component, "the deprivation alleged must be, objectively, 'sufficiently serious.' " *Farmer,* 511 U.S. at 834 (quoting *Wilson v. Seiter,* 501 U.S. 294, 298 (1991)). Analyzing the objective element of an Eighth Amendment medical care claim requires two inquiries. "The first inquiry is whether the prisoner was actually deprived of adequate medical care." *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006). The word "adequate" reflects the reality that "[p]rison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is 'reasonable.' " *Jones v. Westchester County Dept. of Corrections,* 557 F.Supp.2d 408, 413 (S.D.N.Y.2008).

The second inquiry is "whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Salahuddin,* 467 F.3d at 280. The focus of the second inquiry depends on whether the prisoner claims to have been completely deprived of treatment or whether he claims to have received treatment that was inadequate. *Id.* If "the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

medical condition is sufficiently serious." *Id.* A "serious medical condition" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) (citations omitted), *accord, Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1996), *cert. denied,* 513 U.S. 1154 (1995); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Relevant factors to consider when determining whether an alleged medical condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance,* 143 F.3d at 702-03.

**\*5** If the claim is that treatment was provided but was inadequate, the second inquiry is narrower. *Salahuddin,* 467 F.3d at 280. For example, "[w]hen the basis for a prisoner's Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation" is sufficiently serious. *Smith v. Carpenter,* 316 F.3d 178, 185 (2d Cir.2003).

To satisfy the subjective component of an Eighth Amendment claim, the defendant's behavior must be "wanton." Where a prisoner claims that a defendant provided inadequate medical care, he must show that the defendant acted with "deliberate indifference." *Estelle,* 429 U.S. at 105.

Medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act ... that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance,* 143 F.3d 698, 703 (quoting *Farmer v. Brennan,* 511 U.S. 825, 835 (1994)). Thus, to establish deliberate indifference, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer,* 511 U.S. at 837; *Chance,*

143 F.3d at 702-703. The inmate then must establish that the provider consciously and intentionally disregarded or ignored that serious medical need. *Farmer,* 511 U.S. 825, 835; *Ross v. Giambruno,* 112 F.3d 505 (2d Cir.1997). An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle,* 429 U.S. at 105-06. Moreover, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim ... under the Eighth Amendment." *Id.* Stated another way, "medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.; Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation."). However, malpractice that amounts to culpable recklessness constitutes deliberate indifference. Accordingly, "a physician may be deliberately indifferent if he or she consciously chooses an easier and less efficacious treatment plan." *Chance,* 143 F.3d at 703.

Regarding the objective component, the complaint alleges that Defendant Rao provided Plaintiff with inadequate or no medical care after learning of Plaintiff's physical complaints, including persistent vomiting of blood and urinating of blood. Vomiting of blood and urinating of blood are indications of serious medical needs. *See Morgan v. Maass,* No. 94-35834, 1995 WL 759203, at \*2 (9th Cir. Dec. 26, 1995) (finding that vomiting blood constituted a serious medical need); *Kimbrough v. City of Cocoa,* No. 6:05-cv-471, 2006 WL 2860926, at \*3 (M.D.Fla. Oct. 4, 2006) (finding that "[e]ven to a lay person, it is obvious that blood in the urine is an indication of a serious medical need."). Thus, the allegations in the complaint satisfy the objective component.

**\*6** Regarding the subjective component, the complaint alleges that Defendant Rao was aware that Plaintiff had serious medical needs, but consciously and intentionally disregarded or ignored those needs. Dkt. No. 1. Thus, the allegations in the complaint satisfy the subjective component.

Defendants argue that Plaintiff's complaint is conclusory and fails to contain specific allegations of fact indicating

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

a deprivation of rights as against Defendant Rao. Dkt. No. 27-2, at p. 5. The Court disagrees. Plaintiff specifically stated that he informed Defendant Rao about his "medical problems," which included vomiting of blood and urinating of blood, but that Dr. Rao expressed disbelief, consistently "denied" Plaintiff's complaints, and stated that Plaintiff was "crazy." Complaint at ¶ 27. Plaintiff has set forth more than a simple conclusory allegation.

In light of the foregoing, the Court declines to conclude at this stage that Plaintiff has failed to state a claim for deliberate medical indifference against Defendant Rao.<sup>FN19</sup> Accordingly, the motion to dismiss the Eighth Amendment claim against Defendant Rao should be denied.

> FN19. *See Beeks v. Reilly,* No. 07-CV-3865, 2008 WL 3930657, at *7 (E.D.N.Y. Aug. 21, 2008) (citing *Chance,* 143 F.3d at 703-04 (reversing district court's dismissal of medical indifference claim at 12(b)(6) stage because "[w]hether a course of treatment was the product of sound medical judgment, negligence, or deliberate indifference depends on the facts of the case.... It may be that Chance has no proof whatsoever of this improper motive, and that lack of proof may become apparent at summary judgment. But even if we think it highly unlikely that Chance will be able to prove his allegations, that fact does not justify dismissal for failure to state a claim, for Rule 12(b)(6) does not countenance ... dismissals based on a judge's disbelief of a complaint's factual allegations ....") (citations and quotation marks omitted) (other citations omitted); *see also Lloyd v. Lee,* 570 F.Supp.2d 556, 559 (S.D.N.Y.2008) (finding that amended complaint plausibly alleged that doctors knew that plaintiff was experiencing extreme pain and loss of mobility, knew that the course of prescribed course of treatment was ineffective, and declined to do anything to attempt to improve plaintiff's situation besides re-submitting MRI request forms) (citing *Harris v. Westchester County Dep't of Corrections,* No. 06 Civ.2011, 2008 WL 953616, at *23 (S.D.N.Y. Apr. 3, 2008) (despite plaintiff's sparse allegations as to defendant's conduct, at the 12(b)(6) stage plaintiff sufficiently alleged facts supporting a plausible claim that defendant

was deliberately indifferent to plaintiff's medical needs)).

**2. Qualified Immunity**

Defendant Rao asserts that he is entitled to dismissal on the ground of qualified immunity. Dkt. No. 27-2 at pp. 6-8.

"Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Williams v. Smith,* 781 F.2d 319, 322 (2d Cir.1986) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 815 [1982] ). As a result, a qualified immunity inquiry in a prisoner civil rights case generally involves two issues: (1) "whether the facts, viewed in the light most favorable to the plaintiff establish a constitutional violation"; and (2) "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted." *Sira v. Morton,* 380 F.3d 57, 68-69 (2d Cir.2004) (citations omitted), *accord, Higazy v. Templeton,* 505 F.3d 161, 169, n. 8 (2d Cir.2007) (citations omitted).

In determining the second issue (i.e., whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted), courts in this circuit consider three factors:

> (1) whether the right in question was defined with 'reasonable specificity'; whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991) (citations omitted), *cert. denied,* 503 U.S. 962 (1992).<sup>FN20</sup> "As the third part of the test provides, even where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Higazy v. Templeton,* 505 F.3d 161, 169-70 (2d Cir.2007) (citations omitted). [FN21] This "objective reasonableness" part of the test is met if "officers of reasonable competence could disagree on [the legality of defendant's actions]." *Malley v. Briggs,* 475 U.S. 335, 341 (1986). [FN22] As the Supreme Court has explained,

> FN20. *See also Pena v. DePrisco,* 432 F.3d 98, 115 (2d Cir.2005); *Clue v. Johnson,* 179 F.3d 57, 61 (2d Cir.1999); *McEvoy v. Spencer,* 124 F.3d 92, 97 (2d Cir.1997); *Shechter v. Comptroller of City of New York,* 79 F.3d 265, 271 (2d Cir.1996); *Rodriguez v. Phillips,* 66 F.3d 470, 476 (2d Cir.1995); *Prue v. City of Syracuse,* 26 F.3d 14, 17-18 (2d Cir.1994); *Calhoun v. New York State Division of Parole,* 999 F.2d 647, 654 (2d Cir.1993).

> FN21. *See also Anderson v. Creighton,* 483 U.S. 635, 639 (1987) ( "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness of the action.' ") (citation omitted); *Davis v. Scherer,* 468 U.S. 183, 190 (1984) ("Even defendants who violate [clearly established] constitutional rights enjoy a qualified immunity that protects them from liability for damages unless it is further demonstrated that their conduct was unreasonable under the applicable standard."); *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993) (qualified immunity protects defendants "even where the rights were clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights").

> FN22. *See also Malsh v. Correctional Officer Austin,* 901 F.Supp. 757, 764 (S.D.N.Y.1995) (citing cases); *Ramirez v. Holmes,* 921 F.Supp. 204, 211 (S.D.N.Y.1996).

*7 [T]he qualified immunity defense ... provides ample

protection to all but the plainly incompetent or those who knowingly violate the law.

... Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized.

*Malley,* 475 U.S. at 341. [FN23]

> FN23. *See also Hunter v. Bryant,* 502 U.S. 224, 299 (1991) ("The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.") [internal quotation marks and citation omitted].

Here, after liberally reviewing the complaint, accepting all of its allegations as true, and construing them in Plaintiff's favor, the Court declines to conclude that Defendant Rao is entitled to qualified immunity at this stage. As noted, Plaintiff alleges that he informed Dr. Rao of his "medical problems," including persistent vomiting of blood and urinating of blood, but Dr. Rao stated that he did not believe Plaintiff's complaints, consistently denied Plaintiff's complaints, and called Plaintiff " 'crazy,' " which resulted in pain, suffering, and injuries. Complaint at ¶¶ 26-27. Therefore, the motion to dismiss the complaint on the ground of qualified immunity should be denied. [FN24]

> FN24. *See Beeks,* 2008 WL 3930657, at *9 (citing *See McKenna,* 386 F.3d at 437-38 (affirming district court's denial of qualified immunity at motion to dismiss stage on deliberate indifference claim, "[h]owever the matter may stand at the summary judgment stage, or perhaps at trial....") (other citations omitted)).

**3. Eleventh Amendment**

Defendants Ireland, Furnia, Reyell, Silver, and Rao argue

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

that to the extent the complaint seeks damages against them in their official capacities, the claim is barred by the Eleventh Amendment. Dkt. No. 27-2 at pp. 8-9.

The Eleventh Amendment has long been construed as barring a citizen from bringing a suit against his or her own state in federal court, under the fundamental principle of "sovereign immunity." *See* U.S. Const. amend XI ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."); *Hans v. Louisiana,* 134 U.S. 1, 10-21, 10 S.Ct. 504, 33 L.Ed. 842 (1890); *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 267, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). State immunity extends not only to the states, but to state agencies and to state officers who act on behalf of the state. *See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf,* 506 U .S. 139, 142-47, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 101-06, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984).

The Eleventh Amendment bars suits against state officials acting in their official capacities.[FN25] Where it has been successfully demonstrated that a defendant is entitled to sovereign immunity under the Eleventh Amendment, the federal court lacks subject matter jurisdiction over the case, and "the case must be stricken from the docket." *McGinty v. State of New York,* 251 F.3d 84, 100 (2d Cir.2001) (citation omitted); *see also* Fed.R.Civ.P. 12(h)(3).

FN25. *See Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993) ("The immunity to which a state's official may be entitled in a § 1983 action depends initially on the capacity in which he is sued. To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state."); *Severino v.. Negron,* 996 F.2d 1439, 1441 (2d Cir.1993) ( "[I]t is clear that the Eleventh Amendment does not permit suit [under Section 1983] for money damages

against state officials in their official capacities."); *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988) ("The eleventh amendment bars recovery against an employee who is sued in his official capacity, but does not protect him from personal liability if he is sued in his 'individual' or 'personal' capacity."); *see also Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) ("Obviously, state officials literally are persons. But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.... As such, it is no different from a suit against the State itself.... We hold that neither a State nor its officials acting in their official capacities are 'persons' under § 1983."); *Kentucky v. Graham,* 473 U.S. 159, 165-66, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is not a suit against the official personally, for the real party in interest is the entity.").

**\*8** Here, each of the represented Defendants has an official position with DOCS. Therefore, any claims for money damages against these Defendants in their officials capacities are barred by the Eleventh Amendment and should be dismissed.

## II. MOTION TO DISMISS FOR LACK OF PROSECUTION, OR IN THE ALTERNATIVE, FOR AN ORDER COMPELLING RESPONSES

Defendants argue that the complaint should be dismissed on the ground that Plaintiff has failed to prosecute this action. Dkt. No. 36. Defendants argue that in the alternative, Plaintiff should be compelled to respond to paragraphs I(A)(1)(b) and (c) of the Court's Mandatory Pretrial Discovery and Scheduling Order. *Id.*

### A. ANALYSIS

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

Rule 41 of the Federal Rules of Civil Procedure provides, "If the plaintiff fails to prosecute or to comply with these rules or a court order, a defendant may move to dismiss the action or any claim against it." Fed.R.Civ.P. 41(b). As a result, Fed.R.Civ.P. 41(b) may be fairly characterized as providing for two independent grounds for dismissal on motion or on the Court's own initiative: (1) a failure to prosecute the action, and (2) a failure to comply with the procedural rules, or any Order, of the Court. *Id.*

With regard to the first ground for dismissal (a failure to prosecute the action), it is within the trial judge's sound discretion to dismiss for want of prosecution.[FN26] The Second Circuit has identified five factors that it considers when reviewing a district court's order to dismiss an action for failure to prosecute under Rule 41(b):

> FN26. *See Merker v. Rice,* 649 F.2d 171, 173 (2d Cir.1981).

[1] the duration of the plaintiff's failures, [2] whether plaintiff had received notice that further delays would result in dismissal, [3] whether the defendant is likely to be prejudiced by further delay, [4] whether the district judge has taken care to strike the balance between alleviating court calendar congestion and protecting a party's right to due process and a fair chance to be heard and [5] whether the judge has adequately assessed the efficacy of lesser sanctions.[FN27]

> FN27. *See Shannon v. GE Co.,* 186 F.3d 186, 193 (2d Cir.1999) (affirming Rule 41(b) dismissal of plaintiff's claims by U.S. District Court for Northern District of New York based on plaintiff's failure to prosecute the action) (citation and internal quotation marks omitted).

As a general rule, no single one of these five factors is dispositive.[FN28] However, I note that, with regard to the first factor, Rule 41.2 of the Local Rules of Practice for this Court provides that a "plaintiff's failure to take action for four (4) months shall be presumptive evidence of lack of prosecution." N.D.N.Y. L.R. 41.2(a). In addition, I note that a party's failure to keep the Clerk's Office apprised of his or her current address may also constitute grounds for

dismissal under Rule 41(b) of the Federal Rules of Civil Procedure.[FN29]

> FN28. *See Nita v. Conn. Dep't of Env. Protection,* 16 F.3d 482 (2d Cir.1994).

> FN29. *See, e.g., Robinson v. Middaugh,* 95-CV-0836, 1997 WL 567961, at *1 (N.D.N.Y. Sept. 11, 1997)* (Pooler, J.) (dismissing action under Fed.R.Civ.P. 41[b] where plaintiff failed to inform the Clerk of his change of address despite having been previously ordered by Court to keep the Clerk advised of such a change); *see also* N.D.N.Y. L.R. 41.2(b) ( "Failure to notify the Court of a change of address in accordance with [Local Rule] 10.1(b) may result in the dismissal of any pending action.").

**1. Address Changes**

As to the first factor (the duration of Plaintiff's "failures") Defendants argue that Plaintiff was transferred to several different facilities, but failed to update the Court and defense counsel of his changes of address. Dkt. No. 36-2, Lombardo Decl., at ¶¶ 4-5, 7-12 & Dkt. Nos. 49, 50. Defendants argue that the action should be dismissed for this reason alone. Dkt. No. 36-8.

**\*9** Plaintiff has failed at times to update the Court and defense counsel as to his address changes. His most recent failure occurred on July 6, 2009 when he was transferred from Green Haven C.F. to Auburn C.F., and subsequently to Wende C.F., where he now remains. Dkt. No. 50-2, Stachowski Decl., at ¶¶ 3-5. Plaintiff failed to update the Court and defense counsel as to these changes. Thus, Plaintiff's failure to provide an updated address has persisted since July 6, 2009 (less than three months). Generally, it appears that durations of this length (i.e., less than four months) are not long enough to warrant dismissal.[FN30]

> FN30. N.D.N.Y. L.R. 41.2(a) ("[P]laintiff's failure to take action for four (4) months shall be presumptive evidence of lack of prosecution.");

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

*Georgiadis v. First Boston Corp., 167 F.R.D. 24, 25 (S.D.N.Y.1996)* (plaintiff had failed to comply with order directing him to answer interrogatories for more than four months).

The Court notes that Plaintiff has been subject to frequent transfers. Since August 7, 2008, Plaintiff was transferred on seven occasions. Dkt. No. 36-3, Loiodice Decl., at ¶¶ 4-11; Dkt. No. 50-2, Stachowski Decl. at ¶¶ 4-5. Three of the transfers occurred within a span of six days. Dkt. No. 36-3, Loiodice Decl., at ¶¶ 7-11.

Moreover, whether Plaintiff was mentally and physically capable of providing written updates of all of his address changes is unclear. Plaintiff noted in his opposition papers that he was diagnosed as suffering from schizophrenia; has "borderline intellectual" functioning;[FN31] and is unable to read or write; therefore Plaintiff's submissions to the Court are written by others. Dkt. No. 39. Plaintiff also stated that at times he has been "prohibited from possessing any type of writing utensil." Dkt. No. 41. Plaintiff further stated that while at Central New York Psychiatric Center, "any legal work whatsoever" was discouraged and "not facilitate[d]." *Id.* In light of the foregoing, I find that the first factor weighs against dismissal of Plaintiff's complaint.

>    FN31. Plaintiff submitted copies of medical records indicating that he was diagnosed as suffering from, *inter alia*, schizophrenia, paranoid type; has borderline intellectual functioning; and has an IQ of 71. Dkt. No. 5.

As to the second factor (whether plaintiff had received notice that further delays would result in dismissal), I find that Plaintiff has received notice that his failure to provide his current address may result in dismissal. *See* Dkt. No. 12 at 4 *(Order stating that "Plaintiff is also required to promptly notify the Clerk's Office and all parties or their counsel of any change in Plaintiff's address; his failure to do so will result in the dismissal of this action")* (emphasis in original); N.D.N.Y. L.R. 41.2(b) (stating, "Failure to notify the Court of a change of address in accordance with L.R. 10.1(b) may result in the dismissal of any pending action.") [FN32] As a result, I find that the second factor weighs in favor of dismissal of Plaintiff's

complaint.

>    FN32. I note that, to assist *pro se* litigants, the Clerk of the Court for the Northern District of New York has provided to all correctional facilities in New York State copies of the Northern District's Local Rules of Practice and *Pro Se* Manual.

Regarding the third factor (whether defendants are likely to be prejudiced by further delay), I am unable to find, based on the current record, that Defendants are likely to be prejudiced by a delay in the proceedings. While any delay that occurs theoretically impairs the Defendants' memories, the preservation of evidence, and the ability to locate witnesses,[FN33] Defendants have not argued that any delay has occurred due to Plaintiff's failure to update his address. As a result, I find that the third factor weighs against dismissal of Plaintiff's complaint.[FN34]

>    FN33. *See, e.g., Georgiadis v. First Boston Corp., 167 F.R.D. 24, 25 (S.D.N.Y.1996)* ("The passage of time always threatens difficulty as memories fade. Given the age of this case, that problem probably is severe already. The additional delay that plaintiff has caused here can only make matters worse.").

>    FN34. *See Cruz v. Jackson,* No. 94 Civ. 2600, 1997 WL 45348, at *2 (S.D.N.Y. Feb. 5, 1997) (declining to dismiss action for failure to prosecute or failure to comply with court orders where plaintiff had failed to meet discovery deadlines, and noting that the fact that plaintiff "has been in lock-down and transferred to another facility during the pendency of this action also counsels leniency toward [the plaintiff's] delays") (citing *Jones v. Smith,* 99 F.R.D. 4, 14-15 (M.D.Pa.1983) (granting *pro se* plaintiff final opportunity to comply with orders of court, despite repeated wilful, dilatory and contumacious tactics), *aff 'd* 734 F.2d 6 (3d Cir.1984)).

**10** Regarding the fourth factor (striking the balance

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

between alleviating court calendar congestion and protecting a party's right to due process and a fair chance to be heard), I find that Plaintiff's right to receive a further chance to be heard in this matter, at this point, outweighs the need to alleviate congestion on the Court's docket. Moreover, Defendants point to no delay caused by Plaintiff's failure to update his address. As a result, I find that the fourth factor weighs against dismissal of Plaintiff's complaint.

With regard to the fifth factor (whether the judge has adequately assessed the efficacy of lesser sanctions), I find that a strong reminder to Plaintiff of his obligation to provide a current address might be effective and is warranted. Plaintiff, who alleges that he suffers from schizophrenia and is unable to read and write, Dkt. No. 39, has been responsive to prior Orders from the Court,[FN35] and has shown an interest in prosecuting this action. *See* Dkt. Nos. 39, 41 (Plaintiff's Opposition Papers). As a result, I find that the fifth factor weighs against dismissal of Plaintiff's complaint.

> FN35. *See* Dkt. Nos. 7-11 (Report-Recommendation and Order; Plaintiff's Inmate Authorization Forms; Application to Proceed *In Forma Pauperis;* and Signed Last Page of Complaint).

Weighing these five factors together, I conclude that they tip the scales against dismissing Plaintiff's complaint (one of the factors weighing in favor of such dismissal and four of the factors weighing against such dismissal).[FN36] Dismissal based on a lack of prosecution is a harsh remedy to be used only in extreme situations. The Court does not currently view the present case to be in such a situation. For these reasons, I recommend that Defendants' Motion to Dismiss based on Plaintiff's failure to provide a current address (Dkt. No. 36) be denied.

> FN36. *Minnette v. Time Warner,* 997 F.2d 1023, 1027 (2d Cir.1993); *see also Jacobs v. County of Westchester,* Dkt. No. 02-0272, 2005 WL 2172254, at * 3 (2d Cir. Sept. 7, 2005) (remanding case to district court to make further factual findings concerning the plaintiff's lack of responsiveness and concerning his confinement

in a prison psychiatric ward where district court dismissed for failure to prosecute).

**2. Responses to Scheduling Order**

Defendants argue that if the Court does not dismiss the complaint for a failure to prosecute, the Court should issue an order requiring Plaintiff to respond to paragraphs I(A)(1)(b) and (c) of the Court's mandatory pretrial discovery and scheduling order dated November 18, 2008 ("Scheduling Order"). Dkt. No. 36-8, Memo. of Law at pp. 3-4.

The Scheduling Order provided, in relevant part, as follows:

**I. Discovery**

**A. *Documents.*** Within sixty (60) days of the date of this order:

**1. *Plaintiff(s)*** shall provide to counsel for defendant(s) copies of all:

**a.** Documents and other materials which plaintiff(s) may use to support the claims in the complaint;

**b.** Correspondence, grievances, grievance appeals, and other documents relating to requests for administrative remedies or the inability or failure to exhaust such remedies; and

**c.** Complaints and petitions filed by plaintiff(s) in any other cases in any court relating to the same issues raised in the complaint in this action or, if such documents are not within the possession of plaintiff(s), plaintiff(s) shall provide to counsel for defendant(s) a list of any such legal proceedings stating the court in which the proceeding was filed, the caption of the case, and the court number.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

**\*11** Dkt. No. 26, at pp. 1-2.

Defendants admit that they received "what purported to be plaintiff's response to paragraph I(A)(1) of the [Scheduling Order]" in a letter to defense counsel from Plaintiff. Dkt. No. 36-2, Lombardo Decl., at ¶ 19 & Dkt. No. 36-6, Ex. C. In that letter, Plaintiff asserted the following:

> Pursuant to paragraph I(A) of the court's mandatory pretrial discovery and scheduling order dated Nov. 18, [20]08[:]

> a. Documents and materials which plaintiff will use to support the claims in this complaint is [sic] the complete Medical Records for the period of June 14, 2006 to present, and current Tier III documents and pictures surrounding the incident which you forwarded to me pursuant to mandatory pretrial discovery, in addition enclosed please find Lab work report of specimen done on plaintiff which will also be use[d].

> Plaintiff has complied with the court's mandatory pretrial discovery and scheduling order pursuant to paragraph I(A) so your office no longer has to seek dismissal of the complaint for failure to prosecute.

Dkt. No. 36-6, Ex. C.

Defendants view this letter as being nonresponsive to paragraphs I(A)(1)(b) and (c). However, regarding paragraph I(A)(1)(b), Plaintiff specifically stated in the above-quoted letter that he "will use the complete medical records for the period of June 14, 2006 to present, and *current Tier III documents and pictures surrounding the incident which you forwarded to me.*" Dkt. No. 36-6, Ex. C at p. 1 (emphasis added). Moreover, Plaintiff stated in his March 23, 2009 letter to defense counsel that he filed grievances while in Attica C.F., but that he was no longer "in possession of those grievances" because his property was lost while he was at Central New York Psychiatric Center. [FN37] Dkt. No. 39 at p. 2. Plaintiff also stated that he has "no money in his account," therefore he has been unable to obtain copies of his grievances, as well as medical records. *Id.* Accordingly, Plaintiff has responded

to paragraph I(A)(1)(b). He stated that he no longer possesses the grievances he filed at Attica C.F.; he is unable to afford copies; and he intends to use the documents that defense counsel sent to him. To the extent that defense counsel is arguing that Plaintiff must provide copies of the same documents defense counsel has already provided Plaintiff, Dkt. No. 36-7, Ex. D at p. 2, this argument is unavailing.

> FN37. Plaintiff also asserts that he no longer has a copy of the complaint in this action. Dkt. No. 41, at ¶ 8. Accordingly, the Clerk will be directed to provide a copy of the complaint to Plaintiff.

Regarding paragraph I(A)(1)(c), Plaintiff stated in his March 23, 2009 opposition letter that "[t]here is no other complaints or petitions filed by plaintiff in any other cases in any other court [sic]." Dkt. No. 39, at p. 2. Plaintiff reiterated this response in a supplemental opposition letter dated March 31, 2009 by stating that "there are no other known complaints, petitions, etc. filed by plaintiff in any other court with regards to the claims raised in [this case]." Dkt. No. 41, [FN38] at ¶ 6. Accordingly, Plaintiff has responded to paragraph I(A)(1)(c).

> FN38. To the extent that Plaintiff is seeking permission to amend his complaint via his supplemental opposition letter, (Dkt. No. 41), Plaintiff's request must be in the form of a motion. *See* N.D.N.Y. Local Rule 7.1.

**\*12** In light of the foregoing, Defendants' request for an order compelling responses to paragraphs I(A)(1)(b) and (c) of the Scheduling Order should be denied as moot.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motions to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) and 12(c) (Dkt. No. 27) be GRANTED in part and DENIED in part. The motion to dismiss should be granted to the extent that Plaintiff asserts claims for money damages against Defendants in their official capacities. The motion should be denied to

Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

the extent that Defendants moved to dismiss Plaintiff's Eighth Amendment claim against Defendant Rao, and moved to dismiss the complaint against Defendant Rao on the ground of qualified immunity; and it is further

**RECOMMENDED** that the Motion to Dismiss for Failure to Prosecute or in the alternative for an Order compelling Plaintiff's responses (Dkt. No. 36) be DENIED; and it is further

**ORDERED,** *that Plaintiff is required to promptly notify the Clerk's Office and all parties or their counsel of any change in Plaintiff's address; his failure to do so may result in the dismissal of this action;*

**ORDERED,** that the Clerk update Plaintiff's address to reflect that he is currently incarcerated at Wende Correctional Facility; [FN39] and it is further

FN39. Defendants' letter to the Court dated August 21, 2009 indicates that Plaintiff is now incarcerated at Wende C.F. Dkt. No. 50.

**ORDERED,** that the Clerk serve (1) copies of the electronically-available-only opinions cited herein; [FN40] (2) a copy of the Complaint (Dkt. No. 1); and (3) a copy of this Report-Recommendation and Order on Plaintiff.

FN40. Those decisions include *Gadson v. Goord,* 96-CV-7544, 1997 WL 714878 (S.D.N.Y. Nov. 17, 1997); *Yang v. New York City Trans. Auth.,* 01-CV-3933, 2002 WL 31399119 (E.D.N.Y. Oct. 24, 2002); *Sealed Plaintiff v. Sealed Defendant # 1,* No. 06-1590, 2008 WL 3294864 (2d Cir. Aug. 12, 2008); *Morgan v. Maass,* No. 94-35834, 1995 WL 759203 (9th Cir. Dec. 26, 1995); *Kimbrough v. City of Cocoa,* No. 6:05-cv-471, 2006 WL 2860926 (M.D.Fla. Oct. 4, 2006); *Beeks v. Reilly,* No. 07-CV-3865, 2008 WL 3930657 (E.D.N.Y. Aug.21, 2008); *Harris v. Westchester County Dep't of Corrections,* No. 06 Civ.2011, 2008 WL 953616 (S.D.N.Y. Apr. 3, 2008); *Robinson v. Middaugh,* 95-CV-0836, 1997 WL

567961 (N.D.N.Y. Sept. 11, 1997); *Cruz v. Jackson,* No. 94 Civ. 2600, 1997 WL 45348 (S.D.N.Y. Feb. 5, 1997); and *Jacobs v. County of Westchester,* Dkt. No. 02-0272, 2005 WL 2172254 (2d Cir. Sept. 7, 2005).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2009.
Hale v. Rao
Slip Copy, 2009 WL 3698420 (N.D.N.Y.)

END OF DOCUMENT



Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

**H**

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Maurice SAMUELS, Plaintiff,
v.
Donald SELSKY, Glenn Goord, Paul Cecilia, Javier
Iurrue, G. Schwartzman, Dennis Bliden, Jeffery McCoy,
and Christopher P. Artuz, Defendants.
**No. 01CIV.8235(AGS).**

Sept. 12, 2002.

OPINION & ORDER

SCHWARTZ, District J.

I. Introduction

*1 Maurice Samuels alleges that while incarcerated at the Green Haven Correctional Facility,[FN1] prison officials searched his cell and confiscated a number of documents which were deemed to be "subversive" and contraband. Samuels claims that the materials, including theological textbook excerpts, were of a Christian nature and were used in a course he taught in the prison through the New York Theological Seminary. Samuels' alleged possession of these documents led to a misbehavior report and a subsequent disciplinary hearing, for which Samuels was sentenced to 180 days in keeplock and 180 days' loss of packages, commissary privileges, and telephone use. Samuels also alleges that instead of being punished as per his disciplinary hearing, he was sentenced to a more severe punishment, 180 days in a special housing unit which entailed Samuels' being locked in his cell for twenty-three hours per day. On the basis of the allegedly unlawful sanctions to which he was subjected, Samuels has filed the instant action pursuant to 42 U.S.C. § 1983 alleging violations of, *inter alia*, his First Amendment and due process rights, and seeks equitable relief and damages.

Defendants have filed a motion to dismiss the action pursuant to FED. R. CIV. P. 12(b)(1) and (6), and argue that they enjoy qualified immunity barring this suit. For the reasons set forth below, defendants' motion is granted in part and denied in part.

FN1. Defendants repeatedly state that the events giving rise to this action arose while Samuels was incarcerated at the Great Meadow Correctional Facility. Samuels states that the events in question happened at the Green Haven Correctional Facility. Moreover, Samuels' evidence, including the Inmate Disciplinary Report (Exhibit H), the Disciplinary Hearing Record Sheet (Exhibit O), and the Superintendent Hearing Disposition Report (Exhibit P) all note the Green Haven Correctional Facility. In light of the above, the Court determines that defendants' position that the events occurred at Great Meadow is incorrect. The Green Haven Correctional Facility is located in Dutchess County in the Southern District, while Great Meadow is located in Washington County in the Northern District. Defendants make no argument regarding the Court's jurisdiction with respect to the location of the events in question.

II. Factual Background [FN2]

FN2. Unless otherwise indicated, the facts set forth below are gleaned from Samuels' submissions, because on a FED. R. CIV. P. 12(b)(1) or (6) motion, the adjudicating court must assume as true factual allegations made in the complaint. Defendants concede this fact. *See* Defendants' Memorandum of Law in Support of their Motion to Dismiss the Complaint, at 4. It should also be noted that Samuels brings this action *pro se.* As such, it is sometimes difficult to understand fully his contentions. Accordingly, the Court reads the (sometimes confusing) factual allegations in the light most favorable to Samuels.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

Maurice Samuels is currently an inmate at the Sullivan Correctional Facility. Since being incarcerated, Samuels has taken a keen interest in religion. He identifies himself as a member of the Five Percent Nation of Gods and Earths. FN3 While confined at Sing Sing, he received a degree of Master of Professional Studies in Prison Ministry through the New York Theological Seminary ("NYTS"). *See* Complaint Pursuant to U.S.C.A. Section 1983 ("Complaint"), at 4; Exhibit ("Ex.") A. Upon completion of his studies with the NYTS, Samuels was transferred to the Green Haven Correctional Facility. FN4 At Green Haven, Samuels was assigned a clerk's position in therapeutic "Reality and Pain Program." He subsequently redesigned the program, creating the "Reality and Pain Therapeutic Counseling Program." *See* Complaint, at 4. During this period he also served as a volunteer inmate instructor in the Black Studies program, and was later assigned as a clerk in Green Haven's Senior Counselor's Office, where he helped create a program for sex offenders. *See id.* at 4.

FN3. The website of the University of Chicago's Divinity School provides a good summary of the beliefs of the adherents of the Five Percent Nation of Gods and Earths, commonly known as the "Five Percenters." *See* Jonathan Moore, *The Five Percenters: Racist Prison Gang or Persecuted Religion?*, SIGHTINGS, May 21, 1999, *available at* http://divinity.uchicago.edu/sightings/archive_1999/sightings-052199.html. The name of the group stems from its belief that only five percent of people are aware of and teach the truth. The term "Gods" refers to black male members; "Earths" refer to black female members. The group was founded by Clarence 13X, who left the Nation of Islam in 1964. According to Moore, "[m]any of the theological accoutrements of Black Muslim belief remain: many read the Qur'an and Elijah Muhammad's writings (especially his "Message to the Black Man"), and they hold to the exclusive divinity of black men." *Id.* (The Moore article, not part of the record, is provided for background purposes only). Samuels has included two pages outlining the differences between the Nation of Gods and Earths and similar black Muslim groups-the Nation of Islam and the Temple of Islam. *See* Exhibit B.

FN4. *See supra* note 1.

The NYTS later began a certificate program in Christian Ministry in conjunction with Marist College at Green Haven. Samuels was invited to teach several courses for the program, including a course entitled "World Views and Values" and another entitled "Introduction to Theology and Methods." *See* Complaint, at 4; Ex. E, at 12. Samuels is listed on the "Faculty and Administration" page of the Certificate in Ministry Program brochure. *See* Ex. E, at 10. In designing his theology course, Samuels, in conjunction with Professor Mar Peter-Raoul (currently the Chair of the Department of Philosophy and Religious Studies at Marist College), prepared a syllabus which included the following:

*2 a. This is an introductory approach to contemporary Christian Theology, there will be a broad range of material provided for the student so that they [sic] may see the evolution of Christian Theology and Contemporary Theologies, active in the world today.

b. The course is divided into different sessions (1) What is Theology; (2) Philosophy & Theology; (3) Contemporary Theology; (4) Political and Liberation Theology; (5) Feminist/Womanist Theology; and (6) Black & Third World Theology.

c. This is done so that the student can examine the evolution of Christian Theology and Contemporary Theologies, and arrive at the next step in the process, i.e. explore the [sic] how to do theology.

d. This introduction to theology course will be taught from a [sic] interdisciplinary and non-traditional approach.

Complaint, at 5. This syllabus was approved by the appropriate authorities from NYTS, Marist College, and the Department of Corrections ("DOCS"). *See id.* at 5.

The central issue in this case involves a search of Samuels' cell. On September 15, 1999, another member of the Five Percent Nation of Gods and Earths who was involved in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

the NYTS program was disciplined for allegedly possessing a pamphlet entitled "Awake" or "Awaken" which addressed topics such as racism in the criminal justice system and abuses of the Rockefeller drug laws. *See* Complaint, at 6. On October 19, 1999, the assistant inmate director for the NYTS certificate program was interrogated about the program and why some of its members were also members of the Five Percent Nation of Gods and Earths. At the time, Samuels was housed in the inmate honor block housing Unit and taught a pre-G.E.D. and adult basic education class in the morning and afternoon and taught his theology class in the evening. *See* Complaint, at 6. According to defendants, Sergeant Schwartzman, a member of the prison staff, received a report from a confidential informant that Samuels was a leader of a protest planned to occur around January 1, 2000 ("Y2K protest").[FN5] On October 20, 1999, Schwartzman ordered correction officers Williams and Kelly to search Samuels' cell. Samuels states that the confiscated materials included Marist College and NYTS course handouts for the certificate program, previously published material from the NYTS and Marist College, notes from newspaper articles, a manuscript Samuels had been working on since first attending the NYTS, and Kairos statements.[FN6] *See* Complaint, at 7. According to the Cell Search Report, contraband was found which consisted of a "folder of papers containing subversive material." Ex. G. On the same day, an Inmate Misbehavior Report was completed. *See* Ex. H. The rule violations are listed as 104.12 (action detrimental to the order of the facility) and 113.23 (contraband). *See id.* The narrative section of the Inmate Behavior Report states:

> FN5. While denying a link to the Y2K protest, Samuels provides some background on the matter. According to Samuels, DOCS created a program at Green Haven through the Corcraft Industry Division Program known as the Recreational Cell Building Project ("Project"). The Project initially used inmate volunteers to build Inmate Recreational Cells at recently constructed S-Facilities (special housing institutions). According to Samuels, because of poor working conditions, low wages, and other factors, inmates increasingly refused to volunteer for the Project and sought other work assignments. Samuels alleges that DOCS personnel then began using the disciplinary process to systematically force inmates to work

in the Project. *See* Complaint, at 3. Samuels also alleges that prison officials specifically targeted members of the NYTS and the Five Percent Nation of Gods and Earths for compelled work participation in the Project. *See id.* at 4. The planned Y2K protest, in which Samuels claims to have played no role, was intended to protest the program as well as prison conditions generally.

> FN6. The Kairos Statements (referred to by Samuels as "Karios Statements") are critiques of traditional church dogma. The most famous Kairos statement originated as a critique of alleged church complicity in the white *apartheid* regime in South Africa.

On the above date [10/20/99] and time while conducting a cell search on cell D-1-21 which houses inmate Samuels, Maurice 85A0184 the following contraband was found and recovered;

**\*3** (1) Folder of papers containing subversive material These papers speak about inmate [sic] uniting together to fight against opositions [sic] such as the N.Y. parole system and other dept. of correction [sic] programs.

This material is consistant [sic] with information recieved [sic] that inmate Samuels has been active in urging others to participate in a demonstration on or about Jan. 1, 2000, which led to his cell being searched.

Ex. H. The form is signed by G. Williams, a correction officer, and G. Schwartzman. The documents are not identified, nor is there an explanation of why they were considered "subversive." Samuels repeatedly asked prison authorities to identify the "subversive" documents without success. *See, e.g.,* Exhibits ("Exs.") J, K, M, N, V, 7, 9. Defendants have not furnished the confiscated papers for the Court, and make no representation as to what documents were found in Samuels' cell or why they are considered "subversive." Samuels states that the materials seized by the prison officials is not literature pertaining to the Five Percent Nation of Gods and Earths but Christian ministry materials he used in teaching his class and which had previously been approved by the NYTS and prison

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

authorities. *See* Complaint, at 5. Samuels also states that newspaper clippings and a manuscript he had been working on since 1986 were taken. *See* Affidavit [of Maurice Samuels] in Support of Opposition Motion ("Samuels Aff."), at ¶¶ 7-9.

Samuels was immediately placed in keeplock status pending a hearing on the misbehavior report. *See* Defendants' Memorandum of Law in Support of their Motion to Dismiss the Complaint ("Motion Brief"), at 3. Under DOCS rules, Samuels was entitled to an employee assistant to assist in his defense of the charges set forth in the misbehavior report.[FN7] An Assistant Selection Form was provided to Samuels, which instructed Samuels to select three people, one of whom would be assigned to him based on availability. *See* Ex. I. Samuels selected Hanna, Lawrence, and Schwartzman as his three choices. *See id.* Instead, Paul Cecilia was assigned to Samuels. *See* Motion Brief, at 3. Samuels alleges that instead of assisting him in the preparation of his case, Cecilia proceeded to interrogate Samuels, asking him if he was in contact with Green Party candidate (formerly "Grandpa Munster") Al Lewis, whether he had any letters from him, whether he had any letters from outside organizations involved in prison reform, whether he was involved in any planned Y2K protest, and what the "Kairos" document was. *See* Complaint, at 8. Samuels further alleges that Cecilia did not explain the charges contained in the misbehavior report and failed adequately to conduct an investigation on Samuels' behalf.[FN8] Cecilia signed an Assistant Form on October 25, 1999, at 12:53 pm, indicating that he had interviewed witnesses, assisted as requested, and reported back to Samuels. *See* Ex. J. However, on October 26, Green Haven officials requested a one-day extension to hold a disciplinary hearing on the basis that the "assistant is trying to speek [sic] to with witiness [sic]." Ex. L. The extension was granted by "Alternate User 999SHURXR for 999SHU." *See id.* The name of the grantor is not listed on the computer printout.

FN7. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 251-4.1 (2002):(a) An inmate shall have the opportunity to pick an employee from an established list of persons who shall assist the inmate when a misbehavior report has been issued against the inmate if [...] (4) the inmate is confined pending a superintendent's hearing [...].

FN8. Samuels cites a number of failures on Cecilia's behalf: he failed to turn over documentary evidence relating to the charges against Samuels, he failed to provide a written record of the questions he was supposed to ask Samuels' witnesses, he failed to record the testimony of the witnesses interviewed on Samuels' behalf, he failed to explain exactly what material that was confiscated constituted contraband, and he failed to interview the confidential informant to determine his existence or credibility. *See* Complaint, at 9.

**\*4** The "Tier III" disciplinary hearing was held on October 27, 1999.[FN9] At the hearing, two inmates and Dr. George W. Webber testified on Samuels' behalf (Webber testified by telephone). Webber is the director of the Certificate Program and president emeritus of the NYTS. Sgt. Schwartzman testified against Samuels. *See* Ex. O. Samuels also submitted a written brief for the hearing. *See* Ex. M. Samuels was found guilty of "demonstration" and "contraband" on November 9, 1999. The hearing officer, Javier Irurre,[FN10] summarized his findings as follows:

FN9. Tier III hearings are held for "the most serious violations of institutional rules." *Walker v. Bates,* 23 F.3d 652, 654 (2d Cir.1994).

FN10. The name "Javier Irurre" appears on the Hearing Disposition form. *See* Ex. P. Samuels spells the name "Iurrue," *see* Complaint, at 9, while defendants in turn use two spellings for the name-"Iurre" and "Iurrue *See* Motion Brief, at 3. The Court uses the "Irurre" spelling found on the Hearing Disposition form, apparently in Javier Irurre's own handwriting, and on the Tier III assignment form signed by Superintendent Artuz. *See* Appendix 7.

Statement of Evidence Relied Upon: Papers & hand written papers retrieved from your cell show statements inciting revolt and prison unrest. Confidential tape shows similarity between statements in papers you have written and others in your possession with statements found in written material belonging other [sic] inmates inciting the so called Y2K revolt.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

Confidential tape and testimony at the hearing establish a link between the statements in papers found in your cell and phamphlets [sic] circulating among prison population urging to strike in Y2K.

Reason for Disposition: Inciting revolt can not be tolerated in a correctional setting.

Ex. P. Samuels was punished with 180 days of keeplock, 180 days of loss of packages, 180 days of loss of commissary privileges, and 180 days of loss of phone privileges. *See* Ex. P; Complaint, at 11. The hearing officer did not impose special housing unit placement. *See* Ex. P; Complaint, at 11. The Court has not been furnished with a transcript of the hearing or of the "confidential tape" referred to by Irurre.

Samuels alleges that his due process rights were violated at the misbehavior hearing. He alleges that he failed to receive a timely hearing, that he received inadequate assistance from the employee assistant assigned to him (Cecilia), and that Dr. Mar Peter-Raoul was not permitted to testify on Samuels' behalf. *See* Complaint, at 9, 11. Samuels also protests the fact that the misbehavior report never specifies exactly what Samuels did to constitute "demonstration." *See id.* at 11. No written record was apparently made stating the reasons Dr. Peter-Raoul was not permitted to testify. Dr. Peter-Raoul later wrote a lengthy letter addressed to defendants Bliden, McCoy, and Irurre in which she explained the nature of the Kairos documents and stated her desire to serve as a witness for Samuels. *See* Complaint, at 10.

On November 8, 1999 (one day before Irurre found Samuels guilty of demonstration and contraband), Samuels submitted a detailed written brief to First Deputy Superintendent Dennis Bliden and "Jeff Macoy" [sic] on November 8, 1999, requesting that his misbehavior report be dismissed. *See* Ex. N. While waiting for a response to his letter, Samuels was transferred to the Upstate Correctional Facility, a special housing unit facility, where he was housed for 180 days.[FN11] *See* Complaint, at 11; Motion Brief, at 4; Plaintiffs' [sic] Memorandum of Law in Opposition to Defendants' Motion ("Opposition Brief"),

at 27. Neither Samuels nor defendants provides an explanation as to why Samuels was transferred to the special housing unit facility. Jeff McKoy (listed in the caption as Jeffery McCoy) wrote to Samuels on November 12, 1999, advising him that he lacked the authority to overturn a Tier III disposition. *See* Ex. R. Bliden wrote to Samuels on November 18, 1999, stating that any appeal Samuels wished to file had to be directed to the Commissioner in Albany. He stated that "[u]ntil such time as we receive a decision from [Albany], I will not modify the disposition." Ex. U.

[FN11.] Placement in a special housing unit involves confinement for twenty-three hours per day. The inmates assigned to special housing units receive virtually no programming, no congregate activities, and very little natural light. Reading materials are severely restricted, as are visits. *See* Ex. 16, at 5-6 (THE NEW YORK STATE SENATE DEMOCRATIC TASK FORCE ON CRIMINAL JUSTICE REFORM, CRIMINAL JUSTICE REFORM: A TIME THAT'S COME (2001)).

**\*5** As per Deputy Superintendent Bliden's instructions, Samuels submitted a seventeen-page letter to Donald Selsky, the Director of the Inmate Disciplinary Program, in Albany. *See* Ex. V. In the course of his letter to Selsky, Samuels voices his procedurally-based and substantively-based arguments for dismissing his misbehavior adjudication. Selsky affirmed the November 9, 1999 hearing on January 6, 2000 on behalf of Glenn Goord, the Commissioner.[FN12] *See* Ex. 6. Samuels filed a request for a "time-cut" from the determination of the Superintendent on February 28, 2000. *See* Ex. 6. Prisoners' Legal Services of New York ("PLS") sent a letter to Selsky on March 2, 2000, asking him to reconsider his decision. On April 27, 2000, PLS sent a supplemental request for reconsideration, this time outlining in detail the legal bases for which Samuels' disciplinary charges should be withdrawn (by this point, Samuels had already served the imposed penalty; the letter asks Selsky to reverse the disciplinary hearing and expunge the disciplinary charges). *See* Ex. 9. Selsky did not alter his January 2000 decision. Samuels then appealed to the New York State Supreme Court, apparently by means of an Article 78 proceeding. The court, Canfield J., concluded that Samuels' appeal raised a substantial evidence question that could not be resolved by "reference

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

to the objections in point of law." Decision and Order dated October 13, 2000. The court then transferred the matter to the Appellate Division, Third Judicial Department pursuant to N.Y. C.P.L.R. 7804(g).[FN13] *See id.*

> **FN12.** Prisoners' Legal Services of New York cite the date as January 20, 2000. *See* Ex. 7; Samuels cites the date as January 20, 1999. *See* Ex. 6.

> **FN13.** No Appellate Division decision on the matter is in the record. However, defendants' argument on the exhaustion of remedies focuses on administrative remedies and not on this potential deficiency.

Samuels then filed the instant action pursuant to 42 U.S.C. § 1983 based on defendants' alleged violations of his due process, First Amendment, and other constitutional rights, seeking equitable relief as well as compensatory and punitive damages.[FN14] The defendants move to dismiss the complaint pursuant to FED. R. CIV. P. 12(b)(1) (lack of subject matter jurisdiction) and (6) (failure to state a claim upon which relief can be granted). For the reasons set forth below, defendants' motion is granted in part and denied in part.

> **FN14.** In his complaint, Samuels also alleged an Eighth Amendment violation stemming from his treatment during a trip to and from his brother's funeral. This claim was dismissed by order of Judge Mukasey dated September 4, 2001.

III. Legal Standard

A. *Pro Se* Complaints

The Second Circuit has repeatedly held that *pro se* complaints must be read more leniently than those prepared by lawyers. Recently, for example, the Second Circuit noted that a "*pro se* complaint should not be dismissed unless 'it appears beyond doubt that the plaintiff[ ] can prove no set of facts in support of [his]

claim[s] which would entitle [him] to relief." ' *Weixel v. Board of Educ. of the City of New York,* 287 F.3d 138, 145 (2d Cir.2002) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)). Moreover, when considering a motion to dismiss a *pro se* complaint, "courts must construe [the complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggest[s]." *Weixel,* 287 F.3d at 146 (quoting *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (internal quotation marks omitted)). The Second Circuit has also emphasized that a liberal reading of a *pro se* complaint is especially important when the complaint alleges civil rights violations. *See Weixel,* 287 F.3d at 146; *Weinstein v. Albright,* 261 F.3d 127, 132 (2d Cir.2001). Consequently, Samuels' allegations must be read so as to "raise the strongest arguments that they suggest." *Weixel,* 287 F.3d at 146 (quoting *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (internal quotation marks omitted)).

B. Motions to Dismiss Pursuant to FED. R. CIV. P. 12(b)(1) & (6)

**\*6** Defendants move to dismiss the complaint pursuant to FED. R. CIV. P.12(b)(1) and (6). The standard of review for dismissal on either basis is identical. *See, e.g., Moore v. PaineWebber, Inc.,* 189 F .3d 165, 169 n. 3 (2d Cir.1999); *Jaghory v. New York State Dep't of Educ.,* 131 F.3d 326, 329 (2d Cir.1997). In either case, a court must assume as true factual allegations in the complaint and construe the complaint in the light most favorable to the plaintiff. *See, e.g., York v. Association of Bar of City of New York,* 286 F .3d 122, 125 (2d Cir.2002); *Shipping Fin. Servs. Corp. v. Drakos,* 140 F.3d 129, 131 (2d Cir.1998). While the question of subject matter jurisdiction goes to the power of the court to hear a case, the issue on a motion to dismiss is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *York,* 286 F.3d at 125 (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974)).

IV. Legal Analysis

A. Exhaustion of Administrative Remedies

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

1. Legal Standards Governing Exhaustion of Administrative Remedies

Lawsuits by prisoners are governed by 42 U.S.C. § 1997e, which holds in part:

No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

Under this section, where a prisoner brings an action in a district court before exhausting all available administrative remedies, the action must be dismissed. A unanimous Supreme Court has recently interpreted the term "prison conditions" expansively, requiring an exhaustion of all available administrative remedies whether the inmate suit concerns a general prison condition (i.e., quality of food) or a discrete incident specific to one prisoner (i.e., excessive force). *See Porter v. Nussle,* 122 S.Ct. 983 (2002). The Court also held that the exhaustion requirement applies regardless of whether the administrative remedies are "plain," "speedy," or "effective," and also applies when the prisoner "seeks relief not available in grievance proceedings" such as monetary damages. *Id.* at 988.

As a preliminary matter, defendants concede that Samuels has exhausted all administrative remedies concerning his due process violations. *See* Defendants' Supplemental Memorandum of Law and Reply Memorandum of Law in Further Support of Their Motion to Dismiss ("Reply Brief"), at 9. Defendants' concession is apparently based on DOCS Directive No. 4040, which holds that:

[T]he individual decisions or dispositions of the following are not grievable: [...] Media Review, disciplinary proceedings, inmate property claims (of any amount) and records review (Freedom of Information Requests, expunction). However, the policies, rules, and procedures of any of these programs or procedures may be the subject of a grievance.

*7 As noted above, Samuels unsuccessfully appealed his case within the prison facility and later to defendant Selsky in Albany, who denied it and denied reconsideration thereof.

Defendants argue, however, that "if a claim is incidental to a disciplinary determination [...] the fact that the disciplinary charge itself has been appealed does not excuse the failure to file a grievance." Reply Brief, at 9. Defendants thus seek to sever the alleged due process violations (for which Samuels has exhausted all administrative remedies) from several closely related claims-Samuels' claims protesting the confiscation of his papers, his transfer to the special housing unit, and DOCS policy regarding the Five Percent Nation of Gods and Earths (for which defendants argue Samuels has failed to exhaust all administrative remedies). *See* Reply Brief, at 9.

2. Confiscation of Documents

Defendants allege that the confiscation of the religious material is a matter separate from the underlying disciplinary hearing. While Samuels directly appealed his disciplinary adjudication, he concedes that he did not bring any complaint to the inmate grievance program. *See* Complaint, at 1. Defendants argue that Samuels' claim alleging the confiscation of religious material must therefore be dismissed because he failed to exhaust administrative remedies. *See* Reply Brief, at 9-10. Defendants represent that confiscation of religious documents from a cell is a grievable matter. The Court notes, however, that in similar cases inmates have been told that such confiscations are not grievable. *See, e.g., Allah v. Annucci,* 97 Civ. 607, 1999 U.S. Dist. LEXIS 7171, at *2-*3 (W.D.N.Y. Mar. 25, 1999) (plaintiff filed an inmate grievance protesting confiscation of religious material and was told such a seizure was not grievable).

As a preliminary matter, there is considerable confusion regarding exactly which documents were confiscated. Samuels has sought these documents numerous times; defendants have not made the documents available to him or to the Court. Initially, defendants stated that "Plaintiff specifically alleges in his compliant that the defendants confiscated a pamphlet called 'Awake'." Motion Brief, at

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

8. Later, defendants state that it is "unclear from plaintiff's complaint and response whether the pamphlet 'Awake' was confiscated from him or another." Yet since defendants conducted the search and confiscation of the materials from Samuels' cell, they should know whether "Awake" was confiscated from Samuels' cell. Nonetheless, they claim ignorance. Samuels himself makes his position clear: "material taken from Plaintiff [sic] cell [...] was not [...] Awake." Complaint, at 2. In a later brief, he writes "Complainant NEVER POSSESSED a pamphlet entitled "Awake." Opposition Brief, at 3 (emphasis in original).

In any event, it is clear that certain religiously-oriented documents were confiscated from Samuels' cell. Samuels seeks, *inter alia,* punitive and compensatory damages he claims to have suffered through defendants' alleged violation of his rights, including his First Amendment rights. *See* Complaint, at 13. Defendants argue that Samuels "never appealed any grievance relating to the confiscation of religious material" to the Inmate Grievance Program, citing an affidavit of Thomas G. Eagen ("Eagen Aff."), the Director of DOCS's Inmate Grievance Program, dated March 13, 2002. While this may be true, Samuels did protest the confiscation of documents in his direct appeal to Bliden and McKoy and later to Selsky. *See* Exs. N, V, 9. These appeals were denied.

**\*8** As noted, it is factually unclear whether seizures of religious materials may be grieved through the Inmate Grievance Program. However, even if such seizures are grievable, Samuels' alleged failure to exhaust all administrative remedies as required by 42 U.S .C. § 1997e(a) goes only to the narrow issue of the confiscation *qua* confiscation-the damage Samuels suffered from the loss of his property (such as the property value of the books). The main confiscation issue put forward by Samuels is not the confiscation in and of itself, but the confiscation insofar as it was the basis for the misbehavior adjudication.[FN15] This issue was already effectively grieved by Samuels through his direct appeal of his misbehavior determination, which *per se* implicated the confiscation of documents. Defendants argue nonetheless that any confiscation that took place is separate from the disciplinary hearing and thus must be separately grieved. The Court does not agree.

FN15. The real damage suffered by Samuels

was, *inter alia,* his 180 days in keeplock (and later a special housing unit).

Disputes stemming from a disciplinary hearing are properly appealed directly and not through the Inmate Grievance Program. To the extent that the confiscation issue is a constituent element of the misbehavior adjudication, Samuels need not file an administrative grievance because he already sought review of the matter on his direct appeal. The recent case of *Flanagan v. Maly,* 99 Civ. 12336(GEL), 2002 WL 122921 (S.D.N.Y. Jan. 29, 2002), is instructive. In *Flanagan,* the plaintiff brought two separate claims-one stemming from inadequate access to medical and legal resources, and one stemming from an alleged due process violation in a disciplinary hearing. The court found that the plaintiff had not exhausted all administrative remedies with regard to medical and legal access because he failed to utilize the Inmate Grievance Program. With regard to the disciplinary hearing, however, the court held that utilization of the grievance procedures was unnecessary because the plaintiff had already appealed the issues directly:

To require [plaintiff] to file an administrative grievance in these circumstances would be absurd, and Congress cannot have intended such a requirement. When an inmate challenges the procedure at a disciplinary hearing that resulted in punishment, he exhausts his administrative remedies by presenting his objections in the administrative appeals process, not by filing a separate grievance instead of or in addition to his ordinary appeal. Pursuit of the appellate process that the state provides fulfills all the purposes of the exhaustion requirement of [ § 1997e(a) ][FN16], by giving the state an opportunity to correct any errors and avoiding premature federal litigation. Once the alleged deprivation of rights has been approved at the highest level of the state correctional department to which an appeal is authorized, resort to additional internal grievance mechanisms would be pointless.

FN16. The district court mistakenly cites the provision as " § 1997a(e)," a nonexistent section.

*Flanagan,* 2002 WL 122921, at \*2. While the issue referred to in *Flanagan* was a due process defect in the disciplinary hearing (not at issue here because defendants

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

concede that Samuels exhausted all available administrative remedies), the underlying point, that issues directly tied to the disciplinary hearing which have been directly appealed need not be appealed again collaterally through the Inmate Grievance Program, is applicable to the confiscation issue. Moreover, the confiscation in the instant case is part and parcel of the misbehavior adjudication-unlike the medical claim made in *Flanagan* which was divorced from the due process claim.

**\*9** Defendants rely on a single case in support of their contention that the confiscation issue and the disciplinary hearing issue are wholly separate, *Cherry v. Selsky,* 99 Civ. 4636(HB), 2000 U.S. Dist. LEXIS 9451 (S.D.N.Y. July 7, 2000). It is not completely clear which section of the opinion defendants are citing, because no pinpoint citation is given. In *Cherry,* Judge Baer held that the filing of a false misbehavior report by a corrections officer is a grievable matter. *See id.* at *21. However, *Cherry* is readily distinguishable from the instant case because in *Cherry,* the plaintiff had "not brought a claim with respect to the due process afforded him at his disciplinary hearing [...]." *Id.* at *15. In contrast, Samuels makes this claim. As a consequence, the due process violations, including the allegedly wrongful confiscation (to the extent it led to the misbehavior adjudication) may be appealed directly.

Consequently, while Samuels has not exhausted his administrative remedies with regard to the injuries he suffered from the confiscation *alone,* he has exhausted his administrative remedies with regard to the injuries he suffered from the confiscation inasmuch as the confiscation of the religious materials serves as the basis for the disciplinary hearing.[FN17]

> [FN17.] The confiscation of Samuels' documents is not an ancillary issue unrelated to the disciplinary hearing (as was Samuels' Eighth Amendment argument, *see supra* note 14). Instead, the allegedly improper confiscation of materials is part and parcel of the disciplinary proceeding. The primary harm suffered by Samuels of the confiscation was not the value of the documents seized (which is never mentioned by Samuels) but the fact that the confiscation of allegedly harmless materials led to his confinement in keeplock and later in a special

housing unit for 180 days.

3. Special Housing Unit Confinement

Defendants similarly argue that Samuels' claim of retaliatory confinement in a special housing unit is barred because he failed to exhaust all available administrative remedies.[FN18] It is not entirely clear whether Samuels is making an argument based on retaliation. On one hand, he states that "Plaintiff [sic] claim is not on issue of retaliation." Samuels Aff., at ¶ 4. Elsewhere, he argues that "Plaintiff should not need to fear imposition of [special housing unit] confinement because they [sic] have engaged in prison litigation and/or prison reform activity [...]." Opposition Brief, at 25. As noted above, after being sentenced, Samuels was apparently transferred to a special housing unit for 180 days, which involves confinement for twenty-three hours per day.

> [FN18.] There are two separate retaliation issues at play in this action. The first, discussed here, is Samuels' claim of retaliatory confinement in a special housing unit. The second, discussed below, is Samuels' claim that the misbehavior adjudication itself was a form of retaliation for the NYTS's opposition to the Cell Building Project. *See supra* note 5.

Defendants represent to the Court that confinement to a special housing unit is ordinarily grievable. *See* Reply Brief, at 11. Samuels failed to bring this grievance to the Inmate Grievance Program. However, Samuels argues, and defendants do not contest, that Samuels was transferred to the special housing unit as punishment for his misbehavior adjudication, even though he was sentenced to 180 days of keeplock. Consequently, his appeal of his misbehavior adjudication necessarily implicates his sentence-not only his *de jure* punishment of 180 days of keeplock, 180 days' loss of telephone, package, and commissary privileges, but also his *de facto* punishment of 180 days of special housing unit confinement. *See Flanagan,* 2002 WL 122921, at *2. The transfer to a special housing unit potentially implicates due process concerns. *See, e.g., Tookes v. Artuz,* 00 Civ. 4969, 2002 WL 1484391, at *3 (S.D.N.Y. July 11, 2002) (noting that in the Second Circuit, confinement in a special

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

housing unit for more than 101 days generally implicates a liberty interest protected by the Due Process Clause).

4. DOCS Policy Regarding the Five Percent Nation of Gods & Earths

**\*10** Samuels makes an oblique reference to the fact that DOCS has treated members of the Five Percent Nation of Gods and Earths unfairly and partially. *See* Opposition Brief, at 3. To the extent that Samuels has a claim regarding DOCS's treatment of members of the Five Percent Nation, it is not directly tied to his disciplinary hearing and has not been grieved through the Inmate Grievance Program. Moreover, he has not taken issue with DOCS policies regarding the Five Percent Nation in his appeal. Consequently, this issue is dismissed with prejudice.

5. Dismissal of Action

Defendants argue that because Samuels seeks to assert certain unexhausted claims, "the entire action should be dismissed," irrespective of the fact that some claims are (as defendants concede) exhausted. Reply Brief, at 11. Defendants point to no binding precedent in support of this contention. The only New York case cited by defendants is *Radcliffe v. McGinns,* 00 Civ. 4966 (LMM), 2001 U.S. Dist. LEXIS 15528 (S.D.N.Y. Sept. 27, 2001). However, *Radcliffe* does not support defendants assertion that dismissal of some unexhausted claims mandates the dismissal of all claims, because in that case the claims were unexhausted as to *all* defendants. On that basis, the *Radcliffe* court dismissed all claims without prejudice. This Court thus does not find that dismissal of the exhausted claims is warranted.

B. Due Process

1. Samuels Pleads a Valid Due Process Claim

Defendants argue that Samuels does not plead a valid due process claim, claiming that Samuels does not identify a liberty interest, protected by the Due Process Clause, of

which he was deprived. *See* Motion Brief, at 9. Defendants state that "[other] then [sic] allege that he was sentenced to keeplock and transferred to Upstate, plaintiff does not allege any facts that distinguishes [sic] the disciplinary sentence from general prison population conditions." [FN19] *Id.* at 9. Defendants cite *Walker v. Goord,* 98 Civ. 5217(DC), 2000 U.S. Dist. LEXIS 3501, at \*22 (S.D.N.Y. Mar. 22, 2000) for the proposition that a complaint that merely alleges that a plaintiff was housed in a special housing unit does not state a due process claim. *See* Motion Brief, at 10. In fact, *Walker* 's ruling is not so sweeping. In *Walker,* the court held that to establish a liberty interest, a prisoner "must establish that the restraint imposed creates an 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Walker,* at \*21 (quoting *Sandin v. Conner,* 515 U.S. 472, 484 (1995)). The court also reiterated the Second Circuit's holding that there is no "bright-line rule regarding the length or type of sanction" necessary. *Walker,* at \*21 (citation omitted). The prisoner must also establish that the state has granted its inmates a protected liberty interest in remaining free from that confinement or restraint. *Id.* at \*21.

FN19. As noted *supra,* Samuels was also sentenced to 180 days' loss of packages, telephone, and commissary privileges.

**\*11** Samuels is able to meet this burden. The deprivation of liberty Samuels suffered was onerous. He was moved from the inmate honor block housing unit to keeplock and then to a special housing unit. *See supra* note 11. Moreover, unlike the plaintiff in *Walker,* Samuels identifies the length of time he was punished (180 days). *See Walker,* at \*22. In light of these facts, and given the length of his confinement, Samuels has met the *Sandin* test cited above. *See Tookes v. Artuz,* 00 Civ. 4969, 2002 WL 1484391, at \*3 (S.D.N.Y. July 11, 2002). Additionally, the requirement of an appealable hearing, with certain procedural safeguards, *see infra,* indicates that the state has granted inmates a protected liberty interest in remaining free from keeplock and special housing unit placement.

Due process requirements for a prison disciplinary hearing are "in many respects less demanding than those for criminal prosecutions." *Espinal v. Goord,* 180 F.Supp.2d

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

532, 537 (S.D.N.Y.2002) (quoting *Edwards v. Balisok,*
520 U.S. 641, 647 (1997)). At the same time, "[p]rison
walls do not form a barrier separating prison inmates from
the protections of the Constitution." *Duamutef v. Hollins,*
297 F.3d 108, 112 (2d Cir.2002) (citation omitted). With
respect to Tier III hearings such as the one at issue here,
the Fourteenth Amendment requires that:

(1) the inmate receive at least twenty-four hours written
notice of the disciplinary charges against him;

(2) the inmate be permitted to call witnesses and present
evidence "when permitting him to do so would not be
unduly hazardous to institutional safety or correctional
goals";

(3) the inmate be judged by a fair and impartial hearing
officer;

(4) the disciplinary conviction be supported by some
evidence; and

(5) the inmate be provided with a written statement of fact
findings that support the disposition as well as the reasons
for the disciplinary action taken.

*Espinal,* 180 F.Supp.2d at 538 (citing *Wolff v.*
*McDonnell,* 418 U.S. 539, 563-69 (1974)) (internal
citations omitted)).

2. Whether Samuels Received the Process Due Him

Defendants concede that Samuels was entitled to the
aforementioned rights under *Wolff. See* Reply Brief, at 13.
They argue, however, that Samuels received all the
procedural safeguards due him. Before analyzing
defendants points in detail, the Court notes the paucity of
the record before it. While Samuels has provided nearly
fifty exhibits, defendants have provided only a two-page
affidavit by Inmate Grievance Program Director Thomas
G. Eagen dated March 13, 2002, attached to which is a
nine-line computer printout of what purports to be

Samuels' grievance file. Defendants have failed to submit,
*inter alia,* a transcript of the disciplinary hearing, a
transcript or audio recording of the confidential witness
statements, a written basis for the rejection of Samuels'
witnesses, or a copy of the documents that were
supposedly seized from Samuels' cell. While the Court is
cognizant of the fact that the instant motion is not one for
summary judgment, without these and other documents, it
is difficult for this Court fully to evaluate the merits of the
parties' arguments. More troubling is the fact that this is
apparently not the first time an inmate has been sentenced
to a special housing unit on the basis of evidence which
has not been preserved for judicial review. Indeed, in
*Cherry v. Selsky,* 99 Civ. 4636, 2000 U.S. Dist. LEXIS
9451, at *9-*12 (S.D.N.Y. July 7, 2000), a case cited by
defendants, the court noted that on more than one
occasion, Selsky was forced to reverse his previous
decision denying an inmate's appeal because the "record
of [the disciplinary] hearing was incomplete and the
'confidential tape' was 'unavailable for judicial review.'
' *Id.* at *9 (citation omitted). On the occasion cited by the
*Cherry* court, the inmate's record was expunged, but only
after the plaintiff had served 125 days in a special housing
unit. *See id.* at *9.

a. Witnesses

***12** Samuels argues that his due process rights were
violated because he was not permitted to call Dr.
Peter-Raoul as a witness at his disciplinary hearing. *See*
Complaint, at 9; Ex. V, at 2. Defendants state, without
explanation, that "it is clear that the proffered testimony
would have been irrelevant and redundant." Motion Brief,
at 13. The Court agrees with defendants that the right of an
inmate to call witnesses in his defense is not limitless.
Nevertheless, prison authorities' failure to allow an inmate
to call a witness may be grounds for reversal, where the
authorities fail to justify their actions. *See Ayers v. Ryan,*
152 F.3d 77, 81 (2d Cir.1998). In this case, Dr.
Peter-Raoul was apparently the author of some or all of
the "subversive" materials and had close ties to the
theological seminary program at the prison. According to
Samuels, she also "assisted plaintiff with his course
syllabus and provided much of the material utilized"
therein. Complaint, at 9. She was therefore in a unique
position to explain the appropriateness and relevance of
the materials allegedly possessed by Samuels, who had in
fact argued that the materials in question were issued to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

him through the NYTS program with the authorization of prison officials. *See, e.g.,* Complaint, at 5, Ex. V, at 2. The misbehavior hearing record sheet states that, "if any witness is denied [the opportunity to testify,] form 2176 explaining the reason for that determination must be given to the inmate and included as part of the record." Ex. O. No such form was filled out, and nowhere in the record do defendants explain or justify their exclusion of Dr. Peter-Raoul. *See* Ex. Q. Due process rights may be violated where prison authorities fail "without rational explanation" to obtain a witness requested by an inmate during a disciplinary hearing. *Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998). Defendants' failure to justify their exclusion of Dr. Peter-Raoul potentially gives rise to a due process violation. [FN20] Dismissal is therefore inappropriate.

> FN20. Samuels also appears to allege that Cecilia, his employee assistant, was not permitted to testify on Samuels' behalf, and that Schwartzman testified outside Samuels' presence. *See* Ex. V, at 4; Plaintiffs' Supplemental Memorandum of Law and Reply Memorandum of Law in Further Support of Plaintiffs' Motion to Stay Complaint, at 8.

b. Confidential Informant

Samuels also protests the fact that he was not furnished with statements of the confidential informant, and argues that the record is insufficient to permit an assessment of the reliability of the informant's testimony. The Second Circuit has noted that "even if due process does require a hearing officer to conduct an independent assessment of the informant's credibility, that 'would not entail more than some examination of indicia relevant to credibility rather than wholesale reliance upon a third party's evaluation of that credibility.' " *Espinal v. Goord,* 180 F.Supp.2d 532, 540 (S.D.N.Y.2002) (quoting *Russell v. Scully,* 15 F.3d 219, 223 (2d Cir.1993)). In the instant case, the lack of a full record does not permit the Court to determine whether Irurre, the presiding officer at the Tier III hearing, made the required "examination of indicia relevant to the credibility of the confidential informant[ ], whether by an independent assessment or otherwise." *Espinal,* 180 F.Supp.2d at 540. Consequently, dismissal is inappropriate, because it is uncertain whether Samuels' punishment was supported by constitutionally sufficient evidence.

c. Assistance Provided by the Employee Assistant

**\*13** Samuels claims that his employee assistant, Cecilia, violated his due process rights by, *inter alia,* failing to explain the charges against Samuels, failing to provide Samuels with documentary evidence relating to the charges in the misbehavior report, failing to make a written record of the questions he asked the interviewees, failing to record the testimony of the witnesses he allegedly interviewed for Samuels, failing to interview the confidential informant on Samuels' behalf, and failing to interview one of the three witnesses requested by Samuels. *See* Complaint, at 9; Opposition Brief, at 22. Samuels also complains that his employee assistant did not assist in his defense but instead interrogated him about his alleged links to prison reform activists. *See* Ex. V, at 5-6.

Defendants concede that inmates have a limited right to assistance in misbehavior proceedings. *See* *Silva v. Casey,* 992 F .2d 20, 22 (2d Cir.1993) (per curiam). While defendants are correct in asserting that inmates do not have the right to appointed or retained counsel at a misbehavior hearing, *see* *Wolff v. McDonnell,* 418 U.S. 539, 570 (1974), they do have a right to assistance in "certain circumstances [in which they] will be unable to 'marshal evidence and present a defense' [...]." *Silva,* 992 F.2d at 22. Such situations include where the inmate is confined pending a superintendent's hearing. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 251-4.1(a)(4). The Green Haven Notice of Assistance form given to Samuels specifically states that an "inmate shall have the opportunity to pick an employee from established lists of persons who shall assist the inmate when a Misbehavior Report has been issued against the inmate if [...] [t]he inmate is keeplocked or confined to a special housing unit and is unable to prepare his defense." Ex. J. In the instant case, Samuels was entitled to an employee assistant because he was keeplocked immediately after the search of his cell and was unable to prepare his defense.

As noted, Samuels makes broad assertions as to the deficiency of his employee assistant. *See* Ex. V, at 3-8. Based on Samuels' factual assertions, it is possible that employee assistant Cecilia failed to provide even the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

"limited" assistance to which Samuels is entitled.[FN21] Such a failure potentially implicates Samuels' due process rights. *See* *Ayers v. Ryan*, 152 F.3d 77, 80-81 (2d Cir.1998). Because the instant motion requires that the Court accept Samuels' allegations as true, dismissal is inappropriate.

> FN21. By statute, the "assistant's role is to speak with the inmate charged, to explain the charges to the inmate, interview witnesses and to report the results of his efforts to the inmate. He may assist the inmate in obtaining documentary evidence or written statements which may be necessary. The assistant may be required by the hearing officer to be present at the disciplinary or superintendent's hearing." N.Y. Comp.Codes R. & Regs. tit. 7, § 251-4.2. While failure to adhere to regulations does not itself give rise to a claim under 42 U.S.C. § 1983, it may constitute evidence of a constitutional deprivation. *See, e.g., Duckett v. Ward*, 458 F.Supp. 624, 627 (S.D.N.Y.1978).

**d. Actions of the Hearing Officer**

With respect to the hearing officer, Irurre, Samuels makes a variety of claims, including the fact that Irurre prohibited Samuels from calling various witnesses and that he was partial. The Court has not been furnished with a copy of the hearing transcript. Because Samuels' claims potentially implicate constitutional rights, and because any holding on this issue requires that the Court make factual determinations, dismissal is inappropriate.

**e. Timeliness of the Hearing**

*14 Samuels claims that his due process rights were violated because his misbehavior hearing was held eight days after Samuels was confined following the search of his cell. Where an inmate is confined pending a disciplinary hearing (as was the case here), the hearing must be held within seven days of the confinement unless a later date is authorized by the commissioner or his designee. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 251-5.1(a). In this case, Samuels' rights were not violated.

The search took place on October 20, 1999, and the hearing occurred on October 27, 1999. Under § 251-5.1, the date of the incident is generally excluded. *See, e.g., Harris v. Goord*, 702 N.Y.S.2d 676 (N.Y.App. Div.3d Dep't 2000) (holding that the fourteen-day period in § 251-5.1(b), which runs from the date of the writing of a misbehavior report, is calculated by excluding the day the report is written). Thus, Samuels' hearing was held within seven days of his detention. Moreover, as Samuels admits, prison officials sought and received permission to begin the hearing on October 27, 1999, as per the requirements of § 251-5.1(a). *See* Ex. L. For these reasons, Samuels' claim with regard to the timeliness of his hearing is dismissed.

**f. Notice**

Defendants reject Samuels' argument that he received inadequate notice of the charges against him. It is unclear from the record what notice Samuels received, either before or during the disciplinary hearing. While the Court is cognizant of the fact that inmates are entitled to fewer due process rights than other citizens, it is possible to read Samuels' allegations as presenting a valid due process claim. The Court notes, for instance, that inmate rule 104.12 provides that "[i]nmates shall not lead, organize, participate, or urge other inmates to participate in work-stoppages, sit-ins, lock-ins, or other actions which may be detrimental to the order of the facility." N.Y. Comp.Codes R. & Regs. tit. 7, § 270.2(B)(5)(iii). The Appellate Division has held that possession of threatening materials alone does not violate the rule because the inmate must actually lead, organize, participate, or urge other inmates to participate, and not merely intend to do so. *See, e.g., Abdur-Raheem v. Goord,* 665 N.Y.S.2d 152, 153 (N.Y.App. Div. 4th Dep't 1997). While Samuels may have possessed the documents, it is unclear whether he received any notice of how he allegedly led, organized, or participated in (or urged others to participate in) a prohibited activity. Because the determination hinges on a factual determination, dismissal is inappropriate.

**C. Retaliation**

Samuels alleges that his misbehavior adjudication was based on the prison authorities' perception that members

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

of the NYTS were behind the planned Y2K protest. *See* Complaint, at 3-6. Samuels alleges that the materials seized were not subversive and were of a Christian nature. Defendants move to dismiss the retaliation argument, arguing that the prison authorities' decision is entitled to deference. While this may be true, such deference is inappropriate on a motion to dismiss, particularly given the paucity of the record. Without, for example, a transcript of the hearing, a transcript of the testimony of the confidential informant, or a copy of the allegedly subversive documents, the Court cannot blindly defer to the prison authorities. Consequently, dismissal is inappropriate. Defendants also argue that "even if it was improper to discipline plaintiff for possession of contraband, the evidence of plaintiff's involvement in the unauthorized demonstration provided a valid non-retaliatory basis for the disciplinary sanction and transfer." Reply Brief, at 19. This argument is incorrect for two reasons. First, the argument ignores the fact that the contraband documents and testimony of the confidential informant provide the basis for the prison authorities' finding that Samuels was involved in the demonstration. None of these documents is in the record before the Court; thus deference is inappropriate. Second, this argument ignores the fact that Samuels' punishment was ultimately based on the fact that he had violated two rules. His prison file reflects a guilty adjudication on two counts; also, had Samuels been disciplined for violating only one rule, his penalty would likely have been less.

D. Personal Involvement

**\*15** Defendants correctly note that liability of supervisory officials under 42 U.S.C. § 1983 may not be premised on the doctrine of *respondeat superior. See, e.g.,* Poe v. Leonard, 282 F.3d 123, 140 (2d Cir.2002); *Emblen v. Port Auth. of New York/New Jersey,* 00 Civ. 8877(AGS), 2002 WL 498634, at \*10 (S.D.N.Y., Mar. 29, 2002). Consequently, a defendant's personal involvement in the alleged constitutional violation is required. *See, e.g.,* Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658, 690-95 (1978). Such personal involvement may be proven in a number of ways:

(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed

to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir.1995). The Court examines the alleged personal involvement of each defendant in turn.

1. Donald Selsky

Defendants concede Donald Selsky, Director, Special Housing/Inmate Disciplinary Program, was personally involved in the alleged due process violations cited by Samuels. The Court notes that Selsky, acting "on behalf of the commissioner," reviewed and affirmed Samuels' superintendent's hearing and denied Samuels' appeal. Ex. 6, V.

2. Glenn Goord

Defendants argue that Glenn Goord, DOCS Commissioner, has no personal involvement in this case, and that the only link to him in this action is a newspaper article. *See* Reply Brief, at 20-21. This is incorrect, however, since the denial of Samuels' appeal was written by Selsky on behalf of Goord. As noted, defendants concede Selsky's involvement. Goord had a duty to supervise his subordinate who purportedly acted in his name.[FN22] Without further evidence, the Court cannot say as a matter of law that Goord was not personally involved, since personal involvement can include gross negligence "in supervising subordinates who committed the wrongful acts." Colon, 58 F.3d at 873.

FN22. Whereas the doctrine of *respondeat superior* involves the legal assignment of liability to a supervisor for the acts of a subordinate, the instant case involves a subordinate who claims to be (and legally is) acting in the name of his

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

supervisor.

3. Paul Cecilia

Defendants concede Paul Cecilia's personal involvement.

4. Javier Irurre

Defendants concede Javier Irurre's personal involvement.

5. Sergeant Schwartzman

Defendants concede Sergeant Schwartzman's personal involvement.

6. Dennis Bliden

Defendants allege that Samuels never argues that Bliden had the ability to remedy the alleged constitutional violation. However, Bliden wrote to Samuels in response to his appeal of the misbehavior adjudication, stating, "You may appeal this hearing to the Commissioner in Albany. Until such time as we receive a decision from this office, *I will not modify the disposition.*" Ex. U (emphasis added). Significantly, Bliden did not state that he *could* not modify the disposition but stated that he *would* not. This provides at least *prima facie* evidence that Bliden had the authority to overturn the disposition. While further facts may reveal this to be untrue, at this stage dismissal is inappropriate.

7. Jeffery McKoy

**\*16** Samuels fails to provide any support for McKoy's personal involvement in this action. Indeed, in responding to one of Samuels' appeals, McKoy wrote that "I do not have the authority to overturn Tier 3 dispositions." Ex. R. McKoy does not appear to have been complicit in any alleged deprivation of Samuels' rights, and, in contrast to Bliden, he plainly lacked the authority to overturn the

misbehavior adjudication. Consequently McKoy was not personally involved in the matter and all claims against him are dismissed.

8. Christopher P. Artuz

Christopher P. Artuz is Green Haven's Superintendent. Samuels states that his involvement stems from his failure to respond to a note sent to him. Although the note to Artuz does not appear to be in the record before the Court, it is referenced in a note from Bliden to Samuels. *See* Ex. T ("This is in response to your memo of November 12, 1999 to Superintendent Artuz"). Samuels also alleges that Artuz failed to respond when contacted by Dr. Peter-Raoul and Dr. Webber, who sought to intervene on Samuels' behalf. *See* Opposition Brief, at 27. While it is not clear that Artuz was personally involved, the question of Artuz's involvement in this matter is a factual question. In such cases, dismissal should be denied. As the Second Circuit noted in *Williams v. Smith,* 781 F.2d 319, 324 (2d Cir.1986), "even if [the prison superintendent] did not actively affirm the conviction on administrative appeal, we cannot say, on this record, that as Superintendent [of the prison] he was not directly responsible for the conduct of prison disciplinary hearings [...]."

E. Qualified Immunity

Defendants move to dismiss this action based on the qualified immunity of defendants. As defendants correctly point out, government employees are generally immune from liability for civil damages "when their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known." ' *Duamutef v. Hollins,* 297 F.3d 108, 111 (2d Cir.2002) (citation omitted). As a preliminary matter, it should be noted that qualified immunity is only a defense to claims for money damages and are not a defense for equitable relief or injunctions. *See, e.g., Charles W. v. Maul,* 214 F.3d 350, 360 (2d Cir.2000). To the extent that Samuels seeks equitable relief, defendants' potential claims of qualified immunity are no bar.

The Court is unable to determine at this time whether the remaining defendants are entitled to qualified immunity in

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

this case. The reason is that without having basic documentary evidence, including a transcript of the disciplinary hearing, a transcript of the testimony of the confidential informant, and the documents allegedly seized from Samuels' cell, the Court cannot determine whether these defendants violated Samuels' clearly established constitutional or statutory rights. Because it is a fact-intensive question, it cannot be disposed of at this stage.

V. Conclusion

**\*17** For the reasons set forth above, defendants' motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(1) and (6) is DENIED with respect to defendants Selsky, Goord, Cecilia, Irurre, Schwartzman, Bliden, and Artuz. Defendants' motion is GRANTED with respect to Jeffery McKoy, and with respect to the issue of DOCS policy regarding the Five Percent Nation of Gods and Earths and with regard to the timeliness of Samuels' misbehavior hearing.

SO ORDERED.

S.D.N.Y.,2002.
Samuels v. Selsky
Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

C

United States District Court,
E.D. New York.
Anthony PRICE, Plaintiff,
v.
Sheriff Edward REILLY, Kim Edwards, RN III, Perry
Intal, Mary Sullivan, RN, Dr. Benjamin Okonta, MD,
and Nassau University Medical Center, Defendants.
**No. 07-CV-2634 (JFB)(ARL).**

March 8, 2010.

**Background:** Pro se inmate, who suffered from end stage
renal disease requiring dialysis, filed § 1983 action against
sheriff, nurse practitioner, physician, and medical center,
alleging violations of the Eighth Amendment for
defendants' failure to provide adequate medical care.
Defendants moved for summary judgment.

**Holdings:** The District Court, Joseph F. Bianco, J., held
that:

(1) there was no evidence that administrative remedy was
available to inmate;

(2) prison medical staff's modification of inmate's
medication dosage did not constitute deliberate
indifference to his medical needs;

(3) prison's failure to provide food with inmate's
medication was not sufficiently serious to satisfy objective
prong of test for deliberate indifference to serious medical
needs;

(4) medical staff did not act with culpable intent to
consciously disregard inmate's serious medical needs;

(5) genuine issue of material fact as to whether prison
medical staff was aware of, and consciously disregarded
inmate's request for a kidney transplant test precluded
summary judgment;

(6) genuine issue of material fact as to whether inmate's
shoulder pain was a serious medical condition precluded
summary judgment;

(7) sheriff was not liable under § 1983; but

(8) genuine issues of material fact precluded summary

judgment on § 1983 liability of registered nurse and
doctor.

Motion granted in part and denied in part.

West Headnotes

**[1] Federal Civil Procedure 170A** 〰️ **2547.1**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)3 Proceedings
                170Ak2547 Hearing and Determination
                    170Ak2547.1 k. In general. Most Cited
Cases
Generally, plaintiffs' failure to respond or contest facts set
forth by defendants in their statement of facts, submitted
in support of summary judgment, constitutes admission of
those facts, and facts are accepted as undisputed under
local rule. U.S.Dist.Ct.Rules S.D.N.Y., Civil Rule 56.1.

**[2] Federal Civil Procedure 170A** 〰️ **25**

170A Federal Civil Procedure
    170AI In General
        170AI(B) Rules of Court in General
            170AI(B)1 In General
                170Ak25 k. Local rules of District Courts.
Most Cited Cases
District court has broad discretion to determine whether to
overlook a party's failure to comply with local court rules.

**[3] Federal Civil Procedure 170A** 〰️ **2547.1**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)3 Proceedings
                170Ak2547 Hearing and Determination
                    170Ak2547.1 k. In general. Most Cited

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

Cases

District court, when analyzing motion for summary judgment by sheriff and medical personnel in inmate's pro se action alleging cruel and unusual punishment, would treat as admitted only those facts in defendants' statement of facts that were supported by admissible evidence and not controverted by other admissible evidence in the record, given that inmate was acting pro se, he failed to file and serve a response to defendant's statement, but he had identified arguments and factual assertions in statement with which he disagreed. U.S.C.A. Const.Amend. 8; U.S.Dist.Ct.Rules S.D.N.Y., Civil Rule 56.1.

[4] Federal Civil Procedure 170A 🗝 657.5(1)

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(A) Pleadings in General
            170Ak654 Construction
                170Ak657.5 Pro Se or Lay Pleadings
                    170Ak657.5(1) k. In general. Most Cited Cases
Court must construe pro se complaint broadly, and interpret it to raise the strongest arguments that it suggests.

[5] Attorney and Client 45 🗝 62

45 Attorney and Client
    45II Retainer and Authority
        45k62 k. Rights of litigants to act in person or by attorney. Most Cited Cases

Federal Civil Procedure 170A 🗝 657.5(1)

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(A) Pleadings in General
            170Ak654 Construction
                170Ak657.5 Pro Se or Lay Pleadings
                    170Ak657.5(1) k. In general. Most Cited Cases

Federal Civil Procedure 170A 🗝 2546

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)3 Proceedings
                170Ak2542 Evidence
                    170Ak2546 k. Weight and sufficiency.
Most Cited Cases
Though pro se litigant's pleadings and other submissions are afforded wide latitude, pro se party's conclusory assertions, completely unsupported by evidence, are not sufficient to defeat motion for summary judgment.

[6] Civil Rights 78 🗝 1304

78 Civil Rights
    78III Federal Remedies in General
        78k1304 k. Nature and elements of civil actions.
Most Cited Cases
To prevail on a claim under § 1983, a plaintiff must show: (1) deprivation of any rights, privileges, or immunities secured by the Constitution and its laws, (2) by a person acting under the color of state law. 42 U.S.C.A. § 1983.

[7] Prisons 310 🗝 317

310 Prisons
    310II Prisoners and Inmates
        310II(H) Proceedings
            310k316 Exhaustion of Other Remedies
                310k317 k. In general. Most Cited Cases
In order to determine if prisoner exhausted his administrative remedies prior to commencement of lawsuit, as required by PLRA, court must first establish from a legally sufficient source that an administrative remedy is applicable, and that the particular complaint does not fall within an exception. Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

[8] Prisons 310 🗝 313

310 Prisons

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

310II Prisoners and Inmates
310II(H) Proceedings
310k307 Actions and Litigation
310k313 k. Trial. Most Cited Cases

Whether administrative remedy was available to prisoner in a particular prison or prison system, and whether such remedy was applicable to grievance underlying prisoner's suit, for purpose of PLRA's exhaustion requirement, are not questions of fact; rather, such issues either are, or inevitably contain, questions of law. Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

[9] Civil Rights 78 ☞ 1319

78 Civil Rights
78III Federal Remedies in General
78k1314 Adequacy, Availability, and Exhaustion of State or Local Remedies
78k1319 k. Criminal law enforcement; prisons. Most Cited Cases

Sheriff and prison medical staff provided no evidence that an administrative remedy was available to inmate who suffered from end state renal disease, and who sought, but did not receive, medical testing to determine if he was a candidate for kidney transplant, and thus inmate's § 1983 action alleging violations of Eighth Amendment would not be dismissed for his failure to exhaust administrative remedies under PLRA; defendants failed to establish procedural framework for grievance resolution at the prison or the availability of any administrative remedies for prisoner's situation. U.S.C.A. Const.Amend. 8; Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

[10] Sentencing and Punishment 350H ☞ 1533

350H Sentencing and Punishment
350HVII Cruel and Unusual Punishment in General
350HVII(H) Conditions of Confinement
350Hk1533 k. Deliberate indifference in general. Most Cited Cases

Test for determining whether prison official's actions or omissions rise to level of "deliberate indifference" in violation of the Eighth Amendment, as will allow recovery by prisoner in federal civil rights action, is twofold: first, prisoner must demonstrate that he is incarcerated under conditions posing substantial risk of serious harm, and second, prisoner must demonstrate that defendant prison officials possessed sufficient culpable intent. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

[11] Sentencing and Punishment 350H ☞ 1533

350H Sentencing and Punishment
350HVII Cruel and Unusual Punishment in General
350HVII(H) Conditions of Confinement
350Hk1533 k. Deliberate indifference in general. Most Cited Cases

Second prong of test for determining whether prison officials acted with deliberate indifference to rights of prisoners in violation of the Eighth Amendment, that of "culpable intent," in turn involves two-tier inquiry; specifically, prison official has sufficient culpable intent if he has knowledge that inmate faces substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate harm. U.S.C.A. Const.Amend. 8.

[12] Sentencing and Punishment 350H ☞ 1546

350H Sentencing and Punishment
350HVII Cruel and Unusual Punishment in General
350HVII(H) Conditions of Confinement
350Hk1546 k. Medical care and treatment. Most Cited Cases

Mere fact that an inmate's underlying disease is a "serious medical condition" does not mean that prison staff's allegedly incorrect treatment of that condition automatically poses an "objectively serious health risk," in violation of Eighth Amendment. U.S.C.A. Const.Amend. 8.

[13] Prisons 310 ☞ 192

310 Prisons
310II Prisoners and Inmates
310II(D) Health and Medical Care
310k191 Particular Conditions and Treatments
310k192 k. In general. Most Cited Cases

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

**Sentencing and Punishment 350H** 🗝 **1546**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
      350HVII(H) Conditions of Confinement
        350Hk1546 k. Medical care and treatment. Most Cited Cases

Even though inmate's end stage renal disease requiring dialysis was serious medical condition, prison medical staff did not act with deliberate indifference to inmate's medical needs in violation of his Eighth Amendment rights by modifying his medication dosage, since reduction in medication levels posed no objectively serious health risk to inmate; only injury inmate suffered was an increase in phosphorous levels, which was correctable, and a slight rash. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[14] Prisons 310** 🗝 **192**

310 Prisons
    310II Prisoners and Inmates
      310II(D) Health and Medical Care
        310k191 Particular Conditions and Treatments
          310k192 k. In general. Most Cited Cases

**Sentencing and Punishment 350H** 🗝 **1546**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
      350HVII(H) Conditions of Confinement
        350Hk1546 k. Medical care and treatment. Most Cited Cases

Even though inmate's prescriptions indicated that his medications for renal disease were to be taken with meals, prison officials' failure to provide food with the medication was not sufficiently serious to satisfy objective prong of test for deliberate indifference to inmate's serious medical needs, in violation of Eighth Amendment; inmate did not suffer any harm from taking medicine without food. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[15] Sentencing and Punishment 350H** 🗝 **1546**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
      350HVII(H) Conditions of Confinement
        350Hk1546 k. Medical care and treatment. Most Cited Cases

An inmate's mere disagreement with prison officials' prescribed medication dosage is insufficient as a matter of law to establish officials' "deliberate indifference" to his medical needs, in violation of the Eighth Amendment. U.S.C.A. Const.Amend. 8.

**[16] Prisons 310** 🗝 **192**

310 Prisons
    310II Prisoners and Inmates
      310II(D) Health and Medical Care
        310k191 Particular Conditions and Treatments
          310k192 k. In general. Most Cited Cases

**Sentencing and Punishment 350H** 🗝 **1546**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
      350HVII(H) Conditions of Confinement
        350Hk1546 k. Medical care and treatment. Most Cited Cases

Even though inmate disagreed with medical treatment he received at prison, medical staff did not act with culpable intent to consciously disregard inmate's serious medical needs, in violation of his Eighth Amendment rights, by adjusting the dosage levels of his prescription medication for renal disease; dosage inmate received adequately treated his condition, he suffered no injury from modification of dosage other than increased phosphorous levels, and officials changed dosage to correct those levels. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[17] Federal Civil Procedure 170A** 🗝 **2491.5**

170A Federal Civil Procedure
    170AXVII Judgment
      170AXVII(C) Summary Judgment
        170AXVII(C)2 Particular Cases
          170Ak2491.5 k. Civil rights cases in

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

general. Most Cited Cases
Genuine issue of material fact as to whether prison medical staff was aware of, and consciously disregarded inmate's request for a kidney transplant test, precluded summary judgment in inmate's § 1983 action alleging officials' deliberate indifference to his medical needs, in violation of Eighth Amendment. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[18] Sentencing and Punishment 350H ☞ 1546**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1546 k. Medical care and treatment. Most Cited Cases
An inmate's chronic pain can constitute a "serious medical condition" for purposes of claim of deliberate indifference to a serious medical need under the Eighth Amendment. U.S.C.A. Const.Amend. 8;.

**[19] Federal Civil Procedure 170A ☞ 2491.5**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2491.5 k. Civil rights cases in general. Most Cited Cases
Genuine issue of material fact as to whether inmate's shoulder pain was a serious medical condition, and whether prison medical staff acted with deliberate indifference by failing to prescribe pain medication or take x-rays, despite inmate's ongoing complaints, precluded summary judgment, in inmate's § 1983 Eighth Amendment claims against medical staff. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[20] Civil Rights 78 ☞ 1355**

78 Civil Rights
    78III Federal Remedies in General
        78k1353 Liability of Public Officials
            78k1355 k. Vicarious liability and respondeat

superior in general; supervisory liability in general. Most Cited Cases
Supervisor liability in § 1983 action can be shown in one or more of the following ways: (1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring. 42 U.S.C.A. § 1983.

**[21] Civil Rights 78 ☞ 1358**

78 Civil Rights
    78III Federal Remedies in General
        78k1353 Liability of Public Officials
            78k1358 k. Criminal law enforcement; prisons. Most Cited Cases
Sheriff was not liable under § 1983 for alleged deliberate indifference to medical needs of inmate related to inmate's end stage renal disease or chronic shoulder pain; there was no showing that sheriff was personally involved in denying medical treatment to inmate, or that there was a custom or policy at prison of allowing alleged constitutional violations. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[22] Federal Civil Procedure 170A ☞ 2491.5**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2491.5 k. Civil rights cases in general. Most Cited Cases
Genuine issue of material fact as to whether registered nurse on prison medical staff was personally involved in prison's alleged failure to arrange for inmate's kidney transplant test precluded summary judgment in inmate's § 1983 action alleging officials' deliberate indifference to his medical needs, in violation of Eighth Amendment. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

**[23] Civil Rights 78 ☞ 1358**

78 Civil Rights
    78III Federal Remedies in General
        78k1353 Liability of Public Officials
            78k1358 k. Criminal law enforcement; prisons.
Most Cited Cases
If prison doctor denies medical treatment to an inmate, that doctor is "personally involved" in alleged constitutional violation for purposes of § 1983 liability.
U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[24] Federal Civil Procedure 170A ☞ 2491.5**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2491.5 k. Civil rights cases in general. Most Cited Cases
Genuine issue of material fact as to whether doctor denied medical treatment to inmate suffering from end stage renal disease, precluded summary judgment in inmate's § 1983 action alleging prison officials' deliberate indifference to his medical needs, in violation of Eighth Amendment.
U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.
*347 Anthony Price, pro se.

Edward J. Troy, Law Office of Edward J. Troy, Greenlawn, NY, for the Defendants.

**\*348 MEMORANDUM AND ORDER**

JOSEPH F. BIANCO, District Judge:

Pro se plaintiff Anthony Price (hereinafter "Price" or "plaintiff") alleges, pursuant to 42 U.S.C. § 1983, that Sheriff Edward Reilly, Kim Edwards, RN, Perry Intal, Mary Sullivan, RN, Dr. Benjamin Okonta, and Nassau University Medical Center (hereinafter "defendants") violated his Eighth Amendment rights by acting with deliberate indifference to his serious medical needs while plaintiff was incarcerated at the Nassau County Correctional Center (hereinafter "NCCC"). Specifically, plaintiff alleges that defendants: (1) prescribed an incorrect dosage of medication for his renal disease; (2) failed to get him tested for a kidney transplant list; and (3) failed to adequately treat him for shoulder pain. Defendants have moved for summary judgment on all of plaintiffs' claims. For the reasons set forth below, defendants' motion is granted in part and denied in part. Specifically, defendants' motion is granted with respect to plaintiff's claim regarding the dosage of his prescription medication and with respect to all of plaintiff's claims against Sheriff Reilly. Defendants' motion is denied in all other respects.

**I. FACTS**

[1][2][3] The Court has taken the facts set forth below from the parties' depositions, affidavits, and exhibits, and from the defendants' Rule 56.1 statement of facts.FN1 They are not findings of fact by the Court, but rather are assumed to be true for the purposes of deciding this motion. Upon consideration of a motion for summary judgment, the Court shall construe the facts in the light most favorable to the non-moving party-here, the plaintiff. See Capobianco v. City of New York, 422 F.3d 47, 50 n. 1 (2d Cir.2005). Unless otherwise noted, where a party's 56.1 statement or deposition is cited, that fact is undisputed or the opposing party has pointed to no evidence in the record to contradict it.

FN1. The Court notes that plaintiff failed to file and serve a response to defendants' Local Rule 56.1 Statement of Facts in violation of Local Civil Rule 56.1. Generally, a "plaintiff['s] failure to respond or contest the facts set forth by the defendants in their Rule 56.1 statement as being undisputed constitutes an admission of those facts, and those facts are accepted as being undisputed." Jessamy v. City of New Rochelle, 292 F.Supp.2d 498, 504 (S.D.N.Y.2003) (quoting NAS Elecs., Inc. v. Transtech Elecs. PTE Ltd., 262 F.Supp.2d 134, 139 (S.D.N.Y.2003)). However, "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules." Holtz v. Rockefeller & Co., 258 F.3d 62, 73 (2d Cir.2001) (citations omitted); see

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

*also Giliani v. GNOC Corp.,* No. 04 Civ. 2935(ILG), 2006 WL 1120602, at *2 (E.D.N.Y. Apr. 26, 2006)* (exercising court's discretion to overlook the parties' failure to submit statements pursuant to Local Civil Rule 56.1). In his opposition papers, plaintiff identifies defendants' arguments and factual assertions with which he disagrees. In the exercise of its broad discretion, and given plaintiff's *pro se* status, the Court will deem admitted only those facts in defendants' Rule 56.1 statement that are supported by admissible evidence and not controverted by other admissible evidence in the record. *See Jessamy,* 292 F.Supp.2d at 504-05. Furthermore, the Court has carefully reviewed all of the parties' submissions, including plaintiff's deposition, to determine if plaintiff has any evidence to support his claims.

### A. Arrival at NCCC and Medication

Plaintiff was incarcerated in the Nassau County Correctional Center from January 7, 2007 to December 11, 2007. (Price Dep. at 6, 35.) Plaintiff has end stage renal disease and has been on dialysis since 2004 related to kidney failure. (*Id.* at 10; Defs.' 56.1 ¶ 2.) Plaintiff takes two daily medications, Renagel and PhosLo, for this condition. (Price Dep. at 10.) Before arriving**349** at the NCCC,[FN2] plaintiff was taking two 800 milligram pills of Renagel three times a day and two 667 milligram pills of PhosLo three times a day. (*Id.* at 12-13.)

FN2. Plaintiff was incarcerated at the Elmira correctional facility in 2005 and 2006. (Price Dep. at 7-8.)

When plaintiff arrived at the NCCC, he was interviewed by Perry Intal, a nurse practitioner in the medical intake department. (*Id.* at 21-22.) Plaintiff told Intal about his medical history, including that he was a dialysis patient and that he took medications. (*Id.* at 22.) Plaintiff was given a prescription for one 800 milligram pill of Renagel two times a day and one 667 milligram pill of PhosLo two times a day. (*Id.* at 23-24.) Two or three weeks later, plaintiff went to dialysis treatment and a blood test revealed high phosphorous levels. (*Id.* at 25-26.) As a

result, plaintiff was given an increased dosage of medication. (*Id.* at 25-27.) Thereafter, plaintiff's phosphorous levels decreased and about one month later (*id.* at 30-31), his dosage was decreased to one 800 milligram pill of Renagel three times a day and two 667 milligram pills of PhosLo three times a day. (*Id.* at 31-33.) This was the dosage plaintiff received for the rest of his incarceration at the NCCC.[FN3] (*Id.* at 32-33.) Plaintiff believed that the dosage he was receiving was "wrong" and that it was "hurting" him. (*Id.* at 59-60.) However, the more plaintiff complained about the dosage hurting him, "the more it seemed like the people got aggravated." (*Id.* at 60.) In addition, plaintiff's prescriptions for Renagel and PhosLo indicate that the medications were to be taken with meals. (*See* Defs.' Ex. E.) Plaintiff alleges, however, that the medications were sometimes given to him without food or at times that interfered with his meals. (Price Dep. at 23, 60.)

FN3. Plaintiff testified that, at the time of his deposition, he was receiving two 800 milligram pills of Renagel three times a day and two 667 milligram pills of PhosLo three times a day at the Fishkill correctional facility. (Price Dep. at 11-12.)

Besides receiving medication, plaintiff also received dialysis treatment three times a week at the Nassau University Medical Center. (*Id.* at 30.) On some occasions, plaintiff refused dialysis treatment because he "was feeling good" and "wanted to take a break" from treatment. (*Id.* at 56.) Plaintiff's regular medical treatment at the hospital also included a blood test every 30 days. (*Id.* at 27-28, 30.)

### B. Kidney Transplant Request

In February or March 2007, plaintiff spoke with a social worker named "Susan" about getting tested for a kidney transplant. (*Id.* at 76.) A test was required before an inmate could be placed on a waiting list for kidney transplants. (*Id.* at 80-81.) Only two hospitals in the area dealt with such matters: Stony Brook and a hospital in Westchester County. (*Id.* at 75-76.) Susan tried to contact Dr. Benjamin Okonta (hereinafter "Okonta") at Nassau University Medical Center in or about February or March

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

2007 (*id.* at 76-77), but Susan told plaintiff that Okonta did not get back to her.[FN4] (*Id.* at 65-66, 74-78.) Susan also submitted a letter to Okonta in July 2007, stating: "As per our conversation on 7/27/07, I am re-submitting for your review my request [for] your medical services on behalf of our renal dialysis pt., Anthony Price." (*Id.* at 77-78; Defs.' Ex. K.) Plaintiff never received a response from Okonta. (Price Dep. at 82.)

> FN4. Plaintiff never interacted with Okonta except through Susan, the social worker. (Price Dep. at 73-74.)

Susan also submitted a letter to Nurse Mary Sullivan (hereinafter "Sullivan"), the **\*350** day supervisor at the NCCC medical center, stating: "As per our telephone conversation, I am submitting in writing Anthony Price's request for referral and evaluation to a kidney transplant center ... Stonybrook Univ. Medical Ctr." (Def.'s Ex. K.) At some point in time, plaintiff was called down to the NCCC medical center and was told by Sullivan that defendants knew about plaintiff's request to get on the kidney transplant list but that they had "other priorities right now." (Price Dep. at 70.) Plaintiff believed Sullivan was referring to his other health issues. (*Id.* at 70.) Plaintiff did not ask when he would be tested for the kidney transplant list. (*Id.* at 71.)

On September 25, 2007, plaintiff filed a formal grievance regarding his request to be tested for the kidney transplant list.[FN5] (*Id.* at 85.) Plaintiff stated on his grievance form that he had "been waiting to take the test I need to take to get on the kidney transplant list" and that his social worker had told him that she had forwarded the paperwork to the jail, but could not get a response. (Defs.' Ex. F.) Plaintiff requested that he be "given the test to see if I'm a candidate for possibly a kidney transplant." (*Id.*) By interdepartmental memorandum dated September 27, 2007, the Inmate Grievance Coordinator informed plaintiff that the medical grievance "is being discussed with and turned over to the Health Services Administrator. The medical unit will evaluate you. A Grievance Unit Investigator will contact you at a later date to conduct an evaluation of your status and to closeout the paperwork." (*Id.*) In another memo dated October 5, 2007, defendant Kim Edwards,[FN6] informed plaintiff:

> FN5. This was the only formal medical grievance filed by plaintiff. (Price Dep. at 85.)

> FN6. Edwards never wrote medical orders for plaintiff or examined plaintiff. (Price Dep. at 61.) Plaintiff had no interaction with Edwards except her written response to plaintiff's grievance. (*Id.* at 67.)

The social worker can only inform you of treatment options that are available for your medical problem. If you are in need of a "test", documentation must be provided by the attending physician that is responsible for your renal treatment.

(*Id.*) Plaintiff interpreted this response from Edwards to mean that the matter was now in the hands of the medical department, and so he did not further proceed with the grievance and "did not feel it was necessary." (Pl.'s Opp. at 3.)[FN7] Therefore, plaintiff "signed off on the grievance," saying that he had "read it and accepted it." (Price Dep. at 88.)

> FN7. Although plaintiff does not offer this explanation in his deposition, the Court construes the *pro se* plaintiff's sworn "verified rebuttal" to defendants' motion for summary judgment as an evidentiary submission. *See* Patterson v. County of Oneida, *375 F.3d 206, 219 (2d Cir.2004)* ("[A] verified pleading, to the extent that it makes allegations on the basis of the plaintiff's personal knowledge, and not merely on information and belief, has the effect of an affidavit and may be relied on to oppose summary judgment."); *see also* Hailey v. N.Y. City Transit Auth., *136 Fed.Appx. 406, 407-08 (2d Cir.2005)* ("The rule favoring liberal construction of *pro se* submissions is especially applicable to civil rights claims.").

Plaintiff did not get the requested test during the remainder of his incarceration at the NCCC. (*Id.* at 90.) Defendants have submitted evidence that they made efforts to get plaintiff tested and, in fact, scheduled plaintiff for a test at Stony Brook University Hospital on November 29, 2007, but that the test had to be cancelled due to "unforeseen circumstances"; the test was

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

re-scheduled for January 10, 2008. (Defs.' Ex. G, Reschke Aff. ¶¶ 6-7.) Plaintiff was not informed about any scheduled test (Pl.'s Opp. at 2), and he was **\*351** transferred to a different facility in December 2007. (Price Dep. at 35; Reschke Aff. ¶ 7.)

### C. Shoulder Pain

Plaintiff began complaining about shoulder pain to the medical department at the NCCC on January 17, 2007, stating that his right shoulder was "extremely hurting." (Price Dep. at 36; Defs.' Ex. E, Sick Call Request, Jan. 17, 2007.) Plaintiff had received treatment for shoulder pain in the past, including a shot of Cortisone while at the Elmira facility (Price Dep. at 38, 53-54; Defs.' Ex. E, Sick Call Request, Apr. 14, 2007.) After the January 17 complaint, plaintiff was seen a couple of days later and given medication to rub on his shoulder. (Price Dep. at 41.) The medication did not help with the discomfort, and so plaintiff complained again later in January. (*Id.* at 42-43.) Although defendants gave plaintiff Motrin and Naprosyn for the pain, no x-rays were taken for several months. (*Id.* at 44, 55; Defs.' Ex. H, Edwards Aff. ¶ 4.) The pain medication continued to be ineffective, and plaintiff continued to complain. (*See, e.g., id.* at 45, 51.) For instance, in June 2007, plaintiff complained that his right shoulder "hurts really bad." (Def.'s Ex. E, Sick Call Request, June 12, 2007.) Plaintiff never refused medication for his shoulder. (Price Dep. at 56.) When plaintiff eventually was given x-rays, in April and November 2007 (Edwards Aff. ¶ 4), plaintiff was told that nothing was wrong with his shoulder.[FN8] (Price Dep. at 44; *see also* Defs.' Ex. J, Discharge Summary, November 2007 ("Although no definite evidence of venous thrombosis is seen with Rt. upper extremity, short segment acute thrombosis cannot be reliably excluded, Ultrasound might provide additional information....").) Plaintiff states that, with respect to his right shoulder, he currently wears a brace for carpal tunnel syndrome, has a separated shoulder, and takes shots for the pain. (Pl.'s Opp. at 4.)

> **FN8.** Plaintiff testified that he stopped complaining about his shoulder at some point because he was frustrated that defendants were not helping. (Price Dep. at 54-55.) There is evidence that plaintiff complained about his shoulder at least as late as June 2007, and again

complained in November 2007, which resulted in the taking of additional x-rays. (*See* Def.'s Ex. E, Sick Call Request, June 21, 2007; Defs.' Ex. J.)

### II. PROCEDURAL HISTORY

On June 28, 2007, plaintiff filed the initial complaint in this action. Plaintiff filed an amended complaint on August 20, 2007 alleging, pursuant to Section 1983, that defendants Sheriff Edward Reilly, Kim Edwards, Perry Intal, and Nassau University Medical Center violated his Eighth Amendment rights with respect to his medication dosage, kidney transplant request, and shoulder pain. On November 14, 2007, plaintiff filed another complaint in a separate action (No. 07-CV-4841) making substantially the same allegations and expanding on his allegations regarding the kidney transplant request. This complaint named Mary Sullivan and Dr. Benjamin Okonta, as well as the Nassau University Medical Center, as defendants. By Order dated July 11, 2008, the Court consolidated both actions (Nos. 07-CV2634 and 07-CV-4841) because the allegations in the two actions were "factually intertwined."

Defendants moved for summary judgment on May 29, 2009.[FN9] Plaintiff submitted**\*352** an opposition to the motion on August 3 and August 11, 2009.[FN10] Defendants replied on August 20, 2009. Plaintiff submitted a surreply on October 6, 2009. This matter is fully submitted.

> **FN9.** Pursuant to Local Rule 56.1, defendants also served plaintiff with the requisite notice for *pro se* litigants opposing summary judgment motions. *See Irby v. N.Y. City Transit Auth.,* 262 F.3d 412, 414 (2d Cir.2001) ("And we remind the district courts of this circuit, as well as summary judgment movants, of the necessity that pro se litigants have actual notice, provided in an accessible manner, of the consequences of the pro se litigant's failure to comply with the requirements of Rule 56.").

> **FN10.** Plaintiff submitted his two identical oppositions and a sur-reply to the instant motion not only in this action, but also in the now-consolidated action (No. 07-CV-4841). The

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

Court has considered all of plaintiff's submissions in both actions in deciding the instant motion.

### III. STANDARD OF REVIEW

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is appropriate only if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); Reiseck v. Universal Commc'ns of Miami, Inc., 591 F.3d 101, 104 (2d Cir.2010). The moving party bears the burden of showing that he or she is entitled to summary judgment. See Huminski v. Corsones, 396 F.3d 53, 69 (2d Cir.2005). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 122 (2d Cir.2004); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party " 'must do more than simply show that there is some metaphysical doubt as to the material facts .... [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.* ' " Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir.2002) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (emphasis in original)). As the Supreme Court stated in Anderson, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50, 106 S.Ct. 2505 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. Id. at 247-48, 106 S.Ct. 2505 (emphasis in original). Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth " 'concrete particulars' " showing that a trial is needed.

R.G. Group, Inc. v. Horn & Hardart Co., 751 F.2d 69, 77 (2d Cir.1984) (quoting SEC v. Research Automation Corp., 585 F.2d 31, 33 (2d Cir.1978)). Accordingly, it is insufficient for a party opposing summary judgment " 'merely to assert a conclusion without supplying supporting arguments or facts.' " BellSouth Telecomms., Inc. v. W.R. Grace & Co., 77 F.3d 603, 615 (2d Cir.1996) (quoting Research Automation Corp., 585 F.2d at 33).

[4][5] Where the plaintiff is proceeding *pro se,* the Court must "construe [the complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggest[s]." Weixel v. Bd. of Educ. of the City of N.Y., 287 F.3d 138, 145-46 (2d Cir.2002) (alterations in original) (quoting Cruz v. Gomez, 202 F.3d 593, 597 (2d Cir.2000)). Though a *pro se* litigant's pleadings and other submissions are afforded wide latitude, a *pro se* party's conclusory assertions, completely unsupported **353** by evidence, are not sufficient to defeat a motion for summary judgment. Shah v. Kuwait Airways Corp., 653 F.Supp.2d 499, 502 (S.D.N.Y.2009) ("Even a *pro se* party, however, 'may not rely simply on conclusory allegations or speculation to avoid summary judgment, but instead must offer evidence to show that its version of the events is not wholly fanciful.' " (quoting Auguste v. N.Y. Presbyterian Med. Ctr., 593 F.Supp.2d 659, 663 (S.D.N.Y.2009))).

### IV. DISCUSSION

[6] To prevail on a claim under Section 1983, a plaintiff must show: (1) the deprivation of any rights, privileges, or immunities secured by the Constitution and its laws; (2) by a person acting under the color of state law. 42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." Sykes v. James, 13 F.3d 515, 519 (2d Cir.1993).

There is no dispute for purposes of this motion that defendants were acting under color of state law. The question presented, therefore, is whether defendants' alleged conduct deprived plaintiff of his Eighth Amendment rights. Plaintiff alleges that his Eighth Amendment rights were violated when defendants: (1) prescribed him an incorrect dosage of medication for his renal disease; (2) failed to get him tested for the kidney

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

transplant list; and (3) failed to adequately treat him for his shoulder pain. For the reasons set forth below, after drawing all reasonable inferences from the facts in favor of plaintiff, the Court concludes that defendants are entitled to summary judgment on plaintiff's claim regarding the dosage of his medication and on all of plaintiff's claims against Sheriff Reilly. Defendants' motion for summary judgment is denied in all other respects.

### A. Exhaustion

As a threshold matter, defendants argue that plaintiff is barred from raising any Eighth Amendment claim with respect to his kidney transplant request because plaintiff has not exhausted his administrative remedies.[FN11] For the reasons set forth below, the Court disagrees and cannot conclude from this record that plaintiff failed to exhaust his administrative remedies.

> FN11. Defendants raise exhaustion only with respect to plaintiff's kidney transplant request, and so the Court does not consider exhaustion with respect to plaintiff's other claims.

### 1. Legal Standard

The Prison Litigation Reform Act of 1995 ("PLRA") states that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "The PLRA exhaustion requirement 'applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.' Prisoners must utilize the state's grievance procedures, regardless of whether the relief sought is offered through those procedures." Espinal v. Goord, 558 F.3d 119, 124 (2d Cir.2009) (quoting Porter v. Nussle, 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002)). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules." Woodford v. Ngo, 548 U.S. 81, 90, 126 S.Ct. 2378, 165 L.Ed.2d 368

(2006). Therefore, the exhaustion inquiry requires a court to "look at the state prison procedures and the prisoner's grievance to determine whether the prisoner has complied with those procedures." *354Espinal, 558 F.3d at 124 (citing Jones v. Bock, 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007) and Woodford, 548 U.S. at 88-90, 126 S.Ct. 2378).

Prior to Woodford, 548 U.S. 81, 126 S.Ct. 2378 (2006), the Second Circuit "recognized some nuances in the exhaustion requirement: (1) administrative remedies that are ostensibly 'available' may be unavailable as a practical matter, for instance, if the inmate has already obtained a favorable result in administrative proceedings but has no means of enforcing that result; (2) similarly, if prison officials inhibit the inmate's ability to seek administrative review, that behavior may equitably estop them from raising an exhaustion defense; (3) imperfect exhaustion may be justified in special circumstances, for instance if the inmate complied with his reasonable interpretation of unclear administrative regulations, or if the inmate reasonably believed he could raise a grievance in disciplinary proceedings and gave prison officials sufficient information to investigate the grievance." Reynoso v. Swezey, 238 Fed.Appx. 660, 662 (2d Cir.2007) (internal citations omitted); see also Davis v. New York, 311 Fed.Appx. 397, 399 (2d Cir.2009) (citing Hemphill v. New York, 380 F.3d 680, 686, 691 (2d Cir.2004)). However, the Second Circuit has not decided whether the above-discussed considerations apply post- Woodford. See, e.g., Reynoso, 238 Fed.Appx. at 662 ("Because we agree with the district court that [plaintiff] cannot prevail on any of these grounds, we have no occasion to decide whether Woodford has bearing on them."); Ruggiero v. County of Orange, 467 F.3d 170, 176 (2d Cir.2006) ("We need not determine what effect Woodford has on our case law in this area, however, because [plaintiff] could not have prevailed even under our pre- Woodford case law.").

As the Supreme Court has held, exhaustion is an affirmative defense: "We conclude that failure to exhaust is an affirmative defense under the PLRA, and that inmates are not required to specially plead or demonstrate exhaustion in their complaints." Jones v. Bock, 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007); see also Key v. Toussaint, 660 F.Supp.2d 518, 523 (S.D.N.Y.2009) ("Failure to exhaust remedies under the PLRA is an affirmative defense, and thus the defendants have the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

burden of proving that [plaintiff's] retaliation claim has not been exhausted." (citations omitted)).

### 2. Application

Defendants argue that plaintiff did not appeal the resolution of his grievance request, i.e., the memo from Edwards dated October 5, 2007, stating that: "If you are in need of a 'test', documentation must be provided by the attending physician that is responsible for your renal treatment." (Defs.' Ex. F.) Therefore, defendants argue, plaintiff has failed to exhaust his administrative remedies under the PLRA. (Defs.' Br. at 25.) Plaintiff argues in response that he did not believe any further action on his grievance was "necessary" because the matter was put into the hands of the medical department. (Pl.'s Opp. at 3.) For the reasons discussed below, the Court concludes that, on this record, defendants have not met their burden of proving that plaintiff failed to exhaust his administrative remedies.

[7][8][9] As discussed above, the PLRA requires exhaustion only with respect to "such administrative remedies as are available." See 42 U.S.C. § 1997e(a). Therefore, in order to determine whether plaintiff exhausted his administrative remedies, the Court "must first establish from a legally sufficient source that an administrative remedy is applicable and that the particular complaint does not fall within an exception. Courts should be careful to look at the applicable set of grievance procedures,*355 whether city, state or federal." Mojias v. Johnson, 351 F.3d 606, 610 (2d Cir.2003); see also Espinal, 558 F.3d at 124 (holding that, when considering exhaustion, courts must "look at the state prison procedures and the prisoner's grievance to determine whether the prisoner has complied with those procedures" (citations omitted)). "Whether an administrative remedy was available to a prisoner in a particular prison or prison system, and whether such remedy was applicable to the grievance underlying the prisoner's suit, are not questions of fact. They are, or inevitably contain, questions of law." See Snider v. Melindez, 199 F.3d 108, 113-14 (2d Cir.1999). However, "the existence of the procedure may be a matter of fact." Id. at 114.

On the record before the Court on this motion, the Court

is unable to establish from any legally sufficient source that an administrative remedy was available to plaintiff. Defendants have made no submissions to the Court regarding the applicable grievance procedures at the NCCC. See, e.g., Abney v. County of Nassau, 237 F.Supp.2d 278, 281 (E.D.N.Y.2002) (noting that the "Inmate Handbook" for the Nassau County Correctional Facility procedure was "annexed to Defendants' moving papers"). Specifically, defendants have not submitted any evidence, by affidavit or otherwise, that NCCC procedures offer a remedy to address the particular situation in this case.FN12 Therefore, the Court cannot conclude from this record that plaintiff had an available administrative remedy that he failed to exhaust.

FN12. The Court notes that the October 5, 2007 memo from Edwards is unclear as to which party bore the responsibility of obtaining plaintiff's medical records. (Defs.' Ex. F.) Edwards explains in an affidavit that she advised plaintiff that "it would be necessary for his doctors to provide the selected facility with his records before a request for testing would be considered." (Edwards Aff. ¶ 2.) It is unclear whether plaintiff had access to these records or whether the prison would need to obtain them. Thus, there appears to be a factual question as to the implementation of this grievance resolution. A similar situation arose in Abney v. McGinnis, 380 F.3d 663 (2d Cir.2004), in which the Second Circuit held that where a prisoner achieved favorable results in several grievance proceedings but alleged that prison officials failed to implement those decisions, that prisoner was without an administrative remedy and therefore had exhausted his claim for purposes of the PLRA. See id. at 667-68, 669 ("Where, as here, prison regulations do not provide a viable mechanism for appealing implementation failures, prisoners in [plaintiff's] situation have fully exhausted their available remedies."). The Court recognizes that Abney, 380 F.3d 663, was decided before Woodford v. Ngo, 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006), and that, as discussed above, the Second Circuit has not decided whether the various nuances to the exhaustion requirement apply post- Woodford. However, the Court need not decide the applicability of any such nuances to the

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

exhaustion requirement because, as discussed above, defendants have failed to establish the procedural framework for grievance resolution at the NCCC and the availability of *any* administrative remedies.

Although there may be administrative remedies for such a situation under the New York Department of Corrections regulations, *see* 7 N.Y. Comp.Codes R. & Regs. tit. 7, § 701.5(c)(4) ("If a decision is not implemented within 45 days, the grievant may appeal to CORC citing lack of implementation as a mitigating circumstance."), it does not follow that the same procedure applies at the NCCC. *See, e.g., Abney v. County of Nassau,* 237 F.Supp.2d at 283 ("The flaw in Defendants' argument, however, is that the cases relied upon were all decided under the New York State administrative procedure-none were decided in the context of the procedure relied upon-the Nassau County Inmate Handbook procedure.").

B. Plaintiff's Claims of Deliberate Indifference

1. Legal Standard

"[D]eliberate indifference to serious medical needs of prisoners constitutes the **356** 'unnecessary and wanton infliction of pain" proscribed by the Eighth Amendment" and therefore "states a cause of action under § 1983." *Estelle v. Gamble,* 429 U.S. 97, 104-05, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). As the Second Circuit has explained,

[t]he Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody. Moreover, under 42 U.S.C. § 1983, prison officials are liable for harm incurred by an inmate if the officials acted with "deliberate indifference" to the safety of the inmate. However, to state a cognizable section 1983 claim, the prisoner must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice.

*Hayes v. N.Y. City Dep't of Corr.,* 84 F.3d 614, 620 (2d Cir.1996) (citations omitted). Within this framework, "[d]eliberate indifference to a prisoner's serious medical needs constitutes cruel and unusual punishment, in violation of the Eighth Amendment, as made applicable to the states through the Fourteenth Amendment." *Bellotto v. County of Orange,* 248 Fed.Appx. 232, 236 (2d Cir.2007). Thus, according to the Second Circuit,

[d]efendants may be held liable under § 1983 if they ... exhibited deliberate indifference to a known injury, a known risk, or a specific duty, and their failure to perform the duty or act to ameliorate the risk or injury was a proximate cause of plaintiff's deprivation of rights under the Constitution. Deliberate indifference is found in the Eighth Amendment context when a prison supervisor knows of and disregards an excessive risk to inmate health or safety .... Whether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause.

*Ortiz v. Goord,* 276 Fed.Appx. 97, 98 (2d Cir.2008) (citations and quotation marks omitted); *see also Harrison v. Barkley,* 219 F.3d 132, 137 (2d Cir.2000) ("Deliberate indifference will exist when an official 'knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it.' ") (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)); *Curry v. Kerik,* 163 F.Supp.2d 232, 237 (S.D.N.Y.2001) (" '[A]n official acts with the requisite deliberate indifference when that official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' ") (quoting *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (internal quotation marks omitted)).

[10][11] In particular, the Second Circuit has set forth a two-part test for determining whether a prison official's actions or omissions rise to the level of deliberate indifference:

The test for deliberate indifference is twofold. First, the plaintiff must demonstrate that he is incarcerated under conditions posing a substantial risk of serious harm.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

Second, the plaintiff must demonstrate that the defendant prison officials possessed sufficient culpable intent. The second prong of the deliberate indifference test, culpable intent, in turn, involves a two-tier inquiry. Specifically, a prison official has sufficient culpable intent if he has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm.

**\*357** *Hayes,* 84 F.3d at 620 (internal citation omitted); *see also Phelps v. Kapnolas,* 308 F.3d 180, 185-86 (2d Cir.2002) (setting forth two-part deliberate indifference test).

In *Salahuddin v. Goord,* the Second Circuit set forth in detail the objective and subjective elements of a medical indifference claim. 467 F.3d 263 (2d Cir.2006). In particular, with respect to the first, objective element, the Second Circuit explained:

The first requirement is objective: the alleged deprivation of adequate medical care must be sufficiently serious. Only deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation. Determining whether a deprivation is an objectively serious deprivation entails two inquiries. The first inquiry is whether the prisoner was actually deprived of adequate medical care. As the Supreme Court has noted, the prison official's duty is only to provide reasonable care. Thus, prison officials who act reasonably [in response to an inmate-health risk] cannot be found liable under the Cruel and Unusual Punishments Clause, and, conversely, failing to take reasonable measures in response to a medical condition can lead to liability.

Second, the objective test asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner. For example, if the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is

sufficiently serious. Factors relevant to the seriousness of a medical condition include whether a reasonable doctor or patient would find [it] important and worthy of comment, whether the condition significantly affects an inmate's daily activities, and whether it causes chronic and substantial pain. In cases where the inadequacy is in the medical treatment given, the seriousness inquiry is narrower. For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone. Thus, although we sometimes speak of a serious medical condition as the basis for an Eighth Amendment claim, such a condition is only one factor in determining whether a deprivation of adequate medical care is sufficiently grave to establish constitutional liability.

467 F.3d at 279-80 (citations and quotation marks omitted); *see also Jones v. Westchester County Dep't of Corr. Medical Dep't,* 557 F.Supp.2d 408, 413-14 (S.D.N.Y.2008).

With respect to the second, subjective component, the Second Circuit further explained:

The second requirement for an Eighth Amendment violation is subjective: the charged official must act with a sufficiently culpable state of mind. In medical-treatment cases not arising from emergency situations, the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health. Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law. This mental state requires that the charged official act or fail to act while actually aware **\*358** of a substantial risk that serious inmate harm will result. Although less blameworthy than harmful action taken intentionally and knowingly, action taken with reckless indifference is no less actionable. The reckless official need not desire to cause such harm or be aware that such harm will surely or almost certainly result. Rather, proof of awareness of a substantial risk of the harm suffices. But recklessness

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

entails more than mere negligence; the risk of harm must be substantial and the official's actions more than merely negligent.

*Salahuddin,* 467 F.3d at 280 (citations and quotation marks omitted); *see also Jones,* 557 F.Supp.2d at 414. The Supreme Court has stressed that

in the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute "an unnecessary and wanton infliction of pain" or to be "repugnant to the conscience of mankind." Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment.

*Estelle v. Gamble,* 429 U.S. 97, 105-06, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (internal citations omitted); *see also Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) ("A showing of medical malpractice is therefore insufficient to support an Eighth Amendment claim unless the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces a conscious disregard of a substantial risk of serious harm." (internal quotations omitted)); *Harrison v. Barkley,* 219 F.3d 132, 139 (2d Cir.2000) (a medical practitioner who "delay[s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not evince the culpability necessary for deliberate indifference).

2. Application

Plaintiff alleges that defendants violated his Eighth Amendment rights by: (1) prescribing an incorrect dosage of his renal disease medication; (2) failing to have him tested for the kidney transplant list; and (3) failing to properly treat his shoulder pain. The Court considers each claim in turn and, for the reasons discussed below, concludes that defendants are entitled to summary

judgment on plaintiff's claim regarding his medication dosage and on all of plaintiff's claims against Sheriff Reilly. Defendants' motion is denied in all other respects.

a. Medication Dosage

Defendants concede that plaintiff's kidney condition is serious (Defs.' Br. at 21), but argue that the dosage of Renagel and PhosLo prescribed for plaintiff did not result in any injury. Defendants also argue that, even if the dosage was incorrect, it was at most "an error in medical judgment." Finally, defendants argue that plaintiff cannot show deliberate indifference because defendants continually tested plaintiff and twice changed the dosage of his medication depending on his phosphorous levels. (Defs.' Br. at 22.) For the reasons set forth below, the Court agrees and concludes that no rational jury could find that defendants acted with deliberate indifference with respect to the prescription*359 of medication for plaintiff's renal disease.

i. Objective Prong

[12][13][14] Plaintiff has failed to present any evidence that the allegedly incorrect medication dosage posed an objectively serious risk to plaintiff's health. As a threshold matter, the mere fact that plaintiff's underlying renal disease is a serious medical condition does not mean that the allegedly incorrect treatment for that condition poses an objectively serious health risk. *See Smith v. Carpenter,* 316 F.3d 178, 186-87 (2d Cir.2003) ("As we noted in *Chance* [*v. Armstrong,* 143 F.3d 698 (2d Cir.1998) ], it's the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes."). Furthermore, plaintiff has failed to produce any evidence that his medication dosage at the NCCC caused him any objectively serious harm. Instead, plaintiff testified merely that the prescribed dosage was "wrong" and was "hurting" him.[FN13] (Price Dep. at 60.) Plaintiff's belief that the medication dosage was incorrect is insufficient to establish the objective prong of the deliberate indifference test.[FN14] *See Fox v. Fischer,* 242 Fed.Appx. 759, 760 (2d Cir.2007) ("[T]he fact that [plaintiff] was provided Claritin as a substitute for Allegra

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

fails to establish deliberate indifference to a serious medical need, because there is no allegation that the change in medication caused harm, if any, sufficiently serious to establish the objective prong of a deliberate indifference claim...."); *Reyes v. Gardener,* 93 Fed.Appx. 283, 285 (2d Cir.2004) ( "[Plaintiff] has offered no evidence ... showing that the prescribed medication regimen deviated from reasonable medical practice for the treatment of his condition."). Although there is evidence that plaintiff's phosphorous levels increased when he was prescribed a lesser dosage of medication upon arriving at the NCCC (*see* Price Dep. at 23-26), that is not by itself enough to support a finding of an objectively serious condition.[FN15] *See Smith,* 316 F.3d at 188-89 ("Although [plaintiff] suffered from an admittedly serious underlying condition, he presented no evidence that the two alleged episodes of missed medication resulted in permanent or on-going harm to his health, nor did he present any evidence explaining why the absence of actual physical injury was not a relevant factor in assessing the severity of his medical need.") (affirming denial of motion for new trial). Thus, plaintiff's medication dosage claim must fail because he cannot show that the complained-of dosage posed an objectively serious health risk.[FN16]

> FN13. Plaintiff does not distinguish between the initial dosage he received at the NCCC and the later dosages he received, instead arguing generally that all of the dosages he received at the NCCC were incorrect.

> FN14. Plaintiff's conclusory testimony that the dosage was "hurting" him also is insufficient to establish the objective prong of the deliberate indifference test. To the extent plaintiff claims that the medication caused him pain, there is no evidence in the record that plaintiff suffered from chronic pain or, indeed, any other objectively serious symptoms in connection with the medication dosage. Although not mentioned in plaintiff's deposition or in his opposition to the instant motion, plaintiff alleges in his amended complaint that the lesser dosage put him at risk of "itching" and "breaking of bones." (Amended Complaint, No. 07-CV-2634, at 4.) There is evidence that plaintiff suffered from a rash and/or itching while at the NCCC and that plaintiff was told at one point that he had

eczema. (*See* Price Dep. at 45-51.) However, there is no evidence to connect those symptoms with the medication dosage for his renal disease. (*See, e.g., id.* at 46 ("Q. Did anyone ever tell you what was causing a rash? A. I kept going to the-I had went to the dermatologist at Bellevue. To me, the doctor had an attitude like it ain't nothing wrong; like it was acne or something.").) Furthermore, there is no evidence that the rash and/or itching was an objectively serious condition. *See Lewal v. Wiley,* 29 Fed.Appx. 26, 29 (2d Cir.2002) (affirming summary judgment and holding that plaintiff's alleged "persistent rash" was not a "serious medical condition"); *see also Benitez v. Ham,* No. 04-CV-1159, 2009 WL 3486379, at *11 (N.D.N.Y. Oct. 21, 2009) ("[T]he evidence shows that Plaintiff suffered from a severe body itch. While this condition was undoubtedly unpleasant, it simply does not rise to the level of an Eighth Amendment violation."). In any event, even if plaintiff did suffer from an objectively serious condition because of the medication dosage, he cannot prove that defendants acted with a subjectively culpable state of mind, as discussed *infra.*

> FN15. In any event, as discussed *infra,* defendants adjusted plaintiff's dosage in response to the increase in phosphorous levels, and there is no evidence from which a rational jury could conclude that defendants acted with deliberate indifference in prescribing plaintiff's medication.

> FN16. Although he does not raise it in any of his pleadings or in his opposition to the instant motion, plaintiff testified at his deposition that he had to take the medication with meals but that sometimes he was given the medication without food or at times that interfered with his meals. (Price Dep. at 23, 60; Defs.' Ex. E.) The record is unclear as to how often this occurred. The Court assumes, as it must on this motion for summary judgment, that on some occasions plaintiff was given his medications not at meal times or at times that interfered with meals. However, plaintiff points to no evidence whatsoever of any harm caused by defendants' alleged conduct in this regard, and, therefore, no

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

rational jury could find that the provision of medication without food on some occasions was objectively serious. *See Gillard v. Kuykendall, 295 Fed.Appx. 102, 103 (8th Cir.2008)* (affirming summary judgment for defendants where defendants, on some occasions, "were late in giving [plaintiff] his medications and did not always administer them with meals as [plaintiff] apparently desired" where there was no evidence of any adverse consequences). Thus, any deliberate indifference claim based on these allegations would fail as well.

### ii. Subjective Prong

**[15][16]** Plaintiff's claim with respect to his medication dosage also fails because plaintiff cannot show that defendants acted with subjectively culpable intent, i.e., that they were aware of, and consciously disregarded, plaintiff's serious medical needs. Plaintiff's claim is based on his assertion that the prescribed dosage was "wrong." However, mere disagreement with a prescribed medication dosage is insufficient as a matter of law to establish the subjective prong of deliberate indifference. *See Chance v. Armstrong, 143 F.3d 698, 703 (2d Cir.1998)* ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation."); *Sonds v. St. Barnabas Hosp. Corr. Health Servs., 151 F.Supp.2d 303, 312 (S.D.N.Y.2001)* ("[D]isagreements over medications ... are not adequate grounds for a Section 1983 claim. Those issues implicate medical judgments and, at worst, negligence amounting to medical malpractice, but not the Eighth Amendment." (citing *Estelle,* 429 U.S. at 107, 97 S.Ct. 285)); *see also, e.g., Fuller v. Ranney,* No. 06-CV-0033, 2010 WL 597952, at *11 (W.D.N.Y. Feb. 17, 2010)* ("Plaintiff's claim amounts to nothing more than a disagreement with the prescribed treatment he received and his insistence that he be prescribed certain medications. Without more, plaintiff's disagreement with the treatment he received does not rise to the level of a constitutional violation of his Eighth Amendment rights."); *Covington v. Westchester County Dep't of Corr., No. 06 Civ. 5369, 2010 WL 572125, at *6 (S.D.N.Y. Jan. 25, 2010)* ("[Plaintiff's] claims that Defendants failed **\*361** to change or increase his medication and counseling

sessions amount to negligence claims at most, which is insufficient."); *Hamm v. Hatcher,* No. 05-CV-503, 2009 WL 1322357, at *8 (S.D.N.Y. May 5, 2009)* ("Plaintiff's unfulfilled demand for a larger dosage of [the medication] represents a mere disagreement over the course of Plaintiff's treatment and is inconsistent with deliberate indifference ....").

The fact that defendants adjusted the dosage of plaintiff's medication in response to plaintiff's phosphorous levels (*see* Price Dep. at 25-27) is also inconsistent with deliberate indifference. *See Bellotto v. County of Orange, 248 Fed.Appx. 232, 237 (2d Cir.2007)* ("The record also shows that mental health professionals responded to [plaintiff's] concerns about his medications and adjusted his prescription as they believed necessary.") (affirming summary judgment for defendants); *see also Jolly v. Knudsen, 205 F.3d 1094, 1097 (8th Cir.2000)* ("[Defendant's] actions in this case cannot reasonably be said to reflect deliberate indifference. The only relevant evidence in the record indicates that [defendant's] actions were aimed at correcting perceived difficulties in [plaintiff's] dosage levels [in response to blood tests]."); *Fuller, 2010 WL 597952, at *11* ("Moreover, a subsequent decision to prescribe plaintiff a certain medication does not indicate that the medication should have been prescribed earlier.")[FN17] Thus, there is no evidence in the record sufficient for a rational jury to find that defendants acted with deliberate indifference regarding the prescription dosage of plaintiff's renal disease medication.

FN17. To the extent plaintiff also argues that that defendants acted with deliberate indifference because he has received different prescriptions at different facilities, the Court rejects that argument as well. *See, e.g., Cole v. Goord,* No. 04 Civ. 8906, 2009 WL 1181295, at *8 n. 9 (S.D.N.Y. Apr. 30, 2009)* ("[Plaintiff's] reliance upon the fact that subsequent medical providers have provided him with a different course of medication or treatment ... does nothing to establish that [defendant] violated [plaintiff's] Eighth Amendment rights. Physicians can and do differ as to their determination of the appropriate treatment for a particular patient; that difference in opinion does not satisfy the requirements for a constitutional claim of deliberate indifference."

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

(citing *Estelle,* 429 U.S. at 97, 97 S.Ct. 285)).

In sum, based on the undisputed facts and drawing all reasonable inferences in plaintiff's favor, no rational jury could find that defendants were aware of, and consciously disregarded, plaintiff's objectively serious health needs regarding his medication dosage. Accordingly, defendants' motion for summary judgment is granted with respect to this claim.

### b. Kidney Transplant

[17] Defendants also argue that plaintiff cannot proceed with his deliberate indifference claim regarding his request to be tested for a kidney transplant. Defendants do not dispute the objective seriousness of plaintiff's underlying condition or the requested transplant, and instead argue only that defendants lacked subjective culpability. Specifically, defendants argue that they made reasonable efforts to get plaintiff tested. (Defs.' Br. at 23.) However, construing the facts in the light most favorable to plaintiff, a rational jury could find that defendants were aware of, and consciously disregarded, plaintiff's serious medical needs.

Plaintiff began requesting a kidney transplant test as early as February or March 2007 and still had not received one by the time he left the NCCC in December 2007. (*See* Price Dep. at 76-77, 90.) Requests were sent on plaintiff's behalf to Dr. Okonta at the Nassau University Medical Center and to Nurse Mary Sullivan at the NCCC medical department. (*See* Defs.' Ex. K.) The record indicates that plaintiff received no response from Okonta. (*See* Price Dep. at 82.) When plaintiff asked Sullivan about the test, Sullivan told him that defendants had "other priorities right now." (Price Dep. at 70.) Even after plaintiff filed a formal grievance in September 2007, he still did not receive the requested test. (*See* Defs.' Ex. F.) On these facts, where there was a delay of at least nine months in arranging a kidney transplant test for plaintiff despite plaintiff's repeated requests, and where defendants do not dispute the necessity of the test, a rational jury could find that defendants acted with deliberate indifference to plaintiff's serious medical needs. *See Harrison v. Barkley,* 219 F.3d 132, 138 (2d Cir.2000) (holding summary judgment inappropriate where there

was evidence that, *inter alia,* plaintiff was delayed dental treatment for a cavity for one year); *Hathaway v. Coughlin,* 841 F.2d 48, 50-51 (2d Cir.1988) ("[Plaintiff's] affidavit in opposition to [defendants'] motion for summary judgment alleged that a delay of over two years in arranging surgery ... amounted to deliberate indifference to his serious medical needs. We believe this is a sufficient allegation to survive a motion for summary judgment under *Archer* [*v. Dutcher,* 733 F.2d 14 (2d Cir.1984) ] because it raises a factual dispute ...."); *see also Lloyd v. Lee,* 570 F.Supp.2d 556, 569 (S.D.N.Y.2008) ("A reasonable jury could infer deliberate indifference from the failure of the doctors to take further steps to see that [plaintiff] was given an MRI. The argument that the doctors here did not take [plaintiff's] condition seriously is plausible, given the length of the delays. Nine months went by after the MRI was first requested before the MRI was actually taken.").

Defendants point to evidence in the record that they were, in fact, attempting to get plaintiff tested throughout the time in question, but were unsuccessful in their efforts. (*See* Defs.' Br. at 23; Reschke Aff. ¶ 3.) However, defendants' proffered explanation for the delay, i.e., the difficulty of finding a hospital because of transportation and security concerns, raises questions of fact and does not, as a matter of law, absolve them of liability. *See Johnson v. Bowers,* 884 F.2d 1053, 1056 (8th Cir.1989) ("It is no excuse for [defendants] to urge that the responsibility for delay in surgery rests with [the hospital]."); *Williams v. Scully,* 552 F.Supp. 431, 432 (S.D.N.Y.1982) (denying summary judgment where plaintiff "was unable to obtain treatment ... for five and one half months, during which time he suffered considerable pain" despite defendants' "explanations for the inadequacy of [the prison's] dental program"), *cited approvingly in Harrison v. Barkley,* 219 F.3d 132, 138 (2d Cir.2000). Thus, whether defendants' efforts were reasonable over the nine month period at issue is a question of fact for the jury.

In sum, on this record, drawing all reasonable inferences in plaintiff's favor, the Court concludes that a rational jury could find that defendants acted with deliberate indifference regarding plaintiff's request for a kidney transplant test. Accordingly, defendants' motion for summary judgment on this claim is denied.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

c. Shoulder

Defendants argue that summary judgment is warranted on the claim relating to the alleged shoulder injury because plaintiff's complained-of shoulder pain was not objectively serious and plaintiff has failed to show subjectively culpable intent by defendants. For the reasons set forth below, the Court disagrees and concludes that a rational jury could find that defendants acted with deliberate indifference **363** regarding plaintiff's shoulder pain. Thus, summary judgment on this claim is denied.

i. Objective Prong

[18][19] Defendants argue that plaintiff cannot satisfy the objective element of the deliberate indifference test regarding his shoulder because plaintiff alleges only that he had pain in his shoulder and not that he had "a condition of urgency, one that might produce death, deterioration or extreme pain." (Defs.' Br. at 22.) However, plaintiff did complain to the medical department that his right shoulder was "extremely hurting." (Defs.' Ex. E, Sick Call Request, Jan. 17, 2007.) Furthermore, plaintiff states that he now has a separated shoulder and wears a brace for carpal tunnel syndrome. (Pl.'s Opp. at 4.) In any event, chronic pain can be a serious medical condition. See Brock v. Wright, 315 F.3d 158, 163 (2d Cir.2003) ("We will no more tolerate prison officials' deliberate indifference to the chronic pain of an inmate than we would a sentence that required the inmate to submit to such pain. We do not, therefore, require an inmate to demonstrate that he or she experiences pain that is at the limit of human ability to bear, nor do we require a showing that his or her condition will degenerate into a life-threatening one."); Hathaway v. Coughlin, 37 F.3d 63, 67 (2d Cir.1994); see also Sereika v. Patel, 411 F.Supp.2d 397, 406 (S.D.N.Y.2006) ( "[Plaintiff's] allegation that he experienced severe pain as a result of the alleged delay in treatment, together with his allegation that the alleged delay in treatment resulted in reduced mobility in his arm and shoulder, raise issues of fact as to whether his shoulder injury constitutes a sufficiently serious medical condition to satisfy the objective prong of the deliberate indifference standard.") (denying summary judgment). Thus, the Court cannot conclude at the summary judgment stage that plaintiff did not suffer from a serious medical condition.

ii. Subjective Prong

Defendants also argue that plaintiff cannot meet the subjective prong of the deliberate indifference test because plaintiff was seen repeatedly by the medical department and was given pain medication. (Defs.' Br. at 22.) Defendants also point to the fact that when x-rays were ultimately taken, they were negative.[FN18] However, construing the facts most favorably to plaintiff, a rational jury could find that defendants were aware of, and consciously disregarded, plaintiff's serious medical needs. Plaintiff repeatedly complained to defendants over a period of several months, beginning in January 2007, about the pain in his shoulder (see Defs.' Ex. E), and further complained that the pain medication he was being given was ineffective.[FN19] (See, e.g., Price Dep. at 45, 51.) In June 2007, for instance, plaintiff was still complaining that his right shoulder "hurts really bad," and that he had been "complaining of that for months." (Def.'s Ex. E, Sick Call Requests, June 12 and June 17, 2007.) Thus, it is uncontroverted that defendants were aware of plaintiff's alleged chronic shoulder pain.

FN18. The November 2007 x-ray records indicate that "short segment acute thrombosis cannot be reliably excluded, Ultrasound might provide additional information ...." (See Defs.' Ex. J, Discharge Summary, November 2007.) Defendants point to no evidence in the record that they followed up on that x-ray report.

FN19. Plaintiff also informed defendants that he had been given a Cortisone shot for his shoulder at his previous place of incarceration. (See Price Dep. at 38, 53-54; Defs.' Ex. E, Sick Call Request, Apr. 14, 2007.)

Despite plaintiff's complaints, however, plaintiff was not given an x-ray exam for several months (Price Dep. at 44; Def.'s **364** Ex. J), and was not given any pain medication besides Motrin and Naprosyn. (Price Dep. at 55.) Although defendants argue that the treatment for plaintiff's shoulder pain was reasonable under the circumstances, there are factual questions in this case that preclude

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

summary judgment. *See Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998) ("Whether a course of treatment was the product of sound medical judgment, negligence, or deliberate indifference depends on the facts of the case.") (reversing grant of motion to dismiss). Drawing all reasonable inferences from the facts in favor of plaintiff, a rational jury could find that defendants acted with deliberate indifference by not changing plaintiff's pain medication despite his continued complaints that it was ineffective, by failing to take x-rays for several months, and by failing to follow-up on a November 2007 x-ray report indicating that further tests might be needed (*see* Defs.' Ex. J, Discharge Summary, November 2007). *See Brock,* 315 F.3d at 167 ("It is not controverted that [defendant] was aware that [plaintiff] was suffering some pain from his scar. The defendants sought to cast doubt on the truthfulness of [plaintiff's] claims about the extent of the pain he was suffering and, also, to put into question DOCS' awareness of [plaintiff's] condition. But at most, defendants' arguments and evidence to these effects raise issues for a jury and do not justify summary judgment for them."); *Hathaway,* 37 F.3d at 68-69 (holding that, *inter alia,* two-year delay in surgery despite plaintiff's repeated complaints of pain could support finding of deliberate indifference). The fact that defendants offered some treatment in response to plaintiff's complaints does not as a matter of law establish that they had no subjectively culpable intent. *See Archer v. Dutcher,* 733 F.2d 14, 16 (2d Cir.1984) ("[Plaintiff] received extensive medical attention, and the records maintained by the prison officials and hospital do substantiate the conclusion that [defendants] provided [plaintiff] with comprehensive, if not doting, health care. Nonetheless, [plaintiff's] affidavit in opposition to the motion for summary judgment does raise material factual disputes, irrespective of their likely resolution.... [Plaintiff's] assertions do raise material factual issues. After all, if defendants did decide to delay emergency medical-aid-even for 'only' five hours-in order to make [plaintiff] suffer, surely a claim would be stated under *Estelle.*"). Specifically, given the factual disputes in this case, the Court cannot conclude as a matter of law that defendants did not act with deliberate indifference when they allegedly declined to change their treatment for plaintiff's shoulder pain despite repeated complaints over several months that the pain persisted. *See, e.g., Lloyd,* 570 F.Supp.2d at 569 ("[T]he amended complaint plausibly alleges that doctors knew that [plaintiff] was experiencing extreme pain and loss of mobility, knew that the course of treatment they prescribed was ineffective, and declined to do anything to attempt to improve

[plaintiff's] situation besides re-submitting MRI request forms.... Had the doctors followed up on numerous requests for an MRI, the injury would have been discovered earlier, and some of the serious pain and discomfort that [plaintiff] experienced for more than a year could have been averted."). Thus, there are factual disputes that prevent summary judgment on defendants' subjective intent.

In sum, on this record, drawing all reasonable inferences from the facts in favor of plaintiff, a rational jury could find that defendants acted with deliberate indifference to plaintiff's shoulder pain. Accordingly, defendants' motion for summary judgment on this claim is denied.

**\*365** C. Individual Defendants

Defendants also move for summary judgment specifically with respect to plaintiff's claims against three of the individual defendants: Sheriff Edward Reilly (hereinafter "Reilly"), Edwards, and Okonta. For the reasons set forth below, the Court grants defendants' motion with respect to Reilly, and denies it with respect to Edwards and Okonta.

1. Legal Standard

[20] "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under Section 1983." *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (citation and quotation marks omitted). In other words, "supervisor liability in a § 1983 action depends on a showing of some personal responsibility, and cannot rest on respondeat superior." *Id.* Supervisor liability can be shown in one or more of the following ways: "(1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring." *Id.* at 145 (citation omitted).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

2. Application

[21] Although plaintiff alleges in the complaint that Reilly was aware of plaintiff's condition and failed to assist,[FN20] there is no mention whatsoever of Reilly in plaintiff's deposition or in any of the parties' evidentiary submissions. Because there is no evidence in the record that Reilly was personally involved in any of the alleged constitutional violations or that there was a custom or policy of allowing such constitutional violations (and that Reilly allowed such custom or policy to continue), no rational jury could find Reilly liable for any of plaintiff's deliberate indifference claims. *See Richardson v. Goord, 347 F.3d 431, 435 (2d Cir.2003)* ("[M]ere linkage in the prison chain of command is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim."); *see also Mastroianni v. Reilly, 602 F.Supp.2d 425, 438-39 (E.D.N.Y.2009)* ("[T]he plaintiff cannot establish that Sheriff Reilly was grossly negligent in failing to supervise subordinates because the medical care of inmates at the NCCC was delegated to the Nassau Health Care Corporation and plaintiff provides no evidence that Reilly was otherwise personally involved in his treatment."). Therefore, defendants' motion for summary judgment with respect to plaintiff's claims against Sheriff Reilly is granted.

FN20. Plaintiff actually refers in the complaint to "Sheriff Edwards," but the Court determines, liberally construing the complaint, that this allegation refers to Sheriff Reilly.

[22] With respect to plaintiff's claims against Edwards and Okonta, however, there are disputed issues of fact that preclude summary judgment. Defendants argue that Edwards was not personally involved in the alleged constitutional violations because she did not treat plaintiff and merely responded to his grievance request. (Defs.' Br. at 24-25.) However, plaintiff testified that, although Edwards never physically treated him, she "takes care of appointments and makes sure you get to certain specialists" and that "she was in a position to make sure that I get the adequate care that I needed." (Price Dep. at 61-62.) Plaintiff also testified that he submitted a grievance request to **366 Edwards in order to be tested for the kidney transplant list, but that Edwards failed to get him on the list. (Price Dep. at 62-63.) Drawing all

reasonable inferences in favor of plaintiff, a rational jury could find that Edwards was personally involved in the alleged constitutional violations because she was in a position to get plaintiff tested for the kidney transplant list and failed to do so. *See McKenna v. Wright, 386 F.3d 432, 437-38 (2d Cir.2004)* ("Although it is questionable whether an adjudicator's rejection of an administrative grievance would make him liable for the conduct complained of, [defendant] was properly retained in the lawsuit at this stage, not simply because he rejected the grievance, but because he is alleged, as Deputy Superintendent for Administration at [the prison], to have been responsible for the prison's medical program." (citation omitted)). Thus, plaintiff has presented sufficient evidence of Edwards's personal involvement in the alleged constitutional violations to raise a genuine issue of material fact as to whether Edwards is liable for the alleged Eighth Amendment violations.

[23][24] Defendants also argue that Okonta was not personally involved in the alleged constitutional violations because he did not actually treat plaintiff. (Defs.' Br. at 24-25.) This argument misses the mark. It is plaintiff's allegation that Okonta violated plaintiff's constitutional rights precisely by not treating him. Plaintiff has presented evidence that he received no response from Okonta regarding his requests to be tested for the kidney transplant list. Where a prison doctor denies medical treatment to an inmate, that doctor is personally involved in the alleged constitutional violation. *See McKenna, 386 F.3d at 437* (finding "personal involvement" where medical defendants were alleged to have participated in the denial of treatment); *see also Chambers v. Wright, No. 05 Civ. 9915, 2007 WL 4462181, at *3 (S.D.N.Y. Dec. 19, 2007)* ("Prison doctors who have denied medical treatment to an inmate are 'personally involved' for the purposes of jurisdiction under § 1983." (citing *McKenna, 386 F.3d at 437*)). Although defendants argue that they were in fact making efforts to get plaintiff tested (Defs.' Br. at 25), the reasonableness of those efforts, as discussed above, is a factual question inappropriate for resolution on summary judgment.

In sum, defendants' motion for summary judgment on plaintiff's claims against Reilly is granted. Defendants' motion with respect to Edwards and Okonta is denied.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)


### V. CONCLUSION


For the foregoing reasons, the Court grants in part and denies in part defendants' motion for summary judgment. Specifically, the Court grants defendants' motion with respect to plaintiff's claim regarding the dosage of his renal disease medication and with respect to all of plaintiff's claims against Sheriff Reilly. Defendants' motion is denied in all other respects. The parties to this action shall participate in a telephone conference on Monday, April 5, 2010 at 3:30 p.m. At that time, counsel for defendants shall initiate the call and, with all parties on the line, contact Chambers at (631) 712-5670.


SO ORDERED.


E.D.N.Y.,2010.
Price v. Reilly
697 F.Supp.2d 344


END OF DOCUMENT


© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Karus LAFAVE, Plaintiff,
v.
CLINTON COUNTY, Defendants.
**No. CIV.9:00CV0744DNHGLS.**

April 3, 2002.

Karus Lafave, Plaintiff, Pro Se, Plattsburgh, for the Plaintiff.

Maynard, O'Connor Law Firm, Albany, Edwin J. Tobin, Jr., Esq., for the Defendants.

REPORT-RECOMMENDATION [FN1]

FN1. This matter was referred to the undersigned for Report-Recommendation by the Hon. David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b)(1)(B) and L.R. 72.3(c).

SHARPE, Magistrate J.

I. INTRODUCTION

*1 Plaintiff, *pro se,* Karus LaFave ("LaFave") originally filed this action in Clinton County Supreme Court. The defendant filed a Notice of Removal because the complaint presented a federal question concerning a violation of LaFave's Eighth Amendment rights (Dkt. No. 1). Currently before the court is the defendant's motion to dismiss made pursuant to Rule 12(b)(6) and in the alternative, pursuant to Rule 56(b) of the Federal Rules of Civil Procedure (Dkt. No. 5). LaFave, in response, is requesting that the court deny the motion, excuse his inability to timely file several motions, and to permit the

matter to be bought before a jury [FN2]. After reviewing LaFave's claims and for the reasons set forth below, the defendant's converted motion for summary judgment should be granted.

FN2. It should be noted that the date for dispositive motions was February 16, 2001. The defendant's motion to dismiss was filed on September 29, 2000. On January 9, 2001, this court converted the defendant's motion to dismiss to a motion for summary judgment, and gave LaFave a month to respond. On April 16, 2001, after three months and four extensions, LaFave finally responded.

II. BACKGROUND

LaFave brings this action under 42 U.S.C. § 1983 claiming that the defendant violated his civil rights under the Eighth Amendment [FN3]. He alleges that the defendant failed to provide adequate medical and dental care causing three different teeth to be extracted.

FN3. LaFave does not specifically state that the defendant violated his Eighth Amendment rights but this conclusion is appropriate after reviewing the complaint.

III. FACTS [FN4]

FN4. While the defendant provided the court with a "statement of material facts not in issue" and LaFave provided the court with "statement of material facts genuine in issue," neither provided the court with the exact nature of the facts.

Between January and July of 1999, LaFave, on several occasions, requested dental treatment because he was experiencing severe pain with three of his teeth. After being seen on several occasions by a Clinton County

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

Correctional Facility ("Clinton") doctor, he was referred to a dentist. Initially, LaFave's mother had made an appointment for him to see a dentist, but he alleges that Nurse LaBarge ("LaBarge") did not permit him to be released to the dentist's office [FN5]. Subsequently, he was seen by Dr. Boule, D.D.S ., on two occasions for dental examinations and tooth extractions.

> FN5. This appears to be in dispute because the medical records show that LaFave at first stated that his mother was going to make arrangements, but later requested that the facility provide a dentist.

IV. DISCUSSION

A. *Legal Standard*

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc ., 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); accord F.D.I.C. v. Giammettei, 34 F.3d 51, 54 (2d Cir.1994).* The moving party has the burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).* Once this burden is met, it shifts to the opposing party who, through affidavits or otherwise, must show that there is a material factual issue for trial. *Fed.R.Civ.P. 56(e); see Smythe v. American Red Cross Blood Services Northeastern New York Region, 797 F.Supp. 147, 151 (N.D.N.Y.1992).*

Finally, when considering summary judgment motions, *pro se* parties are held to a less stringent standard than attorneys. *Estelle v. Gamble, 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976); Haines v. Kerner, 404 U.S. 519, 520-21, 92 S.Ct. 594, 596, 30 L.Ed.2d 652 (1972).* Any ambiguities and inferences drawn from the facts must be viewed in the light most favorable to the non-moving party. *Thompson v. Gjivoje, 896 F.2d 716, 720 (2d Cir.1990).* With this standard in mind, the court now turns to the sufficiency of LaFave's claims.

B. *Eighth Amendment Claims*

**\*2** LaFave alleges that his Eighth Amendment rights were violated when the defendant failed to provide adequate medical care for his dental condition. The Eighth Amendment does not mandate comfortable prisons, yet it does not tolerate inhumane prisons either, and the conditions of an inmate's confinement are subject to examination under the Eighth Amendment. *Farmer v. Brennan, 511 U.S. 825, 832, 114 S.Ct. 1970, 1975, 128 L.Ed.2d 811 (1994).* Nevertheless, deprivations suffered by inmates as a result of their incarceration only become reprehensible to the Eighth Amendment when they deny the minimal civilized measure of life's necessities. *Wilson v. Seiter, 501 U.S. 294, 298, 111 S.Ct. 2321, 2324, 115 L.Ed.2d 271 (1991) (quoting Rhodes v. Chapman, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981)).*

Moreover, the Eighth Amendment embodies "broad and idealistic concepts of dignity, civilized standards, humanity, and decency ..." against which penal measures must be evaluated. See *Estelle v. Gamble, 429 U.S. 97, 102, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976).* Repugnant to the Amendment are punishments hostile to the standards of decency that " 'mark the progress of a maturing society." ' *Id.* (*quoting Trop v. Dulles, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958)* (plurality opinion)). Also repugnant to the Amendment, are punishments that involve " 'unnecessary and wanton inflictions of pain." ' *Id. at 103,97 S.Ct. at 290* (*quoting Gregg v. Georgia, 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976)).*

In light of these elementary principles, a state has a constitutional obligation to provide inmates adequate medical care. See *West v. Atkins, 487 U.S. 42, 54, 108 S.Ct. 2250, 2258, 101 L.Ed.2d 40 (1988).* By virtue of their incarceration, inmates are utterly dependant upon prison authorities to treat their medical ills and are wholly powerless to help themselves if the state languishes in its obligation. *See Estelle, 429 U.S. at 103, 97 S.Ct. at 290.* The essence of an improper medical treatment claim lies in proof of "deliberate indifference to serious medical

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

needs." *Id.* at 104, 97 S.Ct. at 291. Deliberate indifference may be manifested by a prison doctor's response to an inmate's needs. *Id.* It may also be shown by a corrections officer denying or delaying an inmate's access to medical care or by intentionally interfering with an inmate's treatment. *Id.* at 104-105, 97 S.Ct. at 291.

The standard of deliberate indifference includes both subjective and objective components. The objective component requires the alleged deprivation to be sufficiently serious, while the subjective component requires the defendant to act with a sufficiently culpable state of mind. *See Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). A prison official acts with deliberate indifference when he " 'knows of and disregards an excessive risk to inmate health or safety.' " *Id.* (*quoting Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979). However, " 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " *Id.*

*\*3* However, an Eighth Amendment claim may be dismissed if there is no evidence that a defendant acted with deliberate indifference to a serious medical need. An inmate does not have a right to the treatment of his choice. *See Murphy v. Grabo,* 1998 WL 166840, at *4 (N.D.N.Y. April 9, 1998) (*citation omitted* ). Also, mere disagreement with the prescribed course of treatment does not always rise to the level of a constitutional claim. *See Chance,* 143 F.3d at 703. Moreover, prison officials have broad discretion to determine the nature and character of medical treatment which is provided to inmates. *See Murphy,* 1998 WL 166840, at *4 (*citation omitted* ).

While there is no exact definition of a "serious medical condition" in this circuit, the Second Circuit has indicated what injuries and medical conditions are serious enough to implicate the Eighth Amendment. *See Chance,* 143 F.3d at 702-703. In *Chance,* the Second Circuit held that an inmate complaining of a dental condition stated a serious medical need by showing that he suffered from great pain for six months. The inmate was also unable to chew food and lost several teeth. The Circuit also recognized that dental conditions, along with medical conditions, can vary in severity and may not all be severe. *Id.* at 702. The court acknowledged that while some injuries are not serious enough to violate a constitutional right, other very similar

injuries can violate a constitutional right under different factual circumstances. *Id.*

The Second Circuit provided some of the factors to be considered when determining if a serious medical condition exists. *Id.* at 702-703. The court stated that " '[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain" ' are highly relevant. *Id.* at 702-703 (*citation omitted* ). Moreover, when seeking to impose liability on a municipality, as LaFave does in this case, he must show that a municipal "policy" or "custom caused the deprivation." *Wimmer v. Suffolk County Police Dep't,* 176 F.3d 125, 137 (2d Cir.1999).

In this case, the defendant maintains that the medical staff was not deliberately indifferent to his serious medical needs. As a basis for their assertion, they provide LaFave's medical records and an affidavit from Dr. Viqar Qudsi [FN6], M.D, who treated LaFave while he was incarcerated at Clinton. The medical records show that he was repeatedly seen, and prescribed medication for his pain. In addition, the record shows that on various occasions, LaFave refused medication because "he was too lazy" to get out of bed when the nurse with the medication came to his cell (*Def. ['s] Ex. A, P. 4)* .

FN6. Dr. Qudsi is not a party to this action.

According to the documents provided, Dr. Qudsi, examined LaFave on January 13, 1999, after LaFave reported to LaBarge that he had a headache and discomfort in his bottom left molar (*Qudsi Aff., P. 2*). Dr. Qudsi noted that a cavity was present in his left lower molar. *Id.* He prescribed Tylenol as needed for the pain and 500 milligrams ("mg") of erythromycin twice daily to prevent bacteria and infection. *Id.* On January 18, 19, and 20, 1999, the medical records show that LaFave refused his erythromycin medication (*Def. ['s] Ex. B, P. 1).*

*\*4* Between January 20, and April 12, 1999, LaFave made no complaints concerning his alleged mouth pain. On

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

April 12, 1999, LaFave was examined by LaBarge due to a complaint of pain in his lower left molar (*Def. ['s] Ex. A, P. 4* ). Dr. Qudsi examined him again on April 14, 1999. *Id.* He noted a cavity with pulp decay and slight swelling with no discharge. *Id.* He noted an abscess in his left lower molar and again prescribed 500 mg erythromycin tablets twice daily and 600 mg of Motrin three times daily for ten days with instructions to see the dentist. *Id.* On the same day, LaBarge made an appointment for LaFave to see an outside dentist that provides dental service to facility inmates, Dr. Boule *(Qudsi Aff., P. 3).*

On May 3, 1999, LaBarge was informed by LaFave that his mother would be making a dental appointment with their own dentist and that the family would pay for the treatment (*Def. ['s] Ex. A, P. 4* ). On that same day, Superintendent Major Smith authorized an outside dental visit. *Id.* On May 12, 1999, he was seen by LaBarge for an unrelated injury and he complained about his lower left molar (*Def .['s] Ex. A, P. 5* ). At that time, LaFave requested that LaBarge schedule a new appointment with Dr. Boule because the family had changed their mind about paying an outside dentist. *Id.* LaBarge noted that he was eating candy and informed him of the deleterious effects of candy on his dental condition. *Id.* Thereafter, LaBarge scheduled him for the next available date which was June 24, 1999, at noon. *Id.*

On June 2, 1999, LaFave again requested sick call complaining for the first time about tooth pain in his upper right molar and his other lower left molar (*Def. ['s] Ex. A, P. 6* ). He claimed that both molars caused him discomfort and bothered him most at night. *Id.* LaFave confirmed that he had received treatment from Dr. Boule for his first lower left molar one week before. *Id.* The area of his prior extraction was clean and dry. *Id.* There was no abscess, infection, swelling, drainage or foul odor noted. *Id.* LaBarge recommended Tylenol as needed for any further tooth discomfort. *Id.*

On June 21, 1999, LaFave again requested a sick call and was seen by LaBarge (*Def. ['s] Ex. A, P. 6* ). No swelling, drainage or infection was observed. *Id.* However, LaBarge noted cavities in LaFave's lower left molar and right lower molars. *Id.* LaBarge made arrangements for Dr. Qudsi to further assess LaFave. *Id.* On June 23, 1999, Dr. Qudsi examined his right lower molar and noted cavitation with

decay in that area (*Def. ['s] Ex. A, P. 7* ). In addition, he noted that LaFave had a cavity in his second left lower molar. *Id.* He prescribed 500 mg of erythromycin twice daily for 10 days and 600 mg of Motrin three times daily for 10 days, with instructions to see a dentist. *Id.*

On June 30, 1999, Officer Carroll reported that LaFave was again non-compliant with his medication regimen as he refused to get up to receive his medication (*Def. ['s] Ex. A, P. 8* ). On July 7, 1999, he again requested sick call complaining of a toothache in his lower right molar (*Def. ['s] Ex. A, P. 9* ). Again, LaFave was non-compliant as he had only taken his erythromycin for five days instead of the ten days prescribed. *Id.* During the examination, Dr. Qudsi informed LaFave that extraction of these teeth could be necessary if he did not respond to conservative treatment. *Id.* At that time, LaFave informed Dr. Qudsi that he was going to be transferred to another facility. *Id.* Dr. Qudsi advised LaFave to follow-up with a dentist when he arrived at the new facility. *Id.* Dr. Qudsi prescribed 500 mg Naproxin twice daily for thirty days with instructions to follow-up with him in two weeks if the pain increased. *Id.* The following day, LaFave requested sick call complaining to LaBarge that he had taken one dose of Naproxin and it was not relieving the pain. *Id.* He was advised that he needed to take more than one dose to allow the Naproxin to take effect. *Id.*

**\*5** On July 17, 1999, LaFave was again seen by Dr. Qudsi and he indicated that he did not believe he was benefitting from the prescribed course of conservative treatment with medication (*Def. ['s] Ex. A, P. 10* ). Subsequently, LaBarge made a dental appointment for him on July 23 [FN7], 1999, at 3:15 p.m. *Id.* On July 23, 1999, a second extraction was conducted. *Id.* On July 28, 1999, he was again seen by Dr. Qudsi, for an ulceration at the left angle of his mouth for which he prescribed bacitracin ointment. *Id.* At this time, LaFave continued to complain of tooth pain so he was prescribed 600 mg of Motrin three times daily. *Id.*

FN7. The medical records contain an error on the July 17, 1999, note which indicted that an appointment was set for June 23, 1999, however, it should have been recorded as July 23, 1999.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

On August 4, 1999, he was seen for feeling a sharp piece of bone residing in the area of his lower left molar (*Def. ['s] Ex. A, P. 11* ). Dr. Qudsi recommended observation and to follow-up with dental care if his condition continued. *Id.* The defendant maintains that given all of the documentation that he was seen when he requested to be seen and prescribed numerous medications, the medical staff was not deliberately indifferent to his serious medical needs. The defendant contends that at all times, professional and contentious dental and medical treatment were provided in regards to his various complaints.

In his response, LaFave disagrees alleging that the county had a custom or policy not to provide medical treatment to prisoners. However, LaFave does not allege in his complaint that the county had a "custom or policy" which deprived him of a right to adequate medical or dental care. In his response to the motion for summary judgment, for the first time, LaFave alleges that the county had a policy which deprived him of his rights. He maintains that his continued complaints of pain were ignored and although he was prescribed medication, it simply did not relieve his severe pain.

This court finds that the defendant was not deliberately indifferent to his serious dental and medical needs. Moreover, even if this court construed his complaint to state a viable claim against the county, LaFave has failed to show that the county provided inadequate medical and dental treatment. As previously stated, an inmate does not have the right to the treatment of his choice. The record shows that he was seen numerous times, and referred to a dentist on two occasions over a six month period. While LaFave argues that the dental appointments were untimely, the record shows that the initial delay occurred because he claimed that his mother was going to make the appointment but later changed her mind. In addition, the record demonstrates that he did not adhere to the prescribed medication regime. On various occasions, LaFave failed to get out of bed to obtain his medication in order to prevent infection in his mouth. Although it is apparent that LaFave disagreed with the treatment provided by Clinton, the record does not show that the defendant was deliberately indifferent to his serious medical needs. Accordingly, this court recommends that the defendant's motion for summary judgment should be granted.

*6 WHEREFORE, for the foregoing reasons, it is hereby

RECOMMENDED, that the defendant's motion for summary judgment (Dkt. No. 5) be GRANTED in favor of the defendant in all respects; and it is further

ORDERED, that the Clerk of the Court serve a copy of this Report-Recommendation upon the parties by regular mail.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2002.
Lafave v. Clinton County
Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 985844 (N.D.N.Y.)
(Cite as: 2010 WL 985844 (N.D.N.Y.))

H

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Rabindranath BENJAMIN, Plaintiff,
v.
Pang Lay KOOI, Medical Doctor; Carol Wallace,
Registered Nurse, Cayuga County Jail; and Jackie
Chadwick, Registered Nurse, Cayuga County Jail,
Defendants.
**No. 9: 07-CV-0506 (LEK/DRH).**

Feb. 25, 2010.

Rabindranath Benjamin, Philipsburg, PA, pro se.

Petrone & Petrone, P.C., David H. Walsh, IV, Esq., of
Counsel, Utica, NY, for Defendants.

**REPORT-RECOMMENDATION AND ORDER**[FN1]

> FN1. This matter was referred to the undersigned
> for report and recommendation pursuant to 28
> U.S.C. § 636(b)(1)(B) and N.D.N.Y.L.R.
> 72.3(c).

DAVID R. HOMER, United States Magistrate Judge.

**\*1** Plaintiff pro se Rabindranath Benjamin ("Benjamin"),
formerly an **inmate** in the custody of the Cayuga
County Jail ("Cayuga") and currently in custody in the State of
Pennsylvania, brings this action pursuant to 42 U.S.C. §
1983 alleging that three Cayuga employees violated his
constitutional rights under the Eighth and Fourteenth
Amendments. Compl. (Dkt. No. 1). Presently pending is
defendants' motion for **summary judgment** pursuant to
Fed.R.Civ.P. 56. Dkt. No. 42. Benjamin opposes the
motion and has filed a cross-motion for **summary
judgment**. Dkt. No. 44. Defendants have submitted a

reply to the motion for **summary judgment** and have
responded in opposition to Benjamin's cross-motion. Dkt.
Nos. 45, 46. For the reasons which follow, it is
recommended that defendants' motion be granted and that
Benjamin's cross-motion be denied.

**I. Background.**

The facts are related herein in the light most favorable to
Benjamin as the nonmoving party. *See* subsection II.A,
*infra.*

At all relevant times, Benjamin was incarcerated at
Cayuga. Compl. at 4-7. On October 16, 2006, Benjamin
slipped on water outside the shower area, fell, and lost
consciousness. *Id.* at 4. As a result of the fall, Benjamin
"suffered [from] severe neck and back pain, excruciating
pain in [his] legs, loss of short-term memory, headaches
and migraines, and constant pain in [his] hips." *Id.*
Benjamin was transported by ambulance to Auburn
Memorial Hospital where he was examined, x-rays were
taken, and he had a Computed Tomography ("CT") scan.
Dkt. No. 42-5, Deposition Transcript ("Tr.") at 24-25; *see
also* Dkt. No. 42-1, Ex. B ("Auburn Memorial Hospital
Medical Records"). The CT scan taken of his cervical
spine showed narrowing and degeneration at C6-7
intervertabral disc space with moderately severe cervical
spondylosis at that level. Dkt. No. 42-3 at 18-19.

After five hours, Benjamin was returned to Cayuga where
he was placed in a cell for medical observation for two to
three days. Tr. at 26-29; Rule 7.1 Statement (Dkt. No.
42-1), ¶¶ 7, 8. While in the observation cell, Benjamin was
seen by a nurse and given 650 milligrams of Tylenol every
four hours around the clock. Dkt. No. 42-1, Ex. C
("Cayuga Med. Records"); Rule 7.1 Statement, ¶ 10; Tr.
at 29.[FN2] On October 16, 2006, Benjamin was also
checked every thirty minutes as per instructions from the
Auburn Memorial Hospital Emergency Room. *See* Cayuga
Med. Records. Upon his return to Cayuga, Benjamin
complained to nurses that he "was still in a lot of pain."
Tr. at 29. He had neck, head, and back pain. Tr. at 30.
Benjamin did not eat two to three meals because his food
tray was placed on the floor and he was in too much pain

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 985844 (N.D.N.Y.)
(Cite as: 2010 WL 985844 (N.D.N.Y.))

"to go down to the floor, to slide down to grab the tray to come back up." *Id.*

> FN2. Benjamin states that he saw either Chadwick or Wallace but does not recall which. *Id.*

Benjamin had appointments with Dr. Kooi, a defendant here, on October 20, November 2, and December 1, 2006, and on February 8, 2007 and with Nurse Wallace, a defendant, on January 6, 2006. Cayuga Med. Records. Each time Benjamin saw Dr. Kooi, Nurse Chadwick, a defendant, was present. Tr. at 39. On October 20, 2006, Benjamin told Dr. Kooi that he had pain in his neck, back and hips and found it difficult to walk. Tr. at 34. Dr. Kooi examined Benjamin and continued him on Motrin. Rule 7.1 Statement, ¶ 12; Cayuga Med. Records. Benjamin asked Dr. Kooi to prescribe stronger medication. Tr. at On November 2, 2006, Benjamin told Dr. Kooi that he was still in pain from his injuries. Tr. at 38. Benjamin complained of headaches; Dr. Kooi prescribed Advil and Tylenol. Cayuga Med. Records. Benjamin asked Dr. Kooi to have him moved to a handicapped cell; Dr. Kooi told him to take it up with the Sergeant. Tr. at 39.

**\*2** On December 1, 2006, at Chadwick's urging, Dr. Kooi saw Benjamin for headaches and prescribed Flexeril. Rule 7.1 Statement, ¶ 14; Cayuga Med. Records; Tr. at 39-40. On January 6, 2007, Wallace gave Benjamin aspirin to be taken at the onset of a headache and noted that Benjamin would be re-examined if the aspirin gave no relief. Rule 7.1 Statement, ¶ 15; Cayuga Med. Records. After Benjamin complained of headaches to Chadwick, she gave him a bottle of nasal spray, said that a dry nose could cause headaches, and the nasal spray might give him relief. Tr. at 58. Benjamin told Wallace that his headaches were from his fall, not a dry nose. *Id.* However, Wallace could not prescribe medication for him. Tr. at 50.

On February 8, 2007, Benjamin saw Dr. Kooi and complained of right chest pain. Cayuga Med. Records. Benjamin said that he was not nauseous and was eating. *Id.*; Rule 7.1 Statement. Dr. Kooi prescribed Motrin. Cayuga Med. Records; Rule 7.1 Statement, ¶ 16. Benjamin also told Dr. Kooi that he still experienced headaches "on and off" but was having more pain in his

back and hips and was having difficulty walking. Tr. at 41. Dr. Kooi told Benjamin that he would improve but that it would take six months to a year. *Id.* Benjamin told Dr. Kooi that he was still in pain. Tr. at 42. Benjamin asked Dr. Kooi for an MRI but was told that it was not necessary because an MRI was only for broken bones. Tr. at 42-43.

Benjamin was never refused a request to see Dr. Kooi. Tr. at 55-56; Rule 7.1 Statement, ¶ 18. During his time at Cayuga, Benjamin saw one of the nurses on a daily basis. Tr. at 62; Rule 7.1 Statement, ¶ 19. Benjamin was always given his prescribed medication. *Id.* Benjamin continued to complain of frequent and severe headaches and lower back pain in September through December, 2007. Dkt. No. 44-2, Ex. A. On September 24 and December 20, 2007, Benjamin was seen by medical staff at Moshannon Valley Correctional Center for complaints of low back pain exacerbated by cold weather. *Id.* He was prescribed Motrin and rest. *Id.*

During the two to three days that Benjamin was in a medical observation cell at Cayuga, he was provided with a mattress so worn that it was half the normal size. Tr. at 27. Benjamin had blankets, a sheet, and a toilet but had to wait a day before he received the sheet and blanket. Tr. at 28. He did not have a pillow. *Id.* Benjamin was then placed in the reception area dormitory for three to four days. Tr. at 36. Benjamin had a steel bed, mattress, blankets, and sheets. Tr. at 39. Benjamin was then transferred to a cell in the housing unit which had a slab of concrete on the wall for a bed, a mattress, a blanket, sheets, a toilet, a sink and a mirror. Tr. at 37. Benjamin had requested a handicapped cell and was told that "they were going to work on it." *Id.* Benjamin wanted to be placed in a handicapped cell "for the bars by the toilet" because he was having trouble walking. Tr. at 57. Benjamin requested an extra mattress and pillow, but the request was denied. Tr. at 52-53. This action followed.

## II. Discussion.

**\*3** Benjamin alleges that defendants violated his constitutional rights by denying him adequate medical care for his serious medical needs and by subjecting him to cruel and unusual conditions of confinement. Compl. Benjamin alleges that he suffers from "**pain** to the **back**,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 985844 (N.D.N.Y.)
(Cite as: 2010 WL 985844 (N.D.N.Y.))

hips, neck and legs along with slight headaches. Benjamin has experienced excessive pain to the same areas of the body, headaches and migraines, uneven walking, lack of sleep, short-term memory loss, and loss of concentration. Compl. at 6. Benjamin also asserts that defendants denied him appropriate pain medication and diagnostic testing after his fall. *Id.* at 5-6. Finally, Benjamin alleges that his request for an extra mattress and pillow were improperly denied.[FN3] *Id.* at 6. Defendants seek **summary judgment** on the grounds that (1) Benjamin has failed to establish the personal involvement of defendants Chadwick and Wallace; (2) Benjamin's **Eighth Amendment** deliberate **medical indifference** claim is without merit; and (3) Benjamin's claim that his conditions of confinement amounted to cruel and unusual punishment is without merit. Dkt. No. 42.

> FN3. Additionally, Benjamin alleges that he attempted to file multiple grievances pertaining to his lack of medical treatment but he was told that since the medical staff had already treated him, the situation was resolved and he was unable to file a grievance. *Id.* at 4-5.

Benjamin has cross-moved for **summary judgment** on the grounds that (1) defendants failed to provide adequate medical treatment to him after his fall; (2) the negligent act which caused his fall was foreseeable; and (3) defendants failed to provide him with safe and secure housing. Dkt. No. 44. In response to the cross-motion for **summary judgment** and in reply to the motion for **summary judgment**, defendants assert that defendants are entitled to **summary judgment** because (1) Benjamin failed to respond to defendants' statement of material facts; (2) Benjamin has failed to raise a question of fact as to whether he suffered a serious medical condition; (3) Benjamin has failed to raise a question of fact as to whether defendants acted with deliberate indifference; and (4) any negligence claim asserted against the county is legally insufficient. Dkt. No. 45.

### A. Legal Standard

A motion for **summary judgment** may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party

is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for **summary judgment**. *Gallo v. Prudential Residential Servs.* 22 F.3d 1219, 1223-24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

**\*4** When, as here, a party seeks dismissal or **summary judgment** against a pro se litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006); *see also* Sealed Plaintiff v. Sealed Defendant # 1, 537 F.3d 185, 191 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se,* ... a court is obliged to construe his pleadings liberally.' " (citations omitted)). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion; the requirement is that there be no genuine issue of material fact. *Anderson,* 477 U.S. at 247-48.

### B. Defendants' Motion for Summary Judgment

### 1. Benjamin's Failure To Comply with Local Rule 7.1(a)(3)

As a threshold matter, defendants assert that Benjamin's

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 985844 (N.D.N.Y.)
(Cite as: 2010 WL 985844 (N.D.N.Y.))

failure to respond to their statement of material facts constitutes an admission to the statements contained therein. Dkt. No. 45 at 1-2. Local Rule 7.1(a)(3) of the Northern District of New York provides that a motion for **summary judgment** must include a Statement of Material Facts. "The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established." N.D.N.Y.L.R. 7.1(a)(3). Once a properly supported Local Rule 7.1(a)(3) Statement of Material Facts ("Rule 7.1 Statement") is submitted by the moving party, Rule 7.1 requires that the party opposing **summary judgment** file a response to the moving party's statement. *Id.* The nonmovant's response shall mirror the movant's statement by admitting or denying each of the movant's assertions in matching numbered paragraphs. *Id.* Each denial shall set forth a specific citation to the record where the factual issue arises. *Id.* The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute in separately numbered paragraphs. *Id.*

While Benjamin has opposed defendants' **summary judgment** motion, he has not responded to defendants' Rule 7.1 Statement [FN4] as required by Local Rule 7.1(a)(3). By its terms, Local Rule 7.1(a) (3) provides that *"[t]he Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."* N.D.N.Y.L.R. 7.1(a)(3) (emphasis in original). Courts in this district have not hesitated to enforce Rule 7.1(a)(3) and its predecessor, Rule 7.1(f), by deeming facts admitted upon an opposing party's failure to properly respond. *See N.Y. Teamsters Conference Pension & Retirement Fund v. Express Services, Inc.,* 426 F.3d 640, 648-49 (2d Cir.2005) (upholding grant of **summary judgment** where "[t]he district court, applying Rule 7.1(a)(3) strictly, reasonably deemed [movant's] statement of facts to be admitted" because the non-movant submitting a responsive Rule 7.1(a)(3) statement that "offered mostly conclusory denials of [movant's] factual assertions and failed to include any record citations."); *Gubitosi v. Kapica,* 154 F.3d 30, 31 n. 1 (2d Cir.1998) (per curiam) (accepting as true material facts contained in unopposed local rule statement of material facts); *Meaney v. CHS Acquisition Corp.,* 103 F.Supp.2d 104, 108 (N.D.N.Y.2000) (deeming movant's Rule 7.1(a)(3) Statement admitted where non-movant's response "set forth *no* citations-specific or otherwise-to

the record");" *McKnight v. Dormitory Auth. of State of N.Y.,* 189 F.R.D. 225, 227 (N.D.N.Y.1999) ("deem[ing] the portions of Defendants' 7.1(a)(3) statement that are not specifically controverted by Plaintiff to be admitted"); *Osier v. Broome County,* 47 F.Supp.2d 311, 317 (N.D.N.Y.1999) (deeming admitted all facts in defendants' Rule 7.1(a)(3) statement where "plaintiff submitted thirteen pages of purported facts without any indication where those facts can be located in the record"). Pro se litigants are not excused from compliance with the rule. [FN5]

> **FN4.** With his cross-motion for **summary judgment**, Benjamin included what he refers to as his "Statement of Facts in Support of Motion for **Summary Judgment** for Plaintiff." Dkt. No. 44-1. Benjamin's purported Rule 7.1 Statement is not in compliance with Local Rule 7.1 because it does not set forth a specific citation to the record where each fact is established. Therefore the Rule 7.1 Statement submitted with the cross-motion is not properly supported and will not be considered by the Court to be a proper Rule 7.1 Statement. *See* N.D.N.Y.L.R. 7.1(a)(3).

> **FN5.** *See McNeil v. U.S.,* 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) ("While we have insisted that the pleadings prepared by **prisoners** who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) ("[P]ro se status does not exempt a party from compliance with relevant rules of procedural and substantive law.") (citation omitted); *LoSacco v. City of Middletown,* 71 F.3d 88, 92 (2d Cir.1995) ("Although pro se litigants should be afforded latitude, ... they generally are required to inform themselves regarding procedural rules and to comply with them.... This is especially true in civil litigation.") (internal quotation marks and citations omitted).

**\*5** Because Benjamin failed to include in his opposition papers a Rule 7.1 Statement specifically controverting

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 985844 (N.D.N.Y.)
(Cite as: 2010 WL 985844 (N.D.N.Y.))

defendants' factual assertions in matching numbered paragraphs with specific citations to the record, defendants' factual assertions in their Rule 7.1 Statement are deemed admitted by Benjamin. [FN6] Despite this, "[i]f the evidence submitted in support of the **summary judgment** motion does not meet the movant's burden of production, then **summary judgment** must be denied even if no opposing evidentiary matter is presented." *Vermont Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir.2004)* (citations omitted). "Moreover, in determining whether the moving party has met this burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's [statement of material facts.] It must be satisfied that the citation to evidence in the record supports the assertion." *Id.*

> FN6. In this case, accepting the facts contained in defendants' Rule 7.1 Statement as true is in large part harmless to Benjamin, since many of the facts referenced in the statement are taken from Benjamin's testimony at his pretrial deposition.

## 2. Personal Involvement

Defendants argue that neither Chadwick nor Wallace were personally involved in any wrongdoing. Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith, 21 F.3d 496, 501 (2d Cir.1994)* (citing *Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir.1991)* and *McKinnon v. Patterson, 568 F.2d 930, 934 (2d Cir.1977)*). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson, 790 F.2d 260, 263 (2d Cir.1986)*. The doctrine of respondeat superior is inapplicable to section 1983 claims. *Polk County v. Dodson, 454 U.S. 312, 325 (1981); Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir.1973)*.

Benjamin alleges that Chadwick was present every time that Dr. Kooi examined him. Compl. at 6. At his

deposition, Benjamin testified that he told Chadwick about his medical problems every day when she came to his unit, and she heard all of the complaints that he made to Dr. Kooi, yet he received no examination from anyone. Tr. at 58-59. Benjamin alleges that Wallace "denied any request [that he] put in concerning receiving medical attention" and that when he complained of migraine headaches, Wallace gave him a tube of nasal spray. Compl. at 6.

Applying the standards for personal involvement set forth above, a reasonable juror could conclude that Chadwick and Wallace were personally involved in the alleged provision of inadequate medical care to Benjamin. It is recommended, therefore, that defendants' motion for **summary judgment** in favor of Chadwick and Wallace on the basis of lack of personal involvement be denied.

## 3. Eighth and Fourteenth Amendment Claims

Benjamin asserts various claims under the Eighth Amendment, which explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII. While not clear from the Complaint, it appears that Benjamin was housed at Cayuga as a pretrial detainee on federal charges. [FN7] The Eighth Amendment protections apply to those who have been convicted of a crime, sentenced, and are thus suffering the "punishment" contemplated by the Cruel and Unusual Punishment Clause. *Benjamin v. Fraser, 343 F.3d 35, 49-50 (2d Cir.2003)* (citing cases). Claims concerning the conditions of confinement brought by a pretrial detainee, such as Benjamin, must be analyzed under the Fourteenth Amendment Due Process Clause. *Id.* The standards when evaluating deliberate indifference to a person in custody are identical whether brought under the Eighth or Fourteenth Amendment. *Caiozzo v. Koreman, 581 F.3d 63, 72 (2d Cir.2009)* ("Claims for deliberate indifference to a serious medical condition or other serious threat to the health or safety of a person in custody should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment."); *see also Shane v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189, 199-200 (1989)* ("[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being ... [including] food, clothing, shelter,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 985844 (N.D.N.Y.)
(Cite as: 2010 WL 985844 (N.D.N.Y.))

medical care, and reasonable safety...."). Accordingly, cases analyzed under the Eighth Amendment provide guidance in analyzing cases, as here, considered under the Fourteenth Amendment. Therefore, Benjamin's medical indifference and conditions of confinement claims will be considered under Eighth Amendment standards.

FN7. On September 27, 2006, Benjamin made an initial appearance in federal court on a criminal complaint. *See United States v. Benjamin,* No. 5:06-cr-0392 (N.D.N.Y.). Benjamin was remanded to custody. *Id.* Benjamin subsequently pleaded guilty on February 8, 2007 and was sentenced on May 21, 2007 to a term of incarceration. *Id.* Since the allegations in Benjamin's complaint preceded his conviction, it appears that during the time relevant to this action, he was housed at Cayuga as a pretrial detainee.

**a. Medical Indifference Claims**

*6 Benjamin alleges that he was denied adequate medical care in deliberate indifference to his serious medical needs while he was incarcerated at Cayuga. The Eighth Amendment imposes a duty upon prison officials to ensure that **inmates** receive adequate medical care. *Farmer v. Brennan,* 511 U.S. 825, 832-34 (1994); *see also Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994); U.S. Const. amend. VIII. Not every injury or denial of medical care is a constitutional wrong. Rather, "a prison official violates the Eighth Amendment only when two requirements are met." *Farmer,* 511 U.S. at 834.

First, the **prisoner** must show that the condition to which he was exposed was sufficiently serious. *Farmer,* 511 U.S. at 834. Second, the **prisoner** must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *Id.* "[P]rison officials who actually knew of a substantial risk to **inmate** health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844. Thus, negligence alone is not actionable. *Estelle v. Gamble,* 429 U.S. 97,106 (1976). "Medical malpractice does not become a constitutional violation merely because

the victim is a **prisoner**." *Estelle,* 429 U.S. at 106.

**i. Serious Medical Condition**

" 'Because society does not expect that **prisoners** will have unqualified access to healthcare,' a **prisoner** must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) (quoting *Hudson v. McMillian,* 503 U.S. 1, 9 (1992)). Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) 'the existence of chronic and substantial pain.' " *Brock v. Wright,* 315 F.3d 158, 162 (2d Cir.2003) (citing *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)); *see also Harrison v. Barkley,* 219 F.3d 132, 136 (2d Cir.2000) ("A serious medical condition exists where 'the failure to treat a **prisoner's** condition could result in further significant injury or the unnecessary and wanton infliction of pain.' ") (quoting *Chance,* 143 F.3d at 702). The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case. *Smith,* 316 F.3d at 185. Since medical conditions vary in severity, "a decision to leave a condition untreated will be constitutional or not depending on the facts of the particular case." *Harrison,* 219 F.3d at 136-37.

Defendants argue that "Plaintiff has not produced any evidence beyond his own subjective complaints to suggest that any of his injuries of October 16, 2006 were so life-threatening or so urgent that they required immediate care beyond that received at the Emergency Room on October 16, 2006." Dkt. No. 42-9 at 12, Defs. Mem. of Law. On the other hand, Benjamin claims that while at Cayuga, he suffered from neck, hip, and back pain, migraine headaches, and difficulty walking and sleeping.FN8 Compl. at 6. Construing Benjamin's Complaint with great liberality, Benjamin claims that his medical conditions interfered with his everyday life. Benjamin's medical records from the Federal Bureau of Prisons demonstrate that he was still complaining of pain and suffering in 2007, one year after his fall. Dkt. No. 44-2 at 6; *see also id.,* Ex. A.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 985844 (N.D.N.Y.)
(Cite as: 2010 WL 985844 (N.D.N.Y.))

FN8. While Benjamin has not submitted an affidavit with his opposition to the **summary judgment** motion, his verified Complaint may be considered an affidavit. *See Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d. Cir.2004) ("[A] verified pleading ... has the effect of an affidavit and ... may be relied upon to oppose **summary judgment**."); *Fitzgerald v. Henderson,* 251 F.3d 345, 361 (2d Cir.2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing **summary judgment**").

*7 Depending upon the facts presented, severe back pain, especially if lasting an extended period of time, and migraine headaches may qualify as "serious medical needs" under the Eighth Amendment. *See, e.g., Mendoza v. McGinnis,* No. 05-CV-1124, 2008 WL 4239760 at *10 & n. 16 (N.D.N.Y. Sept. 11, 2008) ("The question of whether chronic back pain can rise to a level of constitutional significance is dependent upon the circumstances of the particular case presented. In this instance, given plaintiff's diagnosed condition of degenerative disc disease, and resolving all ambiguities in plaintiff's favor, I conclude that a reasonable factfinder could find that the condition constitutes a serious medical need." Moreover, "defendants fail to address plaintiff's migraine headaches, which can also constitute a serious medical need."); *Guarneri v. Hazzard,* No. 06-CV-0985, 2008 WL 552872, at *6 (N.D.N.Y. Feb. 27, 2008) (holding that severe back pain, especially if long-lasting, can amount to a serious medical need); *Peterson v. Miller,* No. 04-CV-797, 2007 WL 2071743, at *7 (N.D.N.Y. July 13, 2007) (noting that migraine headaches have "been found by other courts to represent a sufficiently serious potential medical need as to survive a motion for **summary judgment**."); *Faraday v. Lantz,* No. 03-CV-1520, 2005 WL 3465846, at *5 (D.Conn. Dec. 12, 2005) (holding that persistent complaints of "lower back pain caused by herniated, migrated discs [and] sciatica ..." leading to severe pain constitute a serious medical need.); *Moriarty v. Neubould,* No. 02-CV-1662, 2004 WL 288807, at *2 n. 2 (D.Conn. Feb. 10, 2004) (holding that plaintiff's migraine headaches could constitute a sufficiently serious condition to warrant Eighth Amendment protection since they can be "extremely painful and debilitating.").

In this instance, Benjamin complained of back pain and migraine headaches for more than a year and his CT scan showed evidence of degenerative disc disease. *See* Cayuga Med. Records; *see also* Tr.; Dkt. No. 42-3 at 18-19. Benjamin stated that the pain interfered with daily activities, such as walking and sleeping. Compl. Defendants have offered nothing, such as an affidavit from Benjamin's treating physician, to refute Benjamin's claims of chronic pain or to lead this Court to conclude that Benjamin's evidence of a serious medical condition is too insubstantial to raise a genuine issue of fact. As stated by the Second Circuit Court of Appeals, an **inmate** should not be required "to demonstrate that he or she experiences pain that is at a limit human ability to bear, nor do we require that his or her condition will degenerate into a life-threatening one." *Brock,* 315 F.3d at 163. Resolving all ambiguities in Benjamin's favor, Benjamin has presented sufficient evidence to allow a reasonable factfinder to conclude that Benjamin's conditions, namely back pain and migraine headaches continuing for an extended period, could rise to the level of serious medical needs.

### ii. Deliberate Indifference

*8 Deliberate indifference requires the **prisoner** "to prove that the prison official knew of and disregarded the **prisoner's** serious medical needs." *Chance,* 143 F.3d at 702. Deliberate indifference requires more than negligence, but less than conduct undertaken for the very purpose of causing harm." *Hathaway,* 37 F.3d at 66. A prison official acts with deliberate indifference where he "knows of and disregards an excessive risk to **inmate** health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* (citation omitted). Thus, prison officials must intentionally deny treatment or accommodations for medical conditions or intentionally interfere with treatment once prescribed. *Estelle,* 429 U.S. at 104. "Mere disagreement over proper treatment does not create a constitutional claim" as long as the treatment was adequate. *Chance,* 143 F.3d at 703. Thus, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention are not

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 985844 (N.D.N.Y.)
(Cite as: 2010 WL 985844 (N.D.N.Y.))

adequate grounds for a section 1983 claim ." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001).

Indeed, prison officials and medical officers have wide discretion in treating **prisoners**, and Section 1983 is not designed to permit federal courts to interfere in the ordinary medical practices of state prisons. *Church v. Hegstrom,* 416 F.2d 449, 450-451 (2d Cir.1969). Federal courts are generally hesitant to second guess medical judgments and to constitutional ize claims which sound in state tort law. *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986) ("The Constitution does not command that **inmates** be given medical attention that judges would wish to have for themselves.") So strong is this view that determinations of medical providers concerning the care and safety of patients are given a "presumption of correctness." *Perez v. The County of Westchester,* 83 F.Supp.2d 435, 440 (S.D.N.Y.2000) (citing *Kulak v. City of New York,* 88 F.3d 63, 77 (2d Cir.1996)).

*Sonds,* 151 F.Supp.2d at 311-12.

"Further, a delay in treatment does not violate the constitution unless it involves an act or failure to act that evinces 'a conscious disregard of a substantial risk of serious harm." *Thomas v. Nassau County Correctional Center,* 288 F.Supp.2d 333, 339 (E.D.N.Y.2003) (internal quotation marks omitted) (citing *Chance,* 143 F.3d at 703). "The Second Circuit has reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment, ignored a life threatening and fast-degenerating condition for three days, or delayed major surgery for over two years." *Thomas,* 288 F.Supp.2d at 339 (internal quotation marks omitted) (citing *Espinal v. Coughlin,* No. 98 Civ. 2579, 2002 WL 10450, at *3 (S.D.N.Y. Jan. 3, 2002)). Even if a **prisoner** is able to establish delay, he must also show that his condition became worse or deteriorated as a result of the delay. *Thomas,* 288 F.Supp.2d at 339.

**\*9** Benjamin has not established that any of the defendants were deliberately indifferent to his serious medical needs. The record demonstrates that immediately after his fall, staff at Cayuga determined that his injuries warranted

immediate medical attention and he was transported by ambulance to Auburn Memorial Hospital where he was examined and given x-rays and a CT scan. Tr. at 24-25; *see also* Dkt. No. 42-1 (Auburn Memorial Hosp. Med. Records). Upon his return to Cayuga, he was placed in a medical observation cell for several days. Tr. at 26-29; Rule 7.1 Statement, ¶¶ 7, 8. Throughout his stay at Cayuga, he saw a nurse on a daily basis and was never denied his prescribed medication. Tr. at 61-62; Rule 7.1 Statement, ¶ 19. While Benjamin alleges that Wallace only gave him nasal spray when he complained of headaches, he also acknowledged that Wallace had no authority to prescribe medication. Tr. at 50, 58. The record also shows that each time he asked to see Dr. Kooi, the request was granted. Tr. at 55-56. Each time that he saw Dr. Kooi, he was prescribed medication for his pain (*see* Cayuga Med. Records). While Benjamin claimed that Dr. Kooi refused to order an MRI for Benjamin (Tr. at 42-43), Dr. Kooi's decision not to order an MRI does not amount to deliberate indifference. *See Joyner v. Greiner,* 195 F.Supp.2d 500, 505 (S.D.N.Y.2002) ("[w]hether an MRI should have been done is a classic example of a matter for medical judgment as to the appropriate course of treatment and is not actionable under the Eighth Amendment.") (internal quotation marks omitted).

Moreover, the fact that Benjamin wanted different medication than what was prescribed, or that he needed a pillow or extra mattress to ease his pain, also do not state a claim for deliberate medical indifference. A **prisoner** has no right to treatment of his choice and disputes over the proper course of treatment are not actionable under the Eighth Amendment. *See McCloud v. Delaney,* 677 F.Supp. 230, 232 (S.D.N.Y.1988). So long as prison officials act "reasonably," no violation of the Eighth Amendment occurs. *See Salahuddin v. Goord,* 467 F.3d 263, 280-81 (2d Cir.2006).

In other words, Benjamin's medical records and his own testimony confirm that defendants were actively involved in Benjamin's care and were not deliberately indifferent to his needs. Moreover, Benjamin has not alleged or proven that any defendant denied him access to medical care as a form of punishment or to make him suffer. Finally, the Court cannot find, based on the record, that defendants delayed Benjamin's medical treatment. In any event, even if Benjamin could establish that proper medical care was unreasonably delayed, Benjamin has not established that

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 985844 (N.D.N.Y.)
(Cite as: 2010 WL 985844 (N.D.N.Y.))

any delay in treatment resulted in a deterioration or worsening of any medical condition. *See Thomas,* 288 F.Supp.2d at 339 ("Even if a **prisoner** is able to establish delay, in order to establish deliberate indifference, he must also show that his condition became worse or deteriorated as a result of the delay.") In this case, the record shows that after Benjamin was transferred to federal custody, his complaints and treatment remained essentially the same. Dkt. No. 44-2 at 11-12. In September and December, 2007, Benjamin was examined by medical staff at Moshannon Valley Correctional Center after complaining of lower back pain. *Id.* Benjamin was prescribed Motrin and rest. *Id.*

**\*10** Accordingly, no reasonable fact-finder could conclude that defendants were deliberately indifferent to Benjamin's serious medical needs. Therefore defendants' motion for **summary judgment** should be granted as to Benjamin's medical indifference claims.

**b. Conditions of Confinement Claims**

As discussed above, Benjamin's claims that he was subjected to inadequate conditions of confinement are appropriately analyzed under Eighth Amendment standards. *See* subsection II(B)(3) *supra.* The Supreme Court held that "[t]he Constitution 'does not mandate comfortable prisons,' but neither does it permit inhumane ones." *Farmer,* 511 U.S. at 832 (quoting *Rhodes v. Chapman,* 452 U.S.337, 349 (1981)). The Eighth Amendment requires that prison officials provide "humane conditions of confinement" including "adequate food, clothing, shelter and medical care." *Farmer,* 511 at 832.

To succeed on a conditions of confinement claim, both an objective and subjective test must be met. First, the deprivation must, from an objective standpoint, be "sufficiently serious." *Farmer,* 511 U.S. at 834. Therefore, a plaintiff must demonstrate that the conditions of confinement fell below the "minimal civilized measure of life's necessities." *Rhodes,* 452 U.S. at 347; *see also Phelps v. Kapnolas,* 308 F.3d 180, 185 (2d Cir.2002) ("Ultimately, to establish the objective element of an Eighth Amendment claim, a **prisoner** must prove that the conditions of his confinement violated contemporary standards of decency."). Specifically, a **prisoner** must

prove that he has been deprived of a "single, identifiable human need such as food, warmth, or exercise." *Wilson v. Seiter,* 501 U.S. 294, 304 (1991). The subjective test requires a plaintiff to show that the defendant prison officials imposed the conditions with deliberate indifference. *Jolly v. Coughlin,* 76 F.3d 468, 480 (2d Cir.1996).

In this case, Benjamin alleges that when he returned to Cayuga after his trip to the hospital, he was confined in a medical observation cell for two to three days with a mattress so worn that, it was only one-half to three-quarters of a mattress. Tr. at 27. Benjamin testified that he waited a day before he received a sheet and blanket and he did not have a pillow. Tr. at 28. Benjamin also testified that at some point during his incarceration at Cayuga, he requested an extra mattress and a pillow, but the request was denied. Tr. at 52-53. Finally, Benjamin states that he did not eat two to three meals while in the medical observation cell because he could not reach them without increasing his pain.[FN9]

FN9. In contrast, in his cross-motion for **summary judgment** Benjamin asserts that he did not eat the first meal delivered to him but that "by the time the second meal came around the plaintiff being a human being was at this point hungry, so the plaintiff has to slide himself down to the floor and use his feet in an attempt to slide his food tray over to him which was a long and tedious not to mention painful task." Dkt. No. 44-2 at 3.

Even construing the facts in the light most favorable to Benjamin, this combination of conditions for the period of time alleged does not constitute a deprivation that is sufficiently serious to deny Benjamin the minimal measure of necessities for civilized living nor does it violate contemporary standards of decency. *Bell v. Artuz,* No. 98-CV-4710, 1999 WL 253607, at \*3-4 (S.D.N.Y. Apr. 29, 1999) (holding that no Eighth Amendment claim was stated where **prisoner** alleged poor ventilation, asbestos on catwalk behind cells, no bacterial soap, insufficient lighting, no pillows, and lack of space in cell); *Liles v. Camden County Dept. of Corrections,* 225 F.Supp.2d 450, 458-59 (D.N.J.2002) (holding that allegation that **inmates** receive two sheets and one blanket, but no pillow, does

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 985844 (N.D.N.Y.)
(Cite as: 2010 WL 985844 (N.D.N.Y.))

not rise to level of sufficiently serious deprivation to constitute Eighth Amendment violation); *Gutridge v. Chesney,* No. COV.A. 97-3441, 1998 WL 248913, at *1 (E.D.Pa. May 8, 1998) (holding that allegation that **inmate's** blanket was removed for approximately a month and a half failed to state Eighth Amendment claim because **inmate** was not deprived of warmth).

*11 Moreover, Benjamin never alleges that his lack of a blanket or sheet for a day deprived him of a human need, such as warmth. There is nothing in the record to demonstrate that Benjamin was denied heat or clothing during the one day that he was without a blanket or sheet. In fact, when questioned at the deposition, Benjamin stated that he did not remember the temperature in the cell on the day he was without a sheet or blanket. Tr. at 28. He remembered only that it was moist, dark, and gloomy. *Id.* Additionally, with respect to Benjamin's claim that he had to sleep on an undersized mattress for two to three days, such a limited duration does not suffice to satisfy the subjective prong of the analysis. *See Suprenant v. Rivas,* 424 F.3d 5, 20 (1st Cir.2005) ("[D]uration may affect the [constitutional] calculus [for conditions of confinement].") (citing *Hutto v. Finney,* 437 U.S. 678, 686-87 (1978) (holding that unpleasant conditions of confinement "might be tolerable for a few days and intolerably cruel for weeks or months.").

The same holds true with respect to the lack of a blanket and sheet for one day. As to Benjamin's claim that he was essentially denied anywhere from one to three meals because he could not reach his tray without suffering pain, this too fails to state a claim of constitutional proportion. "While no court has explicitly held that denial of food is a per se violation of a **prisoner's** Eighth Amendment rights ...., under certain circumstances a **substantial** deprivation of food may well be recognized as being of constitutional dimension." *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983) (emphasis added); *see also Waring v. Meachum,* 175 F.Supp.2d 230, 240-41 (D.Conn.2001) (finding no Eighth Amendment claim where **inmates** missed one or two meals and there was no indication that future meals were missed); *cf. Moss v. Ward,* 450 F.Supp. 591, 596-97 (W.D.N.Y.1978) (deprivation of food for four consecutive days held unconstitutionally disproportionate punishment for disciplinary violation).

Since Benjamin has not established that he was subject to conditions that would satisfy the objective prong of such a claim, his conditions of confinement claims fail. *See, Brown v. McElroy,* 160 F.Supp.2d 699, 706, n. 4 (S.D.N.Y.2001) (finding that the subjective prong need not be considered when the conditions of confinement alleged are not sufficiently serious). Moreover, even if Benjamin had established a sufficiently serious deprivation for purposes of the Eighth Amendment, he has not established that any defendant acted with a sufficiently culpable state of mind with regard to any deprivation. In fact, there is nothing in the record to demonstrate that any of the defendants personally denied Benjamin meals or bedding, or that they would have had authority to provide those items to Benjamin.

Based on this record, no reasonable fact-finder could conclude that lack of a sheet and blanket for one day, lack of a pillow and extra mattress, or being denied two or three meals would deprive Benjamin of the minimal measures of necessities required for civilized living. Accordingly, defendants' motion should be granted as to the conditions of confinement claims.

**C. Benjamin's Cross-Motion for Summary Judgment**

*12 Benjamin has cross-moved for **summary judgment**. Dkt. No. 44. Benjamin also tries to revisit this Court's prior decision denying him the right to amend his Complaint to add a negligence claim against Cayuga County. *Id.; see also* Dkt. No. 38 (February 2, 2009 Order). The February 2, 2009 Order denied Benjamin's motion to amend his Complaint to add a claim against Cayuga County for negligence because, among other things, Benjamin had failed to alleged that he had served the requisite notice of claim on Cayuga County as required by New York General Municipal Law § 50-e. *See* February 2, 2009 Order at 4-5.

With respect to his negligence claim Benjamin asserts that water build-up outside of a shower created a foreseeable risk of harm to **inmates** passing through that area and, therefore, the County should compensate him for injuries sustained in a fall resulting from that hazard. Dkt. No. 44. Benjamin asserts that his "injuries resulted from the [negligent] behavior of the prison's authorities because

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 985844 (N.D.N.Y.)
(Cite as: 2010 WL 985844 (N.D.N.Y.))

they knew of the existing hazardous conditions due to prior incidents at that exact location and neglected to do anything about it." Dkt. No. 44-2 at 1. Benjamin further claims that his original Complaint demonstrated that he intended to sue Cayuga for injuries suffered as a result of staff negligence and points to the Third Cause of Action in his Complaint, wherein he stated "Plaintiff moves to sue facility for further injuries sustained because of facility's staff negligence." *Id.; see also* Compl. at 5. Benjamin's attempt to have the Court reconsider its February 2, 2009 Order is clearly untimely.[FN10] Nevertheless, in light of Benjamin's *pro se* status, the Court will again address his attempt to assert a claim for negligence against Cayuga County.

FN10. Local Rule 7.1(g) provides that "a party may file and serve a motion for reconsideration or reargument no later than **FOURTEEN DAYS** after the entry of the challenged judgment, order, or decree." N.D.N.Y.L.R. 7.1(g).

As they did in opposition to Benjamin's motion to amend, defendants argue that Benjamin's state law claims for negligence are futile because he failed to file a notice of claim as is required under New York's General Municipal Law § 50-e. Dkt. No. 45 at 3-4. Defendants also take issue with Benjamin's claim that he intended to also sue Cayuga County, pointing out that Cayuga County was not named as a defendant in Benjamin's complaint. Dkt. No. 45 at 3-4; *see also* Compl.

"As 'a condition precedent' to commencing a tort action against New York municipalities, or any of their officers, agents, or employees, New York General Municipal Law section 50-e requires plaintiffs to file a notice of claim within ninety days after the claim arises." *Olsen v. County of Nassau,* No. CV-05-3623, 2008 WL 4838705, at *1 (E.D.N.Y. Nov. 4, 2008). Accordingly, Benjamin's state law claim for negligence against Cayuga County is futile and he will not be permitted to amend his Complaint to include it. Even if the Court were to liberally construe Benjamin's Complaint as including a claim against Cayuga County for negligence, the claim remains futile.[FN11]

FN11. Further, to the extent that Benjamin could have sought permission to file a late notice of

claim, he must do so in state court. *See Olsen,* 2008 WL 4838705, at *3 (citing N.Y. Gen. Mun. Law § 50-e(5)(7)).

Moreover, even if Benjamin could establish that he had filed a timely notice of claim, the Court should not exercise pendent jurisdiction over any state law claims. *See United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 726 (1966) ( "Certainly, if the federal claims are dismissed before trial, even if not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.").

**\*13** As to the medical indifference and conditions of confinement claims, it is recommended herein that judgment be granted to defendants on those claims. *See* subsection II(B)(3) *supra*. For the reasons discussed therein, it is recommended that Benjamin's cross-motion for **summary judgment** be denied in its entirety.

### III. Conclusion.

WHEREFORE, based on the above, it is hereby

**RECOMMENDED** that:

1. Defendants' motion for **summary judgment** (Dkt. No. 42) be **GRANTED** and that judgment be entered in favor of all defendants on all claims; and

Benjamin's cross-motion for **summary judgment** (Dkt. No. 44) be **DENIED** in all respects.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(d).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 985844 (N.D.N.Y.)
(Cite as: 2010 WL 985844 (N.D.N.Y.))


N.D.N.Y.,2010.
Benjamin v. Kooi
Slip Copy, 2010 WL 985844 (N.D.N.Y.)


END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2008 WL 4239760 (N.D.N.Y.)
(Cite as: 2008 WL 4239760 (N.D.N.Y.))

**H**
Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Eric MENDOZA, Plaintiff,
v.
M. McGINNIS, Superintendent, Southport Correctional
Facility, et al., Defendants.
**Civil Action No. 9: 05-CV-1124 (TJM/DEP).**

Sept. 11, 2008.

West KeySummary
**Prisons 310 ☞ 192**

310 Prisons
   310II Prisoners and Inmates
      310II(D) Health and Medical Care
         310k191 Particular Conditions and Treatments
            310k192 k. In General. Most Cited Cases

**Sentencing and Punishment 350H ☞ 1546**

350H Sentencing and Punishment
   350HVII Cruel and Unusual Punishment in General
      350HVII(H) Conditions of Confinement
         350Hk1546 k. Medical Care and Treatment.
Most Cited Cases
Prison employees were not deliberately indifferent to an inmate's serious medical needs. The inmate was seen on numerous occasions by infirmary staff. The inmate's disagreement with a prescribed course of treatment and the refusal of prison nurses and nurse practitioners to honor his request to be seen by a prison physician for his back pain did not provide a basis to find a violation of his rights under the Eighth Amendment. U.S.C.A. Const.Amend. 8.

Eric Mendoza, pro se.

Hon. Andrew M. Cuomo, Office of the Attorney General, State of New York, Senta B. Siuda, Esq., Assistant Attorney General, of Counsel, Syracuse, NY, for Defendants.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior District Judge.

**\*1** This *pro se* action brought pursuant to 42 U.S.C. § 1983 was referred by this Court to the Hon. David E. Peebles, United States Magistrate Judge, for a Report and Recommendation pursuant to 28 U.S .C. § 636(b) and Local Rule N.D.N.Y. 72.3(c). The Report and Recommendation dated July 24, 2008 recommended that Defendants' motion for summary judgment be granted and the action dismissed. No objections to the Report and Recommendation have been filed and Plaintiff's time to do so has expired. Furthermore, after examining the record, this Court has determined that the Report and Recommendation is not subject to attack for plain error or manifest injustice. Accordingly, the Court adopts the Report and Recommendation for the reasons stated therein.

It is therefore,

**ORDERED** that Defendants' motion for summary judgment (dkt.# 53) is **GRANTED,** and Plaintiff's complaint is **DISMISSED** in its entirety.

**IT IS SO ORDERED**

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4239760 (N.D.N.Y.)
(Cite as: 2008 WL 4239760 (N.D.N.Y.))

Plaintiff Eric Mendoza, a New York State prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this action pursuant to 42 U.S.C. § 1983, claiming deprivation of his constitutional rights. In his complaint, plaintiff alleges that the defendants were deliberately indifferent to his serious medical needs by refusing his repeated requests for proper treatment of back pain, migraine headaches, ear aches, and a broken tooth, and on one isolated occasion by giving him the wrong medication, in violation of the Eighth Amendment to the United States Constitution. As relief, plaintiff seeks recovery of not less than six million dollars in damages.

Currently pending before the court is a motion by the defendants seeking the entry of summary judgment dismissing plaintiff's complaint. In their motion defendants assert that as a matter of law the plaintiff cannot establish that any of his health conditions was sufficiently serious to rise to a level of constitutional significance, nor does the evidence support a finding that the defendants were subjectively indifferent to any of his medical needs. Based upon a thorough review of the record now before the court, I find that while some of plaintiff's conditions could potentially be viewed as sufficiently serious to trigger the protections of the Eighth Amendment, no reasonable factfinder could conclude that the defendants were deliberately indifferent to those needs, and therefore recommend that the defendants' motion for summary judgment be granted.

I. *BACKGROUND*[FN1]

> FN1. The following recitation is gleaned from the record now before the court, with all inferences drawn and ambiguities resolved in plaintiff's favor. *Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005); *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). To the extent there is any significant controversy regarding facts material to the claims raised in plaintiff's complaint, they will be noted.

Plaintiff is a New York State prison inmate entrusted to the custody of the New York State Department of Correctional Services ("DOCS"). *See generally* Complaint (Dkt. No. 1); *see also* Defendants' Local Rule 7.1(a)(3)

statement (Dkt. No. 53-3) ¶ 1. At the times relevant to his claims plaintiff was designated first to the Southport Correctional Facility ("Southport"), and later the Auburn Correctional Facility ("Auburn"), where he was transferred on November 28, 2003. Complaint (Dkt. No. 1) ¶¶ 3, 12; Felker Aff. (Dkt. No. 53-3) ¶ 38; *see also* Defendants' Motion (Dkt. No. 53-4) Exh. 1.

**\*2** On August 2, 2003, during his confinement at Southport, Mendoza slipped and fell upon entering a shower area while handcuffed, injuring his head, shoulder and back.[FN2,FN3] Complaint (Dkt. No. 1) Attachment ¶ 12; Felker Aff. (Dkt. No. 53-5) ¶ 4 and Exh. A (Plaintiff's Ambulatory Health Records) 8/2/03 entry. Following the accident plaintiff was returned to his cell, and later transported to the prison infirmary where he was seen by Nurse Scobble for his injuries. Complaint (Dkt. No. 1) Attachment ¶ 12; Felker Aff. (Dkt. No. 53-5) ¶ 4. Nurse Scobble administered Tylenol and, after evaluating the plaintiff, provided him with an ice-pack for his head injury and placed him in the facility's hospital unit for observation. Defendants' Motion (Dkt. No. 53-4) Exh. 2, 21:9-21; Felker Aff. (Dkt. No. 53-5) Exhibit A-1. After remaining in the hospital unit for approximately two and one half hours, Mendoza was returned back to his cell.[FN4] Felker Aff. (Dkt. No. 53-5) Exhibit A-1.

> FN2. According to his medical records plaintiff's complaints regarding his back pre-date the shower accident, reaching back at least to June 2, 2003. Kooi Aff. (Dkt. No. 53-6) ¶ 5. Magnetic resonance imaging ("MRI") testing of Mendoza's back conducted on June 25, 2003 revealed the onset of degenerative disc disease. *Id.* ¶ 7 and Exh. B, pp. B-3, B-4. Plaintiff's records further reflect that Mendoza complained of a "sore back" on July 30, 2003, three days before his fall, and at that time was prescribed Ultram for the pain and placed on a list to see a physician. Felker Aff. (Dkt. No. 53-5) ¶ 5 and Exh. A, 7/30/03 and 7/31/03 Entries.

> FN3. While plaintiff now claims to have suffered a broken tooth as a result of the fall, and for purposes of the pending motion that allegation must be credited, plaintiff's medical records make no reference to plaintiff's claim of suffering

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4239760 (N.D.N.Y.)
(Cite as: 2008 WL 4239760 (N.D.N.Y.))

a broken tooth during the fall, nor do they otherwise substantiate that claim.

FN4. Plaintiff asserts that Nurse Scobble told him a doctor would come to his cell in the afternoon to talk with him, but the doctor never appeared to evaluate him. Complaint (Dkt. No. 1), Attachment ¶ 12.

Mendoza alleges that requests made by him on August 4 and 5, 2003 to be seen by a doctor were ignored.FN5 Complaint (Dkt. No. 1) Attachment ¶ 12. On August 6, 2003, after voicing numerous complaints to the floor officer regarding his continuous pain, Mendoza was visited by Nurse Whendon.FN6 *Id.* During that visit the plaintiff complained of experiencing strong ear pain as a result of his fall in the shower area; defendant Whendon promised to discuss the matter with a prison physician, and prescribed Ultram for plaintiff's pain.FN7 *Id.*

FN5. There is no entry in the plaintiff's ambulatory health record either documenting sick-call requests or reflecting any request by Mendoza for medical services on August 4 or 5, 2003. Felker Aff. (Dkt. No. 53-5) Exhibit A1-2.

FN6. Plaintiff's health records appear to reflect that he was seen by Nurse Practitioner Northrup on that date, and that it was August 10, 2003 when he was seen by Nurse Whendon. Felter Aff. (Dkt. No. 53-5) ¶¶ 7 & 9 and Exh. A, 8/6/03 & 8/10/03 Entries.

FN7. While given the current procedural posture plaintiff is entitled to the benefit of all inferences and the resolution of all ambiguities in his favor, it nonetheless should be noted that a medical record entry memorializing his discussion with Nurse Ripley on August 8, 2003 reflects that while Mendoza did complain regarding his ears, he claimed not to be experiencing any pain, noting that they "just feel funny." Felker Aff. (Dkt. No. 53-5) Exh. A, 8/8/03 Entry. Plaintiff's medical records entry from the August 6, 2003 visit, which fail to make reference to complaints

of ear pain, confirm that Ultram was prescribed on that date, presumably to address the complaints of back pain lodged during that visit. *Id.*, 8/6/03 Entry.

On August 15, 2003, plaintiff again complained to corrections staff of severe pain in his head, back, shoulders, and teeth, after noticing that the lump on his head was swollen and had become discolored. Complaint (Dkt. No. 1) Attachment ¶ 12. When plaintiff asked to see a doctor, an unidentified corrections sergeant responded that because plaintiff did not appear to be experiencing an emergency situation, he would have to wait until sick-call the next day. *Id.* On the morning of August 16, 2003, after continuing to experience serious pain, plaintiff was seen by Nurse P. Mills, but was not permitted to see a physician.FN8 *Id.* Noting that the Ultram which had been prescribed was not working and that plaintiff was also experiencing ear pain, Nurse Mills reported on the medical record entry from that session that plaintiff "needs ear check", discontinued Ultram, and instead prescribed Naprosyn. Felker Decl. (Dkt. No. 53-5) Exh. 1, 8/16/03 Entry.

FN8. While plaintiff's complaint affixes the date of that visit at August 15, 2003, and refers to the medical official who examined him on that date as Nurse Miller, it is apparent from the chronology set forth in that complaint, corroborated by an entry from August 16, 2003 in plaintiff's ambulatory health records, that the visit actually occurred on the latter date, and that the nurse's name is Mills.

A central theme of plaintiff's complaint appears to relate to prison officials' failure to honor his requests to be seen by a prison doctor. In addition to those requests previously discussed, plaintiff's complaint alleges that he requested access to a prison physician on August 15, 16, 23, and 29, 2003, as well as September 2, 4, 11, 16, 18, and 19, 2003. From the time of the accident on August 3, 2003 until his transfer out of Southport on November 24, 2003, Mendoza was not seen by a doctor. *Id.* Complaint (Dkt. No. 1) Attachment ¶ 12. Plaintiff's medical records also reveal, however, that between the time of his injury on August 2, 2003, and the date of his transfer out of Southport on November 28, 2003, plaintiff was seen on

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4239760 (N.D.N.Y.)
(Cite as: 2008 WL 4239760 (N.D.N.Y.))

twenty-five different occasions by seven different registered nurses and one nurse practitioner ("NP"), and completed six physical therapy sessions. Felker Aff. (Dkt. No. 53-5) ¶¶ 4, 7-9, 11-25, 27-30, 32-37. Those records also reflect considerable efforts on the part of prison medical staff to address plaintiff's back condition, including through the use of physical therapy, pain medication, and a combination of other strategies which included a "front cuff order". *Id.*

**\*3** Plaintiff's ear condition was also addressed during many of his visits with medical personnel at Southport. On August 27, 2003 NP Northrup, upon checking plaintiff's ears, determined that they were both filled with wax and prescribed Debrox drops to address that condition. *Id.* ¶ 15 and Exh. A, 8/27/03 Entry. Plaintiff was seen on August 28, 2003 by Nurse Scobble, again complaining of ongoing ear discomfort. *Id.* ¶ 16. Nurse Scobble similarly observed a wax build-up in both ear canals, and again ordered that plaintiff be provided with Debrox drops to alleviate the condition. *Id.* and 8/28/03 Entry.

Despite several intervening visits with prison medical personnel, the next reference in plaintiff's health records to his ear condition is contained in a note of a visit on September 24, 2003 with Nurse Preiser, who wrote that plaintiff was complaining of left ear pain and stating that his left ear made a "buzzing" sound. *Id.* ¶ 29 and 9/24/03 Entry. After being placed on an NP call-out, plaintiff was seen by NP Northrup on that same date; based upon her examination, NP Northrup determined that plaintiff was experiencing a left eustachian tube dysfunction/allergies and prescribed Allegra D to address the condition. *Id.* ¶ 30 and 9/24/03 Entry. After requesting a refill of the Allegra D on October 13, 2003, plaintiff was seen by Nurse Whendon on October 27, 2003 with residual complaints of left ear pain and an inability to hear. *Id.* ¶¶ 31, 32 and Exh. A, 10/13/03 and 10/27/03 Entries. On that occasion, an ear check was ordered. *Id.*

Plaintiff again presented to medical staff at Southport on several subsequent occasions, including November 2, 2003, November 17, 2003, November 23, 2003 and November 24, 2003, complaining of on-going ear pain. *Id.* ¶¶ 33-36. Plaintiff was prescribed Tylenol following the November 23, 2003 visit, and an ear check was recommended. *Id.*

On November 24, 2003 Nurse Ripley examined plaintiff's left ear. Felker Aff. (Dkt. No. 53-5) ¶ 37 and Exh. A, 11/25/03 Entry. Determining that the ear canal was red and inflamed and discovering fluid behind the tympanic membrane, Nurse Ripley referred the plaintiff to NP Northrup and ordered a prescription for Amoxicillin. *Id.*

While his complaint is lacking in specifics on this score, plaintiff maintains that the deficiencies in his medical care continued following his transfer into Auburn on November 25, 2003. Complaint (Dkt. No. 1) Attachment ¶ 12. Plaintiff's medical records, however, reflect a similarly intensive regimen of treatment of the plaintiff by medical personnel at Auburn. Those records show that upon his entry into Auburn Mendoza was examined by Patty Hefrun, RN, who noted prior diagnoses of degenerative disc disease, disc protrusion based upon the June 25, 2003 MRI testing and a recent history of ear pain, and referred plaintiff's records to a physician for review and determination of appropriate medications. Kooi Aff. (Dkt. No. 53-6) ¶ 16 and Exh. A, 11/28/03 Entry. Thereafter, plaintiff was seen by prison medical personnel on a regular basis, and his back and ear conditions were the subject of many of those visits. *Id.* ¶¶ 17-78. Plaintiff's medical records also reveal that the last complaint registered by plaintiff concerning ear pain came on April 13, 2004, and that on May 17, 2004 he was found by a audiologist to have functional hearing. *Id.* ¶¶ 77 and Exh. B, p. B-22.

II. *PROCEDURAL HISTORY*

**\*4** Plaintiff commenced this action on September 7, 2005, and was thereafter granted leave to proceed *in forma pauperis.*[FN9] Dkt. Nos. 1, 6. Plaintiff's complaint alleges defendants' deliberate indifference to his medical needs, both initially at Southport and later at Auburn. *See generally* Complaint (Dkt. No. 1). Named as the defendants in plaintiff's complaint are M. McGinnis, the Superintendent at Southport; J. Burge, the Superintendent of Auburn; Dr. Kooi, a prison doctor at Auburn; and J. Scobble, T. Whendon, Preiser, B. Brandt, P. Miller, and P. Nelson, all of whom are alleged to be registered nurses employed by the DOCS at Southport.[FN10] Dkt. No. 1.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4239760 (N.D.N.Y.)
(Cite as: 2008 WL 4239760 (N.D.N.Y.))

FN9. Since plaintiff's complaint asserts claims based upon occurrences at both the Southport Correctional Facility, which is situated in the Western District of New York, and at Auburn, located in this district, venue properly lies in the Northern District of New York. *See* 28 U.S.C. § 1391(b) (indicating that "[a] civil action wherein jurisdiction is not founded solely on diversity of citizenship may, except as otherwise provided by law, [may] be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State [or] (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred ...").

FN10. On March 14, 2006, in response to defendants' filing of a pre-answer motion seeking the dismissal of the plaintiff's complaint, Senior Judge Thomas J. McAvoy ordered dismissal of plaintiff's claims, without prejudice, against defendants J. Scobble, T. Whendon, Preiser and P. Miller for failure to effect timely service of process. Dkt. No. 37. Despite that ruling, defendant J. Scobble nonetheless remains a defendant since although not reflected in the court's records, she was in fact served in the action.

In April of 2007, Mendoza sought leave to file a second amended complaint, see Dkt. No. 42, attempting to join six additional defendants in the action. FN11 Dkt. No. 42. Plaintiff's proposed second amended complaint also purported to rename as defendants the individuals previously dismissed from the action, including T. Whendon, Preiser and P. Miller. Plaintiff's motion to file a second amended complaint, which was opposed by the defendants, *see* Dkt. No. 44, was denied by the court on July 20, 2007. Dkt. No. 48.

FN11. An earlier effort by the plaintiff to amend his complaint without court leave was rejected. *See* Dkt. Nos. 8, 10.

On January 15, 2008, defendants M. McGinnis, J. Burge, Dr. Kooi, J. Scobble, and B. Brandt, moved seeking the

entry of summary judgment dismissing plaintiff's complaint. Dkt. No. 53. In their motion, the defendants argue that the plaintiff has not properly served two defendants, cannot prove certain defendants' personal involvement in the constitutional violations asserted, and has failed to establish that they were deliberately indifferent to any serious medical need. *Id.* That motion, which plaintiff has opposed, *see* Dkt. No. 55, is now ripe for determination and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c).FN12 *See also* Fed.R.Civ.P. 72(b).

FN12. In his opposition to defendants' summary judgment motion, plaintiff appears to expand his claim considerably to now challenge the propriety of the DOCS practice of escorting prisoners to showers with their hands restrained behind their backs and also to implicate Corrections Officer Bennett, who accompanied him to the shower area, as having culpability in the matter. See Plaintiff's Memorandum (Dkt. No. 55-3) p. 7. This claim, however, is nowhere contained in plaintiff's complaint, nor is C.O. Bennett named as a defendant in the case. Plaintiff cannot properly now, at the summary judgment stage, interject additional legal arguments or new defendants into the action. *See McAllister v. New York City Police Dep't,* 49 F.Supp.2d 688, 697-68 (S.D.N.Y.1999) (noting that it is inappropriate to raise new claims for first time in opposition to summary judgment); *Carribean Wholesales & Serv. Corp. v. U.S. JVC Corp.,* 963 F.Supp. 1342, 1359 (S.D.N.Y.1997) (asserting that a motion for summary judgment is not the appropriate place to present new claims); *Harvey v. New York City Police Dep't,* No. 93 Civ. 7563, 1997 WL 292112, at *2 (S.D.N.Y. June 3, 1997) (same).

III. *DISCUSSION*

A. *Failure To Serve*

In their motion, defendants initially seek dismissal of plaintiff's claims against two unserved defendants,

Not Reported in F.Supp.2d, 2008 WL 4239760 (N.D.N.Y.)
(Cite as: 2008 WL 4239760 (N.D.N.Y.))

including a John Doe defendant identified in plaintiff's amended complaint only as a corrections sergeant at Southport, and Nurse P. Nelson. In support of their motion defendants correctly note at this procedural juncture in the case any named but unserved defendants, particularly those Doe defendants whose identities have not yet been ascertained, are entitled to dismissal, although without prejudice, in light of the fact that jurisdiction over them is lacking. *See* Fed.R.Civ.P. 4(m).

In this instance, however, defendants' motion is unnecessary. While both sergeant John Doe and Nurse P. Nelson are specifically mentioned by those designations in plaintiff's complaint, and Nurse P. Nelson appears to be specifically identified in the body of that pleading as a "defendant.", *see* Complaint (Dkt. No. 1) Attachment ¶ 12, neither is listed as a defendant in either the caption or the two locations within the complaint where the parties are described. *See id.* § 3 and Attachment ¶¶ 3-11. Since neither Sergeant John Doe nor Nurse P. Nelson appears to have been intended by Mendoza to be named as a defendant in the case, and neither has been served with process or voluntarily intervened in the action, I recommend this portion of defendants' motion be denied as moot.

B. *Summary Judgement Standard*

**\*5** Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

C. *Personal Involvement*

In their motion the defendants challenge the sufficiency of plaintiff's allegations regarding the personal involvement of Superintendents McGinnis and Burge, and as well as of Nurse Brandt, arguing that the allegations against those defendants are wholly conclusory and lack specifics connecting them to any constitutional violation alleged in his complaint.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4239760 (N.D.N.Y.)
(Cite as: 2008 WL 4239760 (N.D.N.Y.))

**\*6** Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

### 1. *Nurse B. Brandt*

Plaintiff's complaint fails to elaborate upon Nurse Brandt's role in his medical care at Southport, and in particular the manner in which she was deliberately indifferent to his serious medical needs. The sole mention of that defendant's name in the body of plaintiff's complaint is in a passage in which he alleges, in wholly conclusory fashion and without supporting details, that she and others at Southport and Auburn were deliberately indifferent to his health by failing to provide adequate medical care, and additionally that they "intentionally failed to administer proper medication and refused to fulfill any of [his] requests for proper follow up care." Complaint (Dkt. No. 1) Attachment ¶ 13.

In the face of defendants' summary judgment motion, in which they assert the insufficiency of his allegations against Nurse Brandt, Mendoza fails to offer any evidence which would implicate her personal involvement in the deliberate indifference claimed. During his deposition Mendoza was asked to describe Nurse Brandt's involvement in his treatment. Defendants' Motion (Dkt. No. 53-4) Exh. 1 at 53:22-54-2. In response, plaintiff alleged that he spoke with Nurse Brandt complaining of an ear infection on one occasion, at which time she prescribed Antavera, but on that one occasion she would not grant his request to be seen by a prison physician.[FN13] *Id.* This allegation is insufficient to establish Nurse Brandt's role in the medical indifference alleged. *See Schwartz v. Dennison,* 518 F.Supp.2d 560, 573 n. 11 (S.D.N.Y.2007) (Plaintiff's complaint contained no allegations from which it can be inferred that defendants created, or allowed to continue, an unconstitutional

policy); *Graham v. Poole,* 476 F.Supp.2d 257, 261 (W.D.N.Y.2007) ("Plaintiff's conclusory allegation that Poole failed to provide him with adequate medical care is also insufficient to state a claim."). Accordingly, I recommend that this portion of defendants' motion be granted.

> FN13. There is no reference in plaintiff's health records to the drug "Antavera". According to the plaintiff's ambulatory health record, his ear infection was treated with Debrox (ear drops), Amoxicillin, and Allegra D. Felker Affidavit (Dkt. No. 53-5) ¶¶ 16, 30, 37.

### 2. *Superintendents McGinnis and Burge*

Defendants also argue that plaintiff's complaint is devoid of allegations of any personal involvement, or even awareness, on the part of the superintendents at Southport and Auburn regarding the medical treatment which he was receiving at those facilities. Accordingly, defendants assert, it therefore appears that they are being sued by plaintiff solely by virtue of their positions as facility superintendents.

**\*7** A supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor-there is no *respondeat superior* liability under section 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501. A supervisory official can, however, be liable in one of several ways: 1) the supervisor may have directly participated in the challenged conduct; 2) the supervisor, after learning of the violation through a report or appeal, may have failed to remedy the wrong; 3) the supervisor may have created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) the supervisor may have been grossly negligent in managing the subordinates who caused the unlawful event; or 5) the supervisor may have failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty,* 490 F.3d 143, 152-53 (2d Cir.2007); *see also Richardson,* 347 F.3d at 435; *Wright,* 21 F.3d at 501; *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986). *Richardson,* 347 F.3d at 435 ("[M]ere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4239760 (N.D.N.Y.)
(Cite as: 2008 WL 4239760 (N.D.N.Y.))

of corrections or a prison superintendent in a § 1983 claim.") (citations omitted); see also, e.g., Gill v. Mooney, 824 F.2d 192, 196 (2d Cir.1987) (dismissal appropriate where plaintiff does no more than allege that defendant was in charge of prison); Ayers v. Coughlin, 780 F.2d 205, 210 (2d Cir.1985) (same).

In his response to defendants' motion plaintiff asserts that his claims against Southport Superintendent McGinnis are tied to his position as having responsibility "for training and over all management of [the] facility", and his contention that accordingly, "he is liable for all deficiencies in his staffs [sic] performance of their official duties of care, custody and control." FN14 Plaintiff's Memorandum (Dkt. No. 55-3) at 9. While under other circumstances liability on the part of a supervisor can be imputed based upon the acts of subordinate employees, it is well-established that there is no respondeat superior liability under section 1983. See Richardson, 347 F.3d at 435; Wright, 21 F.3d at 501. Similarly, it is also true that a supervisor can under certain circumstances be held accountable for their gross negligence in managing subordinates, or for knowingly tolerating the existence of a policy or custom giving rise to unconstitutional practices, plaintiff has identified no specifics to support such a claim, instead merely making conclusory, unsupported allegations which are simply insufficient to establish liability. FN15 See Jean-Laurent v. Wilkinson, 540 F.Supp.2d 501, 513 (S.D.N.Y.2008) (indicating that plaintiff must allege specific facts of personal involvement to survive summary judgement); see also Iqbal v. Hasty, 490 F.3d at 152-53; Colon v. Coughlin, 58 F.3d 865, 873-74 (2d Cir.1995).

FN14. Plaintiff's response does not provide any indication as to the basis for his claims against Auburn Superintendent Burge.

FN15. Indeed, in opposition to defendants' motion plaintiff has not even offered any information to indicate the extent, if any, of the supervising responsibilities of a prison superintendent, presumably with little or no medical training, upon medical staff at the prison facility overseen by him or her.

Having carefully reviewed the record in this case I find that plaintiff's claims against those two individuals are predicated exclusively upon their supervisory positions, a conclusion which is buttressed by testimony given during Mendoza's deposition. During his deposition plaintiff asserted that he was suing Southport Superintendent McGinnis not because of any specific denial in medical treatment, but instead because he was the person in charge of the facility. Defendants' Motion (Dkt. No. 53-4) Exh. 2 at 50:8-20. Similarly, plaintiff testified that he was suing Auburn Superintendent Burge because he "is in charge of [the] facility and he had to believe that everything was going straight." Id. at 53:22-54-2.

*8 In order to defeat the portion of defendants' motion for summary judgment asserting lack of personal involvement, it was incumbent upon plaintiff to present evidence to support an inference that the three defendants implicated in that motion had personal involvement in any deliberate indifference to his medical care. In light of his failure to do so, and reliance instead upon mere conclusory allegations regarding their liability, I recommend a finding that defendants Brandt, McGinnis and Burge are entitled to dismissal based upon lack of personal involvement and recommend the entry of an order granting that portion of defendants' summary judgment motion. See Kia P. v. McIntyre, 235 F.3d 749, 763 (2d Cir.2000) ("A plaintiff may not survive a properly asserted motion for summary judgment on the basis of conclusory allegations alone."); D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir.1998); Quarles v. General Motors Corp., 758 F.2d 839, 840 (2d Cir.1985) ("[M]ere conjecture or speculation by the party resisting summary judgment does not provide a basis upon which to deny the motion.").

D. Deliberate Medical Indifference

The centerpiece of defendants' motion is their contention that after surveying the evidence contained in the record the court can only conclude that no reasonable factfinder could find that they were deliberately indifferent to plaintiff's serious medical needs. In their motion, defendants argue both that plaintiff has failed to prove the existence of a serious medical need of constitutional proportions, and that in any event the record belies any claim that they were deliberately indifferent to any such need.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4239760 (N.D.N.Y.)
(Cite as: 2008 WL 4239760 (N.D.N.Y.))

The Eighth Amendment's prohibition of cruel and unusual punishment encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291, 50 L.Ed.2d 251 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981)).

A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement-the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference." *See Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (citing *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M .J.); *see also, generally, Wilson,* 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271. Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1978; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer* ); *Waldo,* 1998 WL 713809, at *2 (same).

**\*9** In order to state a medical indifference claim under the Eighth Amendment, a plaintiff must allege a deprivation involving a medical need which is, in objective terms, " 'sufficiently serious' ". *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (citing *Wilson,* 501 U.S. at 298, 111 S.Ct. at 2324), *cert. denied sub nom., Foote v. Hathaway,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). A medical need is serious for constitutional purposes if it

presents " 'a condition of urgency' that may result in 'degeneration' or 'extreme pain'." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (citations omitted). A serious medical need can also exist where " 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain' "; since medical conditions vary in severity, a decision to leave a condition untreated may or may not be unconstitutional, depending on the facts. *Harrison v. Barkley,* 219 F.3d 132, 136-37 (2d Cir.2000) (quoting, *inter alia, Chance* ). Relevant factors in making this determination include injury that a " 'reasonable doctor or patient would find important and worthy of comment or treatment' ", a condition that " 'significantly affects' " a prisoner's daily activities, or causes " 'chronic and substantial pain.' " *Chance,* 43 F.3d at 701 (citation omitted); *LaFave v. Clinton County,* No. CIV. 9:00CV774, 2002 WL 31309244, at *2-*3 (N.D.N.Y. Apr.3, 2002) (Sharpe, M.J.).

Deliberate indifference, in a constitutional sense, exists if an official knows of and disregards an excessive risk to inmate health or safety; the official must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer* ); *Waldo,* 1998 WL 713809, at *2 (same).

*1. Serious Medical Need*

a) *Broken Tooth*

Among plaintiff's medical complaints are those surrounding defendants' alleged failure to treat a broken tooth which, although not referenced in any of the medical reports following that incident, is alleged to have occurred during the course of the shower incident on August 2, 2003. While in the memorandum in support of their summary judgment motion defendants devote no attention to plaintiff's broken tooth, they seemingly argue that it does not constitute a serious medical need.

Under certain circumstances a dental condition can constitute a serious medical need. *See Bennett v. Erie*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4239760 (N.D.N.Y.)
(Cite as: 2008 WL 4239760 (N.D.N.Y.))

*County Holding Ctr. Med. Dep't),* No. 03-CV-6393P, 2006 WL 897817, at *6 (W.D.N.Y. Mar.31, 2006) (holding that dental infection over nine month period constituted serious medical need); *see also Harrison v. Barkley,* 219 F.3d 132, 137 (2d Cir.2000) ("[B]ecause a tooth cavity will degenerate with increasingly serious implications if neglected over sufficient time, it presents a 'serious medical need' within the meaning of our case law."). Dental conditions, like all medical conditions, can vary in severity and, if left untreated, can support an Eighth Amendment claim depending on the specific facts of the case. *See Chance,* 143 F.3d at 703 ("[A] cognizable claim regarding inadequate dental care, like one involving medical care, can be based on various factors, such as the pain suffered by the plaintiff ...."); *see also Boyd v. Knox,* 47 F.3d 966, 969 (8th Cir.1995) (three-week delay in dental treatment aggravated problem); *Fields v. Gander,* 734 F.2d 1313, 1314-15 (8th Cir.1984) ("severe pain" due to infected tooth); *cf. Dean v. Coughlin,* 623 F.Supp. 392, 404 (S.D.N.Y.1985) (holding "dental needs-for fillings, crowns, and the like-are serious medical needs as the law defines that term"). Thus, for example, a tooth cavity has been held to constitute a degenerative condition in light of the fact that, if left untreated indefinitely "it is likely to produce agony and to require more invasive and painful treatments, such as root canal therapy or extraction." *Harrison,* 219 F.3d at 137 (citation omitted).

*10 In this instance, by contrast, plaintiff asserts the existence of a broken tooth, and does not allege either that it has caused him to experience extreme pain or the likelihood, that if left untreated, his broken would have resulted in degeneration. Indeed, during his deposition Mendoza testified that the pain associated with his broken tooth diminished after medication was prescribed, and that when he complained to a prison nurse regarding the tooth she made an appointment with a dentist who, after determining that it could not be saved, extracted it without causing additional pain. Defendants' Motion (Dkt. No. 53-4) Exh. 1 at 59:5-60:9. Accordingly, I recommend a finding that no reasonable factfinder could conclude that plaintiff's broken tooth represents a medical condition of constitutional significance. *See Chance,* 143 F.3d at 703 (indicating that the factors to consider in determining if dental problems raise to the level of constitutional significance are whether plaintiff suffers from severe pain, deterioration of teeth, or inability to engage in normal activities) (internal citations omitted).

*b) Back Pain and Migraine Headaches*

While noting a conflict among the various court decisions which address the issue, defendants argue that Mendoza's back condition does not rise to a level sufficient to trigger the protections of the Eighth Amendment.[FN16] The question of whether chronic back pain can rise to a level of constitutional significance is dependent upon the circumstances of the particular case presented. In this instance, given plaintiff's diagnosed condition of degenerative disc disease, and resolving all ambiguities in plaintiff's favor, I conclude that a reasonable factfinder could find that the condition constitutes a serious medical need. *See Guarneri v. Hazzard,* No. 06-CV-0985, 2008 WL 552872, at *6 (N.D.N.Y. Feb. 27, 2008) ("[s]evere back pain, especially if lasting an extended period of time, can amount to a 'serious medical need' under the Eighth Amendment.") (citing *Nelson v. Rodas,* No. 01-CV-7887, 2002 WL 31075804, at *14 (S.D.N.Y. Sept.17, 2002)); *Faraday v. Lantz,* No. 03-CV-1520, 2005 WL 3465846, at *5 (D. Conn. Dec 12, 2005) (holding that persistent complaints of "lower back pain caused by herniated, migrated discs [and] sciatica ..." leading to severe pain constitutes a serious medical need.).

FN16. In presenting this argument, defendants fail to address plaintiff's migraine headaches, which can also constitute a serious medical need. *Moriarity v. Neubold,* No. 02-CV-1662, 2004 WL 288807, at *2 n. 2 (D.Conn. Feb. 10, 2004) (suggesting plaintiff's migraine headaches constituted a serious medical need warranting Eighth Amendment protection since they can be "extremely painful and debilitating"); *O'Bryan v. Sedgwick County,* No. 98-3308, 2000 WL 882516, at *5 (D.Kan. June 12, 2000) (assuming plaintiff's migraine headaches, for which he was prescribed medication, was a serious medical need under the Eighth Amendment); *but see Rodriguez v. Mercato,* No. 00 Civ. 8588, 2002 WL 1997885, and *2-3, 8 (S.D.N.Y. Aug, 28, 2002) (migraines and back pain not "sufficiently serious" to implicate the Eighth Amendment)

*c) Ear Pain*

Not Reported in F.Supp.2d, 2008 WL 4239760 (N.D.N.Y.)
(Cite as: 2008 WL 4239760 (N.D.N.Y.))

As is true of back pain, the cases addressing the issue of whether an ear condition, including an infection, may constitute a serious medical need for purposes of the Eighth Amendment are similarly equivocal and fact-specific. *Compare Duffield v. Jackson,* No. CIV-07-90-R, 2007 WL 4210863, at *13 (W.D.Okla. Nov.27, 2007) (assuming that the plaintiff's ear infection, and ear pain was a sufficiently serious condition under the Eighth Amendment); *Golden v. Berge,* No. 03-C-0403, 2003 WL 23221483, at *6 (W.D.Wis. Sept.25, 2003) (finding that plaintiff's allegation that he suffered severe pain in his ear as a result of an ear infection was sufficient to suggest that he had a serious medical need) *with Feazell v. Augusta County Jail,* 401 F.Supp. 405, 407 (D.Va.1975) (ear infection found not to constitute a serious medical need for constitutional purposes). Given this conflict, and resolving all ambiguities in plaintiff's favor, I am unable to conclude, as defendants argue, that plaintiff's ear pain did not constitute a serious medical need.

2. *Deliberate Indifference*

**\*11** Even assuming that any of plaintiff's medical conditions arises to the level of a serious medical need, the record nonetheless is devoid of evidence from which a reasonable factfinder could conclude that defendants were indifferent to that need. A review of plaintiff's medical records from both Southport and Auburn, which are comprehensive, fail to substantiate plaintiff's claim that his complaints were ignored and medical treatment was withheld. Instead, those records reveal at times intense regimens of testing, prescription of medication, use of physical therapy, and other strategies employed by prison medical officials in an effort to address plaintiff's conditions. The records also show that during the relevant periods he was seen frequently by medical staff at Southport and Auburn. Particularly given the extent of efforts on the part of medical personnel at those facilities plaintiff's allegations, even when liberally construed, fall far short of demonstrating indifference by prison officials to his medical needs.

Plaintiff's quarrel with the medical treatment received at Southport appears to center upon his disagreement with chosen courses of treatment and the refusal of prison nurses and nurse practitioners to honor his request to be seen by a prison physician. Unfortunately for the plaintiff, mere disagreement by a prison inmate with a prescribed course of treatment does not provide a basis to find a violation of inmate's rights under the Eighth Amendment. *Estelle,* 429 U.S. at 105-06, 97 S.Ct. at 201-02; *Chance,* 143 F.3d at 703; *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.), *cert. denied,* 506 U.S. 1040, 113 S.Ct. 828, 121 L.Ed.2d 698 (1992). Determinations made by medical providers within their discretion are given a "presumption of correctness" when it concerns the care and safety of patients. *Perez v. County of Westchester,* 83 F.Supp.2d 435, 440 (S.D.N.Y.2000) (citing *Kulak v. City of New York,* 88 F.3d 63, 77 (2d Cir.1996)). As for plaintiff's claims that he should have been permitted to see a doctor at his insistence, it should be noted that the Eighth Amendment, while prohibiting cruel and unusual punishment, does not guarantee a prison inmate unfettered access, at his or her insistence, to a prison physician. *See Wandell v. Koenigsmann,* No. Civ.A. 99-8652, 2000 WL 1036030, at *3 (S.D.N.Y. July 27, 2000) (indicating that as long as the medical care provided was adequate, there is no Eighth Amendment violation); *Church v. Hegstrom,* 416 F.2d 449, 450-51 (2d Cir.1969) (maintaining that medical professionals have wide discretion in treating prisoners, and section 1983 was not designed to permit the federal courts to sit as the final arbiter of the ordinary medical practices of state prisons). In this instance the record reflects that plaintiff was seen at appropriate intervals by medical personnel at Southport, and that those personnel, utilizing their discretion, determined whether it was necessary for the plaintiff to be seen by a physician. Accordingly, the record yields no evidence from which a factfinder could conclude that medical officials at Southport were deliberately indifferent to plaintiff's medical needs.

**\*12** Turning to his period of incarceration at Auburn, Mendoza asserts that while there, Dr. Kooi treated him in a "poor manner" and he was unhappy with Dr. Kooi's conservative course of treatment. Defendants' Motion (Dkt. No. 53-4) Exhibit 1, 54:3-7. Plaintiff also disagreed with the reduced level of pain medication prescribed for him by Dr. Kooi. *Id.* at 45:13-46:17. The records reveal that Dr. Kooi examined the plaintiff on eleven separate occasions over a sixteen month period, and additionally referred him to an audiologist, a neurologist, and a physical therapist, and requested repeat MRI testing of plaintiff's back. Kooi Aff. (Dkt. No. 53-6) ¶¶ 21, 24, 29, 33, 34, 39, 45, 50, 54, 56, 59, 65, 67. In addition, Dr.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4239760 (N.D.N.Y.)
(Cite as: 2008 WL 4239760 (N.D.N.Y.))

Kooi prescribed for the plaintiff a range of different pain and anti-inflammatory medications in order to find which medications provided him the most relief for his conditions, and continued to monitor his progress at regular intervals.

The question of what diagnostic techniques and treatments should be administered to an inmate is a "classic example of a matter for medical judgment"; accordingly, prison medical personnel are vested with broad discretion to determine what method of care and treatment to provide to their patients. *Estelle,* 429 U.S. at 107, 97 S.Ct. at 293; *Chance,* 143 F.3d at 703; *Rosales v. Coughlin,* 10 F.Supp.2d 261, 264 (W.D.N.Y.1998). Moreover, plaintiff's disagreement over the level of pain medication, without more, is insufficient to avoid dismissal of the plaintiff's claim; "[r]ather, to prevail on a claim involving choices between alternative course of treatment, a prisoner must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk to [the prisoner's] health.' " *Toguchi v. Chung,* 391 F.3d 1051, 1058 (9th Cir.2004) (citing and quoting *Jackson v. McIntosh,* 90 F.3d 330, 332 (9th Cir.1996)).

Based upon the foregoing, I find that no reasonable factfinder could conclude that any of the remaining defendants named in plaintiff's complaint were deliberately indifferent to plaintiff's serious medical needs.[FN17]

FN17. Among plaintiff's complaints is a claim that on or about October 20, 2003 he was administered medication meant for another inmate. Complaint (Dkt. No. 1) Attachment ¶ 12. Because plaintiff has not elaborated regarding the incident, either in his complaint or in his responsive motion papers, and fails to identify the nurse involved, nor does he offer any evidence to indicate that the incident was the result of an intentional act, it appears that at best the matter involves a mistake or negligence which would not suffice to support an Eighth Amendment claim. *See Hudson v. Clark,* 319 F.Supp.2d 347, 352 (W.D.N.Y.2004); *see also Daniels v. Williams,* 474 U.S. 327, 330-31, 106 S.Ct. 662, 664-65, 88 L.Ed.2d 662 (1986)

(stating that mere negligence on the part of state officials is not actionable under section 1983 and does not work a constitutional deprivation by itself).

### IV. *SUMMARY AND RECOMMENDATION*

A thorough review of the comprehensive record now before the court fails to disclose evidence from which a reasonable factfinder could conclude that defendants McGinnis, Burge, and Brandt were personally involved in the constitutional deprivations allegedly experienced by the plaintiff. Additionally, the record is lacking in evidence from which a reasonable factfinder could conclude that defendants Nurse Scobble and Dr. Kooi were deliberately indifferent to plaintiff's serious medical need. Accordingly, it is hereby

RECOMMENDED, that defendants' motion for summary judgment dismissing plaintiff's complaint (Dkt. No. 53) be GRANTED, and that plaintiff's complaint be DISMISSED in its entirety.

NOTICE: pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report-recommendation. Any objections shall be filed with the clerk of the court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

**\*13** It is further ORDERED that the Clerk of the Court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

N.D.N.Y.,2008.
Mendoza v. McGinnis
Not Reported in F.Supp.2d, 2008 WL 4239760 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4239760 (N.D.N.Y.)
(Cite as: 2008 WL 4239760 (N.D.N.Y.))

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2008 WL 552872 (N.D.N.Y.)

(Cite as: 2008 WL 552872 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Joseph P Paul GUARNERI, Plaintiff,
v.
Lt. James HAZZARD; Cpl J. Cronk; Deputy Paul
Marsh, Jr.; Deputy Grippin; Deputy Howland; Frederick
C. Lamy, Commissioner; Francis T. Sullivan,
Commissioner; Deputy Mace; John Doe, Deputy; and
Dr. Weitz, Defendants.
No. 9:06-CV-0985.

Feb. 27, 2008.

Joseph P Paul Guarneri, Elmira, NY, pro se.

Girvin & Ferlazzo, P.C., Gregg T. Johnson, Esq., Jacinda
Hall Conboy, Esq., Scott P. Quesnel, Esq., of Counsel,
Albany, NY, for Defendants Hazzard, Cronk, Marsh,
Grippin, Howland, and Mace.

O'Connor, O'Connor, Bresee & First, P.C., Justin O.
Corcoran, Esq ., of Counsel, Albany, NY, for Defendant
Weitz.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, Bruce J. Boivin, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendant Sullivan.

*ORDER*

NORMAN A. MORDUE, Chief Judge.

**\*1** The above matter comes to me following a
Report-Recommendation by Magistrate Judge David R.
Homer, duly filed on the 6th day of February 2008.
Following ten days from the service thereof, the Clerk has
sent me the file, including any and all objections filed by
the parties herein.

After careful review of all of the papers herein,
including the Magistrate Judge's Report-Recommendation,
and no objections submitted thereto, it is

ORDERED, that:

1. The Report-Recommendation is hereby approved.

2. Sullivan's motion to dismiss (Docket No. 43) is
granted and that the amended complaint is dismissed in its
entirety as to her.

3. Dr. Weitz's motion to dismiss (Docket No. 19) is:

a. Granted as to his lack of personal involvement with
the confiscation of the knee brace;

b. Denied as to his lack of personal involvement in
Guarneri's neck, back, and mental health treatments;

c. Denied as to Guarneri's back and neck injuries
sustained in 2003; and

d. Granted as to Guarneri's back and neck injuries
sustained in 2000.

4. The amend complaint is dismissed without
prejudice as to defendants Lamy and John Doe.

5. The Clerk of the Court shall serve a copy of this
Order upon all parties and the Magistrate Judge assigned
to this case.

IT IS SO ORDERED.

**REPORT-RECOMMENDATION AND ORDER**[FN1]

FN1. This matter was referred to the undersigned
for report and recommendation pursuant to 28
U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

DAVID R. HOMER, United States Magistrate Judge.

Plaintiff pro se Joseph Paul Guarneri ("Guarneri"),
presently an inmate in the custody of the New York State
Department of Correctional Services ("DOCS"), brings

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 552872 (N.D.N.Y.)

(Cite as: 2008 WL 552872 (N.D.N.Y.))

this action pursuant to 42 U.S.C. § 1983 alleging that defendants, FN2 six Schoharie County employees ("County defendants"), two New York State Commissioners ("State defendants"), and one physician, violated his First and Eighth Amendment rights while Guarneri was incarcerated at the Schoharie County Correctional Facility ("Schoharie"). Am. Compl. (Docket No. 13). Presently pending are the motions for summary judgment of the physician (Docket No. 19) and the State defendants FN3 (Docket No. 43) pursuant to Fed.R.Civ.P. 12(b)(6). Guarneri opposes both motions. Docket No. 46. For the following reasons, it is recommended that the physician's motion to dismiss be granted in part and denied in part and that the State defendant's motion be granted.

> FN2. Guarneri initially named twelve defendants, two of whom were dismissed by an order dated March 6, 2007 (Docket No. 15) and one who remains unidentified. State Defs. Memorandum of Law (Docket No. 43, Pt. 4) at 3 n. 2.

> FN3. Defendant Lamay has not been served or otherwise appeared in this action. See State Defs. Memorandum of Law at 3 n. 5. Likewise, defendant John Doe has neither been served nor further identified. More than 120 days have elapsed since the amended complaint was filed. Accordingly, it is recommended that the amended complaint be dismissed without prejudice as to both defendant pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b).

## I. Background

The facts are related herein in the light most favorable to Guarneri as the nonmoving party. See subsection II(A) infra.

Guarneri was incarcerated at Schoharie from June 6 to August 2006 for a parole violation. Am. Compl. at ¶ 2. On June 16, 2006, Guarneri represented himself at his preliminary hearing. Id. at ¶ 2. Guarneri claims that the Schoharie law library was inadequate because it lacked appropriate resources and utilized a crude and unreliable library loan system which delivered requested material, if at all, after the date of the preliminary hearing. Id. These deficiencies "infringed and undermined [Guarneri's] constitutional rights." Id. Additionally, Guarneri claims that his time in the library was "intentionally and

unreasonably limited ...." Id. at ¶ 42. Guarneri also contends that defendant Hazzard failed to copy the appropriate Penal Law sections regarding the period of punishment and failed to provide him with the correct case law pertaining to his litigation. Id. at ¶ 45.

*2 Besides his legal difficulty, Guarneri also arrived at Schoharie in grave pain due to pre-existing injuries including herniated discs in his neck and lower back, torn ligaments in his knee, Post-Traumatic Stress Disorder (PTSD), bipolar disorder, and depression. Id. Guarneri claims that on July 21, 2006, he was "denied ... emergency medical care by [defendants] Weitz and [ ] Hazzard for a [knee] give-way episode...." Id. at ¶ 22. Furthermore, Guarneri contended that upon receiving medical attention in the emergency room, hours later and after suffering severe pain, the treatment was wholly inadequate. Id. at ¶ 32. Guarneri also makes reference to incidents occurring in 2000 and 2003 which resulted in his herniated discs, alleging that at the time of the incident defendants Marsh and Hazzard delivered inadequate medical care that was further perpetuated by defendants Weitz and Hazzard with their decision to prohibit Guarneri from receiving a back brace. Id. at ¶ 30. Additionally, Guarneri contends that defendants Hazzard, Crook, Marsh, Grippin, Howland, Mace, John Doe, and Weitz all colluded against him "by not letting [Guarneri] speak to mental health counselors when [he was suffering from] mental health episodes ...." Id. at ¶ 35. Lastly, Guarneri contends that after arriving at Elmira Correctional Facility in August 2006, defendants Hazzard, Mace, and John Doe deliberately interfered with his medical treatment by precluding him from wearing the hinged knee brace which had subsequently been provided to him at Schoharie. Id. at ¶ 2.

In response to defendants repossessing his knee brace, Guarneri timely filed a grievance. Id. at ¶ 22, 25. Guarneri contends that the State defendants failed to respond to this grievance because they were acting in concert with the County defendants, "deliberately and intentionally tak[ing] advantage of ... [Guarneri]." Id. at ¶ 25. The State defendants lack of communication led Guarneri to the conclusion that "resort to an administrative remed[y] would be clearly futile ...." Id.

Additionally, Guarneri alleges that defendant Hazzard

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 552872 (N.D.N.Y.)

(Cite as: 2008 WL 552872 (N.D.N.Y.))

"deliberately and intentionally [attempted to] stop" Guarneri from practicing Catholicism while he was incarcerated. *Id.* at ¶ 36. Guarneri contends that "defendant ... has known for years that [he] has been Catholic and has known the Rev. Ferenezy is not of the Catholic faith;" therefore, Hazzard's actions of arranging meetings between the two when Guarneri requested religious counsel amounted to defendants "tr[ying] to force a different religion on [Guarneri] ... den[ying him] the opportunity to see clergy and Catholic Religious Advisors when requested." *Id.* at ¶ 39.

## II. Discussion

Guarneri asserts two causes of action under the First Amendment that he has been denied (1) meaningful access to the courts and (2) his religious freedom. Additionally Guarneri claims deliberate indifference to a serious medical need in violation of the Eighth Amendment because defendants (1) did not allow him to keep his hinged knee brace upon arrival at Elmira Correctional Facility, (2) provided delayed and inadequate emergency treatment on July 26, 2006, (3) received inadequate care at the time of his disc herniations in 2000 and 2003, and (4) was denied proper medical care when defendants refused to order him a back brace. The physician, Dr. Weitz, moves for summary judgment on the grounds that (1) there was no personal involvement, (2) the amended complaint fails to state a claim for deliberate indifference to serious medical needs, (3) the amended complaint is barred by res judicata and collateral estoppel, and (4) the medical claims relating to Guarneri's back are barred by the statute of limitations [FN4] [FN5] Defendant Sullivan contends dismissal is appropriate because there was no personal involvement.

> FN4. Dr. Weitz advances this valid claim expressly, however briefly, in a footnote in his memorandum of law. Weitz Mem. of Law (Docket No. 19, Pt. 3) at 15 n. 2.

> FN5. Der. Weitz also advances the claim that Guarneri failed to state a valid pendent state law claim. However, the amended complaint fails to allege any pendent state law claims. Thus this argument need not be addressed.

### A. Legal Standard

**\*3** Fed.R.Civ.P. 12(b)(6) authorizes dismissal of a complaint that states no actionable claim. When considering a motion to dismiss, "a court must accept the allegations contained in the complaint as true, and draw all reasonable inferences in favor of the non-movant." *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994). However, "a 'complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6)." *Gilfus v. Adessa,* No. 5:04-CV-1368 (HGM/DEP), 2006 WL 2827132, at *3 (N.D.N.Y.2006) (citing *De Jesus v. Sears, Roebuck & Co.* 87 F.3d 65, 70 (2d Cir.1996) (internal quotations omitted)). Thus, dismissal is only warranted if it appears, beyond a reasonable doubt, that the non-moving party cannot prove a set of facts which would support his or her claim or entitle him or her to relief. *See Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984); *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999).

When, as here, a party seeks dismissal against a pro se litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a *pro se* litigant is entitled to "special solicitude," ... that a *pro se* litigant's submissions must be construed "liberally,"... and that such submissions must be read to raise the strongest arguments that they 'suggest At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not 'consistent' with the *pro se* litigant's allegations, .. or arguments that the submissions themselves do not "suggest, ..." that we should not "excuse frivolous or vexatious filings by *pro se* litigants" ... and that *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law ...."

> *Id.* (citations and footnote omitted).

### B. Personal Involvement

Both defendants contend that Guarneri has failed sufficiently to allege their personal involvement.

" '[P]ersonal involvement of defendants in alleged

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 552872 (N.D.N.Y.)

(Cite as: 2008 WL 552872 (N.D.N.Y.))

constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered "personally involved" if:

(1) [T]he defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

**\*4** *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986)).

Despite Guarneri's submission of an amended complaint, he has failed to allege how Dr. Weitz was involved in the deprivation of his knee brace upon his arrival at Elmira Correctional Facility. Guarneri only references defendants Hazzard, Mace, and John Doe when discussing the events surrounding the confiscation of his knee brace. Am. Compl. at ¶ 19. Thus Guarneri fails to allege any facts indicating that Dr. Weitz was personally involved in those events.

However, Guarneri has contended that Dr. Weitz "denied [Guarneri] appropriate mental health care by not letting [him] speak to mental health counselors ..." and "refused [to] prescribe treatment for (herniated disk) in [sic] the lower back and neck [FN6] ... based on non-medical concerns like cost." Am. Compl. at ¶¶ 35, 30. These allegations specifically identify Dr. Weitz as a participant in the alleged medical indifference he suffered. Thus, Guarneri has succeeded in alleging facts, indicating that Dr. Weitz was personally involved in his medical care.

FN6. This allegation pertains solely to the neck and back injuries sustained in 2003. Those injuries occurring in 2000 have been dismissed as barred by the statute of limitations. *See infra* at subsection II(E).

Additionally, Sullivan has contended that Guarneri fails to allege her personal involvement. Guarneri alleges that the "State acted in concert with [County] defendants by not answering appeals of grievances submitted by [Guarneri] in a timely manner ...." Am. Compl. at ¶ 25. However, failing to "receive a response to a complaint ... is insufficient to establish personal involvement [especially when] there is no other showing that [defendant] knew of or directly participated in any alleged violation." *Abbas v. Senkowski,* No. 03-CV-476 (GLS/DRH), 2005 WL 2179426, at \*2 (N.D.N.Y. Sept. 9, 2005). Additionally, Sullivan may not be held personally liable solely because of his supervisory position. Moreover, Guarneri does not allege the creation or execution of an unconstitutional policy or negligent supervision. Thus, Guarneri's conclusory assertions are insufficient to provide a factual basis to support the personal involvement of Sullivan.

Therefore, it is recommended that Dr. Weitz's motion to dismiss be granted as to his involvement in the confiscation of the knee brace but denied with respect to his involvement in Guarneri's neck, back, and mental health treatments. Additionally, it is recommended that Sullivan's motion to dismiss be granted.

### C. Eighth Amendment

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. CONST. amend. VIII. This includes the provision of medical care. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). A prisoner advancing an Eighth Amendment claim for denial of medical care must allege and prove deliberate indifference to a serious medical need. *Wilson v. Seiter,* 501 U.S. 294, 297 (1991); *Hathaway,* 37 F.3d at 66. More than negligence is required "but less than conduct undertaken for the very purpose of causing harm." *Hathaway,* 37 F.3d at 66. The test for a § 1983 claim is twofold. First, the prisoner must show that there was a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 552872 (N.D.N.Y.)

(Cite as: 2008 WL 552872 (N.D.N.Y.))

sufficiently serious medical need. *Chance v.. Armstrong, 143 F.3d 698, 702 (2d Cir.1998).* Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *Id.* "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer v. Brennan,* 511 U.S. 825, 844 (1994).

**\*5** " 'Because society does not expect that prisoners will have unqualified access to healthcare', a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) (quoting *Hudson v. McMillian,* 503 U.S. 1, 9 (1992)"). Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." *Brock v. Wright,* 315 F.3d 158, 162-63 (2d Cir.2003) (citing *Chance,* 143 F.3d at 702). The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case. *Smith,* 316 F.3d at 185.

Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." *Chance,* 143 F.3d at 702. Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble,* 429 U.S. 97, 104, (1976). "Mere disagreement over proper treatment does not create a constitutional claim," as long as the treatment was adequate. *Id .* at 703. Thus, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists ... are not adequate grounds for a § 1983 claim." *Magee v. Childs,* No. 04-CV-1089 (GLS/RFT), 2006 WL 681223 at \*4 (N.D.N.Y. Feb. 27, 2006). Furthermore, allegations of negligence or malpractice do not constitute deliberate indifference unless the malpractice involved culpable recklessness. *Hathaway v.. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

**1. Knee**

Guarneri may have offered evidence sufficient to conclude that the knee injury he sustained was serious. Generally, knee injuries have been "insufficient to trigger Eighth Amendment protection and support a deliberate indifference claim." *Johnson v. Wright,* 477 F.Supp.2d 572, 575 (W.D.N.Y.2007) (holding that a prisoner's torn meniscus suffered as a result of a basketball injury was not a serious medical need) (quoting *Moody v. Pickles,* No. 03-CV-850 (DEP), 2006 WL 2645124, at \*6 (N.D.N.Y. Sept. 13, 2006) (holding that a "medial meniscal tear, with joint effusion" which did not render plaintiff immobile was not a serious medical need; *see also Williamson v. Goord,* No. 02-CV-521(GLS/GHL), 2006 WL 1977438, at \*9, 14, 16 (N.D.N.Y. July 11, 2006) (holding that a prisoner's knee injuries including arthrosis, degenerative joint disease, and partially torn anterior cruciate ligament ("ACL"), did not constitute "death or degeneration, or [constitute the appropriate level of] extreme pain [contemplated by] the law").

**\*6** In this case, it is unclear how significantly the deprivation of Guarneri's knee brace affected his mobility as he has subsequently indicated his ability to ambulate. Docket No. 46 at 3. However, construing the facts in the light most favorable to Guarneri, the excruciating pain that he alleges may be of sufficient severity. *Id.* Therefore, viewing the evidence in the light most favorable to Guarneri, it appears that his knee injury was a serious medical condition.

Additionally, construing Guarneri's allegations as true, it appears that there exists a question of fact whether defendant acted with deliberate indifference to that medical condition. Guarneri contends that after he was prescribed the hinged knee brace, defendants intentionally interfered with his treatment by denying him use of the brace. Am. Compl. at ¶ 19. Moreover, Guarneri contends that defendants intentionally delayed transporting him to an emergency room when his knee gave way, causing him excruciating pain for an unnecessarily long period of time. *Id.* at ¶ 32.

Therefore, it is recommended that Dr. Weitz's motion on this ground be denied.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 552872 (N.D.N.Y.)

(Cite as: 2008 WL 552872 (N.D.N.Y.))

### 2. Mental Health

Guarneri also alleges that he suffered from and received inadequate medical treatment for PTSD, bipolar disorder, and depression. "Treatment of mental disorders of mentally disturbed inmates is ... a serious medical need" as contemplated by *Estelle. Guglielmoni v. Alexander,* 583 F.Supp. 821, 826 (D.Conn.1984). Thus, considering all of Guarneri's various complaints concerning his mental health, it is clear that he has alleged facts sufficient to provide relief as to whether he suffered a serious medical need as a result of his mental illnesses.

Moreover, Guarneri also contends that defendants have deliberately precluded him "from speaking to mental health counselors when hav[ing] mental health episodes ...." Am. Compl. at ¶ at 34-35. If proven, this constitutes deliberate indifference to Guarneri's mental health needs. Therefore, it is recommended that Dr. Weitz's motion on this ground be denied.

### 3. Back

Guarneri alleges sufficient evidence to present a serious medical need. Other courts have held that "[s]evere back pain, especially if lasting an extended period of time, can amount to a 'serious medical need' under the Eighth Amendment." *Nelson v. Rodas,* No. 01-CV-7887 (RCC/AJP), 2002 WL 31075804, at *14 (S.D.N.Y. Sept. 17, 2002) (citations omitted); *see also, Farraday v. Lantz,* No. 03-CV-1520 (SRU), 2005 WL 3465846, at *5 (D. Conn. Dec 12, 2005) (holding that "persistent[ ] complain[ts] of lower back pain caused by herniated, migrated discs [and] sciatica ..." leading to severe pain constitutes a serious medical need.) Therefore, with regard to the 2003 back injury, Guarneri has alleged a serious medical need.

Additionally, Guarneri alleges that defendant Hazzard "deliberately and with malice denied adequate medical care ...." Am. Compl. at ¶ 23. Thus, construing these allegations in the light most favorable to Guarneri, he has alleged deliberate indifference to this medical need. Thus, it is recommended that defendant's motion on this ground be denied.

### D. Res Judicata/Collateral Estoppel

**\*7** "A final judgment on the merits of an action

precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Allen v. McCurry,* 449 U.S. 90, 94 (1980) (applying res judicata to 42 U.S.C. § 1983 action). Thus, to sustain a claim of res judicata, the defense must show that "(1) the previous action involved an adjudication on the merits; (2) the previous action involved the plaintiffs or those in privity with them; and (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action." *Monahan v. New York City Dep't of Corr.,* 214 F.3d 275, 285 (2d Cir.2000) (citations omitted). In New York State, the analysis is governed by the transactional approach in which later claims are barred if they "aris[e] out of the same factual grouping as an earlier litigated claim even if the[y are] ... based on different legal theories or seek[ ] dissimilar or additional relief." *Id.*

Under the Full Faith and Credit Clause of the Constitution, federal courts must grant state court judgments the same preclusive effects as those given to other courts located within the state. *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (citing *Migra v. Warren City Sch. Dist.,* 465 U.S. 75, 81 (1984)). However, the bar of res judicata will not apply where the original forum is incapable of providing the relief requested by the plaintiff. *Id.; Davidson v. Capuano,* 792 F.2d 275, 278 (2d Cir.1986). The Second Circuit has held that a plaintiff in a § 1983 action who is seeking damages will not be vulnerable to dismissal based upon res judicata, although, a similar plaintiff seeking injunctive relief will be. *Davidson,* 792 F.2d at 277-78; *Fay v. South Colonie Cent. Sch. Dist.,* 802 F.2d 21, 30 (2d Cir.1986).

As a threshold matter, Dr. Weitz correctly notes that Guarneri's previous lawsuit, also filed in the Northern District of New York, is still pending. *See Guarneri v. Bates,* No. 05-CV-444 (GLS/DRH) (report-recommendation of magistrate judge pending final decision before district court). Because the previous action has not received an adjudication on the merits, Dr. Weitz cannot overcome the first prong of the analysis. Thus, it is recommended that Dr. Weitz's motion on this ground be denied without prejudice.

In the alternative, Dr. Weitz also raises the broader affirmative defense of collateral estoppel. "Once a court has decided an issue of fact or law necessary to its

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 552872 (N.D.N.Y.)

(Cite as: 2008 WL 552872 (N.D.N.Y.))

judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *Allen,* 449 U.S. at 94 (1980). Collateral estoppel is applicable:

> [I]f (1) there has been a final determination on the merits of the issue sought to be precluded; (2) the party against whom ... preclusion is sought has a full and fair opportunity to contest the decision ...; and (3) the issue sought to be precluded by the earlier suit is the same issue involved in the later action.

**\*8** *Davis v. Halpern,* 813 F.2d 37, 39 (2d Cir.1987) (citation omitted). The requirement of a full and fair opportunity to contest requires that the plaintiff "was fully able to raise the same factual or legal issues" in the prior litigation as asserted in the present case. *LaFleur v. Whitman,* 300 F.3d 256, 274 (2d Cir.2002).

However, it is clear that there has not been a final determination in the pending federal case and Dr. Weitz, again, cannot surmount the first prong of the test. Therefore, Dr. Weitz's motion should be denied without prejudice on this ground as well.

### E. Statute of Limitations

Dr. Weitz moves to dismiss Guarneri's Eighth Amendment allegations concerning inadequate treatment for his neck and back on the ground that they are barred by the statute of limitations. While there is no provision in § 1983, § 1988 provides that state law may apply if not inconsistent with the Constitution or federal law. 42 U.S.C. § 1988(a) (2003); *Moor v. County of Alameda,* 411 U.S. 693, 702-03 (1973). In New York, the applicable statute of limitations for a § 1983 suit is the three-year period governing suits to recover upon a liability created or imposed by statute. *See Owens v. Okure,* 488 U.S. 235, 249-51 (1989); *Romer v. Leary,* 425 F.2d 186, 187 (2d Cir.1970); N.Y. C.P.L.R. 214(2) (McKinney 2003).

Federal law governs the determination of the accrual date for purposes of a § 1983 claim. *Pearl v. City of Long Beach,* 296 F.3d 76, 80 (2d Cir.2002). The claim accrues "when the plaintiff knows or has reason to know" of the harm. *Id.* (citations omitted). "The crucial time for accrual purposes is when the plaintiff becomes aware that he [or

she] is suffering from a wrong for which damages may be recovered in a civil action." *Singleton v. City of New York,* 632 F.2d 185, 192 (2d Cir.1980). With regard to medical indifference claims, the statute of limitations in a § 1983 suit is derived from personal injury case law, not medical malpractice. *See e.g. Owens,* 488 U.S. at 251.

Here, Guarneri's initial complaint was filed on August 14, 2006. Compl. (Docket No. 1). Thus, claims relating to medical indifference occurring in 2000 are clearly outside the three-year period. However, claims regarding deliberate indifference resulting in herniated discs occurring in 2003 may fall within the three-year statutory period depending on when in 2003 the conduct occurred. Therefore, claims relating to the second back injury in 2003 may present facts upon which relief may be granted depending on when in 2003 the claim is shown to have accrued. At this stage, liberally construing Guarneri's amended complaint, the allegations therein are deemed to assert that claim accrued after August 14, 2003.

Thus, Dr. Weitz's motion on this ground should be granted with regard to the neck and back injuries occurring in 2000 and denied with regard to the back injuries occurring in 2003.

### III. Conclusion

**\*9** For the reasons stated above, it is hereby **RECOMMENDED** that:

1. Sullivan's motion to dismiss (Docket No. 43) be **GRANTED** and that the amended complaint be **DISMISSED** in its entirety as to her;

2. Dr. Weitz's motion to dismiss (Docket No. 19) be:

a. **GRANTED** as to his lack of personal involvement with the confiscation of the knee brace;

b. **DENIED** as to his lack of personal involvement in Guarneri's neck, back, and mental health treatments;

c. **DENIED** as to Guarneri's back and neck injuries sustained in 2003; and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 552872 (N.D.N.Y.)

(Cite as: 2008 WL 552872 (N.D.N.Y.))

    d. **GRANTED** as to Guarneri's back and neck injuries sustained in 2000; and

    3. The amended complaint be **DISMISSED** without prejudice as to defendants Lamy and John Doe.

    Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2008.

Guarneri v. Hazzard
Not Reported in F.Supp.2d, 2008 WL 552872 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2005 WL 3465846 (D.Conn.)
(Cite as: 2005 WL 3465846 (D.Conn.))

H

Only the Westlaw citation is currently available.

United States District Court,
D. Connecticut.
William FARADAY, Plaintiff,
v.
Theresa C. LANTZ, Michael E. Carter, and Edward
Blanchette, Defendants.
No. 3:03CV1520(SRU).

Dec. 12, 2005.

Norman A. Pattis, Williams & Pattis, New Haven, CT, for
Plaintiff.

Neil D. Parille, Attorney General's Office, Hartford, CT,
for Defendants.

*RULING ON DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT*

UNDERHILL, J.

*1 William Faraday, an inmate in the state prison system,
has brought this civil rights action, pursuant to 42 U.S.C.
§ 1983. Faraday alleges that his Eighth Amendment right
to be free from cruel and unusual punishment was violated
by defendants' deliberate indifference to his known
medical needs, namely "herniated, migrated discs" in his
lower back. In his complaint, he seeks compensatory and
punitive damages and injunctive relief against defendant
Edward Blanchette, M.D., the clinical director for the
Department of Correction ("DOC"), who has been sued in
his individual and official capacities. He also seeks
injunctive relief against defendant Theresa C. Lantz, the
DOC Commissioner, and defendant Michael E. Carter, the
former warden of MacDougall-Walker Correctional
Institution ("MacDougall"), both of whom are sued only

in their official capacities.

The defendants have moved for summary judgment
seeking judgment on the grounds that: (1) the undisputed
facts show that Dr. Blanchette was not deliberately
indifferent to Faraday's medical needs; (2) defendants
Lantz and Carter had no personal involvement in the
treatment decisions concerning Faraday and, therefore, are
not proper defendants; and (3) injunctive relief is not
warranted because the DOC is providing Faraday with
constitutionally appropriate care.

*Summary Judgment Standard*

The standard for granting a motion for summary judgment
is well-established. A moving party is entitled to summary
judgment "if the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the
affidavits, if any, show that there is no genuine issue as to
any material fact and that the moving party is entitled to a
judgment as a matter of law." Fed.R.Civ.P. 56(c). The
burden of establishing that there is no genuine factual
dispute rests with the moving party. *See Gallo v.
Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219,
1223 (2d Cir.1994). In ruling on a summary judgment
motion, the court cannot resolve issues of fact. Rather, it
is empowered to determine only whether there are material
issues in dispute to be decided by the trier of fact. The
substantive law governing the case determines which facts
are material. *Anderson v. Liberty Lobby, Inc.,* 477 U.S.
242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In assessing the record to determine whether a genuine
dispute about a material fact exists, the court is required to
resolve all ambiguities and draw all reasonable inferences
in favor of the non-moving party. *Id.* at 255; *Matsushita
Electric Ind. Co. v. Zenith Radio Corp.,* 475 U.S. 574,
587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "Summary
judgment is improper if there is any evidence in the record
that could reasonably support a jury's verdict for the
non-moving party." *Marvel Characters, Inc. v. Simon,* 310
F.3d 280, 285-86 (2d Cir.2002).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3465846 (D.Conn.)
(Cite as: 2005 WL 3465846 (D.Conn.))

*Factual Backgroud*

Faraday began his incarceration at Walker Prison on October 13, 1999. The medical intake forms from Walker indicate that Faraday gave a history of severe lower back pain and three ruptured discs in his lower back. He was referred to a medical doctor for evaluation. (Pl.'s Ex. 2.) The medical records indicate that he was seen in the medical clinic on October 25, 1999, October 29, 1999, December 2, 1999, and December 3, 1999, for continuing complaints of persistent back pain. (*Id.*) He was prescribed Motrin and Advil and given a medical pass for a bottom bunk and extra pillow. (*Id.*)

**\*2** On February 9, 2000, Faraday was transferred to MacDougall. A health history form dated February 16, 2000, indicates that Faraday provided a history of two ruptured discs. (Pl.'s Ex. 3.) The medical records show that Faraday was seen on February 20, 2000, for complaints of lower back pain due to a "known" diagnosis of three ruptured discs, specifically "(?L4, 5, + ?)," secondary to an old injury. The clinical notes indicate that Faraday described having pressure and pain, and limited range of motion. Ibuprofen was prescribed. Again, on February 28, 2000, Faraday was seen at the clinic with complaints of constant lower back pain with sciatica. X-rays were performed on March 22, 2000, at the request of Dr. Timothy Silvis, the staff doctor at MacDougall. The diagnostic radiologic report concluded:

There is no fracture or dislocation seen. Further workup with bone scan is recommended to rule out underlying destructive process involving the left pedicle of the L5 vertebral body. A CT scan of the lumbosacral spine may be necessary if bone scan findings are positive.

(Pl.'s Ex. 4.)

The record contains no medical records for 2001 relating to Faraday's back problems.

On January 17, 2002, Faraday filed an inmate request form asking to speak to the "M.D. (not sick call)" regarding his back, which was bothering him more than usual. He stated that it "comes and goes." He described his problem once again as "herniated migrated disks which ruptured into the vertibre [sic], pressing against my spinal column. Please see me ASAP." (Pl.'s Ex. 1.)

On May 2, 2002, Dr. Silvis sent a request to UCONN Correctional Managed Health Care's Utilization Review Committee, requesting an MRI of Faraday's spine to rule out disc disease.[FN1] The summary of his request set forth in the Utilization Review Report states that Faraday had been having increasing, intermittent low back pain this past year. No old medical records were available despite multiple requests. On the day of the request, Dr. Silvis stated that Faraday was having severe pain in his right leg when walking down stairs. On physical examination, he observed no loss of reflex, wide gait, no point tenderness. The Utilization Review Determination/ Recommendations were that Faraday should start a back exercise program and that Dr. Silvis should resubmit the request if there was no improvement in eight weeks or if there was a significant clinical change. (Pl.'s Ex. 5.)

FN1. In an affidavit filed with defendants's reply brief, Dr. Silvis now states that he submitted this form at the request of Faraday and that he personally did not believe an MRI was medically necessary. (Silvis Aff. ¶ 6.) At this stage of the proceeding, the court gives little credence to this statement, made during the course of litigation. Defendants have not produced a copy of Dr. Silvis' request, which presumably would bear some indication to confirm that the request was at the behest of Faraday, with which Dr. Silvis disagreed. Additionally, two years earlier, Dr. Silvis had stated that he recommended a further workup with bone scan and that a CT scan of the lumbosacral spine might be necessary. The Utilization Review Committee's response indicates that Dr. Silvis had reported that Faraday had been experiencing increasing, intermittent low back pain and severe pain in his right leg on the day of the request. Given these complaints and Dr. Silvis' earlier concerns that further workup, including a CT Scan, might be necessary, his statement that he did not believe an MRI was medically necessary cannot be credited at the summary judgment stage.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3465846 (D.Conn.)
(Cite as: 2005 WL 3465846 (D.Conn.))

On May 18, 2002, Faraday filed another inmate request form, seeking an egg crate foam mattress to alleviate his "continuing back problems, numbness of the arms and legs, and lack of sleep because of discomfort." (Pl.'s Ex. 1.) The response was that the doctor had ordered an x-ray of his cervical spine. (*Id.*) An x-ray performed on May 16, 2002, showed "degenerative disc changes at L4-5 and L5-S1." (Pl.'s Ex. 9.)

At some point, Faraday was admitted to Medical for three and one-half days because he could not walk and on two other occasions had to be taken to Medical in a wheel chair because he was unable to walk.[FN2]

> FN2. Faraday testified to these incidents during his state court habeas hearing (Tr. 28), but neither side has provided medical records relating to these incidents.

**\*3** During 2002, Faraday filed a number of inmate request forms for a pillow pass (to allow him to keep the second pillow he received at Walker), prescription refills, and an MRI, all related to his back problems. (Pl.'s Ex. 1.) Having failed to receive a positive response to these requests, Faraday filed a medical grievance. (*Id.*) Eventually, after his level-three grievance was not answered, Faraday filed a petition for writ of habeas corpus in state court, complaining that the conditions of his confinement were inhumane and dangerous because he had been denied the medical attention necessary to remedy, *inter alia,* his back condition consisting of herniated migrated disks.[FN3] In his petition, Faraday described constant discomfort and difficulty walking, sitting, and sleeping. He stated that, before his incarceration, he had planned to have surgery to remove the discs. He was requesting an MRI to confirm the condition of his back and the need for an operation. He also complained that the officers at MacDougall had refused to issue a double pillow pass. Thus, he requested an MRI to confirm his herniated, migrated disc, an operation to remedy the condition, a foam pad for his bed, and a pass allowing him to keep his second pillow. (Pl.'s Ex. 1.)

> FN3. Faraday also sought medication to lower his cholesterol, but that aspect of his habeas petition is not relevant to the issues presented

here.

A hearing on Faraday's habeas petition was held before the Hon. Richard M. Rittenband on April 16, 2003, at which Faraday and Dr. Blanchette, an internist and infectious disease specialist and the DOC clinical director, testified. Dr. Blanchette testified based on his review of Faraday's medical records, and discussions with Drs. Silvis and Lange, a doctor who he understood had treated Faraday prior to his incarceration.[FN4] Dr. Blanchette testified that a number of representations by Faraday "had been proven to be untrue," including "[f]or example, that he had an MRI of his back. There's no indication this ever occurred." (Tr. at 8.) He also questioned whether Faraday had actually been treated by some of the doctors or at certain hospitals. (Tr. 8-9.) He further testified that Faraday had

> FN4. Faraday explained in the hearing that he had treated with a Dr. Geiter (phonetic) who had since retired, and who had formerly worked in the same office as Dr. Lange. Faraday stated that he had never been treated by Dr. Lange and denied ever having told Dr. Silvis that he had been treated by Dr. Lange. (Tr. 10-11.)

no findings that would indicate ... that an MRI is necessary, and I certainly agree with all his physicians ... that Mr. Faraday is not someone that requires an MRI of his back or surgery.... I would be very much against doing this because it's not clinically indicated. (Tr. at 10.)

[T]he basic issue it comes down to medically ... is: Is this man a candidate for surgery-for neurosurgery-for discectomy and the way to determine that is our clinical findings, and clearly, regardless of what an MRI would show if-if we did it-the only reason to do it is to see, you know, to proceed with surgery otherwise there's no reason to do an MRI, and in this case there is no indication that this man would be a surgical candidate. He doesn't have the neurologic findings. His back pain comes and goes.... If he has exacerbations I would treat him as I would anyone on the street and that is with muscle relaxants and pain medication and bed rest until it-it relieved itself. (Tr. 14.)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3465846 (D.Conn.)
(Cite as: 2005 WL 3465846 (D.Conn.))

**\*4** Following the hearing, Judge Rittenband denied Faraday's claim that defendants had been deliberately indifferent to his medical needs, subject to new information being provided to the court. (Tr. 19, 36.)

At the time of the hearing, Faraday only possessed part of his prior medical records. (Tr. 16.) He subsequently obtained his complete medical records from Manchester Memorial Hospital, which indicated that Faraday had been in a motor vehicle accident in 1990 and presented at the hospital the following day complaining of low back pain, pain upon lifting, stiffness and spasms in the lumbar paraspinal muscle. (Pl.'s Ex. 8.) Faraday was treated at the hospital again in 1992 for complaints of severe back pain, difficulty walking, and tingling in his right foot. (*Id.*) A CT Scan was performed on November 12, 1992, which showed "herniated migrated central right sided disc herniation at the L5-S1 level." (*Id.*)

Faraday filed a motion for reconsideration based on this new evidence, which was granted by Judge Rittenband. Faraday also filed another grievance, complaining that he was still being denied necessary medical treatment even after he supplied Dr. Silvis with proof that he had a herniated migrated disk. (Pl.'s Ex. 9.) His grievance was denied. (*Id.*) Finally, on October 15, 2003, an MRI was ordered for Faraday at the University of Connecticut Health Center. The conclusion on the MRI report was:

1. Degenerative disc disease with mild diffuse disc bulge at L4-5.

2. Small central disc protrusion with degenerative disc disease at L5-S1.

3. No evidence of any disc extrusion, central spinal canal and/or foraminal stenosis.

(Pl.'s Ex. 10.)

Subsequently, at a later state court hearing on February 14, 2005, Judge Rittenband held that the Warden's refusal to provide for a neurological evaluation constituted "deliberate indifference" to Faraday's medical needs. (Def.'s Reply Mem. at 6.) He then ordered the Warden to take Faraday for a neurological evaluation. (*Id.*) The Warden has moved for certification to appeal that decision. The outcome of that request is not known.

*Discussion*

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments, which includes punishments that "involve the unnecessary and wanton infliction of pain." *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). In order to establish an Eighth Amendment claim arising out of the denial of medical care, an inmate must prove deliberate indifference to his serious medical needs. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). This standard incorporates both objective and subjective components. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Smith v. Carpenter,* 316 F.3d 178, 183-84 (2d Cir.2003). Thus, a prisoner must first make a showing of a serious illness or injury. *Hudson v. McMillan,* 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). A prisoner must then demonstrate that the prison official knew of and disregarded an "excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)) (internal quotation marks omitted). "Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation." *Smith,* 316 F.3d at 184.

*A. The Objective Test*

**\*5** Based on the facts of record, the court concludes that

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3465846 (D.Conn.)
(Cite as: 2005 WL 3465846 (D.Conn.))

defendants are not entitled to summary judgment on the ground that Faraday's medical needs were not sufficiently serious to meet the objective test set forth in *Estelle v. Gamble, supra.* As the Second Circuit held in *Brock v. Wright,* 315 F.3d 158, 162 (2d Cir.2003), there is no precise, settled metric to guide the court in its estimation of the seriousness of a prisoner's medical condition. Any inquiry into the objective component of an Eighth Amendment claim must be tailored to the specific facts of each case. *Smith v. Carpenter,* 316 F.3d at 185. In *Chance v. Armstrong,* the Court set forth a non-exhaustive list of factors that are relevant to the inquiry whether a given medical condition is a serious one: (1) whether a reasonable doctor or patient would perceive the medical need in question as "important and worthy of treatment;" (2) whether the medical condition significantly affects daily activities; and (3) "the existence of chronic and substantial pain." 143 F.3d at 702.

There are numerous cases from this circuit and others finding various back conditions to be sufficiently serious to support an Eighth Amendment claim. *E.g., Veloz v. State of New York,* 339 F.Supp.2d 505, 522-24 (S.D.N.Y.2004) (various spinal and lower back conditions); *see also Hathaway,* 37 F.3d at 67 (2d Cir.1994) (finding as "serious" a hip condition that caused a prisoner a great deal of pain over an extended period of time and difficulty walking). That is not to say that all back problems and/or conditions meet this standard. Back conditions, like other medical conditions, vary significantly in severity. *See Chance,* 143 F.3d at 702. In this case, however, Faraday has produced medical records indicating that since his arrival at Walker in 1999, he has persistently complained of lower back pain caused by herniated, migrated discs, sciatica, severe pain walking downstairs, of pain and stiffness when he gets out of bed. He has also produced objective evidence in the form of a CT Scan report supporting his subjective complaints. Indeed, even Dr. Blanchette testified that Faraday had back pain and degenerative joint disease of his spine. (Tr. 21.) Defendants have produced no medical evidence that would lead this court to conclude that Faraday's evidence of his serious medical condition is too insubstantial to raise a genuine issue of material fact.

*B. The Subjective Test*

In addition, Faraday must show that a particular defendant knew and disregarded an excessive risk to inmate health and safety. *Farmer v. Brennan,* 511 U.S. at 837. Mere disagreement over the proper course of treatment is not sufficient. So long as the treatment that the prisoner received was adequate, the fact that he might have preferred a different treatment does not give rise to a constitutional claim. *See Chance,* 143 F.3d at 703. Additionally, negligence, without more, does not establish a violation of a prisoner's Eighth Amendment rights. *Id.*

*6 At the same time, "[i]n certain instances, a physician may be deliberately indifferent if he or she consciously chooses 'an easier and less efficacious' treatment plan." *Id.* (quoting *Williams v. Vincent,* 508 F.2d 541, 544 (2d Cir.1974)). "Whether a course of treatment was the product of sound medical judgment, negligence, or deliberate indifference depends on the facts of the case." *Id.* at 703-04 (finding that plaintiff's allegations, if true, that the doctors' recommendation of a certain course of treatment was based not on their medical views, but monetary incentives, was sufficient to show a culpable state of mind).

*1. Defendant Blanchette*

Dr. Blanchette is the Clinical Director of the Connecticut Department of Corrections, in which capacity he supervises the provision of medical care to inmates confined by the DOC. (Blanchette Aff. ¶ 5.) In addition to supervising the medical care provided to Faraday, Dr. Blanchette reviewed all of Faraday's medical records, spoke with Dr. Silvis, who treated Faraday at MacDougall, and attempted to obtain some of Faraday's pre-incarceration medical records from Dr. Lange. He testified on behalf of the Warden in Faraday's state habeas case, questioning Faraday's credibility about a prior diagnosis by MRI of herniated, migrated discs, and agreeing with "all his physicians" that an MRI was not necessary. Dr. Blanchette would not allow Faraday to have an egg crate foam mattress or second pillow, since these were not indicated for Faraday's condition. (Tr. 14, 21-22.) Contrary to Dr. Blanchette's testimony, Faraday has produced his clinical records from MacDougall, which include a report that a CT Scan of the lumbosacral spine may be necessary and a Utilization Review Report in which Dr. Silvis, as the "requestor," [FN5] had requested an

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3465846 (D.Conn.)
(Cite as: 2005 WL 3465846 (D.Conn.))

MRI, but which request was denied. There is also a question presented by the evidence of record about how diligent the medical staff was in requesting Faraday's previous medical records.

FN5. *See* Note 1, *supra.*

Viewing the evidence in the light most favorable to Faraday, and drawing all reasonable inferences in his favor, the court finds sufficient evidence in the record from which a jury could find that defendant Blanchette intentionally disregarded certain of Faraday's medical records and his complaints of the severity of his condition and, thus, acted with deliberate indifference in denying Faraday's requests for a diagnostic MRI or other neurological consultation. A reasonable jury could find that, without trying to determine the source or cause of Faraday's complaints of severe pain, Dr. Blanchette simply dismissed his complaints. As the Second Circuit held in *Hart v. Blanchette,* No. 04-6399, 2005 WL 2300225, at *2 (2d Cir. Sept.21, 2005) (slip op.), in vacating in part the grant of summary judgment, "[w]hile the evidence at trial may establish only negligence, the determination of the difference between negligence and deliberate indifference is, in the circumstances of this case, one for the trier of fact to make." Therefore, the court will deny the defendants' motion for summary judgment insofar as it pertains to Faraday's claims for money damages and injunctive relief against defendant Blanchette.

*2. Defendants Lantz and Carter*

**\*7** It is unnecessary to reach the issue whether defendants Lantz and Carter acted with deliberate indifference because they were not sufficiently involved with the alleged deprivation of medical care to be liable under section 1983.

In support of their motion for summary judgment, defendants provided the affidavit of Dr. Blanchette in which he testified that defendant Lantz, the DOC Commissioner, and defendant Carter, the former warden of MacDougall, were not medical professionals and had no involvement in the day-to-day medical treatment of inmates.

For liability to exist under 42 U.S.C. § 1983, a defendant must be personally involved in the underlying conduct or events, such that he subjects or causes the plaintiff to be subjected to a violation of constitutional rights. *See Provost v. City of Newburgh,* 262 F.3d 146, 154 (2d Cir.2001). Personal liability cannot be imposed on a state official based on a theory of respondeat superior. *Monell v. New York City Dep't of Soc. Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). In the Second Circuit, personal involvement of a supervisory official may be established when:

(1) the official participated directly in the alleged constitutional violation;

(2) the official, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the official created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the official was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the official exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*See Hernandez v. Keane,* 341 F.3d 137, 145 (2d Cir.2003), *cert. denied,* --- U.S. , 543 U.S. 1093, 125 S.Ct. 971, 160 L.Ed.2d 905 (2005); *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). "Some personal responsibility on the part of the officer must be established and proof of linkage in the prison chain of command is sufficient to establish liability." *Veloz,* 339 F.Supp.2d at 519 (quoting *Hernandez v. Keane,* 341 F.3d at 145) (internal quotation marks omitted).

Faraday relies on the fact that he filed several grievances

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3465846 (D.Conn.)
(Cite as: 2005 WL 3465846 (D.Conn.))

concerning his inadequate medical care as evidence that defendants Lantz and Carter were aware of the constitutional violations but failed to intervene. There is nothing in the record, however, indicating that any of those requests or grievances were sent to defendants Lantz or Carter. In fact, it appears that by 2002, when these requests and grievances were filed, the warden at MacDougall was Brian Murphy. (Pl.'s Ex. 1.)

Neither a "receipt of letters or grievances," *Woods v. Goord,* No. 01 Civ. 3255(SAS), 2002 WL 731691, at *7 (S.D.N.Y. Apr.23, 2002) (collecting cases), nor allegations that an official ignored a prisoner's letter or grievance, is sufficient to establish personal liability for purposes of section 1983. *See Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997); *Atkins v. County of Orange,* 251 F.Supp.2d 1225, 1233 (S.D.N.Y.2003). Faraday has failed to set forth any facts that either of these defendants violated Faraday's constitutional rights either directly or as a supervisor, or that they were aware of the alleged violations and failed to take action to prevent these violations. Accordingly, summary judgment is granted in favor of Lantz and Carter on Faraday's claims against them.

*Faraday's Claims for Injunctive Relief*

**\*8** Defendants urge this court to grant summary judgment on Faraday's claims for injunctive relief on the ground that the DOC is affording adequate medical care to Faraday. In particular, they note that Faraday has had an MRI, which was part of the relief he was requesting. Obviously the court would not order medical tests that have been performed and are no longer necessary. Still, Faraday may still have an Eighth Amendment claim for the delay in treatment. *See Smith v. Carpenter,* 316 F.3d at 186. Whether Faraday is now being afforded proper medical care is an issue that goes to the issue of damages and appropriate injunctive relief, assuming liability is found. That issue cannot be resolved on the basis of the summary judgment papers now before the court.

*Conclusion*

For the reasons set forth above, the court GRANTS

defendants' motion for summary judgment with respect to the claims against defendants Lantz and Carter. Because there are genuine issues of material fact whether defendant Blanchette was deliberately indifferent to Faraday's serious medical needs, the court DENIES the motion for summary judgment with respect to Faraday's claims against defendant Blanchette.

SO ORDERED.

D.Conn.,2005.
Faraday v. Lantz
Not Reported in F.Supp.2d, 2005 WL 3465846 (D.Conn.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2002 WL 31075804 (S.D.N.Y.)
(Cite as: 2002 WL 31075804 (S.D.N.Y.))

▷

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Jeffrey NELSON, Plaintiff
v.
Byron RODAS, et al., Defendants.
**No. 01CIV7887RCCAJP.**

Sept. 17, 2002.

Prison defendants moved for summary judgment on prisoner's civil rights claims. In issuing his report and recommendation, United States Magistrate Judge Peck, held that: (1) prisoner did not satisfy Prison Litigation Reform Act's (PLRA) exhaustion requirements with respect to non-medical claims; (2) if a prisoner's § 1983 complaint contains exhausted and unexhausted claims, district court may address the merits of the exhausted claims and dismiss only those that are unexhausted; and (3) prisoner failed to establish that prison defendants demonstrated deliberate indifference serious medical and dental conditions.

Motion granted as to exhausted claims; unexhausted claims dismissed.

West Headnotes

**[1]** Civil Rights 78 🔗 1319

78 Civil Rights
    78III Federal Remedies in General
        78k1314 Adequacy, Availability, and Exhaustion of State or Local Remedies
            78k1319 k. Criminal Law Enforcement; Prisons.
Most Cited Cases
    (Formerly 78k209)
Prisoner's complaint letter to Commissioner of New York

State Department of Correctional Services (DOCS) with respect to non-medical claims did not satisfy Prison Litigation Reform Act's (PLRA) exhaustion requirements in prisoner's civil rights action. 42 U.S.C. § 1997e(a).

**[2]** Civil Rights 78 🔗 1311

78 Civil Rights
    78III Federal Remedies in General
        78k1306 Availability, Adequacy, Exclusivity, and Exhaustion of Other Remedies
            78k1311 k. Criminal Law Enforcement; Prisons.
Most Cited Cases
    (Formerly 78k194)
Prisoner asserting civil rights claims did not satisfy Prison Litigation Reform Act's (PLRA) exhaustion requirements with respect to non-medical claims by filing appeals from various disciplinary hearing dispositions. 42 U.S.C. § 1997e(a).

**[3]** Civil Rights 78 🔗 1311

78 Civil Rights
    78III Federal Remedies in General
        78k1306 Availability, Adequacy, Exclusivity, and Exhaustion of Other Remedies
            78k1311 k. Criminal Law Enforcement; Prisons.
Most Cited Cases
    (Formerly 78k194)
If a prisoner's § 1983 complaint contains exhausted and unexhausted claims, district court may address the merits of the exhausted claims and dismiss only those that are unexhausted under Prison Litigation Reform Act (PLRA). 42 U.S.C. § 1983; 42 U.S.C. § 1997e(a).

**[4]** Civil Rights 78 🔗 1420

78 Civil Rights
    78III Federal Remedies in General
        78k1416 Weight and Sufficiency of Evidence
            78k1420 k. Criminal Law Enforcement; Prisons.
Most Cited Cases

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31075804 (S.D.N.Y.)
(Cite as: 2002 WL 31075804 (S.D.N.Y.))

(Formerly 78k242(5))
Prisoner failed to establish that prison defendants demonstrated deliberate indifference to serious medical and dental conditions regarding an abnormal growth of tissue-cells within his chest, a defective back, and worn-out amalgams fillings that caused him a perpetual headache; prisoner offered no evidence to support his claims other than conclusory allegations and refused to accept dental treatment. U.S.C.A. Const.Amend. 8; 42 U.S.C. § 1983.

**[5] Conspiracy 91** 🔑 **18**

91 Conspiracy
    91I Civil Liability
        91I(B) Actions
            91k18 k. Pleading. Most Cited Cases
Prisoner's conclusory allegations did not state conspiracy claim under § 1985(3); additionally, conspiracy claim was not stated since prisoner failed to allege that defendants conspired against him because of any racial or class-based, invidious discriminatory animus. 42 U.S.C. § 1985(3).

REPORT AND RECOMMENDATION

PECK, Magistrate J.

**\*1** Pro se plaintiff Jeffrey Nelson, an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), brings this action pursuant to 42 U.S.C. §§ 1983, 1985, and 1986, alleging that numerous Green Haven Correctional Facility employees violated his constitutional rights, and asserting claims for: (1) deliberate indifference to serious medical needs; (2) conspiracy; (3) retaliation; (4) deliberate indifference to serious harm; (5) excessive force; and (6) denial of due process. (Dkt. No. 2: Compl.; Dkt. No. 40: Am. Compl.) Nelson demands compensatory damages of $1.329 billion and punitive damages of an additional $1.329 billion. (Am. Compl. at 36-37.) After the conclusion of discovery, defendants moved for summary judgment under Fed.R.Civ.P. 56, or, in the alternative, to dismiss the amended complaint under Fed R. Civ. P. 12(b)(6).

For the reasons set forth below, (1) defendants' summary judgment motion should be GRANTED as to Nelson's claims against defendants Rodas, Koenigsmann and Licerio for deliberate indifference to serious medical needs and conspiracy; and (2) Nelson's remaining claims should be DISMISSED WITHOUT PREJUDICE for failure to exhaust administrative remedies.

PROCEDURAL BACKGROUND

At all times relevant to this action (October 2000 through May 2001), Nelson was an inmate under DOCS custody at Green Haven Correctional Facility (Dkt. No. 40: Am. Compl. at 3-6, 15-21; Dkt. No. 46: Defs. Br. at 2; Dkt. No. 48: Defs. 56.1 Stmt. ¶ 1),[FN1] and defendants were employed by DOCS at Green Haven.[FN2]

FN1. On November 19, 2001, Nelson was transferred to Clinton Correctional Facility. (Am. Compl. at 1-2.)

FN2. Defendants include: physician's assistant Byron Rodas, Medical Director Carl Koenigsmann, dentist Edward Licerio, corrections counselors Joseph Joseph and Jim Temple, Superintendent Charles Greiner, Deputy Superintendents Jeff McKoy and Gayle Haponik, Corrections Officers Tracy Kohler, Barry Barizone, Jim Lawyer, James Weckesser, "Kordougber," Alvin Thomas and Charles Butenhoff, Sergeant John Ross, Lieutenant Michael Nagy, education supervisor Frank Meeuwisse, and an unknown "John Doe." (Am. Compl. at iii.)

Nelson's original complaint also named Commissioner Goord and Attorney General Spitzer as defendants. (Compl.) On Nelson's consent at the February 6, 2002 conference, his claims against those defendants were dismissed with prejudice. (Dkt. No. 33: 2/8/02 Order .)

Nelson commenced this action by filing a complaint dated

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31075804 (S.D.N.Y.)
(Cite as: 2002 WL 31075804 (S.D.N.Y.))

July 18, 2001, received by this Court's Pro Se Office on July 25, 2001 and filed as of August 23, 2001. (Dkt. No. 2: Compl.) The Court directed Nelson to amend his complaint to provide additional facts supporting the allegations in his complaint. (Dkt. No. 32: 2/6/02 Memo Endorsed Order.) On March 8, 2002, Nelson's amended complaint was filed. (Dkt. No. 40: Am. Compl.)

Nelson's claims in the amended complaint can be divided into two categories. The first category involves claims against defendants Byron Rodas, Dr. Carl Koenigsmann and Edward Licerio for deliberate indifference to Nelson's serious medical (and dental) needs and conspiracy relating thereto (hereafter, the "Medical Claims"). (Am. Compl. at 3-14; Dkt. No. 52: Nelson 4/30/02 Aff. ¶¶ 4-14; Dkt. No. 53: Nelson Br. ¶¶ 5-8.) The second category involves claims against the remaining sixteen defendants for excessive force, deliberate indifference to serious harm, denial of due process,[FN3] retaliation, and conspiracy relating to a variety of incidents at Green Haven, including, *inter alia,* physical attacks by corrections officers and fellow inmates, and various disciplinary measures levied against Nelson (hereafter, the "Non-Medical Claims"). (Am. Compl. at 15-35; Nelson 4/30/02 Aff. ¶¶ 15-33; Nelson Br. ¶¶ 9-12.)[FN4]

FN3. While Nelson's amended complaint does not expressly reference the Due Process Clause, his allegations, construed liberally, appear to claim a denial of due process in various disciplinary proceedings. (Am. Compl. at 15-21.) *See, e.g., LaBounty v. Kinkhabwala,* No. 99-0329, 2 Fed. Appx. 197, 200-01, 2001 WL 99819 at *2-3 (2d Cir.2001) (reversing dismissal of procedural due process claim arising out of prisoner's disciplinary hearing).

FN4. Nelson's submissions are not a model of clarity, often rendering his claims difficult to understand. In one particularly bizarre passage, Nelson appears to confuse this Court with NASA Mission Control:

Therefore the Magistrate Judge residing is a scientist in the Laws of Land of the United States in the Southern Jurisdiction, District

Court of New York State whom adheres and give fair elevation to the United States Constitution and the laws subsequently thereof. As in the near future the constitution and the Laws of the Land of the United States will be firmly establish in the United States Space Society. As the United States NASA-"NATIONAL AERONAUTICS AND SPACE ADMINISTRATION" path the way by advancing the technology for adequate comfortable living condition in such atmosphere.

(Dkt. No. 41: Nelson 2/22/02 Aff. ¶ 5.)

At the close of discovery, defendants moved for summary judgment, or, in the alternative, to dismiss the amended complaint. (Dkt.Nos.45-49, 54.)[FN5]

FN5. The Court's ability to decide the summary judgment motion was seriously hampered by the failure of the Assistant Attorney General on this case to take plaintiff Nelson's deposition. The Assistant Attorney General tried to "pull a fast one" by submitting a proposed order for the taking of Nelson's deposition (an order is needed to depose an incarcerated party) *after* the discovery cut-off date, which the Court accordingly denied. (*See* Dkt. No. 39: 3/11/02 Memo Endorsed Order; *see also* Dkt. No. 43: 3/20/02 Memo Endorsed Order, again denying request to depose Nelson, noting that "[t]he Court is not amused by defense counsel's conduct.")

ANALYSIS

I. NELSON'S NON-MEDICAL CLAIMS SHOULD BE DISMISSED WITHOUT *PREJUDICE FOR FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES*

**\*2** Under 42 U.S.C. § 1997e(a), as amended by the Prison Litigation Reform Act of 1996 ("PLRA"), a prisoner must exhaust administrative remedies before bringing suit in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31075804 (S.D.N.Y.)
(Cite as: 2002 WL 31075804 (S.D.N.Y.))

federal court under federal law:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a) This provision requires complete exhaustion in accordance with the administrative procedures within the New York State Department of Correctional Services ("DOCS"). Exhaustion is required even when a prisoner seeks a remedy that cannot be awarded by such administrative procedures. *Porter v. Nussle,* 534 U.S. 516, 122 S.Ct. 983, 988, 152 L.Ed.2d 12 (2002); *Booth v. Churner,* 532 U.S. 731, 741, 121 S.Ct. 1819, 1825, 149 L.Ed.2d 958 (2001). The Supreme Court this past term made clear that there are no exceptions to the PLRA's exhaustion requirement:

> [W]e hold that the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.

*Porter v. Nussle,* 122 S.Ct. at 992; *accord, e.g., Feaster v. United States Bureau of Prisons,* No. 00-0118, 37 Fed. Appx. 15, 16, 2002 WL 970941 at *1 (2d Cir. May 10, 2002) (applying *Porter v.. Nussle* holding to require exhaustion of prisoner's due process and retaliation claims).[FN6] Dismissal of an action for failure to comply with the PLRA is without prejudice. *E.g., Morales v. Mackalm,* 278 F.3d 126, 128, 131 (2d Cir.2002) (per curiam) (Second Circuit "clarif[ies] that if a district court dismisses a prisoner's complaint for failure to exhaust administrative remedies, it should do so without prejudice.").

> FN6. Prior to the Supreme Court's decision in *Porter v. Nussle,* the Second Circuit had ruled that claims like Nelson's which applied only to the plaintiff, such as "particular instances of assault or excessive force," did not relate to general "prison conditions" and thus were not subject to the PLRA's exhaustion requirement. *Nussle v. Willette,* 224 F.3d 95, 106 (2d

Cir.2000), *rev'd, Porter v. Nussle,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). In *Porter v. Nussle,* the Supreme Court reversed, declaring that claims of every sort relating to prison life-including claims for excessive force against an individual inmate-had to be exhausted before an action could be commenced in this Court pursuant to 42 U.S.C. § 1983. *Porter v. Nussle,* 122 S.Ct. at 988; *see also Lawrence v. Goord,* 238 F.3d 182, 185 (2d Cir.2001) (retaliation claims need not be exhausted), *vacated,* 535 U.S. 901, 122 S.Ct. 1200, 152 L.Ed.2d 139 (2002).

DOCS has a well-established inmate grievance procedure ("IGP"):

> It consists of three levels. The first is the filing of a complaint with the facility's Inmate Grievance Review Committee. The second is an appeal to the facility superintendent. The final level is an appeal to the DOCS Central Office Review Committee in Albany.... A prisoner has not exhausted his administrative remedies until he goes through all three levels of the grievance procedure.

*Hemphill v. New York,* 198 F.Supp.2d 546, 548 (S.D.N.Y.2002); *see also, e.g., Perez v. Blot,* 195 F.Supp.2d 539, 542-43 (S.D.N.Y.2002); *Cruz v. Jordan,* 80 F.Supp.2d 109, 117-18 (S.D.N.Y.1999); *Vasquez v. Artuz,* 97 Civ. 8427, 1999 WL 440631 at *5 (S.D.N.Y. June 28, 1999) (Peck, M.J.); N.Y. Correct. Law §§ 138-39 (McKinney's 2002); Official Compilation of Codes, Rules & Regulations of the State of New York ("NYCRR") Title 7, § 701.1 *et seq.*.

Nelson did not exhaust DOCS' grievance procedures with respect to any of the Non-Medical Claims.[FN7] Nelson concedes that he did not follow the formal grievance procedure with respect to his excessive force claim, but rather appealed directly to DOCS Commissioner Glenn Goord in a letter dated March 10, 2001. (Dkt. No. 52: Nelson 4/30/02 Aff. Ex. 1: 3/10/01 Nelson Letter to Goord; *see* Dkt. No. 50: 3/11/02 Hearing Tr. at 22; Dkt. No. 53: Nelson Br. at 9-11; Am. Compl. at iv; *see also* Dkt. No. 47: Gould Aff. Ex. B: Egan 3/25/02 Aff.) Nelson argues that, in light of correction officers' violent attacks

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31075804 (S.D.N.Y.)
(Cite as: 2002 WL 31075804 (S.D.N.Y.))

and retaliatory behavior, he had "no other resource or remedy at the facility other than to file his complaint(s) ... directly to" Commissioner Goord. (Nelson Br. at 9; 3/11/02 Hearing Tr. at 22; Nelson 4/30/02 Aff. Ex. 1: 3/10/01 Nelson Letter to Goord.) According to Nelson, his situation qualified as an "emergency" under the IGP, thus allowing an appeal directly to Commissioner Goord in lieu of ordinary exhaustion. (Nelson Br. at 9-10.)

> FN7. Defendants originally asserted that only Nelson's excessive force claim was unexhausted, (Dkt. No. 46: Defs. Br. at 34-38; Dkt. No. 54: Defs. Reply Br. at 6-10), effectively ignoring Nelson's apparent failure to exhaust the remaining Non-Medical Claims. Rather than *sua sponte* dismissing such claims for lack of exhaustion, the Court gave Nelson an "opportunity to be heard" on the exhaustion issue (Dkt. No. 57: 8/5/02 Order), as required by *Neal v. Goord,* 267 F.3d 116, 123-24 (2d Cir.2001). Nelson, however, did not respond.

*3 Nelson is mistaken. DOCS grievance procedure establishes an expedited grievance procedure in cases of alleged staff "harassment" of an inmate, defined as "employee misconduct meant to annoy, intimidate, or harm an inmate." 7 NYCRR § 701.11(a). That procedure is as follows:

> (b) Procedure.

> (1) An inmate who feels that s(he) has been the victim of employee misconduct or harassment should first *report such occurrences to the immediate supervisor of that employee.* This does not preclude submission of a formal grievance.

> (2) All allegations of employee misconduct shall be given a grievance calendar number and recorded in sequence. All documents submitted with the allegation must be *forwarded to the superintendent* by close of business that day.

> (3) The superintendent or his designee shall promptly

determine whether the grievance, if true, would represent a bona fide case of harassment as defined in subdivision (a) of this section. If not, then it shall be returned to the IGRC for normal processing.

7 NYCRR § 701.11(b) (emphasis added). Nelson did not follow this procedure when he wrote to Commissioner Goord.[FN8]

> FN8. The IGP also provides for other "emergency situations" as follows:

> > (a) Definition. An emergency shall include, but is not limited to, a situation, action, or condition in which an inmate or an employee's health, safety, or welfare is in serious threat or danger. The IGP supervisor will determine if a grievance falls within this category.

> > (b) The IGP supervisor shall refer any grievance of an emergency nature directly to the appropriate response level with the authority to ensure an immediate or expeditious, meaningful response.

> 7 NYCRR § 701.9. The "IGP supervisor" is a prison employee at Green Haven, *see* 7 NYCRR §§ 701.4(a)(2), 701.4(b)(2)(i), 701.4(d), and is not Commissioner Goord. Nelson thus has no basis to argue that the IGP's exhaustion procedure can be circumvented by the "emergency situation" procedure contained in 7 NYCRR § 701.9, which simply requires the IGP supervisor to direct a grievance to an "appropriate response level" in the event of an emergency.

[1] Courts have repeatedly held that complaint letters to the DOCS Commissioner or the facility Superintendent do not satisfy the PLRA's exhaustion requirements. *See, e.g. Saunders v. Goord,* 98 Civ. 8501, 2002 WL 1751341 at *3 (S.D.N.Y. July 29, 2002) ("It is well established that '[p]laintiffs may not bypass this procedure by sending letters directly to the Superintendent.' "); *Byas v. State,* 99

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31075804 (S.D.N.Y.)
(Cite as: 2002 WL 31075804 (S.D.N.Y.))

Civ. 1673, 2002 WL 1586963 at *2 (S.D.N.Y. July 17, 2002) ("Prisoners may not bypass this procedure [in 7 NYCRR § 701.11(b) ] by sending letters directly to the Superintendent.") (citing cases); *Nunez v. Goord,* 99 Civ. 4640, 2002 WL 1162905 at *1 (S.D.N.Y. June 3, 2002) (inmate's letter to prison Superintendent in lieu of filing grievance failed to exhaust excessive force claim); *Hemphill v. New York,* 198 F.Supp.2d at 548-49 (same; letter to Superintendent does not satisfy 7 NYCRR § 701.11 procedures either); *Mills v. Garvin,* 99 Civ. 6032, 2001 WL 286784 at *3 (S.D.N.Y. Mar.2, 2001) (inmate's letters to prison officials were insufficient to exhaust his administrative remedies; "letter writing is not the equivalent of an exhaustion of administrative remedies under the PLRA."); *Noguera v. Hasty,* 99 Civ. 8786, 2000 WL 1011563 at *12 n. 23 (S.D.N.Y. July 21, 2000) (Peck, M.J.) ("The Court notes that simple letter complaints to the Commissioner of the New York State Department of Correctional Services about excessive force and medical indifference appear quite common, and such complaints are not normally sufficient to serve as a proxy for following and exhausting proper administrative remedies.") (citing cases), *report & rec. adopted in part,* 2001 WL 243535 (S.D.N.Y. Mar.12, 2001) (Wood, D.J.); *Beatty v. Goord,* 98 Civ. 2136, 2000 WL 288358 *4-5 (S.D.N.Y. Mar.16, 2000) (complaint dismissed without prejudice for failure to exhaust where inmate sent letters to prison medical director, Superintendent and Commissioner rather than following IGP); *Adams v. Galletta,* 96 Civ. 3750, 1999 WL 959368 at *3 (S.D.N.Y. Oct.19, 1999) (letter to warden insufficient to exhaust administrative remedies); *Salahuddin v. Mead,* 95 Civ. 8581, 1997 WL 357980 at *4 (S.D.N.Y. June 26, 1997) (letter to Superintendent and Commissioner insufficient to exhaust), *rev'd on other grounds,* 174 F.3d 271 (2d Cir.1999).[FN9]

FN9. Contrary to the *dicta* in *Perez v. Blot,* 195 F.Supp.2d 539, 544-46 (S.D.N.Y.2002), this Court construes *Marvin v. Goord,* 255 F.3d 40, 43 n. 3 (2d Cir.2001), as holding merely that a grievance through informal channels satisfies the exhaustion requirement *if* the prisoner thereby obtained a favorable resolution of his grievance.

*4 [2] Nelson also appears to claim that he satisfied the exhaustion requirement by filing appeals from various disciplinary hearing dispositions. (Dkt. No. 40: Am.

Compl. at iv: "Chronology-Exhaustion of Administrative Remedies.") However, "[e]xhausting appeals of a disciplinary hearing determination does not constitute exhausting administrative remedies for [the inmate's] grievance, even if the underlying facts are the same." *Benjamin v. Goord,* 02 Civ. 1703, 2002 WL 1586880 at *2 (S.D.N.Y. July 17, 2002); *accord, e.g., Byas v. State,* 2002 WL 1586963 at *3 & n. 3 (inmate's claim unexhausted despite "the two letters he sent to Sing Sing Superintendent Greiner within days of the incident and ... his appeal of the disciplinary hearing determination;" "the fact that plaintiff appealed his disciplinary finding does not relieve him of the obligation to file a grievance"); *Cherry v. Selsky,* 99 Civ. 4636, 2000 WL 943436 at *1, 7 (S.D.N.Y. July 7, 2000) (exhaustion of grievance procedure necessary even though inmate appealed disciplinary charges).

Nelson asserts several other exhaustion arguments that border on the frivolous. He argues that the exhaustion requirement is satisfied if the inmate's complaint has been "reviewed at the highest levels of the agency." (Nelson Br. at 10, citing *Noguera,* 2000 WL 1011563 at *10-11.) While this may be true, Nelson has not submitted any evidence that his complaints were, "in fact," investigated at that level. Nelson also argues that a grievance procedure is essentially unavailable if the inmate does not know the identities of the relevant prison officials. (Nelson Br. at 11.) Whether or not this could ever be a factor, here Nelson has had no difficulty identifying his alleged attackers. (*See* Am. Compl. at 15-21.)

Finally, Nelson argues that "an administrative remedy may be inadequate 'because of some doubt as to whether the agency was empowered to grant effective relief' ' or because exhaustion would otherwise be futile. (Nelson Br. at 10-11, quoting *McCarthy v. Madigan,* 503 U.S. 140, 147, 112 S.Ct. 1081, 1088, 117 L.Ed.2d 291 (1992).) The Supreme Court, however, has made clear that *McCarthy* was superseded by the PLRA: "Congress has mandated exhaustion clearly enough, regardless of the relief offered through administrative procedures." *Booth v. Churner,* 532 U.S. at 739-41 & n. 6, 121 S.Ct. at 1824-25 & n. 6 ("we will not read futility or other exceptions into statutory exhaustion requirements where Congress has provided otherwise"); *see also, e.g., Saunders v. Goord,* 2002 WL 1751341 at *3 (rejecting plaintiff's argument that corrections officers interfered with his ability to file

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31075804 (S.D.N.Y.)
(Cite as: 2002 WL 31075804 (S.D.N.Y.))

administrative grievances, stating that "there is no general futility exception [to] the exhaustion requirement under the PLRA.").

In short, Nelson's Non-Medical Claims have not been administratively exhausted, and therefore should be dismissed without prejudice.[FN10]

> FN10. In a March 25, 2002, letter to the Court, Assistant Attorney General Anthony Gould represented that:
>
>> In light of the Court's concern [expressed at the March 11, 2002 conference] that a dismissal of this action on exhaustion grounds might leave plaintiff without a remedy for his excessive force claim, Deputy DOCS Commissioner Anthony Annucci has indicated that, given the particular facts and circumstances of this case, plaintiff herein will be permitted to file a late grievance as to the alleged excessive force incident in March 2001, and that the grievance will be addressed on its merits without reference to the late date of its filing.
>
> (Dkt. No. 58.) By letter dated September 16, 2002, the State declined to extend that position to all the unexhausted claims. (Dkt. No. 63: 9/16/02 Letter to Court from Assistant Attorney General Rebecca Ann Durden.) The Court strongly suggests to Nelson that he file all grievances within fourteen days of this Report & Recommendation. See 7 N.Y.C.R.R. § 701.7(a)(1). The Court need not decide now what the effect would be on a future suit if DOCS denies Nelson's grievance as untimely. The Court reiterates its concern, however, that while DOCS' requirement that grievances be brought within fourteen days may serve valid institutional purposes, it may be too short a "statute of limitations" period to the extent exhaustion of grievance procedures is a PLRA prerequisite to a § 1983 lawsuit. The Court's concern is especially great for suits, such as Nelson's, brought during the period before the

Supreme Court clarified the exhaustion requirement. The Court further notes that 7 N.Y.C.R.R. § 701.7(a) provides for "exceptions" to the fourteen day limit "based on mitigating circumstances" and gives as an example of such a circumstance "referrals back to the IGP by the courts." DOCS would be well-advised to carefully decide whether to grant an "exception" in this case.

Defendants argue, however, that "pursuant to the PLRA's requirement that 'no action' may be brought until administrative remedies are exhausted, 42 U.S.C. § 1997e(a)," Nelson's failure to exhaust his excessive force claims requires the Court to dismiss Nelson's *entire* complaint. (Defs. Br. at 38.) Defendants offer no case law or analysis to support this proposition (*id.*), despite this Court's specific instructions to defense counsel to address the issue. (*See* Dkt. No. 50: 3/11/02 Conf. Tr. at 23-26.)

**\*5** [3] The issue thus is whether the PLRA compels a rule of "total exhaustion"-whether a district court must dismiss a prisoner's entire § 1983 action if some but not all claims are administratively unexhausted, or if the Court may dismiss only those claims that are unexhausted while ruling on the exhausted claims. The decisions are divided on the issue. Some require "total exhaustion." *See, e.g., Julian-Bey v. Crowley,* No. 00-2313, 24 Fed. Appx. 393, 395, 2001 WL 1555950 at \*2 (6th Cir. Dec.3, 2001) (dismissing "mixed" complaint; rejecting argument that "the exhaustion of at least one claim is sufficient to prevent dismissal"); *Graves v. Norris,* 218 F.3d 884, 885 (8th Cir.2000) ("When multiple prison condition claims have been joined, as in this case, the plain language of § 1997e(a) requires that all available prison grievance remedies must be exhausted as to all of the claims."); *Taylor v. Clarke,* No. C 99-4190, 2002 WL 535421 at \*2 (N.D.Cal. Apr.3, 2002) ("An action containing both exhausted and unexhausted [§ 1983] claims at the time of filing should be dismissed without prejudice."); *Rivera v. Whitman,* 161 F.Supp.2d 337, 339-43 (D.N.J.2001) (plain language of § 1997e(a), as well as the legislative intent and policy interests behind it, compel a "total exhaustion" rule).[FN11] Other decisions, however, do not. *See, e.g., McElhaney v. Elo,* No. 98-2173, 230 F.3d 1358 (table), 2000 WL 1477498 at \*3 (6th Cir. Sept.25, 2000) ("If a [§ 1983] complaint contains exhausted and unexhausted claims, the district court may address the merits of the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31075804 (S.D.N.Y.)
(Cite as: 2002 WL 31075804 (S.D.N.Y.))

exhausted claims and dismiss only those that are unexhausted."); *Riley v. Richards,* No. 99-1327, 210 F.3d 372 (table), 2000 WL 332013 at *2 (6th Cir. Mar.23, 2000) (same); *Hartsfield v. Vider,* 199 F.3d 305, 309 (6th Cir.1999) (same); *Johnson v. True,* 125 F.Supp.2d 186, 188 (W.D.Va.2000) ( "total exhaustion" rule contradicts congressional intent and policy), *appeal dismissed,* 32 Fed. Appx. 692 (4th Cir.2002); *Cooper v. Garcia,* 55 F.Supp.2d 1090, 1094-95 (S.D.Cal.1999) (same); *Jenkins v. Toombs,* 32 F.Supp.2d 955, 958-59 (W.D.Mich.1999) (same).

> FN11. *See also, e.g., Lira v. Director of Corr. of State of Calif.,* No. C 00-905, 2002 WL 1034043 at *3 (N.D.Cal. May 17, 2002); *Thorp v. Kepoo,* 100 F.Supp.2d 1258, 1263 (D.Haw.2000); *Keenan v. Twommey,* No. 1:97-cv-549, 1999 U.S. Dist. LEXIS 11829 at *2-17 (W.D.Mich. July 29, 1999), *aff'd,* 229 F.3d 1152 (6th Cir.2000); *Abenth v. Palmer,* No. C 96-3938, 1997 WL 255332 at *1 (N.D.Cal. Apr.28, 1997).

The Second Circuit has not addressed the issue, and the few district court decisions in this Circuit are split. *Compare Saunders v. Goord,* 2002 WL 1751341 at *3 (dismissing inmate complaint containing some unexhausted claims, citing "the plain language of 42 U.S.C. § 1997e(a)"), *with Espinal v. Coughlin,* 98 Civ. 2579, 2002 WL 10450 at *1 (S.D.N.Y. Jan.3, 2002) (dismissing unexhausted claims while ruling on merits of exhausted claims, without discussing why court could do so).

The Court need not try to predict what the Second Circuit (and eventually the Supreme Court) will do, nor take its own position in this general debate. At least on the particular facts of this case, the Court believes it appropriate to address the merits of the exhausted Medical Claims while dismissing the Non-Medical Claims without prejudice.[FN12]

> FN12. The alleged acts about which Nelson complains in his Non-Medical Claims took place from October 2000 through May 2001 (Dkt. No. 40: Am. Compl. at 15-21), and Nelson thus may have relied on the Second Circuit's August 24,

2000 decision in *Nussle v. Willette,* 224 F.3d 95, 106 (2d Cir.2000), *rev'd, Porter v. Nussle,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002), in which the Second Circuit held that the PLRA's exhaustion requirements did not apply to excessive force claims. Inmates who relied on the Second Circuit's *Nussle* decision would have a good argument after dismissal of such a suit that DOCS' time limits for grievances should be extended for a reasonable time after the dismissal order. *See, e.g., Peoples v. Beldock,* No. 01-CV-6326, 2002 WL 1750742 at *2 (W.D.N.Y. July 10, 2002) (complaint dismissed without prejudice for failure to exhaust despite fact that Second Circuit's *Nussle* decision governed at the time complaint was filed; "Should plaintiff choose to file a new grievance, he can thus attempt to show that the intervening change in the law occasioned by [the Supreme Court's decision in] *Nussle* constitutes 'mitigating circumstances' that would justify an exception to the time limit imposed by the [DOCS grievance] regulations. 7 N.Y.C.R.R. § 701.7(a)(1)."); *Hemphill v. New York,* 198 F.Supp.2d 546, 550 (S.D.N.Y.2002) ("Since reliance on the Second Circuit's interpretation [in *Nussle* ] of the PLRA would be the only possible factor that might augur in favor of non-retroactive application of the Supreme Court's [*Porter v. Nussle* ] decision, there is no equitable basis to evade the firm rule of retroactivity" where Second Circuit decision in *Nussle* came long after plaintiff failed to file a grievance).

**\*6** Discovery in this case was completed at the time of the Supreme Court's February 26, 2002 *Porter v. Nussle* decision. (*See* Dkt. No. 18: Rule 16 Scheduling Order, setting a 2/27/02 discovery cut-off date.) The parties and the Court expended a great deal of resources before *Porter v. Nussle* changed the governing law in the Second Circuit. That alone does not preclude retroactive application of *Porter v. Nussle* to pending cases. Here, however, it is significant that the Medical and Non-Medical Claims are easily separated, since they involve discrete parties and acts. (*Compare* Am. Compl. at 3-14 *with id.* at 15-35.) Even under these facts, the Court could dismiss the entire action without prejudice. But I see no reason why the Court cannot exercise its discretion in these particular

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31075804 (S.D.N.Y.)
(Cite as: 2002 WL 31075804 (S.D.N.Y.))

circumstances to dismiss without prejudice the separable Non-Medical Claims while reaching the merits (or rather, lack thereof) of the fully exhausted Medical Claims.

Accordingly, I recommend that only the Non-Medical Claims be dismissed without prejudice as unexhausted, and that the separable exhausted Medical Claims be adjudicated on the merits.

II. SUMMARY JUDGMENT SHOULD BE GRANTED TO DEFENDANTS WITH RESPECT TO NELSON'S CLAIMS OF DELIBERATE INDIFFERENCE TO *SERIOUS MEDICAL NEEDS AND CONSPIRACY RELATING THERETO*

A. *Factual Background Regarding Nelson's Medical Claims*

Shortly after Nelson was transferred to Green Haven on October 11, 2000 (Dkt. No. 48: Defs. 56.1 Stmt. ¶ 11; Dkt. No. 40: Am. Compl. ¶ 8), he submitted a letter dated October 16, 2000 to Green Haven's "Health Services Director," stating:

    May I please be seen by an Medical Doctor. I am requesting a full check up for an blood test for hormone poison, level of mercury poison, problems with my back as i am in need of defecating my back start's stiffen with pressur.

    And my left knee have a tore tigament. As i walk up the stair's my knee give out.

    May I please be seen and treated by an Independent Medical Doctor.

(Dkt. No. 47: Gould Aff. Ex. 1; [FN13] *see* Am. Compl. at 3; Defs. 56.1 Stmt. ¶ 11.) Two days later, on October 18, 2000, Nelson was interviewed by defendant Byron Rodas, a Green Haven physician's assistant. (Am. Compl. at 3; Dkt. No. 52: Nelson 4/30/02 Aff. ¶ 5; Defs. 56.1 Stmt. ¶¶ 7, 9, 12.) Nelson alleges that while he "was explaining his

medical condition, ... Rodas became very defensive saying 'I'm the doctor here and I determine what examination and treatment you require, and from what i see here there is nothing wrong with you.' The interview was terminated and plaintiff was not physically examine [d]." (Am. Compl. at 3; *see* Nelson 4/30/02 Aff. ¶ 5.)

[FN13.] Where both parties submitted the same document, the Court refers to only a single cite for the exhibit.

Nelson wrote a second letter, dated October 23, 2000, to defendant Dr. Carl Koenigsmann, Green Haven's Medical Director, complaining about Rodas' conduct, claiming that he was suffering from "hormone poison, mercury poison," muscle spasms in his back, and torn ligaments in his knee, and requesting a full examination by an "Independent Outside Medical Doctor" as well as a blood test and a "CAT scan." (Gould Aff. Ex. 2; Am. Compl. at 4.) [FN14] Dr. Koenigsmann responded to Nelson's October 16 and 23, 2000 letters by memorandum dated November 1, 2000, stating: "This will acknowledge receipt of your letter regarding treatment issues and/or issues with your Primary Care Provider ["PCP"]. A copy of your letter has been forwarded to your Primary Care Provider for response. The PCP's response and your medical folder will be reviewed." (Gould Aff. Ex. 3; *see* Am. Compl. at 4; Defs. 56.1 Stmt. ¶ 13.)

[FN14.] Nelson also requested "tomography" (Gould Aff. Ex. 2)-an apparently redundant request for a "CAT scan" ("Computerized Axial *Tomography* "). *See Dorland's Illustrated Medical Dictionary,* 295, 1847-48 (29th ed.2000).

*7 Nelson alleges that on October 24, 2000, he was examined by defendant Edward Licerio, a Green Haven dentist, who allegedly advised Nelson that at a "follow-up appointment," Nelson's "worn-out amalgams fillings" that were causing Nelson's "headache and memory-loss" would be removed. (Am. Compl. at 4; Nelson 4/30/02 Aff. ¶ 6; *see* Defs. 56.1 Stmt. ¶¶ 7, 9.) Nelson allegedly explained to Licerio that as Nelson was eating, the "silver spoon ...came in contact with the worn-out fillings, causing plaintiff to receive an electric-charge." (Am. Compl. at 4.)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31075804 (S.D.N.Y.)
(Cite as: 2002 WL 31075804 (S.D.N.Y.))

Nelson claims that at a November 14, 2000 follow-up appointment, Licerio refused to remove the fillings, "giving plaintiff no logical reason" for the refusal. (Am. Compl. at 4-5; Nelson 4/30/02 Aff. ¶ 6.) Licerio also requested Nelson to "sign some medical document(s)," which Nelson refused because he allegedly did not understand the handwriting. (Am. Compl. at 5.)

Nelson's Dental Treatment Records, signed by Licerio, state in relevant part:

Oct 26 2000 Place on [illegible] & filling list

Nov 14 2000 Doesn't want any dental filling done on him, he wants me to take out all his silver fillings in his mouth his request has been denied, he refused to sign the refusal slip.

(Nelson 2/22/02 Aff. Ex. 8.)

Nelson claims that "Licerio was deliberately indifferent to plaintiff serious medical needs by his reckless and complete denial to treat plaintiff for the worn-out filling within his teeth." (Am. Compl. at 6.)

Nelson references a November 19, 1998 report by Dr. Elizabeth Gaary:

Bilateral mammography was performed in the craniocaudad and mediolateral oblique projections. There are no prior studies available for comparison.

There are no clustered irregular microcalcifications. There is no evidence of skin thickening or nipple retraction. There are no lymph nodes visualized. Bilateral right greater than left gynecomastia is noted.[FN15]

FN15. "Gynecomastia" is "excessive growth of the male mammary glands, in some cases including development to the stage at which milk is produced, usually associated with metabolic derangements that lead to estrogen accumulation, testosterone deficiency, and hyperprolactinemia. A mild form may develop transiently during normal puberty." *Dorland's Illustrated Medical Dictionary* (29th ed.2000).

Clinical correlation recommended. If there is a palpable abnormality, ultrasound may be of help for further evaluation.

IMPRESSION: Bilateral gynecomastia right greater than left. If there is a palpable abnormality, ultrasound may be of help for further evaluation.

(Nelson 2/22/02 Aff. Ex. 6; *see* Am. Compl. at 6; Nelson 4/30/02 Aff. ¶ 8.) Based on this report, Nelson claims that Rodas and Dr. Koenigsmann knew of and were deliberately indifferent to Nelson's serious medical needs, presumably regarding the gynecomastia, in denying Nelson access to a doctor for diagnosis and treatment. (Am. Compl. at 6; Nelson 4/30/02 Aff. ¶ 9.)

Based on the above allegations, Nelson charges Rodas, Dr. Koenigsmann, and Licerio with "conspiracy." (Am. Compl. at 10-11; Nelson 4/30/02 Aff. ¶¶ 12-14.)

Nelson filed an "Inmate Grievance Complaint" dated November 21, 2000, in which he requested to be examined by an independent outside medical doctor, a "TOMOGRAPHY, and CAT-SCAN for detail viewing of my back and knee, a blood test to identifie certain poison, and to be treated by an out-side dentist who is knowledgeable in removing worn-out toxic amalgams fillings." (Gould Aff. Ex. 4; *see* Am. Compl. at iv; Defs. 56.1 Stmt. ¶ 14.)

**8** On December 6, 2000, Dr. Koenigsmann responded by memo to an inquiry from the facility grievance coordinator:

I have reviewed the medical record as it relates to this grievance. I have also referred it to the Dental

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31075804 (S.D.N.Y.)
(Cite as: 2002 WL 31075804 (S.D.N.Y.))

Department for evaluation. The investigation reveals that the patient has had evaluations for his back and knee pains in the past including x rays. The decision to proceed with additional studies or specialty referrals is best determined by the Primary Provider. At his time, based on prior examination and results of prior work up, the Primary Provider does not feel these needs exist. Regarding the follow up of the laboratory work performed, the results are available on the medical record and have been reviewed by the Primary Provider. I will request a follow up appointment with the Provider to review the laboratory results.

Pertaining to [Nelson's] claim that a Dental provider had recommended the removal of the patient's amalgam fillings, this is incorrect. The Dental provider responded that [Nelson] requested the removal of the amalgam fillings. Currently there are no generally accepted Dental recommendations for the removal of amalgam fillings nor restrictions on the use of amalgam fillings.

(Gould Aff. Ex. 5; *see* Defs. 56.1 Stmt. ¶ 15.)

The Inmate Grievance Resolution Committee held a hearing on January 2, 2001, and denied Nelson's complaint. (Gould Aff. Ex. 6, first page; Defs. 56.1 Stmt. ¶¶ 16-17.) Nelson appealed to Superintendent Greiner (Gould Aff. Ex. 6, last page; Defs. 56.1 Stmt. ¶ 17), who denied the grievance in a statement dated January 10, 2001:

Grievant would like a check up from an outside doctor, including such tests as a CAT scan and blood work. He also would like to have work done by an outside Dentist.

The investigation indicates that X-rays have been completed for knee & back pain. Your primary provider feels that further studies are not indicated at this time.

Your primary provider should set up an appointment with you to review results of the lab work. There was no indication that your amalgam fillings need to be removed and this is generally not recommended. There

are also no restrictions on using said filling. The use of an outside dentist[ ] is not indicated.

Grievance is denied.

(Gould Aff. Ex. 7; *see* Defs. 56.1 Stmt. ¶ 17.)

Nelson appealed Superintendent Greiner's decision to the Central Office Review Committee ("CORC"), noting the additional complaint that he had mistakenly been provided with "hemorrhoidal ointment" instead of appropriate medicine for his back pain. (Gould Aff. Ex. 7; Defs. 56.1 Stmt. ¶¶ 17-18.) The CORC issued a unanimous report dated February 21, 2001:

Upon full hearing of the facts and circumstances in the instant case, and upon recommendation of the Division of Health Services, the action requested herein is hereby accepted only to the extent that CORC upholds the determination of the Superintendent for the reasons stated.

**\*9** CORC notes that the grievant has been examined by the doctor and received appropriate medical treatment. CORC also notes that the doctor determined that there was no medical need for the additional tests requested by the grievant. Contrary to the grievant's assertions, CORC has not been presented with sufficient evidence to substantiate any malfeasance by the employee referenced in this instant complaint.

CORC asserts that, consistent with Health Services Policy Manual Item # 1.21-Health Care Referrals, the Facility Health Services Directors (FHSD) have the sole responsibility for providing treatment to the inmates under their care. The FHSDs have the responsibility of determining what outside health referrals are needed by the target population. Outside specialists may only make recommendations for treatment; however, the implementation of those recommendations is at the discretion of the FHSDs, based on their professional judgment.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31075804 (S.D.N.Y.)
(Cite as: 2002 WL 31075804 (S.D.N.Y.))

(Gould Aff. Ex. 8; *see* Defs. 56.1 Stmt. ¶ 19.)

**B.** *Summary Judgment Standards in Section 1983 Cases*
FN16

> FN16. For additional cases authored by this Judge discussing the summary judgment standards in Section 1983 cases, in language substantially similar to that in this entire section of this Report and Recommendation, *see, e.g., Walker v. Pataro,* 99 Civ. 4607, 2002 WL 664040 at *4-5 (S.D.N.Y. Apr.23, 2002) (Peck, M.J.); *Espinal v. Goord,* 00 Civ. 2242, 2001 WL 476070 at *5-7 (S.D.N.Y. May 7, 2001)(Peck, M.J.); *Fulmore v. Mamis,* 00 Civ. 2831, 2001 WL 417119 at *5 (S.D.N.Y. Apr.23, 2001) (Peck, M.J.); *Freeman v. Strack,* 99 Civ. 9878, 2000 WL 1459782 at *4 (S.D.N.Y. Sept.29, 2000) (Peck, M.J.); *Culp v. Koenigsmann,* 99 Civ. 9557, 2000 WL 995495 at *4 (S.D.N.Y. July 19, 2000) (Peck, M.J.); *Carbonell v. Goord,* 99 Civ. 3208, 2000 WL 760751 at *4 (S.D.N.Y. June 13, 2000) (Peck, M.J.); *Greenfield v. City of New York,* 99 Civ. 2330, 2000 WL 124992 at *3 (S.D.N.Y. Feb.3, 2000) (Peck, M.J.); *Salahuddin v.. Coughlin,* 999 F.Supp. 526, 534 (S.D.N.Y.1998) (Rakoff, D.J. & Peck, M.J.); *Watson v. McGinnis,* 981 F.Supp. 815, 817 (S.D.N.Y.1997) (Kaplan, D.J. & Peck, M.J.).

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986); *Lang v. Retirement Living Pub. Co.,* 949 F.2d 576, 580 (2d Cir.1991).

The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment-here, defendants. *See, e.g., Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 36 (2d Cir.1994); *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1223 (2d Cir.1994). The movant may discharge this burden by demonstrating to the Court that there is an absence of evidence to support the non-moving party's case on an issue on which the non-movant has the burden of proof. *See, e.g., Celotex Corp. v. Catrett,* 477 U.S. at 323, 106 S.Ct. at 2552-53.

To defeat a summary judgment motion, the non-moving party must do "more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp. .,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Instead, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *accord, e.g ., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. at 587, 106 S.Ct. at 1356.

In evaluating the record to determine whether there is a genuine issue as to any material fact, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. at 2513; *see also, e.g., Chambers v. TRM,* 43 F.3d at 36; *Gallo v. Prudential,* 22 F.3d at 1223. The Court draws all inferences in favor of the nonmoving party-here, Nelson-only after determining that such inferences are reasonable, considering all the evidence presented. *See, e.g., Apex Oil Co. v. DiMauro,* 822 F.2d 246, 252 (2d Cir.), *cert. denied,* 484 U.S. 977, 108 S.Ct. 489 (1987). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Chambers v. TRM,* 43 F.3d at 37.

**\*10** In considering a motion for summary judgment, the Court is not to resolve contested issues of fact, but rather is to determine whether there exists any disputed issue of material fact. *See, e.g., Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 58 (2d Cir.1987); *Knight v. United States Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). To evaluate a fact's materiality, the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31075804 (S.D.N.Y.)
(Cite as: 2002 WL 31075804 (S.D.N.Y.))

substantive law determines which facts are critical and which facts are irrelevant. *See, e.g., Anderson v. Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. at 2510. While "disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment [,][f]actual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. at 2510 (citations omitted); *see also, e.g., Knight v. United States Fire Ins. Co.,* 804 F.2d at 11-12.

"The Court recognizes that it must 'extend extra consideration' to pro se plaintiffs" such as Nelson and that "pro se parties are to be given special latitude on summary judgment motions." *Salahuddin v. Coughlin,* 999 F.Supp. at 535 (citations & internal quotations omitted); *see also, e.g., McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (a pro se party's pleadings should be read liberally and interpreted " 'to raise the strongest arguments that they suggest' "). Moreover, the pro se party must be given express notice of the consequences of failing to respond appropriately to a motion for summary judgment. *See, e.g., Trammel v. Coombe,* No. 97-2622, 201 F.3d 432 (table), 1999 WL 1295856 at *2 (2d Cir. Dec.23, 1999); *McPherson v. Coombe,* 174 F.3d 276, 280-81 (2d Cir.1999) (" '[t]he failure of a district court to apprise *pro se* litigants of the consequences of failing to respond to a motion for summary judgment is ordinarily grounds for reversal.' ") (citations omitted); *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999); *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). Defendants' notice of motion duly advised Nelson of the nature of a summary judgment motion and the consequences of failing to appropriately respond. (*See* Dkt. No. 45: Notice of Motion for Summary Judgment; Dkt. No. 49: 3/25/02 Notice to Pro Se Litigant Opposing Motion for Summ. Judgment Per Local Civil Rule 56.2.)

"Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz,* 93 Civ. 5981, 1999 WL 983876 at *3 (S.D.N.Y. Oct.28, 1999) (citing cases); *see also, e.g., Smith v. Planas,* 975 F.Supp. 303, 305 n. 2 (S.D.N.Y.1997).

Because Nelson has verified his Amended Complaint (Dkt. No. 40: Am. Compl.; Dkt. No. 41: Nelson 2/22/02 Aff. In Supp. of Am. Compl. ¶ 2), this Court will accept for purposes of this motion all admissible facts set forth in the Amended Complaint that are based on Nelson's personal knowledge and about which Nelson is competent to testify. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) ("A verified complaint is to be treated as an affidavit for summary judgment purposes ... provided that it meets the other requirements for an affidavit under Rule 56(e) ... requiring affidavits to be made on personal knowledge, to set forth facts that would be admissible in evidence, and to demonstrate the affiant's competency to testify to the matters in the affidavit ..."); *accord, e.g., Davidson v. Bennis,* No. 96-2999, 152 F.3d 917 (table), 1998 WL 391112 at *1 (2nd Cir. May 20, 1998) (pro se prisoner's verified complaint was "treat[ed] as an affidavit for summary judgment purposes"); *Johnson v. Doe,* 00 Civ. 3920, 2001 WL 314618 at *1 (S.D.N.Y. Mar.30, 2001) ("Although a verified complaint may serve as an affidavit for summary judgment purposes, [citing *Colon* ], mere verification does not transform rhetoric, conclusions, and other non-admissible statements into admissible evidence.").

C. Applicable Law Regarding Claims of Deliberate Indifference to Serious Medical *Needs* [FN17]

FN17. For additional cases authored by this Judge discussing the governing standard in medical indifference claims, in language substantially similar to that in this entire section of this Report and Recommendation, *see Espinal v. Goord,* 00 Civ. 2242, 2001 WL 476070 at *7-10 (S.D.N.Y. May 7, 2001)(Peck, M.J.); *Fulmore v. Mamis,* 00 Civ. 2831, 2001 WL 417119 at *7-8 (S.D.N.Y. Apr.23, 2001) (Peck, M.J.); *Freeman v. Strack,* 99 Civ. 9878, 2000 WL 1459782 at *5-6 (S.D.N.Y. Sept.29, 2000) (Peck, M.J.); *Culp v. Koenigsmann,* 99 Civ. 9557, 2000 WL 995495 at *6-7 (S.D.N.Y. July 19, 2000) (Peck, M.J.); *Carbonell v. Goord,* 99 Civ. 3208, 2000 WL 760751 at *5-6 (S.D.N.Y. June 13, 2000) (Peck, M.J.).

**\*11** To prevail in a § 1983 action, a plaintiff must demonstrate that he has been denied a constitutional or

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31075804 (S.D.N.Y.)
(Cite as: 2002 WL 31075804 (S.D.N.Y.))

federal statutory right and that the deprivation occurred under color of state law. *See* 42 U .S.C. § 1983; *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 2254-55, 101 L.Ed.2d 40 (1988). "Section 1983 itself," however, "creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993) (citation omitted), *cert. denied,* 512 U.S. 1240, 114 S.Ct. 2749, 129 L.Ed.2d 867 (1994).

The Eighth Amendment protects prisoners from "cruel and unusual punishment" in the form of "unnecessary and wanton infliction of pain" at the hands of prison officials and conduct that offends "evolving standards of decency." *E.g.,* *Hudson v. McMillan,* 503 U.S. 1, 5, 8, 112 S.Ct. 995, 998, 1000, 117 L.Ed.2d 156 (1992); *Wilson v. Seiter,* 501 U.S. 294, 297, 308, 111 S.Ct. 2321, 2323, 2329, 115 L.Ed.2d 271 (1991); *Estelle v. Gamble,* 429 U.S. 97, 102, 104-05, 97 S.Ct. 285, 290, 291, 50 L.Ed.2d 251 (1976); *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976).

To establish an Eighth Amendment violation based on a claim that a prison official has placed an inmate's health in danger, the inmate must show that the prison official acted with "deliberate indifference" to the inmate's serious medical needs. *See, e.g.,* *Helling v. McKinney,* 509 U.S. 25, 32, 113 S.Ct. 2475, 2480, 125 L.Ed.2d 22 (1993); *Estelle v. Gamble,* 429 U.S. at 104-05, 97 S.Ct. at 291. The deliberate indifference test applies to dental as well as medical claims. *Chance v. Armstrong,* 143 F.3d 698, 702-03 (2d Cir.1998) (citing cases).

As the Second Circuit has explained, "the deliberate indifference standard embodies both an objective and a subjective prong." *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1994), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). "Objectively, the alleged deprivation must be 'sufficiently serious .' " *Id.; see also, e.g.,* *Hudson v. McMillian,* 503 U.S. at 9, 112 S.Ct. at 1000 ("Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious' "). " 'The Constitution does not command that inmates be given the kind of medical attention that judges would wish to have for themselves ....' " *Dean v. Coughlin,* 804 F.2d

207, 215 (2d Cir.1986). "[O]nly those deprivations denying 'the minimal civilized measure of life's necessities' are sufficiently grave to form the basis of an Eighth Amendment violation." *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 2324, 115 L.Ed.2d 271 (1991) (citation omitted); *see also, e.g.,* *Dean v. Coughlin,* 804 F.2d at 215 (" '[T]he essential test is one of medical necessity and not one simply of desirability.' "). Thus, Eighth Amendment protection is limited to " 'a condition of urgency' that may result in 'degeneration' or 'extreme pain.' " *Chance v. Armstrong,* 143 F.3d at 702; [FN18] *accord, e.g., Morales v. Mackalm,* 278 F.3d 126, 132 (2d Cir.2002); *Harrison v. Barkley,* 219 F.3d 132, 136 (2d Cir.2000) ("A serious medical condition exists where 'the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain.' ").

FN18. The Second Circuit in *Chance v. Armstrong* identified several factors that are relevant in determining whether a serious medical condition exists, including " '[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.' " 143 F.3d at 702. The Second Circuit in that case stated that a medical condition could be serious where the prisoner alleged that he "suffered extreme pain, his teeth deteriorated, and he has been unable to eat properly." *Id.* at 703.

**\*12** "Subjectively, the charged official must act with a sufficiently culpable state of mind." *Hathaway v. Coughlin,* 99 F.3d at 553. "The required state of mind, equivalent to criminal recklessness, is that the official " 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " " *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998) (quoting *Hathaway v. Coughlin,* 99 F.3d at 553 (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 1979, 128 L.Ed.2d 811 (1994))); *see also, e.g., LaBounty v. Coughlin,* 137 F.3d 68, 72-73 (2d Cir.1998) ("To succeed in showing deliberate

Not Reported in F.Supp.2d, 2002 WL 31075804 (S.D.N.Y.)
(Cite as: 2002 WL 31075804 (S.D.N.Y.))

indifference, [plaintiff] must show that the acts of defendants involved more than lack of due care, but rather involved obduracy and wantonness in placing his health in danger.").

Deliberate indifference may be "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care." *Estelle v. Gamble,* 429 U.S. at 104-05, 97 S.Ct. at 291 (fn.omitted); *accord, e.g., Kaminsky v. Rosenblum,* 929 F.2d 922, 926 (2d Cir.1991) ("Cruel and unusual punishment may consist of prison officials delaying an inmate access to needed medical care.").[FN19] However, an "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle v. Gamble,* 429 U.S. at 105-06, 97 S.Ct. at 292; *accord, e.g., Burton v. New York State Dep't of Corrections,* 93 Civ. 6028, 1994 WL 97164 at *2 (S.D.N.Y. March 2, 1994) (Sotomayor, D.J.). "Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim ... under the Eighth Amendment." *Estelle v. Gamble,* 429 U.S. at 106, 97 S.Ct. at 292.[FN20] As the Supreme Court has stated, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle v. Gamble,* 429 U.S. at 106, 97 S.Ct. at 292; *accord, e.g., Hathaway v. Coughlin,* 99 F.3d at 553; *Burton v. New York State Dep't of Corrections,* 1994 WL 97164 at *2. An act of malpractice will amount to deliberate indifference only if "the malpractice involves culpable recklessness, *i.e.,* an act or a failure to act by the prison doctor that evinces 'a conscious disregard of a substantial risk of serious harm." ' *Chance v. Armstrong,* 143 F.3d at 703 (quoting *Hathaway v. Coughlin,* 99 F.3d at 553); *Harrison v. Barkley,* 219 F.3d at 139 ("We agree that the mere malpractice of medicine in prison does not amount to an Eighth Amendment violation.... This principle may cover a delay in treatment based on a bad diagnosis or erroneous calculus of risks and costs, or a mistaken decision not to treat based on an erroneous view that the condition is benign or trivial or hopeless, or that treatment is unreliable, or that the cure is as risky or painful or bad as the malady.... [But][c]onsciously disregarding an inmate's legitimate medical needs is not 'mere medical malpractice.' "); *Hathaway v. Coughlin,* 37 F.3d at 66 ("Deliberate indifference requires more than negligence, but less than conduct undertaken for the very purpose of causing harm.").

FN19. *See, e.g., Hathaway v. Coughlin,* 37 F.3d 63, 67 (2d Cir.1994) (delay for more than two years in removing broken pins from prisoner's hip despite nearly fifty complaints of pain), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995); *Liscio v. Warren,* 901 F.2d 274, 277 (2d Cir.1990) (failure to provide medical attention to a delirious inmate for three days); *Archer v. Dutcher,* 733 F.2d 14, 15-17 (2d Cir.1984) (denying summary judgment where plaintiff "identifie[d] intentional efforts on the part of defendants to delay her access to medical care at a time [when] she was in extreme pain"); *Williams v. Vincent,* 508 F.2d 541, 544 (2d Cir.1974).

FN20. *Accord, e.g., Hathaway v. Coughlin,* 99 F.3d at 553; *Felipe v. New York State Dep't of Correctional Servs.,* No. 95-CV-1735, 1998 WL 178803 at *3 (N.D.N.Y. Apr.10, 1998) (Pooler, D.J.).

**\*13** "It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance v. Armstrong,* 143 F.3d at 703; *accord, e.g ., Hathaway v. Coughlin,* 37 F.3d at 70 (Jacobs, C.J., dissenting) (" 'We do not sit as a medical board of review. Where the dispute concerns not the absence of help, but the choice of a certain course of treatment, or evidences mere disagreement with considered medical judgment, we will not second guess the doctors.' "); *Culp v. Koenigsmann,* 2000 WL 995495 at *7 ("Mere disagreements with the quality of medical care, however, do not state an Eighth Amendment claim."); *see also, e.g., Troy v. Kuhlmann,* 96 Civ. 7190, 1999 WL 825622 at *6 (S.D.N.Y. Oct.15, 1999) ("a prisoner's disagreement with the diagnostic techniques or forms of treatment employed by medical personnel does not itself give rise to an Eighth Amendment claim"); *Brown v. Selwin,* 98 Civ. 3008, 1999 WL 756404 at *6 (S.D.N.Y. Sept.24, 1999) (citing cases); *Negron v. Macomber,* 95 Civ. 4151, 1999 WL 608777 at *6 (S.D.N.Y. Aug.11, 1999); *Espinal v. Coughlin,* 98 Civ. 2579, 1999 WL 387435 at *3 (S.D.N.Y. June 14,

Not Reported in F.Supp.2d, 2002 WL 31075804 (S.D.N.Y.)
(Cite as: 2002 WL 31075804 (S.D.N.Y.))

1999).[FN21]

> [FN21.] Furthermore, a delay in medical treatment does not necessarily invoke the Eighth Amendment:

>> Although a delay in providing necessary medical care may in some cases constitute deliberate indifference, this Court has reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment; ignored a "life-threatening and fast-degenerating" condition for three days; or delayed major surgery for over two years. No such circumstances are present here. At no point was [plaintiff's] condition "fast-degenerating" or "life-threatening," and there is no indication that [defendant] delayed treatment in order to punish him. Moreover, any delay in treatment in this case does not rise to the egregious level identified in *Hathaway.* That [plaintiff] feels something more should have been done to treat his injuries is not a sufficient basis for a deliberate indifference claim.

> *Demata v. New York State Correctional Dep't of Health Servs.,* No. 99-0066, 198 F.3d 233 (table), 1999 WL 753142 at *2 (2d Cir. Sept.17, 1999) (citations omitted) (summary judgment for defendants where plaintiff complained of knee injury in February 1994 and surgery not performed until March 1997); *accord, e.g., Freeman v. Strack,* 2000 WL 1459782 at *9 (no Eighth Amendment claim against nurse who scheduled inmate with appendicitis requiring appendectomy for appointment two hours later rather than seeing inmate immediately where "[t]here was nothing in [the inmate]'s medical history which would have put [the nurse] on notice that [plaintiff] was suffering from the onset of appendicitis ... and there is no evidence that [the officer] gave [the nurse] any reason to believe that there was an emergency on hand"); *Culp v. Koenigsmann,* 2000 WL 995495 at *7-8 (rejecting claim based on fact

that one doctor recommended arthroscopic surgery for knee injury in April 1999, while another doctor concluded that surgery was not warranted until more conservative measures like physical therapy had been tried and failed).

D. *Nelson's Medical Indifference Claims Should Be Dismissed*

[4] Nelson asserts that defendants demonstrated deliberate indifference to the following three "serious medical conditions":

> (i) ... an abnormal growth of tissue-cells within plaintiff chest that serve no physiological function.

> (ii) The worn-out amalgams fillings thats causing plaintiff perpetual headache especially when awaking in the morning, and chewing certain food, and

> (iii) plaintiff defective back-as plaintiff in need of having to defecate his back muscle stiffen with pressure.

(Dkt. No. 40: Am. Compl. at 5; *see* Dkt. No. 52: Nelson 4/30/02 Aff. ¶ 11.)

Nelson offers no evidence to support his claims other than the conclusory allegations in his verified complaint. (Am. Compl. at 3-14; *see also* Nelson 4/30/02 Aff. ¶¶ 4-14.) Unfortunately, defendants fail to fill the gap: through attorney neglect they did not depose Nelson (*see* fn.5 above) and have submitted no admissible evidence on this motion other than copies of Nelson's complaint letters, the State's written responses, and the records pertaining to Nelson's grievance procedure, largely consisting of rank hearsay. (Dkt. No. 47: Gould Aff. Exs. 1-8; *see also* Dkt. No. 46: Defs. Br. at 6-14.) Indeed, defense counsel has not bothered to submit copies of Nelson's medical records.[FN22] The Assistant Attorney General's performance in this case did little to help the Court, or his clients. The Court thus is left guessing as to Nelson's course of medical treatment or lack thereof.[FN23]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31075804 (S.D.N.Y.)
(Cite as: 2002 WL 31075804 (S.D.N.Y.))

FN22. Nelson submitted copies of his cryptic dental treatment records from Green Haven. (Dkt. No. 41: Nelson 2/22/02 Aff. Ex. 8.)

FN23. Although defendants submitted a statement pursuant to Rule 56.1 (Dkt. No. 48), it largely fails to cite supporting admissible evidence. *See* S.D.N.Y. Local Civil Rule 56.1(d) ("Each statement of material fact by a movant or opponent must be followed by citation to evidence which would be admissible ....").

Nevertheless, Nelson has the burden on this motion. While a plaintiff alleging medical indifference in a Section 1983 action is not required to produce "expert medical testimony," *Hathaway v. Coughlin,* 37 F.3d 63, 68 (2d Cir.1994), Nelson "may not rely simply on conclusory allegations or speculation to avoid summary judgment, but instead must offer evidence to show that '[his] version of the events is not wholly fanciful.' " *Morris v. Lindau,* 196 F.3d 102, 109 (2d Cir.1999) (§ 1983 action) (quoting *D'Amico v. City of New York,* 132 F.3d 145, 149 (2d Cir.), *cert. denied,* 524 U.S. 911, 118 S.Ct. 2075, 141 L.Ed.2d 151 (1998)). And although Nelson, as a pro se litigant, is granted a certain degree of leeway, the superficial allegations of his amended complaint fail to satisfy the stringent requirements of an Eighth Amendment claim, for the following reasons.

**\*14** Nelson's first grievance relates to "an abnormal growth of tissue-cells within plaintiff chest that serve no physiological function." (Am. Compl. at 5; *see* Nelson 4/30/02 Aff. ¶ 11.) This apparently refers to a November 19, 1998 report by Dr. Elizabeth Gaary which noted that Nelson's "bilateral right ... gynecomastia" was "greater" than his left gynecomastia. (*See* pages 16-17 above.) Nelson, however, entirely fails to allege how this gynecomastia is " 'a condition of urgency, one that may produce death, degeneration, or extreme pain.' " *Morales v. Mackalm,* 278 F.3d 126, 132 (2d Cir.2002); *see also* cases cited at pages 25-26 above. His allegations thus fail to satisfy the pleading standard for a medical indifference claim, much less the standard for opposing a summary judgment motion.

Second, Nelson complains of indifference to his "defective back-as plaintiff in need of having to defecate his back muscle stiffen with pressure." (Am. Compl. at 5; *see* Nelson 4/30/02 Aff. ¶ 11.) Nelson elsewhere referred to this problem as "muscle spasm[s]" in his back. (Nelson 2/22/02 Aff. Ex. 4: 10/23/00 Nelson Letter to Koenigsmann.) This claim should be rejected, both because there is no evidence that Nelson's alleged back problems were sufficiently serious to qualify as an Eighth Amendment violation, and because Nelson's claim concerns not the absence of help, but the choice of a certain course of treatment.

Severe back pain, especially if lasting an extended period of time, can amount to a "serious medical need" under the Eighth Amendment.[FN24] Here, however, Nelson merely alleges "back spasms," without describing the intensity or duration of the pain. That is insufficient to survive a summary judgment motion, even under the most liberal standard. *See, e.g., Tobias v. County of Putnam,* 191 F.Supp.2d 364, 379 (S.D.N.Y.2002) ("we do not believe that [plaintiff's] injuries caused him such extreme pain as to meet his burden. He does not allege in his complaint that he suffered extreme pain, but rather just vague 'physical injury.' "); *Benitez v. Pecenco,* 92 Civ. 7670, 1995 WL 444352 at \*3 (S.D.N.Y. July 27, 1995) (§ 1983 medical indifference claim dismissed because "there is nothing in the record to suggest that plaintiff's back pain was severe or excruciating"); *Sassower v. City of White Plains,* 89 Civ. 1267, 1995 WL 222206 at \*8 (S.D.N.Y. Apr.13, 1995) (granting defendants summary judgment because, *inter alia,* "Plaintiff does not even attest that she experienced a life threatening condition, nor that she suffered from extreme pain or the threat of death or degeneration. In fact, according to Plaintiffs affidavits, she suffered simply from 'stress and strain.' ").[FN25] While Nelson's pleading might survive a motion to dismiss, more is required to survive summary judgment, even from a pro se plaintiff.

FN24. *See, e.g., Hathaway v. Coughlin,* 37 F.3d at 67 (finding plaintiff with degenerative hip condition who experienced great pain over an extended period of time and had difficulty walking had "serious medical needs"); *Ramos v. Artuz,* 00 Civ. 0149, 2001 WL 840131 at \*11 (S.D.N.Y. July 25, 2001) (claim of chronic back pain survived motion to dismiss); *Cole v. Artuz,*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31075804 (S.D.N.Y.)
(Cite as: 2002 WL 31075804 (S.D.N.Y.))

97 Civ. 0977, 2000 WL 760749 at *5 (S.D.N.Y. June 12, 2000) (claim relating to chronic back injury survived motion to dismiss); *Bryant v. Artuz,* 96 Civ. 3274, 1998 WL 24360 at *2 (S.D.N.Y. Jan.23, 1998) (prisoner's allegation of severe back pain following disc surgery was held to be sufficiently serious medical condition to survive a motion for summary judgment); *Gill v. Gilder,* 95 Civ. 7933, 1996 WL 103837 at *5 (S.D.N.Y. Mar.8, 1996) (denying defendants' motion to dismiss where plaintiff had alleged that a back problem caused him "severe pain"); *cf., Solomon v. Moore,* 97 Civ. 0201, 2000 WL 385521 at *2-3 (S.D.N.Y. Apr.14, 2000) (back pain did not rise to level of violation: "These alleged problems [including back pain] taken together are clearly 'conditions which many people suffer from and function despite on a day-to-day basis and the fact that a sufferer is incarcerated does not elevate every perceived lack of treatment to the level of cruel and unusual punishment.' ").

FN25. *See also, e.g., Fulmore v. Mamis,* 00 Civ. 2831, 2001 WL 417119 at *8 (S.D.N.Y. Apr.23, 2001) (Peck, M.J.) ("At no point was [plaintiff's] condition 'fast-degenerating' or 'life-threatening,' and there is no indication that [defendant] delayed treatment in order to punish him. Moreover, any delay in treatment in this case does not rise to the egregious level identified in *Hathaway [v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) ]. That [plaintiff] feels something more should have been done to treat his injuries is not a sufficient basis for a deliberate indifference claim.").

In addition, Nelson's complaint seems to be, not that the prison authorities failed to treat his back pain, but that they refused Nelson's request for a CAT scan and for a consultation with an outside physician. (*See* pages 15, 17-18, 29-31 above.) Nelson's complaints thus amount to no more than a disagreement about the proper course of treatment that cannot form the basis of an Eighth Amendment claim:

**\*15** [T]he question whether an X-ray or additional

diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice, and as such the proper forum is the state court ....

*Estelle v. Gamble,* 429 U.S. 97, 107, 97 S.Ct. 285, 293, 50 L.Ed.2d 251 (1976); *accord, e.g., Randle v. Mesrobian,* No. 98-1590, 165 F.3d 32 (table), 1998 WL 551941 at *3 (7th Cir. Aug.27, 1998) ("inmates have no automatic right to consult with outside physicians") (citing cases); *Austin v. Rhode Island Dep't of Corr.,* No. 00-104, 2001 WL 1136101 at *3 (D.R.I. Aug.24, 2001) (refusal of prisoner's request to be examined by outside physician did not state a § 1983 claim); *Fulmore v. Mamis,* 2001 WL 417119 at *8-9 & n. 26 (Physician's failure to order CAT scan or orthopedic shoes, and refusal to refill prisoner's inhaler medication on certain occasions reflected, "at most, ... a difference in opinion as to [prisoner's] medical treatment rather than any deliberate indifference to [prisoner's] medical needs," citing cases); *Wicks v. Qualtere,* 95-CV-426, 1997 WL 176338 at *3 (N.D.N.Y. Apr.4, 1997) (Pooler, D.J.) (refusal to order X-ray did not state a claim).FN26

FN26. *See, e.g., Kelley v. Lutz,* No. 95-16003 87 F.3d 1320 (table), 1996 WL 341299 at *1 (9th Cir. June 19, 1996) (prison doctor's denial of inmate's request for CAT scan did not constitute deliberate indifference where inmate had been seen by several specialists and x-rays did not reveal any abnormality); *Vento v. Lord,* 96 Civ. 6169, 1997 WL 431140 at *5 (S.D.N.Y. July 31, 1997) (Sotomayor, D.J.) ("plaintiff's [denied] x-ray request and claim that without new x-rays her physical therapy is ineffective fails to state a claim of deliberate indifference"); *Sharp v. Jeanty,* 93 Civ. 0220, 1993 WL 498095 at *2 (S.D.N.Y. Nov.30, 1993) (Leval, D.J .) (dismissing complaint where prisoner's knee was x-rayed but he was not given an orthroscan, because plaintiff's medical "records indicate[d] an extensive and ongoing course of medical treatment" of his injury, and many of his allegations amounted to "second-guessing the treatments of his health care providers", and explaining that " '[a] prisoner's disagreement

Not Reported in F.Supp.2d, 2002 WL 31075804 (S.D.N.Y.)
(Cite as: 2002 WL 31075804 (S.D.N.Y.))

with his prescribed treatment does not afford a basis for relief under § 1983." '); *see also, e.g., Burley v. O.D.O.C.,* No. CV-99-1462, 2000 WL 1060658 at *4-5 (D.Or. July 11, 2000) (granting defendants summary judgment on Eighth Amendment claim where "[p]laintiff disputes that the lumbar/sacral spine x-ray shows that nothing is wrong with his head, neck, and back" and "believes that only an 'MRI' or 'Cat Scan' can confirm his injuries in those areas"); *Lewis v. Herbert,* No. Civ. A. 96-2933, 1996 WL 663874 at *4 (E.D.Pa. Nov.14, 1996) ("[E]ven if Defendant's decision not to ... order an X-Ray or Cat Scan ... amounted to medical malpractice, a tort is not transformed into a constitutional violation simply because the victim is a prisoner."); *Coppage v. Mann,* 906 F.Supp. 1025, 1038-39 (E.D.Va.1995) (rejecting plaintiff's argument that prison doctor was deliberately indifferent when he ordered two diagnostic tests which were less effective than an MRI; "The case law draws a clear distinction between situations in which the physician provides no medical care, which may amount to deliberate indifference, and those in which the physician provides merely substandard care, which amounts to at most negligence."); *Trejo v. Gomez,* No. C-93-0360, 1995 WL 429247 at *3 (N.D.Cal. July 13, 1995) (rejecting claim that prison doctor's failure to order CAT scan or MRI for inmate complaining of neck, back and shoulder pain constituted deliberate indifference); *Johnson v. Department of Corr.,* 92 Civ. 7716, 1995 WL 121295 at *3 (S.D.N.Y. Mar.21, 1995) (summary judgment for defendants where inmate suffering from hip condition who was examined and treated on numerous occasions complained he should have received an MRI; "the Eighth Amendment does not mandate the use of any particular medical technology or course of treatment"); *Wilkerson v. Marshall,* No. C 94-0009, 1994 WL 564650 at *1-4 (N.D.Cal. Oct.3, 1994) (rejecting inmate's claim that prison doctor's failure to order an MRI constituted deliberate indifference); *Lopez v. Medical Dep't,* Civ. A. No. 90-5287, 1990 WL 174361 at *1 (E.D.Pa. Nov.6, 1990) (prison medical staff's refusal to "take x-rays, perform a CAT scan and administer other medical tests" did not give rise to Eighth Amendment claim).

Nelson's claim regarding his allegedly torn knee ligament suffers from the same deficiencies, and should therefore be dismissed as well. (Am. Compl. at 5; *see* Nelson 4/30/02 Aff. ¶ 11.) His isolated assertion that "As i walk up the stair's my knee give out" fails to make out a claim. *See, e.g., Espinal v. Coughlin,* 98 Civ. 2579, 2002 WL 10450 at *4 (S.D.N.Y. Jan.3, 2002) (plaintiff's claim relating to "an exacerbated injury to his knee" was "at most an allegation of negligence or disagreement with a course of treatment which does not rise to the deliberate indifference standard").

Finally, Nelson claims an Eighth Amendment violation based on indifference to his "worn-out amalgams fillings thats causing plaintiff perpetual headache especially when awaking in the morning, and chewing certain food(s)." (Am. Compl. at 5; *see* Nelson 4/30/02 Aff. ¶ 11.) In contrast to his other medical indifference claims, Nelson's dental indifference claim at least minimally alleges the nature and severity of his pain, which allegations might be sufficient to state a claim. *Cf. Harrison v. Barkley,* 219 F.3d 132, 138 (2d Cir.2000) (Denying summary judgment: "District courts in this Circuit have ruled that a one-year delay in treating a cavity can evidence deliberate indifference on the part of prison officials.... It follows that (1) outright refusal of any treatment for a degenerative condition that tends to cause acute infection *and* pain if left untreated and (2) imposition of a seriously unreasonable condition on such treatment, both constitute deliberate indifference on the part of prison officials."); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (Denying motion to dismiss where prisoner "alleged that he has been in 'great pain' for at least six months, that he has been unable to chew properly, ... that he has choked on his food," and that he has lost "one and possibly three of his teeth," "all because of [the prison doctors'] actions."); *Ramos v. O'Connell,* 28 F.Supp.2d 796, 802 (W.D.N.Y.1998) (summary judgment denied where prisoner alleged that his tooth pain was so "unbearable" that "he was unable to chew food properly, and that the denial of dental treatment caused the infected tooth to abscess"); *Dennis v. Milicevic,* 97 Civ. 7147, 1998 WL 474200 at *3 (S.D.N.Y. Aug.13, 1998) (severe chronic headache following operation raised issue of material fact

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31075804 (S.D.N.Y.)
(Cite as: 2002 WL 31075804 (S.D.N.Y.))

"of whether a sufficiently serious [medical] condition existed"). But here, again, Nelson's complaint appears to be not that his dental problems were not treated, but that they were not treated to his liking-namely, by taking out all of the silver (amalgam) fillings in his mouth that were allegedly causing his headaches and memory loss. (Am. Compl. at 4-5; Nelson 4/30/02 Aff. ¶ 6; Nelson 2/22/02 Aff. Ex. 8: Dental Treatment Record.) FN27 Such a disagreement over the proper course of treatment cannot support an Eighth Amendment Claim, especially where plaintiff offers no evidence as to the efficacy of the requested alternative treatment.

FN27. The November 14, 2000 entry in his Dental Treatment Record states: "Doesn't want any dental filling done on him, he wants me to take out all his silver fillings in his mouth his request has been denied, he refused to sign the refusal slip." (Nelson 2/22/02 Aff. Ex. 8; see page 16 above.)

*16 Indeed, Nelson's refusal to accept dental treatment (see Nelson 2/22/02 Aff. Ex. 8: Dental Treatment Record) effectively rebuts his claim of deliberate indifference to serious medical needs. See, e.g., Brown v. Selwin, 98 Civ. 3008, 1999 WL 756404 at *6-7 (S.D.N.Y. Sept.24, 1999) (finding no deliberate indifference when it was "uncontroverted that [plaintiff] refused medical treatment on several occasions"); Ross v. Kelly, 784 F.Supp. 35, 46-47 (W.D.N.Y.) (evidence failed to establish deliberate indifference to medical needs where plaintiff was largely to blame for many of the delays in his treatment due to his second-guessing of physician's course and refusal of treatment), aff'd, 970 F.2d 896 (2d Cir.), cert. denied, 506 U.S. 1040, 113 S.Ct. 828, 121 L.Ed.2d 698 (1992).

E. Nelson's Conspiracy Claims Under §§ 1983 and 1985 Should Be Dismissed

[5] Nelson alleges that defendants Rodas, Koenigsmann, and Licerio conspired to deny him adequate medical care in violation of 42 U.S.C. §§ 1983 and 1985. (Dkt. No. 40: Am. Compl. at 3-14; Dkt. No. 52: Nelson 4/30/02 Aff. ¶¶ 4-14.) "To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in

concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." Pangburn v. Culbertson, 200 F.3d 65, 72 (2d Cir.1999). FN28 "To state a cause of action under § 1985(3), a plaintiff must allege (1) a conspiracy (2) for the purpose of depriving a person or class of persons of the equal protection of the laws, or the equal privileges and immunities under the laws; (3) an overt act in furtherance of the conspiracy; and (4) an injury to the plaintiff's person or property, or a deprivation of a right or privilege of a citizen of the United States." Thomas v. Roach, 165 F.3d 137, 146 (2d Cir.1999). Further, the § 1985 conspiracy must also be motivated by " 'some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action." ' Mian v. Donaldson, Lufkin & Jenrette Secs. Corp., 7 F.3d 1085, 1088 (2d Cir.1993).

FN28. Accord, e.g., Espinal v. Goord, 00 Civ. 2292, 2001 WL 476070 at *10 (S.D.N.Y. May 7, 2001) (Peck, M.J.); Sundwall v. Leuba, No. Civ. A. 300CV1309, 2001 WL 58834 at *8 (D.Conn. Jan.23, 2001), aff'd, 28 Fed. Appx. 11 (2d Cir.2001); Cipolla v. County of Rensselaer, 129 F.Supp.2d 436, 449 (N.D.N.Y.), aff'd, 20 Fed. Appx. 84 (2d Cir.2001); Santiago v. City of New York, 98 Civ. 6543, 2000 WL 1532950 at *8 (S.D.N.Y. Oct.17, 2000).

Nelson's conspiracy allegations are entirely conclusory, and should therefore be dismissed. See, e.g., Leon v. Murphy, 988 F.2d 303, 311 (2d Cir.1993) (affirming summary judgment dismissing conspiracy claim based only on conclusory allegations); Rivera v. Goord, 119 F.Supp.2d 327, 345 (S.D.N.Y.2000) (Plaintiff "alleges no specific facts that would indicate the existence of any kind of conspiracy against him. The mere use of the word 'conspiracy,' without more, does not state a claim under § 1985."). Further, Nelson's § 1985 conspiracy claim should be dismissed for the additional reason that he failed to allege that defendants conspired against him because of any racial or class-based, invidious discriminatory animus. See, e.g., Brown v. City of Oneonta, 221 F.3d 329, 341 (2d Cir.2000); Moore v. Gardner, 199 F.Supp.2d 17, 24 (W.D.N.Y.2002).

CONCLUSION

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31075804 (S.D.N.Y.)
(Cite as: 2002 WL 31075804 (S.D.N.Y.))

**\*17** For the reasons set forth above, defendants should be granted summary judgment dismissing Nelson's medical claims, and Nelson's remaining claims should be dismissed without prejudice for failure to exhaust administrative remedies.

FILING OF OBJECTIONS TO THIS REPORT AND
RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Richard C. Casey, 500 Pearl Street, Room 1950, and to my chambers, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Casey. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *IUE AFL-CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993), *cert. denied,* 513 U.S. 822, 115 S.Ct. 86, 130 L.Ed.2d 38 (1994); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992); *Small v. Secretary of Health & Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 57-59 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237-38 (2d Cir.1983); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

S.D.N.Y.,2002.
Nelson v. Rodas
Not Reported in F.Supp.2d, 2002 WL 31075804 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2002 WL 1268005 (S.D.N.Y.)
(Cite as: 2002 WL 1268005 (S.D.N.Y.))

**C**
Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Harold RHAMES, Plaintiff,
v.
FEDERAL BUREAU OF PRISONS, et al. Defendants.
**No. 00 CIV.4338IAKH).**

June 6, 2002.

MEMORANDUM AND ORDER GRANTING AND
DENYING MOTION TO DISMISS

HELLERSTEIN, District J.

**\*1** On April 26, 2000, Petitioner, Harold Rhames, filed a complaint seeking damages for medical neglect while he was confined by the United States Bureau of Prisons in the New York Metropolitan Correctional Facility ("MCC"). Defendants move for an order dismissing the Complaint for lack of legal sufficiency pursuant to Fed. R. Civ. Proc. 12(c), or, alternatively, for an order granting defendants summary judgment pursuant to Fed.R.Civ.P. 56. For the reasons discussed below, the motions are partially denied and partially granted.

Rhames' complaint is for deliberate indifference by corrections officials to his medical needs while he was incarcerated in the Metropolitan Correctional Facility, between May 23, 1998 and May 9, 2000, when he was released to state custody to serve a sentence imposed by the New York State courts. He sues the Federal Bureau of Prisons, the Metropolitan Correctional Facility, MCC Warden Dennis Hasty, MCC Medical Director Mark Glover, M.D., MCC Staff Physician Raymond Voulo, M.D., MCC Health Services Administrator Kevin McDonald, and Northwest Regional Director of the Bureau of Prisons David M. Rardin. Plaintiff complains that he has an "aseptic necrotic left hip" because of a

"sickle cell trait;" that because of deliberate indifference to giving him appropriate medical and surgical treatment, he has had to favor his left leg and hip, causing him to limp and drag his right leg; and that improper "medical therapeutics" intensified the necrosis and arthritis of his left hip. He asks for a court order for surgical replacement of his right hip, non steroidal medication, full physical therapy and occupational therapy, a dietician to help him lose weight and, "minimally," several thousand of dollars in damages.

Plaintiff sues his treating MCC physical, Dr. Voulo, for "not pushing forward" with treatment when the department heads failed or refused to order treatment. Plaintiff sues Dr. Glover as the head of the medical department who, despite knowing plaintiff's case, allegedly refused to order proper care. Plaintiff sues Mr. McDonald as the administrative chief of the medical department. Plaintiff sues Warden Hasty as the person who is in overall control of the jail. And plaintiff sues Mr. Rardin because, as Northeast Regional Director of the Bureau of Prisons, he failed to supply the MCC with nursing staff.

Defendants now move to dismiss, on the pleadings under Federal Rule of Civil Procedure 12(c) for failure to state a legally sufficient claim and, alternatively, on the merits under Federal Rule of Civil Procedure 56 for failure to raise a triable issue of material fact.

*Discussion*

1. *Jurisdiction*

As a preliminary matter, I grant defendants' motion to dismiss the Bureau of Prisons and the Metropolitan Correctional Center. As agencies of the United States, these entities are immune from suit. *See FDIC v. Meyer, 510 U.S. 471, 484-86 (1994); Liffiton v. Keuker, 850 F.2d 73, 77 (2d Cir.1988).*

2. *Exhaustion*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 1268005 (S.D.N.Y.)
(Cite as: 2002 WL 1268005 (S.D.N.Y.))

**\*2** The **Prisoner** Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), requires **prisoners** first exhaust "such administrative remedies as are available" before bringing any action "with respect to prison conditions under section 1983 ... or any other Federal law." Since deprivation of medical attention to a **prisoner's** serious medical needs is considered a "prison condition," *see Cruz v. Jordan,* 80 F.Supp.2d 109, 116-17 (S.D.N.Y.1999); *Nussle v. Willette,* 244 F.3d 95 (2d Cir.2000), plaintiff's complaint is governed by the PLRA, and I therefore must evaluate whether plaintiff exhausted the available administrative remedies before I can consider the substance of his complaint.

Plaintiff first notified the prison of his hip problem in May of 1998. On May 25, 1998, on a form provided by the U.S. Department of Justice entitled "**Inmate** Request to Staff Member" (Form BP-148(55)), plaintiff addressed a request to the "Medical Dep[artmen]t" to see an orthopedic specialist for his hip and leg, to see a dermatologist, and to receive a diet plate. On June 11, 1998, Dr. Vuolo, a staff physician, requested that plaintiff be seen by an orthopedist. Dr. Glover, MCC Medical Director, approved the request. Dr. Vuolo examined plaintiff on July 27, 1998, and diagnosed him with degenerative arthritis in his left hip. Also on July 27, Dr. Kahanowicz, an outside orthopedic surgeon, examined plaintiff and concluded that plaintiff had significant arthritis in his left hip with some decrease of function. Dr. Kahanowicz recommended that anti-inflammatory medication be continued, and discussed with plaintiff the potential benefits and complications of surgery. Dr. Glover and Dr. Kahanowicz thereafter discussed plaintiff's condition. Dr. Glover determined that plaintiff was no longer fit for manual labor or physical tasks, and submitted a "Medical Report of Duty Status" form prohibiting plaintiff from being required to perform any physical tasks.

A month later, on August 25, 1998, plaintiff was seen by Dr. Lusskin, another outside orthopedic surgeon. Dr. Lusskin confirmed that plaintiff suffered from osteoarthritis in his left hip, and determined that the condition was also affecting plaintiff's left knee. Dr. Lusskin recommended that plaintiff reduce his weight, receive a cane, perform certain exercises and continue anti-inflammatory medication. Dr. Lusskin's report stated that he did not recommend surgery, because at plaintiff's

relatively young age (49 at the time), replacement hip surgery was not considered medically appropriate.

Six days later, on August 31, 1998, and again on September 15, 1998, plaintiff sent **Inmate** Request forms to the Medical Department, complaining that the cane recommended by the orthopedist had not yet been given to him, that he was still waiting to be seen by a dermatologist, that he was still waiting to receive a diet plate, and that he was not receiving therapeutic treatment for his hip condition. He again sent **Inmate** Request forms to the Medical Department on October 3, 1998 and on October 28, 1998, repeating his requests. The forms dated September 15 and October 3 were also "cc'd" to defendant Hasty, Warden of the MCC.

**\*3** Plaintiff was again examined by Dr. Vuolo on November 2, 1998. Dr. Vuolo reminded plaintiff of the need to lose weight, stated that an x-ray of plaintiff's knee would be performed, and informed plaintiff that he would be seen in three months to reevaluate his condition. Dr. Vuolo's notes do not indicate whether plaintiff brought up the cane, the diet plate or the skin problem.

A week later, on November 9, 1998, plaintiff submitted a form entitled "Request for Administrative Remedy." The form number indicated is "BP-8," although the form looks identical to form BP-9. In the November 9 Request, plaintiff stated that he was not receiving therapeutic treatment as recommended by Dr. Lusskin, that he had not received a cane also as recommended by Dr. Lusskin, that his work assignment had not been changed, that he had not been seen by a dermatologist, and that he still was not receiving a diet plate. The form does not indicate to whom or to which office it was-or should have been-addressed. On December 28, 1998, Plaintiff, yet again, submitted an **Inmate** Request form to the Medical Department, repeating his previous requests, and asking for the hip replacement surgery that his doctors considered medically inadvisable. As with some of his earlier **Inmate** Request forms, plaintiff copied the December 28 form to Warden Hasty.

Plaintiff was next seen by Dr. Vuolo on March 3, 1999, approximately four months after his last visit. Dr. Vuolo again advised plaintiff that he needed to lose weight, and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 1268005 (S.D.N.Y.)
(Cite as: 2002 WL 1268005 (S.D.N.Y.))

repeated Dr. Lusskin's conclusion that plaintiff was too young for hip replacement surgery. Dr. Vuolo's notes indicate that he was aware that the orthopedic consultant had recommended a cane and, presumably, that plaintiff did not have one. Dr. Vuolo's notes do not mention that plaintiff had brought up his skin condition or the diet plate.

Three months later, on June 3, 1999, plaintiff again was seen by Dr. Vuolo, and x-rays for plaintiff's left knee and hip were ordered. There is no evidence that the x-rays were ever taken. Dr. Vuolo recommended, and Dr. Glover approved, another consultation with an outside orthopedist. Accordingly, Dr. Kahanowicz visited with plaintiff on June 24, 1999, recommended that the treatment be continued, and added that, since plaintiff was insisting, a total hip replacement could be performed.

On June 29, 1999, plaintiff submitted a BP-9 Form requesting Administrative Remedy. He stated that he had not been seen by a specialist for a follow-up consultation despite six requests (thus neglecting to mention his visit with Dr. Kahanowicz), and that he had not received a response to the BP-9 form he had submitted November 9, 1998 (thus disregarding the fact that the November 8 form was actually a BP-8) or the BP-8 form that he had submitted June 21, 1999 (six days earlier). He complained that although a diet plate had been prescribed for him when he had earlier been confined at MDC-Brooklyn, none was given to him at the MCC. He also complained that his numerous requests to see a dermatologist had gone unanswered.

**4** On June 30, 1999, one day later, plaintiff wrote to Regional Director David Rardin, attaching the June 29 BP-9 and the submissions described above, complaining that his requests for administrative review of the inattention to his medical needs had not been answered. Plaintiff stated that he had been told by the Warden and the Medical Director that they had not received plaintiff's prior complaints.

Plaintiff's June 30 letter to Regional Director Rardin was returned to plaintiff on August 5, 1999, and he was told that his grievance had to be filed with the Warden of the MCC, and that only an appeal would lie directly to the

Regional Director. Nevertheless, on September 1, 1999, plaintiff again made complaint directly to the Regional Director, essentially repeating his prior complaints but now requesting a hip replacement as the only way to correct his medical condition. Plaintiff claimed, as justification, that he had never before received a response from Warden Hasty, that he was "shunted off" to an Administrative Remedy Coordinator who was not helpful, and that a clause on the reverse of the BP-9 provides that "a BP-9 can be sent directly to the Regional Director." On September 8, 1999, the Regional Directed again rejected plaintiff's complaint for not exhausting the grievance remedies available at the institutional level, that is, by not submitting his complaint on a BP-9 form to the Warden of the MCC. The Regional Director rejected plaintiff's rationale for filing directly as "not a valid reason," and referred him to Legal Staff for assistance with form BP-9.

It appears, from the declaration filed by Dominique Raia, an attorney employed by the Bureau of Prisons ("BOP") and assigned to the Metropolitan Correctional Facility, that BOP's records do not contain any BP-9 forms filed by plaintiff, not even the form plaintiff allegedly submitted on June 29, 1999, with the exception of plaintiff's letters of June 30, 1999 and September 1, 1999 to Regional Director Rardin. An issue of fact is presented, between plaintiff's testimony in his affidavit that he sent the forms he discusses, and the absence of a corresponding record in BOP. On this motion, I must resolve this issue in favor of plaintiff.

There is another issue, whether plaintiff's persistent use of **Inmate** Request Forms addressed to BOP's Medical Department qualifies as proper exhaustion of administrative process. BOP provides a four-part grievance process, as we learn from the Raia declaration, which plaintiff failed to use, despite his persistent requests for medical attention, until June 29, 1999, when he filed his first BP-9, or possibly November 9, 1998, when plaintiff submitted a BP-8 seeking "Administrative Remedy." Under the four-part process, **inmates** must first seek informal resolution of their complaints. 28 N.Y.C.F.R. § 542.13. If the complaint is not resolved informally, the **prisoner** may then submit a formal written request, on a designated form (Form BP-9), to the facility's warden. 28 C.F.R. § 542.24(a). The deadline for completion of informal review or filing of a formal complaint is twenty days from the event giving rise to the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 1268005 (S.D.N.Y.)
(Cite as: 2002 WL 1268005 (S.D.N.Y.))

grievance. *Id.* This time period may be extended "[w]here the **inmate** demonstrates a valid reason for delay." C.F.R. § 542.14(b). If an **inmate's** formal request is denied, the **inmate** has twenty days in which to appeal the decision to the appropriate BOP Regional Director, again using a particular form designated by BOP. C.F.R. § 542.15(a). Upon an adverse determination by the Regional Director, the **inmate** has thirty days in which to appeal to the BOP General Counsel. *Id.*

**\*5** I hold, on the facts presented to me, that plaintiff sufficiently exhausted administrative remedies to allow me to proceed to the substance of this lawsuit. The form "BP-8" which plaintiff testifies he submitted on November 9, 1998, and to which his BP-9 form submitted eight months later, on June 29, 1999, makes reference, adequately satisfies BOP's administrative requirements. These submissions, together with plaintiff's persistent complaints to BOP's Medical Department, afforded corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case, *see Porter,* 122 S.Ct. at 988 (clear purpose of Section 1997e's exhaustion requirement is "to reduce the quantity and improve the quality of **prisoner** suits," by "afford[ing] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case"); *Brown v. Sikes,* 212 F.3d 1205, 1208 (11th Cir.2000) (exhaustion requirement "give[s] the agency a chance to discover and correct its own errors") (quoting *Alexander v. Hawk,* 159 F.3d 1321, 1327 (11th Cir.1998)); *Wyatt v. Leonard,* 193 F.3d 876, 880 (6th Cir.1999) (plaintiff held to have "substantially complied with the exhaustion requirement by giving written notice on several occasions to prison officials," although he did not follow the precise requisite procedures).

While it is important that **prisoners** comply with administrative procedures designed by the Bureau of Prisons, rather than using any they might think sufficient, *see Brown,* 212 F.3d at 1208 (one policy favoring exhaustion requirement is "to avoid the possibility that frequent and deliberate flouting of the administrative processes could weaken the effectiveness of an agency by encouraging people to ignore it procedures") (quoting *Alexander,* 159 F.3d at 1327), it is equally important that form not create a snare of forfeiture for a **prisoner** seeking redress for perceived violations of his constitutional rights. Plaintiff's persistence in his complaints, his use of BP-8

and BP-9 forms, and his letter to Regional Director Rardin (which could be considered an appeal), adequately show compliance with the BOP's procedures. Assuming that plaintiff's version of the facts can be proved, the prison authorities clearly knew or should have known of plaintiff's grievance, and his persistence in pursuing it. The cases cited by the State are distinguishable. *Compare Martinez v. Williams,* 186 F.Supp.2d 353, 357 (S.D.N.Y.2002) (finding plaintiff did not exhaust administrative remedies where he did not utilize available administrative appeal after defendants failed to act on grievance filing); *Beeson v. Fishkill Correction Facility,* 28 F.Supp.2d 884, 887 (S.D.N.Y.1998) (finding **prisoner** did not satisfy exhaustion requirement where he withdrew grievances from administrative process before they were decided on their merits); *Hartsfield v. Vidor,* 199 F.3d 305, 309 (6th Cir.1999) ( **prisoner** had not exhausted where he did not follow grievance to the final administrative appeal); *Freeman v. Francis,* 196 F.3d 641, 645 (6th Cir.1999) ( **prisoner** had not exhausted administrative remedies where he filed suit before the time allotted to respond to his final administrative appeal had lapsed); *Williams,* 192 F.Supp.2d at 763 (dismissing for failing to exhaust where plaintiff failed to take available second appeal and finding that "a letter is not the same as a grievance appeal").

### 3. Merits

**\*6** Plaintiff has alleged a *Bivens* complaint against the five individuals named in the suit, all federal officers. Federal officers cannot be sued in their official capacity for alleged wrongdoing, for such suits are the equivalent of suits against the federal government. *See Armstrong v. Sears,* 33 F.3d 182, 185 (2d Cir.1994); *Robinson v. Overseas Military Sales Corp.,* 21 F.3d 502, 510 (2d Cir.1994). Federal employees may be sued only in their personal capacity if they have performed their duties in such a way as intentionally to cause constitutional violations of a person's rights. *See Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 411-12 (1971); *MacFarlane v. Grasso,* 696 F.2d 217, 225 (2d Cir.1982) ( "sovereign immunity does not bar a suit which seeks to prevent an official of the United States from acting in excess of his statutory authority, from exercising his statutory authority in an unconstitutional manner, or from exercising statutory authority which is itself unconstitutional ."). Deliberate indifference to a

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 1268005 (S.D.N.Y.)
(Cite as: 2002 WL 1268005 (S.D.N.Y.))

**prisoner's** serious medical needs is a violation of the Eighth Amendment to the United States Constitution, as it is the equivalent of "unnecessary and wanton infliction of pain." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976).

For deliberate medical in attention to rise to the level of constitutional violation, two requirements must be met. First, the **prisoner's** medical need must be "serious." *See Wilson v. Seiter,* 501 U.S. 294, 298 (1991); *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). Second, the record must show, or the facts must give rise to a reasonable inference, that the prison officials charged with extending medical care knew of those medical needs and intentionally disregarded them. *Harrison v. Barkley,* 219 F.3d 132, 137 (2d Cir.2000); *Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998).

Plaintiff alleges that the named individuals ignored three medical conditions: an arthritic hip, an unspecified skin condition, and obesity. Since the record contains no information as to plaintiff's skin condition beyond plaintiff's statement that he suffered from some sort of rash, I cannot conclude that plaintiff's skin condition was serious. Plaintiff's obesity and arthritic hip, on the other hand, are serious medical conditions that demanded attention. The question, then, is whether the facts give rise to a reasonable inference that the named prison officials knew of plaintiff's medical needs in regard to his hip and weight problems and whether they nonetheless personally disregarded plaintiff's needs.

As recounted in the previous section, the record shows continuous care and attention by Dr. Vuolo to plaintiff's conditions. Vuolo examined plaintiff fairly regularly and with skill, requested appropriate medical procedures and consultations with orthopedic specialists, and counseled plaintiff on losing weight. The record thus presents ample evidence that there was no indifference on his part. Plaintiff's complaint against Dr. Vuolo must therefore be dismissed.

**\*7** Plaintiff's complaint, then, although alleging **medical indifference**, is more directed to operational and administrative indifference to recommendations made by the doctors. The doctors recommended a cane to ease the pressure on plaintiff's **hip**, but no cane was provided.

Doctors also recommended treatment of plaintiff's obesity, but none beyond counseling was provided. Plaintiff also complains about his degenerated **hip**, but there seems to be a lack of clarity whether or not surgery was the appropriate medical remedy, and a claim of indifference against the defendants on that issue therefore lacks merit.

The record is not clear which of the remaining defendants was allegedly responsible for the indifference to plaintiff's medical needs. In that connection, a supervisor can be sued under 42 U.S.C. § 1983 if his indifference to his supervisory responsibilities is the proximate cause of constitutional injury. *See Morrison v. Lefevre,* 592 F.Supp. 1052, 1075 (S.D.N.Y.1984).

The remaining defendants occupy different positions in the prison hierarchy. Dr. Glover was the Director of the MCC's Medical Department; McDonald was its Health Services Administrator; Hasty was the prison's warden; and Rardin was the Northeast Region Director of the Bureau of Prisons. Plaintiff alleges that each of these men had some level of responsibility for supervising plaintiff's medical care while he was a **prisoner**, and that each failed to do his job, as evidenced by plaintiff's claims that his serious medical needs were not treated. While Dr. Glover as head of the Medical Department approved requests for orthopedic specialists and submitted a form excusing plaintiff from any further manual labor or physical tasks, it is not clear whether he exercised the type of diligence demanded of a person in his position. Likewise, the record is not clear whether McDonald, who allegedly reviewed plaintiff's chart and followed plaintiff's treatment, exercised appropriate diligence. Similarly, the record is not clear as to what role Hasty played as Warden in allowing the indifference to plaintiff's medical needs to continue. On the complaint and record submitted, I must therefore sustain the complaint against these three individuals.

On the other hand, I dismiss the claims against Regional Director Rardin. The complaint alleges breach only of his official supervisory duties by failing to staff the MCC with nurses. There is no evidence beyond plaintiff's bare suppositions that the lack of nurses at the prison facility played any part in the indifference plaintiff alleges to have suffered. *See Morrison,* 592 F.Supp. at 1075.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 1268005 (S.D.N.Y.)
(Cite as: 2002 WL 1268005 (S.D.N.Y.))

### Conclusions

For the reasons stated, defendants' motion for judgment on the pleadings is granted insofar as it makes claim against defendants Bureau of Prisons, Metropolitan Correctional Facility, Rardin, and Vuolo, and denied insofar as it makes claim against defendants Hasty, McDonald and Glover. The parties shall meet with me at Conference on July 9, 2002, at 9:30 A.M., in Courtroom 14D of the U.S Courthouse located at 500 Pearl Street, New York, New York, to discuss appropriate further proceedings.

**\*8** SO ORDERED.

S.D.N.Y.,2002.
Rhames v. Federal Bureau of Prisons
Not Reported in F.Supp.2d, 2002 WL 1268005 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2011 WL 814838 (S.D.N.Y.)

(Cite as: 2011 WL 814838 (S.D.N.Y.))

**C**

Only the Westlaw citation is currently available.
United States District Court,

S.D. New York.
William DE JESUS, Plaintiff,
v.
Joy ALBRIGHT, et al., Defendants.
No. 08 Civ. 5804(DLC).

March 9, 2011.
William De Jesus, Auburn, NY, pro se.

Jeb Harben, Assistant Attorney General, New York, NY, for defendants.

*OPINION & ORDER*

DENISE COTE, District Judge.

**\*1** Plaintiff William De Jesus ("De Jesus"), proceeding *pro se,* brings this action pursuant to 28 U.S.C. § 1983 against various employees of the New York State Department of Correctional Services ("DOC") in their individual capacities.[FN1] De Jesus alleges that, while he was incarcerated in the Fishkill Correctional Facility ("Fishkill"), defendants violated his constitutional rights by failing to attend to his medical needs. Defendants have moved for summary judgment pursuant to Fed.R.Civ.P. 56. For the following reasons, the motion is granted in part.

> FN1. Plaintiff had originally sought also to bring claims against defendants in their official capacities as officers of the DOC, but withdrew those claims in his affirmation in opposition to the defendants' motion to dismiss filed November 16, 2009.

*BACKGROUND*

I. The Parties

Unless otherwise noted, the following facts are undisputed. Plaintiff De Jesus is a prisoner in the custody of the DOC. At the time he filed the complaint, he was resident at Fishkill. Defendant Dr. John Supple ("Supple") is a physician at the Regional Medical Unit ("RMU") at Fishkill who served as plaintiff's primary health care provider. Defendant Dr. Edward Sottile ("Sottile") is a physician and the Facility Health Services Director at the Fishkill RMU. His duties include supervising all medical treatment and the medical staff at Fishkill, including Supple. Defendant Joy Albright ("Albright") is the Nurse Administrator of the Fishkill RMU, in charge of supervising the clinical practice of nurses at that facility, but, according to DOC policies, not a supervisor of the medical care given by doctors. Defendant Angie Maume ("Maume") is the Acting Deputy Superintendent of Health Services at the Fishkill RMU, directing the operations and coordination of support services at the facility, but not, according to DOC policies, directing inmate medical care. Defendant Elizabeth Williams ("Williams") is the Deputy Superintendent of Health Services of the Fishkill RMU, who like Maume, directs support services at the Fishkill RMU, not medical care.[FN2]

> FN2. In his complaint, De Jesus also asserted claims against William Connolly, Superintendent of Fishkill; Lester Wright, Chief Medical Officer of the DOC; and Dr. Ramasree Karri, a psychiatrist who treated plaintiff. De Jesus voluntarily dismissed the claims against these defendants in his opposition to the defendants' motion to dismiss.

II. Medical Treatment Prior to Arriving at Fishkill

De Jesus alleges a history of medical ailments that dates back to October 2005 while resident at New York State's Upstate Correctional Facility. His various medical complaints started with a chronic sore throat, and later included eye pain, problems with eyesight, chronic migraine headaches and continued sore throat.

While resident at Great Meadows Correctional Facility ("Great Meadows") and, later, Coxsackie Correctional Facility ("Coxsackie") De Jesus received

Slip Copy, 2011 WL 814838 (S.D.N.Y.)

(Cite as: 2011 WL 814838 (S.D.N.Y.))

medical care for his throat and eye complaints. He was examined by an otolaryngologist (an ear, nose and throat specialist, or "ENT") in May 2006, when he underwent a CT scan of his throat and was prescribed medication for acid reflux. He was again seen by an ENT in July 2007. In response to complaints about chest pains and seeing flickering lights, De Jesus was given an electrocardiogram ("EKG") in November 2006, the results of which were normal. De Jesus's vision problems were examined by an optometrist in May 2007, who prescribed him glasses, and an ophthalmologist in July 2007, who could not identify anything wrong with his eyes. His medical history indicates that his first complaint of migraine headaches occurred in July 2007. De Jesus was also twice examined by psychiatrists in the Office of Mental Health ("OMH") at Great Meadows in November 2006, neither of whom referred him for further mental health services related to his physical symptoms.

III. Plaintiff's Medical Treatment at Fishkill

*2 De Jesus's complaint concerns the medical care he received during his time at Fishkill, where he was transferred in October 2007. From the beginning of De Jesus's confinement at Fishkill, Supple was assigned to serve as his primary health care provider. De Jesus was seen regularly by Supple and nurses in the RMU starting very shortly after his transfer to Fishkill. These visits were first in reference to his complaints of eye and throat pain, and seeing flashing lights. His medical records show that while at Fishkill, De Jesus consistently exhibited signs of sore throat, including inflammation, red coloration, and increased mucous. De Jesus was prescribed Claritin, triamcinolone, albuterol and other allergy medications that are designed to relieve eye pain and sore throat, among other symptoms. He was also given an x-ray of his sinuses to investigate his complaints of sore throat in November 2007.

De Jesus sent two letters of complaint about his medical treatment shortly thereafter. The first, dated November 19, 2007, was sent to Sottile, and referenced his persistent eye pain and flashing lights in his vision. The second was dated December 7, 2007 and sent to Albright, referencing his eye and throat pain.

De Jesus filed a formal grievance in January 2008

claiming that he was suffering from serious eye and throat pain and that Supple was not properly treating his condition. Nursing staff, including Albright and Maume, investigated De Jesus's grievance and provided information to the Inmate Grievance Resolution Committee ("IGRC"), which reviews such grievances. In the report denying De Jesus's complaint, the IGRC referenced his visits with Supple, the x-ray he received in November 2007 and the prior medical care plaintiff received at Great Meadows and Coxsackie as evidence that he had been receiving treatment for his eye and throat pain.

On February 10, 2008, De Jesus sent a new letter to Williams, referencing severe eye pain, flashing lights and headaches. De Jesus's headaches were referenced in the record of his March 28 medical exam, the first time they were mentioned in his medical records since arriving at Fishkill. Supple referred De Jesus for an examination by an ophthalmologist in April 2008. This exam did not reveal any abnormalities, although the ophthalmologist suggested that plaintiff's eye pain might be connected to his migraines.

De Jesus filed another grievance complaint in June 2008, complaining of eye pain, flashing lights and violent headaches, and requesting an MRI or CT scan. This grievance was also denied because the IGRC found that De Jesus had been seen by several doctors all of whom had found no "organic basis" for his complaints. Upon appeal to the DOC Central Office Review Committee, De Jesus was told that he should refer his request to Sottile, who would have authority to authorize alternate treatments. De Jesus was also informed that he could "request a consultation from an outside provider of his choice by making necessary arrangements and assuming financial responsibility" pursuant to Health Services Policy Manual Item 7.2.

*3 Upon Supple's referral, Dr. Ramasree Karri ("Karri"), a psychotherapist, examined De Jesus in July 2008 but could not identify "any psychiatric condition including somatoform disorders" that could be the root of his ailments. Karri's evaluation notes indicate that plaintiff told her that his eye ailment "slows me down and hinders my ability to move around." De Jesus alleges that this

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 814838 (S.D.N.Y.)

(Cite as: 2011 WL 814838 (S.D.N.Y.))

evaluation, in addition to the earlier psychiatric evaluations conducted at Great Meadows, found that his complaints were not psychological. He also alleges that Karri advised plaintiff to continue to try to determine the root of his symptoms. De Jesus maintains that he has never suffered from any psychological problems or taken psychotropic medication. Karri, however, stated that although she did not identify any obvious psychiatric disorders at the time of her examination, she had not made a medical diagnosis that plaintiff's symptoms "had a diagnosable medical basis or ... could be alleviated through medical treatment."

Supple again advised De Jesus to seek counseling at OMH during examinations in August and October 2008 because "no physical basis for his symptoms ha[d] been found by several medical providers over 2+ years" and he "advised [De Jesus] to try something new that may help." De Jesus filed another grievance in August 2008, complaining generally of "medical issues" related to his throat and eyes, and seeking that Supple be removed as his primary care provider. In the grievance, De Jesus states that Supple had acted rudely and was refusing to meet his medical needs, including by repeatedly referring him to OMH. Like the prior grievances, this was denied because De Jesus had a history of receiving various types of examinations, medication and other treatment. The denial memorandum also informed De Jesus that his request for a new primary medical provider should be referred to Sottile, as the IGRC did not have authority to change his provider. On August 25 and September 15, De Jesus sent complaint letters to Sottile referencing extreme eye pain, visual complications and throat pain.

In September and October 2008, De Jesus began to complain again about severe headaches. A formal grievance he filed on October 3, which requested a change in medical provider but did not specify any particular ailments, was denied in the same manner as his earlier grievances. In October, De Jesus requested an MRI or CT scan, or examination by a neurologist, but Supple did not order these for him. On October 21, De Jesus filed another grievance in which he complained that Supple had an unprofessional and hostile demeanor and that he was being denied specialized examinations. De Jesus wrote "I fear my life is in danger in Dr. Supple's hands." Responding to this complaint, Sottile examined De Jesus on November 7. According to Sottile's notes from the examination, De Jesus complained about his chronic sore throat, eye problems and "occasional headaches." Sottile identified a persistent sore throat problem, prescribed a flovent spray pump and suggested that a gastro-intestinal consult and/or a UGI endoscopy be performed to assess if De Jesus's sore throat was caused by acid reflux. Sottile did not recommend any of the specialized examinations that De Jesus had sought and did not agree that Supple should be removed as his primary care provider. The IGRC thereafter denied De Jesus's October 21st grievance, finding that Supple had performed his duties appropriately and that no change in medical providers was necessary. Supple did not order the gastro-intestinal consult or the UGI endoscopy that Sottile had recommended.

**\*4** In December 2008 and January 2009, De Jesus continued to complain of eye pain, sore throat, headaches and seeing flashing lights in his visits with medical staff. In January he was prescribed Imitrex, a medication for the treatment of headaches, by a Dr. Mamis, who is not a party in this case. Supple continued to prescribe De Jesus Imitrex for the next two or three months, as well as lozenges for his sore throat.

De Jesus alleges that his headaches have been entirely untreated by prison medical staff, and that he was never even prescribed over-the-counter pain medication for these headaches. De Jesus alleges that he continues to suffer from severe eye and throat pain and daily migraine headaches.

IV. De Jesus's Medical Care Since the Filing of the Amended Complaint

Both parties have submitted evidence regarding De Jesus's medical care since the amended complaint in this action was filed on February 23, 2009. Supple continued to be De Jesus's primary care provider. In June 2009, De Jesus visited an optometrist who prescribed him new glasses. In December 2009, he was prescribed eye drops and pain medication to address his eye pain. By April 2010, De Jesus's eye pain and headaches had appeared to ameliorate, according to records from his examination by medical staff. In June 2010, Sottile referred De Jesus for

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

Slip Copy, 2011 WL 814838 (S.D.N.Y.)

(Cite as: 2011 WL 814838 (S.D.N.Y.))

a brain CT scan to check for "cranial pathology."

On August 20, 2010, Dr. Joseph Avanzato, the Acting Facility Health Services Director of Fishkill who replaced Sottile after his retirement, ordered an MRI for De Jesus, which would provide a better analysis of any cranial pathology, if it existed, than a CT scan. The MRI report indicated that De Jesus did not suffer from any brain abnormalities such as a tumor or hemorrhage. Since at least September 2010, De Jesus has been prescribed Propranolol, a medication for the treatment of migraine headaches.

V. Procedural History

De Jesus filed this action *pro se* on June 27, 2008. An amended complaint was filed on February 23, 2009 and served on all defendants in April 2009. The defendants filed a joint motion to dismiss the amended complaint on July 16, 2009, which was fully submitted on December 23, 2009. On January 29, 2010, it was ordered that the motion to dismiss would be treated as one for summary judgment under Fed.R.Civ.P. 56, and that consideration of the motion would take place after the parties made supplemental submissions that included De Jesus's medical and mental health records. No discovery has been taken in this action, but defendants filed supplemental briefing on summary judgment on June 4, 2010, with declarations attaching plaintiff's health records.[FN3] De Jesus submitted briefing and affidavits in August 2010. Defendants filed their reply brief and further affidavits on September 27, 2010.

> FN3. Plaintiff complains that defendants did not submit a statement of material facts as to which there is no genuine dispute pursuant to the Southern District's Local Rule 56.1. Because the defendants' motion to dismiss was converted into one for summary judgment, however, they were not required to file such a statement. *See Schnur v. CTC Commc'ns Corp. Grp. Disability Plan,* 621 F.Supp.2d 96, 101 (S.D.N.Y.2008).

*DISCUSSION*

I. Summary Judgment Standard

Summary judgment may not be granted unless all of

the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(a); *see El Sayed v. Hilton Hotels Corp.,* 627 F.3d 931, 933 (2d Cir.2010). The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination, the court must view all facts in the light most favorable to the non-moving party. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *El Sayed,* 627 F.3d at 933. When the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot "merely rest on the allegations or denials" contained in the pleadings. *Wright v. Goord,* 554 F.3d 255, 266 (2d Cir.2009). That is, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Only disputes over material facts—facts that might affect the outcome of the suit under the governing law—will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *SCR Joint Venture L.P. v. Warshawsky,* 559 F.3d 133, 137 (2d Cir.2009). It is well established that the submissions of a *pro se* litigant must be construed liberally and interpreted to raise the strongest arguments that they suggest. *Chavis v. Chappius,* 618 F.3d 162, 170 (2d Cir.2010) (citation omitted). The rule favoring liberal construction of *pro se* submissions is especially applicable to civil rights claims. *See Weixel v. Bd. of Ed. of the City of New York,* 287 F.3d 138, 146 (2d Cir.2002).

*5 De Jesus asserts a § 1983 claim against defendants for deliberate indifference to his serious medical needs in violation of his Eighth Amendment rights. De Jesus claims that defendants were deliberately indifferent to his medical needs by ignoring his complaints about and failing to treat his chronic sore throat, eye pain and vision problems, and his chronic migraine headaches. He has only demonstrated, however, that there are genuine disputed issues of fact for trial that defendants Supple and Sottile may have violated his constitutional right to receive adequate medical care for treatment of his migraine

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 814838 (S.D.N.Y.)

(Cite as: 2011 WL 814838 (S.D.N.Y.))

headaches.

Defendants present three arguments why they are entitled to summary judgment. First, Albright, Maume and Williams argue that they had no personal involvement in plaintiff's medical treatment, and so could not be held liable for any deliberate indifference of his needs. In addition, all defendants argue that there is no genuine issue of material fact suggesting that there was any deliberate indifference to De Jesus's medical needs. Finally, all defendants also claim that they are entitled to the defense of qualified immunity. This Opinion will address each of these arguments in turn.

II. Personal Involvement

Albright, Maume and Williams move for summary judgment on the ground that they were not personally involved in the alleged deprivation of De Jesus's rights. Section 1983 provides in part that

[e]very person who, under color of any statutes, ordinance, regulation, custom or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to deprivation of any rights, privileges, or immunities secured by the Constitution and laws shall be liable to the party injured.

42 U.S.C. § 1983. To state a claim under § 1983, a plaintiff must show: "(1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages." *Roe v. City of Waterbury,* 542 F.3d 31, 36 (2d Cir.2008).

A defendant's conduct must be a proximate cause of the claimed violation in order to find that the defendant deprived the plaintiff of his rights. *Martinez v. California,* 444 U.S. 277, 285, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980). As a consequence, "the doctrine of respondeat superior ... does not suffice to impose liability for damages under section 1983 on a defendant acting in a supervisory capacity." *Hayut v. State Univ. of N.Y.,* 352 F.3d 733, 753 (2d Cir.2003). It is thus "well settled" that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farid v. Ellen,* 593 F.3d 233, 249 (2d Cir.2010) (citation omitted). Moreover, on claims of

deliberate indifference, a plaintiff must show such indifference on the part of a "particular defendant." *Brock v. Wright,* 315 F.3d 158, 164 (2d Cir.2003).

The personal involvement and liability of supervisory personnel is established when the supervisory official has "actual or constructive notice of unconstitutional practices and demonstrates gross negligence or deliberate indifference by failing to act." *Meriwether v. Coughlin,* 879 F.2d 1037, 1048 (2d Cir.1989) (citation omitted). Thus, a plaintiff may establish a supervisor's personal involvement by showing that:

**\*6** (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference ... by failing to act on information indicating that unconstitutional acts were occurring.

*Back v. Hastings on Hudson Union Free School Dist.,* 365 F.3d 107, 127 (2d Cir.2004) (citation omitted).[FN4]

FN4. The Supreme Court's decision in *Ashcroft v. Iqbal,* ——U.S. ——, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), which found that a supervisor can be held liable only "through the official's own individual actions", *id.* at 1948, arguably casts doubt on the continued viability of some of the categories set forth in *Hastings on Hudson. See Qasem v. Toro,* No. 09 Civ. 8361(HHS), 2010 WL 3156031, at \*3 (S.D.N.Y. Aug.10, 2010) ("The Second Circuit has not yet addressed how *Iqbal* affects the five categories of conduct that give rise to supervisory liability ...."). For the purposes of this case, however, it is not necessary to explore this issue, because Albright, Maume and Williams were not supervisors of the defendants primarily responsible for the alleged violation.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 814838 (S.D.N.Y.)

(Cite as: 2011 WL 814838 (S.D.N.Y.))

De Jesus has not asserted that Albright, Maume and Williams were directly involved in De Jesus's medical treatment. De Jesus argues that they should be liable because during the grievance investigations, they maintained that his complaints were psychological in nature despite their awareness of his prior "negative psychological evaluations." De Jesus also argues that these defendants had supervisory responsibilities over the medical care provided by Supple, his primary care provider. With this awareness and responsibility, De Jesus argues, Albright, Maume and Williams had a duty to overrule Supple's denial of care and reject his assessment that the medical treatments De Jesus requested should be denied because his ailments had a psychological root.

De Jesus's characterization of the situation is not supported by the facts in three respects. First, Albright, Maume and Williams did not play either a direct or supervisory role in De Jesus's treatment, and therefore cannot be held liable for any deficiencies in his medical care. The letters De Jesus sent to Albright and Williams, to which they did not respond, are insufficient to provide evidence of personal involvement. As De Jesus concedes, their relevant actions were limited to conducting the investigations that would inform the IGRC's review of De Jesus's grievances.[FN5] This advisory role is confirmed by the grievance reports. De Jesus's failure to demonstrate any genuine issue suggesting that Albright, Maume or Williams were personally involved in any deprivation of his rights means that these defendants are entitled to summary judgment.

> **FN5.** Even if they had been voting members of the IGRC that had denied De Jesus's grievances, under Second Circuit law, it is "questionable" whether a denial of an inmate's grievance constitutes sufficient personal involvement to make him liable. *McKenna v. Wright,* 386 F.3d 432, 437–38 (2d Cir.2004) (citing *Joyner v. Greiner,* 195 F.Supp.2d 500, 506 (S.D.N.Y.2002) (dismissing claim against superintendent whose involvement was limited to denying grievance regarding inadequate medical care)).

Second, there is no evidence that the rationale for the denial of De Jesus's grievance was any opinion that his ailments were psychological rather than physical. Instead, the grievance committee denials each were based on a finding that De Jesus was receiving adequate medical treatment for his ailments. Therefore, the investigation by the grievance committee took under consideration the medical opinion of Supple that De Jesus was receiving adequate treatment, not, as De Jesus argues, an opinion that plaintiff's ailments were psychological.[FN6] De Jesus has provided no evidence that Albright, Maume and Williams ever denied De Jesus medical care because they "deliberately maintained" that his ailments were psychological, nor any basis to believe that discovery would provide such evidence. The grounds for the denial of De Jesus's grievances are documented, those documents have been produced, and they do not support De Jesus's arguments.

> **FN6.** De Jesus attempts to characterize Supple's alleged opinion that his ailments had a psychological root as an "opinion (belief)" because Supple is not a psychotherapist, and that this "opinion" does not deserve the same kind of deference as a "diagnosis" Supple would make as a medical doctor. Plaintiff provides no support for why this particular opinion, if in fact it was held by Supple, would not be a professional medical opinion or less deserving of deference by non-medical personnel.

**\*7** Finally, although De Jesus argues that Albright, Maume and Williams are supervisory personnel responsible for medical care at Fishkill, they are not supervisors of the individuals whom De Jesus alleges were most directly responsible for violating his constitutional rights—doctors Supple and Sottile. Rather, these individuals are nurses who supervise some nursing and administrative staff, not the doctors in the RMU. Therefore, De Jesus cannot rely on the legal test for a supervisor's personal involvement to find Albright, Maume and Williams liable for any deprivation of his rights.

III. Deliberate Indifference

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 814838 (S.D.N.Y.)

(Cite as: 2011 WL 814838 (S.D.N.Y.))

A. Standard

Although the "Eighth Amendment imposes a duty upon prison officials to ensure that inmates receive adequate medical care," it is well-established that "not every lapse in medical care is a constitutional wrong." *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006) (citing *Farmer v. Brennan,* 511 U.S. 825, 832, 844, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). "Rather, a prison official violates the Eighth Amendment only when two requirements are met." *Salahuddin,* 467 F.3d at 279 (citation omitted). The first requirement is that the alleged deprivation must be "sufficiently serious." *Id.* (citation omitted). The second requirement is that "the charged official must act with a sufficiently culpable state of mind." *Id.* at 280.

The first requirement is objective: "[o]nly deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Id.* at 279 (citation omitted). Determining whether a deprivation is "sufficiently serious" requires two inquiries. First, a court must determine "whether the prisoner was actually deprived of adequate medical care." *Id.* "As the Supreme Court has noted, the prison official's duty is only to provide reasonable care." *Id.* (citing *Farmer,* 511 U.S. at 844–47). An inmate is not entitled to treatment by every available medical alternative as long as his treatment is reasonable. *Estelle v. Gamble,* 429 U.S. 97, 107, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Furthermore, a "mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998). Nonetheless, even if a plaintiff receives "extensive" and "comprehensive, if not doting, health care," he may still be able to identify deficiencies in care that establish a deliberate indifference claim, particularly when the issue is a failure to treat pain. *Archer v. Dutcher,* 733 F.2d 14, 16 (2d Cir.1984).

Second, a court must determine "whether the inadequacy in medical care is sufficiently serious." *Salahuddin,* 467 F.3d at 280. "This inquiry requires the

court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Id.* (citation omitted). If the inadequacy at issue is "a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's [underlying] medical condition is sufficiently serious." *Id.* If, however, "the inadequacy is in the medical treatment given, the seriousness inquiry is narrower." *Id.* Then, "it's the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes." *Smith v. Carpenter,* 316 F.3d 178, 186 (2d Cir.2003). Even in cases where an inmate "suffers from an admittedly serious medical condition," if the alleged deficiencies in treatment are "minor and inconsequential," those lapses will not sustain an Eighth Amendment claim. *Id.* "[T]he actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm." *Id.* at 187.

**\*8** "Because the objective component of an Eighth Amendment claim is necessarily contextual and fact-specific, the serious medical need inquiry must be tailored to the specific circumstances of each case." *Id.* at 185 (citation omitted). Courts use a number of factors to determine whether a medical condition is serious. These factors, which are also instructive in determining whether the medical consequences of a denial of certain treatment are serious, include: "whether a reasonable doctor or patient would find it important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain." *Salahuddin,* 467 F.3d at 280 (citation omitted).

The second requirement for an Eighth Amendment violation is subjective: the prison official must act with a "sufficiently culpable state of mind." *Salahuddin,* 467 F.3d at 280 (citation omitted); *see also Caiozzo v. Koreman,* 581 F.3d 63, 71 (2d Cir.2009). "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin,* 467 F.3d at 280 (citation omitted). "This

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 814838 (S.D.N.Y.)

(Cite as: 2011 WL 814838 (S.D.N.Y.))

mental state requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.* (citation omitted). This means that the prison official "must be subjectively aware that his conduct creates such a risk." *Id.* at 281 (citation omitted).

Prison medical staff is given wide discretion in determining how to treat inmates. In this context, "[t]he decisions of physicians regarding the care and safety of patients are entitled to a presumption of correctness." *Kulak v. City of New York,* 88 F.3d 63, 77 (2d Cir.1996) (citation omitted); *Church v. Hegstrom,* 416 F.2d 449, 450 (2d Cir.1969) (Section 1983 "does not authorize federal courts to interfere in the ordinary medical practices ... of state prisons."). As such, a disagreement between an inmate and medical personnel over the course of treatment does not give rise to a deliberate indifference claim. *Chance,* 143 F.3d at 703. A showing of medical malpractice is therefore insufficient to support a deliberate indifference claim unless "the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces a conscious disregard of a substantial risk of serious harm." *Id.* (citation omitted).

The defendants argue that De Jesus has failed, first, to allege that he suffered from a "sufficiently serious" condition, or that he was deprived of any medical care for his ailments. *Salahuddin,* 467 F.3d at 280 (citation omitted). They also argue that De Jesus has failed to allege that the named individual defendants "act[ed] with a sufficiently culpable state of mind." *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) (citation omitted). The defendants argue that his allegations amount to, at most, a claim of negligence. Defendants are successful in showing that with respect to his sore throat and eye pain, De Jesus has failed to show that he suffered from a deprivation of medical care. But, De Jesus has put forward sufficient facts to raise a material question whether Supple and Sottile deprived him of medical care related to his complaint of chronic migraine headaches, and did so with a sufficiently culpable state of mind. Supple and Sottile, therefore, are not entitled to summary judgment with regard to the medical care provided for De Jesus's migraine headaches.

B. Deprivation of Medical Care in Connection with a

Sufficiently Serious Medical Condition

1. Sore Throat, Eye Pain and Visual Problems

**\*9** Defendants argue that De Jesus's chronic sore throat, eye pain and visual problems do not rise to the level of a "serious medical condition" as required under analysis of an alleged Eighth Amendment violation. *Smith,* 316 F.3d at 186. De Jesus does not attempt to demonstrate why these ailments should be so classified, instead focusing on the debilitating effects of his chronic headaches. Moreover, De Jesus has failed to show that he was "actually deprived of adequate medical care" for these ailments. *Salahuddin,* 467 F.3d at 279.

During his incarceration at Fishkill and immediately before, De Jesus was consistently treated for his sore throat and eye complaints. He was given medication that targeted these ailments and was examined by specialists, including ENTs, ophthalmologists and optometrists, who investigated the source of his symptoms. De Jesus was given a CT scan, an X-ray, and an EKG. Sottile provided further care by prescribing De Jesus a flovent spray pump.

Against this medical history, De Jesus's allegations that he was not treated for these symptoms are truly only complaints that he was not satisfied with the exact method of treatment given or the results achieved. *See Chance,* 143 F.3d at 703. Although De Jesus claims that Supple denied him medical care because of Supple's belief that De Jesus's ailments were psychological, this is contradicted by the record showing that in addition to his referrals to OMH, Supple and other medical providers provided continuous medical care with respect to his sore throat, eye pain and vision problems. Even if De Jesus's medical care providers could arguably have provided De Jesus with further specialist examinations or medication, such as the UGI endoscopy or the gastro-intestinal consult suggested by Sottile, this is merely a disagreement about a medical judgment, not evidence of a deprivation of care. *See Estelle,* 429 U.S. at 107. The claims related to sore throat, eye pain and vision problems are therefore insufficient to withstand summary judgment. *See Wright,* 554 F.3d at 266.

2. Chronic Migraine Headaches

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 814838 (S.D.N.Y.)

(Cite as: 2011 WL 814838 (S.D.N.Y.))

The lack of treatment of De Jesus's chronic migraine headaches leads to the opposite conclusion. First, chronic migraine headaches are often found to be "sufficiently serious" to warrant constitutional protection. *See Benjamin v. Kooi,* No. 07 Civ. 0506, 2010 WL 985844, at *7 (N.D.N.Y. Feb. 25, 2010) (collecting cases); *Moriarty v. Neubould,* No. 02–CV–1662, 2004 WL 288807, at *2 n. 2 (D.Conn. Feb. 10, 2004) (migraine headaches constitute a sufficiently serious condition because they can be "extremely painful and debilitating"). Plaintiff alleges that these headaches caused him severe and constant pain, and were "so serious and violent that at times he [was] unable to work, read, write, or leave his cell are for [sic] meals or activities.... [T]hey significantly affect[ed] plaintiff's daily activities." Defendants do not contest that De Jesus is suffering from headaches, nor do they argue that they do not cause him severe pain or affect his daily activities. Therefore, De Jesus has satisfied the "serious medical condition" requirement as to his complaints of chronic migraine headaches. *See Salahuddin,* 467 F.3d at 280.

**\*10** Second, there is no record of any treatment being given for his headaches between February 10, 2008, when he first complained of headaches at Fishkill (through a letter of complaint), and January 23, 2009, when Dr. Mamis prescribed Imitrex, a migraine medication.[FN7] Even taking into account some ambiguities in the record, it appears that De Jesus's chronic migraine headaches went completely untreated for over eleven months.[FN8] This "failure to provide any treatment for an inmate's medical condition," where the underlying "condition is sufficiently serious," satisfies the objective requirement of the deliberate indifference claim. *Id.* Even though De Jesus has been prescribed medicines to address chronic migraine headaches since 2009 and underwent an MRI in 2010 which determined that he did not suffer from a brain abnormality that might require more aggressive treatment, De Jesus has raised a material question that the eleven-month delay in treatment was a sufficiently serious deprivation, precluding the grant of summary judgment. *See Salahuddin,* 467 F.3d at 281 (refusing to find as a matter of law that it was reasonable to postpone treatment for Hepatitis C for five months).

FN7. In his medical records, De Jesus first

complained of headaches in July 2007, but they were not mentioned in his medical records once he arrived at Fishkill until March 28, 2008. After that date, his reports of headaches were not as consistent as his complaints of sore throat and eye pain, but his medical records show that he told medical staff that he was experiencing migraine headaches in July, September, October and December 2008, and January 2009.

FN8. Although De Jesus was referred to OMH in July 2008, defendants do not argue that this referral was made to address De Jesus's complaints of headaches. The documents produced by defendants indicate that the purpose of the referral was to determine if there was a psychological root of De Jesus's eye pain and vision problems.

Defendants cite to *Woods v. Goord,* No. 01 Civ. 3255(SAS), 2002 WL 31296325, 2002 U.S. Dist. LEXIS 19371, at *21 (S.D.N.Y. Oct. 10, 2002), to argue that De Jesus's allegations fail to recognize the sustained medical treatment he received while at Fishkill, and that his allegations are mere disagreement about proper treatment. Similarly, citing *Estelle,* 429 U.S. at 106, defendants argue that De Jesus's claims are merely complaints that the medical treatment he received was unsuccessful at alleviating his symptoms. But these arguments are not targeted to address the lack of treatment of De Jesus's headaches for eleven months; instead, defendants gloss over this delay and concentrate on his throat and eye symptoms or speak generally about his complaints. In both *Estelle* and *Woods,* the plaintiff had unquestionably received treatment for the condition at issue. *See Estelle,* 429 U.S. at 107; *Woods,* U.S. Dist. LEXIS 19371, at \* \* 20–21. Defendants do not claim that De Jesus was given any treatment for his headaches until January 2009.[FN9] These arguments are therefore unavailing in the context of the complete failure to treat a condition for eleven months.

FN9. Although Sottile stated in his declaration that "efforts have been made to reduce" De Jesus's migraine headaches, the only pain relieving medications he mentioned were "Ibuprofen, Motrin, Imitrex ." De Jesus's records

Slip Copy, 2011 WL 814838 (S.D.N.Y.)

(Cite as: 2011 WL 814838 (S.D.N.Y.))

indicate that Imitrex was not prescribed until January 2009. Ibuprofen—the generic name for Motrin and the term used in his prescription chart—was prescribed by a Dr. Williams in fall 2008 for pain associated with dental issues, including wisdom tooth extraction and toothaches. There is no evidence of ibuprofen being prescribed for the purpose of treating De Jesus's headaches before January 2009.

C. Subjective Element

It having been found that there was no serious deprivation of medical care with regard to his throat and eye complaints, analysis of the subjective element of De Jesus's deliberate indifference claim need only consider whether Supple and Sottile had a "sufficiently culpable state of mind" in denying him care for his chronic migraine headaches. *Salahuddin,* 467 F.3d at 280. It is not necessary to find that a defendant acted or failed to act "for the very purpose of causing harm or with knowledge that harm will result," only that he "evince[d] a conscious disregard of a substantial risk of serious harm." *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (citation omitted).

**\*11** De Jesus has introduced evidence to raise a genuine question that Supple and Sottile failed to treat his chronic migraine headaches while actually aware of a substantial risk that De Jesus would suffer serious harm. If, as the evidence suggests, the doctors failed to attempt any treatment of De Jesus's headaches for over eleven months, this was an "unnecessary and wanton infliction of pain." *Farmer,* 511 U.S. at 834. It is undisputed that Supple was aware of De Jesus's complaints of migraines, as they were noted in his medical records throughout 2008 after March 28 and in the grievance De Jesus filed referencing Supple's medical care in June 2008. Sottile acknowledged that he was aware of De Jesus's complaints from his consultations with Supple and noted that De Jesus suffered headaches in the report from his examination in November 2008. De Jesus alleges that his migraines were a topic he discussed with Sottile at the examination.

The defendants argue that De Jesus's complaints only describe a lack of due care or negligence, which is insufficient to sustain a deliberate indifference claim.

*LaBounty v. Coughlin,* 137 F.3d 68, 72–73 (2d Cir.1998). They further cite to *Wilson v. Seiter,* 501 U.S. 294, 298–303, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991), to support their argument that De Jesus has not presented evidence to satisfy the "wantonness" requirement of a deliberate indifference claim. *LaBounty* and *Wilson* require that a plaintiff present evidence that "the defendants knew of the health dangers and yet refused to remedy the situation." *LaBounty,* 137 F.3d at 73 (citing *Wilson,* 501 U.S. at 302–04).

De Jesus has presented medical records that show that Supple and Sottile were aware of De Jesus's complaints of migraine headaches and did not order any treatment. Although there is no specific evidence that the doctors were aware that there was a risk of continued pain in the absence of medication or other treatment for the migraine headaches, this can be inferred from the fact that such a risk is obvious. *Farmer,* 511 U.S. at 842. Supple and Sottile might have rebutted this inference by showing that they "knew the underlying facts but believed ... that the risk to which the facts gave rise was insubstantial or nonexistent," *id.* at 844, but they have not presented evidence to support such a rebuttal. Just as in *LaBounty,* where the Second Circuit affirmed the district court's decision not to grant summary judgment, the defendants here have not pointed to contrary evidence sufficient to show there is no genuine issue of material fact that they failed to treat a condition that was a danger to De Jesus's health.

Defendants also argue that there is a "presumption of correctness" for "decisions of physicians regarding the care and safety of patients." *Kulak,* 88 F.3d at 77. The physicians' decision in *Kulak* to move the plaintiff to a new ward, however, was supported by their reasoning that this move was needed because his treatment team worked there. Therefore, the *Kulak* defendants supported this presumption of correctness by stating a reason for the challenged action. Here, Supple and Sottile have failed to provide a basis for their decision to not treat De Jesus's headaches for eleven months. Without more from the defendants, the presumption of correctness is overcome by the obvious risk attached to a failure to provide medical care for migraine headaches.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 814838 (S.D.N.Y.)

(Cite as: 2011 WL 814838 (S.D.N.Y.))

**\*12** De Jesus spends a great deal of time in his briefs arguing that Supple's decision not to treat De Jesus's headaches was rooted in a belief that his condition was psychological and not caused by a pathology that could be addressed by non-mental health medical treatments. He cites to _Wood v. Sun,_ 865 F.2d 982 (9th Cir.1998), where the Ninth Circuit found that defendant doctors had been deliberately indifferent to an inmate's medical needs by refusing him treatment because they attributed his complaints to mental health issues. _Id._ at 990. In addressing this argument, defendants argue only that "there is no basis to infer from the record that Dr. Supple took the position that plaintiff's complaints _about his throat_ were psychological ..." (emphasis supplied). As defendants have not specifically addressed whether Supple or Sottile declined to treat De Jesus's _headaches_ due to a belief that they had a psychological, not a physical, cause, and because even if this was the reason for the lack of treatment, they have not presented any argument that this was a reasonable medical judgment, De Jesus has raised a genuine issue of material fact that precludes summary judgment on the subjective element.[FN10]

> **FN10.** De Jesus also presented several affidavits to support his contention that the subjective element was satisfied, at least in part, by Supple's allegedly rude behavior or hostility towards him. As defendants argue at length in their reply memorandum, rude behavior has never been found to be sufficient to make a defendant liable for deliberate indifference. See _Smith v. Goord,_ No. 9:08 Civ. 1364 (NAM/RFT), 2010 WL 3488148, at \*6 (N.D.N.Y. Aug.9, 2010) ("[V]erbal harassment or profanity alone, unaccompanied by an injury no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983.") (citation omitted). This evidence, therefore, does not need to be factored into the analysis here at all. De Jesus has sufficiently shown that there is a genuine dispute precluding summary judgment without any affidavits concerning Supple's attitude or allegedly insensitive statements. Indeed, De Jesus made no allegations that Sottile

acted in anything but a professional manner, yet summary judgment is also precluded on the claim against him.

IV. Qualified Immunity

The defendants also argue that they have qualified immunity from liability. Qualified immunity shields government officials performing discretionary functions "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." _Tracy v. Freshwater,_ 623 F.3d 90, 95–96 (2d Cir.2010) (citation omitted). "This inquiry turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." _Faghri v. Univ. of Connecticut,_ 621 F.3d 92, 97 (2d Cir.2010) (citation omitted). Because qualified immunity is both "a defense to liability and a limited entitlement not to stand trial or face the other burdens of litigation," _Iqbal,_ 129 S.Ct. at 1946 (citation omitted), it should be determined early in the proceedings if possible. _Cowan ex rel. Estate of Cooper v. Breen,_ 352 F.3d 756, 760 (2d Cir.2003).

In evaluating a defense of qualified immunity, the first inquiry is whether, viewing the facts alleged in the light most favorable to the plaintiff, there was a constitutional violation. _Clubside, Inc. v. Valentin,_ 468 F.3d 144, 152 (2d Cir.2006). The next questions are whether that right was clearly established at the time the challenged decision was made, and whether the defendants' actions were objectively unreasonable. _Harhay v. Town of Ellington Bd. of Educ.,_ 323 F.3d 206, 211 (2d Cir.2003). A constitutional right is "clearly established" where "(1) the law is defined with reasonable clarity; (2) the Supreme Court or the Second Circuit has recognized the right; and (3) a reasonable defendant would have understood from the existing law that his conduct was unlawful." _Reuland v. Hynes,_ 460 F.3d 409, 420 (2d Cir.2006) (citation omitted). Courts need not address these questions in this particular order, although "it is 'often beneficial' to do so." _Finnigan v. Marshall,_ 574 F.3d 57, 61 n. 3 (2d Cir.2009) (citing _Pearson v. Callahan,_ 555 U.S. 223, 129 S.Ct. 808, 818, 172 L.Ed.2d 565 (2009)).

**\*13** As described above, De Jesus has established a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 814838 (S.D.N.Y.)

(Cite as: 2011 WL 814838 (S.D.N.Y.))

violation of his Eighth Amendment right to adequate medical care with respect to his chronic migraine headaches. This is a right that has been defined with sufficient specificity and clearly established by the Supreme Court and Second Circuit. *See Estelle,* 429 U.S. at 104; *Salahuddin,* 467 F.3d at 279. De Jesus has raised a genuine issue of material fact with regard to the reasonableness of Supple and Sottile's approach to his chronic migraine headaches, presenting evidence suggesting that they failed to provide any treatment for these headaches for over eleven months.

In support of their contention that Supple and Sottile are entitled to qualified immunity, defendants argue only that the doctors' "actions were objectively reasonable in that they were exercising their medical judgment" without further elaboration. This bald assertion does not provide an adequate ground for finding that Supple or Sottile would have been reasonable in believing that a failure to treat chronic migraine headaches was not a violation of De Jesus's Eighth Amendment rights, and certainly provides no evidence that would indicate that there is no dispute about this material issue. *Thomas v. Roach,* 165 F.3d 137, 143 (2d Cir.1999) ("Summary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness.") (citation omitted).

Sottile and Supple also argue that plaintiff has provided no evidence of a doctor disagreeing with their course of treatment for De Jesus's complaints. First, the record on this point is not at all clear. Dr. Mamis prescribed Imitrex for De Jesus's migraine headaches in January 2009, whereas Supple and Sottile had not taken any action with regard to this complaint. Whether or not this prescription is evidence of an actual disagreement depends on circumstances surrounding Dr. Mamis's evaluation that are not yet developed in the record. Secondly, it is not the burden of plaintiff to show an actual disagreement between doctors to defeat a claim of qualified immunity. Rather, qualified immunity should be granted when defendants have shown that a fact finder could find that "reasonable officers would disagree about the legality of the defendant[s'] conduct under the circumstances." *Poe v. Leonard,* 282 F.3d 123, 133 (2d Cir.2002) (citation omitted). There is a genuine question

whether reasonable doctors could have different opinions about the reasonableness of Supple and Sottile's actions and about whether not treating De Jesus's migraine headaches for over eleven months was deliberate indifference to his medical needs. Qualified immunity, therefore, cannot be granted on this ground.

*CONCLUSION*

Defendants' motion for summary judgment is granted in full as to Albright, Maume and Williams. Summary judgment is also granted as to Supple and Sottile for De Jesus's deliberate indifference claim related to his complaints of sore throat, eye pain and vision problems. Summary judgment is denied as to Supple and Sottile for De Jesus's deliberate indifference claim related to his complaint of chronic migraine headaches.

**\*14** SO ORDERED:

S.D.N.Y.,2011.

De Jesus v. Albright
Slip Copy, 2011 WL 814838 (S.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 3785771 (N.D.N.Y.)

(Cite as: 2010 WL 3785771 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Marc LEWIS, Plaintiff,
v.
J. JOHNSON, et al., Defendants.
No. 9:08-CV-482 (TJM/ATB).

Aug. 5, 2010.

Marc Lewis, pro se.

Christina L. Roberts-Ryba, Asst. Attorney General, for Defendants.

### REPORT-RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.

**\*1** This matter was referred by Senior U.S. District Judge Thomas J. McAvoy, for Report and Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c). The case was transferred to me on January 4, 2010, following the retirement of U.S. Magistrate Judge Gustave J. Di Bianco. (Dkt. No. 125).

While an inmate in the custody of the Department of Correctional Services ("DOCS"), plaintiff filed his complaint, pursuant to 42 U .S.C. § 1983, regarding incidents that occurred during his incarceration at Franklin Correctional Facility ("Franklin") and Upstate Correctional Facility ("Upstate"). Liberally construed, plaintiff's amended complaint [FN1] (Dkt. No. 40) makes several claims against 14 defendants [FN2] relating to events in 2006 and 2007. He alleges that, in retaliation for his filing of a letter complaining of an assault of another inmate by correction officers at Franklin on or about June 15, 2006, defendant Johnson filed a false misbehavior report against plaintiff, and defendant Gardner made inflammatory statements regarding plaintiff to other staff, prompting further acts of retaliation. [FN3] Plaintiff claims that defendants Secore and Favro violated his Eighth Amendment rights by assaulting him on June 19, 2006,

and that defendant Norcross failed to intervene. He also alleges that he was a victim of another unconstitutional assault on June 24, 2006, by defendant Reardon and other unnamed officers. Plaintiff claims that, over the following days and weeks, nurses Davenport, Volpe, Walsh, and Chesbrough, and physician assistant ("PA") Tichenor all denied him constitutionally-adequate medical care, by failing to properly treat him for the various injuries he suffered as a result of the two "assaults." He states that defendant Demars violated his due process rights, while presiding at the disciplinary hearing on the charges brought by defendant Johnson, which resulted in plaintiff's confinement in a Special Housing Unit ("SHU") until the charges were reversed by DOCS in June 2007. Finally, plaintiff suggests that defendants McCasland and Hoffnagle violated plaintiff's First Amendment rights by improperly handling his legal mail in January 2007. Plaintiff seeks substantial monetary damages from the defendants.

FN1. Plaintiff was granted leave to file an amended complaint on January 26, 2009. (Dkt. No. 39).

FN2. It is well-settled that the state itself cannot be sued under section 1983. Komlosi v. New York State OMRDD, 64 F.3d 810, 815 (2d Cir.1995) (citing Will v. Michigan Department of Police, 491 U.S. 58, 71 (1989)). An action against state officers in their official capacities is tantamount to an action against the state. Yorktown Medical Laboratory, Inc. v. Perales, 948 F.2d 84, 87 & n. 1 (2d Cir.1991). To the extent that the defendants are being sued in their official capacity for money damages, that cause of action should be dismissed under the Eleventh Amendment. Huang v. Johnson, 251 F.3d 65, 69-70 (2d Cir.2001); Posr v. Court Officer Shield # 207, 180 F.3d 409, 414 (2d Cir.1999).

FN3. Plaintiff characterizes the subsequent actions of defendants Secore, Favro, Norcross, Reardon, Demars, McCasland, and Hoffnagle as

Slip Copy, 2010 WL 3785771 (N.D.N.Y.)

(Cite as: 2010 WL 3785771 (N.D.N.Y.))

retaliation, although he states or implies that their actions constituted separate constitutional violations, as well.

Presently pending is defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56. (Dkt. No. 110). Plaintiff has responded in opposition to the motion. (Dkt.Nos.123, 124). Defendants filed a reply (Dkt. No. 128), and plaintiff submitted a sur-reply (Dkt.Nos.129, 130). For the following reasons, this court recommends that defendants' motion be granted in part and denied in part. I particular, this court recommends that summary judgment be denied with respect to the Eighth Amendment excessive force or failure-to-intervene claims against defendants Secore, Favro, Norcross, and Reardon. Dismissal is recommended with respect to the plaintiff's other causes of action.

## DISCUSSION

### I. *Facts*

**\*2** Plaintiff authored and signed a letter dated June 15, 2006, complaining to the Superintendent of Franklin and other DOCS officials about the alleged assault of another inmate by at least four correction officers that evening. (Pl.'s Decl., Ex. A, Dkt. No. 124-3). Plaintiff spoke to the Superintendent in the mess hall about the letter on Saturday, June 17th, and the Superintendent said he would look for the letter and get back to the plaintiff. (Pl.'s Deposition ("Dep.") at 18-19, Dkt. No. 110-3). The letter was stamped as received in the anonymous office at Franklin, on June 20, 2006 at 12:42 p.m. (Pl.'s Decl., Ex. A).

### A. The Misbehavior Report Filed by Defendant Johnson

On June 19, 2006, the administration at Franklin received a number of anonymous notes from inmates indicating that violence toward the facility staff was imminent because of prior staff actions involving inmates. Defendant Johnson, who was assigned to investigate these letters, was advised that the plaintiff had approached the Superintendent with "similar concerns" on June 17th. Lt. Johnson obtained samples of plaintiff's handwriting from his guidance folder and compared them to the anonymous, threatening notes. (Johnson Decl. ¶ 5, Dkt. No. 110-8).[FN4] He concluded that plaintiff's known handwriting was

similar to the writing on four of the anonymous letters, including one of the most threatening ones. (*Id.* ¶¶ 5, 6). Based on that and other investigation conducted by several officers, Lt. Johnson filed a misbehavior report on June 19th, accusing plaintiff of authoring some of the threatening letters. (*Id.* ¶ 6 & Ex. A, Dkt. No. 110-8 at 6). He directed that plaintiff be confined in the SHU pending the disciplinary hearing (*Id.*, Ex. A), which is permitted by DOCS directives governing inmate discipline (DOCS Directive 4932, Parts 251-1.6 & 251-1.7, *Id.*, Ex. C, Dkt. No. 110-8 at 21-22).

> **FN4.** Lt. Johnson had prior, on-the-job experience comparing handwriting, but no formal forensic training. (*Id.* ¶ 9; Disc. Hearing Transcript at 21, 23, Dkt. No. 110-8). Citations to the disciplinary hearing transcript will reference the consecutive page numbers on the bottom righthand corner of the pages, not the page numbers in the CM-ECF header.

A disciplinary hearing regarding these charges, for which defendant Demars served as the hearing officer, was conducted over several days. Plaintiff and several other witnesses, including Lt. Johnson and the Franklin Superintendent testified. (Disc. Hearing Transcript at 1-67). Plaintiff was found guilty of the charges and was sentenced, on July 5, 2006, to serve nine months in SHU with corresponding loss of privileges. (Disc. Hearing Transcript at 66; Pl.'s Decl., Ex. B, Dkt. No. 124-4 at 4). After various levels of appeal and review, the guilty disposition was administratively reversed by DOCS on June 19, 2007 because the hearing officer (defendant Demars) did not conduct an independent review of the handwriting comparisons about which Lt. Johnson testified. (Pl.'s Decl., Ex. B, Dkt. No. 124-4 at 6, 13).[FN5] On or about July 2, 2007, plaintiff was ordered released from the SHU at Upstate. (*Id.*, Dkt. No. 124-4 at 14).

> **FN5.** During June 2006, plaintiff received several other misbehavior reports for which he was found guilty and sentenced to additional time in the SHU. Although plaintiff seems to contend that one of these other hearings was reversed, the documentation submitted seems to indicate that only the disciplinary conviction of July 5, 2005 was reversed. (*Id.*, Dkt. No. 124-4

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3785771 (N.D.N.Y.)

(Cite as: 2010 WL 3785771 (N.D.N.Y.))

at 4-6, 11-14).

**B. The First "Assault" on June 19, 2005**

Plaintiff alleges that defendant Gardner, then a sergeant at Franklin, was involved in plaintiff's transfer to the SHU on June 19, 2005, following the filing of the disciplinary charges relating to the threat letters. (Amended Complaint ("AC"), Statement of Facts, ¶¶ 3-4, Dkt. No. 40 at 9-10; FN6 Gardner Decl. ¶¶ 2-7, Dkt. No. 110-10). Plaintiff alleges that, during the transfer, Sgt. Gardner told defendants Secore and Favro that the plaintiff "needed to be taught the policies and procedures of the Franklin Correctional Facility because the plaintiff liked to make threats at correctional staff and write them up." FN7 (AC ¶ 4).

> FN6. Subsequent references to the Amended Complaint will refer only to the paragraph number in the "Statement of Facts," unless the reference is to another section of the pleading.

> FN7. Defendant Gardner did not recall the plaintiff, but states that he would not have made such a statement to an inmate. (Gardner Decl. ¶¶ 5-6).

*3 Plaintiff claims that defendants Secore and Favro then escorted him into the main foyer of the SHU where they struck him on the back of the head and on the jaw. (AC ¶¶ 6-8). Plaintiff alleges these two plaintiffs then dragged him into the "strip frisk room" where these two correction officers tripped plaintiff and then repeatedly punched and kicked him while he was handcuffed on the floor. (AC ¶¶ 9-10). Plaintiff claims further that defendant Norcross was in the strip frisk room while this assault was going on, and failed to intervene. (AC ¶ 11). While there are some minor discrepancies in their accounts, defendants Secore, Favro, and Norcross all state that, during the strip frisk procedure at the SHU, plaintiff raised a fist and then struggled when the officers moved to restrain him. The officers assert that they used the minimum force necessary to bring plaintiff under control, and that he was not "assaulted." (Secore Decl., Dkt. No. 110-11; Favro Decl., Dkt. No. 110-12; Norcross Decl., Dkt. No. 110-18). FN8

> FN8. The correction officer's account of the

incident was documented in a use-of-force report and a subsequent disciplinary hearing, which resulted in a finding that the officers used reasonable and necessary force, and that the plaintiff engaged in violent conduct and other infractions. (Id.).

Plaintiff claims that, as a result of the assault, he suffered injuries to his rib cage and a dislocated jaw. He alleges that, in the hours and days following the incident, Nurse Davenport and Nurse Volpe refused to examine him and treat his injuries. (AC ¶¶ 13-17). Both nurses state that they spoke with and examined plaintiff between June 19 and 22, and found no evidence that he was injured. (Davenport Decl., Dkt. No. 110-19; Volpe Decl., Dkt. No. 110-14). The nurses completed an Inmate Injury Report and/or medical records, which documented their examinations of plaintiff. (Id.; Secore Decl., Ex. B, Dkt. No. 110-11 at 8, 15, 18-19, 22-25; Medical Records FN9 at 34-36). Plaintiff claims that these records were fabricated and false. (AC ¶ 15; Pl.'s Decl., Dkt. No. 124-2 at 4-6).

> FN9. The defendants submitted the plaintiff's medical records *in camera* and they are stamped with sequential page numbers.

**C. The Second "Assault" on June 24, 2005**

Plaintiff alleges that, on June 24, 2005, defendant Reardon assaulted him in his cell in the presence of other unnamed correction officers. Plaintiff alleges that defendant Reardon "took the plaintiffs [sic] left arm and pulled all the way back into a 90 ° degree angle while having him in a body lock ..." (AC ¶ 20). Plaintiff claims that, as a result of this assault, he suffered a torn tendon to his left armpit. (AC ¶ 23).

Officer Reardon acknowledged having contact with plaintiff in the Franklin SHU on June 20 and 24, 2006; he issued inmate misbehavior reports against the plaintiff on both dates. (Reardon Decl. ¶¶ 3-4, 10-12, Dkt. No. 110-13). Defendant Reardon denies assaulting plaintiff and notes that, on June 29th, at the disciplinary hearing regarding the June 20th misbehavior report, plaintiff said nothing about the alleged assault five days earlier. (Id. ¶¶ 5-8, 14). Plaintiff did, however, complain of the alleged assault in a grievance dated June 25th. (Pl.'s Decl., Ex. C, Dkt. No. 124-5 at 39-41). As a result of the grievance,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3785771 (N.D.N.Y.)

(Cite as: 2010 WL 3785771 (N.D.N.Y.))

plaintiff was eventually transferred to the SHU at Upstate. (*Id.*).

**D. Further Issues Regarding Medical Treatment**

**\*4** Plaintiff claims that, upon his admission to Upstate on July 12, 2006, Nurse Walsh refused to examine plaintiff for injuries relating to the two prior assaults, advising him to request sick call. He alleges further that Nurse Chesbrough refused to provide him with treatment the next day because this defendant thought the plaintiff was lying about not being treated earlier at Franklin. (AC ¶¶ 23-24). After reviewing the relevant medical records, defendants Walsh and Chesbrough both concluded that Nurse Chesbrough examined plaintiff both on July 12th and 13th, and concluded that he had no apparent medical problems. (Walsh Decl. ¶¶ 6-7, Dkt. No. 110-15; Chesbrough Decl. ¶¶ 6-9, Dkt. No. 110-16).

Plaintiff also complains that PA Tichenor examined him several months after the alleged assaults, mis-diagnosed his left arm injury, and refused to examine his rib cage and jaw despite claims of continuing pain in those areas. (AC ¶ 25). Based on her review of plaintiff's medical records, defendant Tichenor stated that she examined and treated plaintiff conservatively for various medical conditions, including back and shoulder pain, on September 6, 2006 and several times thereafter. (Tichenor Decl., ¶¶ 6-11, Dkt. No. 110-17).

**E. Issues Regarding Legal Mail**

Plaintiff alleges that, on January 22 and 23, 2007, defendants McCasland and Hoffnagle attempted to deliver two pieces of legal mail that had been opened outside of plaintiff's presence, contrary to DOCS procedures. Plaintiff refused to accept the opened mail on two occasions, and claims that defendant Hoffnagle then lost or destroyed the two parcels, which should have been returned to the sender. (Dep. 66-71, AC ¶¶ 31-33). Plaintiff does not document that he was prejudiced in any particular legal proceedings as a result of the alleged mishandling of his mail.

Defendant McCasland stated that he opened the two parcels of legal mail in plaintiff's presence on January 22nd, but that plaintiff refused the mail because he was upset that another parcel was returned to plaintiff for insufficient postage. (McCasland Decl. ¶¶ 6-9, Dkt. No.

110-20). Defendant Hoffnagle states that, when plaintiff refused the two open parcels the next day, he returned them to the mail room. (Hoffnagle Decl., ¶¶ 4-10, Dkt. No. 110-21). Based on a grievance filed by plaintiff, DOCS found no evidence that the defendants mishandled plaintiff's legal mail, although one report found that the mail officers did not properly document their handling of the parcels. (McCasland Decl., Ex. B, Dkt. No. 110-20 at 44).

**II. *Summary Judgment-Legal Standards***

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56; *Salahuddin v. Goord,* 467 F.3d 263, 272-73 (2d Cir.2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994).

**\*5** The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord,* 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962); *Salahuddin v. Goord,* 467 F.3d at 272. "[I]n a pro se case, the court must view the submissions by a more lenient standard than that accorded to "formal pleadings drafted by lawyers ." *Govan v. Campbell,* 289 F.Supp.2d 289, 295

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3785771 (N.D.N.Y.)

(Cite as: 2010 WL 3785771 (N.D.N.Y.))

(N.D.N.Y.2007) (citing, *inter alia, Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir .1994) (a court is to read a pro se party's "supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest")). "However, a pro se party's "bald assertion," completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995) (citing *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)). While a court " 'is not required to consider what the parties fail to point out," " the court may in its discretion opt to conduct "an assiduous review of the record" even where a party fails to respond to the moving party's statement of material facts. *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir.2001) (citations omitted).

### III. *Excessive Force/Failure to Intervene*

#### A. Legal Standards

#### 1. Eighth Amendment-Excessive Force

Inmates enjoy Eighth Amendment protection against the use of excessive force, and may recover damages under 42 U.S.C. § 1983 for a violation of those rights. *Hudson v. McMillian,* 503 U.S. 1, 9-10 (1992). The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain." *Gregg v. Georgia,* 428 U.S. 153, 173 (1976); *Sims v.. Artuz,* 230 U.S. 14, 20 (2d Cir.2000). To sustain a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999).

In order to satisfy the objective element of the constitutional standard for excessive force, the defendants' conduct must be " 'inconsistent with the contemporary standards of decency.' " *Whitely v. Albers,* 475 U.S. 312, 327 (1986) (citation omitted); *Hudson,* 503 U.S. at 9. "[T]he malicious use of force to cause harm constitute[s][an] Eighth Amendment violation per se [,]" regardless of the seriousness of the injuries. *Blyden,* 186 F.3d at 263 (citing *Hudson,* 503 U.S. at 9). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided

that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9-10 (citations omitted). " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' " *Sims,* 230 F.3d at 22 (citation omitted).

**\*6** The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Id.* at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Id.* (quoting *Hudson,* 503 U.S. at 7). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: the extent of the injury and the mental state of the defendant; the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003).

#### 2. Failure to Intervene

A correction officer who is present while an assault upon an inmate occurs may bear responsibility for any resulting constitutional deprivation, even if he did not directly participate. *See, e.g., Cicio v. Graham,* No. 9:08-CV-534 (NAM/DEP), 2010 WL 980272, at \*13 (N.D.N.Y. March 15, 2010); *Tafari v. McCarthy,* No. 9:07-CV654 (DNH/GHL), 2010 WL 2044705, at\*8 (N.D.N.Y. May 24, 2010) .[FN10] A law enforcement official has an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated by other officers in his or her presence. *Id.*[FN11] In order to establish liability under this theory, a plaintiff must prove that the defendant in question (1) possessed actual knowledge of the use by another correction officer of excessive force; (2) had a realistic opportunity to intervene and prevent the harm from occurring; and (3) nonetheless disregarded that risk by intentionally refusing or failing to take reasonable measures to end the use of excessive force. *Id.; Jean-Laurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008) (citation omitted).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3785771 (N.D.N.Y.)

(Cite as: 2010 WL 3785771 (N.D.N.Y.))

FN10. *See also* *Fischl v. Armitage,* 128 F.3d 50, 57 (2d Cir.1997) (reversing grant of summary judgment for defendant based on evidence that defendant was in the vicinity of an assault on plaintiff and failed to intervene); *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994).

FN11. *See also* *Curley v. Village of Suffern,* 268 F.3d 65, 72 (2d Cir.2001) ("Failure to intercede results in [section 1983] liability where an officer observes excessive force being used or has reason to know that it will be.") (citations omitted).

**B. Application**

Plaintiff has adequately alleged that the named correction officers either participated in, or were present for and failed to intervene in, the application of excessive force. While plaintiff's excessive force claims have weak evidentiary support, he has established that there are genuine issues of material fact that should be resolved by a jury.

**1. The "Assault" on June 19, 2010**

Defendants Secore and Favro admittedly used force to subdue plaintiff on June 19, 2010. In his amended complaint (Dkt. No. 40), deposition (Dep. at 31-38, and pleadings in opposition to the summary judgment motion, plaintiff consistently alleged details of an assault which, if believed, would amount to a "malicious use of force to cause harm" that constitutes a *per se* Eighth Amendment violation regardless of the seriousness of his injuries. *Blyden,* 186 F.3d at 263. Plaintiff claims he was struck in the head or face by each defendant, dragged to another room, tripped, and repeatedly punched and kicked while he was lying handcuffed on the floor. Although plaintiff admits that he kicked at the correction officers to try to defend himself from their blows once he was on the floor (Dep. at 33-34), this did not justify the alleged prior application of excessive force. As described by plaintiff, the incident involved more than an *de minimis* use of force and a malicious and wanton attempt to cause harm. *Sims,* 230 F.3d at 22; *Hudson,* 503 U.S. at 7.

**\*7** The correction officers and Sgt. Norcross all vehemently deny that more than the minimum amount of force required to restrain the plaintiff was used, and the medical evidence does not corroborate plaintiff's claims of significant injuries to his rib cage and jaw.[FN12] However, given that issues of credibility should not be resolved on a summary judgment motion, this court cannot conclude that no rational juror could find that defendants Secore and Favro violated plaintiff's Eighth Amendment rights on June 19, 2006. *See, e.g., Griffin v. Crippen,* 193 F.3d 89, 90-92 (2d Cir.1999) (although plaintiff could offer only his own testimony and evidence of a bruised shin and a swollen left knee in support of his excessive force claim, dismissal was inappropriate because there were genuine issues of material fact concerning whether correction officers, whom plaintiff admittedly assaulted, maliciously used force against him after he was subdued and handcuffed); *Sims v. Artuz,* 103 Fed. Appx. 434, 437 (2d Cir.2004) (plaintiff's allegations that he was kicked and punched while being removed from his cell after causing a disruption, corroborated in part by documented minor injuries,[FN13] were sufficient to withstand a summary judgement motion); *Dallio v. Sanatamore,* 9:06-CV-1154 (GTS/DRH), 2010 WL 125774, at \*9 (N.D.N.Y. Jan. 7, 2010) (because the court should not weigh the evidence or make credibility determinations, summary judgment would be denied where plaintiff alleged that he was repeatedly kicked and punched after he was subdued and restrained by correction officers, notwithstanding the relatively minor injuries the plaintiff suffered and the substantial contrary evidence proffered by the defendants); *Cicio v. Lamora,* 9:08-CV-431 (GLS/DEP), 2010 WL 1063875, at \*7-8 (N.D.N.Y. Feb. 24, 2010) (denying summary judgment on plaintiff's claim that defendant correction officer hit inmate several times after he was subdued and helpless, despite "seemingly overwhelming" contradictory evidence, including the fact that plaintiff suffered only a minor bruise).

FN12. As discussed below, medical records indicate that plaintiff complained of, and in some cases received treatment for, pain in his back and shoulder in the months following June 2006. Plaintiff may have difficulty establishing that his subsequent medical problems were caused by the alleged incident of excessive force. While that may well be the case, and plaintiff may have few, if any, compensable injuries, that does not support dismissal on summary judgment. *See,*

Slip Copy, 2010 WL 3785771 (N.D.N.Y.)

(Cite as: 2010 WL 3785771 (N.D.N.Y.))

e.g., *Reyes v. McGinnis,* 00-CV-6352, 2003 WL 23101781, at *6 (W.D.N.Y. Apr. 10, 2003) (whether an injury to inmates wrist was caused by trauma resulting from defendant's use of handcuffs was a factual issue for the jury); *Gibeau v. Nellis,* 18 F.3d 107, 110 (2d Cir.1994) (while plaintiff may not have proved compensable injuries caused by the use of excessive force, he still could be entitled to a judgment under Section 1983 and an award of nominal damages at trial).

FN13. The Second Circuit reversed the grant of summary judgment, which was based, in part, on the district judge's conclusion that the plaintiff "would have suffered 'far greater injury than actually occurred' if his account [of the incident] were accurate." *Id.*

Plaintiff alleges that he saw that Sgt. Norcross was present while he was being kicked and punched on the floor of the strip frisk room and told plaintiff to "calm down." (Dep. at 36-38). Defendant Norcross admits he was in the room with plaintiff and defendants Secore and Favro, although he denies that any excessive force was applied. (Norcross Decl. ¶¶ 4-9, Dkt. No. 110-18). Given plaintiff's allegations about the nature and duration of the beating he received while in Sgt. Norcross's presence, it would have been clear to this defendant that excessive force was being applied, and he would have had an opportunity to intervene to stop the assault by his subordinates. While there are obviously issues of credibility that may ultimately be resolved against the plaintiff, he has established that there are issues of fact regarding defendant Norcross's culpability that should be addressed at trial.

**\*8** To the extent that plaintiff is alleging that defendants Gardner and Davenport were personally involved in the application of excessive force by defendants Secore and Favro, this court recommends dismissal of those claims. [FN14] Neither defendant was present during the alleged assault and thus did not have a realistic opportunity to intervene. There is no allegation that Nurse Davenport had any reason to anticipate the alleged assault, or any knowledge of the incident until it

was over. In any event, she lacked the authority to intervene while correction officers were using force on an inmate, even if she were present. [FN15]

FN14. *See, e.g., Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (personal involvement is a prerequisite to the assessment of damages in a section 1983 case); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003).

FN15. *See e.g., Rendely v. Town of Huntington,* No. 2:03-CV-3805, 2006 WL 5217083, at *6 (E.D.N.Y. Aug. 30, 2006) (because defendants were civilian government employees, and thus not law enforcement officials, they had no authority or duty to prevent the police officers from taking plaintiff into custody); *Phoenix v. Reddish,* 175 F.Supp.2d 215, 220 (D.Conn.2001) (there is no Supreme Court or Second Circuit authority that imposes an affirmative duty on a non-police state actor to intervene to prevent a police officer from conducting an unlawful search and seizure).

Even if then Sgt. Gardner made the comment to defendants Secore and Favro that plaintiff "needed to be taught the policies and procedures" of the facility "because plaintiff likes to make threats at correctional staff," that alone would not suggest the state of mind required to establish his responsibility, under the Eighth Amendment, for a subsequent assault by the other correction officers. Cf. *Bouknight v. Shaw,* 08 Civ. 5187, 2009 WL 969932, at *5 (S.D.N.Y. Apr. 6, 2009) (to establish officer's liability, under Section 1983, for the assault of plaintiff by other inmates, plaintiff needed to allege more than the fact that the officer spread rumors that plaintiff was a "snitch" and a homosexual; plaintiff needed to allege facts establishing that the officer intended to incite an assault or knowingly disregarded that he had created an environment that generated a significant risk of harm).[FN16] A comment that plaintiff needed to be taught the rules of the prison, as he was being transported to the SHU because of a disciplinary charge, is subject to a completely benign interpretation. Plaintiff's bare allegation that defendant Gardner made that statement does not establish a viable cause of action that Gardner induced the other defendants

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3785771 (N.D.N.Y.)

(Cite as: 2010 WL 3785771 (N.D.N.Y.))

to commit assault.

FN16. It should be noted that verbal abuse, whether threatening, vulgar, or racial in nature, does not, by itself, rise to the level of a constitutional violation. See, e.g., *Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986); *Ramirez v. Holmes,* 921 F.Supp. 204, 210 (S.D.N.Y.1996).

**2. The "Assault" on June 24, 2006**

Plaintiff alleges that, during a cell search on June 24, 2006, defendant Reardon pulled plaintiff's arm back at almost a 90 degree angle while holding him up against a wall. Plaintiff asserts that defendant Reardon was talking "tough stuff" during the incident and was either trying to break plaintiff's arm or cause him pain. (Dep. at 64). Plaintiff claims that he suffered a tear to the tendon under his left arm, which caused lasting limitations in function. (Pl.'s Memo. of Law at 24-25, Dkt. No. 124-1; Dep. at 80). Some months later, PA Tichenor diagnosed plaintiff with a left shoulder sprain and then tendinitis of the left pectoralis major tendon. (Tichenor Decl. ¶ 10; Medical Records at 27, 31). When plaintiff was examined by a prison doctor in April 2008, he detected a slight defect in plaintiff's "left bicep [?] tendon" that was, by that time, "functionally insignificant." (Medical Records at 11; Dep. at 80).

Officer Reardon admittedly interacted with plaintiff on June 24th, when he issued a misbehavior report to him, but denies that he applied any physical force. (Reardon Decl. ¶¶ 10-14). Defense counsel argues that plaintiff failed to mention the alleged assault on June 24th during a subsequent disciplinary hearing on a prior charge defendant Reardon filed on June 20th, indicating that the incident never happened. However, as noted, plaintiff filed a grievance on June 25th describing the assault. His allegations, although largely unsupported, are sufficient to create an issue of fact regarding what force, if any, defendant Reardon applied during the incident on June 24th.

**\*9** Defendants also argue that any use of force on plaintiff on June 24th was *de minimis* and not sufficient to support an Eighth Amendment claim. The alleged use of force described by plaintiff exceeded what was reasonable and necessary under the circumstances-a cell inspection with no suggestion that plaintiff physically resisted or posed any threat to the safety of the officers.FN17 While the alleged use of force on plaintiff's left arm was brief, plaintiff has alleged that it was intense and caused a significant and lasting injury, for which he has provided some, albeit marginal, supporting medical documentation.FN18

FN17. Defense counsel construes a comment during plaintiff's deposition as an admission that he "came off the wall" during the cell search. (Def. Memo. of Law at 19-20, Dkt. No. 110-6). This court interprets plaintiff's testimony (Dep. at 62-63) as speculation that multiple guards were present during the cell search in case he came off the wall or otherwise resisted. Defendant Reardon's declaration about his interaction with plaintiff on June 24th, and the misbehavior report issued against plaintiff, do not suggest that plaintiff did anything to necessitate the use of force. (Reardon Decl. ¶¶ 10-14 & Ex. D, Dkt. No. 110-13 at 32).

FN18. Medical records from January 2007 indicate that plaintiff complained of new injuries to his left arm allegedly caused by an unrelated incident during which a correction officer allegedly pulled that arm through the slot in his cell door. (Medical Records at 24). So the extent to which the left arm injuries detected by the doctor in 2008 were caused by the alleged assaults in June 2006 is unclear.

Plaintiff's allegations regarding defendant Reardon's state of mind are fairly conclusory; however, he does claim that the defendant was talking "tough" under circumstances which could provoke a malicious use of force.FN19 While plaintiff's claim of excessive force against defendant Reardon is very thin, this court finds that there are genuine and material issues of fact that require credibility assessments, which should not be made in the context of a summary judgment motion. *See, e.g., Mitchell v. Keane,* 974 F.Supp. 332, 340-41 (S.D.N.Y.1997) (allegation that officers twisted baton in the chain of the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3785771 (N.D.N.Y.)

(Cite as: 2010 WL 3785771 (N.D.N.Y.))

inmate's shackles, causing considerable pain, when inmate was not resisting and had been subdued, were sufficient to meet objective and subjective elements of Hudson test, so as to preclude dismissal); *Rivera v. Goord,* 119 F.Supp.2d 327, 342 (S.D.N.Y.2000) (finding plaintiff's allegations that defendants "pinned him against a wall, face-first, twisted his arms behind his back, and banged his face against the wall" sufficient to state a claim for excessive force); *Reyes v. McGinnis,* 00-CV-6352, 2003 WL 23101781, at *1, 6 (W.D.N .Y. Apr. 10, 2003) (denying summary judgment motion on excessive force claim against correction officer who, *inter alia,* allegedly applied handcuffs too tightly, and lifted plaintiff from the floor by his handcuffs, causing nerve damage in his wrists and a possible ganglion cyst). Cf. *Robison v. Via,* 821 F.2d 913, 924-25 (2d Cir.1987) (sustaining excessive force claim where the arresting officer twisted the plaintiff's arm, "yanked" her, and threw her up against a car, causing only bruising).

> FN19. During his deposition, plaintiff acknowledged that he was being uncooperative with the guards following his confinement in the SHU-*e.g.,* by refusing meals brought by the officers and acting like a "knucklehead." (Dep. at 63, 65).

**IV. *Due Process***

Plaintiff claims that defendant Demars violated his due process rights in presiding over the disciplinary hearing on the charges initiated by defendant Johnson. For the reasons set forth below, this court finds that the due process claim is not viable and that, in any event, defendant Demars would be protected by qualified immunity for his conduct as a hearing officer.

**A. Applicable Law**

To prevail on a procedural due process claim under section 1983, a plaintiff must show that he possessed a protected property or liberty interest and that he was deprived of that interest without being afforded sufficient procedural safeguards. See *Tellier v. Fields,* 280 F.3d 69, 79-80 (2d Cir.2000) (liberty interest); *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir.1998). Due process generally requires that a state afford individuals "some kind of hearing" prior to depriving them of a liberty or property

interest. *DiBlasio v. Novello,* 344 F.3d 292, 302 (2d Cir.2003). Defendants apparently concede that the disposition of the most serious disciplinary charge against plaintiff, which resulted in a sentence of nine months in the SHU, implicated a liberty interest, the deprivation of which required due process safeguards. [FN20]

> FN20. In *Sandin v. Conner,* 515 U.S. 472, 484 (1995), the Supreme Court held that although states may create liberty interests for inmates that are protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ..., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." The Second Circuit has explicitly avoided a bright line rule that a certain period of SHU confinement automatically give rise to due process protection. See *Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000); *Colon v. Howard,* 215 F.3d 227, 234 (2d Cir.2000). Instead, cases in this circuit have created guidelines for use by district courts in determining whether a prisoner's liberty interest was infringed. *Palmer v. Richards,* 364 F.3d 60, 64-66 (2d Cir.2004). A confinement longer than an intermediate one, and under "normal SHU conditions is "a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under Sandin." *Colon,* 215 F.3d at 231 (finding that a prisoner's liberty interest was infringed by 305-day confinement). Although shorter confinements under normal SHU conditions may not implicate a prisoner's liberty interest, SHU confinements of fewer than 101 days may constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions. *Palmer v. Richards,* 364 F.3d at 65. In the absence of a detailed factual record, cases in this circuit typically affirm dismissal of due process claims in cases where the period of time spent in SHU was short-e.g., 30 days-and there was no indication that the plaintiff endured unusual SHU conditions. *Id.* at 65-66 (collecting

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3785771 (N.D.N.Y.)

(Cite as: 2010 WL 3785771 (N.D.N.Y.))

cases).

**\*10** In *Wolff v. McDonnell,* 418 U.S. 539, 563-64 (1974), the Supreme Court held that due process requires advance notice of the charges against the inmate, and a written statement of reasons for the disposition. The inmate should also have the ability to call witnesses and present documentary evidence, subject to legitimate safety and correctional goals of the institution. *Id.* at 566. Finally, the inmate is entitled to a fair and impartial hearing officer, and the hearing disposition must be supported by "some" or "a modicum" of evidence. *Superintendent v. Hill,* 472 U.S. 445, 455 (1985) (some evidence standard); *McCann v. Coughlin,* 698 F.2d 112, 121-22 (2d Cir.1983) (fair and impartial hearing officer). Violations of state regulations with respect to disciplinary hearings do not, by themselves, necessarily rise to the level of constitutional violations. *See Young v. County of Fulton,* 160 F.3d 899, 902 (2d Cir.1998) (violation of state law is not the "benchmark" for determining whether a constitutional violation has occurred); *Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995) (state law violation does not necessarily rise to the level of a constitutional violation).[FN21]

> FN21. "While failure to adhere to regulations does not itself give rise to a claim under 42 U.S.C. § 1983, it may constitute evidence of a constitutional deprivation." *Samuels v. Selsky,* 01CIV.8235, 2002 WL 31040370, at \*13 n. 21 (S.D.N.Y. Sept. 12, 2002) (citing *Duckett v. Ward,* 458 F.Supp. 624, 627 (S.D.N.Y.1978).

An inmate's right to assistance with his disciplinary hearing is limited. *Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1993). An assistant has been held to be constitutionally necessary in cases in which a plaintiff is confined in SHU, illiterate, or unable to grasp the complexity of the issues, and therefore, unable to marshal evidence and present a defense. *Id.* (citation omitted). In those cases, the assistant must do what the plaintiff would have done if he were able, but need not go beyond the inmate's instructions. *Id.*

**B. Application**

In his amended complaint and Memorandum of Law, plaintiff sets forth several ways in which he alleges that defendant Demars, the hearing officer determining whether plaintiff wrote several anonymous threatening letters, denied him due process in conducting the hearing.[FN22] Plaintiff alleges first that there was no evidence to support the allegations on which defendant Demars found him guilty. (AC ¶ 19). Plaintiff argues further that the hearing officer failed to make an independent assessment of the handwriting comparison evidence, which was the basis on which his guilty disposition was eventually overturned by DOCS. (Pl.'s Memo. of Law at 32; Pl.'s Decl., Ex. B, Dkt. No. 124-4 at 13). Finally plaintiff claims that his right to assistance in handling his disciplinary hearing was violated in several ways, in part because the hearing officer, not another DOCS employee or inmate, provided the assistance. (Pl.'s Memo. of Law at 30).[FN23]

> FN22. Plaintiff claims that he was illegally confined in the SHU from June 19, 2006, when Lt. Johnson's disciplinary charge was filed, until the disciplinary hearing was completed on July 5th. (Pl.'s Memo. of Law at 31, 33). This period of administrative detention in the SHU does not trigger due process protection because it was of such a short duration. *See, e.g., Brown v. Secore,* 9:08-CV-085, 2010 WL 980233, at \*5 (N.D.N.Y. March 15, 2010) (The district court in the Second Circuit, applying *Sandin,* have been consistent in holding that terms of SHU or 'keeplock' of approximately 30 days or less, and the related loss of privileges, do not implicate a liberty interest protected by the Due Process clause, even in the absence of detailed factual development regarding the conditions of confinement.) (collecting cases).

> FN23. Plaintiff claims that defendant Demars violated New York state regulations when he started the hearing on the same day that plaintiff indicated that he wanted assistance in handling the proceeding, without giving plaintiff additional time to prepare. (Pl.'s Memo of Law at 32; DOCS Directive 4932, Part 254.6(a)(1), Dkt. No. 110-8 at 28). However, after defendant Demars ascertained what assistance plaintiff

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3785771 (N.D.N.Y.)

(Cite as: 2010 WL 3785771 (N.D.N.Y.))

needed on the first day of the hearing (June 22, 2006), he adjourned the hearing for several days (until June 30th) while he made arrangements to procure the documents and witnesses plaintiff requested. (Disc. Hearing Transcript at 6-9). Even if there was a technical violation of the DOCS directive, plaintiff waived any objection on June 22nd (*Id.* at 6-7), and clearly suffered no due process violation because he was given ample time to prepare for the continuation of the hearing.

**1. "Some" Evidence**

In finding plaintiff guilty of two charges relating to the anonymous, threatening letters, defendant Demars stated that he relied primarily upon the inmate misbehavior report and Lt. Johnson's testimony regarding the similarities that he observed in the handwriting of several of the threat letters and known samples of plaintiff's writing. (Disc. Hearing Transcript at 66).[FN24] The anonymous letters, which were exhibits at the hearing, threatened physical retaliation against the corrections staff if there was another beating of an inmate, following an alleged assault of an inmate by officers in G-dorm at Franklin. (Johnson Decl., Ex. B, Dkt. No. 110-8 at 8-14). Defendant Johnson's misbehavior report noted that plaintiff had expressed "similar concerns" to the Superintendent two days before the threat letters were received. (Johnson Decl., Ex. B, Dkt. No. 110-8 at 6). During his testimony at the disciplinary hearing, Lt. Johnson set forth his prior experience in handwriting comparison and explained, in some detail, the similarities he observed between the threat letters and the samples of plaintiff's writing from his guidance folder, which were also exhibits. (Disc. Hearing Transcript at 21-22).

> FN24. Lt. Johnson also noted that he considered the testimony of plaintiff and the other hearing witnesses in reaching his conclusions. (*Id.*) Capt. Phelix, when called and questioned by plaintiff, corroborated Lt. Johnson's opinion that there were numerous similarities between plaintiff's handwriting and the writing on some of the threat letters. (Disc. Hearing Transcript at 32-33).

**\*11** While meager, the proof relied upon by defendant

Demars constituted "some evidence" sufficient to satisfy the requirements of due process applicable to prison disciplinary hearings. *See, e .g., Monier v. Holt,* 4:CV-05-2062, 2005 WL 3531369, at *2 (M.D.Pa. Dec. 21, 2005), *aff'd,* 259 Fed. Appx. 518 (3d Cir.2007) (testimony of officer that the threatening note was comparable to a sample of petitioner's handwriting constituted "some evidence" sufficient for due process); *Brown v. Dotson,* 1:07CV114-03, 2007 WL 1033359, at *3 (W.D.N.C. Apr. 2, 2007), *aff'd,* 242 Fed. Appx. 19 (4th Cir.2007), *cert. denied,* --- U.S. ----, 128 S.Ct. 2960 (2008) (testimony regarding handwriting comparison by investigating officer constituted "some evidence" for due process purposes even though a copy of the inappropriate letter he was accused of writing was not made available to him); *Pettus v. McGinnis,* 533 F.Supp.2d 337, 341 n. 3 (W.D.N.Y.2008) (fact that a harassing letter appeared to be in plaintiff's handwriting, and that he had handed a copy to a correction officer, constituted "some evidence" supporting the disciplinary charge); *Bennett v. Jackson,* 2:06CV019, 2006 WL 618124, at *2 (E.D.Ark. Mar. 9, 2006) (testimony by officer that handwriting on the threatening letter was comparable to a sample of plaintiff's writing satisfied due process standards). While DOCS ultimately determined, as a matter of equity or state law, that the hearing examiner should have made an independent handwriting comparison, his apparent failure to do so did not violate the federal due process rights of the plaintiff. *See, e.g ., Monier v. Holt,* 2005 WL 3531369, at *2 (hearing officer did not violate due process by accepting the officer's testimony regarding his handwriting comparison); *Bennett v. Jackson,* 2006 WL 618124, at *2 (hearing officer who accepted officer's testimony regarding handwriting comparison without requiring expert analysis satisfied due process standards); *Brown v. Dotson,* 2007 WL 1033359, at *3 (testimony regarding handwriting comparison by investigating officer was not corroborated because the inappropriate letter plaintiff was accused of writing, which was tainted with bodily fluids, was destroyed).[FN25]

> FN25. In limited circumstances, the Second Circuit has required that a hearing examiner make an independent assessment of the credibility of certain sources of evidence at a prison disciplinary hearing. *See, e.g., Taylor v.*

Slip Copy, 2010 WL 3785771 (N.D.N.Y.)

(Cite as: 2010 WL 3785771 (N.D.N.Y.))

*Rodriguez,* 238 F.3d 188, 194 (2d Cir.2001) (a finding based on information from a confidential informant will satisfy due process requirements only when there has been some examination of the factors relevant to the informant's credibility); *Luna v. Pico,* 356 F.3d 481, 489-90 (2d Cir.2004) (a bare accusation from a non-testifying victim is insufficient to support a disciplinary finding unless the examiner has engaged in some examination of the factors bearing on the victim's credibility). However, the Second Circuit cases have not engrafted, on the "some evidence" standard of *Superintendent v. Hill,* a general requirement that officers at prison disciplinary hearings independently assess the reliability of other sources of evidence. *See Luna v. Pico,* 356 F.3d at 491 (noting that the holding of *Taylor v. Rodriguez* regarding confidential informants provides some guidance, but is not controlling, with respect to other sources of evidence). This court concludes that *Taylor* and *Luna* do not impose a due process requirement that a hearing officer perform independent analysis of lay handwriting comparisons of a witness who testifies at a prison disciplinary hearing and is subject to crossexamination. If Second Circuit or Supreme Court authority is subsequently construed to require such independent analysis in the context of this case, defendant Demars would be entitled to qualified immunity because it would not have been clear to him, in 2006, that his conduct of the hearing violated plaintiff's due process rights.

**2. Adequacy of Assistance at the Hearing**

Because he was transferred to the SHU after disciplinary charges relating to the threatening notes were filed against him, plaintiff was clearly entitled to assistance in preparing for his hearing. *Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998) (citing *Eng v. Coughlin,* 858 F.2d 889, 898 (2d Cir.1988). On the first day of the hearing, defendant Demars noted that plaintiff had not signed the form served on him with the formal charges by which he could request assistance in connection with the hearing. (Disc. Hearing Transcript at 1). [FN26] Dep. Sup. Demars offered assistance to plaintiff in securing

witnesses and documents for the hearing, and plaintiff accepted. Plaintiff explained what help he needed and, before the hearing was adjourned for several days, stated that he was satisfied with the assistance that the hearing officer provided. (Disc. Hearing Transcript at 1-7).

> FN26. Plaintiff completed the form requesting independent assistance in connection with another disciplinary hearing that was proceeding in June 2006, so he clearly was aware of his right to assistance and the related DOCS procedures. (Secore Decl., Ex. C, Dkt. No. 110-11 at 28). Plaintiff formally waived his right to any assistance in connection with another hearing that month. (Reardon Decl., Ex. B, Dkt. No. 110-13 at 10).

*12 Ultimately, defendant Demars arranged for the testimony of all of the witnesses that plaintiff deemed critical, including the Superintendent of Franklin, although Dep. Sup. Demars was dubious about why plaintiff needed the Superintendent. (Disc. Hearing Transcript at 10-19, 25-29, 39, 41-42, 44-45, 53, 61). The hearing officer procured copies of most of the documents that plaintiff requested, although the facility was unable to locate one "pass" which plaintiff requested. Defendant Demars turned down plaintiff's request for DNA testing of the anonymous, threatening letters that prompted the charges. (Disc. Hearing Transcript at 9-10, 29). While plaintiff raised numerous "objections" at the end of the hearing, he did not object to any deficiencies in the assistance he received from defendant Demars. (Disc. Hearing Transcript at 64-65) .[FN27]

> FN27. Plaintiff did object that defendant Demars was biased because he was a "Dep.," (presumably referring to his position as a Deputy Superintendent at Franklin); he stated, at the end of the hearing, that "Albany" (presumably DOCS headquarters) should have appointed a hearing officer. (Disc. Hearing Transcript at 65). *See Chavis v. Flagler,* 01-CV-0510, 2005 WL 563055, at *4 (W.D.N.Y. Mar. 8, 2005) (in due process analysis, prison disciplinary hearing officer are not held to the same standards regarding neutrality and conflicts of interests as judges or adjudicators in other contexts, although

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3785771 (N.D.N.Y.)

(Cite as: 2010 WL 3785771 (N.D.N.Y.))

they may not prejudge the evidence).

Plaintiff cites a 1995 opinion of then-District Judge Sotomayor for the proposition that a hearing examiner who purports to provide assistance to the charged inmate cannot be "impartial" and violates the due process rights of the accused *per se. Lee v. Coughlin,* 902 F.Supp. 424, 433-34 (S.D.N.Y.1995). However, the plaintiff in *Lee* specifically requested assistance from individuals other than the hearing officer. In this case, plaintiff waived any objection to having the hearing officer also provide him assistance in procuring documents and witnesses, by his failure to complete and submit the form requesting assistance from another source, and his statement expressing his satisfaction with the alternative arrangement offered by defendant Demars. *Jackson v. Johnson,* 30 F.Supp.2d 613, 619 (S.D.N.Y.1998) (the courts in this circuit have established that an inmate's silence can constitute waiver of his right to assistance at a disciplinary hearing) (citing, *inter alia, Murray v. Dixon,* 107 F.3d 3 (table), 1997 WL 73152, at *2 (2d Cir.1997) (affirming hearing officer's determination that inmate waived his right to assistance because the inmate "admits that he refused to sign the required request for employee assistance presented to him when he was served with the misbehavior report, and he does not allege that he requested assistance between his refusal and the hearing")).

Moreover, the *Lee* court found that the hearing officer, in fact, provided assistance that was deficient in several substantial respects. *Id.* In a 1998 decision, the Second Circuit held that, when an inmate agrees to accept assistance from a hearing officer who thereafter does nothing to assist, the inmate's due process rights are violated. *Ayers v. Ryan,* 152 F.3d at 81. While the Second Circuit characterized it as possibly "odd or irregular" for a hearing officer to offer to serve as an assistant and for the inmate to accept that offer, it did not characterize this arrangement as a *per se* due process violation. *Id.* At least one subsequent district court in this circuit has held that, where the hearing officer actually provided adequate assistance to an inmate, the fact that the hearing officer also served as the assistant does not violate due process. *Clyde v. Bellnier,* 9:08-CV-909, 2010 WL 1489897, at *6 (N.D.N.Y. April 13, 2010) (Singleton, J.).

**\*13** As discussed above, defendant Demars actually provided reasonable and adequate assistance to plaintiff in connection with his disciplinary hearing. *See, e.g., Jackson v. Johnson,* 30 F.Supp.2d at 619 (a hearing assistant's role is not to act as legal advisor or advocate, but to serve as a surrogate, performing functions, such as contacting witnesses, which the charged inmate could not do because he is not among the general population) (collecting cases); *Clyde v. Bellnier,* 2010 WL 1489897, at *6 (no due process arose when the hearing officer/assistant failed to provide documents that did not exist or that were not relevant to the defense)[FN28]; *Brown v. Dotson,* 2007 WL 1033359, at *3 (inmate facing disciplinary charges for writing a threatening note was not constitutionally entitled to DNA tests in connection with the hearing). This court concludes that, based on the Second Circuit's holding in *Ayers v. Ryan,* defendant Demars did not violate plaintiff's due process rights in connection with his rendering of assistance in connection with the hearing. In any event, Dep. Sup. Demars would be entitled to qualified immunity because he could not have reasonably understood, based on the uncertain controlling law in 2006, that his role in providing reasonable and adequate assistance to plaintiff, while serving as the hearing officer, violated plaintiff's due process rights.

FN28. *See also Clark v. Dannheim,* 590 F.Supp.2d 426, 429-31 (W . D.N.Y.2008) (to establish a procedural due process claim in connection with a prison disciplinary hearing, an inmate must show that he was prejudiced by the alleged procedural errors, in the sense that the errors affected the outcome of the hearing) (collecting cases).

**V. *Alleged Mail Tampering***

The First and Fourteenth Amendments to the U.S. Constitution are implicated when a prisoner's legal mail is obstructed, but a plaintiff must allege that the defendants' actions hindered the prisoner's "efforts to pursue a legal claim." *See Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003) (citing *Monsky v. Moraghan,* 127 F.3d 243, 247 (2d. Cir.1997). In order to establish a claim that a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3785771 (N.D.N.Y.)

(Cite as: 2010 WL 3785771 (N.D.N.Y.))

prisoner's right of access to the courts has been abrogated, actual injury must be shown. *See Lewis v. Casey,* 518 U.S. 343, 351-52 (1996).

Prior to the Supreme Court's decision in Lewis, the Second Circuit had held that "an isolated instance" of interference with an inmate's legal mail delivery was insufficient to state a First Amendment claim, either with respect to the mail itself or with respect to access to courts, where "the infraction was not in accordance with official policy or practice and where no showing had been made that the inmate's right to access to courts was chilled .... " *Washington v. James,* 782 F.2d 1134, 1139 (2d. Cir.1986) (citation omitted). *Lewis* also suggests that the actual harm must be to direct or collateral attacks on the inmate's conviction, or to a challenge to the conditions of confinement. 518 U.S. at 355. "Mere 'delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation.' " *Davis v. Goord,* 320 F.3d at 352 (citing *Jermosen v. Coughlin,* 877 F.Supp. 864, 871 (S.D.N.Y.1995)).

**\*14** Although the amended complaint alleges generally that plaintiff's mail was obstructed while he was in Franklin and Upstate,[FN29] his only focused claim of tampering with legal mail relates to an incident at Upstate in January 2007 involving defendants McCasland and Hoffnagle. (AC ¶¶ 29-33). During his deposition, plaintiff acknowledged that only two pieces of legal mail were opened outside of his presence, and that they may well have been opened by mistake or accident. (Dep. at 67, 74). Although the incident left Plaintiff "a little upset," he did not articulate how the opening and eventual loss [FN30] of the two items interfered with any pending legal matter. (Dep. at 71-75). Even accepting plaintiff's allegations as true, which the defendants dispute (McCasland Decl., Hoffnagle Decl.), the claim relating to the opening and possible destruction of two items of legal mail, without any showing of how plaintiff was prejudiced in a legal proceeding, does not support a viable First Amendment claim. *See, e.g., Morgan v. Montayne,* 516 F.2d 1367, 1370-71 (2d Cir.1975) (inmate's showing of only a single instance where clearly marked legal mail was opened out of his presence, in absence of any indication that the incident affected the correspondence between the inmate and his attorney concerning prisoner's criminal appeal or

any other legal matter, was insufficient to survive summary judgment).

FN29. The conclusory and general allegations of mail tampering are insufficient to overcome summary judgment, and do not identify particular defendants who were personally involved in the alleged violations. *See, e.g., Gilliam v. Quinlan,* 608 F.Supp. 823, 838 (S.D.N.Y.1985) (conclusory allegations of mail tampering insufficient to withstand summary judgment).

FN30. Plaintiff refused to accept the "opened" mail twice and then tried to recover it. By that time, the two items could not be located by DOCS, the post office, or the senders of the mail. Plaintiff alleges that defendant Hoffnagle and DOCS failed to return the mail to the sender pursuant to DOCS procedures. After an investigation, DOCS could not document what happened to the mail, but concluded that was no malfeasance of the part of the staff at Upstate. (Pl.'s Decl. ¶¶ 26-32, Ex. D, Dkt. No. 124-5 at 43-61).

### VI. *Retaliation Claims*

Plaintiff alleges that, in retaliation for his filing of a letter complaining of an assault of another inmate by correction officers, defendant Johnson filed a false misbehavior report against plaintiff, and defendant Gardner made inflammatory statements regarding plaintiff to other staff, prompting further acts of retaliation. Plaintiff characterizes, as retaliation, the subsequent "assaults" involving defendants Secore, Favro, Norcross, and Reardon; the conduct of the disciplinary hearing by defendant Demars; and the alleged mail tampering by defendants McCasland and Hoffnagle. For the reasons set forth below, this court will recommend that plaintiff's retaliation claims be dismissed, either on the merits or on qualified-immunity grounds.

#### A. Applicable Law

In order to establish a claim of retaliation for the exercise of a constitutional right, plaintiff must show first, that he engaged in constitutionally protected conduct, and

Slip Copy, 2010 WL 3785771 (N.D.N.Y.)

(Cite as: 2010 WL 3785771 (N.D.N.Y.))

second, that the conduct was a substantial motivating factor for "adverse action" taken against him by defendants. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citing *Gayle v. Gonyea,* 313 F.3d 677 (2d Cir.2002); *see also Hendricks v. Coughlin,* 114 F.3d 390 (2d Cir.1997)). Third, the plaintiff must establish a causal connection between the protected speech and the adverse action. *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (citing *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds, Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506 (2002)).

*15 The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d at 381 (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003), *superseded by* 2003 U.S.App. LEXIS 13030 (2d Cir. Feb. 10, 2003)) (omission in the original). This objective test applies even if the plaintiff was not himself subjectively deterred from exercising his rights. *Id.*

The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." Accordingly, plaintiff must set forth non-conclusory allegations. *Bennett,* 343 F.3d at 137 (citing *Dawes,* 239 F.3d at 491). Finally, even if plaintiff makes the appropriate showing, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Id.*

A prison inmate has no constitutionally-guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest, as long as the prisoner is provided with procedural due process. *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986). However, if a defendant initiated disciplinary proceedings against plaintiff in retaliation for his exercise of a constitutionally protected right, substantive due process rights are implicated even if the plaintiff did receive, full procedural due process. *Franco v. Kelly,* 854 F.2d 584, 588-89 (2d Cir.1988). Any adverse action taken by defendant in retaliation for the exercise of a constitutional right, even if not unconstitutional in itself, may

states a viable constitutional claim. *Id.*

**B. Application**

**1. First Amendment Protection**

The plaintiff alleges that various acts of retaliation resulted from a letter he wrote and signed, complaining about the assault of another inmate by correction officers. It is unclear, under Second Circuit authority, whether an inmate's complaints about the treatment of another inmate are protected by the First Amendment and, thus, whether they could be the basis of a retaliation claim. *See, e.g., Smith v. Greene,* 9:06-CV-0505, 2010 WL 985388, at *3 (N.D.N.Y. Mar. 16, 2010) (it is far from certain whether the First Amendment protected an inmate's letter to the New York State Inspector General complaining about the use of force against a fellow inmate) (citing *Nevares v. Morrisey,* 95-CV-1135, 1991 WL 760231, at *6 (S.D.N.Y. Sept. 27, 1999) (complaining aloud to correction officers about the treatment of another inmate is not constitutionally protected activity under the First Amendment)); *Pettus v. McGinnis,* 533 F.Supp.2d 337, 339 (W.D.N.Y.2008) (it is unclear whether the First Amendment protected inmate from retaliation for testifying, at a disciplinary hearing of another inmate, that a correction officer assaulted the other inmate); *Rodriguez v. Phillips,* 66 F.3d 470, 478-79 (2d Cir.1995) (an inmate has no clearly established First Amendment right to approach and complain to an officer about how he is disciplining another inmate). We will assume, for sake of argument, that plaintiff's complaint letter in this case was protected by the First Amendment. However, as discussed below, the defendants who allegedly took adverse actions against plaintiff based on this letter would be protected by qualified immunity because it was not clear under controlling law, in 2006 and 2007, that such conduct would violate plaintiff's First Amendment rights.

**2. Connection Between "Speech" and Alleged Adverse Actions**

*16 Plaintiff has alleged that the actions of nine different defendants between June 19, 2006 and January 2007 were carried out in retaliation for his letter of June 15, 2006. With two possible exceptions, plaintiff provides no support for the conclusory claim that these defendants

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3785771 (N.D.N.Y.)

(Cite as: 2010 WL 3785771 (N.D.N.Y.))

were even aware of his letter when they allegedly took adverse action against the plaintiff. It is unlikely that defendants Gardner, Secore, Favro, and Norcross, who were merely involved in plaintiff's move to the Franklin SHU on June 19th, were aware of plaintiff's letter, which was not received in the administrative office at Franklin until the following day. (Pl.'s Decl., Ex. A; Disc. Hearing at 52-53). To the extent these defendants were motivated to take some adverse action [FN31] against plaintiff, which they deny, the fact that plaintiff was just charged with creating some of the anonymous letters threatening the Franklin staff, would be a much more likely trigger.

> FN31. Defendant Gardner's alleged statement on June 19th that plaintiff "needed to be taught the policies and procedures" of the facility "because plaintiff likes to make threats at correctional staff," would not support a retaliation claim because they would not deter an inmate of ordinary firmness in exercising his constitutional rights. *See, e.g., Davis v. Goord,* 320 F.3d at 353 (insulting, disrespectful, sarcastic, or hostile comments directed at an inmate generally do not rise to the level of adverse action) (citing, *inter alia, Dawes v. Walker,* 239 F.3d at 492 (calling inmate a "rat" not a constitutional violation). As noted above, this court rejected plaintiff's conclusory claim that this comment was an actionable incitement of defendants Secore and Favro to assault the plaintiff.

Plaintiff provides no support for the suggestion that defendant Reardon was aware of or motivated by plaintiff's June 15th letter when he allegedly used excessive force on June 24th. In fact, plaintiff provides a more plausible explanation for why defendant Reardon and the other SHU officers might be inclined to "assault" him on June 24th-plaintiff was refusing meals and generally acting like a "knucklehead" toward the staff. (Dep. at 63, 65). There is certainly no indication that defendants McCasland and Hoffnagle, correction officers at Upstate who allegedly tampered with plaintiff's mail in January 2007, knew of or were influenced by plaintiff's June 15, 2006 letter to officials at Franklin.

When he filed the disciplinary action against plaintiff on the afternoon of June 19th, defendant Johnson may not

have seen plaintiff's letter, which was not received by the administrative office until the following day. However, Lt. Johnson's inmate misbehavior report confirms that he was advised about plaintiff's prior contact with the Superintendent on June 17th, so there is some corroboration he was aware of at least the general contents of plaintiff's letter. Defendant Demars, the hearing officer at plaintiff's disciplinary hearing, was clearly aware of the June 15th letter, because plaintiff asked that it be made an exhibit.

However, plaintiff provides no information other than the temporal proximity between his June 15th letter and the conduct of defendants Johnson and Demars to suggest that the letter substantially motivated the alleged adverse actions by the prison officials. There is no indication of any contact between plaintiff and Lt. Johnson before the disciplinary charges were filed, and no evidence of any statements or prior conduct suggesting a retaliatory animosity on the part of either defendant. (Dep. at 19; Johnson Decl. ¶ 4). It is clear that plaintiff was identified as a possible suspect in the investigation of the anonymous threat letters because he expressed "similar concerns" to the Superintendent and in his June 15th letter. However, the disciplinary hearing transcript indicates that defendants Johnson and Demars were motivated by the goal of determining if plaintiff generated some of the anonymous threat letters, not the desire to retaliate against plaintiff for drafting and signing the June 15th letter (which contained complaints, but no threats). Given the record developed in connection with the pending summary judgment motion, plaintiff's conclusory allegations are not sufficient to establish that any of the nine defendants were substantially motivated by his June 15, 2006 letter in taking the actions they took. *See, e.g., Ayers v. Stewart,* 101 F.3d 687 (table), 1996 WL 346049, at *1 (2d Cir.1996) (given the weakness of his retaliation claim, plaintiff's reliance on circumstantial evidence of retaliation-namely, the proximity of the disciplinary action to his complaint where no misbehavior reports were previously filed against him-does not suffice to defeat summary judgment); *Crenshaw v. Herbert,* 445 F.Supp.2d 301, 305 (W.D.N.Y.2006) (because plaintiff offers nothing more than speculation that the moving defendants did what they did because he had filed a grievance, the temporal proximity between the protected activity and the adverse

Slip Copy, 2010 WL 3785771 (N.D.N.Y.)

(Cite as: 2010 WL 3785771 (N.D.N.Y.))

action is not enough to give rise to a genuine issue of material fact); *Williams v. Goord,* 111 F.Supp.2d 280, 290 (S.D.N.Y.2000) (although the temporal proximity of the filing of the grievance and the issuance of the misbehavior report is circumstantial evidence of retaliation, such evidence, without more, is insufficient to survive summary judgment).

**VII. *Deliberate Indifference to Medical Needs***

**A. Legal Standards**

**\*17** In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter,* 316 F.3d 178, 183-84 (2d Cir.2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184.

**1. Objective Element**

In order to meet the objective requirement, the alleged deprivation of adequate medical care must be "sufficiently serious." *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006) (citing *Farmer v. Brennan,* 511 U.S. 825, 834 (1994)). Determining whether a deprivation is sufficiently serious also involves two inquiries. *Id.* The first question is whether the plaintiff was actually deprived of adequate medical care. *Id.* Prison officials who act "reasonably" in response to the inmates health risk will not be found liable under the Eighth Amendment because the official's duty is only to provide "reasonable care." *Id.* (citing *Farmer,* 511 U.S. at 844-47).

The second part of the objective test asks whether the purported inadequacy in the medical care is "sufficiently serious." *Id.* at 280. The court must examine how the care was inadequate and what harm the inadequacy caused or will likely cause the plaintiff. *Id* . If the "unreasonable care" consists of a failure to provide ***any*** treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Id.* (citing *Smith v. Carpenter,* 316 F.3d 178, 185-86 (2d Cir.2003)). However, in cases where

the inadequacy is in the medical treatment that was actually afforded to the inmate, the inquiry is narrower. *Id.* If the plaintiff is receiving ongoing treatment, and the issue is an unreasonable delay or interruption of the treatment, then the "seriousness" inquiry focuses on the challenged delay itself, rather than on the underlying condition alone. *Id.* (citing *Smith,* 316 F.3d at 185). Thus, the court in *Salahuddin* made clear that although courts speak of a "serious medical condition" as the basis for an Eighth Amendment claim, the seriousness of the condition is only one factor in determining whether the deprivation of adequate medical care is sufficiently serious to establish constitutional liability. *Id.* at 280.

**2. Subjective Element**

The second element is subjective and asks whether the official acted with "a sufficiently culpable state of mind." *Id.* (citing *Wilson v. Seiter,* 501 U.S. 294, 300 (1991)). In order to meet the second element, plaintiff must demonstrate more than a "negligent" failure to provide adequate medical care. *Id.* (citing *Farmer,* 511 U.S. at 835-37). Instead, plaintiff must show that the defendant was "deliberately indifferent" to that serious medical condition. *Id.* Deliberate indifference is equivalent to subjective recklessness. *Id.* (citing *Farmer,* 511 U.S. at 839-40).

**\*18** In order to rise to the level of deliberate indifference, the defendant must have known of and disregarded an excessive risk to the inmate's health or safety. *Id.* The defendant must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he or she must draw that inference. (citing *inter alia Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer,* 511 U.S. at 844. Thus, the court stated in *Salahuddin* that the defendant's belief that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin,* 467 F.3d at 281.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3785771 (N.D.N.Y.)

(Cite as: 2010 WL 3785771 (N.D.N.Y.))

Additionally, a plaintiff's disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Sonds v. St. Barnabas Hosp. Correctional Health Services,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001). Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Id.* (citations omitted). An inmate does not have the right to treatment of his choice. *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986). The fact that plaintiff might have preferred an alternative treatment or believes that he did not get the medical attention he desired does not rise to the level of a constitutional violation. *Id.*

Disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment. *Sonds,* 151 F.Supp.2d at 312 (citing *Estelle,* 429 U.S. at 107). Even if those medical judgments amount to negligence or malpractice, malpractice does not become a constitutional violation simply because the plaintiff is an inmate. *Id. See also Daniels v. Williams,* 474 U.S. 327, 332 (1986) (negligence not actionable under Section 1983). Thus, any claims of malpractice, or disagreement with treatment are not actionable under Section 1983.

**B. Application**

**1. "Seriousness" of Plaintiff's Medical Condition and any Alleged Deprivation**

Plaintiff claims that, as a result of the alleged assaults on June 19 and 24, 2006, he suffered a "possible" fractured rib cage, dislocated jaw, and a torn tendon in his left armpit. (AC ¶¶ 14, 23). At his deposition in June 2009, plaintiff complained of continuing physical limitations because of a "torn ligament" in his armpit, as well as discomfort from a lump on his rib cage and a prior injury to his jaw. (Dep. at 80-81).

The record of the medical examinations of plaintiff by several health care providers over the days and weeks following the alleged assaults did not document the injuries claimed by plaintiff. (Secore Decl., Ex. B, Dkt. No. 110-11 at 8, 15, 18-19, 22-25; Medical Records at 25-36). In September and October 2006, PA Tichenor

evaluated plaintiff's claims of back, shoulder, and knee pain, and diagnosed plaintiff with a left shoulder sprain and then tendinitis of the left pectoralis major tendon. (Tichenor Decl. ¶¶ 8-10; Medical Records at 27, 31). When plaintiff was examined by a prison doctor in April 2008 regarding complaints of problems with his knees, feet, and arm, [FN32] the physician detected a slight defect in plaintiff's "left bicep [?] tendon" that was "functionally insignificant" and did not effect his range of motion or strength. (Medical Records at 11; Dep. at 80). Medical records from January 2007 indicate that plaintiff complained of new injuries to his left arm caused by an unrelated incident during which a correction officer allegedly pulled that arm through the slot in a cell door. (Medical Records at 24). Hence, it is unclear whether the doctor's observations relating to the left arm in 2008 are related to the alleged assaults in June 2006 or the later incident.

> FN32. Even plaintiff does not relate medical problems beyond his jaw, rib cage, and left arm to the alleged assaults in June 2006 and related claims of deliberate indifference to those injuries. (Pl.'s Memo. of Law at 10-11; Dep. at 80-81). So, plaintiff's later claims of problems with his back, knees, and feet are not relevant to the evaluation of whether plaintiff had a "serious" medical condition to which the defendants were deliberately indifferent.

**\*19** A "serious medical condition" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Relevant factors to consider when determining whether an alleged medical condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; or (3) the existence of chronic and substantial pain. *Chance,* 143 F.3d at 702-03. Plaintiff's medical issues in June and July 2006 do not meet the objective standards of a "serious" medical condition. *See, e.g., Ninortey v. Shova,* 05 Civ. 542, 2008 WL 4067107, at \*5, 16 (S.D.N.Y. Sept. 2, 2008)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3785771 (N.D.N.Y.)

(Cite as: 2010 WL 3785771 (N.D.N.Y.))

(inmates's complaints of bruises, cuts, a twisted ankle, shoulder pain, a bloody mouth and cracked teeth following an alleged assault, much of which was not confirmed by records of frequent medical examinations and treatment, did not constitute a "serious medical condition"); *Evering v. Rielly,* 98 CIV. 6718, 2001 WL 1150318, at *9 (S.D.N.Y. Sept. 28, 2001) (bruises, redness, soreness, a knot on the back, and a cut on the forearm are superficial injuries that require time to heal, but do not satisfy the objective component of the deliberate indifference standard); *Rodriguez v. Mercado,* 00 CIV. 8588, 2002 WL 1997885, at *8 (S.D.N.Y. Aug. 28, 2002) (plaintiff who claimed to sustain bruises to his head, back, and wrist following an excessive force incident did not have a "sufficiently serious" medical condition); *Tafari v. McCarthy,* 2010 WL 2044705, at *20 (bruises and superficial lacerations resulting from an alleged assault did not satisfy the "serious medical condition" test).

Plaintiff complained that prison medical officials refused to examine or treat him for the injuries relating to the alleged assaults, particularly in June and July 2006. He alleges that, in the days following the assaults, his face and jaw were swollen and he was having difficulty breathing as a result of his rib cage; but does not claim he had more serious injuries or substantial, persistent pain. (AC ¶¶ 14, 17). Plaintiff denied any injuries on June 19th. (Davenport Decl., Exs. A & B). The prison medical records document that he was examined on several occasions by different providers in two facilities who found little evidence of the medical problems about which plaintiff complained.[FN33] Based on the defendants' declarations and the corroborating medical records, plaintiff's conclusory allegations about his denials of medical care would not, in this court's view, create an issue of fact. *See, e.g., Brown v. White,* 9:08-CV-200, 2010 WL 985184, at *8 (N.D.N.Y. Mar. 15, 2010) (plaintiff's conclusory suggestion that defendant nurse completely refused to provide any medical attention on a particular date is insufficient to create a dispute of fact in the face of the sworn declaration and supporting documentary evidence in the record.); *Benitez v. Pecenco,* 92 Civ. 7670, 1995 WL 444352 at n. 5, (S.D.N.Y. July 27, 1995) (conclusory claim that plaintiff was never issued medication was directly contradicted by medical records and was insufficient to create a factual dispute on that issue) (*citing*

*Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) ("mere conclusory allegations or denials are insufficient to withstand a motion for summary judgment once the moving party has set forth a documentary case")).[FN34]

> FN33. The defendants' Memorandum of Law competently summarizes the conflict between plaintiff's claims and the declarations of the defendants and their contemporaneous medical records. (Defs.' Memo. of Law at 4-10, Dkt. No. 110-6).

> FN34. *See also Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005) ("While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff,' ... and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account." (citation omitted)).

**\*20** However, plaintiff challenges the prison medical records that contradict his claims of injury and denied treatment, making conclusory allegations that various medical records were falsified and/or that his medical problems were mis-diagnosed. (AC ¶ 15; Pl .'s Memo. of Law at 3-13). It should be noted that the defendants' declarations and supporting medical records indicate that the plaintiff tried to manipulate care providers to document alleged injuries that the nurses did not detect.[FN35] Plaintiff's conclusory allegation that multiple medical professionals in two different prisons fabricated plaintiff's medical records to suppress evidence of his alleged injuries is highly suspect and would, in this court's view, also be insufficient to sway any rational fact finder. *See, e.g., Benitez v. Mailloux,* No. 9:05-CV-1160, 2009 WL 1953847, at *8 (N.D.N.Y. Mar. 25, 2009) (Treece, MJ) (plaintiff's conclusory contention that defendant falsified his ambulatory health care record is not enough to withstand summary judgment on his deliberate

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3785771 (N.D.N.Y.)

(Cite as: 2010 WL 3785771 (N.D.N.Y.))

indifference claim), *report-recommendation rejected, in part, on other grounds,* 2009 WL 1953752 (N.D.N.Y. July 2, 2009) (Mordue, DJ); *Liner v. Goord,* 115 F.Supp.2d 432, 435 (S.D.N.Y.2000) (dismissing conclusory claims that defendants conspired to tamper with and destroy plaintiff's medical records).FN36

> FN35. Defendant Chesbrough states that he saw plaintiff on nurse's sick call at Upstate on July 13, 2006. "At that time the plaintiff stated he was injured on June 19th at Franklin and that he was not seen by a nurse. I asked him why he would waiting until now to report it. He stated, 'None of your business, just document it.' I again reviewed the medical record which indicated that the plaintiff was seen by an RN on 6/19/06." (Chesbrough Decl. ¶ 9; Medical Records at 32).

> FN36. *But see Archer v. Dutcher,* 733 F.2d 14, 16 (2d Cir.1984) (The records maintained by the prison officials and hospital do substantiate the conclusion that appellees provided Archer with comprehensive, if not doting, health care. Nonetheless, Archer's affidavit in opposition to the motion for summary judgment does raise material factual disputes, for example by alleging that defendants delayed her access to medical care at a time she was in extreme pain.); *Baumann v. Walsh,* 36 F.Supp.2d 508, 512-13 (N.D.N.Y.1999) (although records maintained by prison officials lend credence to [Defendant]'s version of events in that they show Plaintiff was provided with substantial medical care and treatment, Plaintiff's affidavits in support of summary judgment nonetheless raise material factual disputes, regardless of their likely resolution).

Even if plaintiff's conclusory attacks on the reliability of his medical records are not rejected, this court concludes that he did not suffer from a sufficiently "serious" medical condition or suffer a "serious" deprivation of medical care under Eighth Amendment standards. Plaintiff does admit that he received medical attention on several occasions in the months following the alleged assaults in June 2006. (Dep. at 48-57). He does

not take issue with the conservative treatment prescribed by PA Tichenor in the Fall of 2006. (Pl.'s Memo. of Law at 11; Tichenor Decl. ¶¶ 9-10). Even crediting only the medical evidence that plaintiff does not claim is fabricated,FN37 there is no indication that alleged delays in his examination or treatment resulted in any substantial harm or required a dramatic change in the course of his treatment. *See, e. g., Evans v. Manos,* 336 F.Supp.2d 255, 261-62 (W.D.N.Y.2004) (delay in treatment of prisoner who claimed "extreme" back pain, which did not result in substantial harm to plaintiff or significantly change the course of his eventual treatment, was not a "serious" disruption of his medical care). *See also Smith v. Carpenter,* 316 F.3d 178, 188 (2d Cir.2003) (although demonstrable adverse medical effects may not be required under to establish an Eighth Amendment medical-care claim, the absence of subsequent physical injury will often be probative in assessing the risk of delaying treatment in the past).

> FN37. Plaintiff credits, for example, the findings of the prison doctor in April 2008. (Dep. at 44-45, 80-81; Pl.'s Sur-Reply, Dkt. No. 129 at 7). As noted, the only injury that the doctor detected that could be related to the assaults in June 2006 was a possible defect in a tendon that was "functionally insignificant" and did not effect plaintiff's range of motion or strength. (Medical Records at 11). The doctor documented no residual evidence of the jaw and rib cage injuries that plaintiff still claimed to be suffering from as of the time of his deposition in June 2009. (Medical Records at 11; Dep. at 80-81). PA Tichenor, who examined plaintiff in 2006, also makes no notation of jaw or rib case issues. With respect to plaintiff's shoulder issues, defendant Tichenor found, in September 2006, that plaintiff's gait, range or motion, strength, and sensation were all normal. (Tichenor Decl. ¶¶ 8-11, Medical Records at 31). When PA Tichenor diagnosed plaintiff with tendinitis in his left arm in October 2006, he found the tendon was "tender but intact." (Medical Records at 27).

The record does not indicate that plaintiff was suffering from a serious medical condition which, even if

Slip Copy, 2010 WL 3785771 (N.D.N.Y.)

(Cite as: 2010 WL 3785771 (N.D.N.Y.))

completely ignored in June and July 2006, would have created a serious risk to his health. Nor does plaintiff's subsequent medical history reveal that the alleged delay or denial of medical treatment had any adverse impact on plaintiff. Accordingly, this court concludes that summary judgment should be granted with respect to the plaintiff's medical care claims because no rational juror would find that plaintiff suffered a sufficiently serious medical condition or deprivation.

**2. "Deliberate Indifference"**

**\*21** The declarations of defendants Davenport, Volpe, Walsh, Chesbrough, and Tichenor, and the supporting medical records, also undercut plaintiff's conclusory allegations that they were deliberately indifferent to his medical needs. Based on the above analysis of plaintiff's medical condition in June and July 2006, plaintiff can not establish that the defendants recognized a serious risk to his health and deliberately ignored it. Given the court's finding that plaintiff has not established the objective elements of an Eighth Amendment medical care claim, a detailed analysis of the subjective element is not necessary. However, a few specific observations about two defendants are appropriate.

The only allegation against nurse Walsh in the amended complaint is that she refused to examine plaintiff on the day he was transferred to Upstate-July 12, 2006. (AC ¶ 23). The medical records indicate that nurse Chesbrough conducted plaintiff's intake examination of plaintiff on July 12th and saw him in sick call on July 13th. (Chesbrough Decl. ¶¶ 7-9; Medical Records at 32-34). [FN38] Even if defendant Walsh "refused" to examine plaintiff on July 12th, she apparently did so with the knowledge that he would be seen that day by another nurse. Such a claim cannot support a viable cause of action for deliberate indifference. [FN39]

> **FN38.** The plaintiff may be mistaken in his recollection of which nurse performed his intake examination at Upstate on July 12, 2009. (Dep. at 51-53).

> **FN39.** Even plaintiff's more pointed claims that defendants Davenport, Volpe, and Chesbrough refused to examine or treat him on one or more

occasions (Dep. at 41-42, 47, 49-50, 51-53) would not support a claim of deliberate indifference. *See, e.g., Savage v. Brue,* 9:05-CV-857, 2007 WL 3047110 at \*9 (N.D.N.Y. Oct. 18, 2007) (nurse refused pain medication to an inmate confined in a special housing unit for 48 hours with no mattress who complained of "extreme" back and neck pain due to a recent injury, and advised the inmate that he would need to "adjust to it"; while the nurse may have been negligent in her care, she was not reckless or deliberately indifferent); *Evans v. Manos,* 336 F.Supp.2d at 261-62, 263 (terminating and postponing, for two more weeks, the medical appointment of a prisoner who claimed "extreme" back pain because he complained about his care did not constitute deliberate indifference where the doctor had no intention of doing the inmate harm).

Finally, plaintiff's Eighth Amendment claim against PA Tichenor is that he failed to detect or that he mis-diagnosed plaintiff's alleged injuries. (AC ¶ 25; Dep. at 44-45, 56-57, 80-81). [FN40] Based on the authority cited above, even if defendant Tichenor negligently mis-diagnosed plaintiff, that would not constitute "deliberate indifference."

> **FN40.** Plaintiff does dispute the number of times defendant Tichenor treated him, but does acknowledge he saw the physician assistant several times in 2006 and 2007. (Pl.'s Memo. of Law at 10-11).

**VIII. *Qualified Immunity***

Defendants argue that they are entitled to qualified immunity with respect to all of plaintiff's claims. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). However, even if the constitutional privileges are clearly established, a government actor may still be shielded by qualified immunity "if it was objectively reasonable for the public official to believe that his acts did not violate those

Slip Copy, 2010 WL 3785771 (N.D.N.Y.)

(Cite as: 2010 WL 3785771 (N.D.N.Y.))

rights." *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991) (citing *Magnotti v.. Kuntz,* 918 F.2d 364, 367 (2d Cir.1990).

In determining whether qualified immunity applies, the court may first consider whether "the facts alleged show the [defendant's] conduct violated a constitutional right." *Saucier v. Katz,* 533 U.S. 194, 201(2001), modified by *Pearson v. Callahan,* --- U.S. ----, 129 S.Ct. 808, 811 (2009) (holding that, "while the sequence set forth [in Saucier] is often appropriate, it should no longer be regarded as mandatory in all cases"). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier,* 533 U.S. at 201. This court need not address qualified immunity with respect to plaintiff's Eighth Amendment claims against defendants Gardner, Davenport, Volpe, Walsh, Chesbrough, and Tichenor because, as discussed above, he has not established those alleged violations of his constitutional rights.

**\*22** Defendant Demars is entitled to qualified immunity with respect to the due process claim relating to his conduct of plaintiff's disciplinary hearing. As discussed above, the Second Circuit's decisions in *Taylor v. Rodriguez,* 238 F.3d at 194 and *Luna v. Pico,* 356 F.3d at 489-90 did not clearly impose a due process requirement that a hearing officer at a prison disciplinary hearing perform independent analysis of lay handwriting comparisons made by a testifying witness. If the controlling authority were subsequently construed to require such independent analysis in the context of this case, this court finds it would not have been clear to defendant Demars in 2006 that his reliance on the witness' handwriting comparisons violated plaintiff's due process rights. [FN41] Similarly, the court concluded that the controlling authority in this circuit did not clearly prohibit a hearing officer at a prison disciplinary proceeding from also providing required assistance to the charged inmate. *Ayers v. Ryan,* 152 F.3d at 81. Because defendant Demars could not have reasonably understood that he could be violating plaintiff's due process rights by effectively providing assistance at the hearing over which he presided, he is entitled to qualified immunity with respect to that claim.

[FN41]. *Cf. Luna v. Pico,* 356 F.3d at 491 (defendant is protected by qualified immunity because a reasonable hearing officer would not have clearly understood from *Taylor* and other then-existing law that an independent review of the credibility of a non-testifying victim was required by due process).

To the extent a higher court were to determine that any defendant who took adverse action against plaintiff was substantially motivated by plaintiff's June 15, 2006 letter complaining about the beating of another inmate, that defendant would be protected by qualified immunity with respect to a retaliation claim. As of 2006 and early 2007, the controlling authority in this circuit did not clearly provide First Amendment protection to complaints by one inmate about the alleged mistreatment of another inmate. *See, e.g .,* *Pettus v. McGinnis,* 533 F.Supp.2d at 339 (defendant is entitled to qualified immunity because of the uncertainty as to whether the First Amendment protected inmate from retaliation for testifying, at a disciplinary hearing of another inmate, that a correction officer assaulted the other inmate); *Rodriguez v. Phillips,* 66 F.3d at 479.

As to plaintiff's excessive force and failure to intervene claims against defendants Secore, Favro, Norcross, and Reardon, it was clearly established, as of the time of the alleged incidents in June 2006, that inmates had an Eighth Amendment right to be free from excessive force and a failure to intervene. *See, e.g., Hudson,* 503 U.S. at 9-10. Thus, accepting all of plaintiff's allegations about the two incidents on that day as true, qualified immunity cannot be granted to those defendants, because a reasonable person in their position at the time would or should have known that the use of excessive force was a constitutional violation. *See, e.g., Dallio v. Sanatamore,* 2010 WL 125774, at \*14.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' summary judgment motion be **DENIED IN PART,** as to (1) plaintiff's Eighth Amendment claims based on excessive force and/or failure to intervene against defendants Secore, Favro, and Norcross and (2) the Eighth

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3785771 (N.D.N.Y.)

(Cite as: 2010 WL 3785771 (N.D.N.Y.))

Amendment claims based on excessive force against defendant Reardon. And, it is further

**\*23 RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 110) be **GRANTED IN PART,** and that the complaint be dismissed in its entirety as to the remaining claims against all defendants.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

N.D.N.Y.,2010.

Lewis v. Johnson
Slip Copy, 2010 WL 3785771 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 3762016 (N.D.N.Y.)

(Cite as: 2010 WL 3762016 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,

N.D. New York.
Marc LEWIS, Plaintiff,
v.
J. JOHNSON, et al., Defendants.
No. 08-CV-0482.

Sept. 20, 2010.
Marc Lewis, Comstock, NY, pro se.

Christina L. Roberts-Ryba, New York State Attorney General, Albany, NY, for Defendants.

### DECISION and ORDER

THOMAS J. McAVOY, Senior District Judge.

**\*1** This matter brought pursuant to 42 U.S.C. § 1983 was referred to the Hon. Andrew T. Baxter, United States Magistrate Judge, for a Report-Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).

No objections to the August 5, 2010 Report-Recommendation have been raised. After examining the record, this Court has determined that the Report-Recommendation is not subject to attack for plain error or manifest injustice. Accordingly, this Court adopts the Report-Recommendation for the reasons stated therein.

It is, therefore, **ORDERED** that Defendants' motion for summary judgment (Dkt. No. 59) is **DENIED** as to (1) Plaintiff's Eighth Amendment claims based on excessive force and/or failure to intervene against defendants Secore, Favro, and Norcross; and (2) the Eighth Amendment claims based on excessive force against Defendant Reardon. In all other respects, Defendants' motion for summary judgment is **GRANTED** and the Complaint is dismissed in its entirety as to all other claims

against all defendants.

IT IS SO ORDERED.

N.D.N.Y.,2010.

Lewis v. Johnson
Slip Copy, 2010 WL 3762016 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Jerome WALDO, Plaintiff,
v.
Glenn S. GOORD, Acting Commissioner of New York
State Department of Correctional Services; Peter J.
Lacy, Superintendent at Bare Hill Corr. Facility;
Wendell Babbie, Acting Superintendent at Altona Corr.
Facility; and John Doe, Corrections Officer at Bare Hill
Corr. Facility, Defendants.
**No. 97-CV-1385 LEK DRH.**

Oct. 1, 1998.

Jerome Waldo, Plaintiff, pro se, Mohawk Correctional
Facility, Rome, for Plaintiff.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Albany, Eric D. Handelman, Esq., Asst.
Attorney General, for Defendants.

DECISION AND ORDER

KAHN, District J.

**\*1** This matter comes before the Court following a
Report-Recommendation filed on August 21, 1998 by the
Honorable David R. Homer, Magistrate Judge, pursuant to
28 U.S.C. § 636(b) and L.R. 72.3(c) of the Northern
District of New York.

No objections to the Report-Recommendation have been
raised. Furthermore, after examining the record, the Court
has determined that the Report-Recommendation is not
clearly erroneous. *See* Fed.R.Civ.P. 72(b), Advisory

Committee Notes. Accordingly, the Court adopts the
Report-Recommendation for the reasons stated therein.

Accordingly, it is

ORDERED that the Report-Recommendation is
APPROVED and ADOPTED; and it is further

ORDERED that the motion to dismiss by defendants is
GRANTED; and it is further

ORDERED that the complaint is dismissed without
prejudice as to the unserved John Doe defendant pursuant
to Fed.R.Civ.P. 4(m), and the action is therefore dismissed
in its entirety; and it is further

ORDERED that the Clerk serve a copy of this order on all
parties by regular mail.

IT IS SO ORDERED.
HOMER, Magistrate J.

REPORT-RECOMMENDATION AND ORDER [FN1]

FN1. This matter was referred to the undersigned
pursuant to 28 U.S.C. § 636(b) and
N.D.N.Y.L.R. 72.3(c).

The plaintiff, an inmate in the New York Department of
Correctional Services ("DOCS"), brought this pro se
action pursuant to 42 U.S.C. § 1983. Plaintiff alleges that
while incarcerated in Bare Hill Correctional Facility
("Bare Hill") and Altona Correctional Facility ("Altona"),
defendants violated his rights under the Eighth and
Fourteenth Amendments.[FN2] In particular, plaintiff alleges
that prison officials maintained overcrowded facilities
resulting in physical and emotional injury to the plaintiff

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

and failed to provide adequate medical treatment for his injuries and drug problem. Plaintiff seeks declaratory relief and monetary damages. Presently pending is defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b). Docket No. 18. For the reasons which follow, it is recommended that the motion be granted in its entirety.

FN2. The allegations as to Bare Hill are made against defendants Goord, Lacy, and Doe. Allegations as to Altona are made against Goord and Babbie.

I. Background

Plaintiff alleges that on August 21, 1997 at Bare Hill, while he and two other inmates were playing cards, an argument ensued, and one of the two assaulted him. Compl., ¶ 17. Plaintiff received medical treatment for facial injuries at the prison infirmary and at Malone County Hospital. Id. at ¶¶ 18-19. On September 11, 1997, plaintiff was transferred to Altona and went to Plattsburgh Hospital for x-rays several days later. Id. at ¶ 21.

Plaintiff's complaint asserts that the overcrowded conditions at Bare Hill created a tense environment which increased the likelihood of violence and caused the physical assault on him by another inmate. Id. at ¶¶ 10-11. Additionally, plaintiff contends that similar conditions at Altona caused him mental distress and that he received constitutionally deficient medical treatment for his injuries. Id. at ¶¶ 21-22. The complaint alleges that Altona's lack of a drug treatment program and a dentist or specialist to treat his facial injuries constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments. Id. at ¶¶ 22, 27-28.

II. Motion to Dismiss

*2 When considering a Rule 12(b) motion, a court must assume the truth of all factual allegations in the complaint and draw all reasonable inferences from those facts in favor of the plaintiff. Leeds v. Meltz, 85 F.3d 51, 53 (2d Cir.1996). The complaint may be dismissed only when "it

appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Staron v. McDonald's Corp., 51 F.3d 353, 355 (2d Cir.1995) (quoting Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "The issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed, it may appear on the face of the pleading that a recovery is very remote and unlikely, but that is not the test." Gant v. Wallingford Bd. of Educ., 69 F.3d 669, 673 (2d Cir.1995) (citations omitted). This standard receives especially careful application in cases such as this where a pro se plaintiff claims violations of his civil rights. Hernandez v. Coughlin, 18 F.3d 133, 136 (2d Cir.), cert. denied, 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994).

III. Discussion

A. Conditions of Confinement

Defendants assert that plaintiff fails to state a claim regarding the conditions of confinement at Bare Hill and Altona. For conditions of confinement to amount to cruel and unusual punishment, a two-prong test must be met. First, plaintiff must show a sufficiently serious deprivation. Farmer v. Brennan, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citing Wilson v. Seiter, 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); Rhodes v. Chapman, 452 U.S. 347, 348 (1981)(denial of the "minimal civilized measure of life's necessities"). Second, plaintiff must show that the prison official involved was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and that the official drew the inference. Farmer, 511 U.S. at 837.

1. Bare Hill

In his Bare Hill claim, plaintiff alleges that the overcrowded and understaffed conditions in the dormitory-style housing "resulted in an increase in tension, mental anguish and frustration among prisoners, and dangerously increased the potential for violence." Compl.,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

¶ 11. Plaintiff asserts that these conditions violated his constitutional right to be free from cruel and unusual punishment and led to the attack on him by another prisoner. The Supreme Court has held that double-celling to manage prison overcrowding is not a per se violation of the Eighth Amendment. *Rhodes*, 452 U.S. at 347-48. The Third Circuit has recognized, though, that double-celling paired with other adverse circumstances can create a totality of conditions amounting to cruel and unusual punishment. *Nami v. Fauver*, 82 F.3d 63, 67 (3d Cir.1996). While plaintiff here does not specify double-celling as the source of his complaint, the concerns he raises are similar. Plaintiff alleges that overcrowding led to an increase in tension and danger which violated his rights. Plaintiff does not claim, however, that he was deprived of any basic needs such as food or clothing, nor does he assert any injury beyond the fear and tension allegedly engendered by the overcrowding. Further, a previous lawsuit by this plaintiff raised a similar complaint, that double-celling and fear of assault amounted to cruel and unusual punishment, which was rejected as insufficient by the court. *Bolton v. Goord*, 992 F.Supp. 604, 627 (S.D.N.Y.1998). The court there found that the fear created by the double-celling was not "an objectively serious enough injury to support a claim for damages." *Id.* (citing *Doe v. Welborn*, 110 F.3d 520, 524 (7th Cir.1997)).

**\*3** As in his prior complaint, plaintiff's limited allegations of overcrowding and fear, without more, are insufficient. *Compare Ingalls v. Florio*, 968 F.Supp. 193, 198 (D.N.J.1997) (Eighth Amendment overcrowding claim stated when five or six inmates are held in cell designed for one, inmates are required to sleep on floor, food is infested, and there is insufficient toilet paper) *and Zolnowski v. County of Erie*, 944 F.Supp. 1096, 1113 (W.D.N.Y.1996) (Eighth Amendment claim stated when overcrowding caused inmates to sleep on mattresses on floor, eat meals while sitting on floor, and endure vomit on the floor and toilets) *with Harris v. Murray*, 761 F.Supp. 409, 415 (E.D.Va.1990) (No Eighth Amendment claim when plaintiff makes only a generalized claim of overcrowding unaccompanied by any specific claim concerning the adverse effects of overcrowding). Thus, although overcrowding could create conditions which might state a violation of the Eighth Amendment, plaintiff has not alleged sufficient facts to support such a finding here. Plaintiff's conditions of confinement claim as to Bare

Hill should be dismissed.

2. Altona

Plaintiff also asserts a similar conditions of confinement claim regarding Altona. For the reasons discussed above, plaintiff's claim that he suffered anxiety and fear of other inmates in the overcrowded facility (Compl., ¶¶ 21-22) is insufficient to establish a serious injury or harm.

Plaintiff's second claim regarding Altona relates to the alleged inadequacies of the medical treatment he received. The government has an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The two-pronged *Farmer* standard applies in medical treatment cases as well. *Hemmings v. Gorczyk*, 134 F.3d 104, 108 (2d Cir.1998). Therefore, plaintiff must allege facts which would support a finding that he suffered a sufficiently serious deprivation of his rights and that the prison officials acted with deliberate indifference to his medical needs. *Farmer*, 511 U.S. at 834.

Plaintiff alleges that the medical treatment available at Altona was insufficient to address the injuries sustained in the altercation at Bare Hill. Specifically, plaintiff cites the lack of a dentist or specialist to treat his facial injuries as an unconstitutional deprivation. Plaintiff claims that the injuries continue to cause extreme pain, nosebleeds, and swelling. Compl., ¶¶ 22 & 26. For the purposes of the Rule 12(b) motion, plaintiff's allegations of extreme pain suffice for a sufficiently serious deprivation. *See Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir.1996).

Plaintiff does not, however, allege facts sufficient to support a claim of deliberate indifference by the named defendants. To satisfy this element, plaintiff must demonstrate that prison officials had knowledge of facts from which an inference could be drawn that a "substantial risk of serious harm" to the plaintiff existed and that the officials actually drew the inference. *Farmer*, 511 U.S. at 837. Plaintiff's complaint does not support, even when liberally construed, any such conclusion. Plaintiff offers

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

no evidence that the Altona Superintendent or DOCS Commissioner had any actual knowledge of his medical condition or that he made any attempts to notify them of his special needs. Where the plaintiff has not even alleged knowledge of his medical needs by the defendants, no reasonable jury could conclude that the defendants were deliberately indifferent to those needs. *See Amos v. Maryland Dep't of Public Safety and Corr. Services,* 126 F.3d 589, 610-11 (4th Cir.1997), *vacated on other grounds,* 524 U.S. 935, 118 S.Ct. 2339, 141 L.Ed.2d 710 (1998).

**\*4** Plaintiff's second complaint about Altona is that it offers "no type of state drug treatment program for the plaintiff." Compl., ¶ 22. Constitutionally required medical treatment encompasses drug addiction therapy. *Fiallo v. de Batista,* 666 F.2d 729, 731 (1st Cir.1981); *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 760-61 (3d Cir.1979). As in the *Fiallo* case, however, plaintiff falls short of stating an Eighth Amendment claim as he "clearly does not allege deprivation of essential treatment or indifference to serious need, only that he has not received the type of treatment which he desires." *Id.* at 731. Further, plaintiff alleges no harm or injury attributable to the charged deprivation. Plaintiff has not articulated his reasons for desiring drug treatment or how he was harmed by the alleged deprivation of this service. *See Guidry v. Jefferson County Detention Ctr.,* 868 F.Supp. 189, 192 (E.D.Tex.1994) (to state a section 1983 claim, plaintiff must allege that some injury has been suffered).

For these reasons, plaintiff's Altona claims should be dismissed.

B. Failure to Protect

Defendants further assert that plaintiff has not established that any of the named defendants failed to protect the plaintiff from the attack by the other inmate at Bare Hill. Prison officials have a duty "to act reasonably to ensure a safe environment for a prisoner *when they are aware* that there is a significant risk of serious injury to that prisoner." *Heisler v. Kralik,* 981 F.Supp. 830, 837 (S.D.N.Y.1997) (emphasis added); *see also Villante v. Dep't of Corr. of City of N.Y.,* 786 F.2d 516, 519 (2d

Cir.1986). This duty is not absolute, however, as "not ... every injury suffered by one prisoner at the hands of another ... translates into constitutional liability." *Farmer,* 511 U.S. at 834. To establish this liability, *Farmer's* familiar two-prong standard must be satisfied.

As in the medical indifference claim discussed above, plaintiff's allegations of broken bones and severe pain from the complained of assault suffice to establish a "sufficiently serious" deprivation. *Id.* Plaintiff's claim fails, however, to raise the possibility that he will be able to prove deliberate indifference to any threat of harm to him by the Bare Hill Superintendent or the DOCS Commissioner. Again, plaintiff must allege facts which establish that these officials were aware of circumstances from which the inference could be drawn that the plaintiff was at risk of serious harm and that they actually inferred this. *Farmer,* 511 U.S. at 838.

To advance his claim, plaintiff alleges an increase in "unusual incidents, prisoner misbehaviors, and violence" (Compl., ¶ 12) and concludes that defendants' continued policy of overcrowding created the conditions which led to his injuries. Compl., ¶ 10. The thrust of plaintiff's claim seems to suggest that the defendants' awareness of the problems of overcrowding led to knowledge of a generalized risk to the prison population, thus establishing a legally culpable state of mind as to plaintiff's injuries. Plaintiff has not offered any evidence, however, to support the existence of any personal risk to himself about which the defendants could have known. According to his own complaint, plaintiff first encountered his assailant only minutes before the altercation occurred. Compl., ¶ 17. It is clear that the named defendants could not have known of a substantial risk to the plaintiff's safety if the plaintiff himself had no reason to believe he was in danger. *See Sims v. Bowen,* No. 96-CV-656, 1998 WL 146409, at \*3 (N.D.N.Y. Mar.23, 1998)(Pooler, J.)("I conclude that an inmate must inform a correctional official of the basis for his belief that another inmate represents a substantial threat to his safety before the correctional official can be charged with deliberate indifference"); *Strano v. City of New York,* No. 97-CIV-0387, 1998 WL 338097, at \*3-4 (S.D.N.Y. June 24, 1998) (when plaintiff acknowledged attack was "out of the blue" and no prior incidents had occurred to put defendants on notice of threat or danger, defendants could not be held aware of any substantial risk

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

of harm to the plaintiff). Defendants' motion on this ground should, therefore, be granted.

### IV. Failure to Complete Service

**\*5** The complaint names four defendants, including one "John Doe" Correctional Officer at Bare Hill. Defendants acknowledge that service has been completed as to the three named defendants. Docket Nos. 12 & 13. The "John Doe" defendant has not been served with process or otherwise identified and it is unlikely that service on him will be completed in the near future. *See* Docket No. 6 (United States Marshal unable to complete service on "John Doe"). Since over nine months have passed since the complaint was filed (Docket No. 1) and summonses were last issued (Docket entry Oct. 21, 1997), the complaint as to the unserved defendant should be dismissed without prejudice pursuant to Fed.R.Civ.P. 4(m) and N.D .N.Y.L.R. 4.1(b).

### V. Conclusion

WHEREFORE, for the reasons stated above, it is

RECOMMENDED that defendants' motion to dismiss be GRANTED in all respects; and

IT IS FURTHER RECOMMENDED that the complaint be dismissed without prejudice as to the unserved John Doe defendant pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b); and it is

ORDERED that the Clerk of the Court serve a copy of this Report-Recommendation and Order, by regular mail, upon parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v.*

*Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,1998.
Waldo v. Goord
Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2005 WL 2125874 (S.D.N.Y.)
(Cite as: 2005 WL 2125874 (S.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Jamal KEARSEY, Plaintiff,
v.
Adeyemi WILLIAMS, Defendant.
**No. 99 Civ. 8646 DAB.**

Sept. 1, 2005.

*MEMORANDUM & ORDER*

BATTS, J.

**\*1** Plaintiff Jamal Kearsey, proceeding *prose,* has filed the above-captioned case against Defendant Dr. Adeyemi Williams ("Dr.Williams") pursuant to 42 U.S.C. § 1983 alleging that Dr. Williams violated Plaintiff's Eighth Amendment rights by being deliberately indifferent to Plaintiff's serious medical needs. Defendant has moved to dismiss the Complaint for failure to exhaust administrative remedies, for failure to state a claim, and because Defendant is shielded by qualified immunity.FN1 For the reasons stated herein, Defendant's Motion to Dismiss is DENIED.

> FN1. This Court granted Defendant's Motion to Dismiss for failure to exhaust administrative remedies in its June 6, 2002 Order but vacated that Order on September 20, 2004 upon Plaintiff's motion pursuant to Fed.R.Civ.P. 60(b). *See Kearsey v. Williams,* No. 99 Civ. 8646, 2004 WL 2093548 (S.D.N.Y. Sept. 20, 2004).

I. BACKGROUND

In his Complaint, Plaintiff alleges that while he was incarcerated at Rikers Island Correctional Facility ("Rikers"), Defendant, a doctor at Rikers, violated Plaintiff's Eighth Amendment rights by refusing to provide him with an asthma pump when Plaintiff experienced breathing difficulties. Specifically, on April 4, 1999, Plaintiff requested to speak with a doctor because the heat in his cell was aggravating his asthma. (Compl. at 3-4.) When Dr. Williams went to Plaintiff's cell, Plaintiff stated that his chest had "tighten[ed] up" and that he "couldn't breath[e]," and requested that Dr. Williams take him "downstairs" to get an asthma pump. (Id. at 4.) Dr. Williams declined to take Plaintiff downstairs but said that he would send a pump to Plaintiff's cell that evening. (Id.) After a period of time, a corrections officer called Dr. Williams and he also informed him of Plaintiff's medical condition. (Id.) Dr. Williams told the officer that he would bring the asthma pump. (Id.) Plaintiff alleges that Dr. Williams forgot to bring the pump. (Id.)

Plaintiff complained for a third time to Dr. Williams of his inability to breathe and stated that he was experiencing chest pain. (Id.) Once again, Dr. Williams responded by promising to send an asthma pump that evening. (Id.) Plaintiff subsequently asked for Defendant's name, to which Dr. Williams allegedly responded, "I won't send you anything now!" (Id.) Dr. Williams then handed Plaintiff a note with his name. (Id. at 5.) No pump was given to Plaintiff. Shortly after Dr. Williams left, Plaintiff borrowed an asthma pump from a fellow minute, although that pump was different from the one Plaintiff was used to. (Id.) Plaintiff complained of chest pains and breathing difficulties for the rest of the day. (Id.) On April 6, 1999, Plaintiff was having blood work done and spoke with a nurse about his medical condition. (Id.) The nurse ordered an emergency pump that arrived later in the day. (Id.)

On June 24, 1999, Plaintiff filed a Complaint pursuant to 42 U.S.C. § 1983 alleging that Defendant exhibited deliberate indifference to his serious medical needs in violation of Plaintiff's Eighth Amendment rights. Defendant has filed a Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure on the grounds that Plaintiff failed to exhaust administrative

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2125874 (S.D.N.Y.)
(Cite as: 2005 WL 2125874 (S.D.N.Y.))

remedies as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997(e), and, in particular, the exhaustion procedure established by N.Y. Comp.Codes R & Regs., tit. 7, § 701.7, that Plaintiff failed to state a cause of action for which relief can be granted, and that Defendant is shielded from liability based on the doctrine of qualified immunity. (Def.'s Mem. Law at 1, 3, 20.) On June 6, 2002, this Court issued an Order granting Defendant's Motion to Dismiss on the ground that Plaintiff failed to comply with the grievance procedures established by N.Y. Comp.Codes R & Regs., tit. 7, § 701.7. *Kearsey v. Williams,* No. 99 Civ. 8646, 2002 WL 1268014, at *2 (S.D.N.Y. June 6, 2002).

***2** Plaintiff filed a Motion for Relief from Judgment pursuant to Rule 60(b) of the Federal Rules of Civil Procedure.[FN2] Plaintiff argued that the Court had erred in holding that he was required to exhaust the grievance procedures established by N.Y. Comp.Codes R & Regs., tit. 7, § 701.7, because those procedures are required only of inmates at state-run facilities, whereas Rikers, as a municipally-run facility, has different grievance procedures. *Kearsey,* No. 99 Civ. 8646, 2004 WL 2093548, at *2 (S.D.N.Y. Sept. 20, 2004). In its September 20, 2004 Order, the Court vacated its dismissal Order, finding Plaintiff was not required to exhaust the grievance procedures established by N.Y. Comp.Codes R & Regs., tit. 7, § 701.7. *Id.* at *4.

FN2. Plaintiff was represented by counsel when he filed the 60(b) Motion.

Because the Court's June 6, 2002 Order did not reach the additional grounds in Defendant's Motion to Dismiss, the remaining motions were *subjudice.* In this Order, the Court considers Defendant's remaining arguments: that Plaintiff has failed to state a cause of action and that Defendant is entitled to qualified immunity.

## II. DISCUSSION

### A. Rule 12(b)(6) Standard

In a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court "must accept as true the factual allegations in the complaint, and draw all reasonable inferences in favor of the plaintiff." *Bolt Elec., Inc. v. City of New York,* 53 F.3d 465, 469 (2d Cir.1995) (citations omitted). "The district court should grant such a motion only if, after viewing [the] plaintiff's allegations in this favorable light, it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999). A court's review of such a motion is limited and "the issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Burnheim v. Litt,* 79 F.3d 318, 321 (2d Cir.1996). In fact, it may appear to the court that "a recovery is very remote and unlikely but that is not the test." *Branham v. Meachum,* 72 F.3d 626, 628 (2d Cir.1996).

These liberal pleading standards "appl[y] with particular force where the plaintiff alleges civil rights violations or where the complaint is submitted *prose."Chance v. Armstrong,* 143 F.3d 698, 701 (2d Cir.1998). It is well-settled that *prose* complaints are held "to less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner,* 404 U.S. 519, 521 (1972).

### B. Eighth Amendment

Defendant moves to dismiss the Complaint on the grounds that Plaintiff has failed to state a cause of action under 42 U.S.C. § 1983.

### 1. Standard for § 1983 deliberate indifference claim

Section 1983 of Title 42, United States Code, enables a plaintiff to bring a cause of action against a "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Thus, a plaintiff bringing a § 1983 action must

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2125874 (S.D.N.Y.)
(Cite as: 2005 WL 2125874 (S.D.N.Y.))

demonstrate that "the conduct complained of was committed by a person acting under color of state law ... [and that] this conduct deprived a person of rights ... secured by the Constitution or laws of the United States." *Greenwich Citizens Committee, Inc. v. Counties of Warren and Washington Indus. Development Agency,* 77 F.3d 26, 29-30 (2d Cir.1996) (quoting *Parratt v. Taylor,* 451 U.S. 527, 535 (1981)) (internal quotations omitted). Section 1983 is not in itself "a source of substantive rights," but instead "provides a method for vindicating federal rights elsewhere conferred." *Patterson v. County of Oneida, N.Y.,* 375 F.3d 206, 225 (2d Cir.2004) (quoting *Baker v. McCollan,* 443 U.S. 137, 144 n. 3 (1979)).

**\*3** One such source of federal rights is the Eighth Amendment of the Constitution, which states that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. In *Estelle v. Gamble,* the Supreme Court held that prison employees' "deliberate indifference [to an inmate's] serious medical needs" violates the inmate's Eighth Amendment rights and is actionable under § 1983. *Estelle v. Gamble,* 429 U.S. 97, 104-05 (1976). A plaintiff pursuing a § 1983 claim for deliberate indifference to serious medical needs must meet a two-prong standard by demonstrating a serious medical need (the objective prong) and by showing that the defendant employee possessed the requisite culpable mental state (the subjective prong). *See Farmer v. Brennan,* 511 U.S. 825, 837 (1994); *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

2. Serious medical need

The objective prong of the deliberate indifference standard requires a showing of a "sufficiently serious" medical need. *Hathaway,* 99 F.3d at 553 (internal quotations and citations omitted). While "it is a far easier task to identify a few exemplars of conditions so plainly trivial and insignificant as to be outside the domain of Eighth Amendment concern than it is to articulate a workable standard for determining 'seriousness' at the pleading stage," several factors are helpful in determining the seriousness of a medical condition. *Chance,* 143 F.3d at 702-03 (quoting *Gutierrez v. Peters,* 111 F.3d 1364, 1372 (7th Cir.1997)).

A serious medical need is generally characterized by "a condition of urgency that may result in degeneration or extreme pain" or "the unnecessary and wanton infliction of pain." *Chance,* 143 F.3d at 702 (citation omitted). Whether "a reasonable doctor or patient would find [the condition] important and worthy of comment or treatment" reflects on the seriousness of the medical need, as does the effect of the condition on the inmate's "daily activities" and the extent to which the condition causes "chronic and substantial pain." *Id.* (citation omitted). The refusal to treat a patient suffering from what ordinarily would not be considered a serious medical condition also raises Eighth Amendment concerns if the condition is easily treatable and degenerative. *See Harrison v. Barkley,* 219 F.3d 132, 136 (2d Cir.2000) (holding that "the refusal to treat an inmate's tooth cavity unless the inmate consents to extraction of another diseased tooth constitutes a violation of the Eighth Amendment"). The constitutional implications of a decision not to treat an inmate's medical condition depend on the specific facts of the case-"a prisoner with a hang-nail has no constitutional right to treatment, but ... prison officials [who] deliberately ignore an infected gash ... might well violate the Eighth Amendment." *Id.* at 137-37 (internal quotations and citations omitted).

**\*4** While the failure to treat an inmate's generalized asthmatic condition may not implicate the Eighth Amendment, "an actual asthma attack, depending on the severity, may be a serious medical condition." *Scott v. DelSignore,* No. 02 Civ. 029F, 2005 WL 425473, at \*9 (W.D.N.Y. Feb. 18, 2005); *see also Patterson v. Lilley,* No. 02 Civ. 6056, 2003 WL 21507345, at \*3-4 (S.D.N.Y. June 30, 2003). Indeed, "it is common knowledge that a respiratory ailment, such as asthma, can be serious and life-threatening. *Whitley v. Westchester County,* No. 97 Civ. 0420, 1997 WL 659100, at \*4 (S.D.N.Y. Oct. 22, 1997). An acute asthma attack is inarguably a "condition of urgency" that may cause "substantial pain" and that "reasonable doctor[s] or patient[s] would find important and worthy of comment or treatment." *Chance,* 143 F.3d at 702 (citation omitted); *see Whitley,* No. 97 Civ. 0420(SS), 1997 WL 659100, at \*4.

Plaintiff has alleged that on three separate occasions, he

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2125874 (S.D.N.Y.)
(Cite as: 2005 WL 2125874 (S.D.N.Y.))

informed Defendant that he was unable to breathe. (Compl. at 4-5.) He also complained that his chest had "tighten[ed] up," and, later, that he was experiencing "chest pains." (Id.) Plaintiff resorted to using a fellow inmate's inhaler when Defendant refused to provide him with one, which suggests the seriousness of his need. (Id. at 5.) Moreover, by alleging in his Complaint that his asthma "started to act up," Plaintiff describes a time-specific incident more in line with an asthma attack than with a generalized asthmatic condition. (Id. at 4.)

Defendant cites *Reyes v. Corrections Officer Bay,* No. 97 Civ. 6419, 1999 WL 681490 (S.D.N.Y. Sept. 1, 1999), as a case similar to this one where the court found that the plaintiff did not allege a sufficiently serious medical condition. However, unlike the plaintiff in *Reyes,* who went ahead with his scheduled visit with his family after complaining of an asthma attack, Plaintiff continued to complain to officers of his condition. Plaintiff resorted to self-medication, by borrowing an asthma pump from a fellow inmate in order to alleviate his condition. In light of these facts, it can hardly be said that Plaintiff was merely suffering from "discomfort."

Accordingly, the Court finds that in his Complaint, Plaintiff alleges facts that he experienced an asthma attack, serious enough to constitute a sufficiently serious medical need for purposes of an Eighth Amendment claim.

3. Deliberate indifference

To satisfy the subjective prong of the deliberate indifference standard, Plaintiff must prove that the prison official was aware of, and consciously disregarded, the prisoner's medical condition. *Chance,* 143 F.3d at 703; *see also Farmer,* 511 U.S. at 837. The prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Chance,* 143 F.3d at 702 (quoting *Farmer,* 511 U.S. at 837). While purposefully refusing to treat a serious medical condition constitutes deliberate indifference, it need not be the official's purpose to harm the inmate; "a state of mind that is the equivalent of criminal recklessness" is sufficient. *Hathaway,* 37 F.3d at 553.

**5** A physician's mere negligence in treating or failing to treat a prisoner's medical condition does not implicate the Eighth Amendment and is not properly the subject of a § 1983 action. *Estelle,* 429 U.S. at 105-06; *Chance,* 143 F.3d at 703. "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle,* 429 U.S. at 106. Thus, a physician who "delay[s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not exhibit the mental state necessary for deliberate indifference. *Harrison,* 219 F.3d at 139. Likewise, an inmate who disagrees with the physician over the appropriate course of treatment has no claim under § 1983 if the treatment provided is "adequate." *Chance,* 143 F.3d at 703. However, if prison officials consciously delay or otherwise fail to treat an inmate's serious medical condition "as punishment or for other invalid reasons," such conduct constitutes deliberate indifference. *Harrison,* 219 F.3d at 138.

In the instant case, Plaintiff informed Defendant on a number of occasions that he was unable to breathe and that he was experiencing chest pains. (Compl. at 4.) While Defendant's initial decision not to take Plaintiff downstairs for immediate treatment is the sort of prisoner-physician dispute regarding the particularities of medical care that is outside the scope of the Eighth Amendment, the unmistakable inference to be drawn from Plaintiff's allegation that Defendant refused to provide an asthma pump when Plaintiff asked for Defendant's name is that Defendant withheld medical care as retaliation or punishment for Plaintiff's conduct. (Id.) Because consciously delaying treatment in order to punish or retaliate against an inmate meets the subjective standard for deliberate indifference, the Court finds that the Complaint adequately alleges that Defendant acted with the requisite culpable mental state in refusing to treat Plaintiff's asthma attack.

C. Qualified Immunity

Defendant's final argument for dismissal is that, as a government official, Dr. Williams is entitled to qualified immunity.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2125874 (S.D.N.Y.)
(Cite as: 2005 WL 2125874 (S.D.N.Y.))

At the outset, the Court notes that while a defendant may assert a qualified immunity defense on a Rule 12(b)(6) motion, "that defense faces a formidable hurdle when advanced on such a motion." *McKenna v. Wright,* 386 F.3d 432, 434 (2d Cir.2004). This is because "[n]ot only must the facts supporting the defense appear on the face of the complaint, but, as with all Rule 12(b)(6) motions, the motion may be granted only where it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Id.* (internal quotations and citations omitted). The plaintiff thus benefits from all reasonable inferences against the defendant's qualified immunity defense on a Rule 12(b)(6) motion. *Id.*

The defense of qualified immunity protects public officers, including prison physicians, from civil actions related to their conduct while they are acting in an official capacity so long as they do not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Ford v. McGinnis,* 352 F.3d 582, 596 (2d Cir.2003). Such a defense "serves important interests in our political system. It protects government officials from liability they might otherwise incur due to unforeseeable changes in the law governing their conduct." *Sound Aircraft Services, Inc. v. Town of East, 192 F.3d 329, 334 (2d Cir.1999).* Qualified immunity also serves the important public interest of "protecting public officials from the costs associated with the defense of damages action ... [including] the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from accepting public positions." *Crawford-El v. Britton,* 523 U.S. 574, 590 at fn. 12 (1998).

*6 Qualified immunity shields a defendant from liability "if either (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Johnson v. Newburgh Englarged Sch. Dist.,* 293 F.3d 246, 250 (2d Cir.2001); *Brosseau v. Haugen,* 125 S.Ct. 596, 599 (2004)* ("Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted"); *see

*alsoHarlow,* 457 U.S. at 818-19.

"[A] court evaluating a claim of qualified immunity must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation." *Wilson v. Layne,* 526 U.S. 603, 609 (1999); *see also Ying Jing Gan v. City of New York,* 996 F.2d 522, 532 (2d Cir.1993). Determining the constitutional question first serves two purposes: it spares the defendant of unwarranted demands and liability "customarily imposed upon those defending a long drawn-out lawsuit" and determining the constitutional question first "promotes clarity in the legal standards for official conduct, for the benefit of both the officers and the general public ." *Id.*

If a deprivation of a constitutional right has been alleged, a court must determine whether the constitutional right was clearly established by determining: (1) if the law was defined with reasonable clarity, (2) if the Supreme Court or the law of the Second Circuit affirmed the rule, and (3) whether a reasonable defendant would have understood from existing law that the conduct was lawful. *See Young v. County of Fulton,* 160 F.3d 899, 903 (2d Cir.1998). "[T]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 634, 640 (1987).

As the Supreme Court made clear in *Saucier,* determining whether the right in question was clearly established requires particularized, case-specific analysis. *Id.* at 201-02. The case-specific nature of the inquiry does not mean that official conduct is protected by qualified immunity whenever "courts had not agreed on one verbal formulation of the controlling standard." *Id* . at 202-03. A "general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct" even if courts have not ruled on the constitutionality of the specific act in question, and previously decided cases with comparable but not identical facts influence the clarity of the right in question. *Hope v. Pelzer,* 536 U.S. 730 at 741 (2002) (quoting *Anderson v. Creighton, 483 U.S. 635, 640 (1987)*). The fundamental question is whether "the state of the law" at

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2125874 (S.D.N.Y.)
(Cite as: 2005 WL 2125874 (S.D.N.Y.))

the time of the alleged violation gave the defendant "fair warning" that his conduct was unconstitutional. *Id.*

**\*7** Even if the right is clearly established, "defendants may nonetheless establish immunity by showing that reasonable persons in their position would not have understood that their conduct was within the scope of the established protection." *LaBounty v. Coughlin,* 137 F.3d 68, 73 (2d Cir.1998). "[R]easonableness is judged against the backdrop of the law at the time of the conduct.... [T]his inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brosseau,* 125 S.Ct. at 599.

In the present matter, the Court has already determined that Plaintiff's allegations, taken as true, indicate that Defendant violated Plaintiff's Eighth Amendment rights by refusing to treat Plaintiff's asthma attack in retaliation for Plaintiff's request for Defendant's name. *Seesupra* at 10-13.

With regard to whether the right allegedly violated was clearly established at the time of the violation, neither the Supreme Court nor the Second Circuit has held that an asthma attack constitutes a serious medical condition for purposes of a deliberate indifference claim. In considering whether Defendant nonetheless had fair warning of the unconstitutionality of the conduct he is alleged to have engaged in, the Court notes that the Second Circuit has repeatedly held as unlawful denials of treatment that "cause or perpetuate pain" falling short of torture and not resulting in death. *Brock v. Wright,* 315 F.3d 158, 163 (2d Cir.2003). Among the conditions the Second Circuit has deemed serious for Eighth Amendment purposes are a tooth cavity, *Harrison,* 219 F.3d at 137; a degenerative hip condition, *Hathaway,* 99 F.3d 550, 551-52; a painful tissue growth, *Brock,* 315 F.3d at 161; a ruptured Achilles tendon that caused pain and swelling, *Hemmings v. Gorczyk,* 134 F.3d 104, 106-07 (2d Cir.1998); and an eye condition that led to blindness in one eye, *Koehl v. Dalsheim,* 85 F.3d 86, 87 (2d Cir.1996). These various conditions, held to be sufficiently serious, are not life-threatening, although they are painful. An asthma attack, however, can be both painful and fatal. Given the state of the law in the Second Circuit, Defendant had ample warning that the law prohibits a prison doctor from

consciously withholding medical care from an inmate with a painful and potentially fatal medical condition.

The Court finds that at this early stage of litigation, Defendant has not shown that he is entitled to qualified immunity.

### III. CONCLUSION

For the reasons set forth above, Defendant's Motion to Dismiss is DENIED.

Defendant shall file an Answer to the Complaint within thirty (30) days of this Order.

SO ORDERED.

S.D.N.Y.,2005.
Kearsey v. Williams
Not Reported in F.Supp.2d, 2005 WL 2125874 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp., 1998 WL 32518 (S.D.N.Y.)

(Cite as: 1998 WL 32518 (S.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Cedric YOUNG, Plaintiff,
v.
Thomas A. COUGHLIN, III; Robert Kuhlman; Lillian Stetner; Sharon Lilley; Guy Tufua; Sabrina Von Hagn; and B. McCORMICK, C.O., Defendants.
No. 93 Civ. 262 DLC.

Jan. 29, 1998.
Cedric Young, Attica, New York, pro se.

Dennis Vacco, Attorney General for the State of New York, New York City, by Martin Bienstock, Assistant Attorney General, for defendant.

OPINION AND ORDER

COTE, J.

**\*1** On December 7, 1992, plaintiff Cedric Young ("Young"), presently incarcerated at Attica Correctional Facility, filed this action *pro se* pursuant to 42 U.S.C. § 1983. Young filed a first amended complaint on March 31, 1994, challenging the legality of his confinement and certain conditions of confinement. In Opinions of June 7, 1995 and August 7, 1996, the Court granted motions to dismiss the claims against each defendant named in the amended complaint except claims against defendants Dr. Guy Tufua ("Dr.Tufua") and Correctional Officer B. McCormick ("McCormick"). The two remaining defendants now move for summary judgment pursuant to Rule 56, Fed.R.Civ.P. For the reasons discussed below, the motion is granted.

**SUMMARY JUDGMENT STANDARD**

Under Rule 56(c), summary judgment may not be granted unless the submissions of the parties taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). *See*

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the initial burden of "informing the district court of the basis for its motion," and demonstrating "the absence of a genuine issue of material fact." *Celotex v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). To survive a summary judgment motion, the non-moving party has to "make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. *See* Fed.R.Civ.P. 56(e). In determining whether summary judgment is appropriate, the district court " 'must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor.' " *American Casualty Company of Reading, Pennsylvania v. Nordic Leasing, Inc.,* 42 F.3d 725, 728 (2d Cir.1994) (quoting *Consarc Corp. v. Marine Midland Bank, N.A.,* 996 F.2d 568, 572 (2d Cir.1993)). A grant of summary judgment is appropriate when no rational jury could find in favor of the non-moving party because there is no genuine issue of material fact based on the evidence in the record or the substantive law. *Gallo v. Prudential Residential Services, Ltd.,* 22 F.3d 1219, 1224 (2d Cir.1994).

Where, as here, a party is proceeding *pro se,* the Court must liberally read his supporting papers and interpret them " 'to raise the strongest arguments that they suggest.' " *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). A *pro se* party, however, must still allege sufficient facts to survive a motion for summary judgment. *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

**DISCUSSION**

Young contends that Dr. Tufua was deliberately indifferent to his serious medical needs, and in an unrelated incident, that McCormick incited inmates to injure him, all in violation of his constitutional rights. The issues related to the claim against Dr. Tufua will be addressed first.

**I. Inadequate Medical Care Claim**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 32518 (S.D.N.Y.)

(Cite as: 1998 WL 32518 (S.D.N.Y.))

**A. Background**

**\*2** Young's medical care claim arises out of the treatment he received for a chronic pain in his lower abdomen near his appendix. Young began to experience the pain in 1990 while incarcerated at Elmira Correctional Facility ("Elmira,"). [FN1] In this action, Young alleges that during his incarceration at Sullivan Correctional Facility ("Sullivan") in the years 1991 through 1993, Dr. Tufua, the doctor whom he saw most frequently in connection with his complaints about the pain, was deliberately indifferent to his serious medical needs by taking a leave of absence, delaying medical tests, threatening not to treat him, and failing to refer him for treatment of psychological problems that may have caused him to experience the pain.

> FN1. Young did not file a Local Rule 56.1 Statement (formerly Local Rule 3(g)). The facts in this Opinion are undisputed or as alleged by Young, unless otherwise noted. Young's version of the facts is taken from his opposition to defendants' motion for summary judgment, his deposition, his response to defendants' first set of interrogatories and requests for production of documents, and his amended complaint.

Young was transferred to Sullivan on October 3, 1991. Shortly after his arrival, on October 31, 1991, Young noted in his diary that a doctor at the facility's clinic thought he may have detriculosis, a disease of the bowel track, and had referred him for an outside test. During this visit, Young was given milk of magnesia, acetaminophen and other medications for his pain. On November 19, 1991, Dr. Tufua sent Young to Ellenville Community Hospital for a barium enema x-ray. The result of the x-ray was normal, although "multiple small ring-like calcific densities were noted in the right upper quadrant of the abdomen." Doctor A. DeCastro, who recorded the results of the x-ray, noted that the calcific densities might represent stones in the gallbladder or right kidney and recommended a sonogram.

In a letter to Prisoners Legal Services dated December 11, 1991, Young stated that

[t]he medical staff have sent me out to a number of hospitals for test[s] and the results are always ambiguous negative. The medications I have been taking for the pain are on a test term and when the medication wear [sic] off, the pain returns. The pain is in the area of the appendix, which proposes [sic] a dangerous problem causing near black outs and lightheadedness.

He asserted that the doctors were deliberately refusing to cure the problem, alleging that "[o]ne doctor said I needed a collosomy [sic] bag, then the next day he said I needed to be castrated." [FN2] Young concluded that the doctors at Sullivan were "playing games."

> FN2. Young did not identify the doctor.

On December 29, 1991, Young wrote to Superintendent Kuhlman stating that the medical personnel at Sullivan were being deliberately indifferent to his medical needs by pretending they couldn't find anything wrong with him. On December 31, 1991, Dr. Tufua sent Young to the Ellenville Community Hospital for a gallbladder sonogram. The results indicated that his gallbladder and kidneys were normal.

Young's abdominal pain persisted. On January 27, 1992, he wrote to Prisoners Legal Services, alleging that he had been denied proper medical care for over a year, "as if he was sentence [sic] to death." Two days later, on January 29, 1992, Young wrote a letter to Deputy Superintendent Edwards stating:

**\*3** I have been to sick call and even sent out to the clinic for test [sic]. Those test came back negative. The medication I have been receiving has not cured the problem. As a matter of fact, the last pills they gave me made me sicker. I sent some of the stuff to a lawyer. The staff has deliberately refused to give me the proper medication as an extension of my imprisonment (punishment).

When I went outside for test [sic], they sexually harassed me and threaten to physically attack me for no reason other than to embarrass and deprive me of the proper care. This was racism. The last two times I've been to sick call they outright refuse to give me any medication.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 32518 (S.D.N.Y.)

(Cite as: 1998 WL 32518 (S.D.N.Y.))

In a letter to Superintendent Kuhlman dated January 31, 1992, he claimed that although Ms. Lilley, the Nurse Administrator, had informed him two and a half weeks earlier that he would see a doctor, he had not yet seen a doctor despite the constant pain in his stomach after each meal.

That same day, January 31, 1992, Dr. Tufua examined Young and prescribed medication for his abdominal pains.[FN3] Young alleges that Dr. Tufua concluded that he had not been properly medicated and prescribed Donnotal and Colace. Dr. Tufua also referred him to an outside hospital and then went on a three month leave of absence.

>    FN3. On February 17, 1997, Young wrote to Ms. Becton of Prisoners Legal Services acknowledging that he had been taken to several outside facilities for medical tests and had been prescribed medication. Young listed the following medications that he had been given at Sullivan: Simethicone 80mg, Dannatal # 21, Percogesic # 42, Colace # 21, Mylain # 14, and acetaminophen 500mg.

Young's abdominal pain, however, persisted. From February 1992 through April 19, 1992, Young alleges that Sullivan's medical personnel refused togive him any medical care due to Dr. Tufua's absence and the factthat he had been referred to an outside hospital for treatment. Young alleges that the pain got progressively worse: he was "knocked to [his] knees by the pain and was unable to get up from the floor until the pain subsided."

Sometime between April 19 and April 20, 1992, Dr. Tufua apparently returned to the facility. According to the plaintiff, upon his return Dr. Tufua informed Young that he had changed his mind and was not going to give him further medical treatment, not even one aspirin and was removing Young's name from the list for referrals to outside medical providers. Nonetheless, on April 22, 1992, Dr. Tufua saw Young and ordered an Upper GI test series and a pancreatic enzymes test. On April 23, 1992, Young underwent the pancreatic enzymes test and on May 14, 1992, the Upper GI test series was performed. The tests revealed no abnormalities. Young continued to

experience abdominal pain throughout his time at Sullivan; he was transferred to Clinton Correctional Facility in March 1993. Young, presently incarcerated at Attica Correctional Facility, reports that the pain in his stomach is no longer occurring on a regular basis.

**B. *Applicable Legal Standard***

Young's allegations embody a claim for deliberate indifference to serious medical needs under the Eight Amendment. The Eighth Amendment prohibits the infliction of "cruel and unusual punishments" on prison inmates. The "unnecessary and wanton infliction of pain" an a prison inmate constitutes cruel and unusual punishment proscribed by the Eighth Amendment. *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (citation and internal quotation marks omitted).

**\*4** To bring a cause of action pursuant to Section 1983 for a violation of the Eighth Amendment's prohibition, a plaintiff must establish that the deprivation of which he is complaining is "sufficiently serious" to constitute cruel and unusual punishment and that a defendant's actions in allowing the deprivation must have amounted to deliberate indifference. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Thus, there is an objective and subjective component to the test. *See Rivera v. Senkowski,* 62 F.3d 80, 84 (2d Cir.1995).

The requirement that a deprivation must be sufficiently serious is a high standard and contemplates " 'a condition ... that may produce death, degeneration, or extreme pain.' " *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (quoting *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990)) (Pratt, J., dissenting)) ("*Hathaway* "). *See also Farmer,* 114 S.Ct. at 1979; *Koehl v. Dalsheim,* 85 F.3d 86, 88 (2d Cir.1996); *Liscio v. Warren,* 901 F.2d 274, 277 (2d Cir.1990) (must be life-threatening or fast-degenerating). In *Helling v. McKinney,* 509 U.S. 25, 33, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993), the Supreme Court extended Eighth Amendment protection beyond current health problems to those that are "sufficiently imminent" and "sure or very likely to cause serious illness and needless suffering in the next week or month or year." Whether a medical condition is sufficiently serious is to be

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 32518 (S.D.N.Y.)

(Cite as: 1998 WL 32518 (S.D.N.Y.))

judged objectively. *See Rivera,* 62 F.3d at 84; *Hathaway,* 37 F.3d at 66.

In addition, a defendant's conduct, when judged subjectively, must be deliberately indifferent to that serious condition. Deliberate indifference does not exist

unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that substantial risk of serious harm exists, and he must also draw the inference.

*Farmer,* 511 U.S. at 837. *See also Weyant v. Ost,* 101 F.3d 845, 856 (2d Cir.1996). Negligent treatment or medical malpractice, or a claim based on differences of opinion as to matters of medical judgment are insufficient to state a claim. *See Estelle v. Gamble,* 429 U.S. 97, 106-07, 97 S.Ct. 285, 50 L.Ed.2d 251. Medical malpractice may rise to the level of deliberate indifference, however, when such malpractice "involves culpable recklessness, i.e., an act or failure to act ... that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir .1996) (citation omitted) ("*Hathaway II* ").

**1. Young's Serious Medical Need**

Defendants contend that plaintiff did not have a serious medical need that went unmet, emphasizing the lack of a physical cause for Young's abdominal pain. Viewing the record in the light most favorable to Young, however, a reasonable jury could infer that the pain he experienced existed and was sufficiently serious to trigger Eighth Amendment protection. *Hathaway,* 37 F.3d at 66. Even pain that is psychological in origin can constitute a serious medical need. The guarantee of the minimal standards of medical care to prisoners extends to treatment of psychological or psychiatric disorders. *Langley v. Coughlin,* 888 F.2d 252, 254 (2d Cir.1989). *See Riddle v. Mondragon,* 83 F.3d 1197, 1202 (10th Cir.1996); *Gordon v. Kidd,* 971 F.2d 1087, 1094 (4th Cir.1992); *Wood v. Sunn,* 865 F.2d 982, 989 (9th Cir.1988).

**2. Dr. Tufua's Deliberate Indifference**

**\*5** Defendants next contend that there is insufficient evidence to raise a question of fact that Dr. Tufua was

deliberately indifferent to Young's medical needs. Young argues that deliberate indifference is demonstrated by Dr. Tufua's leave of absence from the facility (during which he received inadequate medical care), his delay in referring him to an outside hospital, his threat to provide no further medical care, and his failure to refer Young for psychological services.

**a. Dr. Tufua's Leave of Absence**

Dr. Tufua apparently saw and treated Young on the majority of his medical visits to the infirmary at Sullivan, making him the doctor most familiar with Young's condition. Dr. Tufua, however, cannot be held responsible for Young's medical care during his leave of absence from the facility. It is well-settled that a defendant cannot be held liable under Section 1983 on a theory of respondeat superior. *See Monell v. Department of Social Services,* 436 U.S. 659, 691 (1978). Similarly, any claims against Dr. Tufua under a theory of supervisory liability must also be dismissed as Young fails to allege that Dr. Tufua had direct or indirect supervisory authority over the medical staff while away on leave. *See Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996); *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994); *Keyes v. Strack,* No. 95 Civ. 2367(DC), 1997 WL 187368, at \*3 (S.D.N.Y. April 16, 1997).

**b. The Delay of the Medical Test**

Young further claims that Dr. Tufua unreasonably delayed his referral to an outside hospital for a diagnostic test, thereby evincing deliberate indifference. There is no question that a delay in treating a serious medical condition may constitute deliberate indifference in violation of the Eighth Amendment. *Estelle,* 429 U.S. at 104. The mere delay of care without more, however, is insufficient to state a claim of deliberate medical indifference. *Archer v. Dutcher,* 733 F.2d 14, 18 (2d Cir.1984). *See also Grant v. New York City Department of Corrections,* No. 94 Civ. 2793(CSH), 1996 WL 14463 at \*3 (S.D.N.Y. Jan.16, 1997). Plaintiff must plead and prove harm resulting from the delay of medical care.

Young maintains that although Dr. Tufua referred him on January 31, 1992 to an outside hospital for an Upper GI test series to determine the cause of his abdominal pains, action on the referral was delayed until April 22, 1992. There is no evidence that the delay was due to Dr. Tufua, who did not work at the hospital from February to late April 1992. Moreover, Young fails to establish that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 32518 (S.D.N.Y.)

(Cite as: 1998 WL 32518 (S.D.N.Y.))

the delay interfered with his health in any way. On April 23, 1992, Young underwent a pancreatic enzymes test and on May 14, 1992, the Upper GI test series. Both tests were negative. The crux of Young's complaint is that despite being sent to outside hospitals approximately twenty-five times for various tests to determine the cause of his abdominal pain, the tests were all negative and he was still in pain. While it is frustrating that medical science was unable to determine the cause of Young's pain, it is nonetheless evident that the delay, from January 31, 1992 to April 22, 1992, in referring Young for another outside procedure did not have any detrimental effect on his health.

**c. Dr. Tufua's Threat Not to Treat Young Further**

**\*6** Young also maintains that upon returning from a three month leave of absence, Dr. Tufua told him that he had changed his mind regarding Young's referral to an outside hospital and was not going to provide any more medical treatment to Young, not even one aspirin. Young, however, does not allege that he suffered any injury or damage from these alleged threats. The threat was in all events short lived. It is undisputed that Young was referred for more tests and received them on April 23, 1992, within three or four days of the threat. In these circumstances, the threat does not Constitute a constitutional violation under Section 1983. *See, e.g., Malsh v. Austin,* 901 F.Supp. 757, 763 (S.D.N.Y.1995).

**4. Young's Psychological Needs**

Finally, defendants argue that Young has failed to establish that Dr. Tufua acted with deliberate indifference toward his psychiatric needs. In response to defendants' suggestion that his medical condition was psychological, Young contends that Dr. Tufua had an obligation to refer him for psychological care. [FN4] Young's medical records show, however, and Young does not deny, that on June 17, 1992, Dr. Tufua proposed psychological counselling to Young and Young refused. Having refused to participate in such care, Young cannot claim that the defendant violated his rights by not providing it.

FN4. Young raises this issue for the first time in his opposition to defendants' motion for summary judgment.

In sum, Young's Eighth Amendment claim stems from

Dr. Tufua's failure to identify the cause of and alleviate his abdominal pain during his incarceration at Sullivan. The record shows that the defendant was generally solicitous of Young's medical condition. Young received a full battery of tests for his abdominal pain, including a barium enema x-ray, an ultrasound exam, a pancreatic enzymes test and an Upper GI test series. In addition, Young was also prescribed various medications for his pain, which he details in his diary. Given this undisputed history, the plaintiff has failed to raise an issue of fact that Dr. Tufua was deliberately indifferent to his medical problems.

**II. *Incitement to Sexual Assault Claim***

Young alleges that McCormick, a corrections officer at Sullivan, made sexually suggestive comments to him in the presence of fifteen to twenty inmates on November 14, 1991. Specifically, Young claims that as he was getting on line for a meal, McCormick stated to him "how you doing Boo-Boo", while looking at him in a manner as if to suggest that Young was a homosexual. [FN5] Young claims that McCormick stated "its [sic] gonna happen sooner or later," which Young understood to mean that he would be raped eventually. Young also alleges that McCormick directed other inmates to sexually harass and "jump" him and told his buddies "he [sic] been had before, so I don't see why there is a problem with you guy [sic] having him." While Young alleges that McCormick's remarks incited other inmates to attack him, he conceded at his deposition that he has never been raped or stabbed by an inmate. [FN6] He does contend, however, that he was surrounded by an atmosphere that was harassing and that led to fights with other inmates.

FN5. McCormick denies making these statements.

FN6. State regulations require that "unusual incidents" at correctional facilities be reported and placed on the computer. No "unusual incident" reports exist for Young from 1991 to 1995.

**\*7** The specific incidents of harassment and fights that occurred while he was at Sullivan are the following. [FN7] The first episode of sexual harassment alleged by Young occurred the night of November 14, 1991, when the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 32518 (S.D.N.Y.)

(Cite as: 1998 WL 32518 (S.D.N.Y.))

preacher at a prison chapel placed Young's hand on the preacher's buttocks. Young does not allege that the preacher had been present when McCormick made his remarks. From 1992 through March 1993, Young generally alleges that inmates and unidentified corrections personnel "indirectly called him a homosexual" by either staring at him, rubbing against him, making sexual overtures to him, or instigating fights. Specifically, Young alleges that on October 10, 1992, an inmate named Hardy sexually harassed him by attempting to place his penis on Young's leg. Young further alleges that on December 30, 1992, a corrections officer "hunched his pelvis out as if he wanted to play with his penis." Young claims that on February 3, 1993, the law library clerk "rub-up against [him], almost putting his penis on [Young]." Young mentions numerous other occasions when inmates waved their hands behind his buttocks, ran close behind him as if to "disrespect" him, and attempted to instigate fights in unspecified ways. Although Young attributes each of these incidents to McCormick's comments on November 14, 1991, he never alleges that any of the inmates or guards who harassed him heard McCormick's remarks.

FN7. The incidents of harassment and fights are taken from Young's diary, letters, answers to interrogatories, and deposition.

There are two components to Young's allegations. The first is the direct effect of McCormick's statements on Young. The second is the effect of those statements on others, who were thereby encouraged to abuse Young. For purposes of this analysis it is assumed that McCormick made the statements which Young reports and that the harassment by others occurred as Young describes.

While "sexual abuse of a prisoner by a corrections officer may in some circumstances violate the prisoner's right to be free from cruel and unusual punishment," *Boddie v. Schneider,* 105 F.3d 857, 860-61 (2d Cir.1997), verbal harassment by itself does not violate the Eighth Amendment. *Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) (per curiam); *Ramirez v. Holmes,* 921 F.Supp. 204, 210 (S.D.N.Y.1996). Here, McCormick's comments were not "objectively, sufficiently serious" to state an Eighth Amendment violation. *See* Sims v. Artuz, No. 96 Civ. 0216(LAP), 1997 WL 527882 at *12 (S.D.N.Y.

Aug.25, 1997); *Webb v. Foreman,* No. 93 Civ. 8579(JGK), 1997 WL 379707 at *3 (S.D.N.Y. July 9, 1997). The isolated comments Young describes are not so "cumulatively egregious in the harm they inflict[ ]" as to be "objectively, sufficiently serious." *Boddie,* 105 F.3d at 861.

McCormick's comments, however, could support an Eighth Amendment excessive force claim,[FN8] if they incited other inmates to assault Young sexually, thereby placing him at grave risk of physical harm.[FN9] *See Thomas v. District of Columbia,* 887 F.Supp. 1, 4 (D.D.C.1995) (allegations that a corrections officer sexually harassed an inmate and spread rumors that he was a homosexual and a snitch stated an Eighth Amendment excessive force claim). *See also* Villante v. Dept. of Corrections, 786 F.2d 515, 522-23 (2d Cir.1986) (a guard's deliberate indifference to sexual threats and abuse of one inmate by another states a cause of action); *Mathie v.. Fries,* 935 F.Supp. 1284, 1300 (E.D.N.Y.1996). *Cf. Fischl v. Armitage,* 128 F.3d 50, 58 (2d Cir.1997).

FN8. Excessive force cases are evaluated in a different way from cases involving conditions of confinement or medical claims. In the context of an Eighth Amendment excessive force claim, "the core judicial inquiry is ... whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian,* 503 U.S. 1, 7, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). *See Boddie,* 105 F.3d at 861; *Branham v. Meachum,* 77 F.3d 626, 630 (2d Cir.1996). As with the "deliberate indifference standard", the Court must consider both an objective and a subjective component. The objective component contemplates whether the alleged wrongdoing was objectively "harmful enough". *Hudson,* 503 U.S. at 8. The subjective component considers whether the defendant "possessed a 'wanton' state of mind when engaged in the alleged misconduct." *Branham,* 77 F.3d at 630 (citing *Hudson,* 503 U.S. at 6-7).

FN9. For example, calling a prisoner a "snitch" in front of other prisoners with wanton disregard

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 32518 (S.D.N.Y.)

(Cite as: 1998 WL 32518 (S.D.N.Y.))

for the inmate's safety may constitute an Eighth Amendment violation. *See Northington v. Jackson,* 973 F.2d 1518, 1525 (10th Cir.1992); *Miller v. Leathers,* 913 F.2d 1085, 1069 (4th Cir.1990); *Valandingham v. Bojorquez,* 866 F.2d 1135, 1139 (9th Cir.1989); *Watson v. McGinnis,* 964 F.Supp. 127, 131 (S.D.N.Y.1997).

**\*8** The isolated incidents Young describes are not sufficiently linked to McCormick's statements to constitute an Eighth Amendment violation. Young fails to allege any connection or, with one exception, even close temporal proximity between McCormick's statements and the conduct of which he complains. The only incident which occurred near the time McCormick is alleged to have made his remarks is the incident that occurred that very evening when a preacher at the prison's chapel placed Young's hand on the preacher's body. Since Young does not provide evidence that this individual knew of McCormick's remarks, there is insufficient evidence to support this portion of Young's claim. Moreover, Young does not allege that any of the other individuals who assaulted him were present when McCormick made his comments on November 14, 1991. Although Young claims that McCormick's remarks instigated several fights, the only fight he in fact describes is with an inmate named "Streeter," which occurred on December 21, 1995, more than four years after McCormick's remarks, and at a different correctional facility. In sum, stretching beyond a year from the November 14, 1991 comments, the incidents of harassment are too removed in time to support an inference of causation. Finally, Young does not allege harm of federal constitutional magnitude. *See Boddie,* 105 F.3d at 861; *Williams v. Keane,* No. 95 Civ. 527677(JGK), 1997 WL 527677 at \*11 (S.D.N.Y. Aug.25, 1997). Young's claims against McCormick must therefore be dismissed.

### CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment is granted and the case is dismissed. The Clerk of Court shall enter judgment for the defendants and close the case.

SO ORDERED.

S.D.N.Y.,1998.

Young v. Coughlin
Not Reported in F.Supp., 1998 WL 32518 (S.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))



Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Jesse L. STEWART, Jr., Plaintiff,

v.

Gary HOWARD, D. Monell, N. Marsh, D. Spangenburg, D. Swarts, E. Hollenbeck, J. Edwards, D. Russell, Defendants.

No. 9:09-CV-0069 (GLS/GHL).

April 26, 2010.

Jesse L. Stewart, Jr., Marienville, PA, pro se.

Office of Frank W. Miller, Frank W. Miller, Esq., Michael J. Livolsi, Esq., of Counsel, East Syracuse, NY, for Defendants.

### REPORT-RECOMMENDATION

GEORGE H. LOWE, United States Magistrate Judge.

**\*1** This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Gary L. Sharpe, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Jesse L. Stewart alleges that Defendants, all employees of the Tioga County Jail, violated his constitutional rights by limiting his ability to send legal mail, depriving him of his mattress and bedding during daytime hours, subjecting him to excessive force, denying him medical care after the alleged use of excessive force, and conducting biased disciplinary hearings. Currently pending before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Dkt. No. 30.) Plaintiff has opposed the motion. (Dkt. No. 32.) For the reasons that follow, I recommend that Defendants' motion be granted.

### I. FACTUAL AND PROCEDURAL SUMMARY

This action involves Plaintiff's experiences at Tioga County Jail, where he was incarcerated from August 19, 2008, to January 13, 2009. (Dkt. No. 30-4 at 14:2-11.) The complaint consists almost entirely of copies of grievances and letters that Plaintiff submitted to other individuals and organizations. The "facts" section of the civil complaint form merely directs the reader to "see attached." As such, the precise contours of Plaintiff's claims are difficult to discern. The documents attached to the complaint show that:

On September 22, 2008, Plaintiff requested a grievance form so that he could complain about the facility's legal mail procedures. (Dkt. No. 1 at 41.) A grievance form was issued. *Id.*

On October 27, 2008, Plaintiff requested a grievance form so that he could complain about being denied access to the courts. (Dkt. No. 1 at 44.) Sgt. William "spoke with

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

[Plaintiff] but he refuses to sign off. He states he needs these letters to go out to these courts because he's fighting extradition." *Id.*

On October 30, 2008, Defendant Officer Earl Hollenbeck issued an Inmate Rule Infraction Notice to Plaintiff accusing him of sending mail using another inmate's account. (Dkt. No. 1 at 31.)

In a "notice of intention" dated November 30 2008, Plaintiff alleged that, pending disciplinary action against him, staff at the Tioga County Jail deprived him of his mattress, sheets, and blanket when temperatures were as low as fifteen degrees at night and forced him to sit directly on his steel bed for periods up to seventeen hours. (Dkt. No. 1 at 8.) In support of Defendants' summary judgment motion, Defendant Lt. David Monell declares that when inmates are accused of violating a disciplinary rule, they are placed in administrative segregation pending a hearing. During that time, the inmate's bedding is removed during the day. If this was not done, "inmates may intentionally violate rules in order to be assigned to administrative segregation so they could sleep in the cell all day instead of having to adhere to the normal inmate routine." (Dkt. No. 30-11 at 6 ¶ 12.) The parties agree that inmates' mattresses and bedding are returned at night. (Dkt. No. 1 at 10; Dkt. No. 30-11 at 6 ¶¶ 13-15.)

**\*2** In his "notice of intention," Plaintiff alleged that on November 3, 2008, he asked for a grievance form. (Dkt. No. 1 at 8.) Defendant Officer Douglas Swarts told him "if you don't shut the fuck up I'll have a few people shut you up." *Id.* Two or three minutes later, several other officers, including Defendant Sergeant Dennis Spangenburg, arrived and stood in front of Plaintiff's locked cell. *Id.* Plaintiff asked Defendant Spangenburg why he was denying Plaintiff the right to file a grievance. *Id.* at 8-9. Defendant Spangenburg replied "I can deny you anything I want." *Id.* at 9. Defendant Officers Jonathan Edwards and David Russell then entered Plaintiff's cell

and handcuffed Plaintiff so tightly that the handcuffs "stopp[ed] the flow of blood to [Plaintiff's] hands." *Id.* Defendants Edwards and Russell then escorted Plaintiff to the intake area of the facility. Along the way, they used Plaintiff's "head and body as a ram to open the electronically control[l]ed doors," which cut Plaintiff's lip and caused his nose to bleed. *Id.* Attached to Plaintiff's complaint are affidavits from inmates who state that they witnessed this incident. *Id.* at 14-15.

Plaintiff alleged in his "notice of intention" that upon arrival at the intake area, he was placed in a strip isolation cell. (Dkt. No. 1 at 9.) Several officers "entered in behind me, at what time I was hit with closed fist[s] and what felt like kicks from all directions to my head, back, ribs, and groin area several times." *Id.* Plaintiff was punched in the right eye. *Id.* After that, Plaintiff's handcuffs were removed and Defendant Sergeant Nathaniel Marsh entered the cell, grasped Plaintiff around the neck with one hand, held his mace an arm's length away from Plaintiff's face, and repeated "get the fuck up you little asshole" over and over. *Id.*

Defendants Marsh, Spangenburg, Swarts, Edwards, and Russell have submitted notarized affidavits in support of Defendants' motion for summary judgment stating that they did not assault Plaintiff. (Dkt. No. 30-11 at 10, 12, 18, 22, 24.)

At 10:50 a.m., Defendant Swarts issued two Inmate Rule Infraction Notices. The first stated that Plaintiff "refused to lock in his cell after numerous orders to do so. Duress alarm was activated." (Dkt. No. 1 at 32.) The second stated that Plaintiff "disrupted the pod by yelling threats to jail personnel." *Id.* at 33.

In his "notice of intention," Plaintiff alleged that he needed medical attention but was locked in the cell alone

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

without such attention for approximately fourteen hours. (Dkt. No. 1 at 9.) At 11:30 p.m., Plaintiff was escorted back to his usual cell. *Id.* All of his personal property had been removed and he was given only a mattress and a blanket. *Id.* The next morning, officers removed the mattress. *Id.* Plaintiff was told that he could only shower if he remained handcuffed and shackled. *Id.* He was given only two sheets of toilet paper. *Id.* at 9-10. This pattern of being given a mattress at night and having it removed in the morning continued for ten days. *Id.* at 10.

**\*3** On November 6, 2008, Plaintiff submitted an Inmate Request Form asking to "be released from ... restraint and receive my property back today." (Dkt. No. 1 at 45.) His request was denied. *Id.*

In his "notice of intention," Plaintiff alleged that when his property was finally returned to him, he "became submissive" and "did not file any more grievances as I was told not to or the next time it may be worse." *Id.* at 10.

In his "notice of intention," Plaintiff alleged that Defendant Marsh conducted a biased disciplinary hearing and found him guilty "on all of the infractions." (Dkt. No. 1 at 10.) Another attachment to the complaint shows that on November 12, 2008, Defendant Marsh found Plaintiff guilty and sentenced him to twenty-eight days of keeplock with no programs, no commissary, twenty minute hygiene, and legal phone calls only. *Id.* at 34.

In his "notice of intention," Plaintiff alleged that there is no "inhouse mail, or legal outgoing mail system" at Tioga County Jail and that Defendants refused to mail any item that would cost more than eighty-four cents. (Dkt. No. 1 at 10.)

On December 1, 2008, Officer Sean Shollenberger issued an Inmate Rule Infraction Notice stating that Plaintiff used stamps from another inmate to send personal mail. (Dkt. No. 1 at 35.) A hearing was scheduled for December 17, 2008. Plaintiff filed a written request stating that he had been informed of the hearing and requesting "that any decision to be determined may be done so without my participation or presence ... I do not wish to participate in such hearing." (Dkt. No. 1 at 36.) Plaintiff's request was approved. *Id.* At the hearing, Defendant Marsh found Plaintiff guilty and sentenced him to fourteen days of keeplock, no programs, no commissary, twenty minute hygiene, and legal calls only. *Id.* at 37. Defendant Marsh noted that "this is not the first infraction hearing due to [Plaintiff's] abusing the U.S. Postal Service." *Id.* On December 18, 2008, Plaintiff appealed the decision. *Id.* at 38. Plaintiff stated that he had refused to attend the hearing because of Defendant Marsh's previous use of force against him and because the hearing was not recorded. *Id.* at 39. The Chief Administrative Officer denied the appeal on December 23, 2008, because the "sanctions imposed are appropriate." *Id.* at 38.

On December 17, 2008, Plaintiff requested two grievance forms so that he could complain about the lack of bedding and facility disciplinary and hearing procedures. Grievance forms were issued. (Dkt. No. 1 at 46-47.)

On December 18, 2008, Plaintiff submitted a grievance complaining about the lack of bedding, visits, food, medical care, access to courts, and water. (Dkt. No. 1 at 20.) The grievance coordinator denied the grievance because "[d]iscipline is not grievable. There is an appeal process which the inmate can follow." *Id.* at 22. Plaintiff appealed to the Chief Administrative Officer. *Id.*

**\*4** On December 18, 2008, Plaintiff submitted a grievance complaining about Defendant Marsh's conduct during the disciplinary hearing [FN1] and requesting that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

disciplinary hearings be recorded or monitored by another hearing officer. (Dkt. No. 1 at 23-24.) The Grievance Coordinator denied the grievance because "NYS Minimum Standards requires that records be kept of infraction hearings. Records are kept of the infraction hearing. The TCJ does not have more than one officer available to do infraction hearings." *Id.* at 25. Plaintiff appealed to the Chief Administrative Officer. *Id* . On December 22, 2008, Defendant Marsh completed a Grievance Investigation Form stating that he interviewed Plaintiff. Defendant Marsh found that "this facility keeps all hearing records as well as provide a copy of the hearing record to the inmate. This facility has more than one hearing officer available." *Id.* at 26.

FN1. Although it is not clear, Plaintiff was presumably referring to the November 12, 2008, hearing, which he attended, rather than the December 17, 2008, hearing that he refused to attend.

On December 18, 2008, Plaintiff submitted an Inmate Request Form asking to speak with the Undersheriff or Captain. (Dkt. No. 1 at 48 .)

On December 22, 2008, Plaintiff wrote a letter to the Chairman of the New York Commission of Corrections; the Hon. Thomas J. McAvoy, Senior United States District Judge, and the New York State Attorney General regarding conditions at Tioga County Jail. (Dkt. No. 1 at 16-17.) Specifically, Plaintiff complained about the bedding issue, the grievance and appeal system, and the legal mail system. *Id.*

On December 28, 2008, Plaintiff submitted a grievance complaining about the facility's legal mail procedure. (Dkt. No. 1 at 27.) The Grievance Coordinator denied the grievance because "[t]his facility is not denying

you access to the courts. Minimum standards ha[ve] been and will be controlled by the State of NY, therefore this issue is not grievable. NYSCOC was contacted regarding your reference to a 'new' state directive regarding legal mail. No such directive exists." *Id.* at 28. Plaintiff checked the box indicating that he wanted to appeal to the Chief Administrative Officer and wrote a note that he "was told that Lt. D. Monell is the Chief Officer and that I could not appeal this decision any higher." *Id.*

In his "notice of intention," Plaintiff alleged that on December 31, 2008, he was summoned to the front of the jail for an interview with Defendant Lt. D. Monell. (Dkt. No. 1 at 11.) Defendant Monell questioned Plaintiff about his December 22, 2008, letter to the Commission of Corrections. *Id.* Defendant Monell said that he did not give a damn about federal standards regarding bedding. *Id.* Defendant Monell told Plaintiff he should save his weekly postage allowance until he had enough to send a large document and did not respond when Plaintiff informed him that he was not allowed to do. *Id.* Regarding Plaintiff's complaint that he had received only two sheets of toilet paper, Defendant Monell replied that this was facility policy. (Dkt. No. 1 at 12.) Defendant Monell stated that he had reviewed the videotape of the alleged excessive force incident and did not see anything. *Id.* Defendant Monell asked "in a sarcastic manner" whether Plaintiff wanted protective custody because he felt threatened by the facility's officers. Plaintiff said no. *Id.*

**\*5** On January 1, 2009, Plaintiff filed an Inmate Request Form stating that he had not received responses to his appeals regarding disciplinary hearings. (Dkt. No. 1 at 49.) Defendant Russell responded that "Grievance # 36 was upheld so there is no appeal. Grievance # 35 was not a grievable issue because it regarded disciplinary sanctions." (Dkt. No. 1 at 50.)

On January 1, 2009, Plaintiff wrote to the Commission of Corrections informing them of his

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

conversation with Defendant Monell and requesting an outside investigation. (Dkt. No. 1 at 18.)

On January 5, 2009, Plaintiff filed an Inmate Request Form asking for a grievance form. He stated that "the taking of bedding is not a disciplinary sanction but in fact an illegal practice." (Dkt. No. 1 at 42.) Defendant Monell replied that "removal of bedding is a disciplinary sanction and as such is not a grievable issue. Do not put in any more requests on this matter." *Id.*

On January 5, 2009, Plaintiff filed an Inmate Request Form stating that "the grievant has the right to appeal any decision by the grievance committee to the highest level for confirmation of such determination." (Dkt. No. 1 at 43.) Defendant Monell replied that Plaintiff should "read minimum standards-once the action requested has been met-there is no grounds for appeal. Request for grievance is denied. Do not put in any more requests on this matter ." *Id.*

On January 5, 2009, Plaintiff wrote to the Commission of Corrections again. He stated that he was being illegally denied the right to file grievances and that Defendant Monell "attempted to intimidate me." (Dkt. No. 1 at 19.) In a separate letter, he stated that his "grievance is not in regards to any disciplinary sanctions, but in fact an illegal local procedural practice at Tioga County Jail." (Dkt. No. 1 at 29.) He stated that he had been deprived of bedding, food, medical care, visits, and mail without due process. *Id.* at 29-30.

On January 8, 2009, Plaintiff filed an Inmate Request Form stating that he wanted to file a grievance about "the issue of periodicals and the donation/reading of them." (Dkt. No. 1 at 51.) A sergeant (signature illegible) responded that "this is not a grievable issue-this is a requestable issue which will be denied due to security

problems encountered in the D-pod housing unit involving the newspaper. Donations of books and magazines are allowed-you also are allowed to release property to persons outside of the jail." *Id.* at 52.

Plaintiff filed this action on January 21, 2009. (Dkt. No. 1.) Defendants now move for summary judgment. (Dkt. No. 30.) Plaintiff has opposed the motion. (Dkt. No. 32.) Defendants have filed a reply. (Dkt. No. 36.)

## II. APPLICABLE LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. Only after the moving party has met this burden is the non-moving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin v. Goord,* 467 F.3d 263, 272-73 (2d Cir.2006). The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86 (1986). Rather, a dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material [FN2] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

*Baseball Props., Inc. v. Salvino,* 542 F.3d 290, 309 (2d Cir.2008).

FN2. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson,* 477 U.S. at 248.

**B. Legal Standard Governing Motion to Dismiss for Failure to State a Claim**

*6 To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the allegations of the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnise General Transatlantique,* 405 F.2d 270, 273-74 (2d Cir.1968) [citations omitted]; *accord, Katz v. Molic,* 128 F.R.D. 35, 37-38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties."). Accordingly, it is appropriate to summarize the legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia,* "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U .S. 544, 570 (2007)) (emphasis added).

"Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense ... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not shown-that the pleader is entitled to relief." *Id.* at 1950 (internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009). However, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949.

**III. ANALYSIS**

Defendants argue that they are entitled to summary judgment because (A) Plaintiff refused to cooperate with his deposition; (B) Plaintiff failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act ("PLRA") regarding the November 3 excessive force incident "and other claims such as lack of toilet paper"; (C) Plaintiff has failed to state an Eighth Amendment conditions of confinement claim; (D) Plaintiff's allegations regarding the lack of bedding do not state a due process claim; (E) Plaintiff has failed to state a claim that he was denied access to the courts; and (F) Plaintiff has not alleged that Defendants Howard or Hollenbeck were personally involved in any alleged constitutional violation.

**A. Deposition**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

**\*7** Defendants move, pursuant to Federal Rule of Civil Procedure 37, to dismiss this action because Plaintiff unilaterally ended his deposition before answering any substantive questions. (Dkt. No. 30-12 at 10-11.) In the alternative, Defendants request an order precluding Plaintiff from offering sworn testimony in opposition to any motion brought by Defendants or at trial. *Id.* at 11. I find that Defendants' motion is untimely.

This Court's Mandatory Pretrial Discovery and Scheduling Order, issued on March 31, 2009, granted Defendants permission to depose Plaintiff. The order stated that "[t]he failure of the plaintiff to attend, be sworn, and answer appropriate questions may result in sanctions, including dismissal of the action pursuant to [Rule] 37." (Dkt. No. 21 at 3 ¶ D.) The order also noted that "any motion to compel discovery in the case must be filed not later than ten (10) days after the deadline for completing discovery." FN3 *Id.* at 4 n. 5. The order set July 29, 2009, as the deadline for completing discovery. *Id.* at 4 ¶ A.

FN3. Effective January 1, 2010, the deadlines in the local rules were amended. The local rule now requires that discovery motions be filed no later than fourteen days after the discovery cut-off date. Local Rule 7.1(d)(8).

On July 2, 2009, Defendants requested permission to depose Plaintiff. (Dkt. No. 22.) The Court denied the motion as moot, noting that permission had already been granted. (Dkt. No. 23.) On July 31, 2009, Defendants requested an extension of the discovery cut-off date to allow them time to take Plaintiff's deposition. (Dkt. No. 24.) The Court granted Defendants' request and extended the discovery deadline to September 19, 2009. (Dkt. No. 27.)

On September 14, 2009, Defendants conducted Plaintiff's deposition. (Dkt. No. 30-4 at 9-17.) When defense counsel began asking Plaintiff about his criminal history, Plaintiff stated "[y]ou're browbeating me here, and I'll write to the judge and tell him why I didn't cooperate." *Id.* at 15:14-15. Plaintiff then ended the deposition. *Id.* at 15:20-22. No questions were asked or answered about the events at issue in this action.

Discovery in this case closed on September 19, 2009. Defendants did not file a motion to compel Plaintiff's deposition or for sanctions until they filed the pending motion on October 27, 2009. Because Defendants did not file their motion within ten days of the discovery cut-off date or request an extension of time in which to file a discovery motion, I recommend that their motion to dismiss the case as a sanction for Plaintiff's refusal to cooperate with his deposition be denied.

**B. Exhaustion of Administrative Remedies**

Defendants argue that Plaintiff's claims regarding the November 3, 2008, alleged use of excessive force and the alleged failure to provide medical care after the incident must be dismissed because Plaintiff failed to exhaust his administrative remedies. (Dkt. No. 30-12 at 2-3.) Defendants are correct.

Under the PLRA, "[n]o action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002). In order to properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

institution to which they are confined. *Jones v. Bock,* 549 U.S. 199, 218 (2007).

**\*8** Tioga County Jail has an inmate grievance procedure. (Dkt. No. 30-10 at 8-11.) Under the procedure, the Corrections Officer assigned to the inmate's housing unit initially receives complaints either verbally or in writing and attempts to resolve the complaint informally. *Id.* at ¶ 1.2(A)(1-2). If the complaint cannot be resolved informally, the inmate files a written complaint form, which is forwarded to the Shift Supervisor. *Id.* at ¶ 1.2(A)(3-4). If the Shift Supervisor cannot resolve the complaint, the complaint is forwarded to the Grievance Coordinator, who provides the inmate with a grievance form. *Id.* at ¶ 1.2(A)(5-8). The Grievance Coordinator is responsible for investigating and making a determination on the grievance and must give a written copy of his or her decision to the inmate. *Id.* at ¶ 1.2(A)(9). This written decision must be issued within five business days of receipt of the grievance. *Id.* at 1.3(C). If the inmate does not accept the Grievance Coordinator's determination, "an appeal will be forwarded to the Jail Chief Administrative Officer." *Id.* at ¶ 1.2(A)(11). The inmate must appeal within two business days of receipt of the Grievance Coordinator's determination. *Id.* at ¶ 1.3(D). At the request of the inmate, a copy of the appeal will be mailed by the Jail Administrator to the Commission of Corrections. *Id.* at ¶ 1.2(A)(13). The Jail Administrator must make a determination within two working days. *Id.* at ¶ 1.3(E). The inmate may appeal within three business days of receipt of the decision to the Commission of Corrections. *Id.* at ¶ 1.3(F).

Here, Plaintiff did not file a grievance regarding the alleged use of excessive force on November 3, 2008. (Dkt. No. 30-11 ¶ 6.) Therefore, he did not exhaust his administrative remedies.

Plaintiff's failure to exhaust, however, does not end the inquiry. The Second Circuit has held that a three-part inquiry is appropriate where a prisoner has failed to exhaust his available administrative remedies. *Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004).[FN4]

> **FN4.** The Second Circuit has not yet decided whether the *Hemphill* rule has survived the Supreme Court's decision in *Woodford v. Ngo,* 548 U.S. 81 (2006), in which the Supreme Court held that each step of an available grievance procedure must be "properly" completed before a plaintiff may proceed in federal court. *Chavis v. Goord,* No. 07-4787-pr, 2009 U.S.App. LEXIS 13681, at \*4, 2009 WL 1803454, at \*1 (2d Cir. June 25, 2009).

First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* (citations omitted). Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* (citations and internal quotations omitted).

**\*9** Here, as discussed above, administrative remedies were available to Plaintiff. Defendants preserved the exhaustion defense by raising it in their answer. (Dkt. No. 19 at ¶¶ 8-10.) Plaintiff appears to argue that Defendants are estopped from asserting the defense or that special

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

circumstances exist justifying the failure to exhaust. Specifically, Plaintiff states that exhausting his administrative remedies would have been futile and "may have caused more harm to the plaintiff" because the officers who allegedly assaulted him "are the persons that operate and give the decisions" regarding grievances. (Dkt. No. 32 at 1.)

Plaintiff's explanation is belied by his actual conduct. Plaintiff alleges that Defendant Marsh was involved in the use of excessive force. (Dkt. No. 1 at 9.) Despite this fact, Plaintiff filed a grievance three weeks after the incident complaining about Defendant Marsh's conduct during a disciplinary hearing. (Dkt. No. 1 at 23-24.) This indicates that Plaintiff was not, in fact, afraid to file grievances against the Defendants who allegedly assaulted him and denied him medical care. Thus, Plaintiff has not plausibly alleged that special circumstances prevented him from exhausting his administrative remedies. Therefore, I find that Plaintiff failed to exhaust his administrative remedies regarding the alleged use of excessive force and I recommend that the Court dismiss that claim.

**C. Eighth Amendment Conditions of Confinement**

Plaintiff alleges that Defendants violated his Eighth Amendment rights by removing his personal property, taking away his bedding and mattress during the day, allowing him to shower only if he remained handcuffed and shackled, and providing him with only two sheets of toilet paper. (Dkt. No. 1 at 9-10.) Defendants move for summary judgment of this claim. (Dkt. No. 30-12 at 5.)

The Eighth Amendment to the United States Constitution imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners. *Farmer v. Brennan,* 511 U.S. 825, 832 (1994). In fulfilling this duty, prison officials must "ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.' " *Farmer,* 511 U.S. at 832 (quoting *Hudson*

*v. Palmer,* 468 U.S. 517, 526-27 (1984)).

A viable Eighth Amendment claim must contain both an objective and a subjective component. *Farmer,* 511 U.S. at 834. To prove the objective component of an Eighth Amendment conditions of confinement claim, a prisoner must show that the defendant's "act or omission ... result[ed] in the denial of the minimal civilized measure of life's necessities." *Farmer,* 511 U.S. at 834. Therefore, "extreme deprivations are required to make out a conditions-of-confinement claim." *Hudson v. McMillian,* 503 U.S. 1, 9 (1992). Specifically, an inmate must show that he was deprived of a "single, identifiable human need such as food, warmth, or exercise." *Wilson v. Seiter,* 501 U.S. 294, 304 (1991). Here, Plaintiff does not allege that he was deprived of any human need. He was provided with a mattress and blankets at night, had the opportunity to shower, and received toilet paper. Although his conditions may not have been pleasant, the Eighth Amendment "does not mandate comfortable prisons." *Farmer,* 511 U.S. at 932 (citing *Rhodes v. Chapman,* 452 U.S. 337, 349 (1981)). Therefore, I recommend that the Court grant Defendants' motion and dismiss Plaintiff's conditions of confinement claim.

**D. Due Process**

*1. Bedding*

**\*10** Defendants construe Plaintiff's complaint as asserting a claim that the removal of his bedding during the day violated his right to due process. Defendants argue that this claim should be dismissed. (Dkt. No. 30-12 at 5-6.) Defendants are correct.

An individual claiming that he was deprived of an

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

interest in property "must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Board of Regents v. Roth,* 408 U.S. 564, 577 (1972). Plaintiff had not legitimate claim of entitlement to possessing bedding during the day. Therefore, I recommend that the Court dismiss this claim.

2. *Disciplinary Hearing*

Plaintiff appears to allege that Defendant Marsh deprived him of due process by conducting a biased disciplinary hearing. (Dkt. No. 1 at 10.) Defendants have not addressed this claim. I find that it is subject to *sua sponte* dismissal.

In order to state a claim for violation of his procedural due process rights, a plaintiff must allege facts plausibly suggesting that he was deprived of a liberty interest without due process of law. *Tellier v. Fields,* 280 F.3d 69, 79-80 (2d Cir.2000).

An inmate has a liberty interest in remaining free from a confinement or restraint where (1) the state has granted its inmates, by regulation or statute, an interest in remaining free from that particular confinement or restraint; and (2) the confinement or restraint imposes "an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484 (1995); *Tellier,* 280 F.3d at 80; *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

Assuming *arguendo* that the state has granted inmates in county jails an interest in remaining free from keeplock confinement, the issue is whether Plaintiff's confinement imposed an "atypical and significant hardship" on him in relation to the ordinary incidents of prison life. Courts in the Second Circuit have routinely declined to find a liberty

interest where an inmate's keeplock confinement is an "exceedingly short" period, less than thirty days, and there is no indication that the inmate suffered any "unusual conditions" during the confinement. *Anderson v. Banks,* No. 06-Cv-0625, 2008 U.S. Dist. LEXIS 60932, 2008 WL 3285917 (N.D.N.Y. Aug. 7, 2008) ("Confinements in ... keeplock of less than thirty days will not suffice to demonstrate a protected liberty interest absent other extraordinary circumstances of the confinement demonstrating that it was atypical or significant for other reasons.") (Sharpe, J.) (Homer, M.J.).[FN5]

FN5. The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

Here, Defendant Marsh sentenced Plaintiff to twenty-eight days of keeplock after the November 12, 2008, hearing that followed the alleged excessive force incident. (Dkt. No. 1 at 34.) Defendant Marsh sentenced Plaintiff to fourteen days of keeplock after the December 17, 2008, hearing regarding Plaintiff's alleged use of another inmate's stamps. (Dkt. No. 1 at 37.) There is no indication that Plaintiff suffered any unusual conditions during these keeplock confinements. Notably, Plaintiff's allegations regarding the removal of his bedding occurred not during these keeplock sentences, but rather during earlier administrative segregation periods in October and November. (Dkt. No. 1 at 8-10.) Thus, Plaintiff has not alleged facts plausibly suggesting, or raised a triable issue of fact, that he was deprived of a liberty interest. Therefore, I recommend that the Court dismiss Plaintiff's due process claim against Defendant Marsh *sua sponte.*

**E. Access to the Courts**

**\*11** Defendants argue that Plaintiff's claims regarding Tioga County Jail's legal mail procedures must be dismissed because (1) Plaintiff has not alleged the

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

personal involvement of any Defendant; and (2) Plaintiff has not alleged any actual harm resulting from the procedures. (Dkt. No. 36-3 at 1.) Defendants did not raise this argument in their moving papers. Normally, due process would thus require that I disregard the argument or give Plaintiff an opportunity to file a sur-reply. Here, however, Plaintiff addressed this issue in his opposition despite Defendants' failure to raise it initially. (Dkt. No. 32 at 1.) Moreover, even if he had not, I would recommend that the Court dismiss the claim *sua sponte.*

   "Interference with legal mail implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution." *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003). "A prisoner has a constitutional right of access to the courts for the purpose of presenting his claims, a right that prison officials cannot unreasonably obstruct and that states have affirmative obligations to assure." *Washington v. James,* 782 F.2d 1134, 1138 (2d Cir.1986) (citing *Bounds v. Smith,* 430 U.S. 817, 821-23 (1977)). This right of access, however, guarantees a prisoner "no more than reasonable access to the courts." *Herrera v. Scully,* 815 F.Supp. 713, 725 (S.D.N.Y.1993) (citing *Pickett v. Schaefer,* 503 F.Supp. 27, 28 (S.D.N.Y.1980)). A claim for reasonable access to the courts under § 1983 requires that an inmate demonstrate that the alleged act of deprivation "actually interfered with his access to the courts or prejudiced an existing action." *Id.* (citations omitted). Courts have not found an inmate's rights to be violated when the deprivation merely delays work on his legal action or communication with the court. *Id.* To state a claim for denial of access to the courts, a plaintiff must assert non-conclusory allegations demonstrating both (1) that the defendant acted deliberately and maliciously, and (2) that the plaintiff suffered an actual injury. *Lewis v. Casey,* 518 U.S. 343, 353 (1996); *Howard v. Leonardo,* 845 F.Supp. 943, 946 (N.D.N.Y.1994) (Hurd, M.J.).

   Here, Plaintiff has not raised a triable issue of fact that he suffered any actual injury. In his "notice of intention," he stated that the facility's mail policies "*could*

cause a great effect" and "*could* cause irreparable harm" to two pending *habeas corpus* cases. (Dkt. No. 1 at 10, emphasis added.) In his opposition to the motion for summary judgment, Plaintiff states that he "suffered the loss of one of the court actions" because he could not mail a brief. (Dkt. No. 32 at 1.) However, I note that this statement is not "evidence" because Plaintiff's opposition was not signed under penalty of perjury and does not contain any other language bringing it into substantial compliance with 28 U.S.C. § 1746. *See, LeBoeuf, Lamb, Greene & MacCrae, L.L.P. v. Worsham,* 185 F.3d 61, 65-66 (2d Cir.1999). Therefore, I recommend that Plaintiff's claim regarding legal mail be dismissed.

**F. Personal Involvement**

   **\*12** Defendants argue that Plaintiff has failed to allege personal involvement by Defendants Howard or Hollenbeck. (Dkt. No. 30-12 at 11-12.) Defendants are correct.

   " '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)).[FN6] In order to prevail on a cause of action under 42 U.S.C. § 1983 against an individual, a plaintiff must show some tangible connection between the unlawful conduct and the defendant.[FN7] If the defendant is a supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior* ) is insufficient to show his or her personal involvement in that unlawful conduct.[FN8] In other words, supervisory officials may not be held liable merely because they held a position of authority.[FN9] Rather, supervisory personnel may be considered "personally involved" if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 12

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). FN10

> FN6. *Accord, McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087 (1978); *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

> FN7. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

> FN8. *Polk County v. Dodson,* 454 U.S. 312, 325 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985).

> FN9. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996).

> FN10. The Supreme Court's decision in *Ashcroft v. Iqbal,* ---U.S. ----, 129 S.Ct. 1937 (2009) arguably casts in doubt the continued viability of some of the categories set forth in *Colon. See Sash v. United States,* --- F.Supp.2d ----, No. 08-CV-116580, 2009 U.S. Dist. LEXIS 116580, at *32-39, 2009 WL 4824669, at*10-11 (S.D.N.Y. Dec. 15, 2009). Here, the Court will assume *arguendo* that all of the *Colon* categories apply.

The only allegation in the complaint regarding Defendant Hollenbeck is that he issued an Inmate Rule Infraction Notice to Plaintiff on October 30, 2008. (Dkt. No. 1 at 31.) Plaintiff has not alleged any facts plausibly suggesting, or raised a triable issue of fact, that Defendant Hollenbeck's conduct violated Plaintiff's constitutional rights. Therefore, I recommend that any claims against Defendant Hollenbeck be dismissed.

The complaint's only reference to Defendant Howard is in the caption of the "notice of intention." (Dkt. No. 1 at 7.) Plaintiff could, perhaps, have argued that, as Sheriff, Defendant Howard was responsible for creating or allowing to continue unconstitutional policies. However, Plaintiff did not allege any facts plausibly suggesting, or raise a triable issue of fact, that Defendant Howard was responsible for the policies about which Plaintiff complains. Even if he had, as discussed above, Plaintiff has not provided sufficient evidence for any of his claims regarding those policies to survive summary judgment. Therefore, I recommend that any claims against Defendant Howard be dismissed.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 30) be **GRANTED;** and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of *Anderson v. Banks,* No. 06-Cv-0625, 2008 U.S. Dist. LEXIS 60932, 2008 WL 3285917 (N.D.N.Y. Aug. 7, 2008) in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

**\*13** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette, 984 F.2d 85 (2d Cir.1993)* (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a).

N.D.N.Y.,2010.

Stewart v. Howard

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

▷

Only the Westlaw citation is currently available.

United States District Court,

S.D. New York.

Jerome BELLAMY, Plaintiff,

v.

MOUNT VERNON HOSPITAL, in its official and individual capacity, Dr. Marc Janis, in his official and individual capacity, New York State Department Of Correctional Services, Dr. Lester Wright, in his official and individual capacity, and Dr. J. Pereli, in his official and individual capacity, Defendants.

No. 07 Civ. 1801(SAS).

June 26, 2009.

West KeySummary**Civil Rights 78** ☞ 1358

**78** Civil Rights

  **78III** Federal Remedies in General

    **78k1353** Liability of Public Officials

      **78k1358** k. Criminal law enforcement; prisons. Most Cited Cases

**Prisons 310** ☞ 203

**310** Prisons

  **310II** Prisoners and Inmates

    **310II(D)** Health and Medical Care

      **310k203** k. Reproductive issues. Most Cited Cases

**Sentencing and Punishment 350H** ☞ 1546

**350H** Sentencing and Punishment

  **350HVII** Cruel and Unusual Punishment in General

    **350HVII(H)** Conditions of Confinement

      **350Hk1546** k. Medical care and treatment. Most Cited Cases

A correctional services doctor was not deliberately indifferent to a prisoner's serious medical needs under the Eighth Amendment in connection with the alleged denial of testosterone treatments. The prisoner brought a § 1983 action which alleged that he was denied the treatments which he needed after he developed hypogonadism after an epididymectomy. The doctor not liable for the alleged harm because he was not involved with any denials of the prisoner's treatment and did not create a policy that contributed to the prisoner's alleged harm. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

Jerome Bellamy, Alden, NY, pro se.

Julinda Dawkins, Assistant Attorney General, New York, NY, for Defendants.

### OPINION AND ORDER

SHIRA A. SCHEINDLIN, District Judge.

## I. INTRODUCTION

*1 Jerome Bellamy, presently incarcerated and proceeding pro se, alleges that the New York State Department of Correctional Services ("DOCS") and Dr. Lester Wright, the remaining defendants in this case [FN1], violated Bellamy's constitutional rights. His claims surround denials of requested testosterone treatment by Wright, a doctor and supervisory official for the DOCS. Wright and the DOCS now move for summary judgment. For the reasons stated below, their motion for summary judgment is granted in its entirety.

FN1. The original and amended complaints were also filed against Mount Vernon Hospital, Dr. Mark Janis, Dr. J. Pereli, in their individual and official capacities. The claims against Mount Vernon Hospital and Dr. Mark Janis were dismissed in *Bellamy I* and the claim against Dr. J. Pereli was dismissed in a subsequent order issued by this Court on January 15, 2009. Wright and the DOCS are the only remaining defendants.

## II. BACKGROUND[FN2]

FN2. For more detailed background, see *Bellamy v. Mount Vernon Hosp.,* No. 07 Civ. 1801, 2008

WL 3152963 (S.D.N.Y. Aug. 5, 2008) (*"Bellamy I"* ). Some of the facts recounted here are drawn from the prior opinion.

### A. Facts

### 1. Parties

Bellamy is presently in the custody of the DOCS at the Wende Correctional Facility in Alden, New York.[FN3] The DOCS is a state agency responsible for the care, custody and control of inmates convicted of crimes under New York State laws.[FN4] Wright is both a New York-licensed medical doctor and the Deputy Commissioner and Chief Medical Officer ("CMO") of the DOCS.[FN5] As CMO, he is responsible for the development and operation of a system to provide necessary medical care for inmates in the custody of the DOCS.[FN6]

FN3. *See* Defendants' Rule 56.1 Statement of Facts ¶ 1.

FN4. *See id.* ¶ 2.

FN5. *See id.* ¶ 3.

FN6. *See id.*

### 2. Bellamy's Surgery

In August 2004, while in DOCS custody at Sing Sing

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

Correctional Facility in Ossining, New York, Bellamy underwent an epididymectomy.[FN7] Bellamy was HIV positive at the time of his surgery.[FN8] Around that time, Bellamy developed hypogonadism (a deficiency in the hormone testosterone) as well as a deficiency in the hormone Cortisol.[FN9] As a result of these conditions, Bellamy was prescribed various medications, including a testosterone patch called "Androderm."[FN10] Bellamy contends that without testosterone treatment, he suffers from mood swings, fatigue, nausea, headaches, and lack of appetite.[FN11] However, he also experiences similar symptoms even with medication.[FN12]

> FN7. See *Bellamy I*, 2008 WL 3152963, at *1. An epididymectomy is defined as the surgical removal of the epididymis (the cord-like structure along the posterior border of the testicle). The epididymis is essential to the male reproductive system. See Dorland's Illustrated Medical Dictionary 639, 1342, 1770 (31st ed.2007).

> FN8. See 3/6/08 Deposition Testimony of Jerome Bellamy ("Bellamy Dep. I") at 139:15-17 (where Bellamy says that, prior to the surgery, he was on HIV medication).

> FN9. See *Bellamy I*, 2008 WL 3152963, at *2. These conditions had many side effects, including sexual maladies and dramatic weight loss. See id. While Bellamy contends that the surgery caused the hypogonadism, his treating doctor claims "with a reasonable degree of medical certainty" that the hypogonadism preceded the surgery. See 4/22/08 Affidavit of Dr. Harish Moorjani ("Moorjani Aff."), Ex. J to 6/5/09 Supplemental Declaration of Julinda Dawkins, counsel to defendants, ¶ 4.

> FN10. See, e.g., Amended Complaint ("Am.Compl."), Statement of Facts ¶¶ 5, 7. Androgel is a similar medication. The Amended Complaint is divided into various parts with overlapping paragraph and page numbers. As a result, references to the Amended Complaint are made by noting first the relevant topic header and then the cited or quoted paragraph number.

> FN11. See 1/12/09 Deposition Testimony of Jerome Bellamy ("Bellamy Dep. II") at 35:23-24. Bellamy's hypogonadism may have been caused by his HIV. Bellamy complained of similar symptoms before the surgery and, therefore, before any alleged denial of Androgel or similar medications. See Moorjani Aff. ¶¶ 4-5.

> FN12. See Bellamy Dep. II at 43:21-24 (where Bellamy admits that some of his symptoms resumed even after using the testosterone patch). See also Am. Compl., Statement of Facts ¶ 7 ("[T]his treatment [, Androderm,] still has not proven to be effective in keeping my hormone levels elevated, even after the dosages were increased, and my levels rise high at times then suddenly drops real low.").

**3. Bellamy's Letters to Wright**

Following the surgery, Bellamy wrote to Wright on three pertinent occasions. In the first letter, Bellamy provided background into his ailments and asked Wright to provide him with a hormone treatment (Androgel) which had been provided at a previous facility.[FN13] The second letter asked Wright to force Dr. Gennovese at the Shawangunk facility to provide him with Ensure-a nutritional supplement which had been provided at a previous facility.[FN14] Bellamy's third letter to Wright concerned several matters.[FN15] In particular, Bellamy claimed, *first,* that a female officer entered his cell and retrieved his HIV medication, *second,* that an officer

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

eavesdropped on a medical consultation with his doctor, and, *third,* that he went four days without HIV medication, five days without Cortisol treatment, and six days without testosterone treatment, all while undergoing a mental health evaluation.[FN16]

FN13. *See* Defendants' Rule 56.1 Statement of Facts ¶ 9. *See also* 7/5/05 Grievance Letter from Bellamy to Wright, Ex. D to 3/30/09 Declaration of Julinda Dawkins, counsel to defendants ("Dawkins Decl.").

FN14. *See* Defendants' Rule 56.1 Statement of Facts ¶ 10. *See also* 1/22/07 Grievance Letter from Bellamy to Wright, Ex. E to Dawkins Decl.

FN15. *See* Defendants' Rule 56.1 Statement of Facts ¶ 11. *See also* 6/5/07 Grievance Letter from Bellamy to Wright, Ex. F to Dawkins Deck

FN16. *See* 6/5/07 Grievance Letter from Bellamy to Wright, Ex. F to Dawkins Decl.

Wright's office routinely receives hundreds of letters each year, addressed to him personally from inmates throughout the DOCS system and from individuals writing on behalf of inmates.[FN17] These letters are screened by staff, who then forward them to the appropriate division or bureau within the DOCS with an instruction to respond or with a notation indicating the appropriate action.[FN18] Wright never sees the actual letters or their responses.[FN19] Inmate letters concerning medical care-such as Bellamy's-are forwarded to the Regional Health Services Administrator or the Regional Medical Director, as appropriate, that oversees the facility housing the inmate.[FN20] The concerns are then investigated and addressed by

the regional staff.[FN21]

FN17. *See* Defendants' Rule 56.1 Statement of Facts ¶ 12.

FN18. *See id.*

FN19. *See id.* ¶ 13.

FN20. *See id.* ¶ 14.

FN21. *See id.*

**\*2** All three of Bellamy's letters received responses. Holly A. Collet, the Facility Health Services Administrator at Elmira Correctional Facility, responded to Bellamy's July 5, 2005 letter.[FN22] Pedro Diaz, the Regional Health Services Administrator at Shawangunk Correctional Facility, responded to Bellamy's January 22, 2007 letter.[FN23] Pedro Diaz, also the Regional Health Services Administrator at Sing Sing Correctional Facility, responded to Bellamy's June 5, 2007 letter.[FN24] Wright and Bellamy have never met each other, nor have they had any other personal contact.[FN25] Bellamy admits that he has no evidence that Wright was involved in the responses to any of the three letters.[FN26]

FN22. *See id.* ¶ 15.

FN23. *See id.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

FN24. *See id.*

FN25. *See id.* ¶ 16. *See also* 3/27/09 Affidavit of Dr. Lester N. Wright ("Wright Aff."), Ex. G to Dawkins Decl., ¶ 9; Bellamy Dep. II at 20:23-25.

FN26. *See* Bellamy Dep. II at 26:17-20.

**4. Bellamy's Claims**[FN27]

FN27. In addition to the claims listed here, Bellamy originally charged both the DOCS and Wright with violations of the Americans with Disabilities Act of 1990 (the "ADA") and the Rehabilitation Act of 1973 (the "RHA"). *See* Am. Compl., Legal Claims ¶ 15. However, Bellamy later conceded that "Plaintiff['s] Americans With Disabilities Act and Rehabilitation [Act] fails because those statutes are not applicable here at this junction." Plaintiff's Reply to Defendants' Summary Judgment ("Bellamy's Reply") at 7. This Court interprets Bellamy's Reply as a withdrawal of his ADA and RHA claims against the remaining defendants.

Bellamy admits that he has no evidence that Wright denied him testosterone replacement treatment.[FN28] Nonetheless, Bellamy claims that Wright "was responsible for denying plaintiff's testosterone treatment on different occasions" and "was also made aware of plaintiff's complaints, but failed to abate further injury to the plaintiff."[FN29] Bellamy charges the DOCS because he was in its custody when his claims arose.[FN30] Bellamy

specifically alleges that Wright-acting under color of state law-displayed "deliberate indifference to plaintiff's serious medical needs and violated plaintiff's rights and constituted cruel and unusual punishment under the Eight [h] Amendment of the United States Constitution."[FN31] A similar claim is lodged against the DOCS.[FN32] Bellamy also seeks a preliminary and permanent injunction against the DOCS to provide the medical treatment he requests and to comply with various New York State laws.[FN33] Finally, Bellamy seeks compensatory and punitive damages.[FN34]

FN28. *See* Bellamy Dep. II at 33:14 to 34:15 (Question: "Do you have any kind of evidence that Dr. Wright denied you testosterone treatment?" Answer: "Directly, no.").

FN29. *See* Am. Compl., Defendants ¶ 6.

FN30. *See id.* Many of the claims that allegedly occurred under DOCS supervision have since been dismissed.

FN31. *See id.,* Legal Claims ¶ 13. Bellamy brings his claims pursuant to section 1983 of Title 42 of the United States Code ("section 1983").

FN32. *See id.,* Legal Claims ¶ 14 (repeating the same claim but omitting the phrase that the DOCS "violate[d] plaintiff's rights").

FN33. *See id.,* Legal Claims ¶ 18. Bellamy's original Complaint only requested injunctive

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

relief against the DOCS. However, he later asked for injunctive relief against Wright. *See* Bellamy's Reply at 1. Because Bellamy is proceeding pro se, the *factual* allegations in his Reply Memoranda are treated as if they were raised in his Complaints. *See Gill v. Mooney,* 824 F.2d 192, 195 (2d Cir.1987) (considering a pro se plaintiff's affidavit in opposition to defendant's motion to dismiss in reviewing district court's dismissal of claim). However, it would be improper to allow a plaintiff, even one proceeding pro se, to add a defendant to a claim he had raised more than a year earlier. Thus, Bellamy's claim for injunctive relief against Wright is dismissed. *See Polanco v. City of New York Dep't of Corr.,* No. 01 Civ. 759, 2002 WL 272401, at *3 (S.D.N.Y. Feb. 26, 2002) ("It is well established that a plaintiff may not amend his pleading through papers offered in opposition to a motion to dismiss ... Plaintiff is bound by the allegations of his Amended Complaint.") (citations omitted).

FN34. *See* Am. Compl., Legal Claims ¶¶ 19-21.

**B. Procedural History**

Bellamy's first Complaint was filed on March 2, 2007, and an Amended Complaint followed on July 16, 2007. On August 5, 2008, this Court granted summary judgment to defendants Dr. Janis and Mount Vernon. The DOCS had not been properly served at that point, but it was subsequently served on August 7, 2008. Dr. J. Pereli was dismissed as a defendant on January 15, 2009, for lack of timely service of process.

**III. LEGAL STANDARD**

**A. Summary Judgment**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FN35 An issue of fact is genuine " 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " FN36 A fact is material when it " 'might affect the outcome of the suit under the governing law.' " FN37 "It is the movant's burden to show that no genuine factual dispute exists." FN38

FN35. Fed.R.Civ.P. 56(c).

FN36. *Roe v. City of Waterbury,* 542 F.3d 31, 34 (2d Cir.2008) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

FN37. *Ricci v. DeStefano,* 530 F.3d 88, 109 (2d Cir.2008) (quoting *Anderson,* 477 U.S. at 248).

FN38. *Vermont Teddy Bear Co. v. 1-800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)).

In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact. FN39 "Summary judgment is properly granted when the non-moving party 'fails to make a showing sufficient to establish the existence of an element essential to that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

party's case, and on which that party will bear the burden of proof at trial.' " [FN40] To do so, the non-moving party must do more than show that there is " 'some metaphysical doubt as to the material facts,' " [FN41] and it " 'may not rely on conclusory allegations or unsubstantiated speculation.' " [FN42] However, " 'all that is required [from a non-moving party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.' " [FN43]

FN39. Fed.R.Civ.P. 56(c).

FN40. *Abramson v. Pataki,* 278 F.3d 93, 101 (2d Cir.2002) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). *Accord In re September 11 Litig.,* No. 21 MC 97, 2007 WL 2332514, at *4 (S.D.N.Y. Aug.15, 2007) ("Where the nonmoving party bears the burden of proof at trial, the burden on the moving party may be discharged by showing-that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case.") (quotation omitted).

FN41. *Higazy v. Templeton,* 505 F.3d 161, 169 (2d Cir.2007) (quoting *Matsushita Elec. Indus. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

FN42. *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005) (quoting *Fujitsu Ltd. v. Federal Express Corp.,* 247 F.3d 423, 428 (2d Cir.2001)).

FN43. *Kessler v. Westchester County Dep't of Soc. Servs.,* 461 F.3d 199, 206 (2d Cir.2006) (quoting *Anderson,* 477 U.S. at 248-49).

**\*3** In determining whether a genuine issue of material fact exists, the court must construe the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in that party's favor. [FN44] However, "[i]t is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.' " [FN45] Summary judgment is therefore "only appropriate when there is no genuine issue as to any material fact, making judgment appropriate as a matter of law." [FN46]

FN44. *See Mathirampuzha v. Potter,* 548 F.3d 70, 74 (2d Cir.2008) (quoting *Allianz Ins. Co. v. Lerner,* 416 F.3d 109, 113 (2d Cir.2005)).

FN45. *McClellan v. Smith,* 439 F.3d 137, 144 (2d Cir.2006) (quoting *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997)). *Accord Anderson,* 477 U.S. at 249.

FN46. *Karpova v. Snow,* 497 F.3d 262, 270 (2d Cir.2007) (citing *Tocker v. Philip Morris Cos.,* 470 F.3d 481, 486-87 (2d Cir.2006)).

Further, where the plaintiff is proceeding pro se, his or her pleadings must be considered under a more lenient standard than that accorded to "formal pleadings drafted by lawyers," [FN47] and his or her pleadings must be "interpret[ed] ... to raise the strongest arguments they suggest." [FN48] However, a pro se plaintiff must still meet the usual requirements of summary judgment . [FN49] Thus, a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

pro se plaintiff's "failure to allege either specific facts or particular laws that have been violated renders [his or] her attempt to oppose defendants' motion [for summary judgment] ineffectual." [FN50]

FN47. *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (per curiam). *Accord* Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir.1994) ("Because [plaintiff] is a pro se litigant, we read his supporting papers liberally.").

FN48. *Burgos,* 14 F.3d at 790.

FN49. *See Maalouf v. Salomon Smith Barney, Inc.,* No. 02 Civ. 4470, 2004 WL 2008848, at *4 (S.D.N.Y. Sept.8, 2004). (" 'Proceeding pro se does not otherwise relieve a litigant from the usual requirements of summary judgment, and a pro se party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment.' ") (quoting *Cole v. Artuz,* No. 93 Civ. 5981, 1999 WL 983876, at *3 (S.D.N.Y. Oct.28, 1999)).

FN50. *Kadosh v. TRW,* No. 91 Civ. 5080, 1994 WL 681763, at *5 (S.D.N.Y. Dec. 5, 1994).

**B. Exhaustion of Administrative Remedies**

The Prison Litigation Reform Act (the "PLRA") mandates that a prisoner exhaust all administrative remedies before bringing an action regarding prison conditions.[FN51] Failure to exhaust is an absolute bar to an inmate's action in federal court: "[section] 1997e(a) requires exhaustion of available administrative remedies *before* inmate-plaintiffs may bring their federal claims to

court at all." [FN52] Because the plain language of section 1997e(a) states "no action shall be brought," an inmate must have exhausted his claims at the time of the initial filing, given that "[s]ubsequent exhaustion after suit is filed ... is insufficient." [FN53] Moreover, the exhaustion of administrative remedies must be proper-that is, in compliance with a prison grievance program's deadlines and other critical procedural rules in order to suffice.[FN54] The Supreme Court has held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." [FN55]

FN51. *See* 42 U.S.C. § 1997e(a) (providing that: "No action shall be brought with respect to prison conditions under § 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.") ("section 1997"). *See also Porter v. Nussle,* 534 U.S. 516, 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); Booth v. Churner, 532 U.S. 732, 739 (2001).

FN52. *Neal v. Goord,* 267 F.3d 116, 122 (2d Cir.2001) (quotation marks and citation omitted, emphasis in original).

FN53. *Id.*

FN54. *See Woodford v. Ngo,* 548 U.S. 81, 90-92, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006).

FN55. *Porter,* 534 U.S. at 532.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

While the Second Circuit has recognized that the PLRA's exhaustion requirement is mandatory, it has also recognized three exceptions to the exhaustion requirement:

>when (1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as reasonable misunderstanding of the grievance procedure, justify the prisoner's failure to comply with the exhaustion requirement. [FN56]

FN56. *Ruggiero v. County of Orange,* 467 F.3d 170, 175 (2d Cir.2006).

The Second Circuit has held that " '[a]lert[ing] the prison officials as to the nature of the wrong for which redress is sought,' ... does not constitute proper exhaustion." [FN57] "[N]otice alone is insufficient because '[t]he benefits of exhaustion can be realized only if the prison grievance system is given fair opportunity to consider the grievance' and '[t]he ... system will not have such an opportunity unless the grievance complies with the system's critical procedural rules.' " [FN58]

FN57. *Marias v. Zenk,* 495 F.3d 37, 44 (2d Cir.2007) (quoting *Braham v. Clancy,* 425 F.3d 177, 184 (2d Cir.2005) and citing *Woodford,* 548 U.S. at 94-95) (finding plaintiff "cannot satisfy the PLRA's exhaustion requirement solely by filing two administrative tort claims, or by making informal complaints to the MDC's staff").

FN58. *Id.* (quoting *Woodford,* 548 U.S. at 95).

**C. Eleventh Amendment Immunity**

**\*4** The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State ..." [FN59] "A state's Eleventh Amendment protection from suit extends to its agencies and departments." [FN60] "This [Eleventh Amendment] bar remains in effect when State officials are sued for damages in their official capacity." [FN61] To determine whether the action is an official or individual capacity suit, this Court must look behind the designation and determine whether "the State is the real, substantial party in interest." [FN62] State agencies are not immune from suits asking for injunctive relief under the Eleventh Amendment. [FN63]

FN59. U.S. Const. amend. XI.

FN60. *Morningside Supermarket Corp. v. New York State Dep't of Health,* 432 F.Supp.2d 334, 338 (S.D.N.Y.2006) (citing *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984)). *Accord Bryant v. New York State Dep't of Corr. Servs. Albany,* 146 F.Supp.2d 422 (S.D.N.Y.2001) (affirming the dismissal of a section 1983 claim against the DOCS and a correctional facility because Eleventh Amendment immunity abrogated the court's subject matter jurisdiction to hear the claim).

FN61. *Kentucky v. Graham,* 473 U.S. 159, 169, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (citation omitted).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

FN62. *Ford Motor Co. v. Department of Treasury of Ind.,* 323 U.S. 459, 464, 65 S.Ct. 347, 89 L.Ed. 389 (1945), *overruled in part by Lapides v. Board of Regents of the Univ. Sys. of Ga.,* 535 U.S. 613, 122 S.Ct. 1640, 152 L.Ed.2d 806 (2002).

FN63. *See, e.g., Perez v. Westchester County Dep't of Corr.,* No. 05 Civ. 8120, 2007 WL 1288579, at *6-8 (S.D.N.Y. Apr. 30, 2007) (considering, but then denying, injunctive relief against a county's department of corrections).

**D. Section 1983**

Section 1983 "does not create a federal right or benefit; it simply provides a mechanism for enforcing a right or benefit established elsewhere." FN64 In order to state a claim under section 1983, a plaintiff must show that the conduct complained of was committed by a person or entity acting under color of state law, and that the conduct deprived a person of rights, privileges, or immunities secured by the Constitution. FN65 "[N]either a State nor its officials acting in their official capacities are 'persons' under [section] 1983." FN66 Thus, section 1983 "does not provide a federal forum for litigants who seek a remedy against a state for alleged deprivation of rights secured by the United States Constitution." FN67

FN64. *Morris-Hayes v. Board of Educ. of Chester Union Free Sch. Dist.,* 423 F.3d 153, 159 (2d Cir.2005) (citing *Oklahoma City v. Tuttle,* 471 U.S. 808, 816, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985)).

FN65. *See Palmieri v. Lynch,* 392 F.3d 73, 78 (2d Cir.2004) (citation omitted).

FN66. *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). *Accord Huminski v. Corsones,* 396 F.3d 53, 70 (2d Cir.2005).

FN67. *Bryant,* 146 F.Supp.2d at 425.

Furthermore, "[i]t is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983.' " FN68 Thus, "[a] supervisory official cannot be liable solely on account of the acts or omissions of his or her subordinates." FN69 In 1995, the Second Circuit held that a supervisory official is personally involved only when that official: (1) participates directly in the alleged constitutional violation; (2) fails to remedy the violation after being informed of the violation through a report or appeal; (3) creates or allows the continuation of a policy or custom under which unconstitutional practices occurred; (4) acts with gross negligence in supervising subordinates who commit the wrongful acts; or (5) exhibits deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring. FN70 However, in 2009, the Supreme Court held, "[b]ecause vicarious liability is inapplicable to ... [section] 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's *own individual actions,* has violated the Constitution." FN71 The Supreme Court explicitly rejected the argument that, "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution." FN72 Thus, "[a]bsent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." FN73 For example, "[t]he allegation that plaintiff sent defendant[ ] letters complaining of prison conditions is not enough to allege personal involvement." FN74

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

FN68. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)).

FN69. *Ford v. Conway,* No. 03 Civ. 0927S, 2004 WL 1071171, at *4 (W.D.N.Y. Mar.16, 2004).

FN70. See *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citation omitted).

FN71. *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 1948, 173 L.Ed.2d 868 (2009) (emphasis added).

FN72. *Id.* at 1949.

FN73. *Id.*

FN74. *Laureano v. Pataki,* No. 99 Civ. 10667, 2000 WL 1458807, at *4 (S.D.N.Y. Sept.29, 2000) (granting a motion to dismiss on similar facts). See also *Farid v. Goord,* 200 F.Supp.2d 220, 235 (W.D.N.Y.2002) (dismissing claims of personal involvement against supervisory official who merely sent grievances "down the chain of command for investigation").

**E. Eighth Amendment Right to be Free from Deliberate Indifference to Serious Medical Needs**

**\*5** The Eighth Amendment prohibits the infliction of cruel and unusual punishment on prisoners.[FN75] The Supreme Court has held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' ... proscribed by the Eighth Amendment."[FN76] Because the inadvertent or negligent failure to provide adequate medical care does not rise to the level of deliberate indifference, allegations of medical malpractice or negligent treatment are insufficient to state a claim under section 1983.[FN77] "Prison officials have a duty to provide prisoners with the 'reasonably necessary medical care which would be available to him or her ... if not incarcerated.' "[FN78] However, a prison cannot be required to meet the same standard of medical care found in outside hospitals.[FN79]

FN75. U.S. Const. amend. XIII.

FN76. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (quoting *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). *Accord Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("To violate the Cruel and Unusual Punishments Clause, a prison official must have a sufficiently culpable state of mind .... In prison-conditions cases that state of mind is one of 'deliberate indifference' to inmate health or safety ....") (quotations and citations omitted).

FN77. See *Estelle,* 429 U.S. at 105-06.

FN78. *Candeleria v. Coughlin,* No. 91 Civ. 2978, 1996 WL 88555, at *7 (S.D.N.Y. Mar.1, 1996) (quoting *Langley v. Coughlin,* 888 F.2d 252, 254 (2d Cir.1989)). *Accord Edmonds v. Greiner,* No. 99 Civ. 1681, 2002 WL 368446, at

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

*8 (S.D.N.Y. Mar. 7, 2002) ("A person who is incarcerated is entitled to receive adequate medical care.").

FN79. *See Archer v. Dutcher,* 733 F.2d 14, 17 (2d Cir.1984) ("We have no doubt that the same standards of medical care cannot be imposed upon a prison as are presumed to be realized at a hospital.").

" 'The deliberate indifference standard embodies both an objective and a subjective prong.' " FN80 "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." FN81 "Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation." FN82 "[W]hen a prisoner asserts that delay in his treatment constitutes deliberate indifference on the part of a healthcare provider, the Court looks to the severity of the consequences brought about by the alleged delay." FN83

FN80. *Morrison v. Mamis,* No. 08 Civ. 4302, 2008 WL 5451639, at *5 (S.D.N.Y. Dec.18, 2008) (quoting *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994)).

FN81. *Smith v. Carpenter,* 316 F.3d 178, 183-84 (2d Cir.2003) (quoting *Estelle,* 429 U.S. at 104)).

FN82. *Id.* (citing *Estelle,* 429 U.S. 105-06).

FN83. *Pabon v. Goord,* No. 99 Civ. 5869, 2003 WL 1787268, at *11 (S.D.N.Y. Mar.28, 2003) (citation omitted).

**F. Preliminary and Permanent Injunction**

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." FN84 "A preliminary injunction is an extraordinary remedy never awarded as of right." FN85 "When the movant seeks a 'mandatory' injunction-that is, as in this case, an injunction that will alter rather than maintain the status quo-[he or] she must meet the more rigorous standard of demonstrating a 'clear' or 'substantial' likelihood of success on the merits." FN86 The standard for a permanent injunction is essentially the same as for a preliminary injunction, except that a plaintiff seeking a permanent injunction must show actual success on the merits rather than a likelihood of success on the merits. FN87

FN84. *Winter v. Natural Res. Def. Council, Inc.,* --- U.S. ----, 129 S.Ct. 365, 374, 172 L.Ed.2d 249 (2008). *Accord Citigroup Global Markets Inc. v. VCG Special Opportunities Master Fund,* No. 08 Civ. 5520, 2009 WL 1528513, at *1-2 (S.D.N.Y. June 1, 2009) (discussing *Winter* approvingly). *But see Almontaser v. New York City Dep't of Educ.,* 5 19 F.3d 505, 508 (2d Cir.2008) ("A party seeking a preliminary injunction 'must show irreparable harm absent injunctive relief, and either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in plaintiff's favor.' ") (citation omitted).

FN85. *Winter,* 129 S.Ct. at 376 (citation omitted).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

FN86. *Mitchell v. New York State Dep't of Corr. Servs.,* No. 06 Civ. 6278, 2009 WL 185757, at *2 (W.D.N.Y. Jan. 26, 2009) (quoting *Doninger v. Niehoff,* 527 F.3d 41, 47 (2d Cir.2008)).

FN87. *See Winter,* 129 S.Ct. at 381.

## IV. DISCUSSION

Bellamy asserts an Eighth Amendment deliberate indifference claim against Wright and the DOCS. Defendants respond, first, by asserting Eleventh Amendment immunity with respect to all claims against the DOCS and any claims against Wright in his official capacity. As for the claim against Wright in his individual capacity, defendants argue that he was not personally involved in the alleged harm, nor did he create a policy that contributed to that harm. Bellamy also seeks a preliminary and permanent injunction against the DOCS to provide the medical treatment he requests and to comply with several New York State laws. Defendants argue that Bellamy will not win on the merits, nor will he suffer irreparable harm. Defendants urge this Court to decline to exercise supplemental jurisdiction over any remaining New York State law claims. Finally, Bellamy seeks compensatory and punitive damages.

### A. Exhaustion of Administrative Remedies

*6 This Court determined in a previous opinion that "Bellamy did not fail to exhaust his administrative remedies because he was justified in his belief that no administrative remedy was available to him." [FN88] Thus, Bellamy's claims are not barred by the PLRA.

FN88. *Bellamy I,* 2008 WL 3152963, at *5

(citing *Giano v. Goord,* 380 F.3d 670, 678 (2d Cir.2004)).

### B. Eleventh Amendment Immunity

The Eleventh Amendment immunizes state agencies and state officials acting in their official capacity from suit under section 1983. Accordingly, Bellamy's deliberate indifference claims against both the DOCS and Wright, in his official capacity, are dismissed.

### C. Section 1983 Claim of Deliberate Indifference Against Wright in His Individual Capacity

The Supreme Court's decision in *Iqbal v. Ashcroft* abrogates several of the categories of supervisory liability enumerated in *Colon v. Coughlin. Iqbal'* s "active conduct" standard only imposes liability on a supervisor through section 1983 if that supervisor actively had a hand in the alleged constitutional violation. Only the first and part of the third *Colon* categories pass *Iqbal'* s muster-a supervisor is only held liable if that supervisor participates directly in the alleged constitutional violation or if that supervisor creates a policy or custom under which unconstitutional practices occurred. The other *Colon* categories impose the exact types of supervisory liability that *Iqbal* eliminated-situations where the supervisor knew of and acquiesced to a constitutional violation committed by a subordinate.

Bellamy's remaining claim alleges that Wright, in his individual capacity, was deliberately indifferent to Bellamy's medical needs. However, Bellamy offers no evidence that any of Wright's actions fall into any of the remaining exceptions that would permit supervisory liability. *First,* Bellamy admits that Wright was not personally involved in the letter responses. Both parties agree that they have never had any form of contact. *Second,* Bellamy offers no evidence that Wright created or contributed to a policy or custom of unconstitutional practices. Bellamy also admitted that he can provide no

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

evidence that Wright was responsible for making any decisions regarding his testosterone medications.[FN89] Bellamy's conclusory allegations that Wright must have known about Bellamy's plight is not enough to impute section 1983 liability.[FN90]

> FN89. *See, e.g.,* Bellamy Dep. II at 32:19-21 (Question: "Did Dr. Moorjani say anything that Dr. Wright was involved in the April of 2005 denial?" Answer: "No, he did not.")

> FN90. *See Reid v. Artuz,* 984 F.Supp. 191, 195 (S.D.N.Y.1997) (dismissing an asthmatic prisoner's section 1983 claim against a supervisory official when the pleadings "fail[ed] to allege, let alone establish, any factual basis upon which a fact finder could reasonably conclude personal involvement by the supervisory official defendant ... that [defendant] created or continued a policy or custom which allowed the violation to occur, or that [defendant] was grossly negligent in managing the subordinates who caused the unlawful condition").

Finally, Bellamy offers no evidence that Wright demonstrated deliberate indifference to Bellamy's serious medical needs. Bellamy does not contend that Wright unnecessarily and wantonly inflicted any pain-indeed Bellamy conceded that Wright was not involved in the alleged denials of treatment. Accordingly, Bellamy's deliberate indifference claim against Wright in his individual capacity is dismissed.

**D. Preliminary and Permanent Injunction**

Bellamy asks this Court to order the DOCS-through an injunction-to provide him with adequate medical care and to comply with New York State laws. This request is denied.

**\*7** *First,* Bellamy has not alleged that he is suffering irreparable harm. Instead, he has alleged a number of unrelated and sporadic problems that can be expected in the normal course of incarceration, especially when transferring from facility to facility. It cannot be inferred from his pleadings, his testimony or his letters to Wright that he has consistently been denied any form of treatment. Indeed, each of his three letters address completely different topics without re-addressing prior issues. Bellamy concedes that the disruption of his medication only occurred on a very limited or isolated basis.[FN91]

> FN91. *See* Bellamy Dep. II at 56-57, 75-76 (demonstrating that, over the course of three-years, Bellamy was denied treatment for one three-week period, for one allegedly three-month period-while he was transferring facilities-and a few alleged short-term periods, although those dates are unspecified).

*Second,* Bellamy cannot show a clear or substantial likelihood of success on the merits. Bellamy does not offer evidence that either defendant was deliberately indifferent to his serious medical needs.[FN92] For the objective prong, Bellamy offers no evidence that any deprivation of medication was sufficiently serious. Headaches and fatigue do not rise to the level of seriousness necessary to warrant a preliminary injunction-especially when Bellamy admits that he still suffers similar side-effects while receiving the requested treatment.[FN93] For the subjective prong, Bellamy does not offer any evidence that any DOCS employee acted with the requisite state of mind to be deliberately indifferent to his serious medical needs.

> FN92. While the DOCS itself is immune from section 1983 liability, the following analysis

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

surrounds the DOCS and its employees generally.

FN93. Further, the defendants' affidavits question many of Bellamy's medical propositions. *See, e.g.,* Moorjani Aff. ¶ 4 (claiming that Bellamy exhibited signs of hypogonadism and many of its symptoms, including weight loss, headaches, and fatigue, prior to the surgery).

This Court need not address the balance of equities nor the public interest factors because Bellamy has not shown irreparable harm or a substantial likelihood of success on the merits. Accordingly, Bellamy's request for both a preliminary and permanent injunction is denied.

**E. Supplemental Jurisdiction**

Bellamy asks this Court to compel the DOCS-through an injunction-to comply with New York State Public Health Laws.[FN94] To the extent that there are any remaining state law claims, this Court declines to exercise supplemental jurisdiction over those claims.[FN95]

FN94. *See* Am. Compl., Prayer for Relief ¶ 18.

FN95. *See Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine-judicial economy, convenience, fairness, and comity-will point toward declining to exercise jurisdiction over the remaining state-law claims"). *See also Kshel Realty Corp. v. City of New York,* No. 01 Civ.

9039, 2006 WL 2506389, at *13 (S.D.N.Y. Aug.30 2006) ("[T]he Second Circuit instructs that 'absent exceptional circumstances,' where federal claims can be disposed of on 12(b)(6) or summary judgment grounds, courts should 'abstain from exercising pendent jurisdiction.' ") (quoting *Walker v. Time Life Films, Inc.,* 784 F.2d 44, 53 (2d Cir.1986)).

**V. CONCLUSION**

For the foregoing reasons, defendants' motion for summary judgment is granted. The Clerk of the Court is directed to close this motion (Docket # 64) and this case.

SO ORDERED:

S.D.N.Y.,2009.

Bellamy v. Mount Vernon Hosp.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

**H**

United States District Court,

S.D. New York.

Matthew D'OLIMPIO and Michael Kaplan, Plaintiffs,

v.

Louis CRISAFI, in his individual capacity, Brendan Vallely, in his individual capacity, Thomas D'Amicantonio, in his individual capacity, James Giglio, in his individual capacity, Michael Moffett, in his individual capacity, Paul Nadel, in his individual capacity, Jennifer Treacy, in her individual capacity, Kenneth Post, in his individual capacity, and Timothy Dewey, in his individual capacity, Defendants.

Louis Crisafi, Counterclaim-Plaintiff,

v.

Michael Kaplan, Counterclaim-Defendant.

Nos. 09 Civ. 7283(JSR), 09 Civ. 9952(JSR).

June 15, 2010.

**Background:** Arrestee and former narcotics enforcement investigator brought action against another investigator and other narcotics enforcement officials, alleging malicious prosecution, false arrest, unlawful detention, and other constitutional violations against arrestee, and First Amendment retaliation against investigator. Defendant investigator counterclaimed, alleging defamation by

plaintiff investigator. Defendants moved to dismiss for failure to state a claim.

**Holdings:** The District Court, Jed S. Rakoff, J., held that:

(1) allegations were sufficient to state a claim of supervisory liability against officials;

(2) law enforcement officers lacked even arguable probable cause to make arrest;

(3) investigator's statements were not protected by First Amendment; and

(4) plaintiff investigator was not liable for defamation.

Motions denied in part and granted in part.

West Headnotes

**[1] Civil Rights 78 ⬤═ 1358**

78 Civil Rights

  78III Federal Remedies in General

    78k1353 Liability of Public Officials

      78k1358 k. Criminal law enforcement; prisons.
Most Cited Cases

Arrestee was not required to show discriminatory

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

purpose on the part of law enforcement officers in order to establish the personal involvement needed to support the officers' liability on his § 1983 claim alleging that his search, arrest, and prosecution violated the Fourth Amendment. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**[2] Civil Rights 78 ⚷  1395(6)**

78 Civil Rights

   78III Federal Remedies in General

      78k1392 Pleading

      78k1395 Particular Causes of Action

         78k1395(4) Criminal Law Enforcement; Police and Prosecutors

            78k1395(6) k. Arrest, search, and detention. Most Cited Cases

   Allegations against law enforcement officials were sufficient to state a claim under § 1983 that officials failed to supervise narcotics enforcement investigators; complaint incorporated by reference an investigatory report that described various acts of misconduct by investigator that took place prior to arrestee's arrest, and concluded that there was a lack of appropriate supervision by officials, and arrestee alleged that another investigator complained to official in writing regarding investigator's misconduct prior to arrestee's arrest. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**[3] Arrest 35 ⚷  63.4(2)**

35 Arrest

   35II On Criminal Charges

      35k63 Officers and Assistants, Arrest Without Warrant

         35k63.4 Probable or Reasonable Cause

            35k63.4(2) k. What constitutes such cause in general. Most Cited Cases

   In general, probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime. U.S.C.A. Const.Amend. 4.

**[4] Civil Rights 78 ⚷  1376(6)**

78 Civil Rights

   78III Federal Remedies in General

      78k1372 Privilege or Immunity; Good Faith and Probable Cause

         78k1376 Government Agencies and Officers

            78k1376(6) k. Sheriffs, police, and other peace officers. Most Cited Cases

   In the context of a qualified immunity defense to an allegation of false arrest, the defending officer need only show arguable probable cause. U.S.C.A. Const.Amend. 4.

**[5] Civil Rights 78 ⚷  1358**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

78 Civil Rights

    78III Federal Remedies in General

        78k1353 Liability of Public Officials

            78k1358 k. Criminal law enforcement; prisons. Most Cited Cases

Arrestee's allegations were sufficient to state a § 1983 supervisory liability claim against law enforcement officials, arising out of officials' creation of policy allowing narcotics enforcement investigators to initiate criminal charges based on a phone conversation or faxed affidavit, where arrestee alleged that his arrest for possession of a narcotic and criminal impersonation to obtain prescriptions was predicated on nothing more than his pharmacy's report that it had failed to receive a hard copy of a prescription within a week, which prompted a narcotics enforcement official to call arrestee's doctor's office and speak with an unknown person there, who either stated that he was not aware of any such prescription or effectuated the fax transmission of an affidavit bearing an unverified signature of arrestee's doctor. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

[6] Arrest 35 ⬉ 63.4(8)

35 Arrest

    35II On Criminal Charges

        35k63 Officers and Assistants, Arrest Without Warrant

            35k63.4 Probable or Reasonable Cause

                35k63.4(7) Information from Others

                    35k63.4(8) k. Reliability of informer. Most Cited Cases

Law enforcement officers lacked even arguable probable cause to arrest arrestee for possession of a narcotic and impersonation of a physician based solely on unauthenticated report by physician's staff denying knowledge of arrestee's prescription. U.S.C.A. Const.Amend. 4.

[7] Constitutional Law 92 ⬉ 1941

92 Constitutional Law

    92XVIII Freedom of Speech, Expression, and Press

        92XVIII(P) Public Employees and Officials

            92k1941 k. Discipline or reprimand. Most Cited Cases

A public employee's cause of action for his employer's discipline based on his speech can proceed only if the employee spoke as a citizen on a matter of public concern; otherwise, the employee's speech is outside the scope of the First Amendment. U.S.C.A. Const.Amend. 1.

[8] Constitutional Law 92 ⬉ 1955

92 Constitutional Law

    92XVIII Freedom of Speech, Expression, and Press

        92XVIII(P) Public Employees and Officials

            92k1955 k. Police and other public safety officials. Most Cited Cases

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

**Municipal Corporations 268 ☞ 185(1)**

268 Municipal Corporations

    268V Officers, Agents, and Employees

        268V(B) Municipal Departments and Officers Thereof

            268k179 Police

                268k185 Suspension and Removal of Policemen

                    268k185(1) k. Grounds for removal or suspension. Most Cited Cases

Law enforcement officer's complaints to supervisor about fellow officer's behavior, his workplace incident reports, and his complaint to the inspector general, was speech falling within officer's official duties, and thus was not protected under the First Amendment, as required to support employee's retaliation claim; statements were made privately though channels available through officer's employment and were made in a manner that would not be available to a non-public employee citizen, and subject of statements was that other officer was not performing his job properly. U.S.C.A. Const.Amend. 1.

**[9] Libel and Slander 237 ☞ 28**

237 Libel and Slander

    237I Words and Acts Actionable, and Liability Therefor

        237k26 Repetition

           237k28 k. By others in general. Most Cited Cases

It was simply implausible that narcotics investigator in any legally relevant sense caused the republication of his statements in an investigatory report or newspaper article regarding actions of a fellow investigator, as required to state a claim of defamation under New York law.

**[10] Libel and Slander 237 ☞ 28**

237 Libel and Slander

    237I Words and Acts Actionable, and Liability Therefor

        237k26 Repetition

           237k28 k. By others in general. Most Cited Cases

Under New York law, a plaintiff may not recover damages from the original author for slander arising from the republication of defamatory statements by a third party absent a showing that the original author was responsible for or ratified the republication.

*342 James Brian Lebow, Sr., New York, NY, for Plaintiffs.

Christine Alexandria Rodriguez, Christine A. Rodriguez, Law Office, Ivan B. Rubin, Peter Sangjin Hyun, New York State Office of the Attorney General, New York, NY, for Defendants.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

*MEMORANDUM ORDER*

JED S. RAKOFF, District Judge.

On August 18, 2009, Plaintiff Matthew D'Olimpio brought this action (docket-numbered 09 Civ. 7283) against defendants Louis Crisafi, Brendan Vallely, Thomas D'Amicantonio, James Giglio, Michael Moffett, and Paul Nadel for malicious prosecution, false arrest, unlawful detention, and various other violations of the Constitution and 42 U.S.C. §§ 1983 and 1988. An amended complaint filed on October 29, 2009 joined Michael Kaplan as a plaintiff and added a claim against defendants Nadel, Jennifer Treacy, Kenneth Post, and Timothy Dewey for unconstitutionally retaliating against Kaplan based on his reports of misconduct committed by defendant Crisafi, a fellow investigator employed by the New York State Department of Health's Bureau of Narcotics Enforcement, Metropolitan Area Regional Office ("BNE-MARO"), in violation of the First and Fourteenth Amendments and § 1983.

On December 18, 2009, defendants Giglio, Moffett, and Nadel moved to dismiss all of D'Olimpio's claims against them, and defendants Crisafi, Vallely, and D'Amicantonio moved to dismiss D'Olimpio's malicious prosecution claim. That same day, defendants Nadel, Treacy, Post, and Dewey moved to dismiss Kaplan's claims against them. Meanwhile, on December 3, 2009, Crisafi had filed what was styled as a complaint against Kaplan (docket-numbered 09 Civ. 9952) alleging that Kaplan defamed him through publication of the reports of Crisafi's misconduct discussed in Kaplan's complaint. On the parties' consent, the Court converted Crisafi's complaint into a compulsory counterclaim in the action docket-numbered 09 Civ. 7283 and consolidated the two cases. *See* Transcript, 1/14/10, *Crisafi v. Kaplan,* No. 09 **\*343** Civ. 9952. On January 22, 2010, Kaplan moved to dismiss that counterclaim.

By Order dated March 1, 2010 (the "March 1 Order"), the Court granted the motion of Nadel, Treacy, Post, and Dewey to dismiss Kaplan's retaliation claim; granted Kaplan's motion to dismiss Crisafi's defamation counterclaim; and denied all other motions to dismiss.[FN1] The Order also promised that a Memorandum would issue in due course stating the reasons for these rulings. With apologies to counsel for the extended delay, the Court here provides that Memorandum.

> FN1. Although the Order did not explicitly so state, all the dismissals were with prejudice (which, as it happens, is also the default position when an order does not state whether a dismissal is or is not with prejudice).

The Court turns first to the motions of defendants Crisafi, Vallely, and D'Amicantonio to dismiss D'Olimpio's malicious prosecution claim, as set forth in the First Amended Complaint ("FAC") filed on October 29, 2009.[FN2] The relevant allegations are as follows:

> FN2. The first five causes of action in the FAC are D'Olimpio's claims. The sixth cause of action is Kaplan's claim.

Sometime before November 16, 2007, D'Olimpio, a resident of Brooklyn, was prescribed Vicodin by his doctor. FAC ¶ 17. He called that prescription into his pharmacy and obtained the Vicodin. *Id.* ¶ 18. D'Olimpio's pharmacy contacted the BNE-MARO after it had not received a hard copy of the prescription from D'Olimpio's doctor within seven days. *Id.* ¶ 19. A MARO official called D'Olimpio's doctor's office and spoke to an unknown individual there, who either stated by phone that he was not aware of D'Olimpio's Vicodin prescription or provided a faxed affidavit purportedly signed by the doctor to that effect. *Id.* ¶ 20. Based on these occurrences, and without any further investigation, MARO investigator Crisafi began planning Crisafi's arrest. *Id.* ¶ 21.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

On or about November 16, 2007, D'Olimpio was exiting his doctor's office in Brooklyn and walking toward his car when Crisafi and defendants Vallely and D'Amicantonio, also MARO investigators, showed D'Olimpio their badges and asked to speak with him. *Id.* ¶¶ 4, 27-28. They asked D'Olimpio his name, where he was coming from, what he was doing at the doctor's office, and whether the car was his. *Id.* ¶ 29. D'Olimpio replied it was his wife's car. *Id.* ¶ 30. Crisafi asked D'Olimpio if they could search him for weapons; D'Olimpio consented to be frisked, but not to a full search. *Id.* ¶¶ 31-32. Crisafi then frisked D'Olimpio, reached into his pockets, and took out his car keys. *Id.* ¶ 33. Crisafi asked D'Olimpio whether he would consent to a search of the car; D'Olimpio refused, but Crisafi nonetheless carried out the search. *Id.* ¶¶ 34-36. During the search, Crisafi found a bag containing a bottle marked for Klonopin but containing both Vicodin and Klonopin pills, all of which were lawfully prescribed to Crisafi and which he carried in one bottle for convenience. *Id.* ¶¶ 37-38. Upon finding the bottle and discovering that there were two types of pills inside, Crisafi handcuffed D'Olimpio and moved him into the police car, without making any effort to find out whether the drugs were legally prescribed. *Id.* ¶¶ 39-40.

While D'Olimpio was being driven to the police precinct and again when he was being escorted to a bathroom prior to questioning, D'Olimpio requested an attorney, but these requests were denied. *Id.* ¶¶ 41-44. Before questioning began, D'Olimpio asked Crisafi to call an ambulance so that he could take the Klonopin that he needed; Crisafi told D'Olimpio to call his wife and ask her to come to the precinct with his medication. *Id.* ¶¶ 46-47. When **\*344** D'Olimpio's wife arrived, D'Olimpio was brought into a different room, and his wife was given his possessions. *Id.* ¶ 48. Crisafi then offered D'Olimpio a blue pill, which he took, but D'Olimpio now believes that pill was not a Klonopin pill, as he experienced side effects of confusion and drowsiness after taking it, which he had never felt previously when taking Klonopin. *Id.* ¶ 50. Crisafi began to interrogate D'Olimpio, and at one point

threatened to rescind his father's physician license. *Id.* ¶ 51. D'Olimpio at that point again requested an attorney, and Crisafi again denied his request. *Id.* ¶¶ 52-53.

During the interrogation, Crisafi asked D'Olimpio to confess to charges of criminal possession of a controlled substance for possessing the Vicodin and to charges of criminal impersonation for allegedly calling pharmacies and using false information to obtain prescriptions. D'Olimpio, under the influence of the pill, signed a one-page confession presented to him by Crisafi. *Id.* ¶ 54. At Crisafi's request, Vallely signed a form falsely indicating that he had seen Crisafi inform D'Olimpio of his *Miranda* rights. *Id.* ¶ 55. D'Olimpio's forged signature was also added to this "*Miranda* sheet." *Id.* ¶ 56. Crisafi, perhaps with the assistance of Vallely or D'Amicantonio, also wrote a four-page confession and forged D'Olimpio's signature and initials on it. *Id.* ¶ 57. Furthermore, Crisafi, possibly with the assistance of Vallely and D'Amicantonio, drafted an affidavit falsely attesting that D'Olimpio illegally possessed Vicodin and that he impersonated a doctor to obtain his prescriptions. *Id.* ¶ 58.

D'Olimpio was then taken to the Manhattan Detention Center, where he was held for 24 hours prior to being arraigned. *Id.* ¶¶ 59-60. Based on the four-page confession and the affidavit, he was arraigned on the criminal possession and impersonation charges and then released on his own recognizance. *Id.* ¶¶ 61-62. According to the Complaint, D'Olimpio appeared in court about seven times before the charges against him were finally dropped on September 4, 2008. *Id.* ¶ 76.

On the basis of these allegations, D'Olimpio's third cause of action claims that Crisafi, Vallely, and D'Amicantonio maliciously prosecuted D'Olimpio by initiating the criminal charges.[FN3] These defendants moved to dismiss this malicious prosecution claim, primarily on the basis that the charges against D'Olimpio remained pending against him as of the time of their motion, as

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

demonstrated by a Court Action Sheet of the Criminal Court, New York County. Decl. of Ivan Rubin, 12/22/09, Ex. 1. Because the favorable termination of the prosecution is a necessary element of a malicious prosecution claim under § 1983, *Green v. Mattingly,* 585 F.3d 97, 103 (2d Cir.2009), the pendency of criminal charges would be fatal to this cause of action.

> FN3. In the first, fourth, and fifth causes of action in the FAC, D'Olimpio respectively alleges that Crisafi, Vallely, and D'Amicantonio violated various constitutional rights, falsely arrested him, and unlawfully detained him. No motions to dismiss were filed with respect to these claims.

In his opposition to the motions to dismiss, D'Olimpio asserted that the Assistant District Attorney prosecuting D'Olimpio's criminal case had committed to move orally to dismiss that case at the next court hearing, which was scheduled for February 2, 2010. Based on that representation, this Court granted leave for D'Olimpio to file a Second Amended Complaint ("SAC") following that hearing. The Second Amended Complaint, filed on February 18, 2010, did indeed include the representation that the criminal charges were dismissed on February 2, 2010. SAC **345** ¶ 110. Since D'Olimpio had now sufficiently alleged the favorable termination of the criminal charges against him, the March 1 Order therefore denied the motions to dismiss D'Olimpio's malicious prosecution claim.[FN4]

> FN4. Defendants also asserted that the malicious prosecution claim should be dismissed because D'Olimpio's allegations failed to demonstrate the element of malice-*i.e.,* that there was "some deliberate act punctuated with awareness of 'conscious falsity' " with respect to the institution of criminal proceedings. *Bradley v. Vill. of Greenwood Lake,* 376 F.Supp.2d 528,

534-35 (S.D.N.Y.2005). But D'Olimpio's allegations regarding the false affidavits and confessions were clearly more than sufficient to plead malice.

Defendants Giglio, Moffett, and Nadel moved to dismiss D'Olimpio's second cause of action, which charged them with various constitutional violations based on their supervisory authority over Crisafi and their involvement with an alleged policy leading to D'Olimpio's false arrest. In this regard, the FAC contains the following allegations with respect to these defendants: At the time of the events alleged, James Giglio was the director of the BNE, and worked in the BNE's office in Troy, New York. *Id.* ¶ 5. Michael Moffett was the BNE's Section Chief with responsibility over BNE investigators, and also worked in the Troy office. *Id.* ¶ 6. Paul Nadel was the BNE's Program Director for the MARO, and worked in the same Manhattan office as Crisafi, Vallely, and D'Amicantonio. *Id.* ¶ 7. All three of these defendants had supervisory authority over Crisafi, Vallely, D'Amicantonio, and Kaplan. *Id.* ¶¶ 5-7.

The FAC further alleges that at the time of Crisafi's arrest, MARO followed the following protocol in order to determine whether a narcotics prescription was legitimate: First, when a patient called in a prescription to a pharmacy, the pharmacy would expect to receive a hard copy of the prescription from the patient's doctor within a week. Second, pharmacies were instructed to contact the MARO if they failed to receive a hard copy by the end of the seven-day period. Third, when the MARO was contacted by a pharmacy because the pharmacy did not receive a hard copy, a MARO officer would call the doctor's office and would either speak with the doctor to inquire whether the prescription was legitimate or would ask the doctor to fax an affidavit stating that the prescription was legitimate. *Id.* ¶ 11. With respect to this last step, MARO had a practice of confirming complaints from doctors by telephone and fax without taking any other steps to verify the doctors' identities. *Id.* ¶ 12.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

The FAC also includes the following allegations regarding the failure of Giglio, Moffett, and Nadel to supervise Crisafi: On March 22, 2007, the *New York Times* published an article detailing the abuse of parking placards by government officials. This article included a photograph of a car belonging to Crisafi. *Id.* ¶ 13. Shortly after the publication of that article, the New York State Inspector General's Office began an investigation of Crisafi, which unearthed evidence of other misconduct. *Id.* ¶ 14. Sometime before November 16, 2007, plaintiff Kaplan, a MARO investigator, sent Nadel a written complaint informing him that Crisafi was violating suspects' Fifth Amendment rights. *Id.* ¶ 15. Nadel took no action in response to this complaint. *Id.* ¶ 16. Kaplan followed up with a series of other complaints, including a report to the Inspector General, which are discussed more fully below in the context of Kaplan's retaliation claim. The Inspector General's investigation culminated in a report issued on December 8, 2008, written by Inspector General Joseph Fisch (the "Fisch Report"), which found that Crisafi committed numerous abuses, including many of those alleged by Kaplan, some of **\*346** which were assisted by Vallely and D'Amicantonio. The Fisch Report also found that Giglio and Moffett failed to supervise Crisafi and the MARO office, and noted the fact that Nadel, who was responsible for approving law enforcement operations, was a licensed pharmacist with no previous law enforcement experience. *Id.* ¶¶ 78-79.

Based on the above allegations, Crisafi in his second cause of action asserted § 1983 claims against Giglio, Moffett, and Nadel arising from (1) their creation of a policy allowing MARO personnel to initiate criminal charges based on a phone conversation or faxed affidavit without confirmation of the doctor's identity or that the alleged signature on the affidavit is authentic (the "Policy"); (2) their failure to supervise Crisafi and the MARO; (3) their allowing Nadel, a pharmacist with no prior law enforcement experience, to be the MARO Program Director; and (4) their deliberate indifference to D'Olimpio's rights. *Id.* ¶¶ 122-25.

Defendants attack these claims on several grounds. First, they assert that these claims are based on a broad theory of "supervisory liability" that has been discredited by the Supreme Court in *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Prior to *Iqbal,* well-established Second Circuit law provided five bases for showing that a supervisory defendant had sufficient personal involvement with the alleged violation to maintain a § 1983 claim. A plaintiff could plead personal involvement by showing any of the following:

(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). Defendants argue that *Iqbal's* discussion of supervisory liability took a narrower approach than did *Colon,* therefore rendering D'Olimpio's reliance on some of the *Colon* categories unwarranted.

By way of background, the plaintiff in *Iqbal* brought a " *Bivens* " action against several high-ranking federal officials, including the Attorney General and the Director of the Federal Bureau of Investigation, based on allegations that following the September 11 attacks, the FBI "arrested and detained thousands of Arab and Muslim men" substantially on the basis of their race, religion, or national origin, and that as a result plaintiff was unlawfully

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

subjected to harsh confinement conditions substantially on these discriminatory bases. 129 S.Ct. at 1951. The Supreme Court, however, held, *inter alia,* that the complaint failed to state a claim for intentional discrimination with respect to the Attorney General or FBI Director, and, as part of that discussion, observed that neither *Bivens* itself (*i.e., Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971)) nor § 1983 imposes supervisory liability simply on the basis of *respondeat superior;* rather, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.* at 1948; *see also id.* at 1949 ("[T]he term 'supervisory liability' is a misnomer.... [E]ach Government official ... is only liable for his or her own misconduct."). The Court went on to note that the required showing of personal involvement "will vary with the **\*347** constitutional provision at issue"; as the plaintiff's claim in *Iqbal* was for "invidious discrimination" in violation of the First Amendment and Equal Protection Clause, "the plaintiff must plead and prove that the defendant acted with discriminatory purpose." *Id.* at 1948. Accordingly, the Court rejected the plaintiff's theory that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution." *Id.* at 1949.

[1] The defendants here note that certain courts in this District have read these passages of *Iqbal* to mean that "[o]nly the first and fourth *Colon* categories pass *Iqbal's* muster ... [t]he other *Colon* categories impose the exact types of supervisory liability that *Iqbal* eliminated." *Bellamy v. Mount Vernon Hosp.,* 2009 WL 1835939, at \*6 (S.D.N.Y. June 26, 2009); *see also Newton v. City of N.Y.,* 640 F.Supp.2d 426, 448 (S.D.N.Y.2009) ("[P]assive failure to train claims pursuant to section 1983 have not survived the Supreme Court's recent decision in *Ashcroft v. Iqbal.*"); *Joseph v. Fischer,* 2009 WL 3321011, at \*15 (S.D.N.Y. Oct. 8, 2009) ("Plaintiff's claim, based on [defendant's] 'failure to take corrective measures,' is precisely the type of claim Iqbal eliminated."). This Court respectfully disagrees. As *Iqbal* noted, the degree of personal involvement varies depending on the

constitutional provision at issue; whereas invidious discrimination claims require a showing of discriminatory purpose, there is no analogous requirement applicable to D'Olimpio's allegations regarding his search, arrest, and prosecution. *See, e.g., Whren v. United States,* 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."). *Colon's* bases for liability are not founded on a theory of *respondeat superior,* but rather on a recognition that "personal involvement of defendants in alleged constitutional deprivations" can be shown by nonfeasance as well as misfeasance. 58 F.3d at 873 (internal quotation marks omitted). Thus, the five *Colon* categories for personal liability of supervisors may still apply as long as they are consistent with the requirements applicable to the particular constitutional provision alleged to have been violated. *See, e.g., Sash v. United States,* 674 F.Supp.2d 531, 544 (S.D.N.Y.2009) ("It was with intent-based constitutional claims in mind, specifically racial discrimination, that the Supreme Court rejected the argument that 'a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution.' Where the constitutional claim does not require a showing of discriminatory intent, but instead relies on the unreasonable conduct or deliberate indifference standards of the Fourth and Eighth Amendments, the personal involvement analysis set forth in *Colon v. Coughlin* may still apply." (citation omitted)).

[2] Apart from this argument based on *Iqbal,* Giglio and Moffett assert that D'Olimpio's claims against them should be dismissed insofar as they allege a failure to supervise the MARO investigators. They maintain that D'Olimpio's allegations in this regard are too conclusory to state a claim. The Court disagrees. The FAC incorporates by reference the Fisch Report, which summarizes an investigation beginning in March 2007, describes various acts of misconduct by Crisafi that took place prior to D'Olimpio's arrest, contains a section headed "Lack of Supervision of Crisafi and MARO," and indeed concludes that there was a "lack of appropriate supervision by [Crisafi's] supervisors at MARO and at

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

BNE's headquarters in Troy," where Giglio and Moffett were in charge. Fisch Report, 12/8/08, at 4, 16-17, *available at http:// www. ig. state. ny. us/ *348 pd fs/Investigationöf% 20Employee% 20Misconduct% 20at% 20the% 20DOH% 20Bureau% 20of% 20Narcotics% 20Enforcement.pdf* (cited in FAC ¶ 78). These findings by the Inspector General strongly suggest that defendants Giglio and Moffett "fail[ed] to act on information indicating unconstitutional acts were occurring," or were "gross[ly] negligen[t] in failing to supervise ... subordinates who commit ... wrongful acts," or were otherwise deliberately indifferent to suspects' rights, and also demonstrate "an affirmative causal link between the supervisor's inaction and [plaintiff's] injury." *Poe v. Leonard,* 282 F.3d 123, 140 (2d Cir.2002). For the foregoing reasons, the March 1 Order held that the claims against Giglio and Moffett in this respect cannot be dismissed.

Nadel also argued that the claims against him for his failure to supervise Crisafi must be dismissed because there were no specific allegations of Nadel's personal involvement. The FAC does allege, however, that Kaplan complained to Nadel in writing of Crisafi's misconduct prior to D'Olimpio's arrest. FAC ¶ 15. The Fisch Report, although it does not dwell on Nadel's actions, cites Nadel's lack of prior law enforcement experience and describes complaints by MARO investigators that the lack of a Program Director with law enforcement experience allowed Crisafi "to attain an inappropriate degree of power within the office." Fisch Report at 1, 16. Because the Court, in ruling on a motion to dismiss, must "take all facts and draw all inferences in the light most favorable" to the plaintiff, *Gross v. Rell,* 585 F.3d 72, 75 n. 1 (2d Cir.2009), and because, as noted, the FAC incorporates by reference the allegations of the Fisch Report, the Fisch Report's conclusion that there was a general failure to supervise Crisafi must be taken for these purposes to apply to Nadel, Crisafi's immediate supervisor.[FN5] Thus, the March 1 Order denied the motion to dismiss the claim alleging Nadel's failure to supervise.

FN5. Defendants' reply memorandum asserted that contrary to what was pleaded in the FAC, Crisafi was a Senior Investigator at the time of D'Olimpio's arrest and thus did not report to Nadel at that time. In support of this, it cited to the Fisch Report, which mentions that Crisafi was temporarily promoted between 2006 and March 2008. Fisch Report at 16. The Report does not, however, state that Crisafi ceased reporting to Nadel during this period. The FAC alleges that Nadel, as MARO Program Director, had supervisory authority over all MARO investigators. FAC ¶ 7. In light of the allegations in the FAC, and taking all inferences in favor of D'Olimpio, the Court cannot conclude that Nadel lacked supervisory authority over Crisafi during this period. In any event, it is undisputed that Nadel supervised Vallely and D'Amicantonio, who are also alleged to have violated D'Olimpio's constitutional rights.

With respect to those aspects of plaintiff D'Olimpio's second cause of action that relate to the alleged "Policy," that Policy allegedly permitted BNE investigators to rely on unverified telephone communications with, or faxed affidavits from, doctors' offices to satisfy the requirement of probable cause to arrest suspects or initiate criminal charges. While defendants appear to concede that Giglio, Moffett, and Nadel were sufficiently involved with the formation and operation of this Policy to satisfy the personal involvement requirement of § 1983, they argue that the alleged Policy is not unconstitutional, or at the very least, that the doctrine of qualified immunity should bar further proceedings with respect to these allegations.

[3][4] "In general, probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is **349 committing a crime." *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996). The probable cause determination is

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

based on the "totality of the circumstances," and does not readily lend itself to being reduced to a "neat set of legal rules." *Caldarola v. Calabrese,* 298 F.3d 156, 162 (2d Cir.2002) (internal quotation marks omitted). Furthermore, "in the context of a qualified immunity defense to an allegation of false arrest, the defending officer need only show 'arguable' probable cause." *Id.* (internal quotation mark omitted). The Supreme Court has held that tips from informants can provide probable cause to arrest, but only if either the informant or the information in his/her tips has been shown to be reliable or has been sufficiently corroborated. *See Illinois v. Gates,* 462 U.S. 213, 242, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) ("[E]ven in making a warrantless arrest[,] an officer 'may rely upon information received through an informant, rather than upon his direct observations, *so long as the informant's statement is reasonably corroborated by other matters within the officer's knowledge.'* " (emphasis added)); *Florida v. J.L.,* 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000) (anonymous call to police reporting that person was carrying a gun lacked indicia of reliability sufficient to satisfy "reasonable suspicion" standard with respect to a police officer's stop-and-frisk search, even though that standard requires a lesser showing than probable cause to arrest); *see also United States v. Elmore,* 482 F.3d 172, 179 (2d Cir.2007) ("Even a tip from a completely anonymous informant-though it will seldom demonstrate basis of knowledge and the veracity of an anonymous informant is largely unknowable-can form the basis of reasonable suspicion or probable cause *if it is sufficiently corroborated.*" (emphasis added) (citation omitted)); *Oliveira v. Mayer,* 23 F.3d 642, 647 (2d Cir.1994) ("Information about criminal activity provided by a single complainant can establish probable cause *when that information is sufficiently reliable and corroborated.*" (emphasis added)).

[5] Defendants argue that the Policy provides BNE officers with probable cause (either on the merits or sufficient to entitle them to qualified immunity) because the information provided by the doctors' offices is sufficiently reliable to support a reasonable belief that a crime has been committed. For this proposition, the defendants rely primarily on two out-of-circuit cases,

*United States v. Fooladi,* 703 F.2d 180 (5th Cir.1983), and *Edwards v. Cabrera,* 58 F.3d 290 (7th Cir.1995). While these cases do support the proposition that it may be error to discount information provided by disinterested informants absent reason to doubt these informants' veracity, even when their names are not known to the law enforcement officer, these cases do not stand for the proposition that such information alone suffices to establish probable cause. Rather, in *Fooladi,* the probable cause determination was not based solely on information provided by a representative of a glass manufacturer, which the Fifth Circuit held that the trial court had erroneously disregarded. Instead, the arrest was based not only on the employee's tip that the manufacturer had shipped glassware to a purported business address that was in fact the arrestee's personal address, but also on, among other things, the law enforcement agent's personal observation that the arrestee's residence emanated an odor characteristic of methamphetamine manufacturing and that the arrestee left the premises "holding his gloved hands away from his body as if a chemical were on them." 703 F.2d at 181-84. Similarly, in *Edwards,* the Seventh Circuit found that probable cause existed not just because of a tip from a bus **350** driver, relayed through a dispatcher, that the driver thought he saw several men participate in a drug transaction in a bus station, but also based on the police officer's own personal observations of several men, including the arrestee and his brother, who matched the driver's description standing together outside the bus station; the officer's personal observation that the arrestee's brother was so nervous that he appeared to have urinated on himself; and the officer's subsequent consent search of the brother's garment bag, which yielded a plastic bag appearing to contain marijuana. 58 F.3d at 292.

These cases are thus consistent with the law in this Circuit, as articulated in *Caldarola v. Calabrese,* 298 F.3d 156 (2d Cir.2002). The plaintiff in *Caldarola,* a New York corrections officer challenged his arrest on charges that he was unlawfully collecting job injury benefits even though he was no longer a New York resident and thus was not qualified to receive such benefits. The arresting officer determined there was probable cause to believe the plaintiff had moved from New York to Connecticut based

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

on an investigative file containing reports from two private investigation firms that had been hired by the officer's supervisors. The reports themselves contained, among other things, summaries of investigators' personal interviews with the plaintiff's New York neighbors, surveillance tapes showing the plaintiff emerging from a home in Connecticut and dropping his children off at school, a deed and mortgage for a Connecticut home in the plaintiff's name indicating that it was his primary residence, and work attendance records indicating that the plaintiff had a Connecticut telephone number. The Second Circuit held that it was reasonable for the arresting officer to conclude that these private investigative firms hired by his supervisors were reliable and that the investigators' reports provided information corroborating their conclusions. *Id.* at 163-68. Thus, accepting *arguendo* defendants' assertion that *Caldarola* stands for the proposition that information gathered by private investigators can support probable cause even in the absence of personal knowledge by the arresting officer, the decision certainly does not suggest that an unadorned, unverified phone call or fax can, by itself, without further meaningful corroboration, satisfy probable cause or support qualified immunity.

[6] Returning to the allegations in the FAC, D'Olimpio has asserted that, consistent with the Policy, his arrest was predicated on nothing more than his pharmacy's report that it had failed to receive a hard copy of the prescription within a week, which prompted a MARO official to call D'Olimpio's doctor's office and speak with an unknown person there, who either stated that he was not aware of any such prescription or effectuated the fax transmission of an affidavit bearing an unverified signature of the doctor. None of the above-cited cases suggests that this information originating from an unidentifiable person in a doctor's office can even come close to satisfying probable cause to arrest, absent corroboration or other indicia of reliability. Unlike *Caldarola,* here there is no underlying data providing support for the informant's conclusion. There is no indication that the identity of the informant here could ever be determined. *Cf. J.L.,* 529 U.S. at 270, 120 S.Ct. 1375 ("Unlike a tip from a known informant whose

reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, 'an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity.' " (citation omitted)). There is no suggestion that the MARO investigators had any reason to rely on this particular doctor's office; to the contrary, there are numerous *351 reasons why a doctor or her staff might inadvertently provide inaccurate information, especially given that the relevant information is not affirmatively provided by a tipper, but rather can be elicited by the investigator from whoever happens to pick up the phone in the doctor's office. Moreover, if the doctor herself were involved in wrongdoing with respect to the prescription of narcotics, she would have an incentive to affirmatively mislead the investigators. In sum, while a report from a doctor or her staff denying knowledge of the prescription might be a reasonable basis for further investigation, it is patently deficient as the sole ground for an arrest.

For the foregoing reasons, under the facts alleged and the clearly established law cited herein, defendants lacked even arguable probable cause to arrest D'Olimpio. Because the circumstances of this arrest were consistent with the Policy (as alleged), and because defendants do not dispute that Giglio, Moffett, and Nadel had personal involvement with the establishment and enforcement of this Policy, the March 1 Order declined to dismiss the second cause of action with respect to these allegations.

The Court turns next to those portions of the FAC that assert claims by plaintiff Kaplan, all of which the defendants moved to dismiss. Kaplan's claim of retaliation for expressing his First Amendment rights (the sixth cause of action in the FAC) is based on the following allegations: Kaplan (as noted) is a MARO investigator. FAC ¶ 3. During at least some of the times covered by the FAC, Crisafi was Kaplan's supervisor. *Id.* ¶ 64. As described above, Kaplan complained to Nadel about Crisafi prior to November 16, 2007, but Nadel took no action. *Id.* ¶¶ 15-16. On or about November 17, 2007, Kaplan again went to Nadel and raised concerns about

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

Crisafi: in particular, he stated that Crisafi took prescription narcotics while on duty; that Crisafi would experience facial tics and "zone out"; that Crisafi accidentally discharged his weapon while on duty; that Crisafi lied about his previous job experience; that Crisafi had investigators perform "ill-conceived" and dangerous arrests and searches; that Crisafi was violating suspects' *Miranda* rights; that Crisafi, without authorization, put sirens and lights on his car; and that Crisafi was working outside jobs during work hours. *Id.* ¶ 63. Despite the fact that Kaplan told Nadel that he was afraid of Crisafi and Nadel assured Kaplan that the conversation would be kept confidential, Nadel reported this conversation to Crisafi. *Id.* ¶¶ 63-64. Thereafter, on or about November 20, 2007, Crisafi threatened Kaplan by walking up behind him and saying, "Bang bang, you're dead." *Id.* ¶ 65. At around that same time, Kaplan filed a Workplace Incident Report with the Department of Health's Bureau of Employee Relations detailing these threats and reporting Crisafi's other misconduct, of which he had previously complained to Nadel. *Id.* ¶ 66. In response, Crisafi sabotaged Kaplan's work product on several occasions and began to spread rumors about him, including rumors that Kaplan appeared tired and slept while at the office. *Id.* ¶¶ 67-68. Kaplan then called the Inspector General to report these concerns about Crisafi, and the Inspector General then widened his ongoing investigation of Crisafi to address these issues. *Id.* ¶¶ 69-70. Because, however, the Inspector General's investigation led to interviews with all the MARO inspectors except for Kaplan, Crisafi and Nadel were able to infer that Kaplan was the whistleblower. *Id.* ¶ 71.

Kaplan, after spraining his ankle while on duty, went on workers' compensation leave on or about February 27, 2008. *Id.* ¶ 72. A bullet was shot at Kaplan's house on April 17, 2008, and on April 25, 2008, his house was vandalized. *Id.* ¶¶ 73-74. **352** On August 12, 2008, after Kaplan was notified that Employee Relations never received his first Workplace Incident Report, Kaplan resubmitted it. *Id.* ¶ 75.

After publication of the Fisch Report, Giglio resigned

as the director of the BNE. *Id.* ¶ 81. In December 2008, defendant Jennifer Treacy was appointed Deputy Director of the New York State Department of Health, with supervisory authority over the BNE and the MARO. *Id.* ¶ 82. The Inspector General attempted to persuade Kaplan to return to work, as Crisafi was on leave and would face discipline for his conduct. *Id.* ¶ 83. Kaplan agreed to return to work and received a physician's evaluation that he was fit to return. *Id.* ¶¶ 84-86. Nonetheless, Kaplan was required to undergo three additional physical examinations; after reviewing these, the relevant administrator concluded that Kaplan was fit to return, provided the he be closely monitored, specifically for falling asleep at work. *Id.* ¶¶ 87-90. He was scheduled to return to work on April 10, 2009. *Id.* ¶ 91. The FAC alleges that Treacy, who was romantically involved with Giglio, was upset about Giglio's resignation and blamed Kaplan for causing it; therefore, she ordered the acting director of the BNE not to allow Kaplan to return. *Id.* ¶¶ 92-93. On April 9, 2009, Kaplan was told not to return because of a lack of staff, and on April 23, the Department of Health sent him a letter informing him that he was terminated for failing to complete a study to confirm he did not have a sleep disorder. *Id.* ¶¶ 94-95. Kaplan filed a grievance and, after a hearing, was allowed to return to work. *Id.* ¶ 96.

In May 2009, defendant Kenneth Post was appointed as director of the BNE, and defendant Timothy Dewey was appointed as BNE Section Chief. *Id.* ¶¶ 97-98. In June 2009, Kaplan returned to work, and was informed that he would only be given a temporary assignment and would not perform fieldwork. *Id.* ¶ 99. After his reinstatement, Kaplan was denied access to a state car and was not given a badge, gun, or firearms training; he was confined to desk duties and menial document review. *Id.* ¶¶ 100-101. On July 14, 2009, Kaplan met with Dewey to complain about his treatment. *Id.* ¶ 102. D'Olimpio filed his original complaint in the instant action on August 18, 2009. In September 2009, Stephanie Jubic of Employee Relations confiscated the computers of Crisafi, Vallely, D'Amicantonio, and Kaplan-Kaplan believes Jubic downloaded his emails to find grounds to terminate him. *Id.* ¶ 105. On October 8, 2009, Kaplan was placed on

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

administrative leave and told not to contact anyone at the BNE. *Id.* ¶ 108. On October 16, Jubic mailed Kaplan a letter stating that he would be interrogated on October 27 and would possibly face discipline. *Id.* ¶ 109. Also on October 16, Kaplan had a grievance hearing to discuss being denied his proper job responsibilities. At this hearing, Post stated that as BNE director, it was in his discretion to decide what duties Kaplan should have. *Id.* ¶ 110.

Based on these facts, Kaplan alleges in that defendants Treacy, Post, Dewey, and Nadel retaliated against him with respect to speech that was protected by the First Amendment. These defendants have moved to dismiss Kaplan's claim on several grounds, including that Kaplan's speech was made pursuant to his official duties and hence is not protected by the First Amendment.

[7] A public employee's cause of action for his employer's discipline based on his speech can proceed only if the employee "spoke as a citizen on a matter of public concern"; otherwise, the employee's speech is outside the scope of the First Amendment. *Sousa v. Roque,* 578 F.3d 164, 170 (2d Cir.2009) (internal quotation *353 mark omitted). In *Garcetti v. Ceballos,* 547 U.S. 410, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006), the Supreme Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421, 126 S.Ct. 1951. Though not without reluctance, the Court concludes that this "official duties" exception, as recently elaborated on by the Second Circuit in *Weintraub v. Board of Education,* 593 F.3d 196 (2d Cir.2010), is fatal to Kaplan's retaliation claim.

*Weintraub* made clear that for purposes of determining whether a public employee's speech is protected, a public employee's "official duties" are to be

construed broadly. The plaintiff in *Weintraub* was a public school teacher, and the allegedly protected speech consisted of a grievance he filed with his union challenging a school administrator's decision not to discipline a disruptive student. Quoting *Garcetti,* the Court of Appeals stated that the inquiry into whether a public employee speaks pursuant his official duties is "a practical one," and that the employee's duties should not be interpreted narrowly. 593 F.3d at 202 (internal quotation marks omitted). Thus, *Weintraub* held:

[U]nder the First Amendment, speech can be "pursuant to" a public employee's official job duties even though it is not required by, or included in, the employee's job description, or in response to a request by the employer. In particular, we conclude that Weintraub's grievance was "pursuant to" his official duties because it was "part-and-parcel of his concerns" about his ability to "properly execute his duties," as a public school teacher-namely, to maintain classroom discipline, which is an indispensable prerequisite to effective teaching and classroom learning.... Weintraub's speech challenging the school administration's decision to not discipline a student in his class was a "means to fulfill," and "undertaken in the course of performing," his primary employment responsibility of teaching.

*Id.* at 203 (citations omitted). The court went on to note that its conclusion was supported "by the fact that [Weintraub's] speech ultimately took the form of an employee grievance, for which there is no relevant citizen analogue." *Id.* Whereas actions like writing a letter to a newspaper or informally discussing politics with co-workers are equally available to government employees and ordinary citizens, "[t]he lodging of a union grievance is not a form or channel of discourse available to non-employee citizens." *Id.* at 203-04.

[8] Here, the speech that Kaplan claims is protected falls within Kaplan's official duties as defined by

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

*Weintraub.* In the FAC, Kaplan alleges that the retaliation he allegedly suffered was in response to the following statements: (1) his complaints to Nadel about Crisafi's behavior; (2) his Workplace Incident Reports; and (3) his complaint to the Inspector General. With the possible exception of the latter, each of these statements, as Kaplan concedes, was "made privately though channels available through his employment, and was "made in a manner that would not be available to a non-public employee citizen." Kaplan Supp. Mem., 2/5/10, at 5. Moreover, the common theme of all these statements was that Crisafi was violating suspects' rights and was not performing his job properly, and by implication that Crisafi was interfering with Kaplan's ability to perform his own duties. It is clear that Kaplan's duties as a MARO officer included ensuring that investigations and arrests of narcotics abuses are lawfully conducted. *See, e.g.,* Fisch Report at 2-3 (describing policies and training manuals **\*354** applicable to BNE investigators). All of Kaplan's relevant speech was therefore, either directly or indirectly, " 'part-and-parcel of his concerns' about his ability to 'properly execute his duties' " as a BNE investigator. *Weintraub,* 593 F.3d at 203. Just as the speech in *Weintraub* was in furtherance of the teacher's duty to maintain classroom discipline, Kaplan's speech here, which related to ensuring the "safety of citizens" and the "constitutional rights of suspects," Kaplan Supp. Mem. at 5, was made in furtherance of his law enforcement duties as an investigator endowed with the power to arrest. *Cf. Carter v. Inc. Vill. of Ocean Beach,* 693 F.Supp.2d 203, 211 (E.D.N.Y.2010) ( "All of plaintiffs' complaints to their superiors ... related to their concerns about their ability to properly execute their duties as police officers, as they expressed concern [that various acts] affected their ability to perform their job assignments safely and that they were told not to issue summonses to certain individuals and businesses.... Plaintiffs' speech in challenging ... defendants' alleged cover-ups of officer misconduct ... was undertaken in the course of performing one of their core employment responsibilities of enforcing the law and, thus, was speech made pursuant to their official duties."). Accordingly, Kaplan's allegations cannot support a First Amendment retaliation claim.

In addition, the speech contained in Kaplan's Workplace Incident Reports and his complaint to the Inspector General were unprotected by the First Amendment because these statements were required by law. *See* N.Y. Labor Law § 27-b(6)(a) ("Any employee ... who believes that a serious violation of a workplace violence protection program exists or that an imminent danger exists shall bring such matter to the attention of a supervisor in the form of a written notice."); N.Y. Exec. Law § 55(1) ("Every state officer or employee in a covered agency shall report promptly to the state inspector general any information concerning corruption, fraud, criminal activity, conflicts of interest or abuse by another state officer or employee relating to his or her office or employment .... The knowing failure of any officer or employee to so report shall be cause for removal from office or employment or other appropriate penalty.").[FN6] Speech made pursuant to a public employee's legal obligations is not made "as a citizen."[FN7]

FN6. It is these statutory obligations, as well as *Weintraub's* broad definition of speech made in the course of official duties, that distinguish Kaplan's speech from that of the plaintiff in *Freitag v. Ayers,* 468 F.3d 528 (9th Cir.2006). The plaintiff in *Freitag,* a California correctional officer, claimed she was retaliated against after reporting to the California Inspector General that she and other prison guards were being sexually harassed. Although the Ninth Circuit held that the plaintiff "acted as a citizen" in complaining to the Inspector General and in writing letters to a state senator regarding this harassment, the court's holding was based on the fact that "[i]t was certainly not part of [plaintiff's] official tasks to complain to the Senator or the IG about the state's failure to perform its duties properly." *Id. at* 545. Under New York law, however, such complaints *are* within the official duties of BNE investigators.

FN7. Because Kaplan's speech was made

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

pursuant to his official duties and thus is not constitutionally protected, the Court need not reach other required elements of a First Amendment retaliation claim, including whether his speech addressed matters of "public concern," *see Sousa, 578 F.3d at 170,* and whether the complaint sufficiently alleges a causal connection between the protected speech and the retaliatory acts, *see Gorman-Bakos v. Cornell Coop. Extension of Schenectady County, 252 F.3d 545, 554 (2d Cir.2001).*

For the foregoing reasons, the March 1 Order denied the sixth cause of action in the FAC, and, as the Court now clarifies, the dismissal was with prejudice because it rests on a legal ground that cannot be **\*355** cured by repleading. *Cf. Oliver Schs., Inc. v. Foley, 930 F.2d 248, 252-53 (2d Cir.1991).* The Court notes, however, that the dismissal of Kaplan's First Amendment claim brought pursuant to § 1983 does not alter Kaplan's opportunity under applicable New York law to seek protection from the retaliatory acts he alleges. *See* N.Y. Labor Law § 27-b(6)(e) (prohibiting retaliation based on an employee's filing of a report of workplace violence); N.Y. Exec. Law. § 55(1) (providing that employees who report "improper governmental action" to the Inspector General "shall not be subject to dismissal, discipline or other adverse personnel action").

[9] The Court comes finally to Crisafi's counterclaim for defamation, which insinuates that the aforementioned Workplace Incident Reports filed by Kaplan, Kaplan's complaint to the Inspector General, and even Kaplan's allegations in the FAC are defamatory. Crisafi subsequently conceded, however, that the only potentially actionable statements not protected by privilege or barred by the statute of limitations are those that were allegedly republished on December 8, 2008 by the Inspector General and the *New York Times.* Crisafi Mem. Opp. Kaplan's Mot. to Dismiss, 2/5/10, at 4-5. In this respect, the counterclaim, which was filed on December 3, 2009, alleges the following: Kaplan filed Workplace Incident Reports on or about November 20, 2007 and August 12,

2008 reporting various misconduct by Crisafi, and made a complaint to the Inspector General to the same effect on or about November 20, 2007. Crisafi Compl. ¶¶ 15, 17, 20, Exs. C-E. Crisafi alleges, based on information and belief, that Kaplan's report to the Inspector General "prompted an investigation" focused on Crisafi and relating to Kaplan's complaints. *Id.* ¶ 19. Also upon information and belief, Crisafi alleges that a copy of the Fisch Report was provided to Kaplan in advance of its public release. *Id.* ¶ 35. This report was also provided to the *New York Times,* which described this report in an article published on December 8, 2008. *Id.* ¶ 36 & Ex. F. Upon information and belief, Crisafi alleges that Kaplan gave the Fisch Report to the *New York Times. Id.* ¶ 37. The Fisch Report was published on the *New York Times's* and Inspector General's websites, where it remains accessible. *Id.* ¶¶ 39-40. Crisafi alleges that the contents of the *New York Times* article and the Fisch Report reflect false and defamatory statements made by Kaplan, and have caused Crisafi to be vilified and his reputation to suffer. *Id.* ¶¶ 16, 18, 21, 23-33, 41-43. Accordingly, Crisafi asserted two causes of action alleging that Kaplan defamed him. Kaplan then moved to dismiss these counterclaims on the basis that Kaplan is not responsible for the republication of his allegedly defamatory statements by the *New York Times* or the Inspector General.

[10] Under New York law, a plaintiff "may not recover damages from the original author for ... slander arising from the republication of defamatory statements by a third party absent a showing that the original author was responsible for or ratified the republication." *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc., 314 F.3d 48, 59 (2d Cir.2002).* Crisafi argues that a more lenient standard applies, permitting liability based on Kaplan's mere knowledge or reasonable expectation that his allegedly defamatory statements would be republished. *See, e.g., Campo v. Paar, 18 A.D.2d 364, 368, 239 N.Y.S.2d 494 (1st Dept.1963).* The Court need not resolve which standard applies: Crisafi's counterclaim is deficient under either test because it fails to "state a claim to relief that is plausible on its face." *Iqbal, 129 S.Ct. at 1949* (internal quotation marks omitted).

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

Even accepting as true Crisafi's non-conclusory factual allegations, including **356** those made only on information and belief, it is simply implausible that Kaplan in any legally relevant sense caused the republication of his statements in the Fisch Report or *New York Times* article. Crisafi alleges that Kaplan's complaint prompted the Inspector General investigation, but this allegation is contradicted by the Fisch Report itself, which indicates that the investigation began after the *New York Times* published an article in March 22, 2007 describing abuses of government-issued parking placards. Fisch Report at 3-4. In any event, even if Kaplan's complaint served to expand the scope the investigation, and included allegations consistent with what the Fisch Report eventually concluded, the Report clearly did more than merely parrot Kaplan's charges. The Report, in a section headed "Methodology," states that the investigation was based on, among other things, interviews with Crisafi himself, other BNE employees, Giglio, and Moffett, as well as other police officers and district attorneys who had interacted with Crisafi. *Id.* at 4. Indeed, the Inspector General is required by statute to "investigate," not merely repeat, allegations of malfeasance. N.Y. Exec. Law § 53. And even if, as alleged, Kaplan acted to bring the Report to the attention of the *New York Times*, the *New York Times* article, which consists entirely of a summary of the Fisch Report, reflects Kaplan's allegations only to the extent that such charges were ratified by the Report itself. *See* Crisafi Compl., Ex. F.

For these reasons, the Court concluded that there is no basis for holding Kaplan liable for the republication of his allegedly defamatory statements, even if he intended that his allegations be republished in this manner and gave the *New York Times* a copy of the Fisch Report. "The rationale for making the originator of a defamatory statement liable for its foreseeable republication is the strong causal link between the actions of the originator and the damage caused by the republication." *Van-Go Transp. Co. v. N.Y. City Bd. of Educ.*, 971 F.Supp. 90, 102 (E.D.N.Y.1997) (internal quotation marks omitted). Here,

the duty of the Inspector General to investigate complaints prior to publishing a written report, the fact that the Fisch Report was based on numerous sources beyond Kaplan's allegations, and the fact that the *New York Times* article merely summarized the Fisch Report together sever any causal link that might exist between Kaplan's actions and the December 8, 2008 republications. Thus, the March 1 Order dismissed Crisafi's counterclaim with prejudice.[FN8]

FN8. This result is not inconsistent with *Campo v. Paar*, 18 A.D.2d 364, 368, 239 N.Y.S.2d 494 (1st Dept.1963), which declared that "[a]nyone giving a statement to a representative of a newspaper authorizing or intending its publication is responsible for any damage caused by the publication." This broad pronouncement was made in the context of a narrower holding that the defendant, Jack Paar, could be held responsible for the *New York Post's* publication of his statement, made by him to a reporter during an interview, that the plaintiff "lacked certain qualities which would fit him to be a performer desirable to [Paar's] program." *Id.* at 365, 239 N.Y.S.2d 494. The causal link between Kaplan's statements and the findings of the Fisch Report, which were subsequently summarized by the *New York Times*, is obviously much more attenuated than the relationship in *Campo* between Paar's statement to the newspaper reporter during an interview and the reporter's publication of that statement.

For the foregoing reasons, the Court hereby confirms its decisions to dismiss the sixth cause of action (*i.e.*, all of Kaplan's claims) and to dismiss both of Crisafi's counterclaims, all with prejudice, and to otherwise deny the motions to dismiss. The Clerk of the Court is directed to close **357** the entries numbered 33, 34, 35, 42, and 47 on the docket of case number 09 Civ. 7283 and to close case number 09 Civ. 9952.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

S.D.N.Y.,2010.

D'Olimpio v. Crisafi

718 F.Supp.2d 340

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Page 1

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

**c**

Only the Westlaw citation is currently available.

United States District Court,

S.D. New York.

Gultela QASEM, Plaintiff,

v.

Luis A. TORO; Superintendent of Taconic Correctional
Facility Delores Thornton; Deputy Superintendent for
Security William Rogers; John Does 1-10, Defendants.

No. 09 Civ. 8361(SHS).

Aug. 10, 2010.

**Background:** Inmate brought a § 1983 suit against
corrections officials regarding injuries suffered by the
inmate at the hands of a corrections officer alleged to have
sexually assaulted the inmate. Superintendent and deputy
superintendent for security moved to dismiss claims that
they were deliberately indifferent to the inmate's personal
safety.

**Holdings:** The District Court, Sidney H. Stein, J., held
that:

(1) inmate stated a claim against the movants for Eighth
and Fourteenth Amendment violations, and

(2) movants were not entitled to qualified immunity.

Motion denied.

West Headnotes

**[1] Civil Rights 78 ⚖ 1358**

78 Civil Rights

  78III Federal Remedies in General

    78k1353 Liability of Public Officials

      78k1358 k. Criminal Law Enforcement; Prisons.
Most Cited Cases

**Constitutional Law 92 ⚖ 4825**

92 Constitutional Law

  92XXVII Due Process

    92XXVII(H) Criminal Law

      92XXVII(H)11 Imprisonment and Incidents
Thereof

        92k4825 k. Use of Force; Protection from
Violence. Most Cited Cases

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

**Prisons 310**     **234**

310 Prisons

    310II Prisoners and Inmates

        310II(E) Place or Mode of Confinement

            310k234 k. Duty to Protect; Protective Confinement. Most Cited Cases

**Sentencing and Punishment 350H**     **1537**

350H Sentencing and Punishment

    350HVII Cruel and Unusual Punishment in General

        350HVII(H) Conditions of Confinement

            350Hk1537 k. Protection from Violence. Most Cited Cases

Inmate's allegations against superintendent and deputy superintendent for security in a § 1983 suit, claiming that they were deliberately indifferent to her rights and were responsible for creating or maintaining policies or practices that failed to prevent her from being repeatedly raped and assaulted by a corrections officer, stated a claim for Eighth and Fourteenth Amendment violations; complaint alleged that the officials were responsible for determining where inmates were to be housed and the assignment of guards, and in conjunction with another official, the investigation and response to complaints of staff misconduct. U.S.C.A. Const.Amends. 8, 14; 42 U.S.C.A. § 1983.

**[2] Civil Rights 78**     **1335**

78 Civil Rights

    78III Federal Remedies in General

        78k1334 Persons Liable in General

            78k1335 k. In General. Most Cited Cases

Degree of personal involvement required to overcome a motion to dismiss a § 1983 claim for failure to state a claim varies depending on the constitutional provision alleged to have been violated. 42 U.S.C.A. § 1983; Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[3] Civil Rights 78**     **1355**

78 Civil Rights

    78III Federal Remedies in General

        78k1353 Liability of Public Officials

            78k1355 k. Vicarious Liability and Respondeat Superior in General; Supervisory Liability in General. Most Cited Cases

Categories set forth in case law as supporting personal liability of supervisors under § 1983 apply as long as they are consistent the requirements applicable to the particular constitutional provision alleged to have been violated. 42 U.S.C.A. § 1983.

**[4] Sentencing and Punishment 350H**     **1532**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

350H Sentencing and Punishment

   350HVII Cruel and Unusual Punishment in General

      350HVII(H) Conditions of Confinement

         350Hk1532 k. In General. Most Cited Cases

Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody. U.S.C.A. Const.Amend. 8.

**[5] Sentencing and Punishment 350H ☜ 1533**

350H Sentencing and Punishment

   350HVII Cruel and Unusual Punishment in General

      350HVII(H) Conditions of Confinement

         350Hk1533 k. Deliberate Indifference in General. Most Cited Cases

Official acts with the requisite deliberate indifference for an Eighth Amendment violation when that official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. U.S.C.A. Const.Amend. 8.

**[6] Civil Rights 78 ☜ 1376(7)**

78 Civil Rights

   78III Federal Remedies in General

      78k1372 Privilege or Immunity; Good Faith and Probable Cause

         78k1376 Government Agencies and Officers

            78k1376(7) k. Prisons, Jails, and Their Officers; Parole and Probation Officers. Most Cited Cases

Superintendent and deputy superintendent for security were not entitled to qualified immunity in an inmate's § 1983 suit claiming that they were deliberately indifferent to her rights and were responsible for creating or maintaining policies or practices that failed to prevent her from being repeatedly raped and assaulted by a corrections officer, given the extent of the alleged sexual abuse, the numerous warning signs alleged, and the number of questionable, if not unintelligible, decisions made with respect to the inmate during the course of an investigation. 42 U.S.C.A. § 1983.

**[7] Civil Rights 78 ☜ 1376(2)**

78 Civil Rights

   78III Federal Remedies in General

      78k1372 Privilege or Immunity; Good Faith and Probable Cause

         78k1376 Government Agencies and Officers

            78k1376(2) k. Good Faith and Reasonableness; Knowledge and Clarity of Law; Motive and Intent, in General. Most Cited Cases

Individual defendants are shielded from liability for civil damages under § 1983 if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. 42 U.S.C.A. § 1983.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

Karen K. Won, Cooley Godward Kronish LLP, William O'Brien, Kronish, Lieb, Weiner & Hellman L.L.P., New York, NY, for Plaintiff.

Thomas Patrick McCloskey, Aliazzo, McCloskey & Gonzalez, LLP, Ozone Park, NY, Julia Hyun-Joo Lee, New York State Department of Law, New York, NY, for Defendants.

*OPINION & ORDER*

SIDNEY H. STEIN, District Judge.

**\*1** Plaintiff Gultela Qasem brings this action pursuant to 42 U.S.C. § 1983 against defendants Luis Toro, Delores Thornton, William Rogers, and John Does 1-10 in their individual capacities. The lawsuit arises from injuries allegedly suffered by Qasem at the hands of Corrections Officer Luis Toro while Qasem was an inmate under the custody of the New York State Department of Correctional Services ("DOCS") at Taconic Correctional Facility. The complaint alleges that defendants deprived Qasem of her constitutional rights through (1) direct and repeated acts of sexual assault by Toro; (2) Thornton and Rogers's deliberate indifference to her personal safety; and (3) Thornton and Rogers's maintenance of, or failure to remedy, policies and practices that created an unreasonable risk of sexual assault by Toro. Defendants Thornton and Rogers have now moved to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim for relief.

## I. BACKGROUND

The following facts are taken from the complaint and presumed to be true for the purposes of this motion.

A. *Parties*

Plaintiff Gultela Qasem is currently an inmate at the Bedford Hills Correctional Facility. At the time of the acts alleged in the complaint, plaintiff was an inmate at the Taconic Correctional Facility. (Compl. ¶¶ 5, 21.) Defendant Toro-not a party to the present motion-is a DOCS Corrections Officer. At the time of the acts alleged in the complaint, defendant Delores Thornton was the Superintendent of Taconic and defendant Rogers was the Deputy Superintendent for Security of Taconic. (*Id.* ¶¶ 1, 8-9.)

B. *This Action*

Qasem alleges defendants violated her Eighth and Fourteenth Amendment rights under the United States Constitution as they arise out of a repeated pattern of sexual assault and rape committed against her by Toro.

While an inmate at Taconic, Qasem was assigned to work in Building 93 from approximately February 2007 to November 2007, and for most of that time, she also lived there. (*Id.* ¶¶ 21-22.) Qasem alleges that, on or around March 27, 2007, Toro entered her cell during the afternoon "count time" [FN1] and sexually assaulted her by fondling her breasts, vaginal area, and buttocks while also exposing his penis and forcing Qasem to perform oral sex on him. (*Id.* ¶ 23.) Plaintiff alleges that later that evening Toro ordered her to the officers' station where he raped her. (*Id.* ¶ 24.) Toro then told Qasem that he would write up a disciplinary action against her if she told anyone what he had done to her. (*Id.* ¶ 24.)

Qasem alleges that a pattern of sexual assault emerged over the next eight months. Toro allegedly assaulted and raped Qasem in her cell on numerous occasions during the night count time, in the officers' station, in the shower area, and in the recreation room. (*Id.* ¶¶ 25-26.) Throughout these eight months, Qasem alleges that Toro

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

repeatedly threatened to kill her and her family if she reported his actions. As a result, she did not report Toro's conduct. (*Id.* ¶ 27.) Plaintiff alleges, however, that other corrections staff facilitated Toro's repeated sexual abuse by condoning Toro or plaintiff being in unauthorized areas and allowing Toro into plaintiff's housing area when he was not assigned there. (*Id.* ¶ 28.)

**\*2** Although Qasem did not file a report against Toro based on his conduct, others did, and on July 2, 2007, the DOCS Officer of Inspector General ("IG") commenced an investigation into Toro's actions. (*Id.* ¶¶ 31-33.) When interviewed by an IG representative, Qasem denied the allegations because of the prior threats that Toro had made; despite her denials, plaintiff was reassigned to a different building the day after her interview. (*Id.* ¶¶ 33-34.) As the IG continued its investigation, in August 2007 Qasem was transferred back to building 93, which was the building where Toro worked at that time. Plaintiff contends that by causing her to be transferred back to Toro's building, defendants Thornton and Rogers were deliberately indifferent to her safety and allowed Toro to have continued unfettered access to her, which enabled him to continue raping and sexually abusing her. (*Id.* ¶ 38.) Plaintiff alleges that once she returned to building 93 in August 2007, Toro resumed his sexual assaults, including but not limited to raping her and sodomizing her. (*Id.* ¶ 40.)

During this same time period, plaintiff was transferred in and out of the "keeplock" area in building 93. (*Id.* ¶¶ 39-47.) While she was in keeplock, at least one corrections officer delivered a message from Toro to her, while other corrections staff condoned and disregarded the alleged continuing assaults by Toro. (*Id.* ¶¶ 47-48.) In addition to physical, mental, and emotional injuries she suffered from the repeated rapes and sexual abuse, Qasem alleges that in October 2007 she was diagnosed with genital herpes, a sexually transmitted disease, which she believes was transmitted to her by Toro. (*Id.* ¶¶ 61-63.)

Plaintiff alleges that sometime in November 2007, Toro became aware of the IG investigation and started harassing her by asking her what questions the IG representative had asked her and what her responses were. (*Id.* ¶ 45.) Qasem contends that on November 26, 2007, after she was once again raped by Toro, she told him that she was going to report his conduct, and Toro became violent with her-twisting her arm and wrist. (*Id.* ¶ 50.) The next day, plaintiff was transferred out of Taconic and into Bedford. (*Id.* ¶ 51.)

Plaintiff alleges that Thornton and Rogers were deliberately indifferent to her safety and well-being and that despite ample evidence of the assaults, they permitted Toro to have repeated access to her instead of removing either her or Toro from building 93. (*Id.* ¶¶ 55-60.) Plaintiff maintains that Thornton and Rogers were responsible for the inadequate polices and practices that allowed her to be repeatedly raped and assaulted over a number of months, despite the fact that other corrections officers were aware of Toro's misconduct. (*Id.*)

## II. DISCUSSION

A. *Rule 12(b)(6) Standard*

On a motion to dismiss a claim for relief pursuant to Rule 12(b)(6) a court accepts the truth of the facts alleged in the complaint and draws all reasonable inferences in the plaintiff's favor. *Ashcroft v. Iqbal,* ---U.S. ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009); *Global Network Commc'ns, Inc. v. City of New York,* 458 F.3d 150, 154 (2d Cir.2006). A complaint will be dismissed if it fails to set forth "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 129 S.Ct. at 1949 (quoting *Twombly,* 550 U.S. at 556, 127 S.Ct. 1955).

B. *Supervisory Liability Post-Iqbal*

**\*3** [1] The complaint alleges that defendants deprived Qasem of her constitutional rights through (1) the direct and repeated acts of sexual assault by Toro; (2) defendant Thornton and Rogers's deliberate indifference to her personal safety; and (3) Thornton and Rogers's maintenance of, or failure to remedy, policies and practices that created an unreasonable risk of sexual assault by Toro. Thornton and Rogers respond to the claims against them on several grounds.

First, they assert that Qasem's claims are based on a broad theory of "supervisory liability" that has been discredited by the U.S. Supreme Court in *Ashcroft v. Iqbal, --- U.S. ----, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).* Prior to *Iqbal,* well-established Second Circuit law provided five bases for alleging that a supervisory defendant had sufficient personal involvement with the alleged violation to maintain a section 1983 claim. A plaintiff could plead personal involvement by showing any of the following five courses of conduct:

(1) the defendant participated directly in the alleged constitutional violation, the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Sanders v. N.Y. City Dep't of Corr.,* 07 Civ. 3390, 2009 WL 222161, at \*5, 2009 U.S. Dist. LEXIS 7709, at \*17-18 (S.D.N.Y. Jan. 30, 2009). Defendants contend that *Iqbal's* discussion of supervisory liability took a narrower approach than did *Colon,* thereby rendering Qasem's reliance on *Colon* categories unwarranted.

The Second Circuit has not yet addressed how *Iqbal* affects the five categories of conduct that give rise to supervisory liability under *Colon.* As explained in detail in *D'Olimpio v. Crisafi,* No. 09 Civ. 7283, ---F.Supp.2d ----, ---- - ----, 2010 WL 2428128, at \*4-6, 2010 U.S. Dist. LEXIS 59563, at \*14-18 (S.D.N.Y. June 15, 2010), in the wake of *Iqbal,* certain courts in this district have found that "[o]nly the first and part of the third *Colon* categories pass *Iqbal's* muster," and that "[t]he other *Colon* categories impose the exact types of supervisory liability that *Iqbal* eliminated," because only the first and third categories allege personal involvement sufficiently to permit supervisory liability to be imposed after *Iqbal. Bellamy v. Mount Vernon Hosp.,* No. 07 Civ. 1801, 2009 WL 1835939, at \*1-2, 2009 U.S. Dist. LEXIS 54141, at \*6 (S.D.N.Y. June 26, 2009); *see also Newton v. City of N.Y.,* 640 F.Supp.2d 426, 448 (S.D.N.Y.2009) ("[P]assive failure to train claims pursuant to section 1983 have not survived the Supreme Court's recent decision in *Ashcroft v. Iqbal.*"); *Joseph v. Fischer,* No. 08 Civ. 2824, 2009 WL 3321011, at \*15, 2009 U.S. Dist. LEXIS 96952, at \*42-43 (S.D.N.Y. Oct. 8, 2009) ("Plaintiff's claim, based on [defendant's] 'failure to take corrective measures,' is precisely the type of claim *Iqbal* eliminated."). This Court, as did the Court in *D'Olimpio,* disagrees with this narrow interpretation of *Iqbal.*

**\*4** [2] As *Iqbal* noted, the degree of personal involvement required to overcome a Rule 12(b)(6) motion varies depending on the constitutional provision alleged to

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

have been violated. Invidious discrimination claims require a showing of discriminatory purpose, but there is no analogous requirement applicable to Qasem's allegations of repeated sexual assaults. *See Sash v. United States,* 674 F.Supp.2d 531, 544 (S.D.N.Y.2009) (citing *Chao v. Ballista,* 630 F.Supp.2d 170, 178 n. 2 (D.Mass.2009)); *see also D'Olimpio,* --- F.Supp.2d at ----, 2010 WL 2428128, at *5, 2010 U.S. Dist. LEXIS 59563, at *16. *Colon's* bases for liability are not founded on a theory of respondeat superior, but rather on a recognition that "personal involvement of defendants in alleged constitutional deprivations" can be shown by nonfeasance as well as misfeasance. *Id.* at ----, at *5, 2010 U.S. Dist. LEXIS 59563 at *17 (quoting *Colon,* 58 F.3d at 873).

[3] Thus, the five *Colon* categories supporting personal liability of supervisors still apply as long as they are consistent with the requirements applicable to the particular constitutional provision alleged to have been violated. *Id.*; *see also Sash v. United States,* 674 F.Supp.2d 531, 544 (S.D.N.Y.2009) ("It was with intent-based constitutional claims in mind, specifically racial discrimination, that the Supreme Court rejected the argument that 'a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution.' Where the constitutional claim does not require a showing of discriminatory intent, but instead relies on the unreasonable conduct or deliberate indifference standards of the Fourth and Eighth Amendments, the personal involvement analysis set forth in *Colon v. Coughlin* may still apply." (citation omitted)).

Plaintiff's allegations and inferences, if proven, would entitle her to relief under the Fourteenth Amendment and Eighth Amendments. *See Breithaupt v. Abram,* 352 U.S. 432, 435, 77 S.Ct. 408, 1 L.Ed.2d 448 (1957) (sustaining substantive due process claims where state action shocks the conscience); *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the

Eighth Amendment.") (quoting *Helling v. McKinney,* 509 U.S. 25, 31, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993)).

C. *Colon Categories*

Second and apart from their argument based on *Iqbal,* Thornton and Rogers assert that plaintiff has adequately alleged neither (1) that they were deliberately indifferent to her rights by failing to act on information that unconstitutional acts were occurring nor (2) that they were responsible for creating or maintaining policies or practices that failed to prevent Qasem from being repeatedly raped and assaulted.

[4][5] The Court finds that plaintiff has alleged sufficient facts that Thornton-the Superintendent of the DOCS facility where plaintiff resided-and Rogers-the Deputy Superintendent for Security at that same facility-were deliberately indifferent to her health and safety and that they were responsible for creating or maintaining policies and practices that failed to prevent plaintiff from being raped and assaulted. The Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody. *Hayes v. New York City Dep't of Corrections,* 84 F.3d 614, 620 (2d Cir.1996). "An official acts with the requisite deliberate indifference when that official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).

*5 Specifically, the complaint alleges that defendants were responsible for determining where inmates were to be housed and the assignment of guards, and in conjunction with the IG, the investigation and response to complaints of staff misconduct. Despite an investigation and what plaintiff alleges as substantial evidence of Toro's misconduct known to a variety of individuals (*id.* ¶ 56),

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

defendants Thornton and Rogers allowed plaintiff to be housed in the building where Toro worked (*id.* ¶ 58); they failed to remove him from guarding Qasem (*id.* ¶ 57); they failed to reassign Qasem to another building (*id.*); they allowed Qasem to be transferred back to the building where Toro worked (*id.* ¶ 58); and they did not increase supervision of Toro despite their knowledge of allegations of Toro's assaults and the IG's investigation of him (*id.* ¶ 59). The complaint also alleges that a number of acts occurred under defendants' supervision that were violations of DOCS rules and regulations (*id.* ¶¶ 28, 47), and that defendants Thornton and Rogers allowed those practices to take place.

Although discovery may ultimately reveal that defendants Thornton and Rogers made every reasonable effort to prevent the alleged sexual abuse, Qasem has alleged sufficient facts to allow the Court "to draw the reasonable inference" that the defendants "are liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949.

D. *Qualified Immunity*

[6] Third, Thornton and Rogers claim that qualified immunity requires dismissal of this litigation as to them. So far as the Court can ascertain, defendants contend that they are entitled to immunity principally because Qasem herself initially denied the sexual relationship when asked about it by prison security officers. In their view, her denials by themselves operate as a "reasonable" basis for the decision to place plaintiff back into the building where Toro had unfettered access to her.

[7] Individual defendants are " 'shielded from liability for civil damages' " under 42 U.S.C. § 1983 if " 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Wilson v. Layne,* 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d

396 (1982)); *accord Gilles v. Repicky,* 511 F.3d 239, 243 (2d Cir.2007). "A right is clearly established if (1) the law is defined with Supreme Court or the Second Circuit has recognized the right, and (3) 'a reasonable defendant [would] have understood from the existing law that [his] conduct was unlawful.' " *Anderson v. Recore,* 317 F.3d 194, 197 (2d Cir.2003) (quoting *Young v. County of Fulton,* 160 F.3d 899, 903 (2d Cir.1998)).

This Court cannot find the defendants immune from suit on this record. It is well established that the sexual exploitation of prisoners by prison guards amounts to a constitutional violation. *See Schwenk v. Hartford,* 204 F.3d 1187, 1197 (9th Cir.2000) ("In the simplest and most absolute terms, the Eighth Amendment right of prisoners to be free from sexual abuse was unquestionably clearly established ... and no reasonable prison guard could possibly have believed otherwise."); *Daskalea v. District of Columbia,* 227 F.3d 433, 440, 343 U.S.App.D.C. 261 (D.C.Cir.2000) (affirming prisoner's Eighth Amendment claim after prison guards sexually assaulted her); *Berryhill v. Schriro,* 137 F.3d 1073, 1076 (8th Cir.1998); *Barney v. Pulsipher,* 143 F.3d 1299, 1310 (10th Cir.1998) ("Clearly plaintiffs' deprivations resulting from the sexual assaults are sufficiently serious to constitute a violation under the Eighth Amendment."). *Cf. Farmer v. Brennan,* 511 U.S. 825, 833-34, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.' ") (quoting *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)). Given the extent of the alleged sexual abuse, the numerous warning signs alleged, and the number of questionable-if not unintelligible-decisions made with respect to plaintiff during the course of the IG's investigation, the Court cannot say at this stage of the litigation that Thornton and Rogers are entitled to qualified immunity for their alleged actions.

**III. CONCLUSION**

*6 Because plaintiff has alleged enough facts to raise

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

a plausible claim to relief against the supervisory officials Thornton and Rogers and they are not entitled to qualified immunity on the basis of the record at this stage of the litigation, the motion by Thornton and Rogers to dismiss the complaint is denied.

> FN1. Count time is time during which all activity stops and essentially all inmates are locked into their cells, and corrections staff verify that no inmates are missing. (Compl. ¶ 23 n. 1.)

S.D.N.Y.,2010.

Qasem v. Toro

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2002 WL 731691 (S.D.N.Y.)

(Cite as: 2002 WL 731691 (S.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Charles WOODS, Plaintiff,
v.
Glenn S. GOORD, Commissioner Docs; Dr. Lester N.
Wright, M.D., Mph Associate Commissioner Chief
Medical Officer; Charles G. Greiner, Superintendent of
Green Haven Corr. Fac.; Dr. Norman Salwin, Acting
Health Service Director Green Haven Corr. Fac.; Dr.
Carl J. Koenigsmann, Green Haven Corr. Fac. Health
Service Director; Lawrence Zwillinger, Regional Health
Servens Administrator; Dr. Charles John Bendheim,
Medical Doctor; Dr. Lester S. Silver, U.P.D. Medical
Provider; Dr. Steven Weinstent, U.P.D. Physiatrist;
Barbara Whitney, Medical Records Clerk; Dr. John
Galeno; M. Jones, Correctional Officer; Correction
Physician Services, Inc. (CPS),[FN1] Defendants.

> FN1. Plaintiff refers to Charles Greiner as
> "Grenier" at times, Greiner at other times, and
> occasionally just "Charles," but is sufficiently
> precise such that the Superintendent of Green
> Haven, Charles Greiner, can be identified. The
> correct spelling of "Salwin" appears to be
> Norman Selwin. See Defendants' (Goord et al.)
> Memorandum in Support of Motion to Dismiss
> ("Goord Def. Mem .") at 1. While defense
> counsel uses the name Weinstent, see Galeno
> Defendants' Memorandum in Support of Motion
> to Dismiss ("Galeno Def. Mem.") at 1, the
> correct spelling appears to be Weinstein.

No. 01 CIV. 3255(SAS).

April 23, 2002.

Charles Woods # 82-A-5434, Unit for the Physically
Disabled, Green Haven Correctional Facility, Stormville,
for Plaintiff (Pro Se).

Melinda Chester-Spitzer, Assistant Attorney General,
Office of the Attorney General of the State of New York,
New York, for Defendants Goord, Wright, Greiner,
Selwin, Koenigsmann, Zwillinger, Bendheim, Silver and
Whitney.

Tracy M. Larocque, Esq., Pennock & Breedlove LLP,
Clifton Park, for Defendants Weinstein, Galeno and CPS.

OPINION AND ORDER

SCHEINDLIN, D.J.

**\*1** Charles Woods, proceeding *pro se,* brings this
action pursuant to 42 U.S.C. § 1983 against the New York
Department of Corrections ("DOCS") and its officials, and
various supervisors, health care providers and employees
of Green Haven Correctional Facility ("Green Haven"),
for failing to provide him with medical care in violation of
the Eighth Amendment. Woods also brings claims under
Title II of the Americans With Disabilities Act ("ADA"),
42 U.S.C. § 12132, and section 504 of the Rehabilitation
Act of 1973, 29 U.S.C. § 794, for discrimination on the
basis of disability. He seeks monetary damages and
injunctive relief.

Defendants Glenn Goord, Lester Wright, Charles
Greiner, Norman Selwin, Carl Koenigsmann, Lawrence
Zwillinger, Charles John Bendheim, Lester Silver, and
Barbara Whitney (collectively, the "Goord defendants")
now move to dismiss the Complaint and Amended
Complaint pursuant to Rule 12(b)(6). Defendants Steven
Weinstein, John Galeno and Correction Physician Services
("CPS") (the "Galeno defendants") move to dismiss all
claims pursuant to Rule 12(c). For the reasons below, the
motions are granted in part and denied in part. The claims
against the remaining defendants are dismissed.[FN2]

> FN2. There are five additional defendants. "M.
> Jones" is named in the caption of the Amended
> Complaint, but apparently has not been served.
> Additional defendants are mentioned in the body
> of the Amended Complaint: "Selim Ace," "Mar[
> ]y Kate Moddox Williams," "Randy Duprey,"
> and DOCS. *See* 6/18/01 Amended Complaint
> ("Am.Compl.") ¶¶ (F); (O)-(P); (T). Although
> these individuals and this entity are not listed in

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 731691 (S.D.N.Y.)

(Cite as: 2002 WL 731691 (S.D.N.Y.))

the caption, I will treat them as if they were named defendants. In addition, I will construe the plaintiff's opposition papers to contain factual allegations to the extent that they are consistent with the allegations in the Amended Complaint. *See Burgess v. Goord,* No. 98 Civ.2077, 1999 WL 33458, at *1 n. 1 (S.D.N.Y. Jan. 26, 1999) ("In general, a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of *pro se* litigants makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum.") (citing cases); *see also Gregory v. Daly,* 243 F.3d 687, 691 (2d Cir.2001) (stating that courts should include in their analysis of motions to dismiss "not only the assertions made within the four corners of the Complaint itself, but also those contained in the documents attached to the pleadings or in documents incorporated by reference.").

I. BACKGROUND

The following allegations are drawn from the Amended Complaint and Woods's opposition papers.
A. The Parties

Charles Woods is a 63-year-old prisoner currently incarcerated at Green Haven Correctional Facility ("Green Haven") in Stormville, New York. *See* Am. Compl. ¶ (D) at 2; 1/11/02 Plaintiff's Opposition to Defendants' Motion ("Pl.Opp.2d") at 10.[FN3] Defendant Glenn Goord is the Commissioner of DOCS. *See* Am. Compl. ¶ (G) at 2. Defendants Lester Wright, M.D., and Lawrence Zwillinger, are DOCS's Chief Medical Officer and Regional Health Administrator, respectively. *See id.* ¶¶ (I), (L) at 3. Defendant Charles Greiner is the Superintendent of Green Haven. *See id.* ¶ (H) at 2. Defendants Norman Selwin and Carl J. Koenigsmann are Green Haven's Medical Director and Health Services Director, respectively. *See id.* ¶¶ (J), (K) at 3. Dr. Lester S. Silver is the Medical Director for Green Haven's Unit for the Physically Disabled ("UPD"), where plaintiff resides. *See id.* ¶ (N) at 3.

FN3. Plaintiff submitted a first opposition brief on December 6, 2001. *See* 12/6/01 Objection to Motion and Conference Hearing.

Plaintiff has also sued the following health care professionals. Doctors Charles J. Bendheim, Steven Weinstein and John Galeno each treated plaintiff directly. Dr. Bendheim was the primary care physician for plaintiff and other physically disabled inmates at the time of most of the alleged events. *See id.* ¶ (M) at 3. Defendant Selim Ace is a physical therapist employed by DOCS, and defendant Mary Kate Moddox Williams is his assistant. *See id.* ¶¶ (O)-(P) at 4.

B. Summary of Woods's Medical History at Green Haven

Woods was first incarcerated at Green Haven in December 1995. *See id.* ¶ 1. In early 1996, Woods asked to see a doctor after he began experiencing pain in his hands, knees, elbows, hips and back. *See id.* ¶ 3. He was seen by Dr. Bendheim, who referred him to Dr. Helen Feng, a rheumatologist at Albany Medical Center ("AMC"). *See id.* Dr. Feng examined Woods on May 31, 1996, the first of many such visits. *See id.* Feng and other specialists have since determined that Woods suffers from Rheumatoid Arthritis, Degenerative Joint Disease and leukemia. *See id.* ¶¶ 2, 20. From 1996 to the present, plaintiff has thus required extensive care, including chemotherapy.

*2 Woods alleges that from 1996 to 1999, Dr. Bendheim delayed or did not schedule many specialist-ordered appointments. He alleges that, following surgery on Woods's elbow in 1999, Dr. Weinstein denied him physical therapy in 2000 and 2001. Plaintiff also alleges that from 1996 to the present he has requested, but has been denied, surgery to replace his knees, hips, and elbows with prostheses. In addition, since 1996, Woods has consistently requested a lightweight wheelchair due to the extreme pain he experiences in trying to operate his current, heavy wheelchair. These allegations are fully discussed in Part IV, *infra.*

On April 19, 2001, after years spent exhausting prison grievance procedures, *see infra* note 16, plaintiff filed his original Complaint. *See* 4/19/01 Complaint ("Compl."). On June 21, 2001, plaintiff filed an Amended Complaint. Plaintiff seeks $250,000 in compensatory damages from each defendant for a total of $5,000,000. *See id.* ¶¶ 34,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 731691 (S.D.N.Y.)

(Cite as: 2002 WL 731691 (S.D.N.Y.))

(A)–(C).[FN4]

> **FN4.** Plaintiff does not address the fact that $250,000 multiplied by the number of defendants (17) does not equal $5,000,000.

**II. LEGAL STANDARD**

A motion to dismiss should be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Tarshis v. Riese Org.,* 211 F.3d 30, 35 (2d Cir.2000) (quotation marks and citation omitted).[FN5] "At the Rule 12(b)(6) stage, [t]he issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleading that a recovery is very remote and unlikely but that is not the test." *Sims v. Artuz,* 230 F.3d 14, 20 (2d Cir.2000) (citation, quotation omitted).[FN6] The task of the court in ruling on a Rule 12(b)(6) motion is " 'merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.' " *Id.* (quoting *Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities Inc.,* 748 F.2d 774, 779 (2d Cir.1984)). When deciding a motion to dismiss pursuant to Rule 12(b)(6), courts must "take as true all of the allegations contained in plaintiff's complaint and draw all inferences in favor of plaintiff." *Weinstein v. Albright,* 261 F.3d 127, 131 (2d Cir.2001).

> **FN5.** Plaintiff opposes *summary judgment* in his 40-page brief, to which nearly one hundred pages of exhibits are attached. *See* Pl. Opp.2d. But because defendants moved to dismiss for failure to state a claim, they need not comply with Local Rules 3(g) or 56.1, or any other rule pertaining to summary judgment, as plaintiff argues.

> **FN6.** The same standard applies to Rule 12(c) motions to dismiss. *Fed.R.Civ.P. 12(c); see Simpri v. New York City Agency for Children's Servs.,* No. 99 Civ. 6712, 2001 WL 1661910, at *2 (S.D.N .Y. Dec. 28, 2001) (citing *Irish Lesbian and Gay Org. v. Giuliani,* 143 F.3d 638, 644 (2d Cir.1998)).

Because "most pro se plaintiffs lack familiarity with the formalities of pleading requirements, [courts] must construe pro se complaints liberally, applying a more flexible standard to evaluate their sufficiency." *Lerman v. Board of Elections in the City of New York,* 232 F.3d 135, 140 (2d Cir.2000) (citing *Hughes v. Rowe,* 449 U.S. 5, 9-10 (1980), and *Haines v. Kerner,* 404 U.S. 519, 520-21 (1972)). Courts must remain particularly "mindful of the care exercised in this Circuit to avoid hastily dismissing complaints of civil rights violations." *Gregory,* 243 F.3d at 691. "Complaints based on civil rights statutes must include specific allegations of facts showing a violation of rights instead of a litany of general conclusions that shock but have no meaning." *Burgess,* 1999 WL 33458, at *2 (citing, *inter alia, Barr v. Adams,* 810 F.2d 358, 363 (2d Cir.1987)). "However, assertions must truly be bare for dismissal to be appropriate." *Id.* (citing *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 672 (2d Cir.1995)).

**III. ELEVENTH AMENDMENT IMMUNITY**

**\*3** Plaintiff brings both federal and state claims against all defendants, including state agencies DOCS and CPS, in their official as well as individual capacities. *See* Am. Compl. ¶¶ (D)-(V) ("The Parties"), 32-33.
A. Federal Claims

The Eleventh Amendment bars suit in federal court by a citizen of a state against a state or its agencies, unless the state has waived immunity to suit, *see Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100-01 (1984), or Congress has abrogated the state's immunity, *see Quern v. Jordan,* 440 U.S. 332, 343-44 (1979). *See also Farricelli v. Holbrook,* 215 F.3d 241, 244-45 (2d Cir.2000); *Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993). Because New York has not waived its immunity, *see Oyague v. State,* No. 98 Civ. 6721, 2000 WL 1231406, at *5 (S.D.N.Y. Aug. 31, 2000), and 42 U.S.C. § 1983 was not intended to abrogate states' immunity, *see Quern,* 440 U.S. at 343-44, the Eleventh Amendment bars plaintiff's claims against both DOCS and CPS because they are state agencies.[FN7]

> **FN7.** Woods's claims against DOCS and CPS in their individual capacities are dismissed for failure to state a claim.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 731691 (S.D.N.Y.)

(Cite as: 2002 WL 731691 (S.D.N.Y.))

A state official is also entitled to invoke Eleventh Amendment immunity to the extent that she is sued in her official capacity, because such suit is deemed to be one against the state itself. See *Kentucky v. Graham,* 473 U.S. 159, 169 (1985); *Spencer v. Doe,* 139 F.3d 107, 111 (2d Cir.1998). In addition, suits for monetary damages from the state treasury are barred. See *Edelman v.. Jordan,* 415 U.S. 651, 677 (1974). Thus, plaintiff's claims for money damages against the defendants in their official capacities are dismissed for failure to state a claim on which relief may be granted. See *Spencer,* 139 F.3d at 111; *Severino v. Negron,* 996 F.2d 1439, 1441 (2d Cir.1993).

B. State Law Claims

Plaintiff alleges negligence and violations of New York State Corrections Law against all defendants. See Am. Compl. ¶¶ 32-33. Absent a waiver by the state, however, the Eleventh Amendment also bars *state law* claims against state officials in their official capacity. See *Pennhurst,* 465 U.S. at 99-101. New York has made no such waiver. To the contrary, New York explicitly bars state law claims brought by state prisoners against state law correction personnel in federal court, *see* N.Y. Corr. Law § 24, and the federal courts are bound by this provision, *see Ierardi v. Sisco,* 119 F.3d 183, 186 (2d Cir.1997). Plaintiff's state claims are dismissed in their entirety.

IV. EIGHTH AMENDMENT CLAIMS (PURSUANT TO 42 U.S.C. § 1983)

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege that defendants, while acting under color of state law, denied plaintiff a constitutional or federal statutory right. See *West v. Atkins,* 487 U.S. 42, 48 (1988); *Ruggiero v. Krzeminski,* 928 F.2d 558, 562-63 (2d Cir.1991). The Eighth Amendment's prohibition against cruel and unusual punishment of prison inmates has been construed to include the denial of adequate medical care. See *Farmer v. Brennan,* 511 U.S. 825, 832 (1994); *Estelle v. Gamble,* 439 U.S. 97, 104 (1976) (holding that such behavior amounts to an "unnecessary and wanton infliction of pain" proscribed by the Eighth Amendment); *Edmonds v. Greiner,* No. 99 Civ. 1681, 2002 WL 368446, at *7 (S.D.N.Y. Mar. 7, 2002) ("A person who is

incarcerated is entitled to receive adequate medical care."). Prison officials violate this right when they are deliberately indifferent to an inmate's serious medical needs. See *Estelle,* 429 U.S. at 104; *Word v. Croce,* 169 F.Supp.2d 219, 226 (S.D.N.Y.2001).

**\*4** The Second Circuit has interpreted *Estelle* to consist of objective and subjective elements: *First,* a court must determine whether, objectively speaking, plaintiff's condition is such that the alleged deprivation of medical assistance is " 'sufficiently serious." ' *Hathaway v. Coughlin,* 37 F.3d 63, 66-67 (2d Cir.1994) (quoting *Wilson v. Seiter,* 501 U.S. 294, 298 (1991)). This "standard contemplates a 'condition of urgency, one that may produce death, degeneration, or extreme pain." ' *Id.* (quoting *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J., dissenting)). A serious medical need arises where " 'the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." ' *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quoting *Gutierrez v. Peters,* 111 F.3d 1364, 1373 (7th Cir.1997)). *See, e.g., Rivera v. Goord,* 119 F.Supp.2d 327, 332, 337 (S.D.N .Y.2000) (pain and facial swelling, migraines and burning in eyes gave rise to serious medical need); *Arce v. Banks,* 913 F.Supp. 307, 309 (S.D.N.Y.1996) (failure to treat small cyst on forehead not sufficiently serious).

*Second,* a court must consider whether the official " 'kn[ew] that an inmate face[d] a substantial risk of serious harm, and disregarded that risk by failing to take proper measures to abate it ." ' *Harrison v. Barkley,* 219 F.3d 132, 137 (2d Cir.2000) (quoting *Farmer,* 511 U.S. at 837). The failure to render proper care must result from a "sufficiently culpable state of mind." *Hathaway,* 37 F.3d at 66 (citing *Wilson v. Seiter,* 501 U.S. at 298). "[T]he subjective element of deliberate indifference entails something more than mere negligence but something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Hathaway v. Coughlin II,* 99 F .3d 550, 553 (2d Cir.1996) (citing *Farmer,* 511 U.S. at 835). While mere medical malpractice is not tantamount to deliberate indifference, certain instances of medical malpractice may rise to that level. *See id.* (citing *Farmer,* 511 U.S. at 847).

Here, it is largely undisputed that plaintiff's medical

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 731691 (S.D.N.Y.)

(Cite as: 2002 WL 731691 (S.D.N.Y.))

needs were serious. *See* Galeno Def. Mem. at 5. The key questions in this case turn on whether plaintiff has pleaded facts which show that each defendant was deliberately indifferent to those needs. As stated earlier, Woods's allegations must be assumed true for purposes of this discussion.

A. Dr. Bendheim

Beginning in early 1996, Dr. Bendheim established a pattern of sending plaintiff to specialists, and then ignoring their orders for monthly follow-up visits and blood work. Courts have held that a prison official's delay in scheduling appointments and failure to follow orders of a doctor constitutes denial of adequate medical care. *See, e.g., Gill v. Mooney,* 824 F.2d 192, 195 (2d Cir.1987) ("Prison officials are more than merely negligent if they deliberately defy the express instructions of a prisoner's doctors."); *Brown v. Coughlin,* 758 F.Supp. 876, 882-83 (S.D.N.Y.1991). Moreover, a pattern "might be taken to show that the described incidents were not accidents, inadvertent failures, or random occurrences of medical malpractice." *Abdush-Shahid v. Coughlin,* 933 F.Supp. 168, 182 (N.D.N.Y.1996) (quotation omitted).

*5 At plaintiff's first appointment with Dr. Feng at AMC on May 31, 1996, he was ordered to return one month later. Yet Dr. Bendheim waited until January 31, 1997, *seven* months later, to send plaintiff for a follow-up visit.[FN8] *See* Am. Compl. ¶¶ 3-4. He then failed to have plaintiff's blood work done in advance of the visit, as ordered. *See id.* ¶ 4. Subsequently, rather than schedule plaintiff for an appointment one month from January 31, Dr. Bendheim did not do so until June 10, 1997, *six* months later. *See id.* ¶ 6. Again, Bendheim failed to take the necessary steps to have plaintiff's blood work done. *See id.*

FN8. This claim is not time-barred because the last such act occurred less than three years before plaintiff filed his Complaint. "When a plaintiff challenges a policy that gives rise over time to a series of allegedly unlawful acts, it will often be the case that plaintiff might bring his claim after the first such act, and yet the law may render timely a claim brought prior to the expiration of the statute of limitations on the last such act."

*Connolly v. McCall,* 254 F.3d 36, 40 (2d Cir.2001). *See also id.* (New York statute of limitations of three years for personal injury actions applies to Eighth Amendment claims brought pursuant to section 1983 in New York).

After this appointment, plaintiff saw Dr. Feng in July 1997 and September 1997. *See id.* Yet the pattern of delayed visits continued. In January of 1998, Bendheim failed to schedule a follow-up visit with a hematologist as ordered by a "Dr. Scroggion" in late 1997. *Id.* ¶ 17. In August 1999, Dr. Bendheim ignored orders issued by St. Agnes Hospital-where plaintiff had undergone elbow surgery in the Fall of 1999-to schedule appointments with a hematologist and a rheumatologist. *See* Pl. Opp.2d at 39.[FN9] As a result of Dr. Bendheim's actions, plaintiff's weight dropped dramatically and his white blood cell count became unstable. *See* Am. Compl. ¶ 4.

FN9. Plaintiff does not mention any defendant in connection with this last omission, but liberally construing his pleadings which elsewhere tie Bendheim to a failure to schedule such appointments, I conclude that plaintiff intended to name Bendheim here.

Bendheim thus repeatedly flouted the orders of trained specialists over several years.[FN10] Further, he never rescheduled plaintiff's knee surgery that was put off in June 1996 due to a shortage of beds.[FN11] *See id.* ¶ 17. Although the proof may show otherwise, these allegations state a claim of deliberate indifference to plaintiff's serious medical needs. Defendants' motion is denied with respect to plaintiff's Eighth Amendment claims against Dr. Bendheim.

FN10. Bendheim does not contend that his opinion differed from that of Dr. Feng or any other specialist with respect to plaintiff's allegations regarding the need for follow up visits. *See Amaker v. Goord,* No. 98 Civ. 3634, 2002 WL 523371, at *6 (S.D.N.Y. Mar. 29, 2002) (citing *Troy v. Kuhlmann,* No. 96 Civ. 7190, 1999 WL 825622 (S.D.N.Y. Oct. 15, 1999) ("[A] prisoner's disagreement with the diagnostic techniques or forms of treatment

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 731691 (S.D.N.Y.)

(Cite as: 2002 WL 731691 (S.D.N.Y.))

employed by medical personnel does not itself give rise to an Eighth Amendment claim."), and *Muhammad v. Francis,* No. 94 Civ. 2244, 1996 WL 657922, at *6 (S.D.N.Y. Nov. 13, 1996) ("It is well established that mere differences in opinion regarding medical treatment do not give rise to an Eighth Amendment violation.")).

FN11. Bendheim's argument, that plaintiff does not state a claim because he received plenty of care, is unavailing. *See Hathaway,* 37 F.3d at 68 (defendant doctor's frequent examinations of plaintiff did not preclude finding of deliberate indifference because "course of treatment was largely ineffective, and [he] declined to do anything more to improve [plaintiff's] situation."); *Ruffin v. Deperio,* 97 F.Supp.2d 346, 353 (W.D.N.Y.2000) (stating that deliberate indifference could be pleaded despite frequent treatment by prisoner's doctors where treatment was "cursory" or evidenced "apathy").

**B. Dr. Weinstein**

Following plaintiff's elbow surgery in Fall 1999, Dr. Weinstein refused to carry out plaintiff's surgeon's orders-on seven different occasions in late 2000 and early 2001-by denying plaintiff's requests for physical therapy. *See* Pl. Opp.2d at 38. Instead, Dr. Weinstein prescribed "home treatment" or "self-exercise," despite the fact that plaintiff could not use his arms to do anything including such basic functions as washing or dressing himself. Pl. Opp.2d at 38. I must draw the reasonable inference that, at times, no one was available to assist plaintiff in doing those things.

While plaintiff may not be able to prove his case against Dr. Weinstein, that is not the test here. By alleging that Dr. Weinstein intentionally refused to provide the treatment ordered by a specialist, such that plaintiff was virtually incapacitated, plaintiff has successfully pleaded that Dr. Weinstein was deliberately indifferent to his serious medical needs.

**C. Dr. Silver**

On September 16, 2000, Dr. Silver examined

plaintiff's elbow, which was dripping fluid and causing him "excruciating pain." Pl. Opp.2d at 22-3. Plaintiff requested surgery and a bone scan; Silver's response was "soap it." *Id.* at 22. While a medical doctor's determination is presumed correct, in certain instances a physician may be deliberately indifferent if he consciously chooses "an easier and less efficacious" treatment plan. *Chance,* 143 F .3d at 703. *See also Williams v. Vincent,* 508 F.2d 541, 544 (2d Cir.1974); *Waldrop v. Evans,* 871 F.2d 1030, 1035 (11th Cir.1989). Because plaintiff may be able to prove that such was the case here, this claim cannot be dismissed against Dr. Silver. In addition, on February 8, 2001, plaintiff was taken to St. Agnes Hospital for surgery on his elbow, but was turned away because "the facility failed to properly arrange this trip." Pl. Opp.2d at 23. When he arrived back at Green Haven, he asked Dr. Silver to reschedule the surgery but Dr. Silver refused. *See id.* Once again, allegations that a prison doctor failed to follow the orders of specialists or schedule surgery where the plaintiff's condition is admittedly grave, states a claim of deliberate indifference. Defendants' motion with respect to Dr. Silver is denied.

**D. Dr. Galeno**

*\*6* On August 17, 1999, Dr. Galeno performed surgery on plaintiff's elbow, then "failed to order antibiotics" despite "s[eeing] plaintiff's... infection." Am. Compl. ¶ 12. Instead, Dr. Galeno prescribed "Noprxen" for plaintiff's pain. Pl. Opp.2d at 39. As a result, plaintiff's elbow was infected for three days. *See* Am. Compl. ¶ 12.

While plaintiff alleges that Galeno was aware of some risk to plaintiff, his case against Galeno fails on both prongs. *First,* the alleged deprivation of care caused a localized infection that lasted for three days, which is not a condition approaching urgency, degeneration or great pain. *See Hathaway,* 37 F.3d at 66. *Second,* there was "no delay" in prescribing *some* treatment, and "the fact that plaintiff felt something more should have been done ... [is] not a sufficient basis for a deliberate indifference claim." *Brown v. McElroy,* 160 F.Supp.2d 699, 704 (S.D.N.Y.2001). The allegations against Dr. Galeno state, at most, a claim for one instance of medical malpractice, and therefore must be dismissed. *See Estelle,* 439 U.S. at 104; *Pritchett v. Artuz,* No. 99 Civ. 3957, 2000 WL 4157, at *3 (S.D.N.Y. Jan. 3, 2000).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 731691 (S.D.N.Y.)

(Cite as: 2002 WL 731691 (S.D.N.Y.))

E. Supervisory Defendants: Goord, Greiner, Wright, Selwin, Koenigsmann, and Zwillinger

Plaintiff claims that Goord, Greiner and Wright "failed to remedy a constitutional deprivation and are personally involved." Pl. Opp.2d at 12. He asserts that all of the supervisors named in this lawsuit, Goord, Greiner, Wright, Selwin, Koenigsmann and Zwillinger, had "authority and ability" to address his problems but did not. *Id.* at 34.

It is well established that personal liability cannot be imposed on a state official under a theory of *respondeat superior. See Black v. Coughlin II,* 76 F.3d 72, 74 (2d Cir.1996); *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994).* "The plaintiff must plead ... that the defendant had some direct [or personal] involvement in or responsibility for the misconduct." *Thompson v. State of New York,* No. 99 Civ. 9875, 2001 WL 636432, at *6 (S.D.N.Y. Mar. 15, 2001) (citing *Hendricks v. Coughlin,* 114 F.3d 390, 394 (2d Cir.1997)). A supervisory official may be personally involved in a section 1983 violation where the official: (1) directly participated in the infraction or ordered that the action be taken; (2) failed to remedy a wrong after learning of the violation; (3) created or allowed the policy or custom under which the incident occurred; (4) was grossly negligent in managing subordinates who caused the incident; or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring. *See Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 254 (2d Cir.2001) (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)). To succeed on a claim under section 1983 a plaintiff must allege personal involvement by each defendant in the alleged constitutional deprivation. *See Keyes v. Strack,* No. 95 Civ. 2367, 1997 WL 187368, at *3 (S.D.N.Y. Apr. 16, 1997).

**\*7** The *alleged constitutional deprivations,* upon which supervisory liability may be predicated, are: (1) Bendheim's pattern, from 1996 to 1999, of delaying the scheduling of appointments with specialists and not carrying out their orders. and his failure to reschedule knee surgery; (2) Weinstein's failure to follow a specialist's orders regarding physical therapy; and (3) Silver's opting for the easiest course of treatment for

plaintiff's elbow, and failure to reschedule elbow surgery in February 2001.[FN12] Plaintiff argues that the grievances he filed and the letters he wrote to these supervisors, *see* Am. Compl. ¶¶ 4, 5, 8, 13, establish their personal involvement in these alleged constitutional deprivations, *see* Pl. Opp.2d at 12-15, 19-22.

> FN12. *See Poe v. Leonard,* 282 F.3d 123, 126 (2d Cir.2002) (holding that in order for a supervisor to be held liable under section 1983, a subordinate must have violated the law). Plaintiff argues that the supervisory defendants were personally involved in two additional claims. First, plaintiff argues that he was unconstitutionally denied a lightweight wheelchair. *See* Pl. Opp.2d at 18-19, 25, 32-33. Plaintiff does not allege, however, that any individual defendant or defendants are responsible for this deprivation. Therefore, this claim must be dismissed. In July 1999, plaintiff's elbow required immediate attention, but surgery was delayed for three months. *See* Am. Compl. ¶ 21. Here, too, plaintiff fails to implicate any defendant and thus the claim must be dismissed.

> The test for personal involvement of supervisory officials implies some alleged violation of a federal right. *See Poe,* 282 F.3d at 126. Where, as here, plaintiff does not successfully allege any violation, *supervisory* liability is not adequately pleaded, either. Personal involvement in an alleged violation cannot exist where there is no alleged violation.

1. Commissioner Goord and Superintendent Greiner

Plaintiff alleges that Goord and Greiner "ignored *all* [of his] grievances and appeals, [and] also failed to act on direct information indicating that [the *Milburn* decree is not being enforced]." Pl. Opp.2d at 13 (emphasis added).[FN13] Even construed liberally, however, "direct information" does not refer to anything other than the letters plaintiff wrote to Goord and Greiner, because no other specific facts are alleged with respect to these defendants. *See id.* at 13-14, 19-20, 22. Receipt of letters

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 731691 (S.D.N.Y.)

(Cite as: 2002 WL 731691 (S.D.N.Y.))

or grievances, however, is insufficient to impute personal involvement. *See Thompson,* 2001 WL 636432, at *7; *Rivera,* 119 F.Supp.2d at 344; *Pritchett,* 2000 WL 4157, at *6; *Thomas v. Coombe,* No. 95 Civ. 10342, 1998 WL 391143, at *6 (S.D.N.Y. July 13, 1998).[FN14] "Were it otherwise, virtually every prison inmate who sues for constitutional torts by [prison officials] could name the [supervisor] as a defendant since the plaintiff must pursue his prison remedies, and invariably the plaintiff's grievance will have been passed upon by the [supervisor]." *Thompson,* 2001 WL 636432, at *7. Greiner "passed upon" several of plaintiffs letters by referring them to Lester Wright. *See, e.g.,* 12/10/99 Letter from Wright to Goord, Ex. 6 to Am. Compl. (stating that Commissioner Goord had forwarded plaintiff's September 13, 1999 letter to him). Referring medical complaint letters to lower-ranked prison supervisors, however, does not constitute personal involvement. *See Ramos v. Artuz,* No. 00 Civ. 149, 2001 WL 840131, at *8 (S.D.N.Y. July 25, 2001). Because there are no further allegations regarding Goord or Greiner, plaintiff's case is dismissed as against them.

FN13. In 1980, Judge Robert Ward of this Court certified a class of present and future Green Haven inmates challenging the constitutionality of Green Haven's provision of health care services. *See Shariff v. Artuz,* No. 99 Civ. 321, 2000 WL 1219381, at *4 n .5 (S.D.N.Y. Aug. 28, 2000) (referring to "*Milburn v. Coughlin,* No. 79 Civ. 5077 (S.D.N.Y.)"). The parties entered into a series of agreements culminating in the 1991 modified consent decree, requiring Green Haven to create and maintain an ADA and Rehabilitation Act-compliant unit for the physically disabled-the UPD-and establishing certain guidelines for adequate medical care. *See id.; see also McKenna v. Wright,* No. 01 Civ. 6571, 2002 WL 338375, at *7 n. 9 (S.D.N.Y. Mar. 4, 2002) (recognizing Milburn consent decree); *Green v. Bauvi,* 792 F.Supp. 928, 936 n. 12 (S.D .N.Y.1992) (same). To the extent that plaintiff is alleging a violation of the *Milburn* decree, his action is not properly before this Court and thus cannot be considered. *See McKenna,* 2002 WL 338375, at *7 n. 9 (holding that plaintiff must refile with Judge Ward who

retains supervision over enforcement of the Milburn decree); *Kaminsky v. Rosenblum,* 737 F.Supp. 1309, 1317 n. 6 (S.D.N.Y.1990) ("[Issue of whether Milburn decree was violated] is not, and cannot be, before this Court. Violations of the *Milburn* decree can be remedied only by bringing the alleged violations to the attention of the able District Judge [Ward] who retains supervision over that decree."). Thus, plaintiff's claims to enforce the *Milburn* decree are denied.

FN14. In *Burgess,* I stated that "courts have found personal involvement of a supervisory official where a plaintiff has sent letters or orally informed the official of an ongoing constitutional violation." 1999 WL 33458, at *5 (quoting *Heron v. Dalsheim,* No. 95 Civ. 2625, 1999 WL 2871, at *5 (S.D.N.Y. Jan. 4, 1999)). I note, however, that this statement of law is now against the weight of authority. In any event, plaintiff in *Burgess* alleged that a supervisor said to him "something to the effect that he saw no reason why plaintiff could not take the stairs one day out of the week." *Id.* at *1, *5. This allegation evinced a level of personal involvement outside of the official's receipt of plaintiff's complaints. *See id.* at *5.

2. Associate Commissioner Wright and Health Services Director Koenigsmann

Wright and Koenigsmann, on the other hand, did not merely receive plaintiff's letters, but also responded to them. *See* Pl. Opp.2d at 22. On December 10, 1999, Wright wrote to plaintiff, explaining that plaintiff's letter to Goord had been forwarded to him. *See* 12/10/99 Letter from Wright to Woods ("12/10/99 Wright Ltr."), Ex. 6 to Am. Compl. Wright allegedly gave the following explanation in response to plaintiff's complaint that he was not seeing the rheumatologist often enough:

**8 You have been examined by a rheumatologist on May 6 and July 22 of this year; received a prosthetic elbow brace on July 28, 1999, been evaluated by the orthopedic surgeon on August 18, September 10, September 27 and November 8 of this year, and had surgery on your right elbow on November 12, 1999. On

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 731691 (S.D.N.Y.)

(Cite as: 2002 WL 731691 (S.D.N.Y.))

August 24, 1999 your white blood cell count was 116,000 and this test was repeated at St. Agnes Hospital the same day with a result of 95.5. On September 3 it was 80.8; on September 24 it was 76.4 and on November 4, is was 74.7. You were scheduled to see the hematologist in follow-up at Westchester Medical Center on October 4, but you refused. You had a decompressive laminectomy of your neck on April 27[,] 1999. Your left shoulder triplearthrodesis was postponed to accommodate your neck surgery; as have your bunion surgery and left foot triplearthrodesis....

12/10/99 Wright Ltr. Plaintiff alleges that Wright responded on two other occasions with similarly informative, thorough letters. *See* 10/18/00 Letter from Wright to Goord, Ex. 22 to Am. Compl.; 1/24/01 Letter from Wright to Goord, Ex. 6 to Am. Compl. In response to his complaint regarding the alleged denial of physical therapy, plaintiff alleges that Koenigsmann wrote on May 4, 2000:

I have investigated the allegations made in your letter and discussed your case at length with the Physical Therapy department as well as reviewed the documentation involved in the event. On 5/1/00 you began therapy for your right elbow. The recommendation for Physical Therapy was made both by Physiatry and the Orthopedic Surgeon as well as the types of therapy I.e. [sic] active range of motion and strengthening exercises. When you arrived in Physical Therapy you were instructed to begin active range of motion exercises, you declined to participate in this program and insisted on Passive range of motion. This was not indicated or recommended for your treatment. With that you stated that you would do that in your cell on your own and refused therapy. To be clear, the Physical Therapy personnel were fully prepared to have you participate in the program but the type of therapy must be per the recommendations of the Physicians and Physical Therapists. To refuse care because they will not comply with the program that you want but do not need is potentially hindering maximum recovery from the surgery. I urge you to agree to return to Physical Therapy and follow the program that was arranged for you.

5/4/00 Letter from Koenigsmann to Woods, Ex. 20 to

Am. Compl. Plaintiff argues that Wright and Koenigsmann thus had actual knowledge of these wrongs committed by their subordinates but did not attempt to remedy them except to respond to his complaints.

One court has held that where a supervisor's "involvement went beyond merely the receipt of complaint letters," to "responding, explaining the treatment and defending the institution," personal involvement was established. *Ramos,* 2001 WL 840131, at *8 (Pitman, J.). *See also Rashid v. Hussain,* No. 95 Civ. 676, 1997 WL 642549, at *2-*3 (N.D.N.Y. Oct. 15, 1997) (Pooler, J.) (detailed responses to prisoner's letter establish personal involvement). This is by no means the majority rule, however. *See, e.g., Joyner v. Greiner,* No. 01 Civ. 7399, 2002 WL 550092, at *5 (S.D.N.Y. Mar. 28, 2002) (McMahon, J.) (holding that prison doctor's response to plaintiff's letter did not plead personal involvement); *Ramsey v. Coughlin,* 1 F.Supp.2d 198, 204 (W.D.N.Y.1998) (holding that plaintiff's claim that supervisor responded to his letters is not sufficient to establish personal involvement).

*9 Wright and Koenigsmann's provision of information and advice based on diagnoses from their staff does not appear to constitute "fail[ure] to remedy a wrong." *Colon,* 58 F.3d at 873. Supervisors are entitled to rely on and adopt the recommendations of prison doctors without incurring a charge of personal involvement. *See Thompson,* 2001 WL 636432, at *7; *Keyes,* 1997 WL 187368, at *3. Moreover, it may be said here: "Far from establishing deliberate indifference, [the medical supervisor's] response demonstrates appropriate attention to plaintiff's circumstances." *Joyner,* 2002 WL 550092, at *5. On the other hand, plaintiff alleges that Wright and Koenigsmann responded to his complaints in a detailed, specific manner, a factor not present in *Joyner. See also Rashid,* 1997 WL 642549, at *3 (stating that where defendant merely responded to plaintiff's letter, no personal involvement would be established, but opposite is true where defendant responded in such a way as to suggest notice of the "duration and extent of [plaintiff]'s condition"). Because the depth of their responses indicates full awareness of plaintiff's situation, Wright and Koenigsmann may actually have failed to remedy a wrong by, for instance, not intervening to schedule a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 731691 (S.D.N.Y.)

(Cite as: 2002 WL 731691 (S.D.N.Y.))

rheumatology appointment or ensuring that physical therapy treatment was provided. The motions to dismiss are denied with respect to Wright and Koenigsmann.

3. Acting Health Service Director Selwin

Woods alleges that Norman Selwin "constantly ... denied [plaintiff] medical treatment for his neck, shoulder, wrist, elbows, knees, rheumatoid arthritis monthly appointments, MRI and x-ray consults." Pl. Opp.2d at 20. Beyond this conclusory allegation which provides no dates or time frame, there is no other allegation of Selwin's personal involvement, as defined in *Colon v. Coughlin,* with respect to any of the established allegations of deprivation. The Complaint and Amended Complaint are thus dismissed with respect to Selwin for failure to state a claim.

4. Regional Health Administrator Zwillinger

Plaintiff does allege sufficient facts to state a claim against Zwillinger. FN15  In 1998, Zwillinger was "constantly contacted by Dr. Robert Cohen M.D. (Medical Auditor assigned by Judge Ward U.S.D.J.) and Margaret K. Loftus from Prisoner's Rights Project regarding plaintiff's constitutional deprivation of adequate medical care and the violation of the burn v. Coughlin stipulation." Pl. Opp.2d at 15. Both Cohen and Loftus specifically requested that Zwillinger remedy the lack of regularly scheduled rheumatology appointments. *See* 9/25/98 Letter from Loftus to Zwillinger, Ex. 11 to Am. Compl. ("Mr. Woods ... has not been to see his Rheumatoid Arthritis specialist in over four months."); 8/21/98 Letter from Cohen to Zwillinger, Ex. 10 to Am. Compl. ("Could you please review the care of Mr. Woods with [respect to] ..: 1. Lack of access to specialty care, specifically rheumatology consultation. Mr. Woods needs to be seen regularly by a rheumatologist and is being denied access to necessary consultation.").

> FN15. Several allegations against Zwillinger are dismissed for failure to state a claim. Plaintiff alleges that in January 1996 and as late as March 19, 1996, Zwillinger, Koenigsmann, and Selwin "[led] [the medical team] to believe plaintiff had a reconstruct[ive] should[er] operation at St. Agnes, where in fact plaintiff never had reconstructive surgery, plaintiff had arthroscopic

surgery." Am. Compl. ¶ 16. Plaintiff claims that the effort to mislead the medical team as to the type of surgery he had in 1996 at St. Agnes continues to this day, as does his suffering because of it. *See id.* These allegations are wholly inexplicable and as such, fail to state a claim for which relief can be granted.

**\*10** Thus, Zwillinger had knowledge, beyond receipt of letters or grievances from plaintiff, of an alleged unconstitutional deprivation. *See Poe v. Pearl,* No. 94 Civ.2058, 1997 WL 76576, at \*6 (D.Conn. Jan. 29, 1997) ("A supervisor acts with deliberate indifference if he has actual or constructive knowledge of unconstitutional practices and fails to act on the basis of information available to him."). Outside health and legal professionals appealed directly to Zwillinger on behalf of Woods, and he did nothing. *See Ramos,* 2001 WL 840131, at \*9-\*10 (holding that prison official's receipt of direct and detailed pleas from the Legal Aid Society regarding plaintiff's deprivation of treatment, and failure to respond appropriately, constituted deliberate indifference). Zwillinger thus exhibited deliberate indifference to Woods's serious medical needs by failing to act on Cohen's or Loftus's pleas. *See Colon,* 58 F.3d at 873. Defendants' motion is denied as to Zwillinger.

F. Defendants Ace, Williams and Duprey

Plaintiff does not allege any facts, in either complaint or in his opposition papers, with respect to Selim Ace, Mary Kate Moddox Williams or Randy Duprey. "The courts have consistently held that, where the complaint names a defendant in the caption but no allegations indicating exactly how the defendant violated the law or injured the plaintiff, a motion to dismiss the complaint in regard to th[ose] defendant[s] should be granted." *Marable v. Kurtz,* No. 99 Civ. 1387, 2000 WL 1279763, at \*4 (S.D.N.Y. Sept. 11, 2000) (citation omitted). The Complaint and Amended Complaint are dismissed as to Ace, Williams and Duprey.

V. QUALIFIED IMMUNITY

Defendants argue that, in the event that the Court rules that plaintiff has stated a claim against any defendant, such defendant's actions were objectively

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 731691 (S.D.N.Y.)

(Cite as: 2002 WL 731691 (S.D.N.Y.))

reasonable and therefore entitled to qualified immunity.

The defense of qualified immunity "shields public officials from liability for their discretionary acts that do 'not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Hathaway,* 37 F.3d at 67 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). The court in *Hathaway,* referring to the unconstitutional deprivation of a prisoner's right under the Eighth Amendment to adequate medical care, stated that "[e]ven where, as here, a plaintiff's federal rights are well-established, qualified immunity is still available to an official if it was 'objectively reasonable for the public official to believe that his acts did not violate those rights.' " *Id.* (quoting *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991)).

"Although qualified immunity is typically addressed at the summary judgment stage of the case, the defense may be raised and considered on a motion to dismiss. The motion will be granted if the complaint fails to allege the violation of a clearly established constitutional right." *Hardy v. Jefferson Community Coll.,* 260 F.3d 671, 677 (6th Cir.2001) (citation omitted). An immunity defense usually depends on the facts of the case, however, making dismissal at the pleading stage inappropriate. *See Alvarado v. Litscher,* 267 F.3d 648, 651 (7th Cir.2001); *King v. Simpson,* 189 F.3d 284, 289 (2d Cir.1999) (reversing district court's dismissal on ground of absolute immunity because factual showing was necessary where plaintiff alleged constitutional violation). Thus, a complaint is generally not dismissed under Rule 12(b)(6) on qualified immunity grounds. *See Alvarado,* 267 F.3d at 651 (citing *Jacobs v. City of Chicago,* 215 F.3d 758, 765 n. 3 (7th Cir.2000)). Here, plaintiff *has* successfully alleged a constitutional violation against Bendheim, Weinstein, and Silver, and personal involvement in at least one of those violations by Zwillinger. A determination as to whether these defendants' actions were "objectively reasonable" is necessarily fact-based. Thus, defendants' qualified immunity defense must be rejected at this stage.

## VI. CLAIM AGAINST BARBARA WHITNEY

**\*11** Woods claims that defendant Barbara Whitney copied plaintiff's medical records and released them to the Attorney General's office "without getting an Authorized

medical release form, which is a violation of ... plaintiff's confidentiality." Pl. Opp.2d at 27-28. Woods does not specify when this was done.

It is settled law that release of an inmate's medical records in defense of litigation does not violate any right of the inmate when he has filed suit against prison officials. *See, e.g., Gill v. Gilder,* No. 95 Civ. 7933, 1997 WL 419983, at *2 (S.D.N.Y. July 28, 1997) (citing *Crawford v. Manion,* No. 96 Civ. 1236, 1997 WL 148066, at *1 (S.D.N.Y. Mar. 31, 1997) (Mukasey, J.)). Plaintiff thus waived all rights to privacy in his medical records when he put his medical condition in issue in a lawsuit. In the absence of any allegation that Barbara Whitney's action occurred before suit was instituted or was for some purpose other than the defense of litigation, this claim is dismissed.

## VII. DISCRIMINATION CLAIMS AND ADMINISTRATIVE EXHAUSTION

Plaintiff also claims that defendants have violated his rights under Title II of the ADA and section 504 of the Rehabilitation Act (1) by denying him a lightweight wheelchair; and (2) because in 1998, defendant Jones, a corrections officer, forced plaintiff to stand up so that he could be frisked, causing him to fall. *See* Pl. Opp.2d at 18-19, 25, 32-33; Am. Compl. ¶ 18. To state a claim under Title II of the ADA, a prisoner must show "(1) he or she is a 'qualified individual with a disability'; (2) he or she is being excluded from participation in, or being denied the benefits of some service, program, or activity by reason of his or her disability; and (3) the entity that provides the service, program or activity is a public entity." *Shariff,* 2000 WL 1219381, at *4 (quoting *Clarkson v. Coughlin,* 898 F.Supp. 1019, 1037 (S.D.N.Y.1995)). *See also* 42 U.S.C. § 12132. To state a claim under section 504 of the Rehabilitation Act, a prisoner must allege facts showing that "(1) he is a 'qualified individual with a disability'; (2) he is 'otherwise qualified' to participate in the offered activity or program or to enjoy the services or benefits being offered; (3) he is being excluded from participation or enjoyment solely by reason of his disability; and (4) the entity denying the inmate participation or enjoyment receives federal financial assistance." *Shariff,* 2000 WL 1219381, at *4 (quoting *Clarkson,* 898 F.Supp. at 1036). *See also* 29 U.S.C. § 794(a).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 731691 (S.D.N.Y.)

(Cite as: 2002 WL 731691 (S.D.N.Y.))

Before reaching the merits of these claims, it is necessary to examine whether plaintiff has exhausted prison remedies for these complaints. The Prison Litigation Reform Act of 1980 requires that prisoners pursue available administrative remedies before bringing any federal claim in federal court. *See* 42 U.S.C. § 1997e.[FN16] Recently, the Supreme Court clarified the parameters of this requirement. *See Porter v. Nussle, 534 U.S. 516, 122 S.Ct. 983, 988 (2002).* "All available remedies must now be exhausted; those remedies need not meet federal standards, nor must they be plain, speedy [or] effective." *Id.* Dismissal on the basis of failure to exhaust is now mandatory, whereas it was once within the discretion of the district court. *See id.* (citing *Booth v. Churner, 532 U.S. 731, 739 (2001)*).

> **FN16.** Woods has exhausted administrative remedies for his Eighth Amendment claims. *See* Am. Compl. ¶ 13. Woods's voluminous attachment to his opposition papers shows, *inter alia,* that he has filed grievances regarding (1) Dr. Bendheim's delay in scheduling follow-up visits with Dr. Feng; (2) denial of physical therapy; and (3) lack of treatment of elbow and denial of knee surgery. Further, defendants do not argue that Woods has failed to exhaust available remedies for these claims.

**\*12** Woods does not allege nor offer any evidence that he followed prison grievance procedures for his disability discrimination claims. Thus, they must be dismissed without prejudice.

VIII. INJUNCTIVE RELIEF

The Eleventh Amendment is not a bar to suits in equity against state officials. *See Keyes, 1997 WL 187368, at \*4* (citing *Dube v. State Univ. of New York, 900 F.2d 587, 595 (2d Cir.1990)*). "A state official acting in his official capacity may be sued in a federal forum to enjoin conduct that violates the federal Constitution, notwithstanding the Eleventh Amendment bar." *Dube, 900 F.2d at 595.* Plaintiff seeks an order from the Court requiring "the defendants [to] provide for the plaintiff appropriate [ ] medical treatment in the future." Am. Compl. ¶ (D). Plaintiff does not further specify the nature

of the injunctive relief he requests.

The *Milburn* decree "governs the provision of health care services at Green Haven." *McKenna, 2002 WL 338375, at \*7 n. 9. See also supra* note 13. In light of Judge Ward's exclusive supervision of the *Milburn* decree, *see Kaminsky, 737 F.Supp. at 1317 n. 6,* it is not within this Court's jurisdiction to order the broad injunctive relief that Woods requests. Woods's request that appropriate medical care be provided to him in the future is tantamount to a suit to enforce the *Milburn* decree and, as such, must be refiled with Judge Ward. *See McKenna, 2002 WL 338375, at \*7 n. 9; Kaminsky, 737 F.Supp. at 1317 n. 6; supra* note 13. This portion of the Complaint and Amended Complaint is dismissed.

IX. CONCLUSION

For the foregoing reasons, the Complaint and Amended Complaint are dismissed to the extent that they assert (1) monetary claims against defendants in their official capacities; and (2) state law claims against defendants in any capacity. Plaintiff's claims brought under the ADA and Rehabilitation Act are dismissed for failure to exhaust administrative remedies. Plaintiff's claim for injunctive relief is denied.

Defendants' motions to dismiss are granted with respect to defendants DOCS, CPS, Goord, Greiner, Selwin, Duprey, Jones, and Whitney, and additional defendants Ace, Moddox Williams and Duprey. The motions are denied in part, and granted in part, as to defendants Wright, Koenigsmann, Zwillinger, Bendheim, Weinstein, and Silver. The claims that have been dismissed against these individuals are listed at notes 12 and 15, *supra.* A conference is scheduled for May 10, 2002 at 4:30 p.m.

SO ORDERED:

S.D.N.Y.,2002.

Woods v. Goord
Not Reported in F.Supp.2d, 2002 WL 731691 (S.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2007 WL 446015 (N.D.N.Y.)

(Cite as: 2007 WL 446015 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Candido BAEZ, Plaintiff,
v.
J. HARRIS, Deputy Superintendent, Shawangunk
Correctional Facility; Donald Selsky, Director Special
Housing Unit Program; and Quartarone, Nurse,
Shawangunk Correctional Facility, Defendants.
No. 9:01-CV-807.

Feb. 7, 2007.
Candido Baez, Ossining, NY, Plaintiff Pro Se.

Andrew M. Cuomo, Attorney General for the State of New
York, Maria Moran, Esq., Assistant Attorney General,
Syracuse, NY, Attorney for Defendants.

**MEMORANDUM-DECISION AND ORDER**

NORMAN A. MORDUE, Chief U.S. District Judge.
**INTRODUCTION**

*1 Plaintiff, an inmate in the custody of the New York
State Department of Correctional Services, brought this
action under 42 U.S.C. § 1983. The amended complaint
(Dkt. No. 49) claims that defendants violated his
constitutional rights under the Eighth and Fourteenth
Amendments.

Defendants' motion for summary judgment (Dkt. No.
75) was referred to United States Magistrate Judge David
R. Homer for a report and recommendation pursuant to 28
U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c). Magistrate
Judge Homer's Report and Recommendation (Dkt. No. 81)
recommends that defendants' motion be granted in part
and denied in part.

Plaintiff has submitted an objection (Dkt. No. 82) to
the Report and Recommendation. Pursuant to 28 U.S.C. §
636(b)(1)(C), this Court conducts a *de novo* review of
those parts of a magistrate judge's report and

recommendation to which a party specifically objects.
Where only general objections are filed, the Court reviews
for clear error. *See Brown v. Peters, 1997 WL
599355,*2-*3 (N.D .N.Y.), af'd without op., 175 F.3d
1007 (2d Cir.1999).* Failure to object to any portion of a
report and recommendation waives further judicial review
of the matters therein. *See Roldan v. Racette, 984 F.2d 85,
89 (2d Cir.1993).*

**DISCUSSION**

Plaintiff objects to Magistrate Judge Homer's Report
and Recommendation insofar as it recommends: (1) that
all claims against Selsky be dismissed; and (2) that all
Eighth Amendment claims be dismissed.
**(1) Claims against Selsky**

Plaintiff asserts Eighth and Fourteenth Amendment
claims against Selsky. Plaintiff objects to Magistrate Judge
Homer's recommendation that they be dismissed.

The Court first addresses plaintiff's Eighth
Amendment claims against Selsky. Plaintiff's amended
complaint may be read to assert a claim against Selsky
based on the allegedly premature removal of plaintiff's
bandages after hernia surgery. In a Memorandum-Decision
and Order entered on September 29, 2003 (Dkt. No. 29)
the Court adopted Magistrate Judge Homer's
recommendation (Dkt. No. 27) to dismiss without
prejudice plaintiff's claims based on premature removal of
the bandages because plaintiff had failed to exhaust this
claim. Plaintiff then filed a grievance raising this issue.
The grievance was rejected as untimely, and that rejection
was affirmed on administrative appeal. Accordingly, the
claim remains unexhausted. Plaintiff objects to dismissal
of this claim, arguing that he attempted to exhaust it. The
fact that plaintiff was foreclosed from exhausting the claim
due to the passage of time does not, without more, excuse
him from the administrative exhaustion requirement. *See
Williams v. Comstock, 425 F.3d 175, 176 (2d Cir .2005);
Baez v. Kahanowicz, 2007 WL 102871, *7 (S.D.N.Y.).*
Thus, the Court agrees with Magistrate Judge Homer that
plaintiff's Eighth Amendment claim based on removal of
his bandages must be dismissed for failure to exhaust his

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 446015 (N.D.N.Y.)

(Cite as: 2007 WL 446015 (N.D.N.Y.))

administrative remedies. Further, the Court agrees with Magistrate Judge Homer that, in any event, the claim lacks merit. Accordingly, to the extent that plaintiff asserts an Eighth Amendment claim against Selsky based on this allegation, it is dismissed.

**\*2** Plaintiff also appears to assert an Eighth Amendment claim against Selsky stemming from plaintiff's allegedly premature removal from the hospital and subjection to a lengthy bus trip when he needed immediate medical attention. However, there is no basis to find that Selsky was personally involved in these events. To the extent that plaintiff asserts an Eighth Amendment claim against Selsky based on this allegation, it is dismissed.

To the extent that plaintiff bases an Eighth Amendment claim on the conditions he experienced in SHU, this Court agrees with Magistrate Judge Homer that as a matter of law plaintiff's allegations fail to state such a claim. *See generally Branch v. Goord,* 2006 WL 2807168, \*5 (S.D.N.Y.). Thus, all Eighth Amendment claims against Selsky are dismissed.

With respect to plaintiff's Fourteenth Amendment claims against Selsky, plaintiff's objections state: "Defendant Selsky could have release[d] plaintiff sooner from SHU, but instead waited until I submitted a C.P.L.R. Article 78 [petition] to change his decision and release me. Defendant Selsky was put on notice sooner with my administration *[sic]* appeal to release me from SHU but chose not to." Essentially, plaintiff asserts Fourteenth Amendment liability against Selsky stemming from the disciplinary hearing conducted by defendant Harris and Selsky's handling of plaintiff's appeal from Harris' determination. [FN1]

FN1. In his objection, plaintiff also states: "My father addressed a letter to Mr. Selsky documenting the violations of my rights. Therefore, [Selsky] is personally involve[d] because he was aware of the violation and never release[d] me from SHU[.]" The receipt of a letter does not, however, constitute sufficient personal involvement to generate supervisory liability. *See Sealey v. Giltner,* 116 F.3d 47, 51

(2d Cir.1997); *Garvin v. Goord,* 212 F .Supp.2d 123, 126 (S.D.N.Y.2002).

Selsky's affidavit in support of summary judgment states that he is the Director of the Special Housing/Inmate Disciplinary Program, and that he personally responds, as the Commissioner's authorized designee, to all Tier III appeals taken by inmates. Under the circumstances of this case, the record is sufficient to withstand summary judgment on the issue of personal involvement. *See, e.g., Gilbert v. Selsky,* 867 F.Supp. 159, 166 (S.D.N.Y.1994) ("If a supervisory official learns of a violation through a report or an appeal, but fails to remedy the wrong, that may constitute a sufficient basis for liability."). Likewise, defendants are not entitled to dismissal of plaintiff's claim against Selsky based on plaintiff's confinement in SHU for one year. *See generally Sandin v. Connor,* 515 U.S. 472, 483-84 (1995).

**(2) Claims against Quartarone**

Plaintiff objects to Magistrate Judge Homer's recommendation that the Court dismiss plaintiff's Eighth Amendment claim against defendant Quartarone. Insofar as this claim is based on Quartarone's allegedly premature removal of plaintiff's bandages after his hernia repair surgery, it is unexhausted as discussed above.

Plaintiff's other Eighth Amendment claims, based on his allegedly premature removal from the hospital and bus transfer, do not allege any involvement on the part of Quartarone. The sole named defendant allegedly involved in these events is Forte; however, all claims against him have been dismissed (Dkt. No. 79). Accordingly, all claims against Quartarone are dismissed.

**CONCLUSION**

**\*3** It is therefore

ORDERED the Court accepts and adopts the Report and Recommendation (Dkt. No. 81) of United States Magistrate Judge David R. Homer, except insofar as it recommends dismissal of the Fourteenth Amendment claims as against Selsky; and it is further

ORDERED that defendants' motion for summary judgment (Dkt. No. 75) is granted in part and denied in part; and it is further

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 446015 (N.D.N.Y.)

(Cite as: 2007 WL 446015 (N.D.N.Y.))

ORDERED that dismissal of all claims against defendant Quartarone is granted; and it is further

ORDERED that dismissal of plaintiff's Eighth Amendment claims against defendant Donald Selsky is granted; and it is further

ORDERED that dismissal of plaintiff's Fourteenth Amendment claims against Donald Selsky is denied; and it is further

ORDERED that dismissal of plaintiff's claims against J. Harris is denied.

IT IS SO ORDERED.

**REPORT-RECOMMENDATION AND ORDER**[FN1]

> **FN1.** This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

DAVID R. HOMER, United States Magistrate Judge.

Plaintiff pro se Candido Baez ("Baez"), an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants,[FN2] three DOCS employees, violated his constitutional rights under the Eighth and Fourteenth Amendments. Am. Compl. (Docket No. 49) at ¶¶ 50-53. Presently pending is defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56. Docket No. 75. Baez opposes the motion. Docket No. 76. For the reasons which follow, it is recommended that defendants' motion be granted in part and denied in part.

> **FN2.** Harris, Selsky, and Quartarone. Defs. Mem. of Law (Docket No. 75) at 2. The remaining defendant, Doctor Forte, was dismissed following his death in 2004. Docket No. 79.

## I. Background

The facts are set forth in the light most favorable to Baez as the non-movant. See Section II(A) *infra.*

### A. Disciplinary Hearing

At all relevant times, Baez was incarcerated at Shawangunk Correctional Facility ("Shawangunk"). Am. Compl. at ¶ 1. On November 8, 1999, while in the A yard, Baez swung a five-pound weight and hit inmate Garbez on the left side of his head. Moran Aff. (Docket No. 75), Ex. A at 1. Another inmate, Valdez, began to fight with Baez and both ignored orders from corrections officer Riopelle to stop. *Id.* A response team was able to separate Valdez and Baez, removed them from the yard, and brought both inmates to the infirmary. *Id.* Baez was issued a misbehavior report for assault on an inmate, fighting, refusing a direct order, and having a weapon. *Id.* On the same day, corrections officers searched Baez's cell and confiscated a bottle of expired medication, a broken ruler, and a hard plastic plate. *Id.* at 2. Baez received another misbehavior report for possessing unauthorized medication, contraband, property in unauthorized area, and an altered item. *Id.*

On November 10, 1999, the commencement of Baez's Tier III disciplinary hearing [FN3] was adjourned to November 16, 1999 because the hearing officer, Deputy Superintendent of Programs J. Harris, was unavailable. Docket No. 24, Ex. C; Hrg. Tr. at 1. Baez's assistant for the hearing, Boyham,[FN4] first met with Baez on November 10, 1999 and completed his assistance on November 12, 1999. Hrg. Tr. at 2. On November 16, 1999, Baez's disciplinary hearing commenced. Hrg. Tr. at 1. On November 23, 1999, Harris found Baez guilty of assault, fighting, possessing a weapon, refusing a direct order, and having an altered item and found him not guilty of unauthorized medication, having property in an unauthorized area, and possessing contraband. Moran Aff., Ex. A at 3-4. Baez was sentenced to twenty-four months in the Special Housing Unit ("SHU"),[FN5] loss of packages, commissary, and telephone privileges, and the recommended loss of twenty-four months of good time credit. *Id.* Additionally, Baez lost his inmate grade-pay and program assignment. Compl. (Docket No. 1) at ¶ 17.

> **FN3.** DOCS regulations provide for three tiers of disciplinary hearings depending on the seriousness of the misconduct charged. A Tier III hearing, or superintendents' hearing, is required whenever disciplinary penalties exceeding thirty days may be imposed. N.Y. Comp.Codes R. &

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 446015 (N.D.N.Y.)

(Cite as: 2007 WL 446015 (N.D.N.Y.))

Regs. tit. 7, §§ 253.7(iii), 270.3(a) (2006).

FN4. Boyham, an original defendant in this matter, was dismissed from the case on a motion for summary judgment on September 29, 2003. Docket No. 29.

FN5. SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population...." N.Y. Comp.Codes R. & Regs. tit. 7, § 300.2(b) (2006). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. Id. at pt. 301.

*4 Baez appealed Harris's determination. Docket No. 24, Ex. H. On March 21, 2000, Baez filed a petition pursuant to N.Y. C.P.L.R. Art. 78.FN6 Moran Aff., Ex. C. The defendants received three extensions of time to answer Baez's petition. Am. Compl. at ¶ 10. On May 17, 2000, Donald Selsky, Director, Special Housing/Inmate Disciplinary Program, modified Baez's punishment from twenty-four months to twelve months. Moran Aff., Ex. B at 1-2. On October 26, 2000, Baez's petition was transferred from Ulster County Supreme Court to the Appellate Division, Third Department. Moran Aff., Ex. C at 3. On March 12, 2001, Selsky administratively reversed the disciplinary determination because the hearing officer considered medical evidence not on the record. Moran Aff., Ex. B at 4. On June 14, 2001, Baez's Article 78 petition was denied as moot. Moran Aff., Ex. C at 3-4.

FN6. N.Y. C.P.L.R. Art. 78 (McKinney 1994 & Supp.2006) establishes the procedure for judicial review of the actions and inactions of state and local government agencies and officials.

**B. Medical Treatment**

On December 14, 1999, Baez had hernia repair surgery at Albany Medical Center. Am. Compl. at ¶ 33. Baez was to remain on bed rest in the hospital for three days. Id. On December 16, 1999, Baez was discharged from the hospital. Id. Baez was instructed to keep the

dressing dry and intact for two days and then remove the outer dressing and resume showering. Davidson Decl. (Docket No. 75), Ex. 1. Baez was not allowed to engage in lifting, strenuous work, straining or reaching for six weeks and was allowed to return to work or school. Id. A follow-up examination at the prison clinic was also required. Id. Quartarone removed Baez's bandages and padding from the incision area against doctor's orders. Am. Compl. at ¶ 33.

On the day of Baez's discharge, he was ordered to board a bus for transfer to Downstate Correctional Facility. Id. Baez was taken on a bus trip which included stops at Shawangunk and Wallkill Correctional Facility where Baez began to vomit and experience severe pain. Am. Compl. at ¶ 34. Baez's requests to be taken to the infirmary were ignored. Id. This action followed.

**C. Procedural History**

Baez commenced this action by filing a complaint on May 25, 2001. See Compl. Defendants filed a motion for summary judgment on December 13, 2002. Docket Nos. 21-23. As a result of that motion, several claims and defendants were dismissed. Docket No. 27. That decision was modified on November 18, 2004 and required Baez to file an amended complaint within thirty days of the order. Docket No. 47. Baez complied and filed his amended complaint on December 17, 2004. Docket No. 49. This motion for summary judgment of the remaining defendants followed. Docket No. 75.

**II. Discussion**

Baez asserts three causes of action in his amended complaint. The first alleges that defendant Selsky failed to correct behavior that violated Baez's Eighth and Fourteenth Amendment rights. The second alleges that defendants Harris and Selsky deprived him of his due process rights in connection with a prison disciplinary hearing. The third alleges that defendant Quartarone was deliberately indifferent to his serious medical needs in violation of the Eighth Amendment.FN7 Am. Compl. at ¶¶ 50-53. Defendants seek judgment on all claims.

FN7. Any claims against Dr. Forte have been dismissed and are not being considered on this motion. See note 2 supra.

**A. Standard**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 446015 (N.D.N.Y.)

(Cite as: 2007 WL 446015 (N.D.N.Y.))

**\*5** A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1223-24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988). When, as here, a party seeks summary judgment against a pro se litigant, a court must afford the nonmovant special solicitude.[FN8] *Id.; Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 2006 WL 3499975, at \*5 (2d Cir. Dec. 5, 2006). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *Anderson,* 477 U.S. at 247-48.

> FN8. Baez has, however, filed at least seven other actions in the federal courts of New York since 1990. *U.S. Party/Case Index* (visited Jan. 8, 2007) <http://pacer.uspci.uscourts.gov/cgi-bin/dquery.pl>.

**B. Eighth Amendment**

**1. Defendant Quartarone**
In his third cause of action, Baez contends that "less than forty (40) hours after the [hernia] surgery, defendant Quartarone ... removed the bandages and padding from the incision area of [his] operation," thereby acting with deliberate indifference to his medical needs. Am. Compl. at ¶ 33. Defendants contend that Baez has failed to exhaust his administrative remedies on this claim and, in the alternative, the claim is without merit.

**a. Failure to Exhaust**

Defendants contend that Baez has not exhausted his administrative remedies with regard to the claim that his Eighth Amendment rights were violated by defendant Quartarone. This assertion is based on the fact that Baez did not raise the issue of his surgery dressings being removed prematurely in his Grievance No. UST-2681-00. Defs. Mem. of Law at 10; *see also* Moran Aff., Ex. E.

Issues that have previously been determined become the law of the case. *In re Lynch,* 430 F.3d 600, 604 (2d Cir.2005) (citing *Quern v. Jordan,* 440 U.S. 332, 348 n. 18 (1979)). A district court may reconsider its own decision if the law has since changed, new evidence becomes available, to correct an error, or if a "manifest injustice would otherwise ensue." *Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt International B.V. v. Schreiber,* 407 F.3d 34, 44 (2d Cir.2005).

**\*6** Here, this Court has already decided that Baez did not exhaust his claim regarding removal of the bandages because he never filed a grievance regarding it. Docket No. 27. The Report-Recommendation and Order containing that finding was adopted in full by the district court on September 29, 2003. Docket No. 29. In response to this Court's decisions, Baez filed a grievance on October 3, 2003 where he raised the issue of the early bandage removal. Am. Compl., Ex. A. That grievance was rejected as untimely in the absence of any reason provided for the delay. *Id.* Baez appealed the decision to reject his late grievance, but that decision was affirmed. *Id.* Although Baez attempted to remedy his failure to exhaust, filing an untimely grievance does not amount to an exhaustion of remedies. *Williams v. Comstock,* 425 F.3d 175, 176 (2d Cir.2005). Further, since this Court finds no reason to reconsider its previous decisions, Baez has not exhausted his claim for removal of the bandages.

**b. Medical Treatment**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 446015 (N.D.N.Y.)

(Cite as: 2007 WL 446015 (N.D.N.Y.))

A prisoner advancing an Eighth Amendment claim for denial of medical care must allege and prove deliberate indifference to a serious medical need. *Wilson v. Seiter,* 501 U.S. 294, 297 (1991); *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). More than negligence is required "but less than conduct undertaken for the very purpose of causing harm." *Hathaway,* 37 F.3d at 66. The test for a § 1983 claim is twofold. First, the prisoner must show that there was a sufficiently serious medical need. *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *Id.* "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer v. Brennan,* 511 U.S. 825, 844 (1994).

A serious medical need is " 'one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention.' " *Camberos v. Branstad,* 73 F.3d 174, 176 (8th Cir.1995) (quoting *Johnson v. Busby,* 953 F.2d 349, 351 (8th Cir.1991)). An impairment that a reasonable doctor or patient would find important and worthy to treat, a medical condition that affects the daily activities of an individual, or the existence of chronic and substantial pain are all factors that are relevant in the consideration of whether a medical condition was serious. *Chance,* 143 F.3d at 702-03.

Deliberate indifference requires the prisoner to prove that the prison official knew of and disregarded the prisoner's serious medical needs. *Id.* at 702. Mere disagreement over proper treatment does not create a constitutional claim as long as the treatment was adequate. *Id.* at 703. Allegations of negligence or malpractice do not constitute deliberate indifference unless the malpractice involved culpable recklessness. *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

**\*7** Even assuming that hernia repair surgery is a serious medical need, Baez failed to raise a question of material fact with regard to the alleged deliberate indifference of Quartarone in removing his bandages. The

bandages were removed on the second post-operative day, which was within the instructed time period recommended by Baez's surgeon. Davidson Decl. at ¶¶ 3-4. Therefore, it is recommended in the alternative that defendants' motion for summary judgment on this ground be granted.

### 2. Defendant Selsky

Baez alleges that Selsky "contributed to and proximately caused the ... violation of [his] Eighth and Fourteenth Amendment Rights." Am. Compl. at ¶ 50. Summary judgment in favor of all defendants, including Selsky, with regard to Baez's Eighth Amendment claim resulting from his disciplinary hearing has already been granted. Docket No. 27 at 16. As such, Baez's claim against Selsky for a violation of his Fourteenth Amendment due process rights in connection with his prison disciplinary hearing is dismissed. Baez's claim against Selsky for his alleged involvement in Baez's Eighth Amendment claims relative to his medical care remain at issue.

### a. Personal Involvement

Defendants contend that Baez cannot demonstrate the personal involvement of Selsky in any Eighth Amendment violation.

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). The doctrine of respondeat superior is not a substitute for personal involvement. *Polk County v. Dodson,* 454 U.S. 312, 325 (1981). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). Supervisory personnel may be considered "personally involved," however, if they participated in the conspiracy, learned of the violation but failed to remedy the wrong, created a policy or custom under which unconstitutional practices occurred or allowed such policy or custom to continue, or were grossly negligent in managing subordinates who caused the violation. *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986) (citations omitted).

In his amended complaint, Baez's only allegation as to the personal involvement of Selsky is that he and his

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 446015 (N.D.N.Y.)

(Cite as: 2007 WL 446015 (N.D.N.Y.))

father wrote Selsky a letter documenting the violations of Baez's rights. Am. Compl. at ¶ 42. However, "receiving a letter from an inmate does not constitute sufficient personal involvement to generate supervisory liability." *Petty v. Goord,* No. Civ. 00-803(MBM), 2002 WL 31458240, at *8 (S.D.N.Y. Nov. 4, 2002). Further, there is no evidence that Selsky participated here in the alleged violations or created a policy which allowed constitutional violations to continue.

Therefore, it is recommended that defendants' motion for summary judgment as to Selsky be granted on this ground.

### C. Fourteenth Amendment

**\*8** Defendants Harris and Selsky contend that Baez's due process claim should be dismissed and that qualified immunity bars Baez's claim.

#### 1. Liberty Interest

As a threshold matter, an inmate asserting a violation of his or her right to due process must establish the existence of a protected interest in life, liberty, or property. See *Perry v. McDonald,* 280 F.3d 159, 173 (2d Cir.2001). To establish a protected liberty interest, a prisoner must satisfy the standard set forth in *Sandin v. Conner,* 515 U.S. 472, 483-84 (1995). This standard requires a prisoner to establish that the confinement was atypical and significant in relation to ordinary prison life. *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999); *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

Here, this Court has already decided that Baez has raised a question of fact as to whether twelve months spent in SHU establishes a protected liberty interest. Docket Nos. 27, 29, & 47; *see also Colon v. Howard,* 215 F.3d 227 (2d Cir.2000) (holding that 305 days spent in normal SHU conditions was sufficient to raise a question of significant hardship). Defendants' motion on this ground should, therefore, be denied.

#### 2. Process Provided

At a prison disciplinary proceeding, an inmate is entitled to (1) advance written notice of the charges, (2) an opportunity to call witnesses if it conforms with prison security, (3) a statement of evidence and reasons for the

disposition, and (4) a fair and impartial hearing officer. *Kalwasinski v. Morse,* 201 F.3d 103, 108 (2d Cir.1999) (citing *Wolff v. McDonnell,* 418 U.S. 539, 563-64 (1974)). Additionally, the finding of guilt must be supported by some evidence in the record to comport with due process. *Massachusetts Corr. Inst. v. Hill,* 472 U.S. 445, 455 (1985); *Gaston v. Coughlin,* 249 F.3d 156, 162 (2d Cir.2001).

Again, this Court has already determined that there is a question of fact as to the fourth prong of Wolff. Docket No. 27 at *12;.see also In re Lynch,* 430 F.3d at 604 (quoting *Quern,* 440 U.S. at 348 n. 18)). As such, it is recommended that defendants' motion for summary judgment on this ground be denied.

### C. Qualified Immunity

Defendants also contend that they are entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability insofar as their conduct does not violate clearly established constitutional law of which a reasonable person would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229-30 (N.D.N.Y .2002) (McAvoy, J.), *aff'd,* 80 Fed.Appx. 146 (2d Cir. Nov. 10, 2003). A court must first determine that if plaintiff's allegations are accepted as true, there would be a constitutional violation. Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230. Here, the issue of defendants entitlement to qualified immunity has already been decided in Baez's favor. Docket Nos. 27, 29, & 47.

**\*9** Therefore, it is recommended that defendants' motion for summary judgment on this ground be denied.

### III. Conclusion

For the reasons stated above, it is hereby
**RECOMMENDED** that defendants' motion for summary judgment (Docket No. 75)

1. **GRANTED** as to Quartarone and Selsky in all respects; and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 446015 (N.D.N.Y.)

(Cite as: 2007 WL 446015 (N.D.N.Y.))

2. **DENIED** as to Harris as to the due process claim.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2007.

Baez v. Harris
Not Reported in F.Supp.2d, 2007 WL 446015 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2011 WL 1577761 (N.D.N.Y.)

(Cite as: 2011 WL 1577761 (N.D.N.Y.))

---

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Cedric REID, Plaintiff,
v.
Norman R. BEZIO; J. Wolczyk; H.D. Graham; David Stallone; T. Quinn; Head; M. Chindamo; Robert Davia; Denise B. Sarra; T.J. Gamba; M. Mogavero; Justin A. Taylor; P. Leconey; R. Pirie; A. Taylor; M. Leone; Demarco; A. Jacot; R. Stiles; H. Hooper; R. Geddis; S. Bateman; M. Leonard; and N. Ryerson, Defendants.
No. 9:10–CV–609 (NAM/DRH).

March 30, 2011.
Cedric Reid, Elmira, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General of the State of New York, Christopher W. Hall, Esq., Asst. Attorney General, of Counsel, Albany, NY, for the Defendants.

**REPORT–RECOMMENDATION AND ORDER**[FN1]

FN1. This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

DAVID R. HOMER, United States Magistrate Judge.

*1 Plaintiff pro se Cedric Reid ("Reid"), an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants, twenty-nine DOCS employees at three facilities in the Western and Northern Districts of New York, violated his constitutional rights under the First, Eighth, and Fourteenth Amendments. Compl. (Dkt. No. 1). Reid commenced this action on December 1, 2008, in the Western District. In an order in that district, the claims involving the twenty-four above-named defendants were severed, the claims against the defendants located in the

Western District were dismissed, and the claims against those defendants located in this district were transferred here. Dkt. No. 31; Reid v. Nuttall, No. 08–CV–870A, 2010 WL 2025458 (W.D.N.Y. May 20, 2010). Presently pending is defendants' motion to dismiss as to the Northern District claims and defendants pursuant to Fed.R.Civ.P. 12(b)(6). Dkt. No. 49.[FN2] Reid opposes the motion. Dkt. No. 54. For the following reasons, it is recommended that defendants' motion be granted in part and denied in part.

FN2. The May 20, 2010 order in the Western District denied as moot defendants' motion to dismiss in that district as to the defendants transferred to the Northern District. Dkt. No. 31 at 2–3. Decision on the motion as to the Northern District defendants was deferred to this district. *Id.; see also* Report, Recommendation & Order (Dkt. No. 25) at 2–3 (recommending that the district court defer decision on Northern District defendants to this district). The defendants transferred to this district then filed the present motion.

**I. Background**

The following facts, taken from the complaint, are accepted as true for purposes of this motion to dismiss. *See* subsection II(A) *infra*. In his complaint, Reid asserts various conditions-of-confinement claims as well as claims for conspiracy and retaliation related to seven disciplinary reports. However, the May 20, 2010, order severed and transferred only those claims arising from conduct that occurred at Auburn Correctional Facility ("Auburn") and Gouverneur Correctional Facility ("Gouverneur") in the Northern District. Moreover, in his Memorandum of Law in Opposition to Defendants' Motion to Dismiss, Reid abandoned the retaliation claims related to the second and fifth disciplinary reports as well as all of the remaining conditions-of-confinement claims. Dkt. No. 54 at 2, 15–16. Reid also withdrew his claims against defendants Leconey, Bateman, and Stiles. *Id.* at 14. Therefore, the only remaining claims are those for retaliation and conspiracy relating to the third, fourth,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1577761 (N.D.N.Y.)

(Cite as: 2011 WL 1577761 (N.D.N.Y.))

sixth, and seventh disciplinary reports. Accordingly, defendants Leconey, Bateman, Stiles, Davia,[FN3] Head, Demarco, Jacot, Stallone, Ryerson, Gamba, Mogavero, and Justin Taylor should be dismissed as they are not implicated in the remaining claims.

> FN3. Additionally, Davia has not been served with process or otherwise appeared in the action. A summons for service on Davia was re-issued on March 3, 2011. Dkt. No. 59.

**A. Third Disciplinary Report**

On January 16, 2007, Reid sent a letter to defendant Sarra, Education Supervisor at Auburn, complaining about a teacher. Compl. ¶ 3. Sarra responded the same day, advising Reid that it was not his responsibility to critique the teacher. *Id.* ¶ 3(a). The next day, Sarra confronted Reid in person and stated: "I received two written complaints from you, I don't want anymore." *Id.* ¶ 3(c). On January 18, 2007, Reid was served with a disciplinary report, authored by Sarra, charging him with disobeying a direct order and interfering with staff. *Id.* ¶ 3(d). The same day, Reid filed a grievance concerning the confrontation with Sarra. *Id* . ¶ 3(k). Sarra and defendant Chindamo, a corrections officer at Auburn, were present at the subsequent disciplinary hearing at which Reid was found guilty and sentenced to thirty days in keeplock.[FN4] *Id.* ¶¶ 3(g)-(h). Defendant Graham, Superintendent of Auburn, affirmed this disposition upon administrative appeal. *Id.* ¶ 3(j).

> FN4. "Keeplock is a form of disciplinary confinement segregating an inmate from other inmates and depriving him of participation in normal prison activities." *Green v. Bauvi,* 46 F.3d 189, 192 (2d Cir.1995); N.Y. Comp.Codes R. & Regs. tit. 7, § 301.6.

**B. Fourth Disciplinary Report**

**\*2** On March 28, 2007, Reid filed a grievance against three unidentified Auburn employees. *Id.* ¶ 4. On April 4, 2007, defendant Quinn, a lieutenant at Auburn, lodged a disciplinary report charging Reid with stalking and harassment. *Id.* ¶ 4(a)-(b). This report excerpted parts of Reid's grievance to support the charges. *Id.* Defendant Wolczyk, Commissioner's Hearing Officer at Auburn, presided over the subsequent disciplinary hearing and

found Reid guilty of harassment but not guilty of stalking. *Id.* ¶ 4(c). Reid was sentenced to six months in the Special Housing Unit ("SHU"),[FN5] loss of privileges, and loss of six months "good time" credits. *Id.* Defendant Graham reduced the sentence to thirty days in the SHU and reinstated the good time credits. *Id.* ¶ 4(e). Reid filed a grievance regarding this disciplinary report on April 20, 2007. *Id.* ¶ 4(j). Graham ultimately denied this grievance on May 3, 2007. *Id* .

> FN5. SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population ...." N .Y. Comp.Codes R. & Regs. tit. 7, § 300.2(b) (1995). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

**C. Sixth Disciplinary Report**

On January 11, 2008, defendant Leonard, a teacher at Gouverneur, was interviewed by her supervisor, defendant Geddis, in response to a "serious" grievance Reid had filed against her. *Id.* ¶ 6. On January 14, 2008, Leonard conspired with defendants Geddis, Hooper (counselor at Gouverneur), and Pirie (Deputy Superintendent of Program Services at Gouverneur) to deny Reid's request to sign out of educational programs. *Id.* ¶ 6(b). Leonard then submitted a disciplinary report charging Reid with creating a disturbance, harassment, refusing a direct order, and making threats. *Id.* ¶¶ 6, 6(e). Reid was found guilty of all charges at a subsequent administrative hearing. *Id.* ¶ 6(f). Upon appeal, defendant A. Taylor, a captain at Gouverneur, affirmed the disposition. *Id.* ¶ 6(g). On January 22, 2008, Reid submitted two grievances—one alleging retaliation and harassment by the DOCS employees involved in this incident, the other complaining that proper procedures were not followed. *Id.* ¶ 6(i).

**D. Seventh Disciplinary Report**

Also in January 2008, Reid filed numerous complaints with the DOCS Central Office about the condition of Gouverneur's SHU. *Id.* ¶ 7. Reid refused to be interviewed about these complaints by defendant Leone, a sergeant at Gouverneur, because he feared "unnecessary" force would be used. *Id.* Thereafter, Leone

Slip Copy, 2011 WL 1577761 (N.D.N.Y.)

(Cite as: 2011 WL 1577761 (N.D.N.Y.))

conspired with defendant A. Taylor to charge Reid falsely with assault in order to have him transferred out of Gouverneur. *Id.* ¶ 7(a). On January 31, 2008, Leone authored a disciplinary report against Reid for refusing to be interviewed. *Id.* ¶ 7(b). Geddis presided over the subsequent disciplinary hearing and found Reid guilty of disobeying a direct order. *Id.* ¶ 7(c). Reid appealed this decision to defendant Bezio, DOCS Director of Special Housing and Inmate Disciplinary Programs, who modified the loss of good time credits. *Id.* ¶ 7(f).[FN6]

> [FN6.] Reid correctly acknowledges that he cannot challenge the duration of his sentence through 42 U.S.C. § 1983. *Id.* ¶ 7(g); *see Peralta v. Vasquez, 467 F.3d 98, 104 (2d Cir.2006)* (under the "favorable termination rule," prisoners can only attack sanctions affecting the term of their imprisonment through a habeas petition). Therefore, any claim related to the loss of good time credits is not properly before this court.

## II. Discussion

**\*3** Reid alleges that Sarra, Quinn, Wolczyk, Leonard, Leone, and Geddis processed false disciplinary reports against him in retaliation for written complaints and grievances he submitted. Reid further alleges that supervisory defendants Bezio and Graham learned of the retaliation through complaints and appeals, but did nothing in response. Reid maintains that defendants Chindamo, A. Taylor, Pirie, and Hooper conspired with the aforementioned defendants to retaliate against Reid. Defendants contend that (1) the supervisory defendants were not personally involved in any of the allegedly violative conduct, and (2) the retaliation and conspiracy claims must be dismissed because they are wholly conclusory.

### A. Legal Standard

To survive a 12(b)(6) motion to dismiss, the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)*. Although a complaint need only contain "a short and plain statement of the claim showing the pleader is entitled to relief" (Fed.R.Civ.P. 8(a)(2)), more than mere conclusions are required. Indeed, "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual

allegations." *Ashcroft v. Iqbal, 129 S.Ct. 1937, 1950 (2009)*.

Dismissal is appropriate only where plaintiffs fail to provide some basis for the allegations that support the elements of their claims. *See Twombly, 550 U.S. at 570* (requiring "only enough facts to state a claim to relief that is plausible on its face"). When considering a motion to dismiss, the complaint is to be construed liberally, and the factual allegations are to be accepted as true, and all reasonable inferences must be drawn in the plaintiff's favor. *Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir.2002)*. Additionally, particular deference should be given to a pro se litigant's complaint. *Erickson v. Pardus, 551 U.S. 89, 94 (2007)*.

### B. False Disciplinary Reports/Retaliation

Reid alleges that the third, fourth, sixth, and seventh disciplinary reports were falsified and lodged against him in retaliation for the written complaints and grievances he filed. An inmate "has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest." *Freeman v. Rideout, 808 F.2d 949, 951 (2d Cir.1986)*. To constitute an actionable claim, "[t]here must be more, such as retaliation against the prisoner for exercising a constitutional right" or the denial of procedural protections. *Boddie v. Schnieder, 105 F.3d 857, 862 (2d Cir.1997)*. Claims of retaliation are rooted in the First Amendment. *See Gill v. Pidlypchak, 389 F.3d 379, 380 (2d Cir.2004)*. To state an actionable claim for retaliation, a plaintiff must first show that the conduct at issue was constitutionally protected and, second, that the conduct was a "substantial or motivating factor for the adverse actions taken by prison officials." *Bennett v. Goord, 343 F.3d 133, 137 (2d Cir.2003)*. If the plaintiff establishes these elements, the burden shifts to the defendants who can still defeat the claim by showing, by a preponderance of the evidence, that they would have taken the same action against the plaintiff absent his exercising of the protected conduct. *Graham v. Henderson, 89 F.3d 75, 79 (2d Cir.1996)*.

**\*4** Courts must view retaliation claims with care and skepticism due to the ease with which they can be fabricated and to avoid judicial intrusion into matters of prison administration. *Jackson v. Onondaga County, 549*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1577761 (N.D.N.Y.)

(Cite as: 2011 WL 1577761 (N.D.N.Y.))

F.Supp.2d 204, 214–15 (N.D.N.Y.2008) (McAvoy, J. & Lowe, M.J.). Conclusory allegations alone are insufficient. *Id.* at 214 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)). For purposes of the first element of the claim, it is undisputed that the filing of grievances is constitutionally protected conduct. *See Gill,* 389 F.3d at 384; *Gayle v. Gonyea,* 313 F.3d 677, 682 (2d Cir.2002). Further, "there is little doubt that a misbehavior report would constitute an 'adverse action.' " *Anderson v. Leghorn,* No. 9:07–CV–1184, 2011 WL 691658, at *4 (N.D.N.Y. Jan. 24, 2011) (Treece, M.J.).

### 1. Third Disciplinary Report

Reid alleges that the January 18, 2007, disciplinary report written by Sarra was in retaliation for the January 16, 2007 letter he sent to her complaining that a teacher was distracting him by "popping" her chewing gum loudly. While this letter was not a formal grievance, it serves the same purpose of seeking redress through petition. *See Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988) (prisoners must be afforded "free and uninhibited access to both *administrative and judicial* forums for the purpose of seeking redress of grievances") (internal quotation marks omitted); *Bowens v. Pollock,* No. 06–CV–457A, 2010 WL 5589350, at *11 (W.D.N.Y. Oct. 12, 2010) (inmate's letter complaining of the prison movie selection was an exercise of his constitutionally protected right to seek redress). Therefore, the first prong of this retaliation claim is satisfied.

The issue then becomes whether Reid's letter was a substantial or motivating factor for the third disciplinary report. It has been held that "the temporal proximity of an allegedly retaliatory misbehavior report ... may serve as circumstantial evidence of retaliation." *Gayle,* 313 F.3d at 683. Here, Sarra received Reid's complaint on January 16, confronted him about his complaints on January 17, and lodged the misbehavior report on January 18. Compl. ¶¶ 3–3(d). Lending further support to Reid's claim that the disciplinary report was retaliatory is Sarra's admonition, made during the January 17 confrontation, that "I received two written complaints from you, I don't want anymore." *Id.* ¶ 3(c). Reid has thus pleaded a plausible claim that the third disciplinary report was issued in retaliation for his constitutionally protected petition for redress. As such, it is recommended that defendants' motion to dismiss this claim be denied.

### 2. Fourth Disciplinary Report

Reid alleges that the April 4, 2007 disciplinary report, in which Quinn charged him with stalking and harassment, was in direct response to the grievance he filed on March 28, 2007, complaining about three Auburn employees. As filing a grievance is constitutionally protected conduct, the issue again becomes whether it was a substantial or motivating factor for the fourth disciplinary report. This disciplinary report was filed only one week after Reid's grievance and excerpted direct quotes from the grievance to support the charges. *Id.* ¶ 4(a). These factual allegations provide both circumstantial and direct evidence that the fourth misbehavior report was in retaliation for Reid's grievance. *See Gayle,* 313 F.3d at 683 (finding additional support for plaintiff's retaliation claim where the disciplinary report arose from statements plaintiff made to defendant while discussing the grievance he had filed six days earlier). Additionally, hearing officer Wolczyk's administrative determination finding Reid guilty of the charges was ultimately reversed on appeal. Compl. ¶ 4(g); *see Gayle,* 313 F.3d at 683 (plaintiff's retaliation claim bolstered by the fact that the administrative determination of his guilt was later reversed).

**\*5** Therefore, it is recommended that defendants' motion to dismiss this claim be denied.

### 3. Sixth Disciplinary Report

Reid claims that Leonard lodged a disciplinary report against him on January 14, 2008 in retaliation for a "serious" grievance he had filed against her. However, the causal link between this grievance and the sixth disciplinary report is not clear. In his complaint, Reid notes that on the day the disciplinary report was filed, "he began sputtering in class from pain, which Leonard misinterpreted as hostility." Compl. ¶ 6(c). This suggests that there was an independent motive for the disciplinary report, which charged Reid with creating a disturbance, harassment, refusing a direct order, and threats. *Id.* ¶ 6(e).

Moreover, even though the disciplinary report was submitted only three days after Leonard's supervisor interviewed her about the claims in the grievance, this minimal circumstantial evidence of temporal proximity, standing alone, is insufficient to support a retaliation claim. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1577761 (N.D.N.Y.)

(Cite as: 2011 WL 1577761 (N.D.N.Y.))

Cir.1995) (where circumstantial evidence is the sum total of plaintiff's proof, "we might be inclined to affirm the grant of summary judgment based on the weakness of [plaintiff's] case"). There are therefore insufficient factual allegations to establish a causal link between the grievance and the sixth disciplinary report. Accordingly, it is recommended that defendants' motion to dismiss this claim be granted.

**4. Seventh Disciplinary Report**

Reid maintains that the January 31, 2008 disciplinary report was filed against him by Leone in retaliation for numerous written complaints he had made to DOCS Central Office regarding the condition of the SHU at Gouverneur. As noted above, such written complaints implicate Reid's constitutionally protected right to petition for redress. Therefore, it must be determined whether these written complaints were a substantial or motivating factor for the seventh disciplinary report.

Reid's complaint belies his assertion that the disciplinary report was motivated by his written complaints to the Central Office. These written complaints apparently prompted an internal investigation. However, when Leone attempted to interview Reid about the allegations, Reid admittedly refused to cooperate. Compl. ¶ 7. Leone then authored the disciplinary report, charging Reid with disobeying a direct order for refusing to be interviewed—not for submitting the written complaints. *Id.* ¶ 7(b). There was thus nothing false about this disciplinary report. Further, it is likely that Leone would have taken the same action if the interview Reid refused to cooperate with was not prompted by his exercising a constitutionally protected right.

These facts do not support a claim that Leone filed the disciplinary report to dissuade Reid from seeking redress. On the contrary, Leone was attempting to provide the very redress Reid sought in his written complaints. As Reid fails to allege a causal connection between constitutionally protected conduct and the seventh disciplinary report, it is recommended that defendants' motion to dismiss this claim be granted.

**C. Conspiracy**[FN7]

[FN7.] As it is recommended that the retaliation

claims related to the sixth and seventh disciplinary reports be dismissed, any conspiracy claims associated with those disciplinary reports should also be dismissed. *See Curley v. Vill. of Suffern,* 268 F.3d 65, 72 (2d Cir.2001) (where plaintiff cannot establish a constitutional violation, "he may not maintain a § 1983 cause of action for conspiracy"). The only remaining conspiracy claim is that involving defendant Chindamo.

**\*6** Reid claims that Chindamo "conspired along with Sarra" to process the third disciplinary report. *Id.* ¶ 3(g). To support a § 1983 conspiracy claim, a plaintiff must establish: "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999). Moreover, " 'complaints containing only conclusory, vague, or general allegations [of conspiracy] ... are properly dismissed; diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct.' " *Ciambriello v. County of Nassau,* 292 F.3d 307, 325 (2d Cir.2002) (quoting *Dwares v. City of New York,* 985 F.2d 94, 100 (2d Cir.1993)).

Reid's conspiracy claim is wholly conclusory. The only factual allegation of Chindamo's involvement is that he accompanied Sarra to the disciplinary hearing at which Reid was found guilty of the charges contained in the third disciplinary report. Compl. ¶ 3(g). There are no allegations that Chindamo testified at the hearing or even spoke with Sarra, Reid, or the hearing officer. Chindamo's mere presence at the hearing is insufficient to establish his role in a conspiracy to deprive Reid of his constitutional rights. Accordingly, it is recommended that defendants' motion to dismiss this claim be granted.

**D. Personal Involvement**

Defendants argue that the "supervisory defendants" lacked personal involvement. The only remaining supervisor in this case is Graham. Reid claims that Graham was personally involved in the retaliatory third and fourth disciplinary reports. On January 26, 2007,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1577761 (N.D.N.Y.)

(Cite as: 2011 WL 1577761 (N.D.N.Y.))

Graham affirmed the administrative determination finding Reid guilty of the charges contained in the third disciplinary report. *Id.* ¶ 3(j). On April 24, 2007, Graham granted Reid's request for discretionary review and modified the penalties imposed as a result of the fourth disciplinary report by reducing his time in SHU and reinstating his good time credits. *Id.* ¶ 4(e). On May 3, 2007, Graham denied Reid's grievance related to the fourth disciplinary report. *Id.* ¶ 4(j).

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a 13 prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely due to their position of authority. *Id.* Indeed, "mere linkage in the prison chain of command" is insufficient to implicate prison administrators. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (internal quotation marks omitted).

Historically, a supervisor could only be held liable under § 1983 by one or more of the following: (1) direct participation in the constitutional deprivation; (2) failure to remedy a wrong after learning about it through a report or appeal; (3) creation of a policy that sanctioned the violative conduct or allowed such conduct to continue; (4) grossly negligent supervision of personnel who committed the violation; or (5) failure to act after receiving information indicating that constitutional violations were occurring. *Colon,* 58 F.3d at 873. However, it is unclear whether all five *Colon* bases for supervisor liability remain available in light of the Supreme Court's decision in *Iqbal,* which rejected the notion that a supervisor can be held liable based on "mere knowledge of his subordinate's discriminatory purpose" and instead required a showing of discriminatory purpose by the supervisor himself. 129 S.Ct. at 1948–49.

**\*7** *Iqbal* 's effect has been debated in the district courts. *See, e. g., McCarroll v. Fed. Bureau of Prisons,* No. 9:08–CV–1343, 2010 WL 4609379, at \*4 (N.D.N.Y. Sept. 30, 2010) (Lowe, M.J.) ("Several district courts in the Second Circuit have determined that *Iqbal* nullified some of the *Colon* categories ."); *Kleehammer v. Monroe County,* No. 09–CV–6177, 2010 WL 4053943, at \*8 (W.D.N.Y. Sept. 8, 2010) (implying that only the first and

third *Colon* categories survived *Iqbal* 's requirement of "active conduct" to impose supervisor liability); *D'Olimpio v. Crisafi,* 718 F.Supp.2d 340, 347 (S.D.N.Y.2010) (citing, but disagreeing with, several recent decisions that interpreted *Iqbal* as eliminating all but the first and third *Colon* categories).

Here, Reid does not allege that Graham directly participated in the retaliation or was grossly negligent in his supervision. Reid instead relies on the second and fifth *Colon* categories. Even assuming these categories survived *Iqbal,* a close review of Reid's complaint fails to reveal any allegation that his correspondence put Graham on notice of ongoing retaliation. Reid claims that his appeal raised four grounds on which to reverse the administrative determination related to the third disciplinary report. Compl. ¶ 3(i). However, he does not specify what these grounds actually were. Similarly, Reid does not describe of what he specifically complained in the grievance Graham denied on May 3, 2007.

Without further facts, it cannot simply be assumed that the appeal and grievance made Graham aware of ongoing constitutional violations. Therefore, the factual allegations do not plausibly establish Graham's personal involvement. *See Shomo v. City of New York,* 579 F.3d 176, 184 (2d Cir.2009) (receiving and responding to grievances and letters of complaint is insufficient to establish personal involvement unless such put the supervisor on notice of a constitutional violation that he or she then failed to remedy); *Harnett v. Barr,* 538 F.Supp.2d 511, 524 (N.D.N.Y.2008) (Hurd, J.) ("If the official is confronted with a violation that has already occurred and is not ongoing, then the official will not be found personally responsible for failing to 'remedy' a violation.").

Accordingly, it is recommended that any claims against Graham be dismissed without prejudice. *See Shomo,* 579 F.3d at 184 (affirming the dismissal of supervisory defendants where the complaint failed to allege how the grievances notified them of ongoing violations but granting plaintiff leave to replead because it was possible to remedy the inadequacies).

### III. Conclusion

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1577761 (N.D.N.Y.)

(Cite as: 2011 WL 1577761 (N.D.N.Y.))

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion to dismiss (Dkt. No. 49) be:

1. **GRANTED** with prejudice as to the second, fifth, sixth, and seventh disciplinary reports, the conspiracy claim, the conditions-of-confinement claims, and as to all defendants *except* Graham, Sarra, Quinn, and Wolczyk as to which claims and defendants this action should be terminated;

**\*8** 2. **GRANTED** without prejudice as to defendant Graham as to which this action should be **TERMINATED;** and

3. **DENIED** as to the third and fourth disciplinary reports and as to defendants Sarra, Quinn, and Wolczyk.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the ... recommendation." N.Y.N.D.L.R. 72 .1(c) (citing 28 U.S.C. § 636(b)(1)(B)-(C)). **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2011.

Reid v. Bezio
Slip Copy, 2011 WL 1577761 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp., 1997 WL 642549 (N.D.N.Y.)

(Cite as: 1997 WL 642549 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Zayd Abdur RASHID, f/k/a Aundre Singh, Plaintiff,
v.
Syed HUSSAIN, Dr., D.D.S., Eastern Correctional
Facility; Dr. Korfman, Regional Director; Robert
Mitchell; Superintendent Eastern Correctional Facility;
Frank Tracy, Deputy Superintendent Eastern
Correctional Facility; Robert McArdle, D.D.S., Director
of Correctional Dental Services, Defendants.
No. 95-CV-676 (RSP/DS).

Oct. 15, 1997.
Zayd Abdur Rashid, Sullivan Correctional Facility,
Fallsburg, New York, plaintiff, pro se.

Hon. Dennis C. Vacco, Attorney General for the State of
New York, The Capitol, Albany, New York, for
defendants, Lisa Renee Harris, Asst. Attorney General, of
Counsel.

**MEMORANDUM DECISION AND ORDER**

POOLER, J.
*1 This matter comes to me following a
report-recommendation by Magistrate Judge Daniel
Scanlon, duly filed on the 9th of September, 1997.
Following ten days from service thereof, the Clerk has sent
me the entire file, including any and all objections filed by
the parties herein.

Plaintiff, Zayd Abdur Rashid, has been incarcerated
by the New York State Department of Corrections since
1983 and was incarcerated at Eastern Correctional Facility
from November 11, 1988, until December 2, 1993.
Compl., Dkt. No. 1, ¶ 11; McArdle Aff., Dkt. No. 19, ¶
93. Rashid brings this action pursuant to 42 U.S.C. §
1983, alleging that defendants violated his Eighth
Amendment rights through their deliberate indifference to
his serious dental needs. Compl., ¶¶ 16-25. Specifically,
Rashid claims that on May 26, 1989, he saw a

periodontist, who recommended that Rashid have
periodontal surgery as soon as possible. Id., Exh. B.
Rashid claims that despite his repeated complaints
regarding the condition of his mouth during his
incarceration at Eastern, defendants failed to provide a
periodontal consultation or the recommended surgery.
Rashid eventually saw a periodontist on January 5, 1993,
McArdle Aff., Dkt. No. 19, ¶ 79, but did not have the
recommended surgery. On April 15, 1993, after his
transfer to Clinton Correctional Facility (CCF), plaintiff
had a consultation with Dr. Kenneth Palm, a general
dentist at CCF. Id., ¶¶ 82-83. Dr. Palm noted that plaintiff
had generalized bone loss and chronic periodontitis,
moderate to advanced, and recommended a course of
treatment which included extraction of all of Rashid's
upper teeth. Id., ¶¶ 84-86. Rashid's upper teeth were
extracted by May 11, 1994. Id., ¶¶ 96. Rashid claims
defendants' failure to attend to his dental needs resulted in
the deterioration of his condition and the ultimate loss of
his upper teeth. Compl., ¶¶ 23, 24.

Defendants moved for summary judgment, Dkt. No.
19, arguing that they have been attentive to plaintiff's
dental needs and that, in any event, he has failed to allege
conduct sufficient to state a constitutional claim, Dkt. No.
20. Defendants also argued that plaintiff had failed to
allege personal involvement on the part of defendants
Tracy, McArdle, and Mitchell as required under Section
1983. In a report-recommendation filed on September 9,
1997, Magistrate Judge Scanlon concluded that plaintiff's
claims against defendants in their official capacities were
barred by the Eleventh Amendment. Dkt. No. 37 at 6. The
magistrate judge also recommended that I(1) grant the
motions for summary judgment as to defendants Tracy and
McArdle, on the ground that plaintiff had not alleged their
personal involvement in his dental care, id. at 15-17; and
(2) deny the motion for summary judgment as to
defendants Hussain and Korfman, on the ground that
questions of fact exist as to whether plaintiff had
established a serious dental need and whether defendants
had exhibited deliberate indifference to same, id. at 8-13.
Finally, the magistrate judge concluded that because there
is no evidence that service of the complaint was ever

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642549 (N.D.N.Y.)

(Cite as: 1997 WL 642549 (N.D.N.Y.))

perfected on defendant Mitchell, the court lacked jurisdiction over him and would not consider the claims against him. *Id.* at 15. At plaintiff's request, the time for filing his objections was extended to October 10, 1997. Dkt. No. 39. Plaintiff filed objections to the report-recommendation on October 14, 1997. Dkt. No. 42.

**\*2** I consider *de novo* those portions of the report-recommendation to which Rashid objects. 28 U.S.C. § 636(b)(1). Initially, Rashid objects to the magistrate judge's conclusion that the court lacks jurisdiction over defendant Mitchell because Mitchell was never served with the summons and complaint. Dkt. No. 42, at 2-4. Specifically, Rashid argues that although the United States Marshall attempted to serve the summons and complaint on Mitchell on July 9, 1995, Rashid was not advised that service was not completed until April 11, 1997. He claims that immediately thereafter he sought an order of the magistrate judge directing the United States Marshall to serve the complaint on Mitchell. In response to his request, Rashid received a letter dated May 13, 1997, from the Deputy Clerk of the Court which stated that the Assistant Attorney General had advised the court that she represented all of the defendants, including Mitchell, and that the Attorney General's office filed an answer to plaintiff's complaint and a motion for summary judgment on behalf of all of the defendants. The Clerk advised Rashid that his request for service on Mitchell was therefore moot.

Defendants' answer, filed on August 8, 1995, raised no affirmative defenses concerning service or personal jurisdiction. Dkt. No. 13. Moreover, in their motion for summary judgment, defendants made no jurisdictional arguments with regard to defendant Mitchell, arguing instead that the complaint against him should be dismissed for his lack of personal involvement in the conduct alleged. Dkt. No. 20 at 2-4. In any event, the statements of Assistant Attorney General Harris confirm that defendants raised no jurisdictional defenses regarding Mitchell. Accordingly, I disagree with the magistrate judge's conclusion that the court lacks jurisdiction over Mitchell. The question remaining is whether Mitchell is entitled to summary judgment on the ground that he was not personally involved in the alleged violations of plaintiff's constitutional rights.

It is well settled that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under Section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citations omitted). In a suit for monetary damages under Section 1983, the doctrine of *respondeat superior* does not suffice, and a showing of some personal responsibility of the defendant is required. *Id.* (citing *Johnson v. Glick,* 481 F.2d 1028, 1034 (2d Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)). A defendant who occupies a supervisory position may be found personally involved in the deprivation of a plaintiff's constitutional rights in several ways: (1) the defendant may have directly participated in the infraction; (2) a supervisory official, after learning of the violation through a report or appeal, may have failed to remedy the wrong; (3) a supervisory official may be liable because he or she created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue; or (4) a supervisory official may bear personally liable if he or she was grossly negligent in managing subordinates who caused the unlawful condition or event. *Id.* (citing *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986)).

**\*3** In opposition to defendants' motion for summary judgment, Rashid produced numerous pieces of correspondence in support of his position that Mitchell had notice of Rashid's need for surgery and his continuing pain. Specifically, Rashid produced, among other things, (1) a memorandum dated November 25, 1991, which he sent to defendant Hussain and copied to Mitchell, in which Rashid detailed his ongoing condition and the periodontist's May 26, 1989, recommendation that he have oral surgery; (2) a memorandum to Hussain dated June 2, 1992, copied to Mitchell, in which Rashid again advised Hussain of the recommendation for surgery, his continually deteriorating condition and fear that he would lose his teeth, and his belief that defendants' handling of the situation "constitute[d] a deliberate, depraved indifference to [his] dental needs"; and (3) a letter dated June 9, 1992, from Attorney Penny Shane to Mitchell, in which Shane advised Mitchell that Rashid was "suffering from severe dental problems that cause him to live in pain," and reminding Mitchell of the earlier recommendation that Rashid have surgery. Dkt. No. 31,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642549 (N.D.N.Y.)

(Cite as: 1997 WL 642549 (N.D.N.Y.))

Exh. 6. The record contains evidence that Rashid complained to Mitchell five times concerning the condition of his teeth during the period from November 25, 1991, to July 3, 1993. *Id.* Through these documents, Rashid has presented sufficient evidence to demonstrate the existence of genuine issues of material fact concerning Mitchell's personal involvement in the alleged deprivation of Rashid's rights. Accordingly, I conclude that summary judgment is inappropriate as to Mitchell.

Rashid also objects to the magistrate judge's finding that Rashid failed to allege personal involvement by Tracy and McArdle in the alleged constitutional violations and the recommendation that I grant summary judgment on that basis. Dkt. No. 42 at 3-12. Rashid argues that there is sufficient evidence in the record to establish these defendants' personal involvement or, at that very least, that there are disputed issues of fact in this regard which preclude summary judgment. *Id.* at 5, 11. I conclude that Rashid presented sufficient evidence to raise genuine issues of material facts concerning personal involvement by Tracy and McArdle in the alleged deprivations, such that summary judgment is inappropriate.

Specifically, Rashid produced evidence that Tracy read and responded to at least one of the letters Rashid wrote to Mitchell and received a response from Rashid dated July 3, 1992, detailing Rashid's condition, the history of his treatment, and his complaints regarding his care at Eastern. Dkt. No 31, Exh. 7. I agree with the magistrate judge that the mere fact that Tracy responded to a letter complaining about Rashid's dental treatment would not, by itself, subject Tracy to liability. *Abdush-Shahid v. Coughlin,* 933 F.Supp. 168, 183 (N.D.N.Y.,1996). However, Rashid has presented evidence which suggests Tracy had notice of the extent and duration of Rashid's condition. Without passing judgment on the merits of Rashid's case, I conclude that "it is not beyond doubt that plaintiff could prove no set of facts under one of the *Williams* tests to support his claim of [Tracy's] personal involvement" in the alleged deprivation." *Horne v. Coughlin,* 795 F.Supp. 72, 76 (N.D.N.Y.1991).

**\*4** As to McArdle, I note initially that defendants have made no argument that McArdle was not personally

involved in the alleged deprivations. Dkt. No. 20 at 2-3. Moreover, in response to Rashid's grievance concerning his medical treatment, Mitchell notified Rashid that the "Dental Department advises they have been in contact with the Chief Dentist, who is attempting to make arrangements for grievant to see a periodontal specialist." Dkt. No. 31, Exh. 8. Drawing all inferences in Rashid's favor, as I must on this motion for summary judgment, *id.* at 73, I conclude that Rashid has presented evidence sufficient to raise a question of fact concerning McArdle's personal involvement, either because he knew of a problem and failed to remedy it or because, as dental director, he was grossly negligent in managing subordinates who caused a deprivation to occur, *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994).

In conclusion, after careful review of all of the papers herein, including the magistrate judge's report-recommendation and Rashid's objections thereto, I approve that part of the report-recommendation which denied defendants' summary judgment motions as to defendants Hussain and Korfman. However, for the reasons stated above, I decline to adopt that part of the report-recommendation which granted defendants' motion and dismissed the complaint as to Tracy and McArdle, and I deny the motion as to those defendants. In addition, I decline to adopt the magistrate judge's conclusions as to defendant Mitchell and deny the summary judgment as to Mitchell as well.

IT IS SO ORDERED.

DANIEL SCANLON, Jr., Magistrate J.

**ORDER and REPORT-RECOMMENDATION**

This matter was referred to the undersigned for report and recommendation by the Hon. Rosemary S. Pooler, United States District Judge, by Standing Order dated November 12, 1986. Plaintiff, an inmate, alleges in this 42 U.S.C. § 1983 action that defendants violated his Eighth Amendment rights through their deliberate indifferent to his serious dental need. Defendants counter that they have been attentive to plaintiff's dental needs, and that plaintiff's suit sounds of dental malpractice-which would not be actionable under § 1983. Defendants have motioned for summary judgment (dkt.19), and plaintiff opposes the motion (dkt.29) For the following reasons, the Court

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642549 (N.D.N.Y.)

(Cite as: 1997 WL 642549 (N.D.N.Y.))

records that defendants Dr. McArdle and Tracy be granted summary judgment; that defendants Dr. Korfman and Dr. Hussain be denied summary judgment; and that because the Court lacks jurisdiction over defendant Mitchell, it cannot examine the claims against him. The Court also orders parties to produce affidavits addressing the discrepancies appearing in the records submitted to it.

## BACKGROUND

Plaintiff has been incarcerated by the New York Department of Corrections ("DOCS")since 1983. His DOCS dental records, though not always legible, reflect that from the onset of his incarceration he has required a good deal of dental care. The misconduct that plaintiff alleges stems from his periodontal condition and its treatment. In December 1987, while he was an inmate at the Green Haven Correctional Facility, he was referred to a periodontist for an examination.[FN1] In May 1988, plaintiff was examined by Dr. Andrew Benjamin, a periodontist, who found that plaintiff's level of periodontoclasia was "moderate" (as opposed to "incipient" or "severe"), are recommended that plaintiff receive "ul curettage followed by minimal flap surgery to eliminate ul pocketing." [FN2] Dr. Benjamin estimated that plaintiff would require two to three appointments to complete the recommended treatment. He also noted that plaintiff evidenced "good" oral hygiene. Compl. at ¶¶ 9, 10; Ex. A; McCardle Aff. at ¶¶ 34-38. As of December 5, 1988, plaintiff had not received the recommended surgery. Now incarcerated at the Eastern Correctional Facility ("Eastern"), plaintiff was examined on that date by Dr. Harold Yellin, D.D.S., who likewise recommended that he see a periodontist. There was some delay in obtaining a periodontist, as Dr. Yellin notes in an April 24, 1989 memorandum to plaintiff, "not for a lack of trying" but because "[t]he consultant was simply unavailable." Walter Aff. at Ex. 1 (dkt.32). Dr. Benjamin examined plaintiff on May 26, 1989. He reported that plaintiff:

> FN1. Periodontics is the branch of dentistry concerned with the study and treatment of diseases of periodontal tissue and structures, such as gum disease.

> FN2. According to *The Mount Sinai Medical Center Family Guide to Dental Care,* to which the Court will refer to in this matter to explain dental terms, periodontal disease progresses in

four stages. The first stage is gingivitis, which essentially is an inflammation of the gums and is readily treatable. The second stage is early periodontitis, which in addition to including a swelling of the gums is marked by the formation of pockets (*e.g.,* spaces) forming between the gum and root. Treatment typically requires that plaque and calculus be removed from the diseased area and inflamed, severely damaged tissue is removed via curettage.

Stage three of periodontal disease is moderate periodontitis, which is characterized by swollen, inflamed gums and deep pockets. Treatment of this stage includes a scraping of the each affected tooth surface and curettage of the affected gum. Tooth decay may be planed, in addition to be scraped, to provide a smooth surface to which the regenerating gum may attach. More severe cases of moderate periodontitis may require surgery, such as flap surgery. The last stage of periodontal disease is tooth mobility and loss, which requires periodontal surgery as treatment. At this point, even surgery may not be enough to save the affected tooth or teeth. *See generally,* Jack Klatell, D.D.S., et al., *The Mount Sinai Medical Center Family Guide to Dental Care* 71-81 (1991).

**\*5** needs flap surg. for ul after 2-3 visits of scaling-no surg. was done after last year's scaling. Rec. oper. tx be done asap, then perio surg. to follow.... No hopeless t., but molars very quest. Rec. rubber tip e NaHCO3 + 3 pt. needs prophies + scaling q. 3 months e hygienist, if possible.

Compl. at ¶¶ 11-13, Ex. B.

In December 1989, plaintiff began treating under defendant Dr. Syed Hussain, D.D.S. Plaintiff's dental records reflect that Dr. Hussain saw plaintiff twenty-five times from December 11, 1989 to October 13, 1992. During that interim, plaintiff also was treated twice by Defendant Dr. Martin Korfman, D.D.S. Walter Aff. at Ex. 4. Plaintiff alleges that he visited Dr. Hussain so many times due to "repeated infections, inflammations, and a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642549 (N.D.N.Y.)

(Cite as: 1997 WL 642549 (N.D.N.Y.))

steady deterioration of his gums." He claims that despite the "signs that he was living in pain as a result of his periodontal condition, no effort was made by [defendants] to ensure that [he] receive the recommended surgery for his serious medical need"–despite the fact that he complained in writing to defendants regarding his condition on several occasions. Compl. at ¶¶ 16, 17. *See* Walter Aff. at Ex. 1.

On July 10, 1990, Dr. Hussain did recommended that plaintiff see a periodontist for "re-evaluation." Compl. at ¶ 15; McArdle Aff. at ¶ 59, Ex. J. No action was taken on this recommendation until January 4, 1993, when Dr. Hussain requested that plaintiff's "perio condition" be evaluated. The following day periodontist Dr. Monroe Weinstein examined plaintiff. He found that plaintiff suffered from "severe pockets on maxilla"; had "severe bone loss" at teeth "# 3 & 7", and that teeth "# 8, 9 12, & 14 are questionable." [FN3] Dr. Weinstein recommended a full mouth curettage and extraction of "# 3 & 7." McCardle Aff. at ¶ 79.

> FN3. The "maxilla" is the upper jaw. In dental nomenclature, teeth are given individual numbers. The teeth on the maxilla are numbered from right to left as one through sixteen, starting with number one as the right wisdom tooth and finishing with number sixteen as the left wisdom tooth. All of the teeth discussed in Dr. Weinstein's report, therefore, belong to plaintiff's upper jaw.
>
> The lower jaw, or "mandible," features the teeth numbered seventeen through thirty-two.

Dr. Hussain performed the curettage but did not perform the recommended extractions that day. McCardle Aff. at ¶ 80. Plaintiff was transferred from Eastern to Clinton Correctional Facility in April 1993, where Dr. Kenneth Palm, D.D.S. examined him. Dr. Palm diagnosed plaintiff as suffering generalized bone loss and chronic periodontitis, and he recommended that all of plaintiff's upper teeth be extracted. McCardle Aff. at ¶¶ 84, 86. All of plaintiff's upper teeth eventually were extracted and he was fitted with a full upper denture. Compl. at ¶ 24; McCardle Aff. at ¶¶ 92, 96.

Plaintiff contends that defendants violated his constitutional rights, wherefore he seeks compensatory, punitive and declaratory relief.

## DISCUSSION

I. Standard for Summary Judgment.

Rule 56 allows for summary judgment where the evidence demonstrates that "there is no genuine issue of any material fact and the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A motion for summary judgment may be granted when the moving party carries its burden of showing that no triable issues of fact exist. *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990). In light of this burden, any inferences to be drawn from the facts must be viewed in the light most favorable to the non-moving party. *Id.; United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (*per curiam*). If the moving party meets its burden, the burden shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). A dispute regarding a material fact is genuine "if evidence is such that a reasonable jury could return a verdict for the non-moving party" *Anderson,* 477 U.S., at 248, 106 S.Ct., at 2510. When reasonable minds could not differ as to the import of the evidence, then summary judgment is proper. *Id.,* at 250-251, 106 S.Ct., at 2511.

II. Official Capacity Claims.

**\*6** Plaintiff brings this suit against defendants in both their official and individual capacity. To the extent plaintiff asserts claims for monetary damages against defendants in their official capacities, these claims must be dismissed. Claims against employees of the New York State Department of Corrections for actions taken in their official capacity are suits against the State. Absent the State's waiver or consent, neither of which have been given here, the Eleventh Amendments bars all 42 U.S.C. § 1983 suits for legal or equitable relief brought by citizens against the State and its agencies. *See, e.g., Alabama v. Pugh,* 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978) (per curiam), *Eng v. Coughlin,* 858

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642549 (N.D.N.Y.)

(Cite as: 1997 WL 642549 (N.D.N.Y.))

F.2d 889, 896-97 (2d Cir.1988). Plaintiff's claim for monetary damages from defendants in their official capacities is barred under the Eleventh Amendment.

The Court, therefore, turns to plaintiff's claims asserted against defendants in their individual capacities. *See generally* Hafer v. Melo, 502 U.S. 21, 30-31, 112 S.Ct. 358, 364, 116 L.Ed.2d 301 (1991) ("[T]he Eleventh Amendment does not erect a barrier against suits to impose 'individual and personal' liability on state officials under § 1983").

III. 42 U.S.C. § 1983 and Eighth Amendment Claim.

Plaintiff has brought his complaint pursuant to 42 U.S.C. § 1983, which permits suit against those individuals, acting under color of state law, who caused him to be "depriv[ed] of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. Defendants acted in this matter pursuant to their authority as prison officials under color of New York state law. The only unresolved question is whether they acted in a manner that deprived plaintiff of any "rights, privileges or immunities secured by the United States Constitution." 42 U.S.C. § 1983.

In arguing that defendants have violated his "constitutional rights," the Court infers that plaintiff refers to his Eighth Amendment rights. Plaintiff is *pro se* and we read his complaint liberally. *See* Bass v. Jackson, 790 F.2d 260, 262 (2d Cir.1986) ("*Pro se* complaints ... are held 'to less stringent standards than formal pleadings drafted by lawyers.' "); Soto v. Walker, 44 F.3d 169, 173 (2d Cir.1995). The Eight Amendment, made applicable to the States by the Fourteenth Amendment, prohibits the infliction of cruel and unusual punishment upon prison inmates. Farmer v. Brennan, 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994); Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir .1994), *cert. denied sub nom.* Foote v. Hathaway, 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). In Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), the Supreme Court held that deliberate indifference to an inmate's serious medical needs fell within the scope of the Eighth Amendment's prohibition. Id., at 104, 97 S.Ct., at 291. Under *Estelle,* prison officials violate the Eighth Amendment if they are deliberately indifferent to an inmate's serious medical needs by denying or delaying his

access to medical care or by intentionally interfering with his treatment. Id. at 104-05, 97 S.Ct. at 291-92; *see also* Wilson v. Seiter, 501 U.S. 294, 298, 302-03, 111 S.Ct. 2321, 2324, 2326-27, 115 L.Ed.2d 271 (1991). A state's medical care obligations applies to dental care as well. Chapman v. Rhodes, 434 F.Supp. 1007, 1020 (S.D.Ohio 1977), *aff'd,* 624 F.2d 1099 (6th Cir.1980), *rev. in other part,* 452 U.S. 337, 344, 101 S.Ct. 2392, 2398, 69 L.Ed.2d 59 (1981); Shaffer v. McWilliams, 570 F.Supp. 1422 (W.D.N.Y.1983).

**\*7** The determination of whether a defendant acts with deliberate indifference to a plaintiff's serious medical needs involves both objective and subjective components. Hathaway, 37 F.3d at 66. The objective component requires a determination of whether there has been a sufficiently serious deprivation of a plaintiff's constitutional rights, whereas the subjective component requires an examination of a defendant's state of mind. Id. at 66. The Second Circuit noted:

[d]eliberate indifference requires more than negligence, but less than conduct undertaken for the very purpose of causing harm.... More specifically, a prison official does not act in a deliberately indifferent manner unless that official 'knows of and disregards an excessive risk to inmate health or safety, the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'

*Id.* at 66-67 (*quoting* Farmer, 511 U.S., at 837, 114 S.Ct., at 1979).

To establish an unconstitutional denial of medical care, therefore, plaintiff must meet both prongs of a two part test: first, he must demonstrate that the deprivation alleged is "sufficiently serious"; and second, he must show that defendants acted with "deliberate indifference" to his health or safety. Farmer, 511 U.S., at 834, 114 S.Ct., at 1977; Hathaway, 37 F.3d at 66.

A. Serious Medical Need.

A serious medical need entails a deprivation that is " 'sufficiently serious' in the sense that 'a condition of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642549 (N.D.N.Y.)

(Cite as: 1997 WL 642549 (N.D.N.Y.))

urgency, one that may produce death, degeneration, or extreme pain" exists." *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) (citation omitted); *see also Koehl v. Dalsheim,* 85 F.3d 86, 88 (2d Cir.1996); *Hathaway,* 37 F.3d at 66. This standard prescribes not only the denials of medical treatment that result in "torture or lingering death," but also those denials of medical care that "may result in pain and suffering which no one suggests would serve any penological purpose." *Abdush-Shahid v. Coughlin,* 933 F.Supp. 168, 181 (citing *Estelle,* 429 U.S., at 103, 97 S.Ct., at 290); *see also Koehl,* 85 F.3d at 88 (suggesting it is not necessary for medical deprivation to cause pain as long as deprivation prolongs suffering).

There exist genuine and disputed issues of material fact regarding whether plaintiff's medical condition was "sufficiently serious" that cannot be resolved as a matter of law on a motion for summary judgment. It has been held that "increased tooth sensitivity and attendant pain experienced over an extended period of time identif[ies] a medical need which a reasonable person would consider to be serious." *Reynolds v. Ternullo,* No. 82 Civ. 4018(CSH), 1985 WL 2153, *2 (S.D.N.Y. July 26, 1985); *but see Tyler v. Rapone,* 603 F.Supp. 268 (E.D.Pa.1984) (holding toothache not a serious medical need). Plaintiff alleges his deteriorating periodontal condition caused him considerable pain and suffering, and that defendants prolonged this pain and suffering by delaying and ignoring the treatment recommended by Dr. benjamin. Plaintiff cites the numerous visits he made to Dr. Hussain between December 1989 and October 1992 as evidence of his pain and suffering, and defendants have not presented evidence to undermine this claim. Pain associated with the need for corrective surgery may support a finding of a "serious medical need." *See generally Hathaway,* 37 F.3d 63; *see also Todaro v. Ward,* 565 F.2d 48, 52 (2d Cir.1977) (medical conditions that cause or perpetuate pain constitute serious medical needs).

B. Deliberate Indifference.

**\*8** Defendants contend that regardless of whether plaintiff has demonstrated that he had a serious medical need, he has not presented any evidence that defendants were deliberately indifferent to this need because at most plaintiff has alleged that defendants were negligent. To state a claim of deliberate indifference, plaintiff must show that prison officials intentionally denied, delayed access to or interfered with prescribed treatment. *Estelle,* 429 U.S., at 104-05, 97 S.Ct., at 291. Defendants are absolutely correct in stating that a claim for medical (or dental) malpractice is not actionable under § 1983. "[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." *Id.,* 429 U.S., at 106, 97 S.Ct., at 292. Summary judgment is appropriate if plaintiff's allegations constitute at most malpractice. *Bryant v. Maffucci,* 923 F.2d 979, 984 (2d Cir.1991), *cert. denied,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (citing *Estelle* ). Nor would plaintiff's claim survive under § 1983 if it amounted to mere disagreement with defendants' medical judgment. *Williams v. Coughlin,* 650 F.Supp. 955, 957 (S.D.N.Y.1987). Summary judgment is not available however, if plaintiff presents evidence that would permit a trier of fact to conclude that the disputed medical treatment-or lack thereof-constituted deliberate indifference. *See Abdush-Shahid,* 933 F.Supp. at 181 (citing *Bryant,* 923 F.2d at 984; *Liscio v. Warren,* 901 F.2d 274, 276 (2d Cir.1990); *Kaminsky v. Rosenblum,* 737 F.Supp. 1309, 1317 (S.D.N.Y.1990), *appeal dismissed,* 929 F.2d 922 (2d Cir.1991)). Plaintiff's allegations clearly transcend a claim for dental malpractice or a disagreement in medical judgment.

Prisoners are not entitled to a "perfect plan for dental care," *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986), but a significant, unexplained delay in dental care may amount to deliberate indifference. *See, e.g., Boyd v. Knox,* 47 F.3d 966, 969 (8th Cir.1995) ("A three week delay in dental care, coupled with knowledge of the inmate patient's suffering, can support a finding of an Eighth Amendment violation under section 1983") (citation omitted); *Fields v. Gander,* 734 F.2d 1313 (8th Cir.1984) (claim stated where plaintiff alleged defendants knew of pain resulting from infected tooth but delayed in providing dental care for three weeks); *Hunt v. Dental Dep't,* 865 F.2d 198, 201 (9th Cir.1989) (claim stated where plaintiff alleged that loss of dentures caused severe pain, bleeding gums, and breaking teeth, yet defendants took no action to provide pain relief or prescribe a soft-food diet and delayed three months in obtaining replacement dentures); *cf. Dean v. Coughlin,* 623 F.Supp.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642549 (N.D.N.Y.)

(Cite as: 1997 WL 642549 (N.D.N.Y.))

392, 401 (S.D.N.Y.1985) (deliberate indifference may be manifested by a physician's refusal of treatment); Hathaway, 37 F.3d at 66 (allegations that prison physician knew prisoner had two broken pins in hip and yet delayed surgery for over two years sufficient to meet both components of deliberate indifference claim and withstand motion to dismiss).

**\*9** Deliberate indifference requires a showing that defendants may have acted with a sufficiently culpable state of mind. Hathaway, 37 F.3d at 66. As the Second Circuit explained:

[t]he subjective element requires a state of mind that is the equivalent of criminal recklessness; namely, when the prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."

Hathaway, 99 F.3d at 553 (citations omitted). Plaintiff has plead facts sufficient to survive summary judgment with respect to the deliberate indifference of Dr. Hussain: namely that based upon the evidence, a trier of fact might conclude that Dr. Hussain knew of and disregarded the risk to plaintiff's health.

Dr. Benjamin's May 1988 recommendation suggested that plaintiff receive flap surgery; and when Dr. Benjamin examined plaintiff in May 1989, he recommended that the surgery "be done asap, then perio surg. to follow." Dr. Hussain saw plaintiff twenty-five times from December 11, 1989 to October 13, 1992. Plaintiff alleges that "repeated infections, inflammations, and a steady deterioration of his gums" were the reasons for his numerous visits, and claims that despite the "signs that he was living in pain," Dr. Hussain made no effort to ensure he received the dental surgery Dr. Benjamin had recommended. In July 1990, Dr. Hussain did recommend that plaintiff see a periodontist, but the recommendation was never acted upon. McArdle Aff. at ¶ 56.[FN4] Plaintiff's dental records, which include five grievances and letters written to Dr. Hussain, demonstrate that the question of that defendant's deliberate indifference to his serious medical need is a genuine question of material fact.[FN5] A

reasonable trier of fact might conclude that Dr. Hussain intentionally denied, delayed access to or interfered with plaintiff's prescribed treatment.

FN4. The timing of Dr. Hussain's periodontal recommendation is peculiar. On June 21, 1990, roughly three weeks prior to the recommendation, "Dr. Hussain [had] re-evaluated plaintiff's periodontal condition and noted that it was 'o.k.' " McArdle Aff. at ¶ 58. Even more peculiar is Dr. Hussain's noting that plaintiff's periodontal condition was "o.k." in light of his deposition testimony in plaintiff's collateral state proceeding, in which he admitted that hew as not capable of treating plaintiff's periodontal condition. See Plf's Aff. at Ex. 4, pgs. 63 and 89 (dkt.30).

FN5. These letters, dated November 25, 1991 through March 15, 1993 complain of pain and suffering, and remind Dr. Hussain of Dr. Benjamin's May 1988 and May 1989 recommendations for flap surgery. See Plf's Memo. at Exs. 6, 10 (dkt.31).

Summary judgment should not be available for Dr. Korfman, either. Plaintiff has demonstrated sufficient evidence exists to allow a reasonable trier of fact to conclude that Dr. Korfman was deliberately indifferent to plaintiff's serious medical need. Plaintiff's dental records indicate that Dr. Korfman saw plaintiff three times-once in 1989 and twice in 1991-subsequent to Dr. Benjamin's recommendations that plaintiff should receive flap surgery. During the latter two visits, made on November 15 and December 4, 1991, Dr. Korfman advised plaintiff that he had suffered from bone loss.[FN6] In deposition testimony given for plaintiff's collateral state proceeding, Dr. Korfman agrees that "bone loss suggest[s] ... that [plaintiff] continues to suffer from a periodontal condition." Korfman Depo. at 46:4-6 (dkt.30, Ex. 3). When asked next why he did not have plaintiff treated by a periodontist, Dr. Korfman answers that "[i]n order for him to have any success ... he would have to have had an oral condition that was amenable to healing." Korfman Depo. at 46:7-13. The implication is that plaintiff's oral condition was not curable. Yet, when asked later whether

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642549 (N.D.N.Y.)

(Cite as: 1997 WL 642549 (N.D.N.Y.))

he ever reached a decision that plaintiff's "perio condition was not curable," Dr. Korfman responded that he "never made that conclusion"-with the exception of plaintiff's tooth number ten. Korfman Depo. at 63:22-24; 64:22-65:3. Dr. Korfman further testifies that even though it was "not advisable" that plaintiff should "wait more than a year for periodontal evaluation," he had "no choice" because he "couldn't get a guy to see the patient." [FN7] Korfman Depo. at 67:8-17. In fact by Dr. Korfman's own admission, plaintiff did not see a periodontist until January 5, 1993. Korfman Depo. at 40:9-15. This date was almost two and a half years after Dr. Hussain had recommended that a periodontist "re-evaluate" plaintiff and four and a half years after Dr. Benjamin's initial recommendation that plaintiff receive flap surgery. On March 27, 1989, plaintiff requested that Dr. Yellin, who was then treating him, inform him of the status of his overdue November 1988 periodontist appointment. Dr. Yellin, apologizing that the matter had taken "such a long time," was able to obtain the appointment for plaintiff in May 1989. He explained to plaintiff that the "delay was not for lack of trying on our part"; rather, "[t]he consultant was simply unavailable." Walter Aff. at Ex. 1. Any inferences to be drawn from the facts must be viewed in the light most favorable to plaintiff as the non-moving party. *Thompson, 896 F.2d at 720.* Whether Dr. Korfman could not obtain a periodontist for more than two and a half years is a question of fact.

> **FN6.** Dr. Korfman's November 15, 1991 notes in plaintiff's dental records read, in pertinent part, "[e]xplained to patient about bone loss & possibility of losing # 10." His notes for plaintiff's December 12, 1991 visit read in part "[a]dvised again of removal of 6-8 mm bone loss." McArdle Aff. at Ex. M.

> **FN7.** Dr. Korfman states that Dr. Hussain "probably [could] not" schedule plaintiff to see a periodontist without his approval, thus the inference is that Dr. Korfman is largely responsible for securing a periodontist.

**\*10** Defendants' argument that as a matter of law plaintiff's dental records demonstrate a concerted and continual effort to treat plaintiff's various dental maladies, and that plaintiff ultimately lost the teeth in his upper jaw

for reasons beyond their control, is unavailing. They note that from November 1983 to March 1996-the date of their summary judgment motion-plaintiff had been treated by thirteen DOCS dentists, three DOCS hygienists and two outside periodontists, and that he had received two full thickness flap surgeries and fifteen dental prophylaxes. McCardle Aff. at ¶¶ 98, 103. Yet, as plaintiff counters, the fact that he was seen a number of times by different dental personnel does not invalidate his claim of deliberate indifference. The gravamen of his complaint is that defendants' deliberate indifference stems from their alleged denial and interference with his course of recommended treatment-*e .g.,* the 1988 and 1989 recommendations for surgery-and not that he was denied dental care in general. Though defendants' claims that plaintiff's loss of his upper teeth was attributable to his own actions may ultimately prove correct, plaintiff clearly has furnished evidence that makes their conclusion a genuine question of material fact.

C. Personal Involvement.

The Second Circuit requires that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir.1991); see also Johnson v. Glick, 481 F.2d 1028, 1034 (2d Cir.), cert. denied, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)* ("The rule in this circuit is that when monetary damages are sought under § 1983, the general doctrine of respondeat superior does not suffice and a showing of some personal responsibility of the defendant is required .")

Plaintiff names defendants McArdle, Mitchell and Tracy as supervisors who violated his Eighth Amendment rights. There is no indication whatsoever that service was perfected on defendant Mitchell, therefore, as the Court has no jurisdiction over the claims against him, it cannot consider the claims against him.[FN8] As to the remaining supervisory defendants, although it is undisputed that they had direct or indirect supervisory authority over the dental staff, in and of itself this fact is not sufficient to hold them personally liable for damages for constitutional violations alleged under § 1983. *Abdush-Shahid, 933 F.Supp. at 182 (citing Black v. Coughlin, 76 F.3d 72, 74 (2d Cir.1996)).* Prison supervisors may be held liable only if they

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642549 (N.D.N.Y.)

(Cite as: 1997 WL 642549 (N.D.N.Y.))

personally are involved in actions that deprive an inmate of his constitutional rights. *Id.* This circuit defines "personal involvement" as: (1) direct participation; (2) failure to remedy an alleged wrong after learning of it; (3) creation of a policy or custom under which unconstitutional practices occurred; or (4) gross negligence in managing subordinates. *Black,* 76 F.3d at 74; *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994)).

> FN8. The summons sent to Mitchell was returned unexecuted. *See* dkt. 36.

**\*11** Plaintiff has not furnished evidence that supports his claim that the McArdle and Tracy were "personally involved" in the alleged violation of his Eighth Amendment rights. Tracy, plaintiff argues, was on notice of the "two recommendations for surgery and that [plaintiff] was suffering as a result of not receiving the surgery." Plf's Memo. at 2. The record indicates that Tracy, the Deputy Superintendent of Administration at Eastern, exchanged several correspondences with plaintiff from January 31 to July 13, 1992. In his January 31, 1992 memorandum to plaintiff, Tracy states that he discussed plaintiff's treatment with Dr. Hussain and was told that it was "appropriate." Plf's Memo. at Ex. 7. In a June 9, 1992 letter to Penny Shane, Esq., of Prisoners' Legal Service, Tracy, responding on behalf of Superintendent Mitchell, writes that it "is the opinion of both Dr. Korfman and Dr. Hussein (sic) that [plaintiff] can cervive only limited benefit from a consultation with an outside periodontist, [but] Dr. Hussein (sic) nevertheless agreed to arrange for this consultation." He cautions, however, that "consultations with private periodontists generally take some time to be scheduled and that emergency cases naturally take precedence." *Id.* In his July 13, 1992 memorandum to plaintiff, Tracy explains that "Medical Unit staff are making every effort to obtain a periodontal consultation for you." *Id.*

Prison supervisors are not deemed "personally involved" on the sole allegation that they responded to a plaintiff's letter complaining about his medical treatment. *Abdush-Shahid,* 933 F.Supp. at 182 (*citing Garrido v. Coughlin,* 716 F.Supp. 98 (S.D.N.Y.1989); *Eng v. Coughlin,* 684 F.Supp. 56, 66 (S.D.N.Y.1988)). It is also true that supervisory officials generally are entitled to

delegate medical responsibility to facility medical staffs and are entitled to rely on the opinion of medical staff concerning the proper course of treatment. *Id.* (*citing Smiley v. Westby,* No. 87 Civ. 6047, 1994 WI. 519973, at *8 (S.D.N.Y. Sept. 22, 1994) ("[A] warden who receives assurances from his medical staff that an inmate is receiving appropriate care will ordinarily be insulated from § 1983 liability")). In this instance, it appears Tracy acted appropriately when the plaintiff complained to him about his dental treatment. Tracy spoke with the dentist who had been treating plaintiff and was assured that plaintiff's treatment was correct. There is no indication that Tracy was "personally involved" in the alleged deprivation of plaintiff's Eighth Amendment rights; and indeed, it arguably appears that Tracy may have facilitated plaintiff's January 5, 1993 periodontist consultation. Tracy should be granted summary judgment in this matter.

Summary judgment should be granted for Dr. McArdle as well. By plaintiff's own admission, Dr. McArdle, the Director of Correctional Dental Services, never saw or treated him. Plf's Memo. at 13. Nor is there anything in the record that supports a claim of personal involvement as defined in *Black, supra,* by this defendant. *Black,* 76 F.3d at 74.

Discrepancies in the Record.

**\*12** Plaintiff informs the Court that there is a significant discrepancy in the dental records before it. According to plaintiff, during his collateral state action, which he commenced in 1995, he was given copies of his dental records ("collateral records") to prosecute that case. He supplies these records as an exhibit attached to the affidavit of Lanny E. Walter, Esq., who represented him in his state court claim. *See* Walter Aff. at Ex. 1 (dkt.32). These records are the same records that are being used by parties as evidence in this case. Plaintiff points out, however, that several notations appear in exhibits attached to Dr. McArdle's affidavit that do not appear in the collateral records, though clearly there should be no such discrepancy between these exhibits and the collateral records.

Defendants' exhibits differ from plaintiff's collateral records in a significant manner: they feature notes, all appearing to be of the same handwriting, dating back to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642549 (N.D.N.Y.)

(Cite as: 1997 WL 642549 (N.D.N.Y.))

November 23, 1983 that read "oral hygiene instr."-or some very similar variation thereof. These notes appear in the margins of the following dates of plaintiff's treatment records: November 23, 1983 (*See* McArdle Aff., Ex. A (dkt.19)); January 9, 1985 (*Id.,* Ex. C); January 9, 1990 (*Id.,* Ex. I); February 21 and October 1, 1991 (*Id.,* Ex. K); and February 11, April 27, June 8 and October 13, 1992 (*Id.,* Ex. N). The inference, which obviously is beneficial to defendants, is that plaintiff was consistently given oral hygiene instructions because he was deficient in his personal dental care.

There appears to be a significant fabrication of the records before the Court, which the Court cannot and will not tolerate. Defendants have provided no explanation for this discrepancy. By Order of the Court, they will. Parties are ordered to provide affidavits explaining the discrepancy in plaintiff's dental records by October 1, 1997. Upon review of the affidavits, the Court will decide whether any actions, including sanctions, are appropriate in this instance. Parties are forewarned that failure to provide affidavits by October 1, 1997 may result in sanctions.

### CONCLUSION

WHEREFORE, based upon the foregoing, it is hereby ORDERED, that parties provide affidavits by October 1, 1997 that explain why there is a discrepancy in plaintiff's dental records that defendants have used as an exhibit in this matter (dkt.19) and the dental records that plaintiff used in his collateral state proceeding (dkt.32). Upon review of the affidavits, the Court will decide whether any actions, including sanctions, are appropriate in this instance. Parties are forewarned that failure to provide affidavits by October 1, 1997 may result in sanctions; and it is further

RECOMMENDED, that defendants' motion for summary judgment (dkt.19) be DENIED as to defendants Dr. Hussain and Dr. Korfman; and it is further

RECOMMENDED, that defendants' motion for summary judgment (dkt.19) be GRANTED as to defendants Tracy and Dr. McArdle; and it is further

**\*13** RECOMMENDED, that because the Court has no jurisdiction over defendant Mitchell, it cannot examine the claims against him.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir.1993)* (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989));* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e) and 72.

**SO ORDERED.**

N.D.N.Y.,1997.

Rashid v. Hussain
Not Reported in F.Supp., 1997 WL 642549 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Slip Copy, 2009 WL 890548 (N.D.N.Y.)

(Cite as: 2009 WL 890548 (N.D.N.Y.))

c

Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Harold CHARLES, Plaintiff,

v.

NEW YORK STATE DEPARTMENT OF
CORRECTIONAL SERVICES, et al., Defendants.

No. 9:07-CV-1274.

March 31, 2009.

West KeySummary **Civil Rights 78** 🔑 **1358**

78 Civil Rights

78III Federal Remedies in General
78k1353 Liability of Public Officials
78k1358 k. Criminal Law Enforcement; Prisons.
Most Cited Cases

**Civil Rights 78** 🔑 **1395(7)**

78 Civil Rights

78III Federal Remedies in General
78k1392 Pleading
78k1395 Particular Causes of Action
78k1395(7) k. Prisons and Jails; Probation
and Parole. Most Cited Cases

Prisoner's Americans with Disabilities Act (ADA)
complaint could continue because it was only suing prison
officials in their "official capacity." Prisoner brought a
claim against prison officials for not allowing him to have
his motorized wheelchair in prison. Prison officials argued
that a claim could not be brought against them in their
"individual capacity." However, the complaint was being
brought against prison officials in their "official capacity"
not in their "individual capacity." Americans with
Disabilities Act of 1990, § 201(1)(A), 42 U.S.C.A. §
12131(1)(A).

Troutman, Sanders Law Firm-NY Office, Aaron H.
Mendelsohn, Esq., Amanda R. Gaynor, Esq., of Counsel,

New York, NY.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, Adrienne J. Kerwin, Esq., Ass't Attorney
General, of Counsel, Albany, NY, for Defendants.

### *DECISION and ORDER*

DAVID N. HURD, District Judge.

**\*1** Plaintiff brought this civil rights action pursuant to
42 U.S.C. § 1983. On March 9, 2009, the Honorable
Gustave J. DiBianco, United States Magistrate Judge,
advised, by Report-Recommendation, that defendants'
motion to dismiss be granted in part and denied in part. No
objections to the Report-Recommendation were filed.

Based upon a careful review of entire file and the
recommendations of the Magistrate Judge, the
Report-Recommendation is accepted in whole. *See* 28
U.S.C. 636(b)(1). Accordingly, it is

ORDERED that

1. Defendants' motion to dismiss is GRANTED only
to the extent that the complaint can be read to allege an
ADA or RA claim in defendants' "individual capacities;"

2. Defendants' motion to dismiss is DENIED in all
other respects; and

3. Defendants file and serve an Answer to the
Complaint on or before April 14, 2009.

IT IS SO ORDERED.

### REPORT-RECOMMENDATION

GUSTAVE J. DiBIANCO, United States Magistrate
Judge.

This matter has been referred to me for Report and
Recommendation by the Honorable David N. Hurd,
United States District Judge, pursuant to 28 U.S.C. §
636(b) and Local Rules N.D.N.Y. 72.3(c).

In this amended civil rights complaint, plaintiff

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 890548 (N.D.N.Y.)

(Cite as: 2009 WL 890548 (N.D.N.Y.))

alleges that defendants violated the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq., the Rehabilitation Act (RA), 29 U.S.C. § 794, and the Eighth and Fourteenth Amendments of the United States Constitution when they refused to allow him to use his personal, medically prescribed, motorized wheelchair during his incarceration at Mohawk Correctional Facility (Mohawk). Amended Complaint (AC) (Dkt. No. 10). Plaintiff seeks declaratory, injunctive and monetary relief.

Presently before the court is defendants' motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6). (Dkt. No. 11). Plaintiff has opposed defendants' motion. (Dkt. No. 14). For the following reasons, this court will recommend granting defendants' motion in part and denying the motion in part.

**DISCUSSION**

**1.** *Motion to Dismiss*

To survive a motion to dismiss, the plaintiff must provide "the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.' " *Camarillo v. Carrols Corp.,* 518 F.3d 153, 156 (2d Cir.2008) (quoting *inter alia ATSI Communications, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007)). *See Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Plaintiff's factual allegations must be sufficient to give the defendant "fair notice of what the claim is and the grounds upon which it rests." *Id.* (citing *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.,* 507 F.3d 117, 121 (2d Cir.2007)). When ruling on a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint. *Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (citations omitted).

**2.** *Facts*

Plaintiff is a paraplegic inmate, who also has an injury to his left wrist, a "Stage IV sacral decubitus ulcer on his coccyx," and severe ulcers on his left hip. AC ¶ 19. Plaintiff states that because of his disabilities, he is dependent on a motorized wheelchair and must frequently shift his weight to relieve pressure from sores on his lower body. *Id.* Plaintiff alleges that this condition causes him considerable pain. *Id.* Plaintiff states that he personally owns a specially constructed, motorized wheelchair that

was prescribed for him in 2004 by his physician, prior to plaintiff's incarceration. AC ¶ 21. The wheelchair was prescribed for plaintiff based both on his inability to walk as well as his other severe conditions. *Id.* These conditions prevent plaintiff from operating a manual wheelchair without "extreme discomfort and pain." *Id.* Plaintiff states that his motorized wheelchair also contains special lumbar cushioning to support his spine and enable him to shift his weight to relieve the pressure from his decubitus ulcer. *Id.*

**\*2** Plaintiff states that when he was first incarcerated in the New York State Department of Corrections (DOCS) in April of 2004, he brought his motorized wheelchair with him and was allowed to use it from 2004 until 2006, while he was incarcerated at Rikers Island Correctional Facility. AC ¶¶ 22-23. In May of 2006, plaintiff was transferred to Mohawk and was forced to leave his wheelchair behind. AC ¶ 23. Plaintiff states that he has told defendants that he is experiencing a great deal of pain because he is unable to operate a manual wheelchair, and the defendants have refused to provide plaintiff with "an accommodation" for his disability. AC ¶¶ 27-28.

In April of 2007, plaintiff requested permission to bring his motorized wheelchair to Mohawk. AC ¶ 29. Defendants Dr. Berdick and Richard Harding, the Deputy Superintendent of Programs at Mohawk acknowledged that plaintiff needed a wheelchair, but instead of allowing him to obtain his motorized chair, they told him that someone at the facility would assist him if he could not operate the manual wheelchair. *Id.* Plaintiff claims that in April of 2007, he "alerted" defendants Berdick, Sharma, Harding, Payant, Rabideau, Wright, Raymond, and the Mohawk Reasonable Accommodation Committee that plaintiff wished to obtain his wheelchair, but these individuals and the Committee notified plaintiff that he would not be allowed to do so. AC ¶ 30.

Plaintiff states that he has been provided with a "standard" wheelchair in lieu of allowing him to bring his own wheelchair to Mohawk. AC ¶ 32. Plaintiff states that the wheelchair must be operated manually, and he cannot do so because of his injured wrist. *Id.* Additionally, it is difficult for plaintiff to maneuver his body and to adjust and reposition his body in the standard wheelchair. *Id.* He must perform these movements in order to relieve the pressure from his sacral decubitus ulcer and bedsores. *Id.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 890548 (N.D.N.Y.)

(Cite as: 2009 WL 890548 (N.D.N.Y.))

Because he has been unable to obtain his motorized wheelchair, and the standard wheelchair causes him extreme pain, he has been unable to participate in many prison programs, and he has suffered pain on many occasions. AC ¶ 33.

Plaintiff states that Mohawk personnel, including defendants Payant, Harding, Rabideau, Antonsen, Sharma, and Berdick, have failed to reasonably accommodate plaintiff's disability. AC ¶ 37. Plaintiff states that on many occasions, he has been unable to go to the cafeteria, the visiting room, the commissary, the general library, and the law library in the manual wheelchair. Plaintiff alleges that his requests for assistance in pushing the manual wheelchair have been denied, and thus, he had been denied access to programs and facilities that are available to non-disabled inmates.

Plaintiff states that since April of 2007, he has filed multiple complaints with defendants Annucci, Wright, Diaz, Raymond, Payant, Harding, Rabideau, Sharma, and Berdick regarding his pain and lack of medical treatment. AC ¶ 38. In May of 2007, defendant Rabideau denied plaintiff the authorization to use his medically prescribed wheelchair. AC ¶ 39. Plaintiff states that in a May 2007 memorandum, defendant Rabideau "misled" other officials by informing them that "personal motorized wheelchairs were not allowed at Mohawk." AC ¶ 35. Plaintiff states, however, that other inmates have been allowed to use motorized wheelchairs. *Id.* In June of 2007, plaintiff sent a "reasonable accommodation" request to defendant Harding, who instructed facility personnel to conduct a hearing. AC ¶ 40. Plaintiff states that he believes that defendants and other Mohawk personnel held a reasonable accommodation hearing regarding plaintiff's requests, but denied his request for the motorized wheelchair, despite plaintiff's complaints of "extreme pain and suffering." AC ¶ 41.

**\*3** The amended complaint then discusses letters and complaints that plaintiff states he has written to various defendants. AC ¶¶ 42-47. Plaintiff states that between August and November 2007, he wrote letters to, or received letters from, defendants Payant, Annucci, Antonsen, Sharma, Raymond, and Wright. *Id.* Plaintiff states that on August 31, 2007, defendant Payant wrote to

plaintiff, advising him to tell his doctor about the pain plaintiff was experiencing from using the manual wheelchair. AC ¶ 42. On August 27, 2007, defendant Annucci wrote to plaintiff, telling him that he had been assigned an assistant to push the manual wheelchair, however, on September 26, 2007, defendant Annucci told plaintiff that his complaints were "outside of the jurisdiction of [Annucci's] office." AC ¶ 43. On October 4, 2007, defendant Annucci told plaintiff that his "needs were being met." *Id.*

On September 20, 2007, defendant Antonsen wrote to plaintiff stating that she had investigated plaintiff's complaint, and he should discuss his problems with his doctor "because the nursing staff denied any wrongdoing." AC ¶ 44. Although plaintiff states that he asked for reconsideration of Antonsen's findings, she did not respond. *Id.* Plaintiff states that in October and November, he wrote to defendant Sharma, who responded by telling plaintiff that he had abused his privileges and "recommended that he direct his concerns to his healthcare provider." AC ¶ 45. On October 1, 2007, defendant Raymond wrote to plaintiff telling him that Raymond could not help. AC ¶ 46. In September of 2007, plaintiff wrote to defendant Wright, however, defendant Diaz responded to the letter, stating that defendant Wright, the facility physician, and the medical director had investigated the matter and determined that the motorized wheelchair was not a necessity. AC ¶ 47.

Plaintiff claims that he was barred from participation in programs because of animus or ill will toward his disabilities. AC ¶ 49. Plaintiff claims that the defendants displayed marked hostility and medically inappropriate behavior toward plaintiff in his efforts to obtain and use his motorized wheelchair. AC ¶ 53. Plaintiff also claims that the defendants failed to properly investigate his allegations, despite their awareness of the constitutional violations.

Plaintiff's amended complaint contains two causes of action. The first cause of action is under the ADA and the RA against defendants DOCS; Payant; [FN1] Rabideau; [FN2] Harding; [FN3] Wright; [FN4] Sharma; [FN5] Antonsen; [FN6] Anthony Annucci; [FN7] Diaz; [FN8] and Raymond. [FN9] AC ¶¶ 56-61. Plaintiff's second cause of action alleges that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 890548 (N.D.N.Y.)

(Cite as: 2009 WL 890548 (N.D.N.Y.))

defendants Payant; Rabideau; Harding; Wright; Sharma; Antonsen; Annucci; Diaz; and Raymond violated plaintiff's right to constitutionally adequate medical care by being deliberately indifferent to plaintiff's serious medical needs.[FN10] AC ¶¶ 62-64.

FN1. Leo E. Payant, Superintendent of Mohawk Correctional Facility

FN2. Ann Rabideau, Deputy Superintendent of Health at Mohawk.

FN3. Richard H. Harding, Deputy Superintendent for Programs at Mohawk.

FN4. Lester Wright, Deputy Commissioner and Chief Medical Officer of DOCS.

FN5. Yogemdra D. Sharma, Facility Health Services Director.

FN6. Judi Antonsen, Director of Nursing at Mohawk.

FN7. Anthony Annucci, Deputy Commissioner and Counsel of DOCS.

FN8. Pedro Diaz, Regional Health Services Administrator of DOCS.

FN9. Robert Raymond, ADA Coordinator of DOCS.

FN10. The court notes that neither Cause of Action mentions defendant Dr. Berdick. He is apparently a physician at Mohawk, although his first name is unknown. He is mentioned in the amended complaint along with Dr. Sharma. *See e.g.* AC ¶¶ 34, 36-38. Defense counsel has clearly appeared on Dr. Berdick's behalf.

**3. *ADA and Rehabilitation Act***

**\*4** The ADA and section 504 of the Rehabilitation Act are applicable to inmates in state correctional facilities. *Allah v. Goord,* 405 F.Supp.2d 265, 274 (S.D.N.Y.2005).* In order to state a claim under section 504 of the Rehabilitation Act, the plaintiff must show that he (1) has a disability for purposes of the Act; (2) that he was "otherwise qualified" for a benefit that he was denied; (3) that he was denied the benefit solely because of his disability; and (4) that the benefit is part of a program or activity that receives federal financial assistance. *Romano v. SLS Residential, Inc.* 246 F.R.D. 432, 440 (S.D.N.Y.2007).

Under the ADA, the inmate must establish that he (1) is a qualified individual with a disability; (2) is being excluded from participation in, or being denied benefits of some service, program or activity by reason of his or her disability; and (3) the entity providing the service is a public entity. *Allah v. Goord,* 405 F.Supp.2d at 274. The standards for determining whether plaintiff states a claim under the ADA and the RA are almost identical. The only difference in the statutes is that the RA applies to entities receiving federal financial assistance, and Title II of the ADA applies to all public entities. *Messier v. Southbury Training Sch. .,* 562 F.Supp.2d 294, 320 & n. 13 (D.Conn.2008).

In this case, defendants concede that the statutes apply. However, defendants' first argument is that the individual defendants must be dismissed from the ADA and RA claims because individuals may not be sued under these statutes. Plaintiff argues that the individuals are being sued in their "official capacities" and thus, may be maintained in the case as named. It appears that both sides are making the same argument, but the court will clarify the issue.

The State of New York is a "public entity" within the meaning of the ADA. 42 U.S.C. § 12131(1)(A). Naming a state defendant in his or her "official capacity" is tantamount to naming the State. *Henrietta D. v. Bloomberg,* 331 F.3d 261, 288 (2d Cir.2003), *cert. denied,* 541 U.S. 936, 124 S.Ct. 1658, 158 L.Ed.2d 356 (2004). In *Henrietta D.,* the Second Circuit held that a valid ADA claim may be stated against a state official in his or her official capacity. *Id.* at 288-89. The ADA does ***not,*** however, provide for "individual capacity" suits against state officials. *Garcia v. S.U.N.Y. Health Science Center of Brooklyn,* 280 F.3d 98, 107 (2d Cir.2001).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 890548 (N.D.N.Y.)

(Cite as: 2009 WL 890548 (N.D.N.Y.))

In this case, in plaintiff's response to defendants' motion to dismiss the "individual capacity" suit against the defendants, plaintiff spends a great deal of the memorandum citing *Henrietta* and arguing that the "individuals" may be sued in their "official capacity." Plaintiff's argument is correct, but defendants are arguing that to the extent that plaintiff is suing the defendants in their "individual capacity," not as individuals in their "official capacity," the ADA and RA claims may be dismissed. Defendants' argument is also correct. Thus, both sides are correct, and it appears that plaintiff is only suing the individual officers in their "official capacity." As such, the ADA and RA claims may continue. To the extent that the amended complaint could be interpreted as suing these DOCS officials in their "individual capacity," any ADA or RA claims should be dismissed. However, the ADA and RA claims may proceed as against the State and the individuals in their "official capacity."

**4. *Personal Involvement***

**\*5** In contrast, plaintiff also has a 42 U.S.C. § 1983 claim against the defendants in their "individual capacities" for Eighth and Fourteenth Amendment violations regarding plaintiff's medical care. The state itself cannot be sued under section 1983. *Komlosi v. New York State OMRDD,* 64 F.3d 810, 815 (2d Cir.1995) (citing *Will v. Michigan Department of Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989)). Thus, the individual defendants may only be sued for money damages under section 1983 in their "individual capacities." *See Kentucky v. Graham,* 473 U.S. 159, 165-66, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (discussing the distinction between "individual" or "personal" capacity actions and "official" capacity actions).

However, in order to hold an individual liable for damages in a section 1983 action, plaintiff must allege that the individual was "personally involved" in the constitutional violation of which he complains. *Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006); *Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986). In *Williams,* the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation. 781 F.2d at 323-24. A supervisory official is said to have been personally involved if that official

directly participated in the infraction. *Id.* Personal involvement may be shown if, after learning of a violation through a report or appeal, the supervisory official failed to remedy the wrong. *Id.* Personal involvement may exist if the official created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id.*

In *Farrell,* however, the Second Circuit specifically stated that personal involvement is a generally a question of fact. 449 F.3d at 484. As stated above, in a motion to dismiss, all the facts alleged in the complaint are accepted as true. *Erickson v. Pardus,* 127 S.Ct. at 2200. The plaintiff must satisfy a "flexible plausibility standard," and once a plaintiff has stated his claim adequately, then it may be supported by any set of facts that are consistent with the allegations in the complaint. *Bell Atlantic v. Twombly,* 550 U.S. at 563. Thus the court will consider whether plaintiff has adequately stated the personal involvement of the individual defendants.

**A. Defendants Annucci; Raymond; Diaz; Wright; Payant; and Antonsen**

Defendants argue that plaintiff has not alleged sufficient personal responsibility of these five defendants because plaintiff claims only that he wrote them various letters and received "some brief letters in response." Def. Mem. at 3. (Dkt. No. 11). The issue of personal involvement relates only to the section 1983 claim that defendants were deliberately indifferent to plaintiff's serious medical needs.[FN11] Generally, the failure of a supervisory official to respond to a letter of complaint is insufficient to create personal responsibility. *Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997); *Smart v. Goord,* 441 F.Supp.2d 631, 642-643 (S.D.N.Y.2006). *Sealey* does not, however, stand for the proposition that a letter or letters to a supervisory official is insufficient as a matter of law to create personal responsibility. The court in *Sealey* was considering a motion for **summary judgment** and had the opportunity to see the content and character of the letters that were sent to the supervisor. *Id.*

FN11. This is true because the ADA claim is against defendants in their official capacities, not

Slip Copy, 2009 WL 890548 (N.D.N.Y.)

(Cite as: 2009 WL 890548 (N.D.N.Y.))

in their individual capacities.

**\*6** Additionally, simply affirming the denial of a grievance is generally insufficient to confer personal responsibility on a defendant. *Warren v. Goord,* 476 F.Supp.2d 407, 413 (S.D.N.Y.2007) (finding no personal involvement where plaintiff alleged only that the defendant denied his grievance). However, courts in this circuit have held that when a supervisory official *receives and acts on* a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint, a sufficient claim for personal involvement has been stated. *Johnson v. Wright,* 234 F.Supp.2d 352, 363 (S.D.N.Y.2002) (citing cases).

In *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995), the court found that the plaintiff's statements regarding a letter of complaint were insufficient to raise an issue of fact, however, the court made this finding on *summary judgment* and after stating that because contents of the letter were not specified, the court could not tell whether it would have prompted the superior officer to investigate. *Id.* In *McKenna v. Wright,* 386 F.3d 432, 437-38 (2d Cir.2004), the court held that when allegations of denied medical care come to the attention of the supervisor of a medical program, his adjudicating role in denying a grievance cannot insulate him from responsibility for allowing the continuation of allegedly unlawful policies within his responsibility.

Basically, the cases make clear that the determination of personal involvement based on a letter of complaint to a supervisor or based on a grievance handled by a supervisory official often depends upon the contents of the letter and whether the supervisor referred the letter to a subordinate officer or whether the supervisory official investigated and decided the issue him or herself. *See also Rivera v. Pataki,* 04 Civ. 1286, 2005 U.S. Dist. LEXIS 2747, \*79-81 (S.D.N.Y. Feb. 4, 2005) (discussing situations in which personal involvement may be found based on letters of complaint). Defendants in this case cite *Rivera* for the proposition that writing to a supervisory official does not create personal involvement, however, *Rivera* also stands for the proposition that the contents of the letter and the action of the supervisor may be the determining factor in this analysis. *Id.*

Finally, although the motion in *Rivera* was initially one to dismiss, the parties submitted exhibits, and the court considered the motion as one for summary judgment. *Id.* at \*1-2. The court was given the opportunity to see the letters that plaintiff wrote to the supervisory officials and make the appropriate determination. *Id.* at \* 80. Thus, with this standard in mind, the court may turn to the allegations in this amended complaint to determine whether plaintiff has stated a claim as against the supervisory officials.

The amended complaint states that plaintiff wrote to defendant Annucci, and this defendant responded by stating that plaintiff had been "assigned an assistant to push his manual chair because of his disabilities." AC ¶ 43. Although plaintiff states that one letter from defendant Annucci informed plaintiff that plaintiff's complaints were "outside his jurisdiction," plaintiff claims that in another letter defendant Annucci told plaintiff that "his needs were being met." *Id.* Based on the fact that the court does not know the contents of the letters, this court cannot say that plaintiff has failed to show personal involvement of this defendant. The amended complaint states that this defendant actually investigated the complaint and responded based on that investigation. Without more information, this court cannot recommend dismissal against defendant Annucci on that basis.

**\*7** The claim against defendant Raymond also states that she wrote to plaintiff, telling him that she "had investigated his complaint." AC ¶ 44. Plaintiff also states that he wrote to defendant Raymond in September of 2007, and she responded by stating that she "could not help [plaintiff]." AC ¶ 46. Plaintiff claims that he has filed "multiple complaints" with defendants regarding his continuing pain, suffering and inadequate medical treatment. AC ¶ 38. Plaintiff alleges that in September of 2007, plaintiff sent several complaints to defendant Antonsen, regarding the nursing staff refusing to help plaintiff move his wheelchair and complaining about the pain he was experiencing. AC ¶ 44. Plaintiff claims that defendant Antonsen responded by stating that *she* had investigated the issue, and that plaintiff should discuss the problem with his doctor because "the nursing staff denied any wrongdoing." *Id.* The court makes no findings regarding the merits of plaintiff's allegations, however, at

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 890548 (N.D.N.Y.)

(Cite as: 2009 WL 890548 (N.D.N.Y.))

this stage of the proceedings, the court finds that it cannot recommend dismissal of the constitutional claims as against defendants Annucci, Raymond, or Antonsen based upon a lack of personal responsibility.

Plaintiff claims that in response to a letter to defendant Wright, plaintiff received a letter from defendant Diaz. AC ¶ 47. Plaintiff claims that the letter from defendant Diaz "stated that defendant Wright, along with the facility physician and medical director, had investigated the matter and had determined that his wheelchair was not a necessity." *Id.* In their argument, defendants mix personal involvement with deliberate indifference in stating that a medical judgment regarding necessity of the wheelchair does not constitute deliberate indifference. Def. Mem. at 5. The plaintiff, however, alleged that the letter from Diaz, specifically states that defendant Wright and others investigated the plaintiff's complaint. Regardless of whether the ultimate decision results in liability for deliberate indifference, the allegation that defendant Wright was personally involved in the investigation is sufficient at this stage to allege personal involvement by both defendants Diaz and Wright.

Plaintiff states that he filed grievances regarding the denial of his wheelchair, and the grievances were denied by defendants, including defendant Payant. AC ¶ 31. As stated above, without the ability to see what the extent of the supervisory official's involvement was in the investigation or denial of the grievance, the court cannot make a proper decision with respect to personal involvement. In a footnote, plaintiff argues that the pleadings sufficiently show that defendant Payant was aware of the discriminatory treatment because of the grievances filed by plaintiff. Pl. Mem. at 12 n. 5. (Dkt. No. 14). In the same footnote, plaintiff states that, at a later point in the litigation, a review of those grievances and complaints will illustrate defendant Payant's awareness of plaintiff's complaints and his actions regarding those complaints. *Id.* On a motion to dismiss, the court must accept the statements made by plaintiff in the complaint as true. *Erickson v. Pardus, supra.* Thus, the court will not recommend dismissing the action against defendant Payant for failure to allege the requisite personal involvement.

**B. Defendant Rabideau**

**\*8** Defendant Rabideau is the Deputy Superintendent of Health at Mohawk Correctional Facility. Plaintiff claims that defendant Rabideau answered plaintiff's letter by stating that Mohawk did not authorize the use of motorized wheelchairs for "safety and security reasons." AC ¶ 55. Plaintiff also alleges that in May of 2007 defendant Rabideau specifically denied plaintiff the use of his wheelchair. AC ¶ 39. Defendants argue that this involvement is insufficient. This court disagrees. Based on the facts as alleged by plaintiff, it appears that defendant Rabideau is expressing a "policy" that does not allow motorized wheelchairs under any circumstances since the letter refers to "safety and security." Plaintiff also claims that other individuals have been allowed to use motorized wheelchairs at Mohawk. AC ¶ 35. If this ultimately is found to be an unconstitutional policy,[FN12] defendant Rabideau's endorsement of that policy is sufficient personal involvement in plaintiff's claim. *Wright, supra* (discussing personal involvement based on the supervisor allowing a policy under which constitutional violations are allowed to occur).

> [FN12.] This court must emphasize again that it makes no findings regarding the ultimate merits of plaintiff's complaint, merely, that plaintiff has alleged sufficient personal involvement in his complaint.

**C. Defendant Harding**

Defendant Harding is the Superintendent of Programs at Mohawk. Plaintiff claims that he sent letters of complaint as well as a reasonable accommodation request to defendant Harding. AC ¶¶ 34, 40. It is unclear what the "complaint" letters contained, and plaintiff alleges that in response to the "reasonable accommodation" request, defendant Harding merely instructed SCC Hulihan to conduct a hearing regarding plaintiff's request. The fact that defendant Harding ordered a subordinate to hold a hearing regarding reasonable accommodation, in itself would be insufficient to allege the requisite personal involvement, but since plaintiff claims that there were other letters of complaint, and the court cannot determine what was in those letters or whether they would have alerted defendant Harding to the need for some sort of action, this court cannot recommend dismissal based on lack of personal involvement.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 890548 (N.D.N.Y.)

(Cite as: 2009 WL 890548 (N.D.N.Y.))

**E. Defendants Sharma and Berdick**

Defendant Sharma is the Facility Health Services Director at Mohawk. Dr. Berdick is a physician at Mohawk. Plaintiff states that defendant Sharma personally denied plaintiff's wheelchair request and further refused to adequately respond to plaintiff's complaints. Pl. Mem. at 15. *See e.g.* AC ¶ 36. Plaintiff states that Dr. Sharma and defendant Berdick specifically denied plaintiff the permission to bring his wheelchair to the facility. Thus, plaintiff has stated sufficient personal involvement to survive a motion to dismiss. A review of the defendants' arguments, however, show that instead of arguing that they were not personally involved in plaintiff's claims, they argue that they were not "deliberately indifferent" to his serious medical needs and that the amended complaint should be dismissed on this basis.[FN13] Def. Mem. at 4-5.

> FN13. This is true, notwithstanding the fact that this argument is contained in a section of defendants' memorandum of law that is dedicated to "personal involvement." Defendants' memorandum of law contains two arguments, one relates to the ADA and RA and the second to "personal involvement." It is unclear where the argument on the merits fits into a lack of personal involvement, however, this court has addressed the Eighth and Fourteenth Amendment issue in any event.

*9 Again, defendants are confusing lack of personal involvement with the ultimate question of whether someone who was personally involved with plaintiff should be held liable for deliberate indifference. In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter,* 316 F.3d 178, 183-84 (2d Cir.2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing *inter alia Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)).

It is also true that disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Sonds v. St. Barnabas Hosp. Correctional Health Services,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001). Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Id.* (citations omitted). An inmate does not have the right to treatment of his choice. *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1086). The fact that plaintiff might have preferred an alternative treatment or believes that he did not get the medical attention he desired does not rise to the level of a constitutional violation. *Id.*

While it may be true in the end, that the two doctors in this case, made a medical decision that did not amount to deliberate indifference, this court cannot make that determination in this case based on the pleadings alone. Thus, this court finds that defendants' motion to dismiss based on lack of personal involvement should be denied.

**5. *Qualified Immunity***

Defendants also allege that they are entitled to qualified immunity. Although defendants do not specify the claim to which this immunity would apply, it is clear that this defense would apply *only* to the section 1983 claim because it is a "personal" defense that may only be asserted by the official who is being sued in his "individual capacity." *See Kentucky v. Graham,* 473 U.S. at 166-67. The first step in determining whether an defendant is entitle to qualified immunity is to determine whether the defendant violated plaintiff's constitutional rights, and if so, whether that right was clearly established at the time. *Iqbal v. Hasty,* 490 F.3d 143, 152 (2d Cir.2007). A defendant will be entitled to qualified immunity if his or her actions did not violate clearly established law or if it was "objectively reasonable" for the defendant to believe that his or her actions did not violate clearly established law. *Id.* (citing *Johnson v. Newburgh Enlarged School Dist.,* 239 F.3d 246, 250 (2d Cir.2001)).

*10 Although a defendant may assert the defense of qualified immunity in a motion to dismiss, the Second Circuit has held that it is very difficult for such a defense to succeed at the pleading stage. *McKenna v. Wright,* 386

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 890548 (N.D.N.Y.)

(Cite as: 2009 WL 890548 (N.D.N.Y.))

F.3d at 436-37. The defense must be based on facts appearing on the face of the complaint. *Bezman v. Whitman,* 523 F.3d 119, 125 (2d Cir.2008). Defendants in this case have not really made an argument regarding the Eighth Amendment claim, and instead focused their motion to dismiss on the personal involvement issue. Since this court has determined that plaintiff has stated sufficient personal involvement to survive a motion to dismiss, it is impossible to determine without more, whether the defendants would be entitled to qualified immunity. Thus, this court will not recommend dismissal of the section 1983 claims based on the defense of qualified immunity at this time.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion to dismiss (Dkt. No. 11) be **GRANTED** only to the extent that the complaint can be read to allege an ADA or RA claim in defendants' "individual capacities," and it is

**RECOMMENDED,** that defendants' motion to dismiss (Dkt. No. 11) be **DENIED IN ALL OTHER RESPECTS.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

N.D.N.Y.,2009.

Charles v. New York State Dept. of Correctional Services
Slip Copy, 2009 WL 890548 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2009 WL 890548 (N.D.N.Y.)

(Cite as: 2009 WL 890548 (N.D.N.Y.))

**c**

Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Harold CHARLES, Plaintiff,

v.

NEW YORK STATE DEPARTMENT OF
CORRECTIONAL SERVICES, et al., Defendants.

No. 9:07-CV-1274.

March 31, 2009.

West KeySummary**Civil Rights 78**  1358

78 Civil Rights

78III Federal Remedies in General
78k1353 Liability of Public Officials
78k1358 k. Criminal Law Enforcement; Prisons.
Most Cited Cases
**Civil Rights 78**  1395(7)

78 Civil Rights

78III Federal Remedies in General
78k1392 Pleading
78k1395 Particular Causes of Action
78k1395(7) k. Prisons and Jails; Probation
and Parole. Most Cited Cases

Prisoner's Americans with Disabilities Act (ADA)
complaint could continue because it was only suing prison
officials in their "official capacity." Prisoner brought a
claim against prison officials for not allowing him to have
his motorized wheelchair in prison. Prison officials argued
that a claim could not be brought against them in their
"individual capacity." However, the complaint was being
brought against prison officials in their "official capacity"
not in their "individual capacity." Americans with
Disabilities Act of 1990, § 201(1)(A), 42 U.S.C.A. §
12131(1)(A).

Troutman, Sanders Law Firm-NY Office, Aaron H.
Mendelsohn, Esq., Amanda R. Gaynor, Esq., of Counsel,

New York, NY.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, Adrienne J. Kerwin, Esq., Ass't Attorney
General, of Counsel, Albany, NY, for Defendants.

### *DECISION and ORDER*

DAVID N. HURD, District Judge.

**\*1** Plaintiff brought this civil rights action pursuant to
42 U.S.C. § 1983. On March 9, 2009, the Honorable
Gustave J. DiBianco, United States Magistrate Judge,
advised, by Report-Recommendation, that defendants'
motion to dismiss be granted in part and denied in part. No
objections to the Report-Recommendation were filed.

Based upon a careful review of entire file and the
recommendations of the Magistrate Judge, the
Report-Recommendation is accepted in whole. *See* 28
U.S.C. 636(b)(1). Accordingly, it is

ORDERED that

1. Defendants' motion to dismiss is GRANTED only
to the extent that the complaint can be read to allege an
ADA or RA claim in defendants' "individual capacities;"

2. Defendants' motion to dismiss is DENIED in all
other respects; and

3. Defendants file and serve an Answer to the
Complaint on or before April 14, 2009.

IT IS SO ORDERED.

### REPORT-RECOMMENDATION

GUSTAVE J. DiBIANCO, United States Magistrate
Judge.

This matter has been referred to me for Report and
Recommendation by the Honorable David N. Hurd,
United States District Judge, pursuant to 28 U.S.C. §
636(b) and Local Rules N.D.N.Y. 72.3(c).

In this amended civil rights complaint, plaintiff

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 890548 (N.D.N.Y.)

(Cite as: 2009 WL 890548 (N.D.N.Y.))

alleges that defendants violated the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq., the Rehabilitation Act (RA), 29 U.S.C. § 794, and the Eighth and Fourteenth Amendments of the Unites States Constitution when they refused to allow him to use his personal, medically prescribed, motorized wheelchair during his incarceration at Mohawk Correctional Facility (Mohawk). Amended Complaint (AC) (Dkt. No. 10). Plaintiff seeks declaratory, injunctive and monetary relief.

Presently before the court is defendants' motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6). (Dkt. No. 11). Plaintiff has opposed defendants' motion. (Dkt. No. 14). For the following reasons, this court will recommend granting defendants' motion in part and denying the motion in part.

**DISCUSSION**

**1.** *Motion to Dismiss*

To survive a motion to dismiss, the plaintiff must provide "the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.' " *Camarillo v. Carrols Corp., 518 F.3d 153, 156 (2d Cir.2008)* (quoting *inter alia ATSI Communications, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir.2007)*). *See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)*. Plaintiff's factual allegations must be sufficient to give the defendant "fair notice of what the claim is and the grounds upon which it rests." *Id.* (citing *Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507 F.3d 117, 121 (2d Cir.2007)*). When ruling on a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint. *Erickson v. Pardus, 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007)* (citations omitted).

**2.** *Facts*

Plaintiff is a paraplegic inmate, who also has an injury to his left wrist, a "Stage IV sacral decubitus ulcer on his coccyx," and severe ulcers on his left hip. AC ¶ 19. Plaintiff states that because of his disabilities, he is dependent on a motorized wheelchair and must frequently shift his weight to relieve pressure from sores on his lower body. *Id.* Plaintiff alleges that this condition causes him considerable pain. *Id.* Plaintiff states that he personally owns a specially constructed, motorized wheelchair that

was prescribed for him in 2004 by his physician, prior to plaintiff's incarceration. AC ¶ 21. The wheelchair was prescribed for plaintiff based both on his inability to walk as well as his other severe conditions. *Id.* These conditions prevent plaintiff from operating a manual wheelchair without "extreme discomfort and pain." *Id.* Plaintiff states that his motorized wheelchair also contains special lumbar cushioning to support his spine and enable him to shift his weight to relieve the pressure from his decubitus ulcer. *Id.*

**\*2** Plaintiff states that when he was first incarcerated in the New York State Department of Corrections (DOCS) in April of 2004, he brought his motorized wheelchair with him and was allowed to use it from 2004 until 2006, while he was incarcerated at Rikers Island Correctional Facility. AC ¶¶ 22-23. In May of 2006, plaintiff was transferred to Mohawk and was forced to leave his wheelchair behind. AC ¶ 23. Plaintiff states that he has told defendants that he is experiencing a great deal of pain because he is unable to operate a manual wheelchair, and the defendants have refused to provide plaintiff with "an accommodation" for his disability. AC ¶¶ 27-28.

In April of 2007, plaintiff requested permission to bring his motorized wheelchair to Mohawk. AC ¶ 29. Defendants Dr. Berdick and Richard Harding, the Deputy Superintendent of Programs at Mohawk acknowledged that plaintiff needed a wheelchair, but instead of allowing him to obtain his motorized chair, they told him that someone at the facility would assist him if he could not operate the manual wheelchair. *Id.* Plaintiff claims that in April of 2007, he "alerted" defendants Berdick, Sharma, Harding, Payant, Rabideau, Wright, Raymond, and the Mohawk Reasonable Accommodation Committee that plaintiff wished to obtain his wheelchair, but these individuals and the Committee notified plaintiff that he would not be allowed to do so. AC ¶ 30.

Plaintiff states that he has been provided with a "standard" wheelchair in lieu of allowing him to bring his own wheelchair to Mohawk. AC ¶ 32. Plaintiff states that the wheelchair must be operated manually, and he cannot do so because of his injured wrist. *Id.* Additionally, it is difficult for plaintiff to maneuver his body and to adjust and reposition his body in the standard wheelchair. *Id.* He must perform these movements in order to relieve the pressure from his sacral decubitus ulcer and bedsores. *Id.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 890548 (N.D.N.Y.)

(Cite as: 2009 WL 890548 (N.D.N.Y.))

Because he has been unable to obtain his motorized wheelchair, and the standard wheelchair causes him extreme pain, he has been unable to participate in many prison programs, and he has suffered pain on many occasions. AC ¶ 33.

Plaintiff states that Mohawk personnel, including defendants Payant, Harding, Rabideau, Antonsen, Sharma, and Berdick, have failed to reasonably accommodate plaintiff's disability. AC ¶ 37. Plaintiff states that on many occasions, he has been unable to go to the cafeteria, the visiting room, the commissary, the general library, and the law library in the manual wheelchair. Plaintiff alleges that his requests for assistance in pushing the manual wheelchair have been denied, and thus, he had been denied access to programs and facilities that are available to non-disabled inmates.

Plaintiff states that since April of 2007, he has filed multiple complaints with defendants Annucci, Wright, Diaz, Raymond, Payant, Harding, Rabideau, Sharma, and Berdick regarding his pain and lack of medical treatment. AC ¶ 38. In May of 2007, defendant Rabideau denied plaintiff the authorization to use his medically prescribed wheelchair. AC ¶ 39. Plaintiff states that in a May 2007 memorandum, defendant Rabideau "misled" other officials by informing them that "personal motorized wheelchairs were not allowed at Mohawk." AC ¶ 35. Plaintiff states, however, that other inmates have been allowed to use motorized wheelchairs. *Id.* In June of 2007, plaintiff sent a "reasonable accommodation" request to defendant Harding, who instructed facility personnel to conduct a hearing. AC ¶ 40. Plaintiff states that he believes that defendants and other Mohawk personnel held a reasonable accommodation hearing regarding plaintiff's requests, but denied his request for the motorized wheelchair, despite plaintiff's complaints of "extreme pain and suffering." AC ¶ 41.

**\*3** The amended complaint then discusses letters and complaints that plaintiff states he has written to various defendants. AC ¶¶ 42-47. Plaintiff states that between August and November 2007, he wrote letters to, or received letters from, defendants Payant, Annucci, Antonsen, Sharma, Raymond, and Wright. *Id.* Plaintiff states that on August 31, 2007, defendant Payant wrote to

plaintiff, advising him to tell his doctor about the pain plaintiff was experiencing from using the manual wheelchair. AC ¶ 42. On August 27, 2007, defendant Annucci wrote to plaintiff, telling him that he had been assigned an assistant to push the manual wheelchair, however, on September 26, 2007, defendant Annucci told plaintiff that his complaints were "outside of the jurisdiction of [Annucci's] office." AC ¶ 43. On October 4, 2007, defendant Annucci told plaintiff that his "needs were being met." *Id.*

On September 20, 2007, defendant Antonsen wrote to plaintiff stating that she had investigated plaintiff's complaint, and he should discuss his problems with his doctor "because the nursing staff denied any wrongdoing." AC ¶ 44. Although plaintiff states that he asked for reconsideration of Antonsen's findings, she did not respond. *Id.* Plaintiff states that in October and November, he wrote to defendant Sharma, who responded by telling plaintiff that he had abused his privileges and "recommended that he direct his concerns to his healthcare provider." AC ¶ 45. On October 1, 2007, defendant Raymond wrote to plaintiff telling him that Raymond could not help. AC ¶ 46. In September of 2007, plaintiff wrote to defendant Wright, however, defendant Diaz responded to the letter, stating that defendant Wright, the facility physician, and the medical director had investigated the matter and determined that the motorized wheelchair was not a necessity. AC ¶ 47.

Plaintiff claims that he was barred from participation in programs because of animus or ill will toward his disabilities. AC ¶ 49. Plaintiff claims that the defendants displayed marked hostility and medically inappropriate behavior toward plaintiff in his efforts to obtain and use his motorized wheelchair. AC ¶ 53. Plaintiff also claims that the defendants failed to properly investigate his allegations, despite their awareness of the constitutional violations.

Plaintiff's amended complaint contains two causes of action. The first cause of action is under the ADA and the RA against defendants DOCS; Payant; [FN1] Rabideau; [FN2] Harding; [FN3] Wright; [FN4] Sharma; [FN5] Antonsen; [FN6] Anthony Annucci; [FN7] Diaz; [FN8] and Raymond. [FN9] AC ¶¶ 56-61. Plaintiff's second cause of action alleges that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 890548 (N.D.N.Y.)

(Cite as: 2009 WL 890548 (N.D.N.Y.))

defendants Payant; Rabideau; Harding; Wright; Sharma; Antonsen; Annucci; Diaz; and Raymond violated plaintiff's right to constitutionally adequate medical care by being deliberately indifferent to plaintiff's serious medical needs.[FN10] AC ¶¶ 62-64.

> FN1. Leo E. Payant, Superintendent of Mohawk Correctional Facility

> FN2. Ann Rabideau, Deputy Superintendent of Health at Mohawk.

> FN3. Richard H. Harding, Deputy Superintendent for Programs at Mohawk.

> FN4. Lester Wright, Deputy Commissioner and Chief Medical Officer of DOCS.

> FN5. Yogemdra D. Sharma, Facility Health Services Director.

> FN6. Judi Antonsen, Director of Nursing at Mohawk.

> FN7. Anthony Annucci, Deputy Commissioner and Counsel of DOCS.

> FN8. Pedro Diaz, Regional Health Services Administrator of DOCS.

> FN9. Robert Raymond, ADA Coordinator of DOCS.

> FN10. The court notes that neither Cause of Action mentions defendant Dr. Berdick. He is apparently a physician at Mohawk, although his first name is unknown. He is mentioned in the amended complaint along with Dr. Sharma. *See e.g.* AC ¶¶ 34, 36-38. Defense counsel has clearly appeared on Dr. Berdick's behalf.

### 3. *ADA and Rehabilitation Act*

**\*4** The ADA and section 504 of the Rehabilitation Act are applicable to inmates in state correctional facilities. *Allah v. Goord,* 405 F.Supp.2d 265, 274 (S.D.N.Y.2005). In order to state a claim under section 504 of the Rehabilitation Act, the plaintiff must show that he (1) has a disability for purposes of the Act; (2) that he was "otherwise qualified" for a benefit that he was denied; (3) that he was denied the benefit solely because of his disability; and (4) that the benefit is part of a program or activity that receives federal financial assistance. *Romano v. SLS Residential, Inc.* 246 F.R.D. 432, 440 (S.D.N.Y.2007).

Under the ADA, the inmate must establish that he (1) is a qualified individual with a disability; (2) is being excluded from participation in, or being denied benefits of some service, program or activity by reason of his or her disability; and (3) the entity providing the service is a public entity. *Allah v. Goord,* 405 F.Supp.2d at 274. The standards for determining whether plaintiff states a claim under the ADA and the RA are almost identical. The only difference in the statutes is that the RA applies to entities receiving federal financial assistance, and Title II of the ADA applies to all public entities. *Messier v. Southbury Training Sch.,* 562 F.Supp.2d 294, 320 & n. 13 (D.Conn.2008).

In this case, defendants concede that the statutes apply. However, defendants' first argument is that the individual defendants must be dismissed from the ADA and RA claims because individuals may not be sued under these statutes. Plaintiff argues that the individuals are being sued in their "official capacities" and thus, may be maintained in the case as named. It appears that both sides are making the same argument, but the court will clarify the issue.

The State of New York is a "public entity" within the meaning of the ADA. 42 U.S.C. § 12131(1)(A). Naming a state defendant in his or her "official capacity" is tantamount to naming the State. *Henrietta D. v. Bloomberg,* 331 F.3d 261, 288 (2d Cir.2003), *cert. denied,* 541 U.S. 936, 124 S.Ct. 1658, 158 L.Ed.2d 356 (2004). In *Henrietta D.,* the Second Circuit held that a valid ADA claim may be stated against a state official in his or her official capacity. *Id.* at 288-89. The ADA does *not,* however, provide for "individual capacity" suits against state officials. *Garcia v. S.U.N.Y. Health Science Center of Brooklyn,* 280 F.3d 98, 107 (2d Cir.2001).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 890548 (N.D.N.Y.)

(Cite as: 2009 WL 890548 (N.D.N.Y.))

In this case, in plaintiff's response to defendants' motion to dismiss the "individual capacity" suit against the defendants, plaintiff spends a great deal of the memorandum citing *Henrietta* and arguing that the "individuals" may be sued in their "official capacity." Plaintiff's argument is correct, but defendants are arguing that to the extent that plaintiff is suing the defendants in their "individual capacity," not as individuals in their "official capacity," the ADA and RA claims may be dismissed. Defendants' argument is also correct. Thus, both sides are correct, and it appears that plaintiff is only suing the individual officers in their "official capacity." As such, the ADA and RA claims may continue. To the extent that the amended complaint could be interpreted as suing these DOCS officials in their "individual capacity," any ADA or RA claims should be dismissed. However, the ADA and RA claims may proceed as against the State and the individuals in their "official capacity."

### 4. *Personal Involvement*

**\*5** In contrast, plaintiff also has a 42 U.S.C. § 1983 claim against the defendants in their "individual capacities" for Eighth and Fourteenth Amendment violations regarding plaintiff's medical care. The state itself cannot be sued under section 1983. *Komlosi v. New York State OMRDD*, 64 F.3d 810, 815 (2d Cir.1995) (citing *Will v. Michigan Department of Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989)). Thus, the individual defendants may only be sued for money damages under section 1983 in their "individual capacities." *See Kentucky v. Graham*, 473 U.S. 159, 165-66, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (discussing the distinction between "individual" or "personal" capacity actions and "official" capacity actions).

However, in order to hold an individual liable for damages in a section 1983 action, plaintiff must allege that the individual was "personally involved" in the constitutional violation of which he complains. *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir.2006); *Williams v. Smith*, 781 F.2d 319, 323 (2d Cir.1986). In *Williams*, the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation. 781 F.2d at 323-24. A supervisory official is said to have been personally involved if that official

directly participated in the infraction. *Id.* Personal involvement may be shown if, after learning of a violation through a report or appeal, the supervisory official failed to remedy the wrong. *Id.* Personal involvement may exist if the official created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id.*

In *Farrell,* however, the Second Circuit specifically stated that personal involvement is a generally a question of fact. 449 F.3d at 484. As stated above, in a motion to dismiss, all the facts alleged in the complaint are accepted as true. *Erickson v. Pardus,* 127 S.Ct. at 2200. The plaintiff must satisfy a "flexible plausibility standard," and once a plaintiff has stated his claim adequately, then it may be supported by any set of facts that are consistent with the allegations in the complaint. *Bell Atlantic v. Twombly,* 550 U.S. at 563. Thus the court will consider whether plaintiff has adequately stated the personal involvement of the individual defendants.

### A. Defendants Annucci; Raymond; Diaz; Wright; Payant; and Antonsen

Defendants argue that plaintiff has not alleged sufficient personal responsibility of these five defendants because plaintiff claims only that he wrote them various letters and received "some brief letters in response." Def. Mem. at 3. (Dkt. No. 11). The issue of personal involvement relates only to the section 1983 claim that defendants were deliberately indifferent to plaintiff's serious medical needs.[FN11] Generally, the failure of a supervisory official to respond to a letter of complaint is insufficient to create personal responsibility. *Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997); *Smart v. Goord,* 441 F.Supp.2d 631, 642-643 (S.D.N.Y.2006). *Sealey* does not, however, stand for the proposition that a letter or letters to a supervisory official is insufficient as a matter of law to create personal responsibility. The court in *Sealey* was considering a motion for **summary judgment** and had the opportunity to see the content and character of the letters that were sent to the supervisor. *Id.*

FN11. This is true because the ADA claim is against defendants in their official capacities, not

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 890548 (N.D.N.Y.)

(Cite as: 2009 WL 890548 (N.D.N.Y.))

in their individual capacities.

**\*6** Additionally, simply affirming the denial of a grievance is generally insufficient to confer personal responsibility on a defendant. *Warren v. Goord,* 476 F.Supp.2d 407, 413 (S.D.N.Y.2007) (finding no personal involvement where plaintiff alleged only that the defendant denied his grievance). However, courts in this circuit have held that when a supervisory official **receives and acts on** a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint, a sufficient claim for personal involvement has been stated. *Johnson v. Wright,* 234 F.Supp.2d 352, 363 (S.D.N.Y.2002) (citing cases).

In *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995), the court found that the plaintiff's statements regarding a letter of complaint were insufficient to raise an issue of fact, however, the court made this finding on **summary judgment** and after stating that because contents of the letter were not specified, the court could not tell whether it would have prompted the superior officer to investigate. *Id.* In *McKenna v. Wright,* 386 F.3d 432, 437-38 (2d Cir.2004), the court held that when allegations of denied medical care come to the attention of the supervisor of a medical program, his adjudicating role in denying a grievance cannot insulate him from responsibility for allowing the continuation of allegedly unlawful policies within his responsibility.

Basically, the cases make clear that the determination of personal involvement based on a letter of complaint to a supervisor or based on a grievance handled by a supervisory official often depends upon the contents of the letter and whether the supervisor referred the letter to a subordinate officer or whether the supervisory official investigated and decided the issue him or herself. *See also Rivera v. Pataki,* 04 Civ. 1286, 2005 U.S. Dist. LEXIS 2747, *79-81 (S.D.N.Y. Feb. 4, 2005) (discussing situations in which personal involvement may be found based on letters of complaint). Defendants in this case cite *Rivera* for the proposition that writing to a supervisory official does not create personal involvement, however, *Rivera* also stands for the proposition that the contents of the letter and the action of the supervisor may be the determining factor in this analysis. *Id.*

Finally, although the motion in *Rivera* was initially one to dismiss, the parties submitted exhibits, and the court considered the motion as one for summary judgment. *Id.* at *1-2. The court was given the opportunity to see the letters that plaintiff wrote to the supervisory officials and make the appropriate determination. *Id.* at * 80. Thus, with this standard in mind, the court may turn to the allegations in this amended complaint to determine whether plaintiff has stated a claim as against the supervisory officials.

The amended complaint states that plaintiff wrote to defendant Annucci, and this defendant responded by stating that plaintiff had been "assigned an assistant to push his manual chair because of his disabilities." AC ¶ 43. Although plaintiff states that one letter from defendant Annucci informed plaintiff that plaintiff's complaints were "outside his jurisdiction," plaintiff claims that in another letter defendant Annucci told plaintiff that "his needs were being met." *Id.* Based on the fact that the court does not know the contents of the letters, this court cannot say that plaintiff has failed to show personal involvement of this defendant. The amended complaint states that this defendant actually investigated the complaint and responded based on that investigation. Without more information, this court cannot recommend dismissal against defendant Annucci on that basis.

**\*7** The claim against defendant Raymond also states that she wrote to plaintiff, telling him that she "had investigated his complaint." AC ¶ 44. Plaintiff also states that he wrote to defendant Raymond in September of 2007, and she responded by stating that she "could not help [plaintiff]." AC ¶ 46. Plaintiff claims that he has filed "multiple complaints" with defendants regarding his continuing pain, suffering and inadequate medical treatment. AC ¶ 38. Plaintiff alleges that in September of 2007, plaintiff sent several complaints to defendant Antonsen, regarding the nursing staff refusing to help plaintiff move his wheelchair and complaining about the pain he was experiencing. AC ¶ 44. Plaintiff claims that defendant Antonsen responded by stating that **she** had investigated the issue, and that plaintiff should discuss the problem with his doctor because "the nursing staff denied any wrongdoing." *Id.* The court makes no findings regarding the merits of plaintiff's allegations, however, at

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 890548 (N.D.N.Y.)

(Cite as: 2009 WL 890548 (N.D.N.Y.))

this stage of the proceedings, the court finds that it cannot recommend dismissal of the constitutional claims as against defendants Annucci, Raymond, or Antonsen based upon a lack of personal responsibility.

Plaintiff claims that in response to a letter to defendant Wright, plaintiff received a letter from defendant Diaz. AC ¶ 47. Plaintiff claims that the letter from defendant Diaz "stated that defendant Wright, along with the facility physician and medical director, had investigated the matter and had determined that his wheelchair was not a necessity." *Id.* In their argument, defendants mix personal involvement with deliberate indifference in stating that a medical judgment regarding necessity of the wheelchair does not constitute deliberate indifference. Def. Mem. at 5. The plaintiff, however, alleged that the letter from Diaz, specifically states that defendant Wright and others investigated the plaintiff's complaint. Regardless of whether the ultimate decision results in liability for deliberate indifference, the allegation that defendant Wright was personally involved in the investigation is sufficient at this stage to allege personal involvement by both defendants Diaz and Wright.

Plaintiff states that he filed grievances regarding the denial of his wheelchair, and the grievances were denied by defendants, including defendant Payant. AC ¶ 31. As stated above, without the ability to see what the extent of the supervisory official's involvement was in the investigation or denial of the grievance, the court cannot make a proper decision with respect to personal involvement. In a footnote, plaintiff argues that the pleadings sufficiently show that defendant Payant was aware of the discriminatory treatment because of the grievances filed by plaintiff. Pl. Mem. at 12 n. 5. (Dkt. No. 14). In the same footnote, plaintiff states that, at a later point in the litigation, a review of those grievances and complaints will illustrate defendant Payant's awareness of plaintiff's complaints and his actions regarding those complaints. *Id.* On a motion to dismiss, the court must accept the statements made by plaintiff in the complaint as true. *Erickson v. Pardus, supra.* Thus, the court will not recommend dismissing the action against defendant Payant for failure to allege the requisite personal involvement.

**B. Defendant Rabideau**

**\*8** Defendant Rabideau is the Deputy Superintendent of Health at Mohawk Correctional Facility. Plaintiff claims that defendant Rabideau answered plaintiff's letter by stating that Mohawk did not authorize the use of motorized wheelchairs for "safety and security reasons." AC ¶ 55. Plaintiff also alleges that in May of 2007 defendant Rabideau specifically denied plaintiff the use of his wheelchair. AC ¶ 39. Defendants argue that this involvement is insufficient. This court disagrees. Based on the facts as alleged by plaintiff, it appears that defendant Rabideau is expressing a "policy" that does not allow motorized wheelchairs under any circumstances since the letter refers to "safety and security." Plaintiff also claims that other individuals have been allowed to use motorized wheelchairs at Mohawk. AC ¶ 35. If this ultimately is found to be an unconstitutional policy,[FN12] defendant Rabideau's endorsement of that policy is sufficient personal involvement in plaintiff's claim. *Wright, supra* (discussing personal involvement based on the supervisor allowing a policy under which constitutional violations are allowed to occur).

> [FN12.] This court must emphasize again that it makes no findings regarding the ultimate merits of plaintiff's complaint, merely, that plaintiff has alleged sufficient personal involvement in his complaint.

**C. Defendant Harding**

Defendant Harding is the Superintendent of Programs at Mohawk. Plaintiff claims that he sent letters of complaint as well as a reasonable accommodation request to defendant Harding. AC ¶¶ 34, 40. It is unclear what the "complaint" letters contained, and plaintiff alleges that in response to the "reasonable accommodation" request, defendant Harding merely instructed SCC Hulihan to conduct a hearing regarding plaintiff's request. The fact that defendant Harding ordered a subordinate to hold a hearing regarding reasonable accommodation, in itself would be insufficient to allege the requisite personal involvement, but since plaintiff claims that there were other letters of complaint, and the court cannot determine what was in those letters or whether they would have alerted defendant Harding to the need for some sort of action, this court cannot recommend dismissal based on lack of personal involvement.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 890548 (N.D.N.Y.)

(Cite as: 2009 WL 890548 (N.D.N.Y.))

**E. Defendants Sharma and Berdick**

Defendant Sharma is the Facility Health Services Director at Mohawk. Dr. Berdick is a physician at Mohawk. Plaintiff states that defendant Sharma personally denied plaintiff's wheelchair request and further refused to adequately respond to plaintiff's complaints. Pl. Mem. at 15. *See e.g.* AC ¶ 36. Plaintiff states that Dr. Sharma and defendant Berdick specifically denied plaintiff the permission to bring his wheelchair to the facility. Thus, plaintiff has stated sufficient personal involvement to survive a motion to dismiss. A review of the defendants' arguments, however, show that instead of arguing that they were not personally involved in plaintiff's claims, they argue that they were not "deliberately indifferent" to his serious medical needs and that the amended complaint should be dismissed on this basis. [FN13] Def. Mem. at 4-5.

> [FN13.] This is true, notwithstanding the fact that this argument is contained in a section of defendants' memorandum of law that is dedicated to "personal involvement." Defendants' memorandum of law contains two arguments, one relates to the ADA and RA and the second to "personal involvement." It is unclear where the argument on the merits fits into a lack of personal involvement, however, this court has addressed the Eighth and Fourteenth Amendment issue in any event.

*9 Again, defendants are confusing lack of personal involvement with the ultimate question of whether someone who was personally involved with plaintiff should be held liable for deliberate indifference. In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter,* 316 F.3d 178, 183-84 (2d Cir.2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing *inter alia Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)).

It is also true that disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Sonds v. St. Barnabas Hosp. Correctional Health Services,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001). Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Id.* (citations omitted). An inmate does not have the right to treatment of his choice. *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1086). The fact that plaintiff might have preferred an alternative treatment or believes that he did not get the medical attention he desired does not rise to the level of a constitutional violation. *Id.*

While it may be true in the end, that the two doctors in this case, made a medical decision that did not amount to deliberate indifference, this court cannot make that determination in this case based on the pleadings alone. Thus, this court finds that defendants' motion to dismiss based on lack of personal involvement should be denied.

**5. *Qualified Immunity***

Defendants also allege that they are entitled to qualified immunity. Although defendants do not specify the claim to which this immunity would apply, it is clear that this defense would apply ***only*** to the section 1983 claim because it is a "personal" defense that may only be asserted by the official who is being sued in his "individual capacity." *See Kentucky v. Graham,* 473 U.S. at 166-67. The first step in determining whether an defendant is entitle to qualified immunity is to determine whether the defendant violated plaintiff's constitutional rights, and if so, whether that right was clearly established at the time. *Iqbal v. Hasty,* 490 F.3d 143, 152 (2d Cir.2007). A defendant will be entitled to qualified immunity if his or her actions did not violate clearly established law or if it was "objectively reasonable" for the defendant to believe that his or her actions did not violate clearly established law. *Id.* (citing *Johnson v. Newburgh Enlarged School Dist.,* 239 F.3d 246, 250 (2d Cir.2001)).

*10 Although a defendant may assert the defense of qualified immunity in a motion to dismiss, the Second Circuit has held that it is very difficult for such a defense to succeed at the pleading stage. *McKenna v. Wright,* 386

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 890548 (N.D.N.Y.)

(Cite as: 2009 WL 890548 (N.D.N.Y.))

F.3d at 436-37. The defense must be based on facts appearing on the face of the complaint. *Bezman v. Whitman,* 523 F.3d 119, 125 (2d Cir.2008). Defendants in this case have not really made an argument regarding the Eighth Amendment claim, and instead focused their motion to dismiss on the personal involvement issue. Since this court has determined that plaintiff has stated sufficient personal involvement to survive a motion to dismiss, it is impossible to determine without more, whether the defendants would be entitled to qualified immunity. Thus, this court will not recommend dismissal of the section 1983 claims based on the defense of qualified immunity at this time.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion to dismiss (Dkt. No. 11) be **GRANTED** only to the extent that the complaint can be read to allege an ADA or RA claim in defendants' "individual capacities," and it is

**RECOMMENDED,** that defendants' motion to dismiss (Dkt. No. 11) be **DENIED IN ALL OTHER RESPECTS.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

N.D.N.Y.,2009.

Charles v. New York State Dept. of Correctional Services
Slip Copy, 2009 WL 890548 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.